IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:  INTEL CORPORATION DERIVATIVE
LITIGATION

)
)
)

C.A. No. 08-cv-93 (JJF)

**COMPENDIUM OF UNREPORTED DECISIONS TO
DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED CONSOLIDATED
<u>COMPLAINT OR, IN THE ALTERNATIVE, TO STAY THIS ACTION</u>**

OF COUNSEL:

Jonathan C. Dickey
Marshall R. King
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

POTTER ANDERSON & CORROON LLP
Donald J. Wolfe, Jr. (I.D. #285)
Stephen C. Norman (I.D. #2686)
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, Delaware  19899-0951
(302) 984-6000
E-mail:  dwolfe@potteranderson.com
E-mail:  snorman@potteranderson.com

*Attorneys for Defendants*

Dated:  September 5, 2008

# TABLE OF CONTENTS

**CASES**                                                                      **TAB**

*Amalgamated Bank v. Yost,*
    No. 04-0972, 2005 WL 226117 (E.D. Pa. Jan. 31, 2005).............................................1

*Andreae v. Andreae,*
    No. 11905, 1992 WL 43924 (Del. Ch. Mar. 3, 1992)....................................................2

*Brudno v. Wise,*
    No. 19953, 2003 WL 1874750 (Del. Ch. Aug. 1, 2003) ...............................................3

*Canadian Commercial Workers Indus. Pension Plan v. Alden,*
    No. 1184-N, 2006 WL 456786 (Del. Ch. Feb. 22, 2006) .............................................4

*In re Coca-Cola Enters., Inc.,*
    No. 1927-CC, 2007 WL 3122370 (Del. Ch. Oct. 17, 2007).........................................5

*Commissariat a L'Energie Atomique v. Tottori Sanyo Electronic Co.,*
    No. 03-484-KAJ, 2004 WL 15543482 (D. Del. May 13, 2004)...................................6

*In re Computer Sci. Corp. Deriv. Litig.,*
    No. 06-05288 MRP, 2007 WL 1321715 (C.D. Cal. Mar. 27, 2007) ............................7

*In re Dean Witter P'ship Litig.,*
    No. 14816, 1998 WL 442456 (Del. Ch. July 17, 1998)................................................8

*Honeywell Int'l Inc. v. Audiovox Commc'ns Corp.,*
    No. 04-1337-KAJ, 2005 WL 2465898 (D. Del. May 18, 2005)...................................9

*Khanna v. McMinn,*
    No. 20545-NC, 2006 WL 1388744 (Del. Ch. May 9, 2006) .......................................10

*Lewis v. Fites,*
    No. 12566, 1993 WL 47842 (Del. Ch. Feb. 19, 1993) ...............................................11

*Microchip Tech, Inc. v. Motorola, Inc.,*
    No. 01-264-JJF, 2002 WL 32332753 (D. Del. May 28, 2002)...................................12

*Seinfeld v. Barrett,*
    No. 05-298-JJF, 2006 WL 890909 (D. Del. Mar. 31, 2006) .......................................13

*Simon v. Navellier Series Fund,*
    No. 17734, 2000 WL 1597890 (Del. Ch. Oct. 19, 2000).............................................14

*Smith v. McGee,*
    No. 2101-S, 2006 WL 3000363 (Del. Ch. Oct. 16, 2006) ............................................15

*Stein v. Orloff,*
    No. 7276, 1985 WL 11561 (Del. Ch. May 30, 1985) ...................................................16

*In re Tri-Star Pictures, Inc. Litig.,*
    No. 9477, 1995 WL 106520 (Del. Ch. Mar. 9, 1995) ...................................................17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I do hereby certify that, on September 5, 2008, the within document was filed with the

Clerk of Court using CM/ECF which will send notification of such filing to the following, and

that the document is available for viewing and downloading from CM/ECF:

> Brian D. Long, Esquire
> Rigrodsky & Long, P.A.
> 919 North Market Street
> Suite 980
> Wilmington, DE  19801

> /s/ Stephen C. Norman
> Stephen C. Norman (#2686)
> Potter Anderson & Corroon LLP
> Hercules Plaza – 6th Floor
> 1313 North Market Street
> P. O. Box 951
> Wilmington, Delaware  19899
> (302) 984-6000
> snorman@potteranderson.com

# TAB 1



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

Page 1

**c**
Amalgamated Bank v. Yost
E.D.Pa.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
AMALGAMATED BANK, as Trustee for the
Longview Collective Investment Fund, Derivat-
ively on Behalf of Americasourcebergen Corpora-
tion Plaintiff,
v.
R. David YOST et al. Defendants
andAMERICASOURCEBERGEN CORPORA-
TION Nominal Defendant.
**No. Civ.A.04-0972.**

Jan. 31, 2005.

Deborah R. Gross, Law Offices Bernard M. Gross,
PC, Philadelphia, PA, for Plaintiff.
Steven E. Bizar, Buchanan Ingersoll, P.C., Phil-
adelphia, PA, for Defendants.

*MEMORANDUM AND ORDER*

YOHN, J.
**\*1** Plaintiff Amalgamated Bank brings this share-
holder derivative suit on behalf of Americasource-
Bergen Corporation ("ABC") against the ten cur-
rent members of ABC's board of directors and cer-
tain current and former executives of ABC
("defendants"). The parties are diverse and this
court has jurisdiction pursuant to 28 U.S.C. § 1332.
Plaintiff asserts the following causes of action un-
der Delaware law: (1) breach of fiduciary duty, (2)
abuse of control, (3) gross mismanagement, (4)
waste of corporate assets,[FN1] (5) unjust enrich-
ment, and (6) usurpation of a corporate
opportunity.[FN2]

> FN1. Plaintiff only sues the defendant dir-
> ectors for waste. Pl.'s Compl. at ¶ 95.

> FN2. Plaintiff only sues the eight defend-
> ants who allegedly traded on inside in-

formation for unjust enrichment and usurp-
ation of a corporate opportunity. Pl.'s
Compl. at ¶ 98, 102.

Presently before the court is defendants' motion to
dismiss pursuant to Federal Rules of Civil Proced-
ure 12(b)(6) and 23.1 on the grounds that plaintiff
(1) lacks standing and (2) failed to establish that
pre-suit demand is excused. Also before the court is
plaintiff's motion to strike exhibits and impertinent
language in defendants' motion to dismiss.

The court has considered defendants' motion to dis-
miss and plaintiff's motion to strike. For the reasons
set forth below, I will grant plaintiff's motion to
strike in part and grant defendants' motion to dis-
miss without prejudice.

I. FACTUAL BACKGROUND [FN3]

> FN3. The foregoing factual account ac-
> cepts all allegations contained in the com-
> plaint as true.

ABC is one of the nation's largest wholesale distrib-
utors of pharmaceuticals. Pl.'s Compl. at ¶ 2. ABC
was formed in August 2001 following the merger of
Amerisource Health Corporation ("Amerisource")
and Bergen Brunswig Corporation ("Bergen").*Id.* at
¶ 32.Eight of the ten members of ABC's Board of
Directors acted as directors for ABC's predecessor
corporations. Defendants Yost, Gozon, Wilson, and
Hagenlocker served as directors for
Amerisource.*Id.* at ¶ 37.Defendants Martini, Brady,
Mellor, and Rodgers served on Bergen's Board. *Id.*
ABCs other two directors, defendants Cotros and
Henney, were appointed after the merger. The three
remaining defendants, Collis, Carpenter, and Di-
mick, acted as executive officers for Bergen and
continued in that capacity at ABC after the merger.
*Id.* at ¶ 38.Carpenter and Dimick resigned in 2002.
*Id.* at ¶ 26-27.

According to the complaint, defendants' pattern of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

illegal behavior began well before the merger. ABC's predecessor corporations allegedly violated drug packaging regulations, engaged in Medicare fraud, and distributed counterfeit prescription drugs.[FN4]*Id.* at 42, 44-48, 54.

> FN4. The complaint alleges that "in 2000, ... Americasource bought 52 bottles of counterfeit Retrovir ....", which led to a $50,000 fine. Pl.'s Compl. at ¶ 54. Because ABC was not created until August 29, 2001, I will assume that one of ABC's predecessor corporations committed this infraction.

Plaintiff asserts that ABC continued to purchase counterfeit drugs following the merger. ABC allegedly received shipments from so-called "secondary wholesalers," which often repackage and mislabel drugs. In November 2001, the FDA recalled a shipment of counterfeit Neupogen that had been distributed by ABC. *Id.* at ¶ 55.Between April 2001 and May 2002, ABC allegedly distributed over 2000 boxes of mislabeled Epogen, an anti-anemia drug. *Id.* at ¶ 56.Those consumers who used the counterfeit Epogen suffered pain and injury, and at least one victim has filed suit against ABC. *Id.* In addition, between 2001 and 2002, ABC's subsidiaries allegedly purchased counterfeit Procit, another anti-anemia drug. *Id.* at ¶ 57.[FN5]Plaintiff claims that defendants approved ABC's purchase and distribution of counterfeit drugs, subjecting the corporation to substantial liability. *Id.* at ¶ 84.

> FN5. None of plaintiff's allegations concerning counterfeit drugs specify that defendant's wrongdoings took place after the August 29, 2001 merger that spawned ABC. Nonetheless, for the purpose of this motion, I will assume that this misconduct took place after the merger and hence ABC is responsible.

*2 Defendants also allegedly approved a fraudulent scheme to collect duplicate rebates from drug manufacturers. Manufacturers offer rebates to distributors who sell to institutional pharmacies because their prices are based on Medicare and Medicaid schedules. *Id.* at ¶ 59.All of ABC's contracts with institutional pharmacies include "own and use" clauses, which provide that the drugs must be sold in institutional settings. *Id.* at ¶ 63.ABC allegedly sold drugs to institutional pharmacies with knowledge that the pharmacies resold the drugs to secondary wholesalers who subsequently sold the drugs back to ABC. *Id.* Pursuant to this scheme, ABC collected multiple rebates for the same shipments of drugs. *Id.* In September 2003, *The Wall Street Journal* reported that the Federal Bureau of Investigation ("FBI") and the Food and Drug Administration ("FDA") were investigating ABC for its involvement in the rebate scheme. *Id.* at ¶ 59.

In September 2003, Robert Strusz, a former sales manager at ABC's predecessor, Amerisource, pled guilty to mail fraud in connection with a drug diversion scheme similar to that described above. *Id.* at ¶ 62.Strusz was convicted pursuant to a 1999 FBI sting operation.[FN6]*Id.*

> FN6. The complaint maintains that ABC was the target of the FBI sting. Pl.'s Compl. at ¶ 62. However, the operation took place two years before the ABC merger and defendants assert that Americasource, not ABC, was the target. Defs.' Mem. Supp. Mot. Dismiss at 19. Because the FBI could not investigate ABC before its creation, I will assume that plaintiff intended to allege that Americasource, rather than ABC, was the target of the sting.

According to the complaint, in February 2001, six months before the ABC merger, the FBI notified defendants of the 1999 sting and the subsequent investigation. *Id.* at ¶ 67.Until Strusz's guilty plea in September 2003, defendants allegedly concealed the investigation from the public, artificially inflating ABC's stock prices. *Id.* During this period, defendants Martini, Yost, Brady, Hagenlocker, Rodgers, Collis, Carpenter and Dimick ("the selling

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

Defendants") sold over $35 million in ABC stock. *Id.*

The complaint also alleges that defendants abused their control of the company by paying Yost, Martini, and Martini's son, the former president of ABC, excessive compensation. *Id.* at ¶ 15-16, 40, 88.In addition, defendants allegedly forgave substantial loans made to Martini and his son by Bergen.*Id.* at ¶ 40.Lastly, plaintiff asserts that ABC's directors receive unwarranted and excessive compensation. *Id.* at ¶ 40.

Due to defendants' misconduct, plaintiff alleges that ABC lost a $25 million contract with the Veterans' Administration, its largest customer. *Id.* at ¶ 72.This loss caused ABC to lower its 2003 earnings estimates by $0.40 per share. *Id.*

## II. STANDARD OF REVIEW

In ruling on a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded allegations of fact in the plaintiff's complaint, and any reasonable inferences that may be drawn therefrom, to determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief."*Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996); *Colburn v. Upper Darby Township,* 838 F.2d 663, 665-66 (3d Cir.1988) (citations omitted). Although the court must construe the complaint in the light most favorable to the plaintiff, it need not accept as true legal conclusions or unwarranted factual inferences. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

*3 Courts will grant a 12(b)(6) motion to dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)."The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim."*In re Burl-*

*ington Coat Factory Dec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997).

## III. PLAINTIFF'S MOTION TO STRIKE

In conjunction with their motion to dismiss, defendants submit nine exhibits, marked A through I. Plaintiff moves to strike these exhibits pursuant to Federal Rule of Civil Procedure 12(f),[FN7] and alternatively asks the court to convert defendants' motion into a motion for summary judgment with opportunity for discovery.

> FN7. Under this rule, courts may strike "any redundant, immaterial, impertinent or scandalous matter."Fed.R.Civ.P. 12(f).

To decide a motion to dismiss, courts generally "may not consider matters extraneous to the pleadings."*Burlington,* 114 F.3d at 1420. However, courts may consider documents "integral or explicitly relied on in the complaint" as well as matters of public record, which may be judicially noticed. *Id.* (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996)); *see also In re NAHC, Inc., Sec. Litig.,* 306 F.3d 1314, 1331 (3d Cir.2002). Courts may take judicial notice of facts that are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."Fed.R.Evid. 201. When a court considers an extraneous document on motion to dismiss, it may not use the document to decide facts in dispute because the court must accept all well-pleaded facts as true. *See Nami,* 82 F.3d at 65.

### A. *SEC Proxy Forms*

Plaintiff alleges that eight of the defendants sold company stock while in possession of material non-public information. Pl.'s Compl. at ¶ 10. In the complaint, plaintiff alleges that defendants netted over $35 million from their illicit trades. *Id.* at ¶ 10.However, plaintiff fails to report defendants'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

total holdings, or the percentage of their holdings that were sold. This omission makes it difficult to determine whether defendants' trades were suspicious or unusual. Defendants provide three SEC proxy forms to establish defendants' total holdings in ABC. Defs.' Mem. Supp. Mot. Dismiss Ex. A-C. Plaintiff urges the court to strike these documents.

The court can consider defendants' holdings in ABC because the complaint explicitly refers to the number of shares sold by each defendant. Pl.'s Compl. at ¶ 67. In *Burlington,* the court explained that the purpose of allowing courts to consider extraneous documents in motions to dismiss is to prevent plaintiffs from maintaining claims by "extracting an isolated statement from a document and placing it in the complaint."114 F.3d at 1426. Here, plaintiff cannot argue that defendants fraudulently traded on inside information without showing that defendants' trades were suspicious given their total holdings. In *Oran,* an insider trading case brought under SEC Regulations, the Third Circuit took judicial notice of the defendants' total stockholdings where "[t]he District Court found that the absence of this information was fatal to plaintiffs' case ... because 'plaintiffs provided no information as to whether the trades were normal and routine for each executive'."226 F.3d at 289. Here, the court may consider defendants' total stockholdings before deciding whether defendants' stock trades are suspicious enough to excuse shareholder demand.

*4 Additionally, if the court considers defendants' holdings, it will not create risk of surprise or prejudice because plaintiff uses these numbers in its Opposition Brief. *See* Pl.'s Opp. Defs.' Mot. Dismiss at 17.

### B. *Documents Relating to the Criminal Case Against Robert Strusz*

In the complaint, plaintiff alleges that Robert Strusz, "a sales manager at [ABC's] [FN8] Sacramento distribution center" was convicted for Medi-

care fraud. This assertion is confusing because ABC did not exist until the August 29, 2001 merger. In their motion to dismiss, defendants include the government's Second Superceding Information and Strusz's plea agreement to show that Strusz was never employed by ABC and his conduct took place well before the merger. Defs.' Mem. Supp. Mot. Dismiss at 6-7, Ex. D, E. Plaintiff argues that the court should strike this material because it creates a factual dispute that the court cannot resolve on a motion to dismiss. Pl.'s Reply Supp. Mot. Strike at 6.

> FN8. Plaintiff actually states that Strusz was "a sales manager at Americasource's Sacramento distribution center", but the complaint defines AmericasourceBergen (ABC) as "Americasource."

Although courts have considered criminal case dispositions on motions to dismiss, there is no need to consider these documents. *See Pension Benefit,* 998 F.2d at 1196. From the face of the complaint, plaintiff fails to connect Strusz's conduct with ABC or defendants because the FBI sting took place two years before the 2001 merger. *See* Pl.'s Compl. at ¶ 7. Moreover, plaintiff's allegations that defendants concealed the FBI investigation and traded on this information do not depend on whether ABC or defendants are responsible for Strusz's conduct. *See id.* at 67.Consequently, I will grant plaintiff's motion to strike defendants' Exhibits D and E.

### C. *Documents Relating to Criminal Cases Against McKesson Corporation*

The complaint alleges that due to defendants' misconduct, ABC lost a $25 million contract with the Veterans Administration to competitor McKesson Corporation. Defendants argue that ABC's legal trouble did not cause the company to lose the contract because McKesson is embroiled in legal problems of its own. Defs.' Mem. Supp. Mot. Dismiss at 10-11. To support this claim, defendants attach a press release and an indictment describing the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

charges against McKesson. Defs.' Mem. Supp. Mot. Dismiss Ex. F, G. Plaintiff urges the court to strike these documents because they raise an impermissible factual dispute. Pl.'s Reply Supp. Mot. Strike at 7.

Defendants may not use the McKesson documents to dispute plaintiff's claim that ABC lost its contract due to defendants' misconduct. This is a factual issue and in a motion to dismiss the court must accept the complaint's factual allegations as true. *See Nami,* 82 F.3d at 65. Moreover, the court may not consider the McKesson documents because they are not "integral or explicitly relied on in the complaint."In fact, the complaint says nothing about McKesson's legal trouble. For these reasons, I grant plaintiff's motion to strike Exhibits F and G to defendants' motion to dismiss.

### D. *ABC's Closing Share Prices*

*5 Defendants argue that news of the FBI investigation was not material because public disclosure of the information scarcely affected ABC's stock price. Defs.' Mem. Supp. Mot. Dismiss. at 20-21. To bolster their argument, defendants include a list of ABC's closing stock prices for 2003. *Id.* Ex. H.

Courts often taken judicial notice of stock prices in SEC cases. *See In re NAHC Inc. Sec. Litig.,* 306 F.3d 1314, 1331 (3d Cir.2002) (finding no reversible error where district court took judicial notice of stock prices compiled by the Dow Jones news service); *Ieradi v. Mylan Lab., Inc.,* 230 F.3d 594, 600 n. 3 (3d Cir.2000) (taking judicial notice of stock prices reported by Quotron Chart Services). Additionally, ABC's stock prices are "capable of accurate and ready determination" because the company's opening and closing stock prices are reported on the NASDAQ website. *See* Defs.' Opp.Pl.s' Mot. Strike at 7 n. 3. Plaintiff claims that the court may not consider this information because materiality is a question of law. Pl.'s Reply Supp. Mot. Strike. at 5. Nonetheless, the question of materiality is not central to my analysis and I deny plaintiff's

motion to strike defendants' Exhibit H.

### E. *ABC's Certificate of Incorporation*

Defendants contend that plaintiff must meet a heightened burden because ABC's Certificate of Incorporation exempts directors from liability for certain conduct. *See* Defs.' Mem. Supp. Mot. Dismiss at 26. In support of this argument, defendants attach ABC's Certificate of Incorporation as Exhibit I. Under Delaware law, which governs defendants' motion to dismiss,[FN9] courts may properly take judicial notice of a certificate of incorporation for this purpose. *See In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1270 (Del.Ch.1995) ("The court may take judicial notice of the certificate in deciding a motion to dismiss."). Additionally, a certificate of incorporation's "accuracy cannot be questioned" because it a public document filed with the Secretary of State. Consequently, I deny plaintiff's motion to strike defendants' Exhibit I.

> FN9. I discuss choice of law in Part IV.B & C.

### F. *Plaintiff's Request to Convert Defendants' Motion into a Motion for Summary Judgment with Opportunity for Discovery*

Plaintiff contends that if the court considers defendants' exhibits, it must convert the motion to dismiss into a motion for summary judgment with opportunity for discovery. Ordinarily, when a "court considers evidence beyond the complaint in deciding a Rule 12(b)(6) motion, it is converted to a motion for summary judgement."*Anjelino v. New York Times Co.,* 200 F.3d 73, 88 (3d Cir.2000) (citing Fed.R.Civ.P. 12(c)). However, as I discussed above, courts may consider documents "integral to or expressly relied upon in the complaint", as well as matters of public record, without converting a motion to dismiss into a motion for summary judgment. *Burlington,* 114 F.3d at 1326;*see also Pension Benefit,* 998 F.2d at 1196. Moreover, derivative plaintiffs must meet the pleading requirements

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

set forth in Federal Rule 23.1 before causing corporations to expend resources and money in discovery. *See Stepak ex rel. Southern Co. v. Addision,* 20 F.3d 398, 410 (11th Cir.1994) (recognizing that under Federal Rule 23.1, "the shareholder is not normally entitled to discovery at the demand stage."). Finally, the Delaware Supreme Court has expressly held that derivative plaintiffs have sufficient "tools at hand" to develop facts for pleadings without discovery. *Brehm v. Eisner,* 746 A.2d 244, 266-67 (Del.2000).

*6 Here, the court may consider defendants' Exhibits A, B, C, H, and I because they are matters of public record. Thus, I deny plaintiff's request to convert the motion to dismiss into a motion for summary judgment.

### G. *Conclusion*

For the above reasons, I will grant plaintiff's motion to strike Exhibits D, E, F and G and deny the motion to strike Exhibits A, B, C, H, and I.

### IV. DEFENDANTS' MOTION TO DISMISS

#### A. *Derivative Suits Generally*

A derivative suit "permits an individual shareholder to bring a suit to 'enforce a corporate cause of action against officers, directors, and third parties.' " *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (quoting *Ross v. Bernhard,* 396 U.S. 531, 534, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)). It "places in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.' " *Kamen,* 500 U.S. at 95 (quoting *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). To protect against abuse of this remedy, courts developed the standing and demand requirements, which are set forth in Federal Rule of Civil Procedure 23.1.[FN10]*See Kamen,* 500 U.S. at 95;*Blasband*

*v. Rales,* 971 F.2d 1034, 1040 (3d Cir.1992).

FN10. This rule provides that:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs.

#### B. *Standing*

Under Federal Rule 23.1(1), to maintain a derivative suit, the complaint must allege "that the plaintiff was a shareholder ... at the time of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

transaction of which the plaintiff complains...." In *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.,* 417, U.S. 703, 708 & n. 4 (U.S.1974), the Supreme Court observed that there is some question as to whether this rule applies in diversity cases because it may be substantive rather than procedural, and thus violate the teachings of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 79-80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[FN11] The Court chose not to resolve this issue [FN12] because the applicable state law contained an identical contemporaneous ownership requirement. *See id.* at 709, 714 (approving the district court's decision not "to resolve this issue ... since its examination of state law indicated that Maine probably followed the 'prevailing rule' requiring contemporaneous ownership in order to maintain a shareholder derivative action."); *see also Bensen v. American Ultramar,* No. 92 CIV. 4420, 1996 U.S. Dist. LEXIS 1222, at *18 n. 9 (S.D.N.Y. Feb. 6, 1996) ("In this diversity case, I need not decide whether the New York or federal 'contemporaneous ownership' rule applies. Here, both would apply in the same way.") (citing *Bangor Punta,* 417 U.S. 708-09 & n. 4) (additional citations omitted). Here, Delaware follows a contemporaneous ownership requirement similar to the federal rule.[FN13]*See*Del.Code Ann. Tit. 8 § 327 ("In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.")

FN11. In *Erie,* the Court held that in diversity actions courts should apply state substantive law and federal procedural law. 304 U.S. at 79-80.

FN12. More than thirty years after *Bangor Punta* this issue remains unsettled. *See* Leslie M. Kelleher, *Taking "Substantive Rights" (in the Rules Enabling Act) More Seriously,* 74 Notre Dame L.Rev. 47, 116

n. 299 (1998); G. Richard Shell, *Arbitration and Corporate Governance,* 67 N.C. L.Rev. 517, 575 n. 264 (1989) ("The issue of whether rule 23.1 is substantive or procedural is not finally settled.").

FN13. Because ABC is a Delaware corporation, Delaware substantive law applies here.

*7 In *Blasband,* a derivative suit arising under Delaware law, the Third Circuit did not consider Federal Rule 23.1(1)'s contemporaneous ownership requirement. 971 F.2d 1040. Instead, the court applied Del.Code Ann. Tit. 8 § 327, which both parties agreed was applicable, to evaluate the plaintiff's standing. *Id.* Here, like *Blasband,* both parties appear to agree that the court should apply Delaware standing law.[FN14]Hence, because the standing requirements for derivative plaintiffs in Delaware and the Federal Rules are virtually identical, and because neither party disputes that Delaware law applies, I will use Delaware law to evaluate plaintiff's standing. *See Brambles USA, Inc. v. Blocker,* 731 F.Supp. 643, 648 & n. 8 (D.Del.1990) (applying Delaware standing law where "[t]he parties [did] not complain[ ] of any inconsistency between federal and state law,""all parties argue decisions from the courts of the State of Delaware," and the court "[found] that following either would produce the same result").

FN14. Defendants exclusively rely on Delaware standing law and plaintiff does not dispute that Delaware law applies. *See* Defs.' Mot. Dismiss at 11-12; Pl.'s Opp. Defs.' Mot. Dismiss at 32; Defs.' Reply to Pl.'s Opp. Defs.' Mot. Dismiss at 1 n. 1.

Under Delaware law, "[i]n the context of a corporate merger, ... a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at time of commencement of suit but that he must also maintain shareholder status throughout the litigation."*Lewis v. Anderson,* 477 A.2d 1040, 1046 (Del.1984) (citations omitted).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

Defendants argue that plaintiff lacks standing to assert claims that arise out of conduct that occurred prior to ABC's creation. Defs.' Mem. Supp. Mot. Dismiss at 11. The complaint repeatedly refers to misconduct that occurred as far back as 1996. Pls.' Compl. at ¶ 42-49, 54, 62. However, it also states that ABC "was created in August of 2001." *Id.* at ¶ 32. Thus, ABC's predecessor corporations and their directors must be responsible for this conduct. *Id.* at ¶ 42-48.[FN15] Plaintiff only claims to own stock in ABC, and thus cannot ground its claims on conduct that took place before August 2001.[FN16] *See id.* at ¶ 80.

> FN15. At times, the complaint attributes pre-merger conduct to ABC. Compl. at ¶ 54, 62. I will assume that one of ABC's predecessor corporation was responsible for this conduct.

> FN16. While plaintiff may not ground its claims on defendants' pre-merger conduct, it may use such conduct to show that the demand requirement should be excused because defendants personal and business relationships prevent them from independently considering plaintiff's suit. Additionally, plaintiff can use pre-merger allegations to show that defendants knew about ABC's illegal conduct.

Plaintiff does allege facts that occurred after August 2001. *See id.* at ¶ 55-57, 59, 62, 63, 67, 69. As a shareholder of ABC, plaintiff has standing to assert claims that arise out of these facts. Hopefully, its amended complaint will more specifically allege the dates of the complained of acts and base its claims on those acts only rather than intermixing pre- and post-August 29, 2001 acts.

## C. Demand

Federal Rule 23.1(2) requires that a derivative complaint "allege with particularity the efforts ... made by the plaintiff to obtain the action the plaintiff de-

sires from the directors ... and, ... the reason for the plaintiff's failure to obtain the action or for not making the effort." Whereas the Supreme Court has yet to determine whether Rule 23.1(1)'s contemporaneous ownership requirement is procedural or substantive, the Court has decided that the demand requirement is purely procedural and "speaks only to the adequacy of the shareholder representative's pleadings." *Kamen,* 500 U.S. at 96. Hence, 23.1(2) imposes a pleading requirement, which dictates when and how facts must be alleged in federal court, to comply with a state's substantive demand requirement. *RCM Sec. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1330 (2d Cir.1991); *In re General Motors Class E Stock Buyout Sec. Litig.,* 790 F.Supp. 77, 80 (D.Del.1992); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform,* 58 U. Chi. L.Rev. 1, 34 n. 105 (1991). Thus, I must apply state substantive law when considering defendants' Rule 23.1(2) motion. *See Kamen,* 500 U.S. at 97 ("Thus, in order to determine whether the demand requirement may be excused by futility in a derivative action ..., we must identify the source and content of the substantive law that defines the demand requirement in such a suit."); *Blasband,* 971 F.2d at 1047 ("The substantive requirements of demand are a matter of state law."). Because ABC is a Delaware corporation, Delaware law governs.[FN17]

> FN17. Both parties rely on Delaware demand futility law. *See* Pl.'s Opp. Defs.' Mot. Dismiss at 2 n. 2; Defs.' Mot. Dismiss at 1.

*8 Delaware's demand requirement, which is nearly identical to 23.1(2), is set forth in Court of Chancery Rule 23.1.[FN18] This requirement, "exists as a threshold, first to ensure that a stockholder exhausts his intercorporate remedies, and then to provide a safeguard against strike suits." *Aronson v. Lewis,* 473 A.2d 815, 811-12 (Del.1983), *overruled in part by Brehm,* 746 A.2d 244. Plaintiff has not made a demand on ABC's board. Instead, it contends that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

the requirement should be excused because a demand to bring suit would be futile. Pl.'s Compl. at ¶ 81.

> FN18. This rule provides that:
>
> > In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share of membership thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.
>
> > Del. Ch. Ct. R. 23.1.

Under Delaware law, derivative plaintiffs must satisfy one of two tests to establish that demand is excused.[FN19]When a plaintiff's claims arise from an affirmative business decision made by a corporation's board of directors, courts apply the two-prong test laid out in *Aronson,* 473 A.2d at 814. Under *Aronson,* courts will excuse pre-suit demand if the complaint alleges, with particularity, sufficient facts to create a reasonable doubt that (1) the majority of the directors are disinterested and independent, or (2) the challenged transaction is otherwise the product of the directors' valid exercise of business judgment. *Id.*"If either prong is satisfied, demand is excused."*Brehm,* 746 A.2d at 256.

> FN19. Often these tests come to similar results. *See Guttman v. Jen-Hsun Huang,* 823 A.2d 492, 500 (Del.Ch.2003) ("[T]he differences between the *Rales* and the

*Aronson* tests in the circumstances of this case are only subtly different, because the policy justification for each test points the court toward a simialr analysis.")

When a plaintiff does not challenge an affirmative business decision, courts employ the modified test set forth in *Rales v. Blasband,* 634 A.2d 927, 933-34 (Del.1993). Under *Rales,* courts will excuse pre-suit demand if the complaint makes particularized factual allegations that "create a reasonable doubt that, ... the board of directors could have properly exercised its independent and disinterested business judgment in response to a demand."*Id.* at 934.Delaware courts perform demand futility analysis for each separate claim in a derivative suit. 2 Rodman Ward, Jr., et al., *Folk on the Delaware General Corporation Law* § 327.4 n. 154 (4th ed. Supp.2004).

*1. Demand Futility for the Fiduciary Duty Claim*

After reviewing the complaint, it is difficult to determine which standard to apply to each claim because plaintiff incorporates each allegation into its claims, and fails to clarify which facts give rise to which claims. Nonetheless, plaintiff's breach of fiduciary duty claim apparently arises from plaintiff's allegation that defendants caused ABC to distribute counterfeit drugs and commit Medicare fraud. Pl.'s Compl. at ¶ 84. ABC's board allegedly approved this conduct, and consequently I will use *Aronson* to analyze this cause of action. *See In re Abbot Laboratories Deriv. S'holders Litig.,* 325 F.3d 795, 806-07 (7th Cir.2001) (applying *Aronson* where plaintiff alleged that defendant directors knew about continuing violations of federal regulations "and decided no action was required.").

a. Are the Director Defendants Disinterested and Independent?

Under *Aronson'* s first prong, a plaintiff seeking to excuse demand must use particularized facts to create a reasonable doubt that "the directors are disin-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

terested and independent."*Aronson,* 473 A.2d at 814. To satisfy its burden, a plaintiff must show that at least half of the board was either interested or not independent. *In re Oracle Corp. Deriv. Litig.,* 824 A.2d 917, 944 n. 69 (Del.Ch.2003). Directors are interested when they appear on both sides of a challenged transaction or expect to derive a personal financial benefit from a transaction that is not shared by stockholders generally.*Aronson,* 473 A.2d at 812. Here, plaintiff does not claim that ABC's directors received any individual benefit as a result of ABC's illegal conduct.[FN20] Instead, plaintiff questions whether the directiors are sufficiently independent to make an impartial decision. Pl.'s Compl. at ¶ 81.

> FN20. Plaintiff claims that defendants' are interested because they face a substantial likelihood of liability for breach of fiduciary duty. Pl.'s Opp. Defs.' Mot. Dismiss at 19. Because this argument reaches the merits of the claim, I will address it under the second prong. *See White v. Panic,* 793 A.2d 356, 366 n. 30 (Del.Ch.2000) ("[P]laintiff states that the 'substantial likelihood that each of the defendants is liable ...' provides a disqualifying interest for demand purposes. This theory of interest is properly considered in the context of the second prong....")

*9 Plaintiff argues that ABC's board is incapable of considering a demand because they have "extensive, long-standing personal, professional, and familial relationships" with each other. Pl.'s Compl. at ¶ 81. Plaintiff asserts that ABC's board is "heavily entrenched" because eight of the ten directors served together with ABC's predecessor companies. However, the complaint fails to set forth any particularized facts, and it does not explain why this precludes the board from considering a demand independently. *Id.* at 37.Moreover, in Delaware, "neither mere personal friendships alone, nor mere outside business relationships alone, are sufficient to raise a reasonable doubt regarding a

director's independence."*Litt v. Wycoff,* No. 19083-NC, 2003 Del. Ch. LEXIS 23, at *16 (Del. Ch. Mar. 25, 2003).

Plaintiff also contends that the directors' compensation renders them interested. Pl.'s Opp. Defs.'s Mot. Dismiss at 18. According to the complaint, ABC's directors receive a $50,000 per year stipend, along with stock options and fees for attending meetings. Pl.'s Compl. at ¶ 40. In Delaware, allegations that "directors are paid for their services, .... without more, do not establish any financial interest."*Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds by*Brehm, 746 A.2d at 253-54;*see also White v. Panic,* 793 A.2d 356, 366 (Del.Ch.2000) ("[T]he fact that each [director] is paid an annual retainer of $30,000 plus a fee of $1000 for each meeting attended and annual grants of stock options does not make them beholden to [the company's CEO].").

Finally, plaintiff argues that the board cannot independently consider its demand because it is dominated by defendants Yost and Martini. In Delaware, "a plaintiff charging domination must allege particularized facts .... [t]he shorthand shibboleth of 'dominated and controlled directors' is insufficient."*Aronson.* 473 A.2d at 816. Plaintiff asserts that Yost and Martini alone appoint new directors, and refuse to delegate the decision to a nominating committee. Pl.'s Compl. ¶ at 38, 40. This contention, without more particularized allegations, must fail because "the law is well-settled that [a controlling director's] involvement in selecting each of the directors is insufficient to create a reasonable doubt about their independence."*White,* 795 A.2d at 366. Plaintiff also contends that Yost and Martini's compensation shows that they control the board. In *Aronson,* the plaintiff alleged that a majority stockholder dominated the board because he received excessive compensation and interest-free loans. 473 A.2d at 808. The court rejected the plaintiff's contention and held that the board's approval of a lucrative employment agreement did not establish control. *Id.* at 816.For these reasons, plaintiff's com-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

plaint fails to create a reasonable doubt about ABC's directors' independence.

### b. The Board's Business Judgment

**\*10** Even if a plaintiff fails to create a reasonable doubt about the board's independence, a court will excuse the demand requirement if a plaintiff raises a reasonable doubt that "the directors exercised proper business judgment in the transaction."*Grobow,* 539 A.2d at 189. The *Aronson* court explained that even if directors appear disinterested and independent, if they acted illegally in approving a transaction, their interest "in avoiding personal liability automatically and absolutely disqualifies them from passing on a shareholder's demand."473 A.2d at 817.

Plaintiff claims that defendants' breached their fiduciary duties and thus failed to exercise valid business judgment by approving ABC's distribution of counterfeit drugs and participation in Medicare fraud.[FN21]Pl.'s Opp. Defs.' Mot. Dismiss at 24. Plaintiff's allegations in support of this claim are vague and conclusory. Plaintiff asserts that ABC and its subsidiaries twice purchased counterfeit drugs between 2001 and 2003, leading to one private lawsuit. Pl.'s Compl. at ¶ 56, 57. However, ABC was not formed until August 29, 2001 and the complaint fails to specify that ABC, and not its predecessors, are responsible for the illegal conduct. *Id.* at 55-57.The complaint also states that ABC is under investigation for Medicare fraud. *Id.* at ¶ 59.Nonetheless, these facts alone do not indicate that defendants knew about and approved these transactions.

> FN21. Plaintiff's burden here is particularly steep because ABC's Certificate of Incorporation limits directors' liability for breach of fiduciary duty to cases where directors (1) breach their duty of loyalty, (2) act in bad faith or intentionally violate the law, (3) unlawfully pay a dividend or purchase stock, or (4) engage in self-

dealing. *See* Defs.' Mem. Supp. Mot. Dismiss Ex. I. Under Delaware law, "[w]hen a certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption."*In Re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1270 (Del.Ch.1995). Here, plaintiff has alleged that ABC's board conduct falls outside the exemption because the directors allegedly knowingly approved the company's illegal conduct. Pl.'s Compl. at ¶ 84.

Plaintiff relies heavily on *Abbott,* a Seventh Circuit case applying Delaware demand futility law. 325 F.3d 795. In *Abbott,* the court excused the demand requirement because the defendant directors allegedly caused the company to violate FDA rules. *Id.* at 809.The court inferred that the directors knew about and approved of the illegal conduct because violations continued after "six years of noncompliance inspections, ..., Warning Letters, and notice in the press, all of which ... resulted in the largest civil fine ever imposed by the FDA...."*Id.*Here, the only facts that suggest that defendants knew about ABC's violations are the November 2001 FDA report and the September 2003 *Wall Street Journal* article. Pl.'s Compl. at ¶ 55, 59. The FDA report came just three months after ABC's creation and plaintiff fails to allege that the report concerned ABC, and not its predecessors. Additionally, plaintiff fails to allege that ABC committed any violations after the *Wall Street Journal* story. Thus, even if I assume that the story put defendants on notice of ABC's misconduct, there is no indication that defendants consciously caused ABC to break the law. Lastly, in *Abbot,* where the corporation's misconduct led to the highest fine in FDA history, the court reasoned that " 'the magnitude and duration of the alleged wrongdoing is relevant in determining whether the failure of the directors to act constitutes a lack of good faith." ' 325 F.3d at 809

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

Page 12

(quoting *McCall v. Scott,* 239 F.3d 808, 823 (6th Cir.2001). Here, ABC's conduct has not resulted in government action or fines. Thus, there is no suggestion that the directors acted with "a lack of good faith." *Id.*

**\*11** Even if proven, the allegations in plaintiff's complaint fail to establish that defendants breached their fiduciary duties, which would "absolutely disqualif[y] them from passing on a shareholder's demand."*Aronson,* 473 A.2d at 817. Hence, demand is not excused for plaintiff's breach of fiduciary duty claim.

### 2. *The Abuse of Control and Waste Claims*

Plaintiff's abuse of control and waste claims apparently arise from its allegations that defendants' paid themselves excessive compensation.[FN22][FN23] Pl.'s Compl. at ¶ 88; Pl.'s Opp. Defs.' Mot. Dismiss at 29. Because the board approved these transactions, I will use *Aronson.See Brehm,* 746 A.2d at 256 (applying *Aronson* where derivative plaintiffs challenged a board's approval of an allegedly wasteful and extravagant employment contract).

> FN22. Plaintiff also claims that defendants' insider trading constitutes an abuse of control. Because insider trading was not approved by the board, I will analyze these allegations under *Rales* in my discussion of the unjust enrichment and usurpation of a corporate opportunity claims. *See* Part II.B.4.

> FN23. Initially, plaintiff alleges that defendants "waste[d] valuable corporate assets" by "failing to conduct proper supervision." Pl.'s Compl. at ¶ 95. This allegations more closely resembles a gross mismanagement claim than a waste claim. In its Opposition Memorandum, plaintiff revises its contention and claims that Defendants wasted "valuable assets by approving compensation and benefits" for Martini and

Yost. Pl.s' Opp. Defs.' Mot. Dismiss at 32. I will assume that plaintiff intends its waste claim to arise out these allegations.

#### a. Are the Directors Disinterested and Independent?

As I concluded above, plaintiff has failed to allege facts showing that ABC's board members were disabled from considering a demand due to their not being disinterested or their lack of independence. *See* Part IV.B.1.a.

#### b. The Board's Business Judgment

Plaintiff claims that because the director defendants illegally approved excessive compensation, they are disqualified from considering plaintiff's demand. Delaware courts "have defined 'waste' to mean 'an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.'" *White,* 783 A.2d at 554 (Del.2001) (quoting *Brehm,* 746 A.2d at 263)."If ... there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste...."*Lewis v. Vogelstein,* 699 A.2d 327, 336 (Del.Ch.1997) (emphasis in original). Plaintiff asserts that defendant Yost received over $1 million per year in salaries and incentives and defendant Martini received over $500,000 per year. Pl.'s Compl. at ¶ 15, 16. The complaint also alleges that the board forgave $1.4 million in loans to Martini and his son in connection with the AmericaSource-Bergen merger. *Id.* at ¶ 40.These allegations alone do not establish that defendants face liability for waste because nothing suggests that Yost and Martini failed to render "any substantial consideration," or that these payments were not made in "good faith." *Vogelstein,* 699 A.2d at 336.

Plaintiff also fails to provide facts showing that Yost and Martini's compensation was excessive. For instance, plaintiff does not compare Yost and Martini's compensation to compensation at compar-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

able organizations, and fails to allege that their compensation was disproportionate to services rendered. Plaintiff also does not claim that the board failed to obtain legal advice or guidance before making these payments. *See Litt,* 2003 Del. Ch. LEXIS 23, at *23, *39 (dismissing a plaintiff's fiduciary duty claim for excessive bonus payments, where the complaint failed to allege that the board did not obtain "appropriate legal advice", or that the compensation was "disproportionate to the services rendered").

**\*12** Plaintiff also argues that defendant directors are liable for paying "[ABC's] directors excessive and unjustified stipends."Pl.'s Opp. Defs.' Mot. Dismiss at 32. This argument also fails because naked allegations that "directors are paid for their services, .... without more, do not establish any financial interest."*Grobow,* 539 A.2d at 188.

### 3. *The Unjust Enrichment and Usurpation of Corporate Opportunity Claims*

Plaintiff's unjust enrichment and corporate opportunity claims stem from defendants' alleged insider trading.[FN24]Pl.'s Compl. at ¶ 98, 102. I will apply *Rales* to these claims because the board did not approve defendants' individual stock trades. *See Guttman v. Jen-Hsun Huang,* 823 A.2d 492, 499-500 (applying *Rales* to the plaintiff's allegations that "the defendant-directors individually breached their fiduciary duties by ... purposely trading in their individual capacities while possessing material, non-public information....").

> FN24. Although plaintiff also appears to base its unjust enrichment claim on the alleged excessive compensation, I previously analyzed this allegation as a part of the abuse claim.

Under *Rales,* a court must determine whether the complaint creates "a reasonable doubt that, ... the board of directors could have properly exercised its independent and disinterested business judgment in

responding to a demand."634 A.2d at 934. Plaintiff contends that the five directors who allegedly traded on inside information are disabled from considering a demand because of their risk of liability.[FN25]It is well established that "the mere threat of personal liability ... is insufficient to challenge ... the independence or disinterestedness of directors...."*Aronson,* 473 A.2d 805, 815. Rather, plaintiff must show that directors "face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand."*Guttman,* 823 A.2d at 503.

> FN25. Plaintiff also argues that defendants are "interested per se" because of their alleged insider trades. However, mere allegations of insider trading do not make a director "interested." *See Guttman,* 823 A.2d at 502 ("It is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information.")

In *Guttman,* the court held that a derivative plaintiff failed to prove that directors faced a substantial threat of liability for insider trading because the complaint did not show that defendants acted "with scienter," which is required under Delaware insider trading law. *Id.* at 505.The court explained that the timing of the trades was "quite disparate," and three of the five defendants sold an insubstantial percentage of their holdings. *Id.* at 503-04.Here, plaintiff also fails to establish that defendants traded with scienter and face a substantial likelihood of liability. Plaintiff repeatedly asserts that defendants knew about the FBI investigation, which is the alleged inside information. However, Plaintiff offers few facts to support this claim. Plaintiff alleges that the FBI notified defendants in February 2001, six months before the Americasource-Bergen merger. Pl.'s Compl. at ¶ at 67. This arguably suggests that the former directors of Americasource had know-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

Page 14

ledge of the investigation. But, the complaint alleges no facts that indicate that defendants Martini, Brady, or Rodgers, who were affiliated with Bergen before the merger, had knowledge of the investigation. The complaint also asserts that defendants Martini and Yost were members of ABC's Executive Committee and defendant Hagenlocker was Chairman of the company's Audit and Corporate Responsibility Committee. *Id.* at ¶ 15, 16, 20, 39.These allegations are insufficient to support an inference that defendants knew about an FBI investigation that began before ABC was even created.

**\*13** Additionally, there is no suspicious pattern in defendants' stock sales to suggest that they traded with scienter. Five members of the board sold company stock between the FBI notification in February 2001 and the public disclosure in September 2003. This period extends more than two years and none of the sales were made within two months of the notification or the disclosure. *Id.* at 67.Moreover, like *Guttman,* the complaint fails to show that defendants' trades were "inconsistent with trading practices in prior years."823 A.2d at 504. In its Opposition Memorandum, plaintiff submits a chart comparing defendants' sales during the trading period with defendants' sales in the following eight months. Pl.'s Opp. Defs.' Mot. Dismiss at 18. Although the director defendants sold roughly two-and-half times more stock during the trading period,[FN26] this is unsurprising because the trading period spanned thirty-two months, more than four times as long as the subsequent time span.

> FN26. According to plaintiff's Opposition Memorandum, the defendant directors sold 209,279 shares of ABC in the thirty-two months between the FBI notification and the public disclosure and 82,763 shares in the following eight months. Pl.'s Mem. Opp. Defs.' Mot. Dismiss at 18.

Finally, plaintiff fails to show that defendants face a substantial risk of liability because four of the five defendants sold only a modest portion of their holdings. Only one of the director defendants, Hagenlocker, sold more than 50% of his ABC stock during the trading period. Pl.'s Opp. Defs.' Mot. Dismiss at 17. In *Guttman,* the court held that "the mere fact that two of the directors sold large portions of their stock does not ... support the conclusion that those two directors face a real threat to liability."823 A.2d at 504. Defendants Brady, Rodgers, Yost, and Martini sold 32.7%, 21.1%, 14.4%, and 6.9% of their shares. Without more particularized allegations showing scienter, these trades do not indicate that defendants "face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand."*Guttman,* 823 A.2d at 503. Moreover, the defendants' decision to maintain substantial holdings in ABC "suggest[s] that they had every incentive to keep [the company] profitable."*In re Advanta Corp. Sec. Litig.* 180 F.3d 525, 540-41 (3d Cir.1999) (dismissing plaintiff's claims under SEC insider trading regulations where the defendants sold 5% and 7% of their total holdings).

Plaintiff's other arguments alleging lack of independence fail for the reasons explained above. *See* Part IV.B.1.a. Thus, demand is not excused for plaintiff's unjust enrichment and usurpation of a corporation opportunity claims.

### 4. *The Gross Mismanagement Claim*

To support its final claim for gross mismanagement, Plaintiff alleges that defendants "abandoned and abdicated their responsibilities" to the corporation. Pl.'s Compl. at ¶ 91. This claim does not involve an affirmative decision by ABC's board and thus I will use the *Rales* test. *See In re Baxter,* 654 A.2d at 1269 (applying *Rales* where the defendant directors allegedly failed to oversee and supervise the corporation). Like the breach of fiduciary duty claim, plaintiff relies on its allegations that ABC distributed counterfeit drugs and participated in Medicare fraud. However, instead of arguing that defendants knowingly caused the company to engage in illegal conduct, plaintiff contends that de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)

fendants' failure to oversee the company exposed it to liability.

*14 Plaintiff argues that the board is disabled from considering a demand because its members face a "substantial likelihood of liability." *In re Baxter,* 654 A.2d at 1269. A failure to oversee liability "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."*In re Caremarkl Int'l Derivative Litig.,* 698 A.2d 959, 967 (Del.Ch.1996). To establish liability for oversight, a plaintiff must prove "a sustained or systematic failure of the board to exercise oversight...."[FN27]*Id.* at 971.Often, this necessitates that plaintiffs plead "with particularity that the directors ignored obvious danger signs of employee wrongdoing."*In re Baxter,* 654 A.2d at 1270-71 (citing *Graham v. Allis-Chalmers Mfg. Co.,* 188 A.2d 125, 130 (Del.1963)). Again, plaintiff provides few facts to show that defendants had any knowledge of ABC's misconduct. Plaintiff alleges that ABC engaged in isolated incidents of misconduct, many of which probably occurred before ABC was created. See Pl.'s Compl. at ¶ 54-56, 59. There are no specific allegations that suggest that ABC's directors should have known about the company's illegal conduct. Plaintiff argues that the September 2003 *Wall Street Journal* article indicates that defendants had knowledge of misconduct and ignored warning signs. However, plaintiff fails to allege that ABC continued to violate the law after this article, and thus there is no indication that defendants consciously permitted the company to break the law. The complaint fails to allege facts that show that defendants are disabled by their risk of liability for oversight. Consequently, plaintiff is not excused from making a demand on the board.

> FN27. Again, because ABC's Certificate of Incorporation insulates defendants from liability for certain breaches of fiduciary duty, plaintiff has a heightened burden. However, the liability standard for oversight claims usually requires a showing of bad faith, which is not covered by ABC's

> Certificate. *See Caremark,* 698 A.2d at 971 (holding that "lack of good faith ... is a necessary condition to liability [for an oversight claim]").

## V. CONCLUSION

Plaintiff's complaint fails to meet the stringent pleading requirements for derivative suits set forth in Federal Rule of Civil Procedure 23.1 and Delaware law. I grant defendants' motion to dismiss because plaintiff failed to make a demand on ABC's board and does not plead with particularity facts showing that the board is incapable of considering a demand. I will grant plaintiff's request for leave to amend to give plaintiff an opportunity to allege, with greater particularity, facts showing that demand should be excused.[FN28]An appropriate order follows.

> FN28.Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."

### *ORDER*

And now, this _____ day of January, 2005, upon consideration of plaintiff's motion to strike (Document No. 14) and defendants' motion to dismiss (Document No. 10), IT IS HEREBY ORDERED as follows:

1. Plaintiff's motion to strike is GRANTED IN PART and DENIED IN PART as follows:

a. Exhibits D, E, F, and G are STRICKEN.

b. The balance of the motion is DENIED.

2. Defendants' motion to dismiss is GRANTED and plaintiff's complaint is DISMISSED without prejudice to the right of the plaintiff to file an amended complaint, if it can do so within the strictures of Rule 11, within sixty days of the date hereof.

E.D.Pa.,2005.
Amalgamated Bank v. Yost

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 16
Not Reported in F.Supp.2d, 2005 WL 226117 (E.D.Pa.)


Not Reported in F.Supp.2d, 2005 WL 226117
(E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 2



Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

**C**

Andreae v. Andreae
Del.Ch.,1992.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Mark M. ANDREAE, Custodian, Gail P. Andreae,
Jane Guisinger, John Guisinger, Christine A. Liegl,
Christine A. Liegl, Custodian, David P. Taylor and
Christine A. Liegl, Co-Trustees, Andreae J.
Waanders and F. Harold Taylor, IV, Plaintiffs,
v.
Frank W. ANDREAE, II; John Doe # 1; and John
Doe # 2, Defendants,
andPeninsular Diesel, Inc., Nominal Defendant.
**Civ. A. No. 11905.**

Submitted: May 17, 1991.
Decided: March 3, 1992.
Revised: March 5, 1992.

On Defendants' Motion to Dismiss: Granted in Part
and Denied in Part.

**\*\*202** Kevin Gross, Rosenthal, Monhait & Gross,
P.A., Wilmington, of counsel: Robert S. Brown,
Brown, Cummins & Brown Co., L.P.A., Cincinnati,
for plaintiffs.
Gregory P. Williams, Anne C. Foster, and Chris J.
Pietrafitta, Richards, Layton & Finger, Wilmington,
for defendants Frank W. Andreae, II, and Peninsu-
lar Diesel, Inc.


MEMORANDUM OPINION

HARTNETT, Vice Chancellor.
**\*1** Although this suit was brought as a stockholder
derivative action, it is essentially an intra-family
dispute involving a small family-owned corpora-
tion. No pre-suit demand was made pursuant to
Chancery Rule 23.1 and a motion to dismiss for

that reason has been filed.

The Court finds that one of the claims of plaintiffs,
if true, sufficiently raises the reasonable doubt that
the actions of the directors **\*\*203** of Peninsular
Diesel, Inc. could not have been the result of the
proper exercise of business judgment and therefore
pre-suit demand is excused as to that claim.

Plaintiffs have, however, failed to carry their bur-
den of showing that pre-suit demand is excused as
to the other claims and they therefore must be dis-
missed.

Defendants' motion to strike the naming of John
Doe # 1 and John Doe # 2 as defendants must also
be granted. Defendants' motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted must be denied.


I

It is somewhat difficult to ascertain from the com-
plaint the legal rationale for plaintiffs' claims. The
facts, according to the complaint, are that corporate
defendant Peninsular Diesel, Inc. ("Peninsular
Diesel") was, until the recent sale of its assets, a
franchised distributor for Detroit Diesel Corpora-
tion ("DDC"), the Allison Transmission Division of
General Motors Corporation and other businesses.
Defendant Frank W. Andreae, II, owns all the
shares of Class A Voting common stock of Penin-
sular Diesel and is the President and a director of
the corporation. The remaining defendants desig-
nated as "John Doe # 1" and "John Doe # 2" ("Doe
directors"), whose true identities are not disclosed,
although apparently known, are also allegedly dir-
ectors of Peninsular Diesel and with Frank Andreae
constitute the entire Board of Directors.

The plaintiffs are owners of Class B Non-Voting
Shares of common stock of Peninsular Diesel, col-
lectively owning 66% of the outstanding common
shares.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                            Page 2
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

Plaintiffs claim that Frank Andreae has grossly mis-managed Peninsular Diesel and has otherwise dis-regarded the best interests of the corporation in or-der to benefit or protect himself. The earliest in-stance of this alleged mismanagement was the fir-ing of Clark Andreae, Jr., a Vice President of Pen-insular Diesel, in November of 1987.

According to the complaint, Clark Andreae was dis-missed by Frank Andreae in part because he objec-ted to Frank Andreae's decision to continue devel-oping Peninsular Diesel's "6.2 Engine Program". Peninsular Diesel's then existing Articles of Incor-poration did not permit this type of unilateral action by Frank Andreae. In April of 1988, Frank Andreae allegedly asked the Board of Directors **204 to ex-ecute a unanimous consent stating that: (1) Clark Andreae had been suspended by Frank Andreae; (2) Clark Andreae had indicated that he would pursue a claim for damages against the corporation in con-nection with the suspension; and (3) it appeared to be in the best interests of Peninsular Diesel and its shareholders to resolve the dispute by repurchasing Clark Andreae's and his immediate family's Penin-sular Diesel stock. Frank Andreae advocated a re-purchase price of $2,044,000.

*2 Plaintiffs assert that the repurchase plan was re-commended by Frank Andreae so that he could avoid potential personal liability for the unauthor-ized firing of Clark Andreae. They further urge that these actions demonstrate Frank Andreae's gross mismanagement and his disregard for the best in-terests of Peninsular Diesel's other shareholders.

Since 1985, Peninsular Diesel's reported sales and profits have declined sharply. Its reported sales and profits for 1989 fell well short of the projected fig-ures in its Business Plan Forecast. Plaintiffs point to these decreasing profits, and more specifically the "very substantial, and increasing losses" gener-ated by the "6.2 Engine Program" to support their claim that Frank Andreae has grossly mismanaged the corporation.

Plaintiffs also claim that Frank Andreae caused im-

proper accounting adjustments to be made to Penin-sular Diesel's books in order to overstate its profits or understate its losses. They contend that he re-duced the Customer Deposit Account by $474,530 and credited this amount to income, even though such action was in direct contradiction with previ-ous Peninsular Diesel accounting procedures. Plaintiffs assert that income was again overstated when he attributed a DDC obsolete inventory credit to income rather than to an account payable. He also allegedly caused the corporation to improperly credit $40,000 to his federal income tax withhold-ing account in order to avoid liability for underpay-ment of his quarterly estimated federal income tax.

Concerned about the decline in profits, certain of the plaintiffs wrote to Frank Andreae in November of 1989. They expressed their concern about Penin-sular Diesel's earnings, the accounting adjustments, and the perceived possibility that the corporation would lose its DDC franchise. Their letter included a seven-point remedial plan and an offer to assist Frank Andreae in the revitalization of Peninsular Diesel. In response, Frank Andreae suspended the mailing of monthly financial statements to plaintiffs.

**205 Plaintiffs then wrote to Frank Andreae de-manding the renewed distribution of financial state-ments, confirmation of whether the DDC franchise would be renewed, and a response to the issues raised by their November letter. Frank Andreae agreed on April 11, 1990 to provide plaintiffs with quarterly, rather than the requested monthly, finan-cial statements. On April 19, 1990, Frank Andreae provided plaintiffs with a copy of a letter from the president of DDC indicating that Peninsular Dies-el's franchise would not be renewed unless a more sales-oriented executive was brought into the cor-poration and given a significant equity position.

On April 20, 1990, plaintiffs Gail P. Andreae and Mark A. Andreae sent to Peninsular Diesel a re-quest to inspect its books and records pursuant to 8 *Del.C.* § 220. Peninsular Diesel responded in May of 1990 by offering to permit plaintiffs to inspect

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                              Page 3
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

the tax returns for the previous three years and to inspect the monthly financial statements that plaintiffs had not received. Plaintiffs' other requests were denied. Plaintiffs brought suit in this Court on May 19, 1990 seeking a right to inspect. That suit was settled when Frank Andreae agreed to permit a specifically described inspection. Although the inspection was conducted in August of 1990, plaintiffs contend in this suit that they were not given access to all the agreed upon documents.

\*3 On May 2, 1990, one of the plaintiffs apparently heard that Frank Andreae was considering selling Peninsular Diesel. After numerous requests, he received a copy of a proposed Letter of Intent between Peninsular Diesel, DDC and Frank Andreae. The letter provided, in part, that Frank Andreae would receive $500,000 in consideration for an agreement of noncompetition and confidentiality. Plaintiffs allege that this noncompetition agreement, for which there was no separate or independent bargaining, directly reduced the $1 million over book value sale price that Peninsular Diesel was originally to receive in the transaction. Plaintiffs argue that the personal diversion of $500,000 to Frank Andreae was imposed by him as a condition of the sale, thereby depriving Peninsular Diesel of the $500,000 it otherwise would have received.

The sale transaction closed between October 19 and October 30, 1990. Prior to the closing, plaintiffs claim that Frank Andreae improperly listed as current expenses, rather than capitalizing them, certain improvements to Peninsular Diesel assets that were retained in corporate form. They further claim that he intends to obtain a Freightliner truck dealership, and will use these retained Peninsular Diesel assets in its operation. It is further claimed such action would \*\*206 benefit Frank Andreae and his children, to the exclusion of the other Peninsular Diesel shareholders, although plaintiffs do not state just how this is so.

The suit was brought as a stockholder derivative action and plaintiffs allege that: (1) the directors of Peninsular Diesel have breached their fiduciary du-

ties to the corporation; (2) the directors have grossly mismanaged the corporation; and (3) Frank Andreae has usurped to himself a corporate opportunity. Plaintiffs further allege that no pre-suit demand was made on Peninsular Diesel's Board of Directors because the directors, although unnamed, authorized and acquiesced in the challenged transactions and were otherwise dominated by Frank Andreae. They also assert that pre-suit demand was excused because Frank Andreae personally benefitted from the directors' wrongdoing.

Plaintiffs also seek the appointment of a receiver for Peninsular Diesel and an accounting.

Defendants Frank W. Andreae and Peninsular Diesel have moved pursuant to Chancery Rule 23.1 to dismiss the complaint for the failure of the plaintiffs to have made a pre-suit demand on Peninsular Diesel's directors and for the failure to have adequately pled a basis for a pre-suit demand being excused. Defendants have also moved pursuant to Chancery Rule 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief may be granted. Finally, defendants have moved pursuant to Chancery Rule 12(f) to strike all references to the "John Doe" directors.

II

In order to pursue a stockholder derivative litigation on behalf of a corporation, a stockholder must meet the requirements of Chancery Rule 23.1. In addition to the requirement that a plaintiff own stock in the corporation at the time of the transaction of which he complains, Rule 23.1 requires the plaintiff to

\*4 "allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort."

Compliance with the demand requirement is not merely procedural, but rather is a matter of sub-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                Page 4
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

stantive right. *Tandy-crafts, Inc. v. Initio Partners,* Del.Supr., 562 A.2d 1162 (1989); *Haber v. Bell,* Del. Ch., 465 A.2d 353 (1983).

Because it is the corporation itself that suffers the injury complained of in a stockholder derivative action, the corporation **207 must be given the opportunity to decide whether suit should be brought, and if it is, how it will be conducted. *Spiegel v. Buntrock,* Del.Supr., 571 A.2d 767 (1990). This policy of allowing corporate control of litigation brought on its behalf is the underpinning for the requirement that a stockholder make demand on the Board of Directors for relief before a stockholder derivative action may be brought. If, however, the stockholder can show that pre-suit demand on the Board would have been futile, the demand requirement is excused.

When confronted with a claim of demand futility, this Court must determine whether, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

The Delaware Supreme Court has recently made it clear that the two aspects of the demand futility test are "two alternative hurdles, either of which a derivative shareholder complainant must overcome to successfully withstand a Rule 23.1 motion." *Levine v. Smith,* 591 A.2d 194, 206 (1991). Once either showing is made, it may be inferred that the Board is incapable of making a valid decision about the derivative claim. *Id.*

In order to establish demand futility under the first prong of the test, the stockholder must show, through the pleading of particularized facts, that a majority of the Board have a financial interest in the transaction or are so dominated by the proponent of the transaction that their "discretion is sterilize[d]." *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779, 784 (1981). If the stock-

*holder fails to make this showing, he must overcome the second prong of the test in order to demonstrate demand futility.*

Absent a showing of director interest or domination, the stockholder must plead particularized facts that create a reasonable doubt that the challenged transaction was the result of a valid exercise of business judgment. In essence, the stockholder must rebut the presumption of the business judgment rule that the directors "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* 473 A.2d at 812.

*5 Because plaintiffs did not make a pre-suit demand on the Board of Peninsular Diesel, they must overcome one of the hurdles of the demand futility test.

### **208 III

Plaintiffs first claim that a pre-suit demand on the Board of Peninsular Diesel would have been futile because the directors were interested in the challenged transactions and lacked independence. In support of this contention, plaintiffs claim that Frank Andreae usurped a corporate opportunity when he negotiated and accepted $500,000 for a noncompetition agreement with the purchaser of Peninsular Diesel's assets, DDC, and that the Board of Directors was dominated by him.

The complaint states that the original agreed upon price was $1 million over the book value of the corporation's assets. Plaintiffs allege that Frank Andreae renegotiated the terms of the sale so that $500,000 of the $1 million premium was diverted to him by means of a personal noncompetition agreement between himself and DDC. According to plaintiffs, Peninsular Diesel had an expectancy therefore to the $500,000 that Frank Andreae wrongfully appropriated to himself.

Even if Frank Andreae, however, was financially interested in this transaction, plaintiffs have failed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 5
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

to allege that the other two directors received any financial gain from the transaction. Because the complaint does not create a reasonable doubt about the disinterestedness of a majority of the Board, demand cannot be excused on this ground.

### IV

Plaintiffs also claim that the directors lacked independence because Frank Andreae dominated the other two directors. Because Frank Andreae is the owner of all of Peninsular Diesel's voting stock, he alone chooses the members of the Board. Plaintiffs contend that this ability to elect all the directors creates a conclusive presumption of Frank Andreae's domination of the Board, because the other two directors are entirely beholden to Frank Andreae for their positions.

Plaintiffs' argument has consistently been rejected by the Delaware courts. *Grobow v. Perot,* Del.Ch., 526 A.2d 914, 924 (1987), *aff'd,*539 A.2d 180 (1988); *Stein v. Orloff,* Del.Ch., C.A. No. 7276-NC, Hartnett, V.C., slip op. at 11 (May 10, 1985). The Delaware Supreme Court, in *Aronson v. Lewis, supra,* stated that

"it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person **209 becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches upon independence."

Stated differently, the relevant inquiry is not how the director got his position, but rather how he comports himself in that position.

Plaintiffs have not pled any facts that demonstrate that the unnamed directors did not exercise their own independent business judgment in decision-making or that they merely submitted to the will of Frank Andreae. With only a conclusory allegation of domination, and nothing more, plaintiffs have failed to create a reasonable doubt as to the independence of a majority of the Peninsular Diesel Board.

### V

*6 Having failed to satisfy the first prong of the demand futility test, in order to withstand the motion to dismiss, plaintiffs are required to plead particularized facts that would create a reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment.

The business judgment rule is a presumption that the directors of a corporation have informed themselves and have acted in the best interests of the corporation when making a business decision. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872 (1985); *Stroud v. Grace,* Del.Ch., C.A. No. 10719-NC, Hartnett, V.C., mem. op. at 15 (Nov. 1, 1990). Unless that presumption is rebutted, a Court cannot substitute its judgment for that of the directors when their decision can be attributed to any rational business purpose. *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946, 954 (1985).

Plaintiffs advance four arguments in support of their claim that a pre-suit demand on the Board of Peninsular Diesel would have been futile because the challenged transactions were not the result of a valid exercise of business judgment. First, plaintiffs claim that in approving the terms of the sale of Peninsular Diesel's assets, the directors' action was "patently improper" because they failed to obtain the best possible price for the corporation's assets. Secondly, plaintiffs allege that the directors approved the repurchase of Clark Andreae's stock without fully informing themselves as to all material facts surrounding the transaction. Thirdly, plaintiffs assert that Peninsular Diesel has been grossly mismanaged. Finally, plaintiffs contend**210 that the falsification of Frank Andreae's tax withholding records, allegedly exposing Peninsular Diesel to criminal liability, cannot be the product of a valid business judgment.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 6
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

## VI

When all the allegations of the complaint are considered as a whole, plaintiffs have borne their burden (if only barely so) of alleging facts which, if true, reasonably raise the doubt that a diversion of one-half of the premium portion of the sale price of the corporation to Frank Andreae was the result of a valid exercise of business judgment.

According to plaintiffs, the payment to Frank Andreae of $500,000 directly reduced by one-half the original $1 million over book value sale price. If Peninsular Diesel would have otherwise received $1 million but instead received half that amount for no apparent valid business reason, no person of ordinary, sound business judgment would deem the revised sale price to be proper. *Compare Grobow v. Perot,* Del.Supr., 539 A.2d 180 (1988) (where Board paid substantial premium in repurchase of dissident director's shares, but it was held that waste was not sufficiently alleged because complaint itself showed business purposes for the premium) *with Avacus Partners, L.P. v. Brian,* Del. Ch., C.A. No. 11,001-NC, Allen, C. (Oct. 24, 1990) (where corporation paid over 10 times fair market value for stock and 100 times recently established purchase price of another corporation, it was held that waste was sufficiently alleged to withstand Rule 23.1 motion to dismiss). *See also Caruana v. Saligman,* Del. Ch., C.A. No. 11,135-NC, Chandler, V.C. (Dec. 21, 1990) (mere seven percent reduction in sale price of subsidiary was held to be insufficient to state claim of waste).

\*7 Because plaintiffs have created a reasonable doubt that the Board's decision to sell Peninsular Diesel's assets at one-half of the originally agreed premium (if true) could have been the product of a valid exercise of business judgment pre-suit demand on the Board as to claims challenging the sale transaction is excused, and defendants' motion to dismiss this claim must be denied.

Plaintiffs next contend that the business judgment rule's protection is not available to the Peninsular Diesel directors to shield from judicial scrutiny their approval of the repurchase of Clark Andreae's stock. According to plaintiffs, Frank Andreae's dismissal \*\*211 of Clark Andreae violated the corporation's Articles of Incorporation as they existed at that time. Plaintiffs further assert that Frank Andreae directed the Board to execute a unanimous consent stating that Clark Andreae had only been suspended and that it would be in the best interests of the corporation to buy back Clark Andreae's stock and thereby preclude possible litigation against Peninsular Diesel. Clark Andreae's stock was subsequently repurchased by Peninsular Diesel for approximately $2,044,000. Plaintiffs assert that the unnamed directors failed to inform themselves of the circumstances surrounding this action in that Frank Andreae was only seeking to protect himself from personal liability.

Plaintiffs however have failed to allege facts which, if true, would create a reasonable doubt that the majority of the directors' approval of the stock repurchase was not the result of a valid exercise of their business judgment. The complaint is devoid of any allegations that the price paid for Clark Andreae's stock was excessive or that the corporation was in some other way injured by the transaction. The bare assertion that the Doe directors failed to inform themselves regarding "material facts" is insufficient to rebut the business judgment rule's presumption that the directors acted in an informed manner.

Even if the allegation that Frank Andreae proposed this transaction solely to avoid personal liability is accepted as being true, plaintiffs have not pled facts that could lead to the reasonable conclusion that the unnamed directors were unaware of this motivation or that avoiding litigation with Clark Andreae was not a rational business purpose for their decision. Demand on the Board of Peninsular Diesel therefore cannot be excused on this ground.

## VII

## VIII

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                      Page 7
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

Plaintiffs also contend that Peninsular Diesel has been grossly mismanaged by Frank Andreae and the unnamed directors and that the directors have consistently made poor decisions regarding the operations of Peninsular Diesel. Plaintiffs give as examples: the Board's refusal to meet DDC's demand that a new sales executive be put in a position such as Chief Operating Officer; the Board's "roundly criticized" commitment to the 6.2 Engine Program; and the Board's approval of accounting procedures that were in contradiction to the recommendations of Peninsular Diesel's auditors. According to plaintiffs, the results of this alleged mismanagement have been the loss of the DDC franchise, substantial financial losses in **212 connection with the 6.2 Engine Program, and a significant decline in the profitability of Peninsular Diesel which has been somewhat "understated" by the accounting procedures adopted by the Board.

*8 The decisions that plaintiffs contend support a claim of gross mismanagement are precisely the types of operating decisions that the business judgment rule is meant to protect. The fact that Peninsular Diesel suffered losses overall and more specifically in connection with the 6.2 Engine Program cannot by itself defeat the presumption of propriety a Board enjoys. Moreover, there have not been alleged facts which, if true, could lead the Court to reasonably conclude that the change in accounting procedures, even though against the advice of the corporation's auditors, was without a rational business purpose. And while plaintiffs may think it would have been more prudent for the directors to acquiesce in DDC's demand for new leadership of Peninsular Diesel in exchange for the renewal of their franchise, this Court may not engage in such second-guessing absent specific allegations of how the Board failed to fulfill its duty to make an informed, good faith decision.

Plaintiffs have not even alleged that the directors failed to inform themselves or that they did not act in a good faith belief that these operating decisions were in the best interests of the corporation. They

have therefore failed to allege facts that could create a reasonable doubt that the Board exercised its valid business judgment in connection with these decisions.

### IX

Plaintiffs' final claim in support of their contention that the directors did not properly exercise their business judgment is that Frank Andreae required Peninsular Diesel to falsely report to the Internal Revenue Service that $40,000 had been withheld from his compensation. Allegedly Frank Andreae wrote a personal check to the corporation to cover this amount. According to plaintiffs, this was done so that Frank Andreae could avoid the penalties that are incurred when too small an amount for taxes is withheld from compensation.

Even accepting, arguendo, plaintiffs' contention that Frank Andreae caused a false report to be made, plaintiffs have made no allegation that the other two directors were in any way involved in this transaction. Because the other directors make up a majority of the Board, plaintiffs have failed to allege particularized facts that would create a reasonable doubt that a majority of the directors did **213 not validly exercise their business judgment (if they made any judgment at all). Plaintiffs have also failed to assert how the corporation suffered any injury from this transaction. Pre-suit demand on the Board of Peninsular Diesel therefore cannot be excused on this ground.

### X

Plaintiffs have also requested this Court to appoint a "receiver" for Peninsular Diesel and order an accounting. Plaintiffs have not, however, set forth any basis for this relief, leaving the Court to speculate as to their rationale.

At the outset it should be noted that unless Peninsular Diesel is insolvent or is being liquidated (neither of which has been alleged), it would be a custodian,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

not a receiver, that would be appointed to conduct the business of Peninsular Diesel. See BALOTTI & FINKELSTEIN, *The Delaware Law of Corporations and Business Organizations,* 2d Ed. § 7.50 (1990). While the two terms have been used somewhat interchangeably throughout our caselaw, the distinction should be made because they have different statutory antecedents. *Compare 8 Del.C. §* 226(b)*with*8 *Del.C.* § 291.

\*9 In general, there are two bases for the appointment of a custodian: (1) when the stockholder or director deadlock scenarios set forth in 8 *Del.C.* § 226 occur; or (2) when the managers of the corporation are guilty of fraud, gross mismanagement or creating such extreme circumstances that cause the imminent danger of great loss which cannot otherwise be prevented. *Hall v. John S. Isaacs & Sons Farms, Inc.,* Del.Supr., 163 A.2d 288 (1960). As plaintiffs have not alleged that any of the § 226 deadlock situations exist, they must be proceeding on the second theory of imminent danger to the corporation.

A very strong showing of fraud or gross mismanagement by the Board must be made before this Court will exercise its discretion to appoint a custodian for a solvent corporation. *Tansey v. Oil Producing Royalties, Inc.,* Del.Ch., 133 A.2d 141 (1957). Plaintiffs have alleged facts asserting an improper diversion of one-half of the premium for the sale of the assets of the corporation. This allegation is sufficient to state a claim that might, at some later stage, lead to the Court's appointing a custodian for the corporation. Defendants' motion to dismiss these prayers for relief pursuant to Chancery Rule 12(b)(6) is therefore denied.

## \*\*214 XI

In addition to their motions to dismiss, defendants have moved to strike the complaint's references to the "John Doe" directors. In support of their motion defendants cite *Hutchinson v. Fish Engineering Corp.,* Del. Ch., 153 A.2d 594 (1959), in which it

was held that the naming of "Doe" defendants is impermissible in Delaware.

Although plaintiffs concede that *Hutchinson* expresses the Delaware courts' disfavor of the use of fictitious names, they argue that the references to the "John Doe" directors in the complaint should not be stricken at this stage of the proceedings because the named defendants have prevented the plaintiffs from ascertaining the names of the current directors of the corporation. Because Frank Andreae owns all of the corporation's voting stock, plaintiffs claim that they have been excluded from the election process and have not been informed of the outcome of corporate elections.

Plaintiffs' naming of "John Doe" defendants here is puzzling, however, because plaintiffs commenced a prior action in this Court pursuant to 8 *Del.C.* § 220 seeking the production of books and records of Peninsular Diesel and in that suit they apparently learned the identities of the directors, in addition to Frank Andreae, who allegedly were responsible for the alleged breach of fiduciary duties.

The purpose of the fictitious names practice, where it is permitted, is to toll the statute of limitations if a plaintiff cannot through reasonable diligence ascertain the identity of the appropriate defendant. *See*59 AM.JUR.2d *Parties* §§ 16, 17 (1987). Even if Delaware condoned this pleading practice, plaintiffs could not meet the basic prerequisite that permits it because they know, or should know, the identities of the appropriate defendants. Defendants' motion to strike the complaint's references to the "Doe" directors must, therefore, be granted.

## XII

\*10 In summary, all the stockholder derivative claims of the complaint, except those claims relating to the diversion of $500,000 of the sales price to Frank Andreae, II, are dismissed pursuant to Chancery Rule 23.1 because plaintiffs did not make a pre-suit demand on Peninsular Diesel's Board or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                          Page 9
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

plead particularized facts that show that a pre-suit demand would have been futile. Plaintiffs' claim for the appointment of a custodian is not dismissed pursuant to Chancery Rule 12(b)(6) because plaintiffs have pled facts which, if true, might eventually lead to the appointment of a custodian for the corporation. **215 Defendants' remaining motion, that references to the "John Doe" directors be stricken, is granted.

IT IS SO ORDERED.

Del.Ch.,1992.
Andreae v. Andreae
Not Reported in A.2d, 1992 WL 43924 (Del.Ch.), Fed. Sec. L. Rep. P 96,571, 18 Del. J. Corp. L. 197

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 3



Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874750 (Del.Ch.)

Page 1

**H**
Brudno v. Wise
Del.Ch.,2003.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Stephen BRUDNO
v.
William A. WISE, Byron Allumbaugh, John M.
Bissell, Juan Carlos Braniff, James F. Gibbons, An-
thony W. Hall, Jr., Ronald L. Kuehn, Jr ., J. Car-
leton MacNeil, Jr., Thomas R. McDade, Malcom
Wallop and Joe B. Wyatt, and nominal defendant El
Paso Corp.,
**No. Civ.A. 19953.**

April 1, 2003.

Dear Counsel:

STRINE, Vice Chancellor.
*1 This opinion addresses a motion to stay a deriv-
ative action brought in this court in the name of El
Paso Corporation against its directors (the
"Delaware Action"). In summary, the Delaware Ac-
tion alleges that the directors and officers of El
Paso breached their fiduciary duties by either dir-
ectly committing (in the case of the directors who
were key managers) or indirectly (by failing to pre-
vent in the case of the outside directors) serious vi-
olations of the federal securities laws and of federal
energy market regulation policies. As a remedy, the
Delaware Action primarily seeks to hold the de-
fendant-directors responsible for any damages or
costs that El Paso will incur as a result of federal
securities suits (the "Federal Securities Action")
and Federal Energy Regulatory Commission
("FERC") inquiries pending against El Paso and
certain company insiders.

In this opinion, I conclude that the Delaware Action
should be stayed for now in favor of the prior

pending Federal Securities Action. I do so not
based on any rigid application of the *McWane*[FN1]
framework, which is pressed upon me by the de-
fendants. Rather, the reasoning of this opinion re-
cognizes the inherently discretionary nature of a de-
cision on a stay motion and the importance of strik-
ing a sensible balance of the relevant competing in-
terests. Although it is true that the Delaware Action
is a derivative action and that the interests of El
Paso in that case are not perfectly aligned with the
plaintiffs in the Federal Securities Action, that lack
of alignment is not responsive to the most compel-
ling reason to enter a stay.

> FN1.*McWane Cast Iron Pipe Corp. v. Mc-
> Dowell-Wellman Eng'g Co.,* 263 A.2d 281
> (Del.1970).

In reality, the Delaware Action is a placeholder in-
demnity action filed on El Paso's behalf. The
primary relief that the plaintiffs in the Delaware
Action seek is full indemnity by the director de-
fendants for any injury suffered by El Paso as a res-
ult of the Federal Securities Action and any adverse
regulatory action by FERC. Thus, to a great extent,
the plaintiffs here expressly hinge El Paso's right to
relief on the outcome in the Federal Securities Ac-
tion. As a result, it makes little sense for this Action
to proceed until the bases for the plaintiffs' indem-
nity claims are settled, or at the very least, closer to
that point.

Given this reality, it is perhaps not surprising that
the judge handling the Federal Securities Action
consolidated a derivative action filed in her court
with the Federal Securities Action and then stayed
the derivative action. The derivative action filed in
the federal court (the "Federal Derivative Action")
was filed before the Delaware Action and raises
substantively the same claims as the Delaware Ac-
tion complaint does. In view of my federal col-
league's discretionary decision regarding the order
in which the prior-filed Federal Securities and De-
rivative Actions should proceed, it is therefore also

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874750 (Del.Ch.)

in keeping with principles of comity to enter a stay for the time being.

For these reasons, the defendants' motion for a stay is granted.

## I.

*2 El Paso is an energy company with diverse operations, ranging from actual energy production to energy trading. Beginning in July 2002, the first of eleven class action complaints were filed against El Paso and certain company insiders and advisors in the United States District Court for the Southern District of Texas. By order, the eleven actions were consolidated and are defined herein collectively as the Federal Securities Action. Since that time, the federal court has selected a lead plaintiff and a consolidated class action complaint has been filed.

The Federal Securities Action levels very serious allegations of wrongdoing at El Paso, three top managers of the company, the company's outside auditors, and the underwriter of certain company note offerings. In essence, the federal plaintiffs allege that El Paso engaged in a sustained effort to artificially inflate the public's perception of the company's performance. To that end, the company allegedly issued materially false and misleading SEC disclosures that falsely inflated company revenues and earnings.

Among the techniques allegedly used to accomplish the illicit purpose of falsely portraying El Paso's economic position were the misuse of mark-to-market accounting principles for certain company investments, the use of matched (*i.e.*, perfectly offsetting) trades by El Paso energy traders to generate phony and inflated gross revenues,[FN2] and the improper shifting of liabilities to off-balance sheet entities controlled by El Paso. As important, the company is alleged to have participated in the unlawful manipulation of the energy markets in California and to have reaped improper gains by the conduct, while simultaneously informing public investors that the company's performance was attributable to legitimate business activities. According to the Federal Securities Action complaint, the price of El Paso shares plummeted after an adverse ruling by the FERC's Chief Administrative Law Judge suggested that El Paso had violated certain legal obligations by withholding natural gas supplies to California and (the complaint implies) driving up prices, thereby reaping illicit profits.

> FN2. According to the complaint in the Federal Securities Action, "wash" or "round trip" trades are perfectly offsetting trades in commodities effected at approximately the same time. Because the trades offset exactly, the inference the Federal Securities plaintiffs urge is that the only purpose for them is to generate phony gross revenues because there are no other trading profits that the trades can generate. According to the Federal Securities plaintiffs, El Paso was touting its substantially higher transactions volumes during the time its energy traders were engaging in these "wash" or "round trip" trades.

The Federal Securities plaintiffs seek to represent a class of plaintiffs who purchased El Paso securities during the period from November 9, 2000 to September 23, 2002. On the proposed class's behalf, the complaint seeks monetary damages.

On August 22, 2002, Grunet Realty Corp. filed a derivative complaint on El Paso's behalf in the United States District Court for the Southern District of Texas. That complaint names a number of defendants not named in the Federal Securities Action; they are the outside directors of El Paso. The Federal Derivative Action points to the same conduct alleged in the Federal Securities Action and seeks to hold the El Paso board responsible for the harm that the company has suffered as a result of it.

The basis for that fiduciary-duty based contention is that certain inside directors actively participated in the misconduct, and that the outside directors are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874750 (Del.Ch.)

culpable for their failure to prevent the misconduct. Indeed, the complaint in the Federal Derivative Action acknowledges that its primary thrust is to ensure that the El Paso directors, rather than El Paso, bear ultimate responsibility for any costs arising out of the Federal Securities Actions or the FERC proceeding. To that end, one of the two counts in the Federal Derivative complaint is expressly styled as one for indemnification and/or contribution.

**\*3** On October 2, 2002, this Delaware Action was filed. Like the Federal Derivative Complaint, the complaint in the Delaware Action alleges the same misconduct as does the complaint in the Federal Securities Action and seeks to hold the El Paso outside directors responsible for any harm to El Paso from that conduct on substantially the same theories as are alleged in the Federal Derivative Complaint. Notably, the Delaware Action complaint contains the following section:

*DAMAGES SUSTAINED BY THE COMPANY*

56. The Individual Defendants' breach of fiduciary duties will cause the Company to incur millions of dollars in damages and has had, and will continue to have, devastating effects on the Company including:

*a. subjecting the Company to substantial liability as a result of the FERC having found that El Paso manipulated the price of natural gas in California;*

*b. subjecting the Company to substantial liability in securities fraud litigation based on the Individual Defendants' causing the Company to issue false financial statements and failing to make proper disclosure of,* inter alia, *the Company's violation [sic] FERC regulations; and*

*c. subjecting the Company to a possible downgrade in its credit rating.*[FN3]

FN3. Compl. ¶ 56.

Although the complaint in the Delaware Action does seek certain other relief -for example, a disgorgement of the defendant directors' remuneration for the period of time during which they were supposedly breaching their fiduciary duties - the primary thrust of the complaint is that the defendants should indemnify El Paso for any harm arising from the Federal Securities Actions and any proceedings before the FERC.

Two days after the Delaware Action was filed, Judge Lynn N. Hughes, to whom the Federal Securities Action and the Federal Derivative Action are assigned, asked the plaintiff in the Federal Derivative Action to either convert its claim to a securities claim or agree to a stay of its derivative claim. On October 8, 2002, the Federal Derivative plaintiff consented to a stay, stating "Although Grunet [the plaintiff] believes that the [Court's] Order provides no meaningful choice, it elects to stay its derivative claim without participating in discovery in the pending securities claim, without prejudice to its ability to move [the] Court either to participate in discovery or to take other actions to advance the derivative claim."[FN4]

FN4. Pl.'s Br. Ex. F.

On February 7, 2003, the defendants in the Federal Securities Action filed a motion to dismiss the consolidated complaint. Pursuant to Judge Hughes' scheduling order, briefing on that motion should now be nearly completed.

II.

The defendants in the Delaware Action have moved for a stay, citing *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Corp.*[FN5] and its progeny. In short, they contend that the Federal Securities Action and the Federal Derivative Suit constitute prior pending suits under the *McWane* doctrine and thus my discretion must incline in favor of a stay of this later filed Delaware Action. In support of that argument, the defendants note that *McWane*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874750 (Del.Ch.)

does not require a total coincidence of claims or parties between actions and that this Action involves allegations of misconduct substantively indistinguishable from the Federal Securities Action and the Federal Derivative Action, both of which were first-filed.

FN5.263 A.2d 281 (Del.1970).

*4 In response, the plaintiffs note the obvious reality that the Federal Securities plaintiffs seek to recover damages from El Paso and thus are not similarly situated to derivative plaintiffs seeking to recover damages for El Paso. They also cite authority that indicates that *McWane* does not apply to representative actions when there has been no determination that the plaintiffs in the prior filed action actually can fairly represent the interests of the plaintiffs in the later filed action.[FN6]Finally, the plaintiffs argue that the Federal Derivative Action has been stayed, is dead in the water, and therefore cannot justify a stay of this Action, which the plaintiffs contend should be regarded as the only pending derivative action on El Paso's behalf.

FN6.*E.g., Dura Pharms., Inc. v. Scandipharm, Inc.,* 713 A.2d 925, 929 n. 1 (Del.Ch.1998).

To resolve the present motion, however, I find it unnecessary to add another tree to the thick and tangled forest that has become our state's *McWane* jurisprudence. Even if the plaintiffs' preferred *forum non conveniens* standard applies, a stay is in order.[FN7]This same result also obtains, if it is remembered that this court, like all trial courts, retains the inherent discretion to control its own docket, subject only to statutory and rule constraints and the requirement to exercise its discretion rationally.[FN8]

FN7.*See generally Gen. Foods Corp. v. Cryo-Maid, Inc.,* 198 A.2d 681 (Del.1964). I acknowledge that several of the *Cryo-Maid* factors would tend to be relevant only if the primary issue addressed in this

opinion was whether this case should be stayed in favor of the Federal Derivative Action going forward. Because, for now, I choose not to confront the question of whether this Action should be stayed in favor of the now-stayed Federal Derivative Action, most of the *Cryo-Maid* factors are inapposite. What is central is the discretionary authority this court has to determine that a matter on its docket should not proceed because that procession would cause undue burdens and costs in light of related litigation pending in another jurisdiction. The "all other practical problems" prong of *Cryo-Maid* recognizes this reality and the fact that trial courts will confront stay motions based on highly variant factual scenarios.

FN8.*See Joseph v. Shell Oil Co.,* 498 A.2d 1117, 1123 (Del.Ch.1985).

At this point, "practical considerations" make it unduly complicated, inefficient, and unnecessary for this Delaware Action to proceed ahead or apace of the Federal Securities Action. In concluding that this is so, I am most fundamentally driven by my reading of the plain language of the complaint in the Delaware Action. From such a reading, the only rational conclusion that can be drawn is that the Delaware Action largely turns on the outcome of the Federal Securities Action. Put simply, if the Federal Securities Action were to lead in the exoneration of El Paso and the other defendants on the grounds that the company did not in fact engage in any type of securities violation, market manipulation, or improper conduct of any kind designed to artificially inflate the value of El Paso, it is not apparent what, if anything, would be left of this Action. As important, because this Action largely seeks to hold the director-defendants liable for any harm coming to El Paso on account of the Federal Securities Action-and the FERC proceedings, which are also intertwined in the claims pled in the Federal Securities Action-this case cannot ration-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874750 (Del.Ch.)

ally proceed to trial in advance of the Federal Securities Action. How the Federal Securities Action and the related FERC proceedings come out and what they cost are crucial to the final determination of this case as pled, because this case is, in reality, a claim primarily for indemnification.

It may be that that reality is what motivated Judge Hughes to stay the Federal Derivative Action. If that is so, it is difficult to fault the idea that the primary liability case should go forward before the case seeking indemnity, when the indemnity case's outcome necessarily depends on the outcome of the primary case.[FN9]That judgment about how the cases should precede made by a judicial colleague should not be lightly disregarded. In other words, whether or not the derivative claims are, in some measure, ripe enough for current assertion, they cannot be adjudicated in full (or even in large measure) until the Federal Securities Action is tried.

> FN9. Under Delaware law, claims for indemnity are regarded as not ripe until the liability for which indemnification is sought is determined. See Dana Corp. v. LTV Corp., 668 A.2d 752, 755-56 (Del. Ch.), aff'd,670 A.2d 1337 (Del.1995). Although my ruling does not depend on the application of this general principle to the derivative claims here, its basic logic supports the result I reach.

*5 In view of these factors, I believe that the interests of litigative efficiency, judicial economy, and comity weigh heavily in favor of the entry of a stay for the time being.Given that the overwhelming thrust of the Delaware Action complaint is a demand for indemnification largely for harm to be incurred by El Paso in the Federal Securities Action, the sensible ordering of events is for the Federal Securities Action to proceed first.

As with any stay ruling, the court should remain flexible and open to revisiting the situation as events develop. It may be that at some point in time

there would be utility to having either the Federal Derivative Action or this Action [FN10] proceed in some way at the same time as the Federal Securities Action. At this early stage, however, it seems sensible (for El Paso and its stockholders) that El Paso's resources be devoted for some time exclusively to the Federal Securities Action. Given the lack of any pressing need for the simultaneous procession of either of the derivative actions, litigative efficiency can be advanced at no discernible cost to other interests. Therefore, a stay shall be indefinitely entered.[FN11]Absent an extraordinary development that cannot be reasonably foreseen, the plaintiffs should not seek to lift the stay until the earlier of the final dismissal of the Federal Securities Action or March 1, 2004.

> FN10. Because Judge Hughes likely entered a stay largely for the same reasons as I have, I believe it premature to discuss whether this Action ought to be stayed indefinitely in favor of the earlier-filed, but now stayed, Federal Derivative Action based on a broader forum non conveniens analysis and/or in keeping with the policy undergirding McWane.That question is better addressed later when more is known about the progression of the Federal Securities Action and the Federal Derivative Action.

> FN11. The Federal Securities plaintiffs have a strong incentive to develop evidence that will be useful to the plaintiffs in this Action and the Federal Action. It is conceivable, however, that if the Federal Securities Action drags out for too long that the derivative plaintiffs might have a legitimate justification to argue for some discovery specifically directed at the outside directors of El Paso, because those directors are not a direct target of the Federal Securities plaintiffs. As indicated, the court recognizes the need to possibly revisit the stay at some time, but not within the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                              Page 6
Not Reported in A.2d, 2003 WL 1874750 (Del.Ch.)

        near future.

                III.

For the foregoing reasons, the defendants' motion
for a stay is hereby GRANTED. IT IS SO
ORDERED.

Del.Ch.,2003.
Brudno v. Wise
Not Reported in A.2d, 2003 WL 1874750 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 4



Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

**C**
Canadian Commercial Workers Industry Pension
Plan v. Alden
Del.Ch.,2006.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
CANADIAN COMMERCIAL WORKERS IN-
DUSTRY PENSION PLAN, derivatively and on
behalf of Case Financial, Inc., a Delaware corpora-
tion, Plaintiff,
v.
Eric ALDEN, Harvey Bibicoff, Gordon Gregory,
and Lorne Pollock, former and present directors
and officers of Case Financial, Inc., Defendants,
andCASE FINANCIAL, INC., a Delaware corpora-
tion, Nominal Defendant.
**No. Civ.A. 1184-N.**

Submitted Oct. 7, 2005.
Decided Feb. 22, 2006.

Michael F. Bonkowski, Chad J. Toms, Saul Ewing
LLP, Wilmington, Delaware; Timothy E. Hoeffner,
Shiloh D. Napolitan, Saul Ewing LLP, Phil-
adelphia, Pennsylvania, for Plaintiff.
Albert H. Manwaring, IV, Pepper Hamilton LLP,
Wilmington, Delaware, for Defendant Eric Alden.
Edward M. McNally, Thomas E. Hanson, Jr., Mor-
ris, James, Hitchens & Williams LLP, Wilmington,
Delaware; Robert Weiss, Narvid Scott & Schwartz,
LLP, Sherman Oaks, California, for Defendants
Harvey Bibicoff and Gordon Gregory.
William M. Lafferty, Natalie J. Haskins, Morris,
Nichols, Arsht & Tunnell, LLP, Wilmington,
Delaware; Jeffrey I. Shinder, Kerin E. Coughlin,
Constantine Cannon, New York, New York, for
Defendant Lorne M. Pollock.

MEMORANDUM OPINION

PARSONS, Vice Chancellor.

*1 Plaintiff Canadian Commercial Workers In-
dustry Pension Plan ("CCWIPP" or "Plaintiff")
brought this derivative action on behalf of nominal
defendant Case Financial, Inc. ("Case Financial")
against four former directors and officers of Case
Financial. All four individual defendants moved to
dismiss. Two individual defendants-Gordon
Gregory ("Gregory") and Lorne Pollock
("Pollock") (collectively, the "Settling Defend-
ants")-settled with CCWIPP just before argument
of their motions. This is the Court's decision on the
remaining individual defendants' motions to dis-
miss. For the reasons stated below, the Court denies
in part and grants in part defendant Eric Alden's
("Alden") and defendant Harvey Bibicoff's
("Bibicoff") motions to dismiss.

I. BACKGROUND [FN1]

> FN1. The facts set forth herein are taken
> from the First Amended Derivative Com-
> plaint ("Amended Complaint") unless oth-
> erwise indicated and accepted as true for
> purposes of the individual defendants' mo-
> tions to dismiss.

A. The Parties

CCWIPP is a Canadian pension plan. At all relev-
ant times, it owned Case Financial stock and, as of
the filing of the Amended Complaint, owned
1,449,000 shares.

Case Financial is a Delaware corporation with its
principal place of business in California. It provides
funding to personal injury attorneys to cover the
costs of litigation. The current iteration of Case
Financial came into existence via an asset purchase
agreement between a predecessor entity, also called
Case Financial, and Asia Web in or around 2002.
Asia Web bought substantially all of the assets of
the predecessor entity and then changed the name
of the resulting company to Case Financial. The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

original Case Financial entity continues to exist and is referred to by the parties as Old Case.

Defendant Alden is the former President, CEO and Co-Chairman of Case Financial. He resigned his positions on February 23, 2004.

Defendant Bibicoff is a former director of Case Financial.[FN2]He resigned as a director on October 7, 2004. From February to June 2004, Bibicoff also served as interim CEO of Case Financial.

> FN2. The Court will refer to Alden and Bibicoff collectively as "Defendants".

### B. Plaintiff's Allegations

CCWIPP advances claims against both Alden and Bibicoff for 1) breach of the duty of loyalty and corporate waste, 2) breach of the duty of oversight, i.e., a Caremark[FN3] claim, and 3) common law fraud arising out of the formation of Case Finan- cial.

> FN3.In re Caremark Int'l Derivative Litig., 698 A.2d 959 (Del.Ch.1996).

In support of its duty of loyalty claims, CCWIPP alleges, inter alia, that Alden received stock op- tions in contravention of his agreement with the Case Financial board of directors, that Alden used Case Financial property and employees to operate his tax preparation business without reimbursing Case Financial and that Alden used Case Financial capital to further his own private investments. Plaintiff also alleges that, shortly after the creation of Case Financial, Bibicoff improperly transferred accounts receivable from Old Case to an entity in which he had a significant interest, that Bibicoff improperly authorized the payment of bonuses to management and that Bibicoff usurped corporate opportunities of Case Financial by funding litiga- tion via Bibicoff & Associates, a company he ran out of his office at Case Financial.

**\*2** In support of its duty of oversight claims, CCWIPP alleges that Alden's and Bibicoff's failure

to prevent the various alleged breaches of the duty of loyalty by the other and by the Settling Defend- ants constitutes a breach of the duty of oversight as defined in Caremark.For example, having pled that Alden improperly received stock options, CCWIPP alleges that "[d]espite their knowledge of the pre- mature issuance of stock to [ ] Alden, Defendants took no action as directors of [Case Financial] to stop the issuance of these shares to [ ] Alden."[FN4]In further support of its Caremark claim, Plaintiff alleges that Alden and Bibicoff "consistently and continuously" failed to follow Case Financial's internal policies.[FN5]Finally, CCWIPP alleges that Case Financial personnel oth- er than Defendants failed to follow Case Financial's internal policies, and that Defendants "consciously ignored their duties to [Case Financial] and failed to perform their oversight responsibility to ensure, for example, that borrowers were paying the amounts due to [Case Financial] on time and in full."[FN6]

> FN4. Am. Compl. ¶ 27.

> FN5.Id. ¶ 60.

> FN6.Id. ¶ 65.

In support of its fraud claims, CCWIPP alleges that "certain of the Defendants" [FN7] provided Asia Web with materially inaccurate financial state- ments, while "Defendants" [FN8] failed to disclose to Asia Web a request by one of Old Case's lenders that Old Case perform a fraud audit. Finally, CCWIPP alleges that Defendants allowed Asia Web to purchase worthless notes from a group of investors of which Gregory was a part.

> FN7.Id. ¶ 13.

> FN8.Id. ¶ 17.

### C. Alden's Release

On June 7, 2004, Case Financial entered into an Agreement and Mutual Release (the "Release") with Alden.[FN9]The Release provided for the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

"release and discharge" by Case Financial of Alden from

> FN9.*Id.* ¶ 65; Def. Eric Alden's Opening Br. in Support of his Mot. to Dismiss Pl. [CCWIPP's] First Am. Derivative Compl. ("AOB") Ex. B. The Court may consider the Release in deciding a motion to dismiss because the Complaint makes reference to it. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d 611, 620 n. 30 (Del.Ch.2005).

any and all debts, claims, demands, liabilities, obligations, contracts, agreements, guarantees, causes of action, known and unknown, against any of them which any of them now owns, holds or has at any time heretofore owned or held by reason of any act, matter, cause or thing whatsoever done prior to the execution of this Agreement.[FN10]

> FN10. AOB Ex. B. ¶ 4.

The Release does not, however, "release or discharge Alden from any act or conduct that constitutes a crime under California and/or federal law" (the "Crime Exception").[FN11]

> FN11.*Id.*

The parties to the release waived the protections of Section 1542 of the California Civil Code ("Section 1542")[FN12] and were represented by counsel.FN13

> FN12.Cal. Civil Code § 1542 provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must materially affected his or her settlement with the debt- or."

> FN13. The parties argue and the Court agrees that California law governs the Re-

lease. It was entered into in California by a California resident and makes explicit reference to California law.

### D. Alden's Motion to Dismiss

Alden moves for dismissal on three grounds. First, he seeks dismissal of the entire Amended Complaint based on an affirmative defense. According to Alden, the Release extinguished any claims Case Financial may have had against him. Second, he moves for dismissal of Plaintiff's *Caremark* claim-Count II of the Amended Complaint-on the grounds that Plaintiff's allegations are not sufficiently egregious to fall outside of the protections of Case Financial's 102(b)(7) exculpatory provision. Finally, Alden moves in the alternative for dismissal of the entire Amended Complaint, arguing that CCWIPP is an inadequate representative of the stockholders of Case Financial under Court of Chancery Rule 23.1.

### E. Bibicoff's Motion to Dismiss

*3 Bibicoff also moves for dismissal on three grounds. First, he argues that the Case Financial board of directors improperly abdicated its duties by delegating prosecution of these claims to CCWIPP without an adequate investigation into their merits. He contends that abdication warrants dismissal of the entire Amended Complaint. Second, Bibicoff moves for dismissal of the *Caremark* claim for failure to state a claim upon which the Court can grant relief. Finally, Bibicoff moves for dismissal of the fraud claim for lack of personal jurisdiction over him because, he argues, the claim does not arise out of his conduct as a director of Case Financial. He further argues that this Court should decline to exercise "pendent" [FN14] jurisdiction over the fraud claim because the facts of the claim are unrelated to CCWIPP's fiduciary duty claims.

> FN14. Opening Br. of Defs. [Bibicoff and Gregory] in Support of their Mot. to Dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

miss ("BOB") at 16.

## II. ANALYSIS

### A. Legal Standard

The standard for dismissal pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleadings. In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint. All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true. However, neither inferences nor conclusions of fact unsupported by allegations of specific facts are accepted as true. That is, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences.[FN15]

> FN15.*Albert v. Alex Brown Mgmt. Servs.,* 2005 WL 1594085, at *12 (Del.Ch. June 29, 2005) (internal citations omitted).

### B. The Release

Alden argues that the Release extinguished any and all claims Case Financial may have had against him. "When a motion to dismiss relies upon affirmative defenses, such as waiver and release, the Court may dismiss a claim if the plaintiff includes in its pleadings facts that incontrovertibly constitute an affirmative defense to a claim."[FN16]CCWIPP has not done this with respect to the fraud and duty of loyalty claims, but has done so with respect to the *Caremark* claims against Alden.

> FN16.*Capano v. Capano,* 2003 WL 22843906, at *2 (Del.Ch. Nov.14, 2003) (internal quotation omitted).

1. The Crime Exception Creates a Factual Issue that Precludes Dismissal of the Fraud and Duty of Loyalty Claims (Counts I and III of the Amended Complaint)

CCWIPP has pled facts in connection with the fraud claim that, if proven, may constitute a violation of the federal securities laws, the California securities laws or both. If such facts are proven true, they would bar application of the Release because of the Crime Exception contained therein.

Section 10 of the Securities Exchange Act of 1934 (the "Exchange Act") provides, in relevant part, that "[i]t shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities & Exchange] Commission ["SEC"] may prescribe...."[FN17] SEC Rule 10b-5 makes it unlawful for any person

> FN17.78 U.S.C. § 78j(b).

**\*4** (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.[FN18]

> FN18.17 C.F.R. § 240.10b-5.

The federal courts repeatedly have held, although in varying forms, that "[a] violation of Rule 10b-5 comprises four elements: a (1) misleading (2) statement or omission (3) of a 'material' fact (4) made with scienter."[FN19]A federal jurisdictional means, *e.g.,* the use of the mails or "any facility of any national securities exchange,"[FN20] is an additional, necessary element of a violation of section 10 of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

the Exchange Act.[FN21]

> FN19.*U.S. v. Smith,* 155 F.3d 1051, 1063 (9th Cir.1998); *see also SEC v. Hasho,* 784 F.Supp. 1059, 1106 (S.D.N.Y.1992) ("To establish liability under [section 10 of the Exchange Act and Rule 10b-5], the SEC must establish ... (1) a misrepresentation, or an omission (where there is a duty to speak), or other fraudulent device; (2) in the offer or sale, or in connection with the purchase or sale, of a security; (3) scienter on the part of the defendant ... and (4) materiality, in the case of any misrepresentation or omission....")."Although criminal violations of § 10(b) require a showing that the act was done willfully, the elements of [ ] civil and criminal violations of the statute are otherwise the same, and courts in criminal cases frequently cite civil interpretations of the statute to determine whether there has been a violation."*In re Enron Corp. Secs., Derivative & ERISA Litig.,* 235 F.Supp.2d 549, 579 n. 18 (S.D.Tex.2002).

> FN20.*Hasho,* 784 F.Supp. at 1106.

> FN21.*SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir.1993).

Like section 10, section 25401 of the California Corporate Securities Law of 1968 provides that it is

> unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. [FN22]

> FN22.Cal. Corp.Code § 25401.

"[K]nowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them" is also an element of a violation of section 25401. [FN23]

> FN23.*People v. Simon,* 9 Cal.4th 493, 37 Cal.Rptr.2d 278, 886 P.2d 1271, 1291 (Cal.1995).

CCWIPP alleges that Defendants misstated Old Case's accounts payable and overhead to Asia Web in connection with the sale of Old Case's assets.[FN24] Plaintiff further alleges that Defendants failed to disclose significant legal fees owed by Old Case, along with a request for a fraud audit by one of Old Case's creditors.[FN25]In the aggregate, the allegedly misrepresented and omitted amounts total approximately $1.5 million.[FN26]These misstatements and omissions, Plaintiff avers, were material and induced Asia Web to issue securities to Defendants. The Amended Complaint also alleges that Defendants were aware of these misstatements and omissions.[FN27]These allegations, if proven, could give rise to a violation of California or the federal securities laws. To wit, Defendants allegedly 1) offered to buy stock from Asia Web, 2) by means of an oral communication, 3) which included a material untrue statement and 4) knew the statement was untrue. Therefore, contrary to Alden's contention, the Amended Complaint does not include facts that incontrovertibly support his affirmative defense of release to the fraud claim.

> FN24. Am. Compl. ¶ 14.

> FN25.*Id.* ¶¶ 15-17.

> FN26.*See id.* ¶¶ 14, 37 Cal.Rptr.2d 278, 886 P.2d 1271 (alleging a difference of $136,000 between the amounts disclosed and actually owed), 15 (alleging that $133,714.83 in legal bills were not disclosed), 16 (alleging that a creditor was owed $1.3 million).

> FN27.*See, e.g., id.* ¶¶ 14, 37 Cal.Rptr.2d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

278, 886 P.2d 1271 (alleging that Defendants represented that overhead would be approximately $70,000 per month when it was $200,000 per month immediately following the closing of the stock issuance), 17 (alleging that Defendants were aware of a fraud audit request letter but did not disclose it to Asia Web before closing on the asset purchase transaction).

Similarly, the Amended Complaint does not include facts that incontrovertibly constitute an affirmative defense to the duty of loyalty claim because there is a possibility, however remote, that the alleged actions may constitute crimes such as theft or common law fraud under California law. As such, the Crime Exception also precludes dismissal of the duty of loyalty claim pursuant to the Release.[FN28]

> FN28. This decision on a motion to dismiss does not preclude Alden from arguing at a later stage in this litigation that the Release, in fact, does extinguish the duty of loyalty claim.

*5 Alden argues that CCWIPP cannot defend against the motions to dismiss by arguing that the Crime Exception bars enforcement of the Release because it did not so argue in its Complaint.[FN29] Alden misapprehends Delaware law. As he correctly observes, Court of Chancery Rule 15(aaa) requires plaintiffs confronted with a Rule 12(b)(6) motion to dismiss to either stand on the allegations of their complaint or amend their complaint.[FN30] Rule 15(aaa) does not, however, require a plaintiff to make all of its *arguments* in its complaint. CCWIPP alleged *facts* that may constitute a crime in its Complaint. This is all Rule 15(aaa) requires.[FN31]

> FN29. Def. [ ] Alden's Reply Br. in Support of His Mot. to Dismiss Pl. [CCWIPP's] First Am. Derivative Compl. ("ARB") at 11-13.

> FN30. *Id.* at 12, 37 Cal.Rptr.2d 278, 886

P.2d 1271 (citing *Stern v. LF Capital Partners, LLC,* 820 A.2d 1143 (Del.Ch.2003)).

> FN31. *See Stern,* 820 A.2d at 1144 (denying motion to amend complaint where plaintiffs chose to stand on their complaint but then sought to amend to make more detailed allegations of fact based on information known to plaintiffs at time they filed original complaint); *Orman v. Cullman,* 794 A.2d 5, 28 n. 59 (Del.Ch.2002) (refusing to consider additional facts alleged in briefing on a motion to dismiss when facts were offered to substantiate allegations made in complaint).

2. The Release extinguished any claims Case Financial may have had against Alden for breaches of the duty of oversight (Count II of the Amended Complaint)

In contrast to the allegations made by CCWIPP in connection with the fraud claim, the allegations made in connection with its *Caremark* claim do not give rise to an inference that the challenged conduct may constitute a crime. At most, the allegations give rise to an inference of poor management of Case Financial.[FN32] As such, the Crime Exception does not apply to the *Caremark* claim.

> FN32. As explained *infra,* Part II.C.1, there arguably is significant overlap between the underlying wrongs complained of in the breach of loyalty claim and the "self-dealing transactions" involving directors and officers as to which the *Caremark* claim alleges Defendants failed to provide adequate oversight in conscious disregard of their duties to Case Financial. The allegations of the Amended Complaint in this regard are extremely vague and provide no support for inferring some independent form of criminal activity related to the degree of oversight. The other alleged misconduct that Defendants allegedly failed to monitor relates to mana-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

gerial concerns such as the creditworthiness of borrowers and the perfection of security interests. *See* Am. Compl. ¶ 81.

CCWIPP further argues that Alden procured the Release by fraudulent inducement and thus it is null and void. Alternatively, it argues that Alden's fraudulent nondisclosure of potential claims bars enforcement of the Release. As to the former argument, CCWIPP misapprehends California law; as to the latter, CCWIPP has pled facts that incontrovertibly refute this argument.

General releases of all claims known and unknown are completely enforceable under California law FN33 if the release explicitly covers "unknown or unanticipated claims," both parties were represented by counsel and the parties waived the protections of Section 1542.FN34The Release here satisfies these three requirements. Moreover, fraudulent inducement is not a defense to the enforcement of a general release that satisfies these requirements.FN35 Fraud in the inception, *i.e.,* one party did not know what it was signing, and a misrepresentation by a fiduciary are defenses to the enforcement of a release,FN36 but neither of those exceptions applies here.

> FN33.*Winet v. Price,* 4 Cal.App.4th 1159, 1173, 6 Cal.Rptr.2d 554 (Cal.Ct.App.1992).

> FN34.*San Diego Hospice v. County of San Diego,* 31 Cal.App.4th 1048, 1053-54, 37 Cal.Rptr.2d 501 (Cal.Ct.App.1995) (citing *Winet,* 4 Cal.App.4th at 1168, 6 Cal.Rptr.2d 554).

> FN35.*Id.*

> FN36.*Id.* at 1054-55, 6 Cal.Rptr.2d 554.

In a final attempt to avoid enforcement of the Release, CCWIPP relies upon a dictum from *San Diego Hospice* to the effect that fraudulent nondisclosure bars enforcement of a general release.FN37Even assuming that is a correct state-

ment of California law, it does not bar enforcement of Alden's Release because CCWIPP has pled facts that eliminate any requirement of disclosure on the part of Alden to Plaintiff. A duty to disclose arises when "(1) the material fact is known to (or accessible only to) the defendant and (2) *the defendant knows the plaintiff is unaware of the fact and cannot reasonably discover the undisclosed fact.*"FN38CCWIPP has pled that defendants Bibicoff and Gregory, who were serving as officers and directors of Case Financial when it entered into the Release, were aware of all of the material facts that Alden allegedly did not disclose.FN39Under California law, this knowledge is imputed to Case Financial.FN40Therefore, under the facts alleged by CCWIPP, no duty to disclose by Alden arose.

> FN37. Pl.'s Am. Mem. of Law in Opposition to Defs.' Mots. to Dismiss ("POB") at 35 (citing *San Diego Hospice,* 31 Cal.App.4th at 1055, 37 Cal.Rptr.2d 501).

> FN38.*San Diego Hospice,* 31 Cal.App.4th at 1055, 37 Cal.Rptr.2d 501 (internal citations omitted).

> FN39.*Compare* Am. Compl. ¶ 67 (listing five facts Alden allegedly did not disclose) *with* Am. Compl. ¶¶ 13-21, 58 (alleging all individual defendants had knowledge of Alden's activities).

> FN40.*Austin v. Hallmark Oil Co.,* 21 Cal.2d 718, 729, 134 P.2d 777 (Cal.1943) ("[A] corporation is presumed to know what is known to its managing officers and directors.").

*6 In sum, Plaintiff has shown no reason to bar enforcement of the Release as to the *Caremark* claim against Alden. Thus, the Court concludes that the Release bars that claim and dismisses it with prejudice.

C. The Complaint Fails to Adequately State a *Caremark* Claim

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                              Page 8
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

To state a claim for breach of the duty of oversight, CCWIPP must allege facts that show "(1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of...."[FN41] Such a claim is a difficult one to prove.[FN42]

> FN41.*Caremark,* 698 A.2d at 971;*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 833 A.2d 961, 976 (Del.Ch.2003) ("Two key elements necessary to proving a breach of fiduciary duty claim in this instance would be that (1) the directors knew or should have known that a violation of the law was occurring and, (2) 'the directors took no steps in a good faith effort to prevent or remedy that situation.' ") (quoting *Caremark,* 698 A.2d at 971).

> FN42.*Guttman v. Huang,* 823 A.2d 492, 505-06 (Del.Ch.2003); *Caremark,* 698 A.2d at 967 ("The theory here advanced is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.").

The duty of oversight implicates both the duty of care and the duty of loyalty:

> Although the *Caremark* decision is rightly seen as a prod towards greater exercise of care by directors in monitoring their corporations' compliance with legal standards, by its plain and intentional terms, the opinion articulates a standard for liability for failures of oversight that requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith. Put otherwise, the decision premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs.[FN43]

> FN43.*Guttman,* 823 A.2d at 506.

Thus, if the Amended Complaint adequately states a *Caremark* claim, the stated claim necessarily falls outside the liability waiver provided by Case Financial's 102(b)(7) exculpatory charter provision.[FN44]

> FN44.*See Caremark,* 698 A.2d at 971 ("Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation ... in my opinion only a sustained or systematic failure of the board to exercise oversight ... will establish the *lack of good faith* that is a necessary condition to liability.") (emphasis added); *Guttman,* 823 A.2d at 506 ("Functionally, *Caremark* also matches the liability landscape for most corporate directors, who are insulated from monetary damage awards by exculpatory charter provisions."); *cf. In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 290 (Del.Ch.2003) ("Where a director consciously ignores his or her duties to the corporation, thereby causing economic injury to its stockholders, the director's actions are either 'not in good faith' or 'involve intentional misconduct.' ").

Plaintiff's *Caremark* allegations fall into two categories. First, CCWIPP alleges that Defendants' failure to stop each other's and the Settling Defendants' alleged self-dealing transactions violated their duty of oversight.[FN45] Second, CCWIPP alleges that Defendants themselves, along with officers of Case Financial, "failed to follow the policies and procedures or standard industry practices to investigate the creditworthiness of the proposed borrowers."[FN46]"Thus," CCWIPP argues, "Defendants ... consciously ignored their duties to [Case Financial] and failed to perform their oversight responsibility to ensure that borrowers were paying the amounts due to [Case Financial] on time and in full."[FN47]Plaintiff's Amended Complaint avers just a few specific facts coupled with numerous general-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                        Page 9
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

izations and conclusory allegations; together, these facts and unsupported legal conclusions fall well short of stating a *Caremark* claim.

> FN45. Am. Compl. ¶¶ 27, 31, 34, 41, 45, 57, 58.

> FN46.*Id.* ¶ 63.

> FN47.*Id.* ¶ 65.

### 1. Failure to stop other Defendants' alleged self-dealing transactions

CCWIPP's claim for breach of the fiduciary duty of oversight is exceedingly general. First, they attempt to have most of their breach of loyalty allegations double as *Caremark* claims, as well, by averring that "Defendants breached [this duty of oversight] by continually failing to provide adequate oversight over the underwriting and operations of [Case Financial,] consciously ignoring their duties to [Case Financial.] Specifically, Defendants failed to (a) prevent directors and officers from engaging in self-dealing transactions...."[FN48] The Amended Complaint, however, lacks the specificity required to support a *Caremark* or conscious disregard claim, as opposed to a duty of loyalty claim, for the alleged self-dealing transactions.[FN49] A conclusory allegation at the end of a general description of self-dealing transactions that Defendants were aware of, or consciously ignored, their duties to Case Financial in failing to be aware of the challenged transactions or to stop them is not sufficient to support a separate *Caremark* claim or demonstrate conscious disregard of the directors' duties.

> FN48.*Id.* ¶ 81(a).

> FN49.*See, e.g., Guttman,* 823 A.2d at 507 ("[Plaintiffs'] conclusory complaint is empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its

work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation."); *Malpiede v. Townson,* 780 A.2d 1075, 1092-94 (Del.2001) (where, as here, a defendant raises a Section 102(b)(7) provision as a defense, a plaintiff must allege "well-pleaded facts supporting a breach of loyalty or bad faith claim"); *David B. Shaev Profit Sharing Account v. Armstrong,* No. 1449-N, slip op. at 11-12 & n. 13 (Del. Ch. Feb. 13, 2006) (listing a variety of ways a plaintiff can plead a *Caremark* claim, but concluding, in the demand excusal context, that plaintiff's bald allegations that defendants should have known about wrongdoing within the company simply because of the financial materiality of the wrongdoing were insufficient).

**\*7** The Amended Complaint identified seven or eight self-dealing transactions. Defendant Alden allegedly participated in and benefited from at least half of those actions.[FN50]The other individual Defendant, Bibicoff, approved at least two of those transactions. Some or all of these incidents may give rise to liability on the part of Alden or Bibicoff or both under a breach of the duty of loyalty theory. On the facts alleged, however, they fail to support a *Caremark* claim. As an interested party, Alden had loyalty obligations, but neither logic nor precedent suggests he had a separate enforceable duty to oversee his own actions in such circumstances.[FN51]For example, CCWIPP alleges that Alden failed to prevent Bibicoff from investing his own money in lines of business similar to those pursued by Case Financial and that Alden and Bibicoff failed to stop each other and the Settling Defendants from running other businesses out of their Case Financial offices. But, directors of Delaware corporations generally have no duty to monitor the personal affairs of other directors and officers.[FN52]In addition, the Amended Complaint fails to allege specific facts showing that the accused directors had knowledge

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

of the alleged wrongdoing or ignored a "red flag" regarding it or that the board exhibited a sustained or systematic failure to exercise oversight.[FN53]

> FN50.*See* Am. Compl. ¶¶ 23-27, 32-34, 47-49 and 50-53.

> FN51. Similarly, alleged self-dealing activities of Bibicoff himself, *see id.* ¶¶ 28-31, 35-41, cannot provide the predicate for a claim that Bibicoff breached his duty of oversight. Further, based on the scant facts alleged, the decision by Bibicoff and Gregory, as members of the Compensation Committee of the Case Financial board, to pay Alden and Pollock bonuses to cover taxes related to the receipt of company stock, *see id.* ¶ 32, provides no basis for a duty of oversight claim. Bibicoff conceivably could be liable for a breach of loyalty in that situation, but Defendants' motion does not address that issue. Moreover, the allegations regarding the decision to pay bonuses to cover taxes lack specificity in terms of, for example, whether Bibicoff's approval of that transaction was disinterested, independent and informed, and whether it proximately resulted in any loss to the corporation.

> FN52.*Beam,* 833 A.2d at 971.

> FN53.*See id.*("In *Graham v. Allis-Chalmers Manufacturing Co.,* the Delaware Supreme Court held that 'absent cause for suspicion there is no duty upon directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.... [T]he quoted statement in *Graham* refers to wrongdoing *by the corporation.*"); *Caremark,* 698 A.2d at 971.

The remaining self-dealing transactions that CCWIPP alleges Defendants failed to stop do not come close to the level of sustained or systematic failure of oversight necessary to sustain a *Caremark* claim. The Amended Complaint provides few, if any, details regarding the various incidents. No dates are given for some and others appear to have occurred before Case Financial even existed. CCWIPP's pleading also fails to provide much, if any, specific information on any damage that proximately resulted from the alleged failures of oversight.

2. Failure to oversee Case Financial personnel FN54

> FN54. Plaintiffs' argument that Defendants should be held to a higher standard of care because they are professionals-Alden is a CPA, while Bibicoff is an attorney-is unavailing. First, no Delaware case has held that directors with professional qualifications are held to a higher standard of care in the duty of oversight context. Second, CCWIPP fails to articulate how Defendants' status as professionals provides them greater ability to ferret out wrongdoing or puts them in a "unique position to know" what their fellow directors are doing. *Cf. In re Emerging Commc'ns S'holders Litig.,* 2004 WL 1305745, at *39-40 (Del.Ch. May 3, 2004) (holding after a full trial on the merits that a director with *financial expertise* and "in a unique position to know" should have argued more vociferously that the *$10.25 price* of a proposed transaction was unfair where the court concluded that the price was $27.80/share too low and that the director was not independent); *see also* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004? A Retrospective on Some Key Developments,* 153 U. Pa. L.Rev. 1399, 1445-47 (2005) ("It would be a perversity of corporate governance goals, in my view, for the Delaware courts to announce a gen-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

eral rule that a director with special expertise is more exposed to liability than other directors solely because of her status as an expert. Rather, the facts and procedural posture should be key.").

To reiterate, in order to state a *Caremark* claim adequately, CCWIPP must plead facts that would support a reasonable inference that there was a "sustained or systematic" failure of oversight.[FN55]"In other words, liability is premised on a showing that the directors were conscious of the fact that they were not doing their jobs."[FN56]

> FN55.*Caremark,* 698 A.2d at 971.

> FN56.*Saito v. McCall,* 2004 WL 3029876, at *6 (Del.Ch. Dec.20, 2004) (internal quotation omitted), *aff'd,*2005 Del. LEXIS 106 (Del. Mar. 8, 2005); *Guttman,* 823 A.2d at 506.

CCWIPP has not pled such a sustained or systematic failure. At most, Plaintiff has pled facts detailing one concrete incident in which it is possible Case Financial's policies were not followed.[FN57]The few remaining paragraphs of the Amended Complaint addressed to the *Caremark* claim only broadly allege that procedures were not followed.[FN58]CCWIPP does not describe how Defendants, as directors, interacted with Case Financial personnel, how much time they spent, or did not spend, overseeing the activities of Case Financial personnel, etc. In fact, Plaintiff pleads that Case Financial used both an Underwriting Manual and a Standard Operating Procedures Manual,[FN59] so it arguably had adequate procedures and safeguards. The *Caremark* section of the Amended Complaint then conclusorily avers that Defendants "ignored their duties to the Company."[FN60]Absent supporting facts, such bald conclusions need not and will not be accepted as sufficient to survive a motion to dismiss. [FN61]

> FN57. Am. Compl. ¶¶ 61-62. This sole

specific example of a violation of Case Financial's policies relates to advances Alden made to an attorney in March and April of 2001, more than a year before the formation of Case Financial. CCWIPP complains that two years later Defendants still had not taken "any affirmative action to recover these fees."*Id.* ¶ 62.Perhaps, CCWIPP could have questioned that inaction as a breach of the duty of care, but, as pled, it does not provide a basis for a breach of the duty of *oversight* claim that would be outside the protections of Case Financial's 102(b)(7) exculpatory provision.

> FN58.*See id.* ¶¶ 63-64 ("[O]fficers responsible for the underwriting analysis on behalf of [Case Financial] failed to follow the policies and procedures.... In addition, for many of these loans, the Company failed to perfect the security interests it received....").*Cf. Saito,* 2004 WL 3029876, at *7 (concluding that plaintiffs had "barely" stated a *Caremark* claim even though they had pled numerous, specific facts demonstrating that directors should have been aware of accounting irregularities and a $40-$55 million accounting problem in an acquisition target).

> FN59. Am. Compl. ¶ 59.

> FN60.*Id.* ¶ 65.

> FN61.*In re Walt Disney Co.,* 825 A.2d at 285 ("Conclusory statements, without specific allegations to support them, will not suffice [to survive a 12(b)(6) motion to dismiss]."); *UbiquiTel Inc. v. Sprint Corp.,* 2005 WL 3533697, at *2 (Del.Ch. Dec.14, 2005) ("Neither inferences nor conclusions of fact unsupported by allegations of specific facts are accepted as true.") (internal quotation omitted).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                          Page 12
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

*8 CCWIPP also has not pled specific facts supporting a reasonable inference that Defendants were conscious of the fact that they were not doing their jobs. Likewise, the Amended Complaint contains no specific allegations that Defendants ignored red flags that should have alerted them that Case Financial personnel were ignoring company policies.

CCWIPP's allegations, therefore, fail to meet the requirements for pleading a *Caremark* claim. Thus, the Court dismisses Plaintiff's *Caremark* claim as to both Alden and Bibicoff.[FN62]

> FN62. CCWIPP's failure to state a *Caremark* claim provides an independent, alternative ground for dismissal of this claim as to Alden.

D. Adequacy of CCWIPP as a Derivative Plaintiff

To pursue a derivative claim, CCWIPP must satisfy the adequacy requirements of Court of Chancery Rule 23.1.[FN63] The burden of proof, however, rests with the defendant challenging a plaintiff's adequacy.[FN64] Alden contends that CCWIPP is not an adequate derivative plaintiff for the Case Financial stockholders because 1) CCWIPP is a creditor of Case Financial as well as a stockholder, 2) CCWIPP is not the driving force behind the litigation and 3) CCWIPP "bears a high degree of vindictiveness toward [him]."[FN65] To prevail, Alden "must show a *substantial likelihood* that the derivative action is not being maintained for the benefit of the shareholders."[FN66]

> FN63.*Emerald Partners v. Berlin,* 564 A.2d 670, 673 (Del.Ch.1989) ("Although Chancery Rule 23.1 contains no specific requirements as to the competency of a stockholder derivative plaintiff, the analogous adequacy requirements of Chancery Rule 23, which relates to class actions, is applied....Rule 23.1 is intended to make explicit that adequacy of representation is a requirement of derivative as well as class actions.") (internal citations and quotation

> omitted).

> FN64.*Id.* at 674.

> FN65. AOB at 25.

> FN66.*Emerald Partners,* 564 A.2d at 674 (emphasis added) (citing *Youngman v. Tahmoush,* 457 A.2d 376, 380 (Del.Ch.1983); *Owen v. Modern Diversified Indus., Inc.,* 643 F.2d 441 (6th Cir.1981)).

The elements relevant to this inquiry are

(1) the existence of economic antagonisms between the plaintiff and those he would represent; (2) the nature of the remedy sought; (3) indications that the named plaintiff was not the driving force behind the litigation; (4) plaintiff's unfamiliarity with the litigation; (5) the existence of other litigation pending between plaintiff and defendants; (6) the relative magnitude of plaintiff's personal interests as compared with his interest in the derivative action itself; (7) plaintiff's vindictiveness toward the defendants; and (8) the degree of support plaintiff receives from the stockholders he purports to represent.[FN67]

> FN67. Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 9-2[b] (2005) [hereinafter *Wolfe & Pittenger* ] (citing *Katz v. Plant Indus., Inc.,* 1981 WL 15148, at *2 (Del.Ch. Oct.27, 1981)); *accord Youngman,* 457 A.2d 376.

A combination of these factors often forms the basis of a dismissal of a plaintiff as inadequate, but a strong showing as to one factor is sufficient if that factor "involve[s] some conflict of interest between the derivative plaintiff and the class."[FN68] The primary factor in this inquiry "is whether there is an economic conflict between the plaintiff and the other stockholders making it likely that the interests of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

the other stockholders will be disregarded in the prosecution of the suit."[FN68]"Purely hypothetical, potential, or remote conflicts of interest [ ] will not disable a derivative plaintiff."[FN70]

FN68.*In re Fuqua Indus., Inc. S'holder Litig.,* 752 A.2d 126, 130 (Del.Ch.1999).

FN69. David A. Drexler, Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Delaware Corporation Law & Practice* § 42.03[3] (2002) [hereinafter *Drexler, Black & Sparks* ] (internal citation omitted).

FN70.*Id.*

The Delaware courts have not directly addressed what the proper procedural standard is to evaluate a motion to disqualify a derivative plaintiff pursuant to Rule 23.1. The inquiry is highly factual.[FN71]In this case, the record remains largely undeveloped. The movant Alden proffered facts outside of the pleadings but did not engage in any discovery; the nonmovant Plaintiff chose not to present any counterveiling evidence of its own. Therefore, the Court considers it appropriate to apply the familiar summary judgment standard:

FN71.*See Wolfe & Pittenger* § 9-2[b] ("[T]he Delaware decisions [on the question of adequacy of a derivative plaintiff] are markedly fact-specific.").

*9 Summary judgment will be granted where the moving party demonstrates that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. When determining whether to grant summary judgment, a court must view the facts in the light most favorable to the nonmoving party.[FN72]

FN72.*UbiquiTel Inc. v. Sprint Corp.,* 2006 WL 44424, at *2 n. 15 (Del.Ch. Jan.4, 2006) (internal quotation omitted); *Cf.*Court of Chancery Rule 12(b)(6); *Flynn v. Bachow,* 1998 WL 671273, at *4

(Del.Ch. Sept.18, 1998) (exercising discretion to convert motion to dismiss into motion for summary judgment because movant offered documents outside of the pleadings to the court for consideration).

As with a motion for summary judgment, CCWIPP does not have to supply affidavits or other competent evidence to meet Alden's motion to dismiss for inadequate representation. When it elects not to do so, however, the test is whether the factual showing made by Alden is sufficient to demonstrate that CCWIPP would be an inadequate representative.FN73

FN73.*See Gutridge v. Iffland,* 2005 WL 3454129, at *5 (Del. Dec.15, 2005) ("The burden initially falls upon the moving party to show the nonexistence of a material fact, but then shifts to the non-moving party to show the contrary."). The burden only shifts, however, if the movant has made a sufficient showing. *Phillips v. Del. Power & Light Co.,* 216 A.2d 281, 285 (Del.1966) ("[W]e have made it plain that the moving party has the initial burden; he has the job of seeing that the record contains enough evidence to justify the granting of his motion. If he fails, the resisting party need not introduce anything into the record.").

Alden submitted an affidavit in support of his motion and thus attempts to rely on facts outside of the pleadings.[FN74]CCWIPP argues that, Alden's facts notwithstanding, it is an adequate derivative plaintiff. Because CCWIPP has not disputed Alden's allegations, the Court assumes they are true, but otherwise draws inferences in favor of the nonmoving Plaintiff.

FN74. AOB Ex. D (Aff. of Eric Alden).

Alden first argues that because CCWIPP is a large creditor, as well as a stockholder, of Case Financial there exists a disabling economic antagonism

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

between it and Case Financial's other stockholders.[FN75]This Court has held, however, that "the fact that the plaintiff may have interests which go beyond the interests of other stockholders, but are at least coextensive with the interests of the other stockholders, will not defeat the plaintiff serving as a derivative representative."[FN76]CCWIPP's interests are at least coextensive with the interests of the other stockholders: it wants the largest recovery possible so that it will realize some value for its equity investment.[FN77] Further, the requirement that this Court approve settlements of derivative actions provides a check against CCWIPP settling this suit for an inadequate amount that merely provides it recovery as a creditor but not as a stockholder.

> FN75. Alden Aff. ¶ 14; AOB at 25-26.

> FN76.*Drexler, Black & Sparks* § 42.03[3] (citing *Youngman,* 457 A.2d at 380).

> FN77.*Cf. Production Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 790 n. 56 (Del.Ch.2004) (observing that the interests of creditors and stockholders in an insolvent company may diverge). The *Production Resources* case did not address the specific situation presented here, however, where one entity is both a large creditor and a large stockholder.

Alden also alleges that this suit is part of a pattern whereby the current CEO of Case Financial, Michael Schaffer ("Schaffer"), purchases assets, launches a new business with a new name to generate gratuitous trading activity in the new business's stock and then, when the stock price inevitably goes down, sues everyone involved.[FN78]Schaffer is the true driving force behind this litigation, Alden further argues, not CCWIPP.[FN79]Assuming these very general allegations are true, they do not necessarily disqualify CCWIPP from serving as a derivative plaintiff in this case because there may be an innocent explanation for the pattern of facts involving Schaffer. Drawing all reasonable inferences

in CCWIPP's favor, the Court cannot rule out that possibility. Further, there is nothing inherently improper about the CEO of a company being the driving force behind a suit attempting to recover money for his company.

> FN78. Alden Aff. ¶¶ 5-8.

> FN79. AOB at 26.

Alden also alleges that instituting this suit against him when he had previously entered into a release with Case Financial demonstrates vindictiveness towards him. It is possible that CCWIPP brought this suit only to harass Alden, but it is also possible that CCWIPP did so because it had a good faith argument that the Release was not enforceable and believed Alden had wronged Case Financial. Further, "[i]nadequacy as a class representative is not made out merely because of a disconcordant relation between plaintiff and defendants. To the contrary, this may inspire plaintiff to be an even more forceful advocate."[FN80]

> FN80.*Emerald Partners,* 564 A.2d at 676 (internal quotation omitted).

***10** At this early stage of the litigation, where the only evidence offered on the question of adequacy is Alden's affidavit and there has been no discovery the Court finds that Alden's allegations and the inferences from them could support a conclusion that CCWIPP is an inadequate derivative plaintiff, but they do not compel that conclusion. In the Court's opinion, Alden has not yet shown a substantial likelihood that CCWIPP is not acting for the benefit of all Case Financial stockholders.[FN81]Further development of the facts, however, may prove that CCWIPP is an inadequate derivative plaintiff. Therefore, the Court denies without prejudice Alden's motion to disqualify CCWIPP as a derivative plaintiff.

> FN81.*See Wolfe & Pittenger* at text accompanying n. 95 ("Mere allegations that the plaintiff is motivated by personal gain or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                              Page 15
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

animus are unlikely to succeed, at least in the early stages of the litigation."); *Emerald Partners,* 564 A.2d at 676 (considering deposition testimony on the question of adequacy of a derivative plaintiff); *Youngman,* 457 A.2d 376 (same).

### E. The Case Financial Board's Decision to Allow CCWIPP to Prosecute this Action

Defendant Bibicoff asserts that the Case Financial board impermissibly abdicated its duties by delegating prosecution of this action to CCWIPP. CCWIPP served its demand on the Case Financial board on March 11, 2005; three days later, the board delegated prosecution to CCWIPP.[FN82] According to Bibicoff, "the haste with which the decision was made precluded the meaningful deliberations required of a board deciding whether to pursue derivative litigation ."[FN83]

FN82. Am. Compl. ¶¶ 71-72.

FN83. Reply Br. of Defs.' [Bibicoff and Gregory] in Support of their Mot. to Dismiss ("BRB") at 3.

Upon receipt of a valid stockholder demand, the board of directors of a Delaware corporation must engage in a two-step process.

First, the directors must determine the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations, both legal and financial, bearing on a response to the demand. If a factual investigation is required, it must be conducted in good faith. Second, the board must weigh the alternatives available to it, including the advisability of implementing internal corrective action and commencing legal proceedings.[FN84]

FN84.*Wolfe & Pittenger* § 9-2[b] (quoting *Rales v. Blasband,* 634 A.2d 927, 935 (Del.1993)).

There is neither a prescribed procedure that a board must follow in carrying out these tasks nor a set amount of time these tasks must take.[FN85] Further, a formal factual investigation may not always be necessary for the board to sufficiently inform itself.[FN86]

FN85.*Id.; see also Charal Inv. Co. v. Rockefeller,* 1995 WL 684869, at *3 (Del.Ch. Nov.7, 1995) ("[N]o formula exists by which the Court may determine if a 'reasonable' investigation period has elapsed.").

FN86.*Wolfe & Pittenger* § 9-2[b].

In essence, Bibicoff argues that the Case Financial board could not possibly have fulfilled its demand-response duties in the time it did. Bibicoff may be correct that three days was an insufficient amount of time for the Case Financial board to fulfill its duties in the context of this case, but the Court cannot draw that conclusion without further development of the relevant facts. Three days is not per se insufficient *as a matter of law.* In fact, the "amount of time needed for a response [varies] in direct proportion to the complexity of the technological, quantitative, and legal issues raised by the demand."[FN87] "[W]hether the board has taken a reasonable amount of time in its investigation is essentially a question of fact."[FN88] As such, the Court cannot resolve the question of whether the Case Financial board fulfilled its duties on the undeveloped record available at this preliminary stage of the litigation. Therefore, the Court denies Bibicoff's motion to dismiss the entire Amended Complaint because of an improper delegation by the Case Financial board.

FN87.*Charal Inv. Co.,* 1995 WL 684869, at *3 (quoting *Allison v. Gen. Motors Corp.,* 604 F.Supp. 1106, 1117-18 (D.Del.1985)).

FN88.*Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 16
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

### F. Jurisdiction over Bibicoff with respect to the Fraud Claim

**\*11** This Court has personal jurisdiction over non-resident directors and officers of Delaware corporations under 10 *Del. C.* § 3114.[FN89]"[T]he Delaware courts have consistently held that Section 3114 is applicable only in connection with suits brought against a nonresident for acts performed in his ... capacity as a director ... of a Delaware corporation."[FN90]Further narrowing the scope of Section 3114, "Delaware cases have consistently interpreted [early cases construing the section] as establishing that [it] ... appl[ies] only in connection with suits involving the statutory and nonstatutory fiduciary duties of nonresident directors."[FN91]

> FN89. Regarding directors elected, appointed or serving after September 1, 1977, 10 *Del. C.* § 3114(a) states in relevant part:
>
> Every nonresident of this State who ... accepts election or appointment as a director ... of a corporation organized under the laws of this State ... shall, by such acceptance or such service, be deemed thereby to have consented to the appointment of the registered agent of such corporation ... as an agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director ... is a necessary or proper party, or in any action or proceeding against such director *...for violation of a duty in such capacity,* whether or not the person continues to serve as such director ... at the time suit is commenced. Such acceptance or service as such director ... shall be a signification of such director ... that any process when so served shall be of the same legal force and validity as if served upon such director ... within this State .... (emphasis added).

> Regarding officers elected, appointed or serving after January 1, 2004, *see*10 *Del. C.* § 3114(b) (providing for same jurisdiction over officers as for directors).

> FN90.*Wolfe & Pittenger* § 3-5[a] (citing cases).

> FN91.*Id.* Effective January 1, 2004, 10 *Del. C.* § 3114 was amended to bring officers of Delaware corporations within its reach. The language and holdings of the pre-2004 cases concerning Section 3114 thus now apply to officers, too.

Bibicoff argues that the claim of fraud arising out of his pre-formation conduct as an employee of Case Financial's predecessor, Old Case, does not concern his service as a director of Case Financial and thus this Court lacks personal jurisdiction over him with respect to that claim. "[O]nce a defendant has moved to dismiss the complaint for lack of personal jurisdiction the plaintiff bears the burden of showing that the court has personal jurisdiction over the defendant."[FN92]Where, as here, "no evidentiary hearing [has been] held, the plaintiff typically meets this burden by making a prima facie showing that the exercise of personal jurisdiction is appropriate."[FN93]"[I]n such a case, the record is construed in the light most favorable to the plaintiff ."[FN94]

> FN92.*Newspan, Inc. v. Hearthstone Funding Corp.,* 1994 WL 198721, at \*3 (Del.Ch. May 10, 1994).

> FN93.*Wolfe & Pittenger* § 3-3 (citing cases). Bibicoff argues, citing *Newspan,* 1994 WL 198721, at \*3, that once a defendant questions the existence of personal jurisdiction over it, "a plaintiff cannot simply rest on the bare allegations in its complaint."BOB at 13. He further argues, again citing *Newspan,* that to meet its burden, "a plaintiff must offer 'affirmative proof in support of its contention that there

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

is personal jurisdiction."*Id.* at 13.Bibicoff accurately restates *one* of the standards described by former Chancellor Allen in *Newspan.*The Chancellor did not, however, decide among the various standards he set out. *See Newspan,* 1994 WL 198721, at *3 ("I need not, however, for resolution of this case decide the Delaware rule...."). Later decisions of this Court have made clear that a plaintiff can, in fact, make the necessary prima facie showing using only the facts alleged in the complaint. *See Optimalcare, Inc. v. Hightower,* 1996 WL 417510 (Del.Ch. July 17, 1996) (denying a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction relying solely on facts as alleged in plaintiff's complaint despite quoting language from *Newspan* concerning plaintiff not resting on allegations in its complaint).

> FN94.*Cornerstone Techs., LLC v. Conrad,* 2003 WL 1787959, at *3 (Del.Ch. Mar.31, 2003).

Bibicoff does not dispute this Court's jurisdiction over him for purposes of CCWIPP's breach of loyalty claims. The actions giving rise to the alleged fraud claim in Count I of the Amended Complaint, however, occurred before Bibicoff's service as a director of Case Financial.[FN95]As such, this Court has jurisdiction over Bibicoff with respect to the fraud claim only if one of the 'exceptions' to the strict construction of Section 3114 applies.[FN96]This Court has "held that once jurisdiction is obtained pursuant to Section 3114, non-resident directors are properly before the court with respect to any claims that are sufficiently related to the cause of action asserted against such directors in their capacity as directors."[FN97]

> FN95. Am. Compl. ¶ 22 ("After the asset purchase transaction was completed, Defendants took on positions as directors and officers of Case Financial."). On or about May 24, 2002, the assets and business of

Old Case became the assets and business of Case Financial, a Delaware corporation.*Id.* ¶ 11.

> FN96.*See Goodrich v. E.F. Hutton Group, Inc.,* 1987 WL 17045, at *1 (Del.Ch. Sept.10, 1987) ("[Section 3114] does not contemplate consent by a director [to jurisdiction] for acts that were not performed in his capacity as a director.").

> FN97.*Wolfe & Pittenger* § 3-5[a] (citing cases).

In this case, whether the fraud claim is sufficiently related to the fiduciary duty claims against Bibicoff to give rise to personal jurisdiction depends on whether the claims arise out of the "same nucleus of operative facts."[FN98]Or, put another way, construing the Amended Complaint in the way most favorable to Plaintiff, as the Court must, is the fraud claim predicated on the same nucleus of facts as one of the fiduciary duty claims?[FN99]

> FN98.*Hovde Acquisition, LLC v. Thomas,* 2002 WL 1271681, at *4 n .16 (Del. Ch. June 5, 2002) (citing a case construing Section 3114 in the context of applying Delaware's implied consent statute for managers of limited liability companies).

> FN99.*Infinity Investors Ltd. v. Takefman,* 2000 WL 130622, at *6 (Del.Ch. Jan.28, 2000) ("The Court of Chancery has held that once jurisdiction is properly obtained over a non-resident director defendant pursuant to § 3114, such non-resident director is properly before the court for any claims that are *sufficiently related to the cause of action* asserted against such directors in their capacity as directors. Here, Infinity's tort claim is predicated on the same set of facts as one of its breach of fiduciary duty allegations.... Clearly, the two claims are closely related.").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 18
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

CCWIPP alleges in support of its fraud claim that, in conjunction with the asset purchase agreement between Asia Web and Old Case, Asia Web purchased certain notes from a financing group of which Gregory was a part.[FN100]The debtor on the notes was Old Case and they were in default. Defendants neither informed Asia Web that the notes were in default nor told Asia Web that, shortly after the asset purchase agreement closed, Bibicoff would transfer $458,000 in accounts receivable that could have been used to repay the notes to Case Funding, Inc. ("Case Funding"), an entity in which he had a significant, direct interest.[FN101]As a result of this nondisclosure and subsequent transfer, Plaintiff alleges, Case Financial had to write off the value of the notes.[FN102]

> FN100. Am. Compl. ¶¶ 19-20.

> FN101.*Id.* ¶¶ 20, 28.Plaintiff alleges, without greater specificity, that "Asia Web was not made aware that the notes were in default."*Id.* Reading this statement in the light most favorable to Plaintiff, the Court assumes that Plaintiff means *Defendants, including Bibicoff,* did not make Asia Web aware that the notes were in default. *See* Am. Compl. ¶ 85 ("Defendants ... made misrepresentations to Asia Web ... (d) by misrepresenting the value of the bridge financing group's Old Case notes.").

> FN102. Am. Compl. ¶ 21, 89.

**\*12** In support of its breach of the duty of loyalty claim, Plaintiff alleges that Bibicoff transferred the same $458,000 in accounts receivable from Old Case to Case Funding instead of insisting that they be used to pay off the notes then owned by Case Financial.[FN103]Bibicoff thus profited at the expense of Case Financial, Plaintiff argues, in violation of his duty of loyalty to Case Financial.[FN104]Hence, Plaintiff's fraud claim is predicated on the same nucleus of facts as one of its fiduciary duty claims. In other words, both the fraud claim and the breach of the duty of loyalty

claim depend on a number of the same facts. It is therefore proper as a matter of Delaware law for this Court to exercise personal jurisdiction over Bibicoff with respect to the fraud claim.

> FN103.*Id.* ¶ 28.

> FN104.*Id.* ¶¶ 29, 75(b).

It is also proper as a matter of constitutional law for this Court to exercise jurisdiction over Bibicoff as to the fraud claim. "[T]he due process clause of the Fourteenth Amendment [of the U.S. Constitution] requires that a nonresident defendant have 'minimum contacts' with the forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." ' [FN105] "The touchstone of this minimum contacts analysis is foreseeability-whether the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." [FN106]Bibicoff's acceptance of a position as a director of a Delaware corporation certainly should have made him aware of the possibility of being haled into court here.FN107Further, having to defend against the fraud claim in Delaware cannot be said to be unfair or to offend notions of substantial justice when Bibicoff is already before this Court for alleged breaches of his fiduciary obligations to a Delaware corporation and that corporation was likely harmed as a result of his alleged fraud.[FN108]Bibicoff will face only minimal inconvenience in having to respond to an additional claim in this action.

> FN105.*Conrad,* 2003 WL 1787959, at \*13 (quoting *Int'l Shoe Co. v. Wash.,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

> FN106.*Wolfe & Pittenger* § 3-3 (internal quotation omitted).

> FN107.*Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* 1996 WL 608492, at \*5 (Del.Ch. Oct.16, 1996) (holding that Sec-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                              Page 19
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

tion 3114 puts directors on notice of the possibility of being haled into court in Delaware); *cf. Conrad*, 2003 WL 1787959, at *13 (observing that officer of Delaware LLCs should not be surprised at being haled into court here and exercising jurisdiction over nonresident officer); *see also Cairns v. Gelmon*, 1998 WL 276226, at *3 (Del.Ch. May 21, 1998) (holding that act of incorporating a company under the laws of Delaware satisfied the minimum contacts requirement of *International Shoe* );*Manchester v. Narragansett Capital, Inc.*, 1989 WL 125190, at *7 (Del.Ch. Oct.19, 1989) ("Furthermore, given the fact that the individual defendants are all ... directors of the corporation, it would be artificial to distinguish their actions as having been taken in different guises when, as directors, they control the corporation. In that capacity, they should expect to answer in a Delaware court for the contract actions related to plaintiff's breach of fiduciary duty claims.").

FN108.*See Manchester,* 1989 WL 125190, at *7 (although not discussing due process requirements, finding jurisdiction over nonresident director proper with respect to breach of contract claim where the same facts that gave rise to breach of fiduciary duty claims gave rise to the breach of contract claim).

### III. CONCLUSION

For the reasons stated, Alden's motion to dismiss the entire Amended Complaint because of the Release is granted as to the *Caremark* claim, but denied as to the fraud and duty of loyalty claims. Alternatively, Count II of the Amended Complaint-the *Caremark* claim-is dismissed as to Alden for failure to state a claim. The *Caremark* claim is similarly dismissed as to Bibicoff. Bibicoff's motion to dismiss Count I of the Amended Complaint-the fraud claim-for want of personal jurisdiction is

denied. Alden's and Bibicoff's motions to dismiss the entire Amended Complaint because CCWIPP is an inadequate derivative plaintiff and because of an improper delegation by the Case Financial board of directors, respectively, are denied.

Pursuant to Rule 15(aaa), the dismissal of the *Caremark* claims against Alden and Bibicoff is with prejudice.

IT IS SO ORDERED.

Del.Ch.,2006.
Canadian Commercial Workers Industry Pension Plan v. Alden
Not Reported in A.2d, 2006 WL 456786 (Del.Ch.), 31 Del. J. Corp. L. 1070

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 5



Not Reported in A.2d                                                                        Page 1
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

**H**
In re Coca-Cola Enterprises, Inc. Shareholders Lit-
igation
Del.Ch.,2007.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
In re COCA-COLA ENTERPRISES, INC. SHARE-
HOLDERS LITIGATION.
**C.A. No. 1927-CC.**

Submitted: Aug. 6, 2007.
Decided: Oct. 17, 2007.

Norman M. Monhait, of Rosenthal, Monhait &
Goddess, P.A., Wilmington, Delaware; of Counsel:
James E. Miller, Patrick A. Klingman, and Karen
M. Leser, of Shepherd, Finkelman, Miller & Shah,
LLC, Chester, Connecticut; Scott R. Shepherd,
James C. Shah, and Nathan Zipperian, of Shepherd,
Finkelman, Miller & Shah, LLC, Media,
Pennsylvania; Mark C. Gardy and James S. Notis,
of Gardy & Notis, LLP, Englewood Cliffs, New
Jersey; Nadeem Faruqi, of Faruqi & Faruqi, LLP,
New York, New York; Craig B. Smith, of Smith,
Katzenstein & Furlow, LLP, Wilmington,
Delaware, Attorneys for Plaintiffs.
Edward P. Welch and Jennifer C. Voss, of Skadden,
Arps, Slate, Meagher & Flom LLP, Wilmington,
Delaware; of Counsel: Jay B. Kasner, of Skadden,
Arps, Slate, Meagher & Flom LLP, New York,
New York, Attorneys for Defendants The Coca-
Cola Company, J. Alexander M. Douglas, Gary P.
Fayard, Irial Finan, Steven J. Heyer, Robert A.
Keller, James E. Chestnut, Joseph R. Gladden, Jr.,
and Deval L. Patrick.
Samuel A. Nolen, Srinivas M. Raju, and Michael R.
Robinson, of Richards, Layton & Finger, P.A.,
Wilmington, Delaware; of Counsel: Todd R. David,
John A. Jordak, Jr., and Ambreen A. Delawalla, of
Alston & Bird LLP, Atlanta, Georgia, Attorneys for
Nominal Defendant Coca-Cola Enterprises, Inc.

and Defendants Fernando Aguirre, John R. Alm, E.
Liston Bishop III, Howard G. Buffet, John L.
Clendenin, James E. Copeland, Jr., Calvin Darden,
Rick L. Engum, J. Trevor Eyton, Marvin J. Herb, L.
Phillip Humann, John E. Jacob, Donna A. James,
Summerfield K. Johnston III, Summerfield K.
Johnston, Jr., Jean-Claude Killy, Lowry F. Kline,
Patrick J. Mannelly, Paula R. Reynolds, and G.
David Van Houten.

**MEMORANDUM OPINION**

CHANDLER, Chancellor.
*1 While there may never be a decisive victory in
the Great American Cola Wars,[FN1] the plaintiffs in
this action seem to think they got the wrong stock,
baby-uh huh.[FN2] Plaintiffs, who are shareholders in
Coca-Cola Enterprises, Inc. ("CCE"), the primary
bottler and distributor of Coca-Cola products, con-
clude their fifty-page complaint with a lengthy and
unfavorable comparison between the stock price
performance of their company, CCE, with Pepsi
Bottlers Group, its counterpart in the world of Pep-
si. Dismayed that the Pepsi Bottlers Group has out-
performed CCE despite the fact that the Coca-Cola
Company ("Coke") has outperformed PepsiCo,
plaintiffs have authored a tale of abuse spanning
two decades, in which defendant Coke has, "[s]ince
CCE's creation," [FN3] somehow high jacked the
CCE board and forced its members to operate CCE
solely to benefit Coke. Stripped of its histrionics,
however, the amended complaint essentially alleges
claims that challenge the fundamental nature of the
relationship between Coke and CCE-a relationship
that plaintiffs acknowledge was established over
twenty years ago in a perpetual Master Bottle Con-
tract. Sobered from their rhetorical high by defend-
ants' motions to dismiss, plaintiffs have attempted
to save their case by showing equitable tolling, but
their attempt has not satisfied their burden. Con-
sequently, for the reasons described later, plaintiffs'
amended complaint is dismissed as time-barred.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                                Page 2
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

FN1. *See Pepsico, Inc. v. The Coca-Cola Co.,* 114 F.Supp.2d 243, 245 (S.D.N.Y.2000) (noting the fabled marketing battle between Coke and Pepsi).

FN2. *Cf.* The Pepsi Legacy 1990, http://www.pepsi.com/ads_and_ history/legacy/1990/1990.php (last visited Oct. 17, 2007) (recalling the Diet Pepsi Commercial featuring Ray Charles and the "Uh Huh Girls" singing "You've Got the Right One, Baby").

FN3. Am. Compl. ¶ 1.

## I. BACKGROUND

### A. Procedural History

On February 7, 2006, the International Brotherhood of Teamsters filed a derivative action in this Court on behalf of CCE against Coke and current and former members of the CCE board of directors alleging breaches of fiduciary duty. In March and April of the same year, two substantially similar complaints were filed here by Robert Lang and Natalie Gordon. Lang and Gordon moved to consolidate, and the Teamsters filed a competing consolidation motion. After a brief dispute between the plaintiffs, the three filed an amended, consolidated complaint on September 29, 2006. On October 16, 2006, defendants filed their motions to dismiss. Following briefing and oral argument, this is my decision on the motions.

### B. Facts

Nominal defendant CCE is the largest bottler and distributor of Coke beverage products in the world. Initially formed as a wholly owned subsidiary of Coke, CCE was spun off in 1986 as an independent, public company. Its relationship with former parent Coke, of course, continued pursuant to a series of contracts and licensing agreements, the most important of which is the 1986 Master Bottle Contract

("MBC").

The MBC defines the contours of the relationship between CCE and Coke that persists today.[FN4] In addition to establishing that CCE may buy Coke's syrup and concentrate, bottle, and sell the soda, the MBC grants Coke certain rights and saddles CCE with certain responsibilities. For example, CCE must allow Coke representatives access to CCE facilities to conduct inspections to assure Coke that CCE is "complying with instructions" and other standards.[FN5] The MBC also provides that: (1) Coke has the right to pull the final product if it is not satisfied and can force CCE to recall the product after shipment;[FN6] (2) Coke has the right to set and revise prices of its concentrates and syrups;[FN7] (3) CCE must "develop and stimulate and satisfy fully the demand" for Coke beverages;"[FN8] (4) CCE must "cooperate in and vigorously promote" all joint marketing programs with Coke;[FN9] (5) CCE must present for approval to Coke its "plans for the ensuing year" and the plans must be approved by Coke;[FN10] (6) CCE must report on its progress to Coke at least quarterly if not more frequently;[FN11] (7) Coke may give to CCE technology it has or develops;[FN12] and (8) CCE must furnish financial or other records to Coke upon request.[FN13]

FN4. The Court may properly consider the contract in deciding this motion to dismiss because plaintiffs expressly refer to and rely on the contract in their amended complaint. *In re Dean Witter P'ship Litig.,* C.A. No. 14816, 1998 WL 442456, at *6 n. 46 (Del. Ch. July 17, 1998), *aff'd,* 725 A.2d 441 (Del.1999); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 320 (Del.2004) ("On a motion to dismiss, the Court may consider documents that are 'integral' to the complaint"). The amended complaint references the MBC and its terms repeatedly. *See* Am. Compl. ¶¶ 6, 46, 55, 56, 66, 94-97.

FN5. MBC art. IV, ¶ 11.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                     Page 3
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

FN6.*Id.* at ¶ 13.

FN7.*Id.* at art. V., ¶ 14.

FN8.*Id.* at art. VI, ¶ 17.

FN9.*Id.* at ¶ 18.

FN10.*Id.* at ¶ 20(a).

FN11.*Id.* at ¶ 20(b).

FN12.*Id.* at art. XII, ¶ 36.

FN13.*Id.* at ¶ 40(c).

**\*2** Plaintiffs allege that Coke and the directors of CCE have worked together to abuse the relationship between the two companies. At the heart of the amended complaint is the contention that by maximizing sales volume, CCE has maximized Coke's profits at the expense of CCE's. CCE's decisions to push for increased volume can only be explained, plaintiffs contend, by Coke and the individual defendants' desire to aid Coke's financial future. Connected to this core theme are arterial sections flowing with vitriol about Coke's domination, channel stuffing, and harmful experimentation in various warehouse delivery systems.

*1. Coke's Alleged Domination and Abuse*

Despite conceding that Coke has directly named just three of CCE's thirteen directors and that Coke owns just a thirty-six percent share of CCE, plaintiffs maintain that Coke controls and dominates CCE. Plaintiffs trace the history of this domination to CCE's origins in the mid-1980s.

Plaintiffs stuff much of the amended complaint with conclusory allegations of control and abuse.FN14An allegation is conclusory when it merely states a generalized conclusion with no supporting facts. For example, the bald assertion that "Coke ultimately controls virtually every aspect of CCE's operations and profitability in a manner designed to maximize Coke's own financial condi-

tion" is conclusory.FN15That allegation does not explain *how* Coke controls CCE; it perfunctorily concludes that Coke exerts control without offering any support. Plaintiffs' amended complaint is riddled with similar, conclusory statements.FN16

FN14. On a motion to dismiss, this Court assumes that the well-pleaded allegations in a complaint are true, but does not accept the truthfulness of conclusory allegations. *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006).

FN15. Am. Compl. ¶ 54.

FN16.*See, e.g.,* Am. Compl. ¶ 50 ("For all practical purposes, Coke controls CCE.").

There are, however, several substantive allegations of control and abuse. First, the MBC provides "Coke with the ability to manipulate its own financial condition from sales to CCE through, among other things, price changes, sales volume changes, financing terms, and other terms of payment and conditions."FN17Second, Coke forces "CCE to pay a higher price for beverage base and concentrate than CCE otherwise would have paid" if the MBC were negotiated at arm's length.FN18Third, a 2002 Sales Growth Initiative Agreement between Coke and CCE incentivized increased sales volume at the expense of profit by providing CCE with payments from Coke if it hit certain sales volume thresholds.FN19Fourth, "Coke is directly involved in CCE's annual business planning process" and can manipulate this process by withholding its approval.FN20

FN17. Am. Compl. ¶ 55.

FN18.*Id.* at ¶ 56.

FN19.*Id.* at ¶¶ 59-64.

FN20.*Id.* at ¶¶ 66-67.

*2. Channel Stuffing*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

The plaintiffs define "channel stuffing" as "last minute forced sales increases," [FN21] and argue that Coke pushed this practice on CCE. Plaintiffs allege that Coke caused CCE to engage in channel stuffing by giving advance warning of future price increases, giving discounts in price for increased orders in volume or other incentives for ordering more, and over-delivery of product. Plaintiffs cite as an example the fact that CCE allegedly parked numerous trailers filled with product in the parking lots of various accounts in the early 1990s. Plaintiffs contend that this practice persisted (albeit to a lesser extent) in 2004 in the Kansas City area and that CCE would count this parked product as having been sold.

FN21. *Id.* at ¶ 85.

### 3. Wal-Mart Delivery

*3 Finally, plaintiffs assert that the individual defendants and Coke forced CCE to change the way it delivers products to the Wal-Mart account. Previously, CCE and the other Coke bottlers utilized a direct store delivery distribution method whereby the bottlers could negotiate for the pricing and marketing of the beverages at each individual retail location. For large, national accounts (like Wal-Mart), CCE negotiated on behalf of all Coke's major bottlers. The amended complaint alleges that in 2004 Coke somehow "forced" CCE to test a new warehouse delivery system for the Wal-Mart account. In 2005, plaintiffs say, "Coke directed that CCE propose [to the other bottlers] the switch to the Warehouse Delivery system"[FN22] for delivery of the Powerade energy drink for all Wal-Mart stores. Plaintiffs stress that CCE did so without following the proper notice procedures outlined in its agreement with the other bottlers and that this switch is detrimental to "the long-term best interests of CCE."[FN23]

FN22. Pls.' Answering Br. 9.

FN23. Am. Compl. ¶ 112.

### C. Defendants' Motions to Dismiss

Defendants have moved to dismiss the complaint pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted and Rule 23.1 for failure to adequately plead demand futility. Defendants offer a litany of reasons to dismiss this action. First, defendants argue that the amended complaint is barred by the statute of limitations or the doctrine of laches, because plaintiffs' claims arise out of contractual agreements formed in the mid-1980s. Second, defendants assert that the amended complaint's allegations are factually insufficient to state a claim as a matter of law, because the allegations are conclusory and speculative. Third, defendants say that the CCE board of directors is comprised of a majority of independent directors and that the decisions challenged in the amended complaint were well informed and made in the exercise of sound business judgment.

### D. Plaintiffs' Response

Plaintiffs obviously disagree. They challenge whether a statute of limitations / laches defense can appropriately be raised at this stage in the litigation and argue that, even if such a defense is properly presented now, it is inapplicable in this case. Further, plaintiffs stress that their allegations are legally sufficient and that demand would have been futile.

## II. ANALYSIS

### A. Standard of Review and Pleading Requirements

Court of Chancery Rule 8(a) requires that pleadings give notice of the claim being asserted through a "short and plain statement" that shows "the pleader is entitled to relief."[FN24]When a complaint fails to do so, it must be dismissed under Rule 12(b)(6). In reviewing a motion to dismiss, this Court must, as noted above, take as true all well-pleaded factual

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

allegations and make every reasonable inference in favor of the plaintiff. The Court will not, however, give any credence to conclusory allegations or wildly speculative and unreasonable conj ecture.FN25

> FN24. Ct. Ch. R. 8(a).

> FN25.*See Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001).

*\*4* Plaintiffs' amended complaint purports to state a cause of action for breach of the duty of loyalty against Coke FN26 and the individual defendants. To establish a breach of the fiduciary duty of loyalty, plaintiffs must show that the defendants either (1) "stood on both sides of the transaction and dictated its terms in a self-dealing way," or (2) "received in the transaction a personal benefit that was not enjoyed by the shareholders generally."FN27

> FN26. Coke strenuously denies that it is a controlling shareholder of CCE and, therefore, denies that it owes any fiduciary duties. Because I have decided to dismiss the complaint on other grounds, I need not address this issue.

> FN27.*Chaffin v. GNI Group, Inc.,* C.A. No. 16211-NC, 1999 WL 721569, at \*5 (Del. Ch. Sept. 3, 1999); *see also Joyce v. Cuccia,* C.A. No. 14953, 1997 WL 257448, at \*5 (Del. Ch. May 14, 1997) ("To state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs.").

Immediately, the Court may dispose of the claim related to the distribution of beverages to Wal-Mart because the amended complaint manifestly fails to allege facts showing that a breach of the duty of loyalty occurred in connection with that transac-

tion. The switch to a warehouse distribution arrangement with Wal-Mart was effected by an agreement between CCE (on behalf of the consortium of bottlers) and Wal-Mart. Plaintiffs have not alleged that either Coke or any of the individual defendants are somehow on Wal-Mart's side, nor are there any facts that show any of the defendants will derive a personal benefit from the transaction. Plaintiffs have included a conclusory assertion that this distribution arrangement will harm the long-term interests of CCE and will help Coke, but this amorphous allegation is insufficient.FN28By failing to allege facts showing the elements of a breach of the fiduciary duty of loyalty with respect to the Wal-Mart distribution arrangement, plaintiffs have failed to state a claim upon which relief can be granted.

> FN28. If a complaint were held sufficient simply because it restates the legal elements of a particular cause of action, Rule 8(a) would be rendered meaningless. Plaintiffs need not offer prolix tales of abuse belabored by needless details, but plaintiffs must allege *facts* sufficient to show that the legal elements of a claim have been satisfied.

Plaintiffs' other claims are supported by more robust factual allegations, but they are ultimately no more successful. Because plaintiffs' other claims are really complaints about the painful effects of the terms of the 1986 MBC, the claims accrued in 1986 and are time-barred.

### B. *Statute of Limitations and Doctrine of Laches*

Courts of Equity came into being because universally applicable legal rules are bound to work injustice in certain individual cases.FN29As such, it would be antithetical for a court of equity to blindly apply a statute of limitations to bar equitable claims.FN30Nevertheless, because "equity follows the law," FN31 it is firmly established that this Court can and will apply a statute of limitations by analogy.FN32In fact, the Supreme Court has held

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

that "[a]bsent unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period."[FN33]Where, as here, a plaintiff seeks money damages for breach of fiduciary duties, the claim will "be subject to the three-year limitations period of 10 *Del. C.* § 8106" and this Court need not "engage in traditional laches analysis." [FN34]

> FN29. H. Jefferson Powell, *"Cardozo's Foot": The Chancellor's Conscience and Constructive Trusts,* 56 LAW & CONTEMP. PROBS. 7, 7-8 (1993).

> FN30. A statute of limitations sets a strict time period after which a claim, if not made, is barred. The doctrine of laches, on the other hand, bars a particular plaintiff from bringing a claim about which he had knowledge where the plaintiff's unreasonable delay prejudiced a defendant. Laches is an intensely factual analysis. *See Fed. United Corp. v. Havender,* 11 A.2d 331, 345-346 (Del.1940) (noting that delays of even as short as two months have been held to constitute laches under Delaware law).

> FN31.*E.g., In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 584 (Del. Ch.2007).

> FN32.*Acierno v. Goldstein,* C.A. No. 20056, 2004 WL 1488673, at *2 (Del. Ch. June 29, 2004) ("The time fixed by the analogous statute of limitations is deemed to create a time period beyond which delay is presumptively unreasonable for purposes of laches."); *Fike v. Ruger,* 754 A.2d 254, 260 (Del. Ch.1999), *aff'd,*752 A.2d 112 (Del.2000); *In re MAXXAM, Inc.,* 659 A.2d 760, 769 (Del. Ch.1995); *Bovay v. H.M. Bylesby & Co.,* 29 A.2d 801, 803 (1943); *see also*27A AM.JUR.2D*Equity* § 198 (West 2007).

> FN33.*U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.,* 677 A.2d 497, 502 (Del.1996).

> FN34.*Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1064 (Del. Ch.1989).

Defendants argue that the claims in the amended complaint all arise from the 1986 MBC. As such, defendants contend, those claims are time-barred under section 8106. Plaintiffs have three responses. First, plaintiffs argue that defendants may not use the statute of limitations or the doctrine of laches as a defense in a motion to dismiss. Second, plaintiffs say their claims are based on discrete claims that occurred within the past three years rather than on the 1986 contract. Third, plaintiffs contend that if the statute of limitations applies, it has been equitably tolled. For the reasons stated below, none of these responses is persuasive and the claims in the amended complaint are barred under section 8106.

*1. This Court May Properly Consider the Statute of Limitations and the Doctrine of Laches when Reviewing a Motion to Dismiss.*

**\*5** Plaintiffs devote considerable energy attempting to persuade this Court that a motion to dismiss is an improper mechanism by which one might determine whether claims are time barred. In so doing, plaintiffs (at best) misunderstand or (at worst) disregard well settled Delaware law. As this Court has stated time and time again, when the allegations of a complaint show the action was commenced too late, a defendant may properly seek dismissal under the statute of limitations or the doctrine of laches.[FN35]Plaintiffs have in fact correctly conceded that the statute of limitations is used as a presumptive guide for this Court,[FN36] but plaintiffs have failed to overcome that presumption. The allegations of the amended complaint itself affirmatively establish the plaintiffs' claims are based on the 1986 MBC.

> FN35.*E.g., Tyson Foods,* 919 A.2d at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 7
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

*Kahn v. Seaboard,* 625 A.2d 269, 277 (Del. Ch.1993); *Boeing Co. v. Shrontz,* C.A. No. 11273, 1992 WL 81228, at *2 (Del. Ch. Apr. 20, 1992); *see also* 1 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 13.8 (3d ed., supp.2006).

FN36. Pls.' Answering Br. at 17.

*2. The Wrath of Kahn: Claims Accrue at the Moment of Initial Wrongdoing-Not when their Effects Are Felt.*

In *Kahn v. Seaboard Corp.,* Chancellor Allen dismissed a complaint that alleged a breach of fiduciary duty claim against directors who "structure[ed the contract] so as to obtain better terms for Flour than would have been the case had the transactions been negotiated on an arm's length basis."[FN37]Specifically, he found that "[t]he wrong attempted to be alleged is the use of control over Seaboard to require it to enter into a contract that was detrimental to it and beneficial, indirectly, to the defendants. Any such wrong occurred at the time that enforceable legal rights against Seaboard were created."[FN38]Ultimately, it is that principle that dooms plaintiffs' amended complaint.

FN37.625 A.2d 269, 270 (Del. Ch.1993) (quoting complaint).

FN38.*Id.* at 271.

Under Delaware law, a plaintiff's cause of action accrues at the moment of the wrongful act-not when the harmful effects of the act are felt-even if the plaintiff is unaware of the wrong.[FN39]Defendants contend plaintiffs' claims of abuse by Coke and so-called "channel stuffing" are really challenges to the 1986 MBC. Plaintiffs, of course, resist this characterization. Instead, plaintiffs counter, their complaint challenges certain transactions that occurred within the last three years. Specifically, they

challenge: (1) a 2002 Sales Growth Initiative Agreement that incentivized increased volume in sales; (2) the revisions to the 2004 Rocky Mountain Division business plan; (3) the use of databases by Coke to track daily CCE sales; and (4) channel-stuffing practices.

FN39.*Wal-Mart Stores, Inc. v. AIG life Ins. Co.,* 860 A.2d 312, 319 (Del.2004) ("This Court has repeatedly held that a cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."); *Albert v. Alex Brown Mgmt. Servs., Inc.,* C.A. No. 762-N, 2005 WL 1594085, at * 18 (Del. Ch. June 29, 2005) ("The court reiterates that a claim accrues at the time of the alleged wrongdoing, and not when the plaintiff suffered a loss."); *Fike v. Ruger,* 754 A.2d 254, 260 (Del. Ch.1999) ("A cause of action accrues at the moment of the wrongful act, even if the plaintiff is ignorant of the wrong."), *aff'd,*752 A.2d 112 (Del.2000); *In re Dean Witter P'ship Litig.,* C.A. No. 14816, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998) ("The general law in Delaware is that the Statute of Limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action."), *aff'd,*725 A.2d 441 (Del.1999); *cf. Schreiber v. R.G. Bryan,* 396 A.2d 512, 516 (Del. Ch.1978) ("[W]hat must be decided is when the specific acts of alleged wrongdoing occur, and not when their effect is felt."); 2 EDWARD P. WELCH, ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 327.3.2 (2007-1 supp.) ("Generally, the determinative issue is when the specific acts of alleged wrongdoing occurred, and not when their effect is felt.").

The claim challenging the 2002 Sales Growth Initi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                 Page 8
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

ative is clearly time-barred under the three-year statute of limitations. The amended complaint quotes from the agreement itself and challenges actual provisions and terms of the contract. Plaintiffs appear to have conceded as much by abandoning this argument in their answering brief.

The claim challenging the revisions to the 2004 Rocky Mountain Division Business Plan is also time barred. Plaintiffs argue that in 2004 Coke forced CCE to revise the plan to push for an increase in sales volume at the expense of CCE's profits. Under the 1986 MBC, however, CCE is *obligated* to submit its annual plans to Coke and those plans must be approved by Coke.[FN40] The revised plan did not call for a waste of CCE's assets or resources; rather, it called for a 5.5% gross profit gain combined with an increase in projected sales volumes instead of the 7.3% gain combined with a decrease in projected sales called for in the original plan. This was clearly permitted and expected under the terms of the 1986 MBC. If plaintiffs have a valid claim on this point, they had it in 1986.

> FN40. MBC art. VI, ¶ 20(a).

*6 The claim challenging the use of databases by Coke to track sales of CCE also appears to have been abandoned by plaintiffs. Even if it were not, the use of databases provided by Coke to CCE is clearly permitted by and contemplated in the 1986 MBC.[FN41] Again, if there is a valid claim, it is a claim that existed in 1986.

> FN41. *See id.* at art. XII, ¶ 36.

Finally, the crux of the claim challenging the alleged channel stuffing is that "Coke routinely has forced CCE to purchase additional beverage base or concentrate beyond CCE's immediate needs, and/or has raised prices on such materials, without adequate notice, all in order to improve Coke's own financial condition and meet Coke's earnings guidance and sales volume projections."[FN42] Coke has every right, however, under the 1986 MBC to "revise at any time, in its sole discretion, the price

of any of the Concentrates or Syrups, the terms of payment, and other terms and conditions of supply, any such revision to be effective immediately upon notice to the Bottler."[FN43] Plaintiffs have alleged only that Coke exercised its rights under the contract.

> FN42. Am. Compl. ¶ 85.

> FN43. MBC art. V, ¶ 14(a).

Each one of these claims is, therefore, time-barred because each "hinges upon the allegations that the terms and conditions established by a contract are unfair to the plaintiff[s]."[FN44] Plaintiffs attempt to avoid dismissal by claiming that they are challenging the actions taken in the last three years,[FN45] but concede that the contract "may have provided the means by which the Defendants effectuated their breaches of fiduciary duty."[FN46] Plaintiffs took a similar position (and made a similar concession) at oral argument.[FN47] This is precisely the argument considered and rejected by Chancellor Allen in *Kahn*[FN48] and by the Federal District Court in *Marvel*.[FN49] I likewise reject it. The actions challenged in the amended complaint represent the manifestation of the bargain struck in 1986 between Coke and CCE.[FN50] Absent tolling, therefore, these claims are barred by section 8106.[FN51]

> FN44. *In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 74 (D.Del.2002) (interpreting Delaware law).

> FN45. Plaintiffs' reliance on *Teachers' Ret. Sys. of La. v. Aidinoff* is misplaced. There, the Court found a claim based on actions taken under a contract was not time-barred because the contract had a provision that granted an annual right of termination. 900 A.2d 654, 666 (Del. Ch.2006). The Court found that the complaint was actually challenging the decision of the defendants to continue to honor the harmful contract when they could have opted out each year. *Id.* Here, the 4plaintiffs admit that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 9
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

MBC is perpetual. Am. Compl. ¶ 95; MBC art. VIII, ¶ 24.

FN46. Pls.' Answering Br. at 21.

FN47. Transcript of Oral Argument at 53.

FN48. *Kahn v. Seaboard Corp.,* 625 A.2d 269, 271 (Del. Ch.1993).

FN49. *Marvel,* 273 B.R. at 74.

FN50. *Compare Kahn,* 625 A.2d at 270 (quoting complaint: "defendants have violated their duty of loyalty by structuring such transaction so as to obtain better terms for Flour than would have been the case had the transaction been negotiated on an arm's-length basis"), *with* Am. Compl. ¶ 56 ("Coke also requires CCE to pay a higher price for beverage base and concentrate than CCE otherwise would have paid to Coke if CCE's beverage base agreements with Coke had been negotiated at arms' length").

FN51. Plaintiffs' claims may also be barred under 8 *Del. C.* § 327, which requires ownership of stock contemporaneously with the wrongs challenged in a derivative suit. Plaintiffs have only alleged that they owned CCE stock from October 15, 2003, to the present, but the wrong actually complained of is the 1986 MBC. *See 7547 Partners v. Beck,* 682 A.2d 160 (Del.1996) (strictly applying section 327 to bar a derivative suit).

### 3. *Plaintiffs Have Not Met their Burden of Establishing that the Statute has Been Equitably Tolled.*

When a complaint asserts a claim that is, as here, on its face barred by the statute of limitations, plaintiffs bear the burden of pleading specific facts demonstrating that the statute was tolled.[FN52] Equitable tolling will toll the statute of limitations "for claims of wrongful self-dealing,

even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary."[FN53] Nevertheless, neither equitable tolling nor any other theory can toll the statute of limitations beyond the point at which the plaintiff had actual knowledge or should have been aware of the facts giving rise to the wrong.[FN54]

FN52. *In re Dean Witter P'ship Litig.,* C.A. No. 14816, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998), *aff'd,* 725 A.2d 441 (Del .1999); *Yaw v. Talley,* C.A. No. 12882, at *6 (Del. Ch. Mar. 2, 1994).

FN53. *Dean Witter,* 1998 WL 443456, at *6; *see also Kahn,* 625 A.2d at 275.

FN54. *In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 585 (Del. Ch.2007) ("Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.").

Plaintiffs summarily state that they "did not know or have reason to know of Defendants' self-interested wrongdoing prior to 2004."[FN55] The amended complaint itself, however, belies that assertion by relying on and quoting from documents publicly filed with the SEC prior to 2004.[FN56] Moreover, plaintiffs undercut their own argument with the affected rhetoric of the complaint's allegations. In the amended complaint, plaintiffs conjure images of the long-suffering whipping boy CCE, mistreated "[s]ince [its] creation"[FN57] by Coke, whose abuses are recounted by CCE's former employees with "unanimity." FN58 With respect to the channel stuffing allegations, the amended complaint details practices from the "early 1990s,"[FN59] and it chronicles Coke's alleged domination from the 1980s to the present.[FN60] Finally, Coke and CCE have publicly disclosed their agreements with one

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

another and their individual finances in filings under the Federal securities laws. The plaintiffs have railed against particular actions that have occurred in the last three years, but those actions were the foreseeable results of a contract formed in 1986. Intermittently, plaintiffs seem to acknowledge as much.[FN61] As in *Tyson,* *"[i]f* plaintiffs believed that these contracts were unfair, they could reasonably have been aware of their injuries in [1986]."[FN62] Consequently, plaintiffs have failed to meet their burden of establishing that the statute of limitations has been tolled.

FN55. Pls.' Answering Br. at 20.

FN56.*See, e.g.,* Am. Compl. ¶¶ 62-64.

FN57.*Id.* at ¶ 1.

FN58.*Id.* at ¶¶ 68-73.

FN59.*Id.* at ¶ 91.

FN60.*Id.* at ¶¶ 46-49.

FN61.*See* Pls.' Answering Br. at 21 (admitting that the MBC "may have provided the means by which the Defendants effectuated their breaches of fiduciary duty"); Transcript of Oral Argument at 53 ("[W]e believe that the control arises as a result of the contractual relationships and the actions taken pursuant to those contractual relations....").

FN62.*In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 586 (Del. Ch.2007).

### III. CONCLUSION

*7 CCE's relationship with Coke may not be optimal, but it is guided by a contract formed in 1986. If the plaintiffs in this action or if CCE's shareholders in general believe it is time CCE took a more aggressive, competitive stance vis-à-vis Coke, they ought to put pressure on management; they cannot

seek to do so by dressing up their frustration in the guise of fiduciary duty claims. Because the amended complaint objects to so-called wrongs that all rationally flow from Coke and CCE's 1986 agreement, plaintiffs' claims accrued in 1986. Because plaintiffs have alleged facts that show they either were or should have been aware of these claims for far more than three years before filing this action, the amended complaint is dismissed as time-barred.

IT IS SO ORDERED.

Del.Ch.,2007.
In re Coca-Cola Enterprises, Inc.
Not Reported in A.2d, 2007 WL 3122370 (Del.Ch.), 33 Del. J. Corp. L. 227

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 6

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)

▷
Commissariat A L'Energie Atomique v. Tottori
Sanyo Electronic Co., Ltd.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
DELL COMPUTER CORPORATION, et al., De-
fendants.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
TOTTORI SANYO ELECTRONIC CO., LTD., De-
fendant.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
BEST BUY CO. OF MINNESOTA, INC., et al.,
Defendants.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
FUJITSU LIMITED, et al., Defendants.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
TATUNG COMPANY, et al., Defendants.
**No. Civ.A. 03-484-KAJ, Civ.A. 03-857-KAJ,
Civ.A. 03-931-KAJ, Civ.A. 03-1036-KAJ, Civ.A.
04-99-KAJ.**

May 13, 2004.

Richard D. Kirk, Morris, James, Hitchens & Willi-
ams, Wilmington, DE, for Plaintiffs and Counter-
Defendant.
Richard L. Horwitz, Potter Anderson & Corroon,
LLP, Wilmington, DE, for Defendants and Counter-
Claimant.
William J. Marsden, Jr., Fish & Richardson, P.C.,
Robert H. Richards, III, William J. Wade, Richards,
Layton & Finger, M. Duncan Grant, Pepper

Hamilton LLP, Josy W. Ingersoll, Young, Con-
away, Stargatt & Taylor, Jeffrey S. Goddess,
Rosenthal, Monhait, Gross & Goddess, Wilming-
ton, DE, for Defendants.

*MEMORANDUM ORDER*

JORDAN, J.

I. INTRODUCTION

**\*1** Presently before me are several Motions to Con-
solidate filed by plaintiff, Commissariat à l'Énergie
Atomique ("CEA"), in the following patent in-
fringement cases currently pending in this court:
*CEA v. Dell Computer Corp., et al.,* Civ. No.
03-484-KAJ (D.Del. May 19, 2003) (Docket Item
["D.I."] 89, D.I. 142); *CEA v. Tottori Sanyo Elec-
tronic Co., Ltd.,* Civ. No. 03-857-KAJ (D.Del. Sept.
4, 2003) (D.I.10, D.I.27); *CEA v. Best Buy Co., et
al.,* Civ. No. 03-931-KAJ (D.Del. Oct. 6, 2003)
(D.I.48, D.I.81); and *CEA v. Fujitsu Ltd.,* Civ. No.
03-1036-KAJ (D.Del. Nov. 13, 2003) (D.I.14).
Also before me are Motions to Stay the Case filed
by the defendants in Civ. No. 03-484-KAJ (D.I.93);
Civ. No. 03-931-KAJ (D.I.47); and *CEA v. Tatung
Co., et al.,* Civ. No. 04-099-KAJ (D.Del. Feb. 13,
2004) (D.I.16). For the reasons that follow, CEA's
Motions to Consolidate will be granted in part and
denied in part and the defendants' Motions to Stay
the Case will be granted.

II. BACKGROUND

CEA alleges, in all of the cases listed above, that
the defendants are infringing its U.S. Patent No.
4,701,028 ("the '028 patent") and U.S. Patent No.
4,839,412 ("the '412 patent"), which claim certain
liquid crystal display ("LCD") technology. (D.I. 90
at 3.) [FN1] CEA categorizes the defendants by en-
tity, as follows: module manufacturers, original
equipment                          manufacturers/distributors
("OEM/distributors"), and retailers. (D.I. 186 at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)

11:18-12:17.) In all, CEA has sued over 60 defendants on the same patents. (*Id.* at 15:6-11.) CEA would like the cases against all these defendants consolidated for discovery, pretrial, and trial purposes. (*Id.* at 17:18-18:2.)

> FN1. For ease of reference, and because plaintiffs and defendants essentially make the same arguments in all of their motions, I will cite the docket items associated with *CEA v. Dell Computer Corp., et al.,* Civ. No. 03-484-KAJ, and the transcript from the hearing on the parties' motions (D.I.186), unless otherwise noted. CEA did not file Motions to Consolidate in *CEA v. Tatung Co., et al.* and *CEA v. Sharp Corp., et al.,* Civ. No. 04-231-KAJ (D.Del. Apr. 13, 2004), which also allege infringement of the '028 and '412 patents. CEA also has a patent infringement case against Chi Mei Optoelectronics Corporation pending in the Northern District of California. (D.I. 186 at 9:20-23.)

At the hearing on the parties' motions, the defendants in all of the cases advanced a unified position in response to CEA's Motions to Consolidate.[FN2] (*Id.* at 20:3-12.) The defendants would like the case to go forward against the LCD module manufacturers only, those parties being Samsung Electronics, Fujitsu Display Technologies Corporation, and Tottori Sanyo, and for the case to be stayed against all remaining defendants. (*Id.* at 20:15-21:1; 43:12-18.)

> FN2. From this point forward, any reference herein to "the defendants" means those defendants who were represented at the April 20, 2004 hearing. This does not include the defendants in *CEA v. Tatung Co., et al.* or the defendants in *CEA v. Sharp Corp., et al.* (*See* D.I. 186 at 21:9-19.)

III. STANDARD OF REVIEW

In general, a district court has broad discretion when deciding whether to consolidate or stay proceedings. *See* Fed.R.Civ.P. 42(a); *Bechtel Corp. v. Laborers' International Union,* 544 F.2d 1207, 1215 (3d Cir.1976). Federal Rule of Civil Procedure 42 provides that, "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Fed.R.Civ.P. 42(a) (2004).

The power to stay proceedings "is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *Cheyney State College Faculty v. Hufstedler,* 703 F.2d 732, 738 (quotation omitted). When considering a motion to stay, the court considers the following factors: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues and trial of the case; (3) whether discovery is completed; and (4) whether a trial date has been set. *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991).

IV. DISCUSSION

A. CEA's Motion to Consolidate

**\*2** CEA argues that, because the pending actions involve the same patent, they necessarily have common questions of law and fact, and that this court "routinely grants motions to consolidate when two actions are pending that involve the same or similar patents." (D.I. 90 at 4-5.) CEA also argues that consolidation is appropriate when a single plaintiff has filed multiple actions in the same court (*id.*), particularly where, as here, the cases involve the same patents, the same infringing products, and the same distribution chain (*id.* at 6).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)

Page 3

At the April 20, 2004 hearing, the defendants proposed that the case go forward against the LCD module manufacturers, specifically, Samsung Electronics, Fujitsu Display Technologies Corporation, and Tottori Sanyo. (D.I. 186 at 20:15-21:1.) CEA argued that the retailer action, *CEA v. Best Buy Co., et al.,* Civ. No. 03-931-KAJ, should be consolidated with the manufacturer actions, the main reason being that haling the retailers into this court will force the manufacturers to consent to jurisdiction in order to defend their products. (*Id.* at 49:25-50:19.)

Because the defendants did not object to consolidating the cases against Samsung Electronics, Fujitsu Display Technologies Corporation, and Tottori Sanyo at the hearing (*see id.* at 22:2-6), and because the cases involve common questions of law and fact pertaining to infringement of the '028 and '412 patents, those cases will be consolidated for all pretrial and trial purposes, without prejudice to any of the manufacturers filing a motion to sever from the others at trial, once the pretrial matters are concluded. However, I will not consolidate the retailer action with the manufacturer cases. CEA has not come forward with any compelling reason why the case against the retailers should proceed in lockstep with the cases against the manufacturers. Therefore, CEA's Motions to Consolidate will be granted in part and denied in part; they are granted to the extent that they seek to consolidate the Samsung Electronics, Fujitsu Display Technologies Corporation, and Tottori Sanyo module manufacturers, and denied to the extent that they seek to consolidate the remaining defendants.

B. Defendants' Motions to Stay the Case

Defendants argue that CEA's case against the OEM/distributors and retailers should be stayed pending resolution of the case against the manufacturers. (D.I. 94 at 5; D.I. 186 at 41:23-42:11.) CEA responds that it would be unduly prejudiced and placed at a tactical disadvantage if a stay were granted, and that granting a stay as to the retailers would not simplify the issues in this case. (D.I. 106

at 4-6.) Applying the factors enumerated in *United Sweetener, supra,* I find that it is appropriate to stay the case against the OEM/distributors and the retailers pending the outcome of the case against the manufacturers.

First, CEA has not articulated, in its papers or at the hearing (*see* D.I. 186 at 25:24-29:4) any real prejudice or tactical disadvantage that it would suffer if the proceedings against the OEM/distributors and retailers are stayed. *See United Sweetner,* 766 F.Supp. at 217. CEA asserts that a stay would "substantially delay" its right to adjudicate its claims against the remaining defendants and that it would be most efficient for the court and the parties "to take discovery and present arguments in this case only one time and not through delayed piecemeal litigation."(D.I. 106 at 5.) Should CEA prevail in this case, it will be compensated for any delay it experiences in recovering damages against the remaining defendants by interest on the award. CEA also argues that, should a preliminary injunction be entered against the manufacturers,[FN3] the injunction would not be broad enough to encompass the retailers if the case against them is stayed. (D.I. 186 at 35:7-36:4.) Such a speculative argument, on its own, does not demonstrate enough prejudice to outweigh the remaining factors in favor of granting a stay. Furthermore, and as explained more fully below, staying the case against the remaining defendants may streamline the case and avoid piecemeal litigation altogether.

> FN3. CEA has filed Motions for a Preliminary Injunction in *CEA v. Dell* (D.I.58) and *CEA v. Tottori Sanyo* (D.I.18).

*3 Although CEA argues that granting a stay would not simplify the issues pending against the retailers, "[i]t is common practice to stay all pending [patent] litigation except the first suit between the patent owner and a manufacturer or a higher level supplier."David F. Herr, *Annotated Manual for Complex Litigation,* § 33.63 (3d ed.2003); *see also Katz v. Lear Siegler, Inc.,* 909 F.2d 1459, 1464 (Fed.Cir.1990) ("litigation against or brought by the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)

Page 4

manufacturer of infringing goods takes precedence over a suit by the patent owner against customers of the manufacturer"). Because the manufacturers are intimately involved in the design, operation, and use of the accused LCD panels, they are in the best position to contest the validity and infringement of CEA's asserted patents. Resolving these issues prior to proceeding against the OEM/distributors and retailers would surely simplify this case. If, for example, CEA's patents were found invalid or the manufacturers would found to be not infringing, then there would be no need to proceed against the OEM/distributors or retailers, thus conserving judicial resources and expense to the parties.[FN4]

> FN4. As to the final two *United Sweetener* factors, discovery is not complete in any of the cases, and even though a trial date in October 2005 has been set in *CEA v. Dell,* Civ. No. 03-484-KAJ (*see* D.I. 106 at 3), neither of these factors weigh strongly against granting a stay under the circumstances presented by these cases.

V. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that CEA's Motions to Consolidate in *CEA v. Dell Computer Corp., et al.,* Civ. No. 03-484-KAJ (D.I.89, D.I.142); *CEA v. Tottori Sanyo Electronic Co., Ltd.,* Civ. No. 03-857-KAJ (D.I.10, D.I.27); and *CEA v. Fujitsu Ltd.,* Civ. No. 03-1036-KAJ (D.I.14) are GRANTED IN PART and DENIED IN PART. They are GRANTED to the extent that they seek to consolidate the cases against Samsung Electronics, Fujitsu Display Technologies Corporation and Tottori Sanyo for pretrial and trial purposes, without prejudice to defendants filing motions to sever once the pretrial matters are completed; and in all other respects, CEA's Motions to Consolidate are DENIED. Counsel should confer on an appropriate simplified case caption for the proceeding against the three named manufacturer defendants. It is further ORDERED that CEA's Motions to Consolidate in *CEA v. Best Buy Co., et al.,* Civ. No. 03-931-KAJ (D.I.48, D.I.81) are DENIED. It is fur-

ther ORDERED that defendants' Motions to Stay the Case in Civ. No. 03-484-KAJ (D.I.93); Civ. No. 03-931-KAJ (D.I.47); and Civ. No. 04-099-KAJ (D.I.16) are GRANTED to the extent that they seek to stay the proceedings against the OEM/distributors and retailers.

D.Del.,2004.
Commissariat A L'Energie Atomique v. Tottori Sanyo Electronic Co., Ltd.
Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 7



Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

**H**
In re Computer Sciences Corp. Derivative Litigation
C.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
In re COMPUTER SCIENCES CORPORATION
DERIVATIVE LITIGATION.
This Document Relates to All Cases.
**Lead No. CV 06-05288 MRP (Ex).**
**Nos. CV 06-05356 MRP (Ex), CV 06-06512 MRP**
**(Ex).**

March 26, 2007.

Chad Allen Carder, Jeffrey W. Golan, Barrack Rodos and Bacine, Philadelphia, PA, John L. Haeussler, Stephen R. Basser, Barrack Rodos and Bacine, San Diego, CA, for Plaintiff.
Dean J. Kitchens, Gibson Dunn & Crutcher, Los Angeles, CA, for Defendant.

**ORDER GRANTING DEFENDANT COM-
PUTER SCIENCES CORPORATION'S MO-
TION TO DISMISS PLAINTIFFS' SHARE-
HOLDER DERIVATIVE COMPLAINT FOR
FAILURE TO PLEAD DEMAND FUTILITY
PURSUANT TO FED. R. CIV. P. 23.1 AND
12(B)(6)**

Hon. MARIANA R. PFAELZER, United States
District Judge.

I.

**INTRODUCTION**

**\*1** Plaintiffs [FN1] are shareholders of Nominal Defendant Computer Sciences Corporation ("CSC" or the "Company") and have brought this derivative case alleging the improper "backdating" of options to buy CSC stock, which were granted to certain

CSC executives between May 1996 and May 2004. Plaintiffs' Verified Corrected Consolidated Shareholder Derivative Complaint, filed January 3, 2007 (the "Complaint"), asserts a series of exclusively derivative state and federal law claims against two sets of Defendants: 1) CSC executives who received and/or participated in the granting of the backdated options (collectively, the "Officer Defendants" (*see* Compl. ¶¶ 16-27)); and 2) members of the CSC board of directors who approved the stock option grants and/or any financial statements or disclosures that misrepresented information related to the option grants (collectively, the "Director Defendants" (*see* Compl. ¶¶ 28-40)). Plaintiffs, alleging futility, have not made a demand on CSC's board. Defendants have moved to dismiss Plaintiffs' Complaint, arguing: 1) Plaintiffs have failed to make a demand or to properly plead with particularity that demand is excused under Federal Rules of Civil Procedure 23.1 and 12(b)(6); and 2) Plaintiffs have failed to establish standing by alleging they owned CSC stock at the time the questioned backdating transactions occurred, pursuant to Rule 23.1.[FN2]

FN1. Plaintiffs include lead plaintiff, Laborers International Union of North America National Industrial Pension Fund, and consol plaintiffs, LIUNA Staff and Affiliates Pension Fund and Daniel Huffman.

FN2. (*See* Nominal Defendant CSC's Motion to Dismiss Plaintiffs' Shareholder Derivative Complaint for Failure to Plead Demand Futility Pursuant to Fed.R.Civ.P. 23.1 and 12(b)(6), filed Jan. 8, 2007 ("CSC Motion"); Director and Officer Defendants' Motion to Dismiss Plaintiffs' Shareholder Derivative Complaint Pursuant to Fed.R.Civ.P. 12(b)(6), filed Jan. 8, 2007; Defendant Thomas A. McDonnell's Motion to Dismiss Plaintiffs' Shareholder Derivative Complaint Pursuant to Fed.R.Civ.P. 12(b)(6), filed Jan. 19, 2007.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

The Court finds that while all of Plaintiffs' claims are derivative, thereby requiring a demand on CSC's board under governing Nevada law, Plaintiffs have not pled with sufficient particularity why demand should be excused in this case. Further, Plaintiffs have not alleged that they owned CSC stock during all of the relevant periods when the questioned transactions occurred as well as during the pendency of this case, as is required by Rule 23.1. Accordingly, the Court *GRANTS* Nominal Defendant CSC's Motion to Dismiss Plaintiffs' Complaint, with *LEAVE TO AMEND.*

## II.

## BACKGROUND

CSC, a Nevada corporation formed in 1959 that currently has approximately 77,000 employees and over $14 billion in annual revenues, provides information technology consulting services worldwide. The Company's shares are traded on the New York Stock Exchange.

On June 29, 2006, CSC issued a press release announcing that the Securities and Exchange Commission ("SEC") had launched an investigation of the Company's stock option grants and stock option practices. (Compl.¶ 5.) It later confirmed the SEC investigation and an investigation by the U.S. Attorney's Office for the Eastern District of New York in another press release on August 1, 2006.(*Id.*) In response to these announcements, Plaintiffs each filed separate shareholder derivative complaints against CSC on various dates between August and October 2006, asserting federal and state law claims related to allegations of options backdating. This Court consolidated the cases, and Plaintiffs filed a Verified Corrected Consolidated Complaint on January 3, 2007.

*2 The practice of backdating a stock option occurs when persons responsible for the timing, pricing and/or approval of a stock option grant retroact-

ively set the exercise price for the option based on a date other than the date on which the option was actually granted. Often, the exercise price of these options is set on a date that precedes a known rise in the company's stock price, thereby increasing the likelihood, if not guaranteeing, that the options are "in the money" upon exercise and immediately increasing the value, or compensation, to the grantee. This practice is contrary to a compensatory stock option's basic purpose of aligning company management and shareholder interests in maximizing the value of the company and its stock, as a manager who can retroactively pick the exercise price of his options is less concerned about prospectively earning or increasing their value by performing his duties well. However, the practice is not improper, in and of itself, provided it is: 1) fully disclosed to necessary parties, including securities and tax authorities, corporate directors and shareholders; 2) properly accounted for under Generally Accepted Accounting Principles ("GAAP") in the company's financial disclosures to shareholders, the SEC and other regulatory agencies; 3) correctly taxed at both the company and grantee levels; and 4) permitted under the company's bylaws and/or shareholder-approved stock option plans.

Problems arise, however, when these conditions are not met, as management may have an incentive to conceal the backdating in order to receive the likely higher compensation without incurring its attendant costs to the company and themselves. This potentially violates management's fiduciary duties, including the duty of loyalty, among others. Concealment of the backdating can take many forms, including "schemes to falsify corporate books and records, to mislead the corporation's board of directors and outside auditors, to file false reports and financial statements with the [SEC], and to mislead shareholders, the investing public and the financial press."(Compl.¶ 47.) These schemes can result in "significant accounting, disclosure and tax consequences" for the company. (Compl.¶¶ 46, 52-53.)

Plaintiffs allege that between 1996 and 2004, the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

Page 3

CSC Director and Officer Defendants "colluded" with one another to: 1) improperly backdate CSC option grants to CSC Chief Executive Officer ("CEO") Van Honeycutt and several other CSC executives in violation of shareholder-approved stock option plans; 2) improperly record and account for the backdated option grants in violation of GAAP; 3) improperly take tax deductions based on backdated option grants in violation of the Internal Revenue Code; 4) produce and disseminate false financial statements and other SEC filings that improperly accounted for the backdated option grants and concealed their existence; and 5) improperly exercise or permit the exercise of the backdated options.FN3

> FN3. Plaintiffs' Complaint divides the various Defendants into the following named groups:
>
> • *Director Defendants:* Irving W. Bailey, II ("Bailey"), F. Warren McFarlan ("McFarlan"), Thomas H. Patrick ("Patrick"), Stephen L. Baum ("Baum"), Rodney F. Chase ("Chase"), David J. Barram ("Barram"), Thomas A. McDonnell ("McDonnell"), William R. Hoover ("Hoover"), James R. Mellor and William P. Rutledge (Compl.¶ 40);
>
> • *Officer Defendants:* Van B. Honeycutt ("Honeycutt"), Leon J. Level ("Level"), Thomas R. Madison, Jr., Ronald W. Mackintosh, Milton E. Cooper, Edward P. Boykin, Michael W. Laphen ("Laphen"), Paul M. Cofoni ("Cofoni"), Paul T. Tucker and Hayward D. Fisk ("Fisk") (Compl.¶ 27);
>
> • *Compensation Committee Defendants:* Bailey, McFarlan and Patrick (Compl.¶ 35);
>
> • *Audit Committee Defendants:* Bailey, Patrick, Baum, Chase and Barram (Compl.¶ 39);

• *Nominating and Corporate Governance Committee:* Baum, Chase and McFarlan (Compl.¶¶ 13, 128); and

• *Insider Selling Defendants:* Cofoni, Fisk, Honeycutt, Laphen and Level (Compl.¶ 113).

**\*3** Plaintiffs' specifically derivative claims are: 1) against all Defendants for breach of fiduciary duties; 2) against the Director Defendants for violating Section 14(a) of the Securities Exchange Act; 3) against all Defendants for breach of fiduciary duties relating to the filing of false financial statements with the SEC; 4) against the Officer Defendants for unjust enrichment; 5) against all Defendants for gross mismanagement; 6) against all Defendants for constructive fraud; 7) against all Defendants for corporate waste; 8) against the Insider Selling Defendants for breach of fiduciary duties for insider selling and misappropriation of information; 9) against the Insider Selling Defendants for violation of California Corporations Code § 25402; 10) against the Director Defendants for violation of California Corporations Code § 25403; 11) against the Officer Defendants for rescission; 12) against all Defendants for constructive trust; and 13) against Defendants Honeycutt, Level, Bailey, Baum, Chase, Hoover and McFarlan for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5. (Compl.¶¶ 156-226.) On February 28, 2007, Plaintiffs voluntarily dismissed all claims against Defendant Michael E. Keane, as well as their claims for abuse of control and disgorgement under the Sarbanes Oxley Act of 2002 against the remaining Defendants.

Plaintiffs support their core allegations of options backdating by citing to: 1) the two CSC press releases disclosing the government investigations; and 2) the allegedly coincidental timing of options grants just before substantial rises in CSC's stock price between 1996 and 2004, which Plaintiffs describe as a "striking pattern that could not be the result of chance."(Compl.¶¶ 70-71, 109.) Plaintiffs seek to recover damages based on additional tax

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

and compensation expenses resulting from the backdated options, as well as costs they claim will arise from the internal investigations, responses to government investigations and other results of the alleged backdating.

### III.

### DISCUSSION

#### A. Legal Standards

*1. Motion to Dismiss under Rule 12(b)(6)*

A court should dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d 924, 928 (9th Cir.1994). Review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir.1996). Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss. *Assoc. Gen. Contractors, Inc. v. Metro. Water Dist. of So. Cal.,* 159 F.3d 1178, 1181 (9th Cir.1998). In dismissing for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995) (citations omitted).

*2. Shareholder Derivative Suits under Rule 23.1*

*4 Under Federal Rule of Civil Procedure 23.1, a shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such a demand would have been futile. Fed.R.Civ.P. 23.1. All of Plaintiffs' claims in this case are derivative, requiring a demand on CSC's board or a particularized showing of demand futility.[FN4]Rule 23.1, however, does not establish the circumstances under which demand would be futile, which are instead determined under the law of CSC's incorporating state, Nevada. *In re Silicon Graphics, Inc. Secs. Litig.,* 183 F.3d 970, 989-90 (9th Cir.1999) (citing *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)). Nevada law is consistent with both Federal Rule of Civil Procedure 23.1 and Delaware law regarding demand futility pleading requirements, and Nevada courts look to Delaware law for guidance on issues of corporate law. *See*Nev.Rev.Stat. § 41.520(2) (West.2007), *and*Nev. R. Civ. P. 23.1 (requiring particularized pleading for plaintiff's failure to make a demand on the board); *see also Shoen v. SAC Holding Corp.,* 137 P.3d 1171, 1179-80 (Nev.2006) (applying Delaware law's particularity requirements for pleading demand futility). However, on a motion to dismiss for failure to comply with the requirements of Rule 23.1 and Delaware law, a court limits its consideration of the facts to the particularized facts alleged in the complaint, thus Plaintiffs' pleading burden is more onerous than that required to withstand an ordinary motion to dismiss. *Aronson,* 473 A.2d at 813. Conclusory "allegations of facts or law not supported by allegations of specific fact may not be taken as true."*Levine v. Smith,* 591 A.2d 194, 207 (Del.1991).

> FN4. Plaintiffs argue that their derivative claim under Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), for alleged misrepresentations in CSC proxy statements is not subject to a demand requirement, citing persuasive authority in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

the form of two cases from the Southern District of New York, *Vides v. Amelio,* 265 F.Supp.2d 273, 276 (S.D.N.Y.2003), and *Katz v. Pelz,* 774 F.Supp. 121, 127 (S.D.N.Y.1991). These two cases held there was no demand requirement for a derivative Section 14(a) claim by looking at "Delaware law and federal policy." *Vides,* 265 F.Supp.2d at 276. Subsequent cases from that district that have disagreed with the holding and reasoning of these cases, finding instead that Second Circuit case law clearly supported the application of the demand requirement to derivative Section 14(a) claims. *See, e.g., St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler,* No. 06 Civ. 688(SWK), 2006 WL 2849783, at *4-*9 (S.D.N.Y. Oct.04, 2006) (citing *Lewis v. Graves,* 701 F.2d 245, 247-50 (2d Cir.1983) and other S.D.N.Y. cases that hold the demand requirement applicable to derivative Section 14(a) litigation), The parties in this case have not cited to, and the Court is not aware of, any Ninth Circuit or other binding precedent that speaks to this issue. The Court has reviewed all of the cases cited by both parties and finds more persuasive the ones requiring a demand for derivative Section 14(a) claims for the reasons stated in the *St. Clair* case. *See St. Clair,* 2006 WL 2849783, at *4-*9. Accordingly, the Court finds demand is required for Plaintiffs' derivative Section 14(a) claim.

In order to evaluate whether demand is futile and excused, Nevada courts have adopted two different tests employed by Delaware courts. *See, e.g., Shoen,* 137 P.3d at 1181-84 (evaluating and applying the two Delaware law demand futility tests, under *Rales v. Blasband,* 634 A.2d 927, 933-34 (Del.1993), and *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)). When the alleged wrong constitutes a business decision by the whole board of directors, a court should employ the *Aronson* test,

which evaluates whether, under the particularized facts. alleged, a reasonable doubt is created that: 1) the directors are disinterested and independent; or 2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000). In contrast, when the board members who decided the challenged act have since changed or when the challenged act does not constitute a business decision by the board, a court should employ the *Rales* test, which determines whether the particularized factual allegations create a reasonable doubt that, as of the time the complaint was filed, a majority of the board could have properly exercised its independent and disinterested business judgment in responding to a demand. *Rales v. Blasband,* 634 A.2d 927, 934 (Del.1993).

**\*5** Directorial "interest" exists whenever divided loyalties are present, or where the director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. *Rales,* 634 A.2d at 936 (citations omitted). The personal benefit must arise "from the challenged transaction." *Id.* at 933.Director "independence" exists when a director's decision is based on "the corporate merits of the subject before the board" rather than on "extraneous considerations or influences." *Aronson,* 473 A.2d at 816. When lack of independence is charged, the plaintiff must allege particularized facts showing that the board is either dominated by an officer or director who is the proponent of the challenged transaction, perhaps by a close personal or familial relationship or by force of will, or that the board is so under the director or officer's influence that its discretion is "sterilized." *Rales,* 634 A.2d at 936;*Telxon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del.2002) (citation omitted).

Plaintiffs claim that they allege sufficient facts un-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

der either futility theory. Defendants argue that only the *Rales* test is appropriate because Plaintiffs have not sufficiently pled that they are challenging a transaction or decision that CSC's entire board, as a majority or whole, approved. For reasons discussed next, the Court finds that Plaintiffs' Complaint does not sufficiently allege that the wrongful actions related to the backdated options constitute transactions or decisions by CSC's whole board, thus only the *Rales* test is appropriate in evaluating demand futility.

Plaintiffs name all of the current CSC directors in the Complaint, but a plaintiff cannot show demand futility merely because the derivative complaint generally "alleges that a majority of the directors participated in wrongful acts, without regard to their impartiality or to the protections of the business judgment rule."*Shoen,* 137 P.3d at 1180-81. Otherwise, the Complaint alleges that the Director Defendants "colluded" with unnamed CSC executives to backdate stock option grants and to disseminate false financial disclosures on behalf of CSC to conceal those grants. However, these allegations do not describe the particular role any one director played in the wrongful activity or explain the details of the "collusion" such that the backdating actions are attributable to the entire board. In fact, as it relates to the CSC board as of October 2006, the Complaint arguably only makes particularized allegations as to Honeycutt, who received a substantial number of the backdated options, and Compensation Committee Defendants Bailey and McFarlan, who were most directly responsible for the timing, pricing and approval of the backdated option grants between 1996 and 2004. (Compl.¶¶ 125-26.)

*6 Plaintiffs' Complaint tries to ascribe the backdated option grants by the Compensation Committee to: 1) the Audit Committee, who improperly accounted for those grants; 2) the Nominating and Corporate Governance Committee, who voted to keep Honeycutt as a director even after the allegations of his receipt of backdated options surfaced;

and 3) the board as a whole, by stating the other directors' "specialized financial expertise" and overarching responsibility to delegate, supervise and approve the committees' actions meant that the whole board "must have known" or "should have known" of the Compensation Committee's wrongdoing. (Compl.¶¶ 31, 33-38, 57-63, 125, 127-29, 131-36, 140.) These allegations, too, are insufficient to implicate the whole CSC board. *See Rales,* 634 A.2d at 934 n. 9 ("where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates), demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand"). Plaintiffs have not alleged with particularity which actions, omissions or communications would connect the members and actions of the various committees to each other and to the board as a whole, except to list the committees' and board's membership and intersecting fiduciary duties and responsibilities under CSC's bylaws. For the purpose of excusing demand, Plaintiffs cannot rely on the directors' statutory duties to fill in these deficiencies in the particularity of its allegations, or, effectively, to allege that what might have happened in law must have happened in fact.

Additionally, while the Complaint alleges that "entire board approved the decision to maintain Honeycutt as a director, Chairman and CEO" after the government investigations commenced (Compl.¶ 129), this decision does not reasonably imply that the entire board was complicit in the option backdating transactions. The decision by the board to maintain Honeycutt in his current positions is separate and distinct from the backdating transactions that occurred at the subcommittee level. These two decisions, or transactions, were made by different board member groups for likely different reasons, and any connection between the two is not particularized in the Complaint.

Finally, while the Complaint brings statutory claims for dissemination of false financial and proxy state-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

ments and other violations which might be otherwise attributable to a whole-board decision, Defendants correctly point out "that these claims have no factual basis independent of the alleged backdating activities[, as] liability for these claims will not exist absent proof of the underlying improper backdating transactions themselves;" these allegations do not amount to "concerted board action" with respect to the original backdating transaction. (CSC Mot. at 10 (citing *Shoen,* 137 P.3d at 1185 n. 63).)

For these reasons and the reasons discussed next, Plaintiffs' Complaint does not challenge any transaction or decision related to options backdating that was undertaken by the CSC board as a whole. Thus, this Court will evaluate Plaintiffs' allegations of demand futility under *Rales.*

**B. Defendants' Motion to Dismiss**

*7 Defendants move to dismiss the Complaint on the grounds that Plaintiffs did not make a demand on CSC's board, as required by Nevada and Delaware law, and that Plaintiffs fail to plead particularized facts excusing the demand, as required by Rule 23.1 and *Rales.*CSC also argues that Plaintiffs have not sufficiently alleged that they owned CSC stock during the periods in which the questioned transactions occurred, as is required by Rule 23.1.

*1. Demand Futility under the Rales Test*

In the Court's view, Plaintiffs' Complaint does not contain particularized allegations raising a reasonable doubt as to whether, as of the time the Complaint was filed, a majority of the board could have properly exercised its independent and disinterested business judgment in responding to a demand.*Rales,* 634 A.2d at 934. Plaintiffs' allegations do not show that "a majority of the board members are interested in the decision to act on the demand or dependent on someone who is interested in that decision."*Shoen,* 137 P.3d at 1185. Although the Complaint alleges a "substantial likelihood" of

liability for each and all of CSC's directors, it does not sufficiently plead particularized facts supporting this allegation such that this risk of liability constitutes an "interestedness" preventing them from impartially considering a demand. *Guttman v. Huang,* 823 A.2d 492, 499, 502-03 (Del.Ch.2003).

When Plaintiffs filed their derivative suits in August and October 2006, CSC's board consisted of seven directors, all of whom were outside, non-employee directors, with the exception of Honeycutt, who was both CEO of CSC and Chairman of CSC's board. A brief overview of the directors' board and committee membership as of October 2006 is as follows:

• Honeycutt: insider, CEO of CSC since 1995, director since 1993 and Chairman of the board since 1997;

• Bailey: outsider, director since 1992, served on the Compensation Committee from 1996 until May 2004;

• Barram: outsider, director since November 2004;

• Baum: outsider, director since 1999;

• Chase: outsider, director since 2001;

• McFarlan, outsider, director since 1989, served on the Compensation Committee from 1996 until May 2004; and

• Patrick: outsider, director since 2004, served on the Compensation Committee since August 2004.

(*See generally* Compl. ¶¶ 12-41.) [FN8]Plaintiffs' allegations focus primarily on the Director Defendants' interestedness in having participated in either the backdating or related transactions, or in facing a "substantial likelihood" of personal liability for their roles in the backdating scheme. With the exception of Honeycutt, Plaintiffs' Complaint does not appear to target, or raise a reasonable doubt as to, any other director's independence. The Court will thus address the interestedness of each Director

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

Page 8

Defendant group and board committee, as cited in the Complaint.

> FN5. In support of the CSC Motion, Defendants have asked the Court to take judicial notice of the following documents: 1) CSC's SEC Schedule 14A Proxy Statement, filed on June 30, 2004; 2) certain sections of CSC's Restated Articles of Incorporation, dated June 11, 2003; 3) CSC's Form 8-K, filed with the SEC on November 8, 2004; and 4) several SEC Forms 4, filed with the SEC on May 14, 2004. (*See* Defendants' First and Second Requests for Judicial Notice in Support of the Motion to Dismiss by Computer Sciences Corporation and Director and Officer Defendants Pursuant to Fed.R.Civ.P. 12(b)(6), filed Jan. 8, 2007 and Feb. 22, 2007, respectively.)

> Plaintiffs do not oppose Defendants' requests. The Court therefore takes judicial notice of these documents under Federal Rule of Evidence 201, as they are: 1) public records filed with the SEC; 2) documents whose contents are alleged in Plaintiffs' Complaint; and 3) documents that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."Fed.R.Evid. 201(b).*See Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F.3d 1022, 1025 n. 2 (9th Cir.2006) (court may take judicial notice of public records); *United States v. Ritchie,* 342 F.3d 903, 907-08 (9th Cir.2003) (in evaluating Rule 12(b)(6) motion, court may consider documents external to the complaint by judicial notice or by incorporation by reference in the complaint); *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994) ("court documents whose contents are alleged in a complaint and whose authenticity no

party questions ... may be considered in ruling on a Rule 12(b)(6) motion to dismiss"), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir.2002).

From these documents, the Court accepts as true the following relevant facts for the limited purpose of adjudicating the issues raised by the CSC Motion: 1) CSC director Patrick first joined the Compensation Committee of the CSC board on August 9, 2004; 2) CSC director Barram first joined the CSC board on November 8, 2004; and 3) the SEC Forms 4 filed with the SEC on May 14, 2004 disclosed certain option grants that were made on May 12, 2004, bearing an exercise price of $39.04 per share, to the individuals, and in the amounts, found on those forms, which are listed in the second request for judicial notice.

*a) Honeycutt*

**\*8** The Court finds that the Complaint alleges with particularity that Honeycutt is an interested director, because he received a substantial number (approximately 2.5 million) of the backdated options. (Compl.¶¶ 16, 67.) By receiving a personal financial benefit from the challenged options grants that is not equally shared by the stockholders, he is potentially facing a "materially detrimental impact" caused by liability or required restitution for the received options that is not shared by the corporation or its stockholders if those grants are found to be wrongful. *Rales,* 634 A.2d at 936 (citations omitted).

*b) Compensation Committee Defendants*

The Complaint alleges that CSC's Compensation Committee "is specifically responsible under its charter for reviewing and approving stock options and other equity awards to CSC insiders."(Compl.¶

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

126.) Three directors-Bailey, McFarlan and Patrick are named as Compensation Committee Defendants, but only two-Bailey and McFarlan-served during the period in which the backdating transactions occurred from May 1996 to May 2004. The Court finds that the Complaint makes particularized allegations creating a reasonable doubt as to Bailey's and McFarlan's interestedness, due to their direct participation in the options backdating transactions as the primary gatekeepers for CSC's options grant process during the liability period.

However, the Court does not believe the same is true with respect to the third Compensation Committee Defendant, Patrick. Patrick joined the Compensation Committee in August 2004, whereas the last wrongful backdating transaction occurred in May 2004, before Patrick served on the Committee. Plaintiffs' allegations that Patrick "must have known" or "should have known" of any wrongdoing by his predecessors on the Compensation Committee by virtue of his fiduciary duties, "specialized financial expertise" and later service on the same committee are conclusory and lack particularity in connecting Patrick to the backdating transactions. *See Guttman,* 823 A.2d at 505-07 (holding conclusory allegations that directors failed to prevent wrongdoing do not establish a "substantial likelihood" of personal liability). Plaintiffs also contend that Patrick is liable and interested as a Compensation Committee Defendant, notwithstanding his August 2004 committee service start date, because there is "no way" to know when the last backdated option grant, dated May 12, 2004, actually occurred. However, documents that Plaintiffs' Complaint cites, including several SEC Forms 4 from 2004, show that this last option grant was disclosed to, and filed with, the SEC on May 14, 2004, only two days after the options' alleged grant date, but still several months before Patrick commenced his service on the Compensation Committee. Therefore, Plaintiffs' allegations with respect to director Patrick's involvement in the backdating transactions are without sufficient particularity to show he is interested.

*c) Audit Committee Defendants*

**\*9** CSC's Audit Committee, according to the Complaint, had primary responsibility for properly accounting for the Compensation Committee's recommended option grants in the Company's financial disclosures to shareholders, regulators and tax authorities. (Compl.¶¶ 61, 119-120, 127.) The Complaint names Bailey, Patrick, Baum, Chase and Barram as Audit Committee Defendants, and alleges that the Audit Committee Defendants "colluded" with the Compensation Committee Defendants in generating, approving and disseminating improper and false accounting and financial statements that concealed the backdated options, in violation of GAAP, federal securities laws and other regulations. (Compl.¶ 127.)

As stated previously, Plaintiffs have not alleged with particularity which actions, omissions or communications would connect the members and actions of the Compensation Committee to the Audit Committee, except to list the two committees' membership and intersecting fiduciary duties and responsibilities under CSC's bylaws. Plaintiffs would have the Court assume that the Audit Committee Defendants performed their statutory duties in communicating with the Compensation Committee and Honeycutt and in accounting for the backdated options, but that they violated their fiduciary duties by doing so in a manner that wrongfully concealed the alleged impropriety of the option grants. These allegations will not suffice for the purposes of evaluating demand futility. First, Plaintiffs' simple allegation that the Audit Committee members must have done their statutory duties in communicating information relevant to the backdating while knowing and concealing its wrongful aspects, is not particularized. The Court requires more specific allegations of facts concerning the likely or actual time, place and manner of specific communications related to the wrongful backdating as well as facts supporting the alleged knowledge of the Audit Committee Defendants of the backdating, as opposed to communications and knowledge of op-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

tion grants, in general. Second, the Company's "directors are entitled to a presumption that they were faithful to their fiduciary duties," which, without more particularized facts showing otherwise, precludes the Court from assuming that the Audit Committee members violated their fiduciary duties while performing their statutory duties.*Beam v. Stewart,* 845 A.2d 1040, 1048 (Del.2003); *In re Silicon Graphics,* 183 F.3d at 989.

Plaintiffs' allegations otherwise reduce to a conclusory assertion that the Audit Committee Defendants knowingly disseminated false financial statements that concealed the Compensation Committee's backdating, because the Audit Committee members' fiduciary duties and accounting expertise required them to detect and report accounting errors. However, mere oversight or error in detecting accounting irregularities does not establish a "substantial likelihood" of director liability. *See, e.g., Guttman,* 823 A.2d at 507 (no demand futility shown because allegations did not establish that audit committee members could have been expected to discover accounting irregularities). Likewise, a Complaint cannot establish a "substantial likelihood" of director liability that excuses demand by merely making conclusory allegations that a director disseminated financial statements he knew to be false. *Id.* at 503-07.With the exception of Bailey, who also served on the Compensation Committee when the backdated option grants occurred, the Court finds that the Complaint does not establish a reasonable doubt that the other Audit Committee Defendants are disinterested and able to impartially consider a demand to investigate the options backdating transactions.

*d) Nominating and Corporate Governance Committee Defendants*

**\*10** The Complaint also faults the Nominating and Corporate Governance Committee, which is responsible for recommending director, committee and chairperson nominations and advises on corporate governance issues. (Compl.¶ 128.) Baum, Chase

and McFarlan are named as Defendants because of their membership on this committee. (*Id.*) The Complaint tries to attribute the improper actions of the Compensation Committee to the Nominating and Corporate Governance Committee, because it voted to keep Honeycutt as a director even though he was a primary recipient of the backdated options. Plaintiffs allege that this vote "unnecessarily diluted the Board's ability to objectively examine accounting problems from Honeycutt's tenure as Chairman and CEO, and heightened Honeycutt's ability to promote his self-interests in that regard."(*Id.*)

It is not clear what this allegation means in the demand futility analysis. If the purpose of this allegation is to show that this committee, generally, arid its members, individually, demonstrated a lack of independence from Honeycutt by voting to retain him in the face of alleged wrongdoing, the Complaint does not do so with sufficient particularity. The bare allegation that the vote occurred, without more, does not show that this Committee is dominated by Honeycutt, perhaps by virtue of either a close personal familial relationship or by force of will, or that the Committee is so under his influence that its discretion is "sterilized." *Rales,* 634 A.2d at 936;*Telxon,* 802 A.2d at 264. Alternatively, if the purpose of the allegation is to show that the Nominating and Corporate Governance Committee members face a "substantial likelihood" of liability for voting to retain Honeycutt, thereby placing his personal interests over those of the corporation and breaching their fiduciary duties to the corporation, this, too, is not particularly alleged. Any connection between the backdating transactions, which form the core wrongdoing cited by Plaintiffs' Complaint, and a vote to retain the current CEO and Chairman as a director at the onset of an investigation into those transactions is too attenuated to permit the Court to reasonably imply that the Committee members face a "substantial likelihood" of liability for their vote.

Thus, with the exception of McFarlan, who also

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

served on the Compensation Committee when the backdated option grants occurred, the Court finds that the Complaint does not establish a reasonable doubt that the other Nominating and Corporate Governance Committee Defendants are disinterested and able to impartially consider a demand to investigate the options backdating transactions.

*e) The CSC Board as a Whole* Finally, the Complaint claims the whole CSC board is "interested" and unable to impartially consider a demand because: 1) it voted to retain Honeycutt as a director, Chairman and CEO after the backdating allegations materialized (Compl.¶ 129); 2) it issued and/or approved false financial statements that concealed the backdating transactions (Compl.¶¶ 125, 140); 3) the board members' individual "specialized financial expertise," access to "internal corporate documents," meetings and information, as well as their overarching responsibility to delegate, supervise and approve the various committees' actions meant that the board "must have known" or "should have known" of the subordinate committees' wrongdoing and are therefore directly liable for it (Compl.¶¶ 125, 131-137, 140-43); 4) alternatively, the board members face a "substantial likelihood" of liability for their failure to detect and remedy the options backdating, constituting gross negligence and a breach of their fiduciary duties (Compl.¶¶ 125, 140-43); 5) all of the directors were individually and collectively interested in concealing the backdating to preserve their positions on the board (Compl.¶¶ 151-55); and 6) all of the directors had an interest in concealing the backdating to avoid any negative repercussions that would lower the chances of the Company's being bought by a third party, thereby allowing the directors to "cash-out." (Compl.¶ ¶ 144-50). (*See also* Compl. ¶¶ 31, 33-38, 57-63, 125, 127-29, 131-36, 140-46.) Each of these allegations against the board as a whole is also insufficient; the Court addresses each in turn.

**\*11** As discussed previously, the board's vote to retain Honeycutt in his current position as CEO, a director and Chairman of the does not reasonably

imply that the entire board was complicit in the option backdating transactions, which constituted separate and distinct events that occurred at the subcommittee level. These two decisions were made by different board member groups for likely different reasons, and any implication that one decision "tainted" the other is not reasonable under the facts alleged. Without more, this allegation also does not raise the specter of dependence or interestedness that demonstrates futility. Though Honeycutt can be considered to be interested in the backdating transactions, there are no facts alleged by Plaintiffs that show he had the requisite "close relationships" with other board members or any "force of will" that dominated the board or "sterilized" its discretion such that it lacked independence. *Rales,* 634 A.2d at 936;*Telxon,* 802 A.2d at 264. Furthermore, the assertion that the mere vote to retain Honeycutt at the onset of the investigation created a "substantial likelihood" of liability for all of the board members for breach of their fiduciary duties, thereby creating an "interestedness," is too tenuous to excuse demand under *Rales.*

The allegations faulting the board for approving the Compensation Committee's backdated stock options grants as well as approving and disseminating false financial and proxy statements that concealed the backdating are also conclusory and insufficient to show futility in this case. The Complaint alleges that the board members' individual "specialized financial expertise," access to "internal corporate documents," meetings and information, as well as their overarching responsibility to delegate, supervise and approve the various committees' actions meant that the board "must have known" or "should have known" of the subordinate committees' wrongdoing.[FN6]However, a plaintiff cannot claim demand futility merely because the derivative complaint generally "alleges that a majority of the directors participated in wrongful acts, without regard to their impartiality or to the protections of the business judgment rule."*Shoen,* 137 P.3d at 1180-81. Nor can a plaintiff show that a director, or a whole board, is interested under the *Rales* test simply be-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

cause the board approved of the transactions of which the plaintiff complains or failed to oversee subordinates who engaged in the questioned transaction.*Rales,* 634 A.2d at 934 n. 9;*see also Guttman,* 823 A.2d at 505-07 (holding conciusiory allegations that directors failed to prevent wrongdoing do not establish a "substantial likelihood" of personal liability). This is because "the mere threat of personal liability for approving a questioned transaction, standing, alone, is insufficient to challenge either the independence or disinterestedness of directors."*Aronson,* 473 A.2d at 815;*see also Blasband v. Rales,* 971 F.2d 1034, 1049 (3d Cir.1992) (holding that, under Delaware law, a plaintiff may not "bootstrap allegations of futility" by pleading merely that "the directors participated in the challenged transaction or that they would be reluctant to sue themselves"); *In re Silicon Graphics,* 183 F.3d at 990 (holding mere threat of liability for approving a questioned transaction, standing alone, is insufficient to challenge the independence or disinterestedness of directors). A director has a disabling interest for pre-suit demand purposes only where the potential for liability rises to a "substantial likelihood;" this would require more particularity in "the precise roles that these directors played at the company, the information that would have come to their attention in these roles, and any indication as to why they would have perceived the [wrongdoing]" than Plaintiffs' generalized allegations provide. *Guttman,* 823 A.2d at 503.

> FN6. To the extent that Plaintiffs' Complaint alleges that the whole CSC board faces a "substantial likelihood" of liability because of grossly negligent, willful or *ultra vires* acts that should not be subject to the business judgment rule, the Court notes that it would evaluate such allegations only under the *Aronson* test, which is not applicable here.

*12 Next, the Complaint alleges that all of the directors were individually and collectively interested in concealing the backdating to preserve their posi-

tions on the board. (Compl.¶¶ 151-55.) However, Plaintiffs do not establish any board "entrenchment" motive by particularized facts, such as showing entrenchment maneuvers in response to a known or viable threat to their board positions. Demand futility cannot be pled merely by asserting that the directors acted or would act to preserve their positions. *Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

Finally, the Complaint's allegation that all of the Director Defendants had an interest in concealing thebackdatingtoavoidanynegativerepercussions-public, regulatory, criminal or otherwise-that would lower the chances of the Company's being bought by a third party and the directors' opportunity to "cash-out" in the sale, also falls short. There are too few facts supporting this larger allegation to reasonably imply any of the directors have a direct or disabling personal or financial interest. For example, the Complaint states that CSC had been seriously considering, if not pursuing a company sale since a failed merger attempt in 1998, but then it also cites to press releases and statements indicating that the Company had "spurned" or rejected later, more lucrative offers from major corporations like Lockheed Martin and Hewlett Packard, as well as a bevy of private equity shops. (Compl.¶ 149.) This later alleged fact appears to contradict Plaintiffs' assertion that the board members are anxious to sell the company to "cash-out." Even granting Plaintiffs' premise that the board members would want to conceal the backdating to avoid the taint of scandal, thereby lowering the price that suitors would offer CSC, it would be pure speculation to assume that the directors would inevitably be able to "cash-out" upon the consummation of a sale that has no current basis in fact. Such hypothetical allegations do not raise a reasonable doubt about the board's current disinterestedness.

*f. Comparison to Recent Delaware Cases:* Ryan *and* Tyson Foods

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

Plaintiffs have cited two recent, unpublished decisions by the Delaware Chancery Court, *Ryan v. Gifford,* No. CIV.A. 2213-N, 2007 WL 416162 (Del.Ch. Feb.6, 2007) (unpublished), and *In re Tyson Foods, Inc.,* No. CIV.A. 1106-N, 2007 WL 416132 (Del.Ch. Feb.6, 2007) (unpublished), that Plaintiffs believe are factually and legally apposite to the issues this case. In *Ryan,* the court evaluated whether demand was excused with regard to derivative claims centered around alleged options backdating transactions that were executed by a compensation subcommittee of the issuing company's board. 2007 WL 416162, at *8. In that case, three of the total six board members sat on the compensation committee, which was alleged to have directly orchestrated the backdated options grants that violated shareholder-approved stock option plans. *Id.* The court applied both the *Aronson* and *Rales* tests to the demand futility question, because it imputed the backdating transactions and alleged wrongdoing of the subcommittee to the entire board, in part because the enacting subcommittee and interested directors comprised "half or more" of the total board seats. *Id.,* at *8-*9.Ultimately, the court found that the plaintiffs' allegations satisfied both the *Aronson* and *Rales* tests in holding that demand was excused. *Id.,* at *9.

*13 In *Tyson Foods,* shareholders brought derivative and class action claims relating to the directors' breaches of their fiduciary duties that stemmed from the alleged "spring-loading" of options.[FN7]2007 WL 416132, at *5 and *17. The *Tyson Foods* court held that demand was excused for certain shareholder derivative claims questioning related-party transactions, primarily because many of the directors were dependent or interested as members of the Tyson family or as participants in the related-party transactions that also involved the Tyson family. *Id.,* at *11-*12.As it related to the "spring-loaded" stock option grants, the court determined that the plaintiffs' allegations of the directors' liability for approving the grants were sufficient to toll the statute of limitations. *Id.,* at *17.

FN7."A compensation committee that 'spring loads' options grants them to executives before the release of material information reasonably expected to drive the shares of such options higher."*In re Tyson Foods,* 2007 WL 416132, at *5 n. 16.

The critical aspect of both cases, Plaintiffs argue, is found in the Delaware Chancery Court's treatment of a director's apparent risk of liability for fiduciary duty breaches in the face of allegations of option grants that violated shareholder-approved stock option plans. In both decisions, the same author, Judge Chandler, maintained that when a plaintiff alleges that a director has violated a shareholder-approved stock option plan by virtue of "backdating" or "spring-loading" an option grant, that plaintiff has alleged a "substantial likelihood" of liability for that director for breaching his or her fiduciary duty. *See Ryan,* 2007 WL 416162, at *10 ("Backdating options qualifies as one of those rare cases in which a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.") (citations and quotations marks omitted); *In re Tyson Foods,* 2007 WL 416132, at *18 ("A director who intentionally uses inside knowledge not available to shareholders in order to enrich employees while avoiding shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary.").

However, regardless of whatever precedential effect these unpublished Delaware Chancery Court cases may have, this Court has reviewed the *Ryan* and *Tyson Foods* cases and finds they are factually distinguishable from this one. First, in both cases, the plaintiffs alleged that the questioned option grants implicated directors who directly approved or received the grants, or who were demonstrably dependent on directors who did; the total number of these "interested" directors comprised "half or more" of the total directors who would be considering a shareholder demand. *See Ryan,* 2007 WL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

416162, at *8 n. 29 (interested directors comprised "half or more" of the total directors) (citing *Rales*, 634 A.2d at 932-35);*In re Tyson Foods,* 2007 WL 416132, at *2, *11-*12, *18-*19 (holding plaintiffs' "complaint should properly target only the members of the compensation committee at the time the options were approved," consisting of seven of the past directors, while three of the current ten directors approved the options, one received them and two more were arguably dependent on the receiving director as family members). In CSC's case, the option grants are executed by a subcommittee comprising at most two of the seven directors on CSC's board. Even adding the one director who received the backdated options, Honeycutt, to the "interested" group, there remains a clear four-director board majority whose disinterestedness and independence is not placed in reasonable doubt by Plaintiffs' allegations. Thus, without more particularized allegations connecting the actions and interests of Honeycutt and Compensation Committee Defendants Bailey and McFarlan to the remaining CSC directors, it would be inappropriate for this Court to attribute the option grants to the entire board or to evaluate demand futility under *Aronson.* The *Ryan* and *Tyson Food* opinions' analysis and findings of futility under the *Aronson* test, including their evaluation of the directors' liability under the business judgment rule, are inapposite in this case.

*14 Second, the pleaded facts of options manipulation in those two cases differ from the ones in this case, particularly where such factual distinctions are critical to showing director liability and interestedness in the demand futility analysis. The options "spring-loading" allegations that the plaintiffs made in *Tyson Foods* differ significantly from the backdating allegations made by the CSC Plaintiffs, making comparisons inappropriate. By contrast, the allegations of options backdating in *Ryan* appear stronger and more particular than those put forth by Plaintiffs in this case. Since all of Plaintiffs' claims in this case derive from the core allegations of options backdating, any comparative weakness in the

backdating allegations lowers the chances that the Director Defendants' alleged liability for the backdating will be "substantial." This diminishes the reasonableness of any doubt as to their disinterestedness or independence when evaluating demand futility under *Rales*.

The complaint that persuaded the court of demand futility in *Ryan* alleged that: 1) every challenged option grant occurred during the lowest market price of the month or year in which it was granted; and 2) "empirical evidence" in the form of an investment bank's statistical analysis showed the annualized return on the options grants to company management was nearly ten times higher than that of the market for the same period. 2007 WL 416162, at *8-*9. This suggested backdating of the option grants. In contrast, Plaintiffs in this case rely on two CSC press releases announcing the government investigations and a stock price analysis that purports to show that the options grants invariably preceded known rises in CSC's stock price. (Compl.¶ 70.) A brief look at the stock price graphs cited in Plaintiffs' Complaint shows a less clear backdating trend than Plaintiffs allege. For example, of the ten challenged stock option grants, eight occurred within one or two weeks of May 1. On its face, this trend more strongly suggests a standardized timing for the option grants, rather than a post hoc, opportunistic one. Further, the grants in 1997, 1998, 1999, 2000, 2001 and 2003, in the Court's view, do not clearly indicate an option that was priced at the low of a known stock price trough, or at least at the lowest stock price that occurred within a reasonable period before or after May 1. Obviously, the detailed statistical analysis that the plaintiffs employed in *Ryan* is not necessary to making particularized allegations of backdating. However, compared to the more compelling statistical analysis showing abnormal, above-average market returns for the option grants in *Ryan,* the stock price analysis in Plaintiffs' Complaint shows a less convincing and compelling picture as it relates to options backdating. This, in turn, presents a lower risk of liability to the CSC

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

directors for the backdating, concurrently diminishing their interestedness in the futility analysis.

*15 The Court acknowledges the view advanced in those unpublished Delaware Chancery Court cases, that a director faces a "substantial likelihood" of liability for options backdating, but notes that this "rule" only applies to directors who directly approved or received the backdated options, or who are dependent on those who did, and only when plaintiffs allege with particularity that the options backdating occurred. To apply this view as a rule ascribing liability and interest to all directors when the core allegations of backdating are comparatively weak and lack particularity would circumvent the demand requirement in every case where backdating or spring-loading of options is claimed. Because of these distinctions, this Court finds it inappropriate to give the analysis and holdings of *Ryan* and *Tyson Foods* weight in this case.

### g) Demand Futility Conclusions

The Court finds that Plaintiffs' Complaint raises a reasonable doubt as to the interestedness of directors Honeycutt, Bailey and McFarlan, by virtue of having allegedly received the backdated options or by virtue of having directly served on the committee that controlled their timing, pricing and approval. Three of the seven CSC directors are interested, but the remaining four-Barram, Baum, Chase and Patrick-constituting a majority of the CSC board, are not. Accordingly, Plaintiffs have not shown that demand should be excused in this case.

### 2. Contemporaneous Ownership Requirement

The Court also finds that Plaintiffs have not adequately pled their status as shareholders at all times relevant to the transactions of which they complain and during the course of the lawsuit, as is required by Federal Rule of Civil Procedure 23.1 and Nevada Rule of Civil Procedure 23.1. *Lewis v. Chiles,* 719 F.2d 1044, 1047 (9th Cir.1983), *accord Keever v. Jewelry Mountain Mines, Inc.,* 100 Nev.

576, 688 P.2d 317, 317-18 (Nev.1984) (evaluating Nev. R. Civ. P. 23.1 and holding a plaintiff who sold shares before the commencement of derivative action lacked standing); *see also Kona Enters., Inc. v. Estate of Bishop,* 179 F.3d 767, 769 (9th Cir.1999) (holding Rule 23.1 contemporaneous stock ownership requirement applies in diversity actions). Plaintiffs' Complaint targets option grants that occurred from May 1996 to May 2004, as well as several stock sales extending into 2006. However, the Complaint only generally alleges that each Plaintiff "is, and was during the relevant period," or "is, and was at all times relevant to," a shareholder of CSC stock. (Compl.¶¶ 12-14, 122.) This general allegation is insufficient to allege contemporaneous ownership during the period in which the questioned transactions occurred, and is, in fact, inaccurate by Plaintiffs' own varying admissions. Plaintiffs' Opposition brief states that the earliest any of the Plaintiffs can represent to the Court that they owned CSC stock is November 15, 2001, a fact nowhere found in the Complaint. (*See* Pls. Opp'n to CSC Mot. at 29 n. 13.) At the hearing on the CSC Motion, Plaintiffs stated that they could represent to the Court that they owned CSC stock during all periods going back to May 1997, another new representation that is also not in the Complaint. This ongoing ambiguity as to Plaintiffs' actual ownership of CSC stock, caused by Plaintiffs themselves is the precise reason why Plaintiffs must allege contemporaneous ownership of CSC stock during all periods relevant to the 1996-2004 transactions and during the pendency of this case. Plaintiffs lack standing for failing to do so as required under Rule 23.1.

## IV.

## CONCLUSION

*16 Plaintiffs have not made particularized allegations raising a reasonable doubt as to the independence or disinterestedness of a majority of CSC's dir-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1321715 (C.D.Cal.)

Page 16

ectors who would be considering a demand to in-
vestigate the options backdating transactions.
Plaintiffs have therefore not shown that demand is
excused in this case, under Rule 23.1, *Rales* and ap-
plicable Nevada law. Further, Plaintiffs have not
established standing by sufficiently alleging that
they owned CSC stock during all periods relevant
to the questioned transactions and during the pen-
dency of this suit, as is required by Rule 23.1.

For the above-stated reasons, the Court orders:

1) Nominal Defendant CSC's Motion to Dismiss
Plaintiffs' Shareholder Derivative Complaint for
Failure to Plead Demand Futility Pursuant to Fed.
R. Civ P. 23.1 and 12(b)(6), filed Jan. 8, 2007, is
*GRANTED;*

2) Director and Officer Defendants' Motion to Dis-
miss Plaintiffs' Shareholder Derivative Complaint
Pursuant to Fed.R.Civ.P. 12(b)(6), filed Jan. 8,
2007, is *DENIED* as moot;

3) Defendant Thomas A. McDonnell's Motion to
Dismiss Plaintiffs' Shareholder Derivative Com-
plaint Pursuant to Fed.R.Civ.P. 12(b)(6), filed Janu-
ary 19, 2007, is *DENIED* as moot; and

4) Plaintiffs are granted twenty (20) days' *LEAVE
TO AMEND* their Complaint from the date of this
order.

IT IS SO ORDERED.

C.D.Cal.,2007.
In re Computer Sciences Corp. Derivative Litiga-
tion
Not Reported in F.Supp.2d, 2007 WL 1321715
(C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 8



Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

▷
In re Dean Witter Partnership Litigation
Del.Ch.,1998.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
In re DEAN WITTER PARTNERSHIP LITIGA-
TION
No. CIV. A. 14816.

July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner,
Jr., Esquire, of Chimicles, Jacobsen & Tikellis,
Wilmington, Delaware; of Counsel: Nicholas E.
Chimicles, Esquire, Denise Davis Schwartzman,
Esquire, Francis J. Farina, Esquire, and M. Kather-
ine Meermans, Esquire, of Chimicles, Jacobsen &
Tikellis, Haverford, Pennsylvania, Attorneys for
Plaintiffs.
Kenneth J. Nachbar, Esquire, of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware; of Coun-
sel: Martin London, Esquire, Richard A. Rosen, Es-
quire, Robert N. Kravitz, Esquire, and Tracy An-
binder Baron, Esquire, of Paul, Weiss, Rifkind,
Wharton & Garrison, New York, New York, Attor-
neys for Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.
*1 Investors, owners of interests in numerous real
estate limited partnerships, seek an accounting and
damages from general partners and financial ad-
visors for breaches of the fiduciary duties of care,
loyalty and candor. Information available to the in-
vestors long before these lawsuits were instituted
put the investors on notice of the wrongs about
which they now complain. Therefore, all of the in-
vestors' claims are barred by operation of the ap-
plicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions
brought by plaintiff investors against defendants
Dean Witter, Discover & Co. ("Dean Witter Dis-
cover"), Dean Witter Reynolds, Inc. ("Dean Witter
Reynolds"), Dean Witter Realty, Inc. ("Dean Witter
Realty") (collectively "Dean Witter"), the man-
aging and associate general partners of seven Dean
Witter real estate limited partnerships, and Tempo-
GP, Inc. ("Tempo-GP"), the general partner of
Dean Witter/Coldwell Banker Tax Exempt Mort-
gage Fund, L.P. ("Tax Exempt Mortgage Fund").FN1

> FN1. An Order of Consolidation dated Au-
> gust 16, 1996, consolidated three actions
> filed in the Court of Chancery-*Segel v.
> Dean Witter, Discover & Co.,* C.A. No.
> 14816 (filed Feb. 6, 1996); *Schectman v.
> Dean Witter, Discover & Co.,* C.A. No.
> 14829 (filed Feb. 9, 1996); *Dosky v. Dean
> Witter, Discover & Co.,* C.A. No. 14838
> (filed Feb. 15, 1996)-and added to the con-
> solidated action plaintiffs from two other
> suits, one pending in the Southern District
> of New York-*Grigsby v. Dean Witter
> Reynolds, Inc.,* S.D .N.Y., No. 96 Civ.
> 4064(LAP) (originally filed Dec. 27,
> 1995)-and one pending in the District of
> Maryland-*Young v. Dean Witter, Discover
> & Co.,* C.A. No. H-96-1139 (D.Md.)
> (originally filed Feb. 6, 1996).*See* Order of
> Consolidation (Aug. 16, 1996) (Docket
> No. 9).

Plaintiffs are customers of Dean Witter Reynolds,
who between 1984 and 1989, purchased from Dean
Witter Reynolds units of the following limited part-
nerships: Dean Witter Realty Income Partnership I,
L.P. ("Income I"); Dean Witter Realty Income Part-
nership II, L.P. ("Income II"); Dean Witter Realty
Yield Income Partnership III, L.P. ("Income III");
Dean Witter Realty Income Partnership IV, L.P.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                      Page 2
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

("Income IV"); Dean Witter Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable").[FN2] With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> FN2. These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, *i.e.,* all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate general partners of the Proprietary Partnerships.[FN3]Officers and employees of Dean Witter

Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> FN3. Managing and associate general partners will be referred to collectively as the "general partners."

*2 Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.-the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities.[FN4]

> FN4. In their Amended Complaint, none of the plaintiffs claim to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.,* Del.Supr., 657 A.2d 254, 264 (1995).

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present.[FN5]Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants.[FN6]

> FN5. First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint* ]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

> FN6. Complaint ¶ 3.

*3 Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts.[FN7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation,[FN8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

> FN7. Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition* ].

> FN8. Complaint ¶ 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones.[FN9]

> FN9. Pls.' Memo. in Opposition at 2.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                  Page 4
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

Defendants filed a motion to dismiss on December 10, 1996.[FN10]The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims.[FN11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

> FN10. Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

> FN11. Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations.[FN12]This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.[FN13]Moreover, it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss."FN14

> FN12.*Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

> FN13.*Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993).*See also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

> FN14.*Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

*4 In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (*i.e.,* nonconclusory) allegations of the complaint for purposes of the motion.[FN15]I am also required to draw from the complaint all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein.[FN16]Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them.[FN17]In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint.[FN18]

> FN15.*Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

> FN16.*Id.*

> FN17.*In re Santa Fe Pac. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

> FN18. Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 5
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

1994), *aff'd,*Del.Supr., 642 A.2d 837 (1994).

Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04-289, Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder. Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id* . at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing).*See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

## III. ANALYSIS

*A. Statute of Limitations*

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.[FN19]With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their preconsolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the Partnerships.FN20 Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

> FN19.10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

> FN20. Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-*Segel*-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶¶ 1, 9.

*B. Time of Accrual*

The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action.[FN21]Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

sale of the Partnerships. Second, plaintiffs allege that defendants [FN22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

> FN21.*David B. Lilly Co. v. Fisher,* D. Del., 18 F.3d 1112, 1117 (1994); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* Del.Supr., 330 A.2d 130, 132 (1974).

> FN22. Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint ¶¶ 266-68.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations.[FN23]Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989.[FN24]Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1992-years before plaintiffs filed their Amended Complaint.

> FN23.*Seidel v. Lee,* D. Del., C.A. No. 93-494-JJF, at 16, Farnen, C.J. (Dec. 30, 1996) (applying Delaware law) (fiduciary duty claim accrues when breach accomplished).*See also In re Merrill Lynch Ltd. Partnerships Litig.,* S.D.N.Y., No. 95 Civ. 10657(MBM), at 11-20 (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).

> FN24. Complaint ¶¶ 9-23.

*5 With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s.[FN25]Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989.[FN26]Plaintiffs filed their complaint on February 6, 1996-well past the expiration of the three-year limitations period. *Absent tolling,* therefore, all of plaintiffs' claims fall outside the statutory period and would be time-barred.

> FN25.*See, e.g.,* Complaint ¶¶ 91-121 (Yield Plus), ¶¶ 129-35 (Yield Plus II), ¶¶ 136-46 (Yield Plus & Yield Plus II), ¶¶ 156-79 (Growth Properties), ¶¶ 193-98 (Income I), ¶¶ 209-16 (Income II), ¶¶ 233-39 (Income II, III & IV).

> FN26.*Dofflemyer,* 558 F.Supp. at 379 (fiduciary duty claim accrues at time of breach).

## C. Tolling

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal*[FN27]-reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 7
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

fund might be established-first put them on notice of their potential claims.[FN28]Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them.[FN29]

> FN27. This article will be referred to as the "*Wall Street Journal* article" or the "article."

> FN28. Pls.' Memo. in Opposition at 9.

> FN29.*See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as 'inherently unknowable' injuries or fraudulent concealment.").

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility.[FN30]For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury.[FN31] Often, plaintiffs can establish "blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception.[FN32]This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. [FN33]

> FN30.*Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

> FN31.*Seidel,* op. at 17.

> FN32.*See, e.g., Isaacson,* 330 A.2d at

133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

> FN33.*Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth.[FN34]Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry.[FN35]"Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]."[FN36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence.[FN37]

> FN34.*Litman,* op. at 8.

> FN35.*Halpern,* 313 A.2d at 143.

> FN36.*Id.*

> FN37.*Id.*

*6 Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.[FN38]Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]."[FN39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 8
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

FN40

FN38.*Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).

FN39.*Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

FN40.*In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.[FN41] Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury.[FN42] Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice.[FN43] Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not* on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim).[FN44]

FN41.*United States Cellular,* 677 A.2d at 504;*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 35, Allen, C. (Nov. 21, 1995).

FN42.*In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F.Supp. 527, 554

(1994) (inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

FN43.*See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); *Seaboard,* 625 A.2d at 275 (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern,* 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence).*See also Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

FN44. Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.,* Del.Super., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the stat-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 9
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

ute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion."*In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., C.A. Nos. 12111 & 12353, at 13, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990-an entirely different situation than the one presented to the *In re Maxxam* Court.

## D. Were Plaintiffs on Inquiry Notice?

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published.[FN45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales

practices, nor did it identify any limited partnerships by name.

> FN45.*See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships.[FN46] As a matter of law, defendants assert, disclosures in any of those documents-the sole source of plaintiffs' allegations-were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

> FN46. According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.

> The Court may properly consider the contents of the *Wall Street Journal* art-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

Page 10

icle, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint. *Glaser v. Norris,* Del. Ch., C.A. No. 9583, at 9 n. 1, Chandler, V.C. (Jan. 6, 1992).

*7 Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied-and were entitled to rely-on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i.e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct.[FN47] Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

FN47. Pls.' Memo. in Opposition at 3.

As noted above, the limitations period is tolled until

such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury.[FN48] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.[FN49] Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? [FN50]

FN48. *In re ML-Lee Acquisition Fund II, L.P. Litig.,* 848 F.Supp. at 554 (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

FN49. *McCoy v. Goldberg,* S.D.N.Y., 748 F.Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc.,* E.D. Mich., 785 F.Supp. 626, 633 (1992) (citations omitted), *aff'd,* 6th Cir., 35 F.3d 565 (1994).

FN50. Defendants assert that when plaintiffs read the article, they responded

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 11
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits.[FN51] For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments."[FN52] In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses.[FN53]

> FN51. *See, e.g.,* Income III, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

> FN52. Pls.' Memo. in Opposition at 51.

> FN53. *Id.* at 48.

**\*8** Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." [FN54] Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%."[FN55] But in

the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

> FN54. *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

> FN55. Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting."[FN56] Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries .[FN57] As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations.[FN58] But, the trusting plaintiff still must be *reasonably attentive* to his interests. "*[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                     Page 12
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

*filings.*" [FN59]Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.[FN60]

> FN56.*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

> FN57.*See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) ("Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

> FN58.*Seaboard,* 625 A.2d at 275.

> FN59.*Seidel,* op. at 18 (emphasis added).

> FN60.*Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed.[FN61] Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure.[FN62]In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989.[FN63]Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%."This blatant contradiction should have been a "red flag" to any investor-and should have prompted an inquiry by plaintiffs into the health of their investments. [FN64]

> FN61. Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

> FN62. For the fiscal year 1989, the Income II Partnership shows a net income figure of $7,043,996 and cash distributions of $13,768,450. *Id.* at 7.

> FN63.*Id.*

> FN64.*In re Prudential Sec. Inc. L.P. Litig.,* S.D.N.Y., 930 F.Supp. 68, 76 (1996) ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

**\*9** The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

[FN65]Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement.[FN66]Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims.FN67

> FN65.*See, e.g.,* Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B (attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

> FN66.*See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern,* 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

> FN67.*See Ruger v. Funk,* op. at 6 ("Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer

blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions-described in these annual reports as "annualized returns"-and the declining partners' capital and net income lower than the distributions should have caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

### IV. CONCLUSION

On the basis of this record, I conclude that the in-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                          Page 14
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

formation in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants.[FN68]Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim).[FN69] The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations.[FN70]

> FN68. Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig.,* 930 F.Supp. at 76-77; (2) that some investors in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales practices or the investments in question, nor mentioned by name the limited partnership defendants in this case, thus

raising a serous doubt as to how the article alone could have prompted such an in- quiry.

> FN69.*Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

> FN70. Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late.*Glaser v. Norris,* Del. Ch., C.A. No. 9538, at 30-31, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.

Del.Ch.,1998.
In re Dean Witter Partnership Litigation
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 9



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)

Page 1

**H**
Honeywell Intern. Inc. v. Audiovox Communications Corp.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
HONEYWELL INTERNATIONAL INC., and Honeywell Intellectual Properties Inc., Plaintiffs,
v.
AUDIOVOX COMMUNICATIONS CORP., Audiovox Electronics Corporation, Nikon Corporation, Nikon, Inc., Nokia Corporation; Nokia Inc., Sanyo Electric Co., Ltd., and Sanyo North America Corporation, Defendants.
HONEYWELL INTERNATIONAL INC., and Honeywell Intellectual Properties Inc., Plaintiffs,
v.
APPLE COMPUTER, INC.; Argus A/K/A Hartford Computer Group, Inc.; Casio Computer Co., Ltd.; Casio, Inc.; Concord Cameras; Dell Inc.; Eastman Kodak Company; Fuji Photo Film Co., Ltd.; Fuji Photo Film U.S.A., Inc.; Fujitsu Limited; Fujitsu America, Inc.; Fujitsu Computer Products of America, Inc.; Kyocera Wireless Corp.; Matsushita Electrical Industrial Co.; Matsushita Electrical Corporation of America; Navman NZ Limited; Navman U.S.A. Inc.; Olympus Corporation; Olympus America, Inc.; Pentax Corporation; Pentax U.S.A., Inc.; Sony Corporation; Sony Corporation of America; Sony Ericsson Mobile Communications AB; Sony Ericsson Mobile Communications (USA) Inc.; Toshiba Corporation; and Toshiba America, Inc., Defendants.
OPTREX AMERICA, INC., Plaintiff,
v.
HONEYWELL INTERNATIONAL INC., and Honeywell Intellectual Properties Inc., Defendants.
**No. Civ.A. 04-1337-KAJ, Civ.A. 04-1338-KAJ, Civ.A. 04-1536-KAJ.**

May 18, 2005.

Steven J. Balick, John G. Day, Ashby & Geddes, Leslie A. Polizoti, Thomas C. Grimm, Morris, Nichols, Arsht & Tunnell, Karen L. Pascale, Bouchard, Margules & Friedlander, P.A., Wilmington, DE, for Plaintiffs.
Richard L. Horwitz, Philip A. Rovner, David Ellis Moore, Potter Anderson & Corroon, LLP, William J. Marsden, Jr., Thomas Lee Halkowski, Tara D. Elliott, Fish & Richardson, P.C., Paul A. Bradley, McCarter & English, LLP, Matt Neiderman, Duane Morris LLP, Donald W. Huntley, Donald W. Huntley, Esq., Robert J. Katzenstein, Robert Karl Beste, III, Smith, Katzenstein, & Furlow, Amy Elizabeth Evans, Cross & Simon, LLC, Chad Michael Shandler, William J. Wade, Richards, Layton & Finger, Francis G. Connolly, III, Francis Di-Giovanni, Connolly, Bove, Lodge & Hutz, John W. Shaw, Adam Wyatt Poff, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Barry M. Graham, Darren M. Jiron, Timothy J. Vezeau, Robert J. Benson, Avelyn M. Ross, Roderick B. Williams, Christopher E. Chalsen, Christopher J. Gaspar, Parker H. Bagley, Steven J. Rizzi, Arthur I. Neustadt, Carl E. Schlier, Pro Hac Vice, for Defendants.

*MEMORANDUM ORDER*

JORDAN, J.

Introduction & Background

**\*1** In these three actions, Honeywell International Inc., a Delaware corporation, and Honeywell Intellectual Properties Inc., an Arizona corporation, (collectively "Honeywell") have asserted that their rights under U.S. Patent No. 5,280,371, issued January 18, 1994, (the " '371 patent) have been infringed. The '371 patent claims a liquid crystal display ("LCD") apparatus said to provide enhanced brightness and clarity when compared with prior art LCDs. (*See* '371 patent, attached to C.A. No. 04-1338-KAJ Docket Item ["D.I."] 1 at Ex. 1, col. 1 lines 48-61; col. 6, lines 1-42.) In Civil Action No. 04-1337-KAJ, Honeywell asserts the '371 patent against 8 defendants. (C.A. No. 04-1337-KAJ D.I. 39.)In Civil Action No. 04-1338-KAJ, it asserts the same patent against another 27 defendants.[FN1]In Civil Action No. 04-1536-KAJ, Optrex America, Inc., a New York corporation, ("Optrex") has sued for a declaratory judg-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)

ment that it does not infringe Honeywell's rights under the '371 patent and that the patent is invalid. (C.A.No. 04-1536-KAJ D.I. 1.)

> FN1. Honeywell chose to file two separate suits simultaneously because a conflict of interest of one of its law firms prevented that firm from representing Honeywell against certain of the defendants, but it now seeks consolidation of the actions. (*See*C.A. No. 04-1338-KAJ D.I. 135 at n. 1.)

Pending before me are several motions bearing on the management of these cases.[FN2]Honeywell seeks consolidation of the actions. (C.A. No. 04-1338-KAJ D.I. 134;C.A. No. 04-1536-KAJ D.I. 14) A third party, Seiko Epson Corporation, a Japanese company, ("Seiko Epson") seeks to intervene because it is the original manufacturer of LCDs said to be the infringing component in some of the defendants' consumer electronics. (*See*C.A No. 04-1337-KAJ D.I. 50;C.A. No. 04-1338-KAJ D.I. 136 at 7-9); Optrex, another seller of allegedly infringing LCDs to defendants in the suits filed by Honeywell, seeks to have its case tried first.FN3(C.A. No. 04-1536-KAJ D.I. 23.)And several of the defendants in the actions brought by Honeywell have filed motions to stay the litigation against them while Honeywell first tries its infringement claims against the manufacturers of the LCDs. (*See, e.g.*,C.A. No. 04-1337-KAJ D.I. 60, 63, 101, and 112;C.A. No. 04-1338-KAJ D.I. 95, 158, 161, 181, and 189.)

> FN2. A chart listing the motions filed by the parties is appended.

> FN3.Federal Rule of Civil Procedure 7(b)(1) provides in pertinent part that, "[a]n application to the court for an order shall be by motion...." It is the custom and expectation of this court that, unless otherwise ordered by the court, an application like Optrex's should be made by way of formal motion. That expectation was not met in this instance. Failure to abide by Rule 7 necessarily brought with it a failure to abide by Local Rule 7.1.1, respecting the certification of counsel required with all non-

dispositive motions. Solely because Optrex's request, which came by way of a letter, can be readily disposed of in light of my rulings on the motions properly made, I have considered it and address it herein.

On May 16, 2005, I held a consolidated pretrial conference in these cases pursuant to Federal Rule of Civil Procedure 16. At that time, I heard argument on the various motions and issued preliminary rulings. This Order confirms those rulings and provides a further explication for them. For the reasons stated herein, as well as those stated in open court at the Rule 16 conference, Seiko Epson's motion to intervene is granted, Honeywell's motion to consolidate is granted in part, Optrex's request is granted to the extent stated herein, and the motions to stay submitted by defendants in the Honeywell-filed cases are granted. In short, Honeywell will be required to litigate its infringement claims in the first instance against the manufacturers of the accused LCDs, not against the many customers of those manufacturers who incorporate the LCDs into their consumer electronics.

Standard of Review

**\*2** Motions to intervene are entrusted to the discretion of the court. *See Kleissler v. U.S. Forest Service,* 157 F.3d 964, 969 (3d Cir.1998) ("We will reverse a district court's determination on a motion to intervene as of right if the court has abused its discretion by applying an improper legal standard or reaching a conclusion we are confident is incorrect.") Intervention as of right is governed by Federal Rule of Civil Procedure 24(a), which states in relevant part, "[u]pon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."That rule has been interpreted

to require proof of four elements from the applicant

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)

seeking intervention as of right: first, a timely application for leave to intervene; second, a sufficient interest in the litigation; third, a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action; and fourth, inadequate representation of the prospective intervenor's interest by existing parties to the litigation.

*Kleissler,* 157 F.3d at 969.

A district court also generally has broad discretion when deciding whether to consolidate or stay proceedings. *See Bechtel Corp. v. Laborers' International Union,* 544 F.2d 1207, 1215 (3d Cir.1976) ("A United States district court has broad power to stay proceedings."); *Blake v. Farrell Lines, Inc.,* 417 F.2d 264, 266 (3d Cir.1969) ("the trial judge, under Rule 42(a), is given the broad authority to 'make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay' ").

With respect to consolidation, Federal Rule of Civil Procedure 42(a) provides that, "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

The power to stay proceedings "is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants."*Cheyney State College Faculty v. Hufstedler,* 703 F.2d 732, 738 (3d cir.1983) (quotation omitted). When considering a motion to stay, the court considers the following factors: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues and trial of the case; (3) whether discovery is completed; and (4) whether a trial date has been set. *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991).

**Discussion**

*3 These cases are the second set of LCD technology cases to come before this court on a grand scale. The first set, in which the lead case is *Commissariat A L'Energie Atomique v. Samsung, et al.,* C.A. No. 03-484-KAJ (consolidated), involved the plaintiff ("CEA") suing a host of manufacturers, distributors, and retailers of LCDs or products containing them. After sorting through the various motions to stay and to consolidate, I concluded that consolidation of cases against the manufacturer defendants was appropriate because those cases involved common questions of law and fact pertaining to infringement. *See id.,* May 13, 2004 Mem. Order at 5-6. However, I declined to consolidate the cases involving non-manufacturer defendants because no sound reason was given for immediately addressing what could only be the derivative liability of those defendants. *See id.*For that same reason, I stayed the cases against the non-manufacturer defendants, observing, "litigation against or brought by the manufacturer of infringing goods takes precedence over a suit by the patent owner against customers of the manufacturer."*Id.* at 7 (quoting *Katz v. Lear Siegler, Inc.,* 909 F.2d 1459, 1464 (Fed.Cir.1990).

I was persuaded then and remain persuaded that large-scale litigation like this requires the business and strategic legal interests of the plaintiff to cede some ground to case management imperatives. It is impracticable to try an infringement case against 40 some defendants or third-party defendants with many different accused devices, and it is unwise to attempt any such thing when liability depends exclusively upon infringement being found as to an LCD component that the defendants do not manufacture and when at least some of the manufacturers of the LCDs are before the court and are willing to stand behind their products in this litigation.[FN4]*Cf. Kahn v. General Motors Corp.,* 889 F.2d 1078, 1081 (Fed.Cir.1989) (noting that the "customer suit exception" to the preference for allowing a first-filed action to proceed first is based on "the manufacturer's presumed greater interest in defending its actions against charges of patent infringement").

FN4. Optrex and Seiko Epson are before the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)

court already. Other LCD manufacturers identified as "Curitel, Philips, Wintek, and Samsung SDI" have been named in a third party complaint (*see* C.A. No. 04-1338-KAJ D.I. 167 at 5), and LCD manufacturers identified as "Arima Display, AU Optronics, CPT, Hannstar, Hitachi, Primeview, Quanta Display, Inc., ST-LCD, TM Display, and Tottori Sanyo" have not been named or appeared in any of the cases to date. (*See id.*)

Honeywell has been frank to say that it deliberately avoided suing the manufacturers to avoid "the complications faced by this Court in the French government's LCD action, C.A. No. 03-484 [i.e., the *CEA* suit]." (C.A. No. 04-1338-KAJ D.I. 147 at 3, ¶ 2.) Honeywell also accurately assesses the several motions to stay and the motion to intervene as an effort by the movants to "recast [Honeywell's lawsuits] as a case against LCD suppliers...." (C.A. No. 04-1338-KAJ D.I. 167 at 5.) What Honeywell fails to appreciate is that, from the perspective of the host of defendants Honeywell has chosen to sue, and in the interest of judicial economy, dealing with the manufacturers first is the fairest and most efficient way to proceed. It is not a complication to be resisted.

*\*4* Thus, Honeywell's motions to consolidate will be granted because the cases certainly do involve common questions of law and fact which make sense to handle for certain purposes on a consolidated basis. *See* Fed.R.Civ.P. 42(a). Whether a single trial against all the non-manufacturer defendants makes sense is a question for another day. For now it is sufficient to order that trial and pretrial activities with respect to the dispute between Honeywell and those manufacturer defendants presently before the court will be handled on a consolidated basis. Any pretrial activities with respect to Honeywell's claims against the non-manufacturer defendants will also be handled, for the time being, on a consolidated basis. It is likely that the claims against and by the manufacturer defendants will later be separated out for pretrial proceedings as well as a separate trial. As further noted herein, however, there will be some discovery permitted of the non-manufacturer de-

fendants, so all will remain in the case for the time being.

The motion to intervene filed by Seiko Epson will also be granted, because it puts a willing manufacturer defendant in the forefront of litigation aimed squarely at its product. Seiko Epson correctly claims that it has met the test for intervention as of right under Rule 24(a). Its motion is timely; discovery has not even begun in the case and case management issues are only now being addressed. It has a sufficient interest in the litigation; indeed, as a manufacturer of the product component which is at the heart of these cases, it has a compelling interest. It can rightly claim that its interests will be impaired or affected, as a practical matter, by the disposition of the action, unless it is involved in the case directly and able to make its positions known. Finally, because it is uniquely situated to understand and defend its own product, its interests are not adequately represented by existing parties to the litigation.

For evidently similar reasons, Optrex has taken affirmative steps to insert itself in this litigation and to have the opportunity to have the dispute over its LCDs heard before the suits against the non-manufacturer defendants are permitted to go forward. As stated at the May 16 conference, I agree that the dispute between Honeywell and the manufacturers should go forward first. To that extent. Optrex's request to proceed with its claims on a priority basis will be granted.

As to the several motions to stay, they too are granted to the extent stated in open court. The non-manufacturer defendants will not be given a complete and immediate stay of all proceedings involving them, because I will permit Honeywell certain limited discovery to learn who the suppliers of LCDs are for the various devices that Honeywell must now specifically identify as accused products.[FN5] I will otherwise stay the litigation against the non-manufacturer defendants, however, since a stay would not unduly prejudice Honeywell, it will vastly simplify the issues and trial of the case against the manufacturer defendants, and it comes at time when discovery has not even begun and no trial date has been set. *See United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)

(setting forth test for propriety of a stay). At the appropriate time, a separation of the suits against the manufacturer and non-manufacturer defendants may well be warranted, for ease of case administration.

> FN5. At the case management conference, I granted a defense request that Honeywell be required to identify the products it is accusing of infringement. To date, it has only stated that "[a]t least some of the LCD screen-containing products manufactured, imported, offered for sale, and/or sold by [the named defendants] infringe the '371 patent literally and/or under the doctrine of equivalents...." (C.A. No. 04-1338-KAJ D.I. 1 at ¶ 53.)

**\*5** At the close of the case management conference, I instructed the parties to confer and provide me with proposed language respecting permissible discovery activities directed at the non-manufacturer defendants during the stay. A further and separate order will be entered following the parties' filing or filings in that regard.

Conclusion

For the reasons stated in open court on May 16, 2005 and herein, it is hereby ORDERED that

(1) Honeywell's motions to consolidate (C.A. No.

04-1338-KAJ D.I. 134;C.A. No. 04-1536-KAJ D.I. 14) are GRANTED to the extent that Civil Action Nos. 04-1337-KAJ, 04-1338-KAJ and 04-1536-KAJ are consolidated for the present for all purposes, with a consolidated case caption to be suggested by the parties by June 17, 2005;

(2) Seiko Epson's motions to intervene (C.A. No. 04-1337-KAJ D.I. 50 and C.A. No. 04-1338-KAJ D.I. 136) are GRANTED;

(3) Optrex's request to proceed with its dispute in advance of Honeywell being permitted to proceed with its litigation against the non-manufacturer defendants (C.A. No. 04-1536-KAJ D.I. 23) is GRANTED to the extent described herein; and

(4) the several motions to stay (C.A. No. 04-1337-KAJ D.I. 60, 63, 101 and 112;C.A. No. 04-1338 D.I. 95, 158, 161, 181 and 189) are GRANTED to the extent described herein, with a further order regarding the stay to be proposed by the parties no later than June 17, 2005.

HONEYWELL V. AUDIOVOX, ET AL.

| C.A. No | Defendant | Pending Motions |
| --- | --- | --- |
| 04-1337 | Audiovox Communications | 1) Motion to Stay (D.I.112) |
| | Audiovox Electronics | 1) Customer defendants' Motion to Stay (D.I.101) |
| | Nikon Corporation Nikon Inc. | 1) Motion to Stay (D.I.60) |
| | Nokia Corporation | 1) Motion for leave to file third party complaint (D.I.57) |
| | Nokia Inc. | 2) Motion to Stay (D.I.63) |
| | | 3) Joinder in Toshiba's Motion to Bifurcate filed in C.A. No. 04-1138 at |

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)

Page 6

|  |  |
|---|---|
|  | D.I. 164 (D.I.97) |
| Sanyo Electric Co. | No Motions |
| Sanyo North America |  |
| Curitel Communications (Third Party Deft) | No Motions |
| Toshiba Corp. (Third Party Deft) | No Motions |
| Seiko Epson Corporation (non-party) | 1) Motion to Intervene (D.I.50) |

HONEYWELL V. APPLE COMPUTER, ET AL.

| C.A. No | Defendant | Pending Motions |
|---|---|---|
| 04-1338 | Apple Computer | 1) Joinder (D.I.172) in Toshiba's motion to bifurcate (D.I.164) |
|  |  | 2) motion to stay (D.I.181) |
|  | Argus a/k/a Hartford Computer | 1) motion to stay (D.I.181) |
|  | Casio Computer | 1) Joinder (D.I.172) in Toshiba's |
|  | Casio Inc. | motion to bifurcate (D.I.164) |
|  | Concord Cameras | 1) Joinder (D.I.172) in Toshiba's motion to bifurcate (D.I.164) |
|  |  | 2) motion to stay (D.I.181) |
|  | Dell Inc. | 1) Joinder (D.I.172) in Toshiba's motion to bifurcate (D.I.164) |
|  |  | 2) motion to stay (D.I.181) |
|  | Eastman Kodak | 1) Joinder (D.I.194) in Toshiba's motion to bifurcate (D.I.164) |
|  |  | 2) motion to stay (D.I.181) |
|  | Fuji Photo Film | 1) motion for more definite statement, |
|  | Fuji Photo Film USA | for stay, and for partial dismissal (D.I. 95) |
|  |  | 2) motion to transfer (D.I.97) |
|  |  | 3) brief filed (D.I.156) in support of |
|  |  | Seiko Epson's motion to intervene (D.I. 136) |

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)

Page 7

| | |
|---|---|
| | 4) briefs filed (D.I.166, 183) in support |
| | of Toshiba's motion to bifurcate (D.I. |
| | 164) |
| Fujitsu Limited | 1) Joinder (D.I.172) in Toshiba's |
| Fujitsu America | motion to bifurcate (D.I.164) |
| Fujitsu Computer | |
| Kyocera Wireless | 1) motion to stay (D.I.158) |
| Matsushita Electrical Industrial | 1) Joinder (D.I.172) in Toshiba's |
| Matsushita Electrical Corp. | motion to bifurcate (D.I.164) |
| Navman NZ | 1) motion to stay (D.I.181) |
| Navman USA | |
| Olympus Corp. | 1) motion to stay (D.I.161) |
| Olympus America | |
| Pentax Corporation | 1) motion to stay (D.I.158) |
| Pentax USA | |
| | 2) Joinder (D.I.172) in Toshiba's |
| | motion to bifurcate (D.I.164) |
| Sony Corp. | 1) Joinder (D.I.172) in Toshiba's |
| Sony Corp. Of America | motion to bifurcate (D.I.164) |
| | 2) motion to stay (D.I.189) |
| Sony Ericsson Mobile AB | 1) Joinder (D.I.196) in motion to stay |
| Sony Ericsson Mobile USA | (D.I.158) |
| Toshiba Corporation | 1) motion to bifurcate (D.I.164) |
| Toshiba America | no motions |
| Philips Electronics (3rd pty dft) | no motions |
| Wintek Electro-Optics (3rd pty dft) | no motions |
| Optrex America (3rd pty dft) | no motions |
| Seiko Epson (non-party) | 1) motion to intervene (D.I.136) |
| PLAINTIFFS-HONEYWELL | 1) motion to consolidate and for stay (D.I.134) |

OPTREX AMERICA INC. V. HONEYWELL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)


| C.A. No | Defendant | Pending Motions |
|---------|-----------|-----------------|
| 04-1536 | Honeywell International | 1) Motion to consolidate and for stay |
|         |           | (D.I.14) |
|         | Honeywell Intellectual | 1) Motion to consolidate and for stay |
|         | Properties | (D.I.14) |

D.Del.,2005.
Honeywell Intern. Inc. v. Audiovox Communications
Corp.
Not Reported in F.Supp.2d, 2005 WL 2465898 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 10



Not Reported in A.2d                                                        Page 1
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

▷
Khanna v. McMinn
Del.Ch.,2006.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Dhruv KHANNA, Patrick Sams, and Sybil Meisel,
derivatively and on behalf of all those similarly
situated, Plaintiffs,
v.
Charles MCMINN, Daniel Lynch, Frank Marshall,
Richard Shapero, Robert Hawk, Robert E. Knowl-
ing, Jr., Debra Dunn, Hellene Runtagh, Larry
Irving, Charles Hoffman, L. Dale Crandall, Richard
A. Jalkut, and Crosspoint Venture Partners, L.P.,
Defendants,
andCOVAD COMMUNICATIONS GROUP, INC.,
a Delaware corporation, Nominal Defendant.
**No. Civ.A. 20545-NC.**

Submitted Nov. 7, 2005.
Decided May 9, 2006.

Stuart M. Grant, Jay W. Eisenhofer, Michael J.
Barry, and Cynthia A. Calder, of Grant & Eisen-
hofer, P.A., Wilmington, Delaware; Mark C.
Gardy, and Jill Abrams, of Abbey Gardy LLP, New
York, New York; and Curtis V. Trinko, of The Law
Office of Curtis V. Trinko, LLP, New York, New
York, for Plaintiffs.
Alan J. Stone, Natalie J. Haskins, and Jason A. Cin-
cilla, of Morris, Nichols, Arsht & Tunnell, Wilm-
ington, Delaware; Douglas M. Schwab, Norman J.
Blears, Robin E. Wechkin, and Kristi K. Hansen, of
Heller Ehrman White & McAuliffe LLP, Menlo
Park, California, for Defendants Charles McMinn,
Daniel Lynch, Frank Marshall, Rich Shapero,
Robert Hawk, Robert E. Knowling, Jr., Debra
Dunn, Hellene Runtagh, Larry Irving, Charles
Hoffman, L. Dale Crandall, and Richard A. Jalkut.
David C. McBride, Danielle Gibbs, and Adam W.

Poff, of Young Conaway Stargatt & Taylor, LLP,
Wilmington, Delaware; Steven M. Schatz, Terry T.
Johnson, and Clayton Basser-Wall, of Wilson
Sonsini Goodrich & Rosati, P.C., Palo Alto, Cali-
fornia, for Defendant Crosspoint Venture Partners,
L.P.
Jesse A. Finkelstein, Lisa Zwally Brown, and Can-
dice Toll Aaron, of Richards, Layton & Finger,
P.A., Wilmington, Delaware; Paul H. Dawes, Dari-
us Ogloza, Jacqueline D. Molnar, and David M.
Friedman, of Latham & Watkins LLP, Menlo Park,
California, for Nominal Defendant Covad Communi-
cations Group, Inc.

MEMORANDUM OPINION AND ORDER

NOBLE, Vice Chancellor.
**\*1** Plaintiff Dhruv Khanna ("Khanna") is a
cofounder and shareholder of Nominal Defendant
Covad Communications Group, Inc. ("Covad") and
served as its General Counsel and Executive Vice
President from its formation in 1996 until June
2002 when he was removed from these positions
amidst charges of sexual impropriety. On Septem-
ber 15, 2003, he brought this action, both derivat-
ively and as a class action, to challenge acts and
omissions of Covad's board while he was Covad's
General Counsel and to contest certain omissions
and misrepresentations which he alleges impaired
the accuracy of Covad's proxy statements issued in
advance of shareholders' meetings.[FN1]On August
3, 2004, Sybil Meisel and Patrick Sams, also Covad
shareholders, joined him as representative plaintiffs
with the filing of the Amended Derivative and
Class Action Complaint (the "Amended Com-
plaint").

> FN1. Khanna, on August 11, 2003, also
> filed an action, under 8 *Del .C.* § 220, to
> compel Covad to grant him access to cer-
> tain of its books and records. *See Khanna
> v. Covad Commc'n Group, Inc.,* 2004 WL
> 187274 (Del. Ch. Jan. 23, 2004). For con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

venience, exhibits produced at the § 220 trial are identified as "JTX", and the transcript of that trial is referred to as "Trial Tr."

The Individual Defendants are current and former directors of Covad. Also named as a defendant is Crosspoint Venture Partners, L.P. ("Crosspoint"), a venture capital firm closely connected to some of Covad's directors, a former investor in Covad, and the principal beneficiary of some of the actions which the Plaintiffs challenge. The Plaintiffs seek to impose liability on Crosspoint under principles of fiduciary duty for certain conduct when it was a large shareholder of Covad and under notions of aiding and abetting and *respondent superior.*

The Defendants, as one would expect, have moved to dismiss the Amended Complaint under Court of Chancery Rule 23.1 because pre-suit demand upon the board was not excused and under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Not so typically, the Defendants have also moved to dismiss because, they contend, (1) Khanna did, in fact, make demand upon Covad's board through a letter transmitted shortly after he was terminated and (2) Khanna is not qualified to act as a representative plaintiff in this action because of his former role as General Counsel of Covad and because of the mixed motives prompting the filing of this action-not only as a shareholder, but as a disgruntled former employee. In addition, the Defendants seek dismissal of Meisel and Sams as representative plaintiffs because they are alleged to have been "tainted" by their association with Khanna. Finally, the parties quarrel over the confidential treatment to be given to certain of Khanna's allegations. This dispute requires resolution of opposing motions relating to maintaining the Amended Complaint under seal.

## I. FACTS [FN2]

FN2. The "facts" are drawn primarily from the "well-pleaded" allegations of the Amended Complaint. Some "facts" are taken from documents (or portions thereof) incorporated into the Amended Complaint. Finally, for the debates over disqualification and confidential treatment of portions of the record, the Court looks to a broader range of sources.

Covad, a service provider of broadband internet and network access using digital subscriber line (DSL) technology, is a Delaware corporation headquartered in San Jose, California. It filed for bankruptcy in August 2001 and departed from that jurisdiction in December 2001.

### A. *The Plaintiffs' Challenges-A Brief Overview*

In the Amended Complaint, the Plaintiffs seek redress for six matters (other than disclosure claims) allegedly resulting from breaches of fiduciary duties by various Covad Directors: (1) allowing the vesting of Defendant Charles McMinn's ("McMinn") founders' shares in Covad even though he had not satisfied the requirements for vesting; (2) permitting McMinn and Defendant Rich Shapero ("Shapero"), with Crosspoint, to develop Certive, Inc. ("Certive"), a competitor of Covad; (3) Covad's subsequent investment in Certive; (4) Covad's acquisition of BlueStar Communications Group, Inc. ("BlueStar"), an act that rescued a failing investment of Crosspoint and was the principal cause of Covad's entry into bankruptcy; (5) the BlueStar earn-out settlement; and (6) Covad's investment in DishnetDSL ("Dishnet"), an entity with which McMinn was involved, and the payments Covad made to end that relationship. Crosspoint is alleged to be liable for the adverse consequences of some of those fiduciary failures either directly, as a controlling shareholder, or as an aider and abettor and under the doctrine of *respondeat superior.*

*2 Additionally, Khanna, in correspondence with Covad's Board, shortly after his termination, made

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

numerous allegations of wrongdoing against members of Covad's Board. The Plaintiffs contest the sufficiency of Covad's proxy statements in 2002, 2003, and 2004 principally because, it is alleged, the charges Khanna made against Covad's Board were not fully disclosed to the shareholders who could have used the information in determining how to vote for directors standing for reelection to the Board.

### B. Covad's Board of Directors

When this action was filed, Covad's Board consisted of eight directors.

### 1. Charles McMinn

McMinn is a founder of Covad and Chairman of its Board of Directors. He has been on the Board-with the exception of an approximately one-year absence from November 1999 to late-October 2000-since October 1996. He was the company's Chief Executive Officer and President from October 1996 to July 1998.

McMinn is also a founder of Certive, which was incorporated in July 1999, and was Certive's Chief Executive Officer from November 1999 to October 2000. McMinn served as a director of BlueStar until Covad acquired it. He is also a member of Dishnet's board.

### 2. Robert Hawk

Hawk has been a member of Covad's Board since April 1998. Hawk is a "Special Limited Partner" of Crosspoint.[FN3] It is alleged that "through Crosspoint and directly, Hawk has owned a substantial equity interest in BlueStar."[FN4] Through Crosspoint, Hawk owned 12% of Diamond Lane (which paid $52 million to Covad for services rendered in 1998 and 1999) and a "significant" stake in Efficient Technologies, both of which are Covad vendors. Additionally, Hawk is alleged to have

"joined the [Covad] board as a result of his friendship, connections and/or business affiliations with Defendants Shapero and/or McMinn."[FN5]

> FN3. Amended Compl. at ¶ 12.
>
> FN4. *Id.*
>
> FN5. *Id.*

### 3. Charles Hoffman

Since June 2001, Hoffman has been a director, President, and Chief Executive Officer of Covad. It is alleged that he was recruited by McMinn and "immediately forged a close relationship with defendant McMinn,"[FN6] whom he regards as his boss. Hoffman receives various benefits from Covad, including a $500,000 salary, a $375,000 annual bonus, a $100,000 signing bonus, term life insurance, and stock options.[FN7]

> FN6. *Id.* at ¶ 17.
>
> FN7. *Id.* at ¶ 138.

### 4. Larry Irving

Irving has served as a member of Covad's Board since April 2000. In the Amended Complaint, the Plaintiffs identify various instances in which Irving joined other Covad directors in making, what the Plaintiffs consider, egregious decisions.[FN8]

> FN8. These decisions include allowing Shapero to sit on the boards of Covad competitors, allowing Hawk to maintain his investment in BlueStar, granting Hoffman an overly generous compensation package, allowing McMinn to serve on the Covad and Dishnet boards while the two companies were in litigation, and retaliating against Khanna when he objected to the Board's improper conduct. *Id.* at ¶ 139.

### 5. Richard A. Jalkut

Jalkut was appointed to the Covad Board on July

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

18, 2002. He is the President and Chief Executive Officer of TelePacific, Inc., a Covad reseller.

### 6. Daniel Lynch

Lynch has been a member of the Covad Board since April 1997. Lynch is a member of the Board of Advisors of Certive,[FN9] appointed soon after Covad's investment in Certive. He is also a long-time friend of McMinn. The two own homes in the same neighborhood and neighboring wineries in St. Helena, Napa.[FN10]

> FN9. The Amended Complaint fails to develop sufficiently, for particularized pleading purposes, the nature of Certive's Board of Advisors. It may be that appointment to this position carried significant remunerative benefits, but the Plaintiffs' conclusory pleadings in this respect fail to set forth the detail necessary to satisfy Court of Chancery Rule 23.1.

> FN10. Amended Compl. at ¶ 9.

### 7. L. Dale Crandall

*3 Crandall was appointed to the Covad Board on June 20, 2002. He also sits on the board of BEA Systems ("BEA"), a company that supplies Covad with software and related support.[FN11]Covad paid in excess of $2.2 million to BEA in 2004.

> FN11. Calder Decl., Ex. E, at 4. These facts are drawn from Covad's 2004 Proxy Statement. Although one may doubt whether this aspect of Covad's 2004 Proxy Statement was incorporated into the Amended Complaint, this information is not outcome-determinative.

### 8. Hellene Runtagh

Runtagh has been a member of the Covad Board of Directors since November 1999. "She became a director with the consent and approval of the McMinn-Shapero director appointees. Defendant Runtagh derived the benefits of being and remaining on the Board of Directors of, and receiving compensation from, Covad by supporting and favoring the self-dealing of other directors in the BlueStar and Dishnet Transactions."[FN12]

> FN12. Amended Compl. at ¶ 15.

### C. Former Covad Board Members

A brief review of the following former Covad directors is important to understanding, as the Plaintiffs tell the story, the "incestuous" nature of Covad's Board, as well as the transactions challenged by the Plaintiffs.

### 1. Frank Marshall

Marshall served on Covad's Board from October 1997 to December 2002 and was Covad's interim chief executive officer from November 2000 until June 2001. He also serves on Certive's Board of Advisors. He has been a partner in Sequoia Capital ("Sequoia"), a venture capital firm, which invested with Crosspoint. He is a director of NetScreen Technologies, a Covad vendor that received $33,000 from Covad in 2001. Defendant Marshall is alleged to be a longtime friend of McMinn.

### 2. Rich Shapero

Shapero served on the Covad Board-as Crosspoint's designee-from July 1997 to May 2002 and on the Covad compensation committee.

Shapero is the Managing Partner, as well as a General Partner, of Crosspoint. Crosspoint had stakes in various entities associated with Covad, such as Certive, BlueStar, Diamond Lane, and Efficient Technologies, another Covad vendor. Shapero was also a member of the boards of BlueStar and NewEdge Networks ("NewEdge").

### 3. Robert E. Knowling, Jr.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Knowling was Covad's Chief Executive Officer and a member of Covad's Board from July 1998 until November 1, 2000. He also served as Chairman of the Board from September 1999 until his departure from Covad in November 2000. Knowling is a former colleague of Hawk, with whom he worked at "US West Communications, Inc. and/or its affiliates."[FN13]Covad's stock price began its "steep descent in the [s]pring of 2000"[FN14] on Knowling's watch.

> FN13. Amended Compl. at ¶ 13.

> FN14.*Id.*

**4. *Debra Dunn***

Dunn served on the Covad Board from April 2000 to October 2000. She is a senior executive at Hewlett-Packard. Dunn was recruited to join the Covad Board through Knowling, who served on Hewlett-Packard's Board of Directors.

**D. *Crosspoint and Other Relationships***

Crosspoint is a "venture capital firm that invests in early stage companies in two strategic areas: (a) Virtual Service Providers and E-Business Services; and (b) Broadband Infrastructure."[FN15]Crosspoint had invested in Covad, Certive, BlueStar, and NewEdge and also "owned a significant stake in Diamond Lane and Efficient Technologies, both of which were Covad vendors."[FN16]In addition, Crosspoint "co-invested in one or more companies alongside" Sequoia, with which Marshall is affiliated.[FN17]As noted, Shapero serves as Crosspoint's General and Managing Partner, and Hawk is a Special Limited Partner. Crosspoint "cashed out" its investment in Covad in "1999-2000." [FN18]

> FN15.*Id.* at ¶ 18.

> FN16.*Id.* NewEdge is a "provider of dedicated internet access for businesses and communications carriers...."*Id.* at ¶ 11.Diamond Lane is "a Covad vendor who

Covad paid $52 million for services rendered in 1998 and 1999."*Id.*

> FN17.*Id.* at ¶ 18.

> FN18.*Id.*

**E. *The Plaintiffs' Challenges***

**1. *The Certive Claims*[FN19]**

> FN19. Although referred to, for convenience, as the "Certive Claims," there are three separate aspects: (1) the vesting of McMinn's "founders' shares" (Count I); (2) the usurpation by McMinn of Covad's business opportunity with respect to the activities of Certive (Count II); and (3) the decision of Covad's Board to invest in Certive (Count III).

*\*4 The Plaintiffs allege that the events surrounding Covad's investment in Certive reflect a pattern of self-dealing by McMinn and Crosspoint and that various supine Covad directors were rewarded with lucrative positions in exchange for their support.

Covad went public in January 1999. McMinn was no longer chief executive officer, but needed to remain a full-time employee of Covad until November 2000 for his founders' shares to vest fully. While employed at Covad, McMinn began looking for other investment opportunities. He wrote to Knowling, then-chief executive officer of Covad: "The taking of board seats [with Crosspoint affiliates] and coming up with ideas that Crosspoint and I could invest in is what [C]rosspoint wanted me to do and what I thought we had agreed to with me helping them."[FN20]He justified his involvement with other companies by contending that "these would be deals that Covad would benefit from [and] that Covad may or may not want to invest in/ partner with."[FN21]Knowling, although concerned about the example that McMinn's behavior would set for other Covad employees, eventually acquiesced: "You are the founder and exceptions can be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 6

made to make anything work."[FN22]Thus, McMinn received his "founders' shares" despite the fact that he did not remain with Covad on a full-time basis until November 2000. This special treatment was not reported to Covad's shareholders.

> FN20.*Id.* at ¶ 43.

> FN21.*Id.* at ¶ 44.

> FN22.*Id.* at ¶ 46.

One of the opportunities that McMinn was pursuing involved Certive, a privately-held provider of computerized data integration services. Certive's website, as of mid-2002, explained that Certive was "developing a full-service e-business network to provide live support and systems to entrepreneurs over a broadband connection...."[FN23] McMinn was a founder of Certive, which was incorporated in July 1999 when McMinn was a full-time employee of Covad. Crosspoint and McMinn held substantial stakes in Certive. McMinn received 1,333,333 founders' shares of Certive and invested $1 million for an additional 666,667 Series A Preferred Shares. Crosspoint received 3 million Series A Preferred shares for an investment of $4.5 million.

> FN23.*Id.* at ¶ 47.

Certive is alleged to have been in Covad's "line of business." [FN24]Covad was not offered the opportunity to invest in Certive's Series A Preferred round of financing.

> FN24.*Id.* at ¶ 153.

On September 22, 1999, the Covad Board blessed McMinn's involvement and investment in Certive *ex post.*This blessing came two months after McMinn had founded Certive and one month after McMinn and Crosspoint had invested in Certive's Series A Preferred shares. Covad's Board decided that "the company would not be interested in pursuing an investment in [Certive] on the terms and conditions offered to McMinn and Crosspoint."FN25At this meeting, the Covad Board

also adopted a "corporate opportunity policy" which forbade, without prior approval, a fiduciary of Covad to sit on the board of, or invest in, a company in competition with Covad.

> FN25.*Id.* at ¶ 55.

*5 Nineteen days later, however, Covad invested in Certive's Series B-1 Preferred round of financing. Covad paid $5 million for 1,111,111 Series B-1 Preferred shares (approximately $4.50 per share). Additionally, Covad signed a Shareholders' Rights Agreement that bound Covad to vote its shares in favor of Crosspoint and McMinn's designees on the Certive Board. Hawk, Lynch, Marshall, and Knowling participated in the Covad Board's deliberations and vote.

After Covad's investment in Certive, Lynch and Marshall were invited to serve on Certive's Board of Advisers. "[Advisory board] positions are highly sought after and potentially lucrative as advisory board members in Silicon Valley companies are given stock options which during the 1990s became a source of great wealth for many people."[FN26]

> FN26.*Id.* at ¶ 56.

### 2. The BlueStar Transactions

For convenience, Covad's involvement with Blue-Star may be viewed as two separate, although closely related, transactions: (1) the BlueStar acquisition, and (2) the BlueStar earn-out settlement.

### a. BlueStar Acquisition

On June 16, 2000, Covad announced that it had entered into a merger agreement with BlueStar. BlueStar sold DSL services directly to retail customers. From mid-1999 on, Crosspoint owned more than 40% of BlueStar's outstanding shares. McMinn and Hawk "owned a substantial number of preferred shares."[FN27]Shapero and McMinn sat on the BlueStar board.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

FN27.*Id.* at ¶ 58.

"By mid-2000, BlueStar had incurred significant debt and liabilities and was losing millions of dollars every month. Its efforts to raise money through an initial public offering of stock were unsuccessful and it (and its major investor, Crosspoint) needed a bail-out."[FN28]Shapero lobbied Knowling for Covad to acquire BlueStar, and Covad eventually succumbed. A fairness opinion prepared by BlueStar's financial advisor for the transaction reported, "The management of [BlueStar] ... informed us that [BlueStar], as of June 14, 2000, expected to exhaust its liquidity in the near term and did not have a financing source for funding its anticipated operating and capital needs over the following 12 months ."[FN29]In addition to BlueStar's fiscal problems, senior Covad management opposed the transaction: "BlueStar's entire business was built on a feet-on-the-street direct sales model already tried and rejected by Covad."[FN30]The merger is alleged to have been "fraught with self-dealing because of the interlocking and conflicting relationships between the Covad and BlueStar boards."[FN31]

FN28.*Id.* at ¶ 61.

FN29.*Id.* at ¶ 63.

FN30.*Id.* at ¶ 69.

FN31.*Id.* at ¶ 71.

On September 22, 2000, Covad completed the BlueStar acquisition by issuing approximately 6.1 million shares of Covad common stock to BlueStar shareholders under an exchange ratio that enabled BlueStar preferred and common shareholders to receive an average price of $14 .23 per share of BlueStar. Additionally, BlueStar's stock options and warrants were converted into approximately 255,000 Covad shares at a fair value of $6.55 per share. The total consideration Covad paid was valued at, at least, $200 million.[FN32]Knowling, Marshall, Lynch, Dunn, and Runtagh approved the BlueStar acquisition.

FN32.*Id.* at ¶ 73.

*6 The acquisition immediately appeared to be a failure as, the day after the merger was announced, Covad's shares dropped 27%. On June 25, 2001, within a year after the merger, Covad announced it was shutting down the BlueStar network and laying off more than 400 employees.

b. *BlueStar Earn-Out Settlement*

In addition to the consideration paid at the time of the merger, BlueStar shareholders were entitled to receive up to 5,000,000 additional Covad common shares at the end of 2001 if BlueStar achieved certain revenue and EBITDA goals. "Despite BlueStar's utterly dismal performance and failure to even approach, let alone reach, its EBITDA targets, in April 2001 Covad reached an agreement with BlueStar representatives, negotiated by Lynch, whereby BlueStar stockholders were given 3,250,000 of the 5,000,000 shares, in exchange for a release of all claims against [Covad]...."[FN33] Lynch negotiated this settlement without final BlueStar accounting results and even though the former BlueStar shareholders were not entitled to any payments until the end of 2001. At the same time that Lynch's negotiations were taking place, Marshall "was sending emails to the Covad Board calling the BlueStar acquisition 'a very costly mistake, probably the worst mistake I have ever seen a company make.' ' [FN34] No corporate record was kept of the negotiations. The BlueStar earn-out settlement cost Covad $100 million, to the substantial benefit of Crosspoint, Shapero, McMinn, and Hawk (who collectively received almost half of the 3,250,000 shares from the earn-out settlement).[FN35] Covad reported that McMinn, Hawk, and Shapero did not participate in the meetings concerning the review and approval of the BlueStar earn-out settlement.[FN36]Marshall, Lynch, Runtagh, and Irving participated in the BlueStar earn-out settlement deliberations and vote.

FN33.*Id.* at ¶ 74.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

FN34.*Id.*

FN35.*Id.* at ¶ 78.

FN36.*See* Amended Compl. at ¶ 80 ("In fact, [Covad] has publicly stated that McMinn, Hawk and Shapero did not participate in the meetings concerning the 'review and approval' of the [BlueStar earn-out settlement]."); *see also* Stone Aff., Ex. E at 121 (Covad's 10-K for fiscal year ending December 2000).

### 3. *The Dishnet Transaction*

McMinn sat on the Board of Directors of Dishnet and held options to purchase shares of that company. Dishnet is a privately held telecommunications company that provides DSL and dial-up access in India.

On February 15, 2001, Covad-through a wholly owned subsidiary-purchased 2,000,000 shares of Dishnet for $22,980,000. In addition to the subscription agreement, Dishnet entered into an agreement with Covad to license Covad's proprietary operational support system for use in India. The business relationship soon deteriorated.

In October 2001, Dishnet filed a proof of claim in Bankruptcy Court against Covad asserting damages in excess of $24 million. Covad attempted to exercise its $23 million put option in Dishnet. As a result of these actions, McMinn was simultaneously sitting on the boards of two companies engaged in a substantial legal dispute.

Covad and Dishnet resolved their dispute. Among the terms of the settlement were (1) the sale of Covad's investment in Dishnet for $3 million, (2) resolution of Dishnet's claims against Covad, and (3) the relinquishment of Covad's put option in Dish- net.

### F. *Proxy Disclosures and Khanna's Letter to Covad's Board*

*7 The Plaintiffs allege that Khanna protested against the transactions discussed above on the grounds that they were compromised by self-dealing and otherwise lacked substantive business purpose. Covad's Board then "vowed to remove Khanna so he would not be an obstacle to their self-dealing."[FN37]Khanna was accused of sexual harassment, removed as General Counsel, and placed on administrative leave in June 2002.

FN37. Amended Compl. at ¶ 110.

On June 10, 2002, Covad issued its 2002 Proxy Statement. The annual meeting of Covad shareholders was scheduled for July 25, 2002. On June 19, 2002, after he was relieved of his duties, Khanna (through his attorney) sent a letter to Covad's Board "outlining among other things, the breaches of fiduciary duty alleged against the Board in [the Amended Complaint], including the Board's conduct in the Certive, BlueStar, and Dishnet transactions."[FN38]Khanna contends that this was not a demand on the Board; "[r]ather, it was a last-ditch attempt on his part to get the slim minority of directors who did not have direct interests in these transactions to do something to seek a remedy for the corporation."[FN39]

FN38.*Id.* at ¶ 122.

FN39.*Id.* at ¶ 123.The letter, which may be considered as incorporated into the Amended Complaint, was part of the record in the § 220 action as JTX 123. *See, e.g.,* Amended Compl. at ¶ 3.

Although Khanna's charges were broadly directed at alleged fiduciary breaches by the Covad Board-breaches which, if as alleged, would have affected all public shareholders adversely-the response sought by Khanna was unique to him and provided no direct benefit to the other shareholders. Khanna attempted to extract the following terms:

1. Mr. Khanna shall be allowed to join the Covad Board of Directors, as Vice Chairman, with a not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 9

less than 15-year contract, ... he shall be respons-
ible for overall conflict of interest compliance.

2. Mr. Khanna shall be given a role as Executive
Vice President for Corporate Strategy reporting
directly to the CEO, which shall include the fol-
lowing areas: Public Advocacy Strategy, includ-
ing legal and related PR strategy, press release
review, and second (second to the CEO) public
spokesperson (without any impairment to the
CFO's role as head of Investor Relations); Legal
Strategy, including Litigation Initiation and Set-
tlement Strategy; New and Existing Product Im-
plementation Strategy; ILEC Restructuring
Strategy; and related strategies.

3. He will retain the responsibility of being Co-
vad's chief representative at trade associations....

4. He will remain on all pre-existing e-mail mail-
ing lists and will join any applicable new ones.

5. He will be compensated at all times not less
than a comparable officer that serves as both an
officer and as a director. He shall not be termin-
ated or investigated for any reason other than
fraud or illegal conduct during the 15-year peri- od.

6. Covad will make a statement to the legal de-
partment, corporate officers and members of the
Board clearing Mr. Khanna of any and all viola-
tions of law and stating that he has been subjec-
ted to two separate investigations and has been
cleared of any ethical or integrity violations as
well....

*8 7. Mr. Khanna will have five individuals re-
porting to him on a solid line basis ..., and his ad-
ministrative support person ..., plus a minimum
of four individuals reporting to him on a dotted
line basis....[FN40]

FN40. JTX 123.

On July 9, 2002, shortly after his letter to Covad's

Board, Khanna sent a draft fiduciary duty com-
plaint. His implicit threat: if the Board did not ac-
cede to his selfish wishes, a derivative and class ac-
tion complaint would be brought, purportedly for
the benefit of all shareholders.

Covad's Board formed a committee, consisting of
directors Runtagh and Crandall, to investigate
Khanna's allegations; the committee was not ini-
tially given any power to act independently of the
Covad Board. Additionally, Crandall was given the
authority to act alone on behalf of the committee if
his opinion differed from that of Runtagh. Although
Khanna was not aware of it, at some point Jalkut
became a member of the committee. On September
20, 2002, the Board gave the committee authority
to determine whether or not to bring a suit based on
Khanna's allegations of wrongdoing.

In October 2002, the committee concluded that the
company should not pursue litigation based on the
Certive matters.[FN41] The Amended Complaint
charges that only disclosures Covad's Board made
of Khanna's allegations and the subsequent invest-
igations into those allegations were in its March
2003 10-K, its May 2003 10-Q, and its 2004 Proxy
Statement.[FN42] Both of Covad's 2003 disclosures
were essentially the same; its March 2003 10-K re-
cited:

> FN41.*Id.* at ¶ 129. It is unclear from the
> Amended Complaint when the committee
> decided not to pursue claims based on the
> other transactions of which Khanna com-
> plained. It does allege that the committee
> "informed Khanna that [it] believed his al-
> legations were without merit" on Decem-
> ber 26, 2002. *Id.* at ¶ 133.

> FN42.*Id.* at ¶¶ 204, 213. Paragraph 213 of
> the Amended Complaint contradicts Para-
> graph 204 by alleging that the disclosures
> were in the 2003 Proxy Statement. Addi-
> tionally, Paragraph 133 of the Amended
> Complaint alleges that the "only public
> disclosure" of Khanna's allegations and the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

investigation occurred in Covad's March 2003 10-K; however, the Amended Complaint explains in other paragraphs that disclosures were made at least in the May 2003 10-Q and the 2004 Proxy Statement. *See id.* at ¶¶ 204, 213.

In June 2002, Dhruv Khanna was relieved of his duties as our General Counsel and Secretary. Shortly thereafter, Mr. Khanna alleged that, over a period of years, certain current and former directors and officers had breached their fiduciary duties to the Company by engaging in or approving actions that constituted waste and self-dealing, that certain current and former directors and officers had provided false representations to our auditors and that he had been relieved of his duties in retaliation for his being a purported whistleblower and because of racial or national origin discrimination. He has threatened to file a shareholder derivative action against those current and former directors and officers, as well as a wrongful termination lawsuit. Mr. Khanna was placed on paid leave while his allegations were being investigated.

Our Board of Directors appointed a special investigative committee, which initially consisted of Mr. Crandall and Ms. Runtagh, to investigate the allegations made by Mr. Khanna. Mr. Jalkut was appointed to this committee shortly after he joined our Board of Directors. This committee retained an independent law firm to assist in its investigation. Based on this investigation, the committee concluded that Mr. Khanna's allegations were without merit and that it would not be in the best interest of the Company to commence litigation based on these allegations. The committee considered, among other things, that many of Mr. Khanna's allegations were not accurate, that certain allegations challenged business decisions lawfully made by management or the Board, that the transactions challenged by Mr. Khanna in which any director had an interest were approved by a majority of disinterested directors in accord-

ance with Delaware law, that the challenged director and officer representations to the auditors were true and accurate, and that Mr. Khanna was not relieved of his duties as a result of retaliation for alleged whistleblowing or racial or national origin discrimination. Mr. Khanna has disputed the committee's work and the outcome of the investigation.

*9 After the committee's findings had been presented and analyzed, the Company concluded in January 2003 that it would not be appropriate to continue Mr. Khanna on paid leave status, and determined that there was no suitable role for him at the Company. Accordingly, he was terminated as an employee of the Company. While the Company believes the contentions of Mr. Khanna referred to above are without merit, and will be vigorously defended if brought, it is unable to predict the outcome of any potential lawsuit.FN43

FN43.*Id.* at ¶ 133.

No other public disclosure was made of Khanna's termination and the charges he made in his letter to the Board.

## II. CONTENTIONS

A. *Derivative Fiduciary Duty Claims*

Count I of the Amended Complaint alleges breaches of fiduciary duty against McMinn, Shapero, Marshall, Lynch, Hawk, and Knowling for allowing McMinn's founders' shares to vest. The Defendants respond that the Plaintiffs' claim is time-barred and that this decision is protected by the business judgment rule.

Count II of the Amended Complaint charges McMinn, Shapero, and Crosspoint with breaching their fiduciary duties by usurping a Covad corporate opportunity in founding, and investing in Series

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

A Preferred shares of, Certive. The Defendants argue that this claim is time-barred, that it was properly rejected by a majority of disinterested and independent directors, and that the Plaintiffs have not properly alleged that pre-suit demand upon the Board would have been futile. Additionally, Crosspoint argues that this claim should be dismissed because the Plaintiffs do not sufficiently allege that Crosspoint owed fiduciary duties to Covad's shareholders.

Count III of the Amended Complaint alleges breaches of fiduciary duty by McMinn, Shapero, Hawk, Lynch, Marshall, and Knowling during Covad's acquisition of a substantial equity interest in Certive. The Plaintiffs assert that some of these directors were interested in the transaction and that the investment was detrimental to Covad's shareholders. The Plaintiffs contend that the investment constituted corporate waste. The Defendants respond that the Plaintiffs' claims surrounding the Certive investment are time-barred, that there was no breach of a duty of loyalty because the transaction was approved by a majority of disinterested and independent directors, that the Plaintiffs' claim for breach of fiduciary duty for failure to seek restitution for the Certive investment fails as a matter of law, and that pre-suit demand is not excused.

Count IV of the Amended Complaint asserts a claim against McMinn, Shapero, Hawk, Lynch, Marshall, Dunn, Knowling, Runtagh, and Irving for breaches of fiduciary duty with respect to the two BlueStar transactions (the acquisition and the earn-out settlement). The Defendants assert that this claim is time-barred and that the Plaintiffs have not shown that a majority of the directors who approved these transactions were interested or lacked independence.

Count V of the Amended Complaint alleges breaches of fiduciary duty by McMinn, Shapero, Hawk, Lynch, Marshall, Hoffman, Runtagh, and Irving for the Dishnet transaction. The Defendants contend that the Dishnet settlement was approved a majority of disinterested and independent directors.

**\*10** In addition, the Defendants assert that the Plaintiffs have failed to plead a proper claim for waste. Moreover, the Director Defendants have attempted to invoke the exculpatory provision adopted in Covad's Amended and Restated Certificate of Incorporation under 8 *Del.C.* § 102(b)(7), which would shield them from personal liability for money damages based on any breach of the duty of care.

Count VI of the Amended Complaint asserts a derivative claim against Crosspoint for aiding and abetting Covad's directors in breaching their fiduciary duties in the Certive and BlueStar transactions. Crosspoint argues that the Plaintiffs do not sufficiently plead an underlying breach of fiduciary duty (so there can be no secondary liability) and that the Plaintiffs failed to plead that Crosspoint knowingly participated in any breach of duty.

Count VII of the Amended Complaint seeks to set forth a claim against Crosspoint under the doctrine of *respondeat superior.* The Plaintiffs allege that Shapero and Hawk-acting as Crosspoint's agents-caused harm to Covad by orchestrating the Certive and BlueStar transactions. Crosspoint responds the Plaintiffs have failed to plead an underlying breach of fiduciary duty for the Certive and BlueStar transactions and that the Plaintiffs' *respondeat superior* claim fails as a matter of law.

B. *Demand on the Board and Demand Futility*

The Defendants also contend that Khanna's letter to the Board was a demand on Covad's Board and the Plaintiffs have not set forth facts that show that the demand was wrongfully rejected. Furthermore, the Defendants contend that, even if Khanna did not make a demand on Covad's Board, the Plaintiffs have not set forth facts demonstrating that demand would have been futile and, thus, all derivative claims must be dismissed. The Plaintiffs respond that Khanna's letter to the Board was not a demand and that they have indeed pleaded facts showing that demand on Covad's Board would have been fu-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 12

tile and, therefore, that demand should be excused.

C. *Direct Claims for Breach of Fiduciary Duty with regard to Covad's 2002, 2003, and 2004 Proxy Statements*[FN44]

> FN44. The Plaintiffs do not allege that the board elections were contested.

Count VIII of the Amended Complaint is a direct claim against McMinn, Shapero, Hawk, Lynch, Marshall, Irving, Hoffman, and Runtagh for breaches of fiduciary duty resulting from material omissions in Covad's 2002 Proxy Statement. In 2002, McMinn, Hawk, and Hoffman were reelected to the Covad Board. The Plaintiffs allege that 2002 Proxy Statement did not disclose certain information-*e.g.*,Khanna's June 19, 2002 letter to the Board, the Standstill Agreement,[FN45] the real reasons for Khanna's termination, that the BlueStar earn-out criteria had not been met, and that McMinn was working for Certive in 1999-and that these omissions were material to shareholders. The Defendants argue that the Plaintiffs' claim is barred by laches and that Covad satisfied its disclosure obligations.

> FN45. Covad and Khanna entered into the "Standstill Agreement" which allowed for "confidential settlement discussions" during the period of July 10, 2002 through July 23, 2002. *Id.* at ¶ 116.This period was subsequently extended through July 26, 2002. Under the Standstill Agreement, the parties agreed that "[d]uring the Negotiating Period, neither party shall take any actions to advance, or that will have the effect of advancing, its litigation position, and they shall diligently and vigorously focus their attention on resolving the disputes among them."*Id.*

Counts IX and X concern Covad's 2003 and 2004 Proxy Statements. In 2003, Lynch, Irving, and Jalkut were reelected to the Covad Board; and in 2004, Crandall and Runtagh were reelected. The Plaintiffs allege that certain information was either inadequately disclosed or entirely omitted-Khanna's June 19, 2002 letter, the real reasons for Khanna's termination from Covad, that the BlueStar earn-out criterion had not been met, and which transactions and directors Khanna was challenging-and that these omissions were material to shareholders. Again, the Defendants argue that the Plaintiffs' claims are barred by laches and that Covad satisfied its disclosure requirements.

D. *Motion to Disqualify Plaintiffs*

**\*11** Covad contends that Khanna must be disqualified as a representative plaintiff because (1) Khanna's ethical duties, as Covad's former General Counsel, prevent him from pursuing this litigation; (2) he is barred from pursuing litigation against his former client on matters with which he had a "substantial relationship"; (3) he participated, or at least acquiesced, in the challenged transactions; and (4) he has a personal agenda against the Defendants separate from Covad shareholders. Khanna denies all of these allegations. Additionally, Covad contends that Sams and Meisel must be disqualified because they have been "tainted" by exposure to Khanna's privileged information and because they are not the "driving force" behind this litigation.

E. *Motions to Strike Portions of the Amended Complaint-Motions to Seal/Unseal the Record*

Covad contends that Paragraphs 52, 54, 55, and 57 of the Amended Complaint should be stricken because they disclose privileged information in violation of Khanna's attorney-client duties. Khanna argues that these paragraphs should not be stricken because the information is public information gained from the § 220 proceeding and, with regard to paragraph 52, because Covad waived any privilege it may have had by introducing its facts as evidence at the § 220 trial.

Comparable arguments regarding privilege are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

made in the competing motions to seal and unseal the record.[FN46]In addition to the challenges presented above, Covad argues that Paragraphs 43, 44, and 74 of the Amended Complaint should remain sealed because they contain confidential and sensitive information.

> FN46. Plaintiffs have moved to unseal the record, in addition to Covad's motion for continued sealing of portions of the record.

### III. DEMAND FUTILITY

The Plaintiffs seek to assert multiple derivative claims on behalf of Covad. The Court must first inquire as to whether demand was made on Covad's Board. If it was not, the Court must then determine whether demand is excused.

#### A. Legal Standard for Demand Futility

"A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile."[FN47]This requirement, found in Court of Chancery Rule 23.1,[FN48] arises from the fundamental principle that the board of directors manages the business and affairs of a corporation, including decisions of whether to bring suit on behalf of the corporation.[FN49]In order to bring a derivative claim, a plaintiff "must overcome the powerful presumptions of the business judgment rule...."[FN50] Indeed, "[t]he key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties."[FN51]"By its very nature the derivative suit impinges on the managerial freedom of directors."[FN52]As a consequence, Court of Chancery Rule 23.1 imposes on a plaintiff a pleading burden that is "more onerous" than the burden a plaintiff must satisfy when confronted with a motion to dismiss under Court of Chancery Rule

12(b)(6).[FN53]

> FN47.*Ash v. McCall,* 2000 WL 1370341, at *6 (Del. Ch. Sept. 15, 2000).

> FN48.CT. CH. R. 23.1 ("The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.").

> FN49.*See*8 *Del.C.* § 141; *see also White v. Panic,* 793 A .2d 356, 363 (Del. Ch.2000), *aff'd,*783 A.2d 543 (Del.2001).

> FN50.*Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993). This Court has previously explained that

> > [t]he purpose for the demand requirement and concomitant heightened pleading standard is to "effectively distinguish between strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery and suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf."

> *White,* 793 A.2d at 364 (quoting DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 9-2(b)(3)(i), at 554 (1998)); *see also Beam v. Stewart,* 845 A.2d 1040, 1050 (Del.2004).

> FN51.*Beam,* 845 A.2d at 1050 (citing *Aronson v. Lewis,* 473 A .2d 805, 812 (Del.1984), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244, 254

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(Del.2000)).

FN52.*Aronson,* 473 A.2d at 811."The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit."*Rattner v. Bidzos,* 2003 WL 22284323, at *7 (Del. Ch. Sep. 30, 2003) (citations omitted).

FN53.*Levine v. Smith,* 591 A.2d 194, 207 (Del.1991), *overruled on other grounds, Brehm,* 746 A.2d at 254.

*12 As this Court has previously explained, depending on the circumstances, inquiry into whether demand is excused proceeds under either *Aronson v. Lewis*[FN54] or *Rales v. Blasband.*[FN55]

FN54.473 A.2d 805 (Del.1984).

FN55.634 A.2d 927 (Del.1993).

Under the two-pronged *Aronson* test, demand will be excused if the derivative complaint pleads particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."As the Supreme Court stated in *Rales*..., however, there are three circumstances in which the *Aronson* standard will not be applied: "(1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where ... the decision being challenged was made by the board of a different corporation."In those situations, demand is excused only where "particularized factual allegations ... create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have

properly exercised its independent and disinterested business judgment in responding to a demand."[FN56]

FN56.*In re Bally's Grand Deriv. Litig.,* 1997 WL 305803, at *3 (Del. Ch. June 4, 1997) (footnotes omitted). See also the Court's discussion at Part III(C)(2), *infra,* addressing analysis of "substantial threat[s] of personal liability" for directors applicable under *Rales* in certain circumstances.

In other words, if the pleadings present particularized "facts sufficient to create a reasonable doubt that ... a majority of the directors are disinterested and independent,"[FN57] then demand will be excused under either the test in *Rales* or the first prong of *Aronson.*

FN57.*White,* 793 A.2d at 364.The burden of demonstrating demand futility lies with the Plaintiffs. *See Aronson,* 473 A.2d at 812.

Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.""Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[FN58]

FN58.*In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *8 (Del. Ch. Apr. 29, 2005) (quoting *Aronson,* 473 A.2d at 812, 816),*aff'd,*2006 WL 585606 (Del. Mar. 8, 2006); *see also Beam,* 845 A.2d at 1049;*Rales,* 634 A.2d at 936.

If, however, the Court's "review of the complaint reveals that it does not allege with particularity facts from which the court could reasonably con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Page 15

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

clude" that at least half "of the directors in office when the complaint was filed were disabled from impartially considering a demand," then the plaintiff's derivative claim will be dismissed-unless the second prong of *Aronson* applies and is satisfied.[FN59]

> FN59.*Highland Legacy Ltd. v. Singer,* 2006 WL 741939, at *1 (Del. Ch. Mar. 17, 2006); *see also Beneville v. York,* 769 A.2d 80, 86 (Del. Ch.2000) (describing analysis where half of board compromised).

"At the motion to dismiss stage of the litigation, '[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." ' [FN60] The Court "need not blindly accept as true all allegations, nor must [it] draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." [FN61]Pleading with particularity is essential for a plaintiff to satisfy the requirements of demand excusal. Indeed, such "pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)." [FN62] The Court must, however, "accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff." [FN63]

> FN60.*White v. Panic,* 783 A.2d 543, 549 (Del.2001) (citations omitted); *see also Kahn v. Roberts,* 1994 WL 70118, at *5 (Del. Ch. Feb. 28, 1994) ("Conclusory allegations of domination and control, without particularized facts showing that an individual person or entity interested in the transaction controlled the board's vote on the transaction, are insufficient to excuse pre-suit demand.").

> FN61.*White,* 783 A.2d at 549 (citation

omitted).

> FN62.*Brehm,* 746 A.2d at 254 ("What the pleader must set forth are particularized factual statements that are essential to the claim. Such facts are sometimes referred to as 'ultimate facts,' 'principal facts' or 'elemental facts.' " (citations omitted)).

> FN63.*Rattner,* 2003 WL 22284323, at *7 (citing *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988), *overruled on other grounds, Brehm,* 746 A.2d at 254).

**B.** *Khanna's Letter Was Not a Demand to Covad's Board*

**\*13** Before proceeding to demand futility analysis, the Court must first ascertain whether Khanna's letter of June 19, 2002, constituted a demand on the Covad Board. By making demand on a board of directors, a plaintiff concedes the disinterestedness and independence of that board.[FN64]It is then left to the board to determine whether to pursue litigation. A plaintiff's only recourse, in that circumstance, would be to demonstrate that demand was wrongfully rejected, but, as with any board decision, rejection of shareholder demand is afforded the presumptions of the business judgment rule.FN65

> FN64.*See, e.g., Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70, 73 (Del.1997) (quoting *Levine,* 591 A.2d at 197-98).

> FN65.*Id.*

In determining whether Khanna's June 19, 2002, letter to the Board was a demand, the Court cannot look for "magic words" establishing that a communication is a demand for purposes of Court of Chancery Rule 23.1.[FN66]

> FN66.*See Yaw v. Talley,* 1994 WL 89019, at *7 (Del. Mar. 2 1994) ("There is no all-inclusive legal formula defining what

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

types of communications will constitute a demand. That determination is essentially fact-driven.").

To constitute a demand, a communication must specifically state: (i) the identity of the alleged wrongdoers, (ii) the wrongdoing they allegedly perpetrated and the resultant injury to the corporation, and (iii) the legal action the shareholder wants the board to take on the corporation's behalf. Those elements are consistent with and derive from the policies underlying the demand requirement.[FN67]

FN67.*Id.*

The burden of demonstrating that a communication was a demand lies with the party alleging that the communication should be viewed as such.[FN68]

FN68.*See id.*("Policy considerations require that the burden lie with the party asserting that a demand was made, and that ambiguous communications be construed against a finding of a demand.").

In this instance, the Defendants contend that the June 19, 2002, letter from Khanna's attorney [FN69] constituted a demand. The letter clearly meets the first two requirements of a demand: it identified the alleged wrongdoers and the harm they caused Covad. The issue, then, is whether the letter identified "the legal action the shareholder wants the board to take on the corporation's behalf."[FN70]Covad argues that the letter can be "fairly construed [to give] rise to the inference that Khanna was demanding the Board take legal action on the corporation's behalf"[FN71] and cites, in particular, to various requests (or, in the Defendants' view, demands) made by Khanna in the letter, such as his reinstatement as General Counsel and his appointment to Covad's Board.[FN72]

FN69. JTX 123.

FN70.*Yaw,* 1994 WL 89019, at *7

(emphasis added).

FN71. Reply Mem. in Supp. of Covad Commc'ns Group, Inc.'s Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Covad Reply Br. to Dismiss") at 3.

FN72. JTX 123, at 11-12.

Though it is not a question free from doubt, the Court rejects Defendants' argument for the following reasons. First, the Defendants bear the burden of establishing that demand was, in fact, made, and any ambiguity must be construed against a finding of demand. Second, the remedial actions sought by Khanna related to his removal as Covad's General Counsel and his future employment status at Covad. The relief would have been for his personal benefit; it would have accomplished little (or nothing) for the shareholders. The transactions challenged in this litigation are related, at most, tangentially to his termination dispute. In other words, the remedies Khanna sought in the letter addressed directly his claimed wrongful suspension and likely termination, and the letter cannot fairly be read as an attempt to seek a remedy for the challenged transactions for the good of Covad or its shareholders.FN73

FN73. This question is complicated by transmission of a draft complaint. *See* Amended Compl. at ¶ 123; JTX 124. Although the transmission of a draft complaint, along with other communications, has been previously held not to constitute demand, *see Yaw,* 1994 WL 89019, at *6-*8, the aggregate here draws near the threshold of demand status.

**\*14** Covad points out language in the letter-for example, the threat to "light a legal fuse" [FN74]-that could be read as an expansive threat to seek a remedy for every wrong alleged in the letter and that the remedies Khanna sought, while inadequate to "make whole" the shareholders at large, nonetheless were the remedies Khanna chose. A far more

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

plausible reading of the letter, however, is that the remedies Khanna sought were, as the letter's opening sentence provides, "relat[ed] to his removal from the position of General Counsel of Covad."FN75Ambiguity of this sort must be resolved in favor of Khanna (*i.e.,* the party not seeking to show that the letter was a demand). Therefore, the Court concludes that Khanna's June 19, 2002, letter did not constitute demand upon the Covad Board .FN76

FN74. JTX 123 at 12.

FN75.*Id.* at 1.

FN76. Covad also argues that the letter constituted demand because "[t]he Board did exactly what it was required to do upon receiving a pre-lawsuit demand" and notes that "Khanna was an active and willing participant in the investigation."Covad Reply Br. to Dismiss, at 4. Although this may be true, the Board's interpretation of what the letter represented does not control the Court's determination of whether it was a demand.

C. *Plaintiffs' Failure to Allege with Particularity that the Covad Board was Interested or Lacked Independence*

The Court now turns to the question of whether at least half of the Covad Board was either interested or lacked independence when this action was filed.FN77 The Court's demand-futility analysis here is somewhat complicated by the relatively long time-span during which the challenged transactions took place and by turnover in the membership of Covad's Board. A majority of Covad's Board changed after the events surrounding Counts II and III and, probably, Count I. Additionally, the Plaintiffs bring Count I (the vesting of McMinn's founders' shares) on the theory that it was result of board inaction-*i.e.,* that no business decision was made. The parties agree, therefore, that demand-futility with respect to the Certive Claims must be

analyzed under *Rales.*FN78 A majority of the Covad board has *not* changed, however, since the events surrounding Counts IV and V (*i.e.,* the "BlueStar Claims" and the "Dishnet Claims," respectively); therefore, the Court employs the two-prong standard of *Aronson* with respect to these claims.

> FN77.*See, e.g., Brehm,* 746 A.2d at 257;*see also Highland Legacy Ltd.,* 2006 WL 741939, at \*4;*In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 WL 139768, at \*8 (Del. Ch. Jan. 10, 2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at \*10 (Del. Ch. Dec. 18, 2002); *In re Bally's Grand,* 1997 WL 305803, at \*3.*Cf.*DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 9-2[b], at 9-75 to -76, 9-78 (2005), (considering which "Board"-at the time of suit or the time of the transaction-must be evaluated under *Aronson* ).

> FN78.*See Rales,* 634 A.2d at 934.With respect to Count I, the Amended Complaint fails to allege the vesting of the disputed Covad shares: *Rales,* in one form or another, will control. *See, e.g.,* Pls.' Ans. Br. in Opp'n to Covad Commc'ns Group, Inc.'s Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Pls.' Ans. Br. to Covad's Mot. to Dismiss") at 30; Covad Reply Br. to Dismiss at 9; Pls.' Ans. Br. in Opp'n to Dir. Defs. Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Pls.' Ans. Br. to Dirs.' Mot. to Dismiss") at 31. *But cf. In re Bally's Grand,* 1997 WL 305803, at \*3-\*4 (declining to examine demand futility because complaint failed to identify directors on board at filing).

"Demand futility [will] be determined solely from the well-pled allegations of the Complaint."FN79This analysis is fact-intensive and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 18
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

proceeds director-by-director and transaction-by-transaction.[FN79]The Covad Board, at the time of filing of this action, consisted of eight directors: Irving, Jalkut, Lynch, Crandall, Runtagh, Hawk, Hoffman, and McMinn.[FN81]If the Court concludes that the Plaintiffs failed in their efforts to allege that at least four of the directors were not disinterested and independent for demand purposes, then the Court's analysis with respect to *Rales* and the first-prong of *Aronson* is at an end.

> FN79.*In re Cooper Co., Inc.,* 2000 WL 1664167, at *5 (Del. Ch. Oct. 31, 2000).
>
> FN80.*See, e.g., Beam,* 845 A.2d at 1051 (explaining that review occurs on a "case-by-case basis").
>
> FN81. As explained below, consideration of Jalkut does not prejudice the Plaintiffs. *See* Part III(C)(5), *infra.*

As a preliminary matter, the Court notes that the Amended Complaint repeatedly sets forth certain generalized, conclusory allegations. In the interest of efficiency, the Court examines these now. Demand-futility jurisprudence often recites that certain allegations cannot "without more," or "standing alone," satisfy the particularized pleading requirements of Court of Chancery Rule 23.1. These conclusory allegations add no, or only *de minimis,* substance to the Court's demand-futility inquiry; they are to be distinguished from substantive allegations that are, by themselves, insufficient but, when viewed *in toto,* may push the analysis over the threshold of "reasonable doubt" and thereby excuse demand.

*15 First, the Plaintiffs repeatedly allege that the Covad Board is McMinn (and/or Shapero) "dominated," or some variant thereof.[FN82]Indeed, the Plaintiffs' theory as to why demand is excused appears, at times, to hinge largely on this characterization. The Plaintiffs have not, however, alleged that McMinn is a controlling shareholder, and, even if he were, "[t]here must be coupled with the alleg-

ation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person."[FN83]Whether McMinn (or any other director) "dominates" the Covad Board is a question that must be resolved director-by-director, based on particularized allegations of fact. "Independence is a fact-specific determination made in the context of a particular case. The court must make that determination by answering the inquiries: independent from whom and independent for what purpose?"[FN84]Conclusory, across-the-board allegations of a lack of independence will not prevail; allegations of this type are akin to the "shorthand shibboleth" which this Court has long-rejected. FN85

> FN82.*See, e.g.,* Amended Compl. at ¶¶ 32, 40, 138.
>
> FN83.*Aronson,* 473 A.2d at 815;*see also Beam,* 845 A.2d at 1050.
>
> FN84.*Beam,* 845 A.2d at 1049-50;*see also Highland Legacy, Ltd .,* 2006 WL 741939, at *5 ("There must be some alleged nexus between the domination and the resulting personal benefit to the controlling party."(citing *Aronson,* 473 A.2d at 816)).
>
> FN85.*See, e.g., Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *7;*see also*WOLFE & PITTENGER,*supra* note 77, § 9-2[b], at 9-57, 9-69 to -72.

Second, the Amended Complaint repeatedly alleges that McMinn (or another director) "recruited" certain individuals to be Covad directors, that those individuals took their seats at McMinn's (or others') "behest," and that those individuals became directors with the other directors' "consent and approval." FN86Again, conclusory allegations of this nature do not advance the Court's inquiry; they will not "sterilize" a director's judgment with respect to demand.[FN87]"The proper focus is the care, skill and diligence used by the directors in making the chal-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

lenged decision rather than upon the way in which the directors obtained their seats in the boardroom."FN88"Directors must be nominated and elected to the board in one fashion or another,"FN89 and to hold otherwise would unnecessarily subject the independence of many corporate directors to doubt. Conclusory allegations of this type do not cast suspicion on the independence of directors without additional facts demonstrating reason to view the nomination process askance. As a consequence, such allegations, "without more," are of little assistance in view of the requirement for particularity-and the "piling-on" of more and similar conclusory allegations will not sum to a reasonable doubt.

FN86.*See, e.g.,* Amended Compl. at ¶¶ 15-17.

FN87.*See Aronson,* 473 A.2d at 816.*See also White,* 793 A.2d at 366;*Benerofe v. Cha,* 1996 WL 535405, at *7 (Del. Ch. Sept. 12, 1996); *cf. In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) (applying summary judgment standard).

FN88.*Emerald Partners v. Berlin,* 1993 WL 545409, at *4 (Del. Ch. Dec. 23, 1993).

FN89.*In re W. Nat'l Corp.,* 2000 WL 710192, at *15.

Third, the Amended Complaint sets forth the repeated incantation that the directors' lack of independence is demonstrated by their "pattern" of votes and "acquiescence" in permitting McMinn and others to benefit from self-dealing transactions.FN90The complaint fails either to explain, in most instances, how the directors' alleged acquiescence benefited them (other than possibly as addressed in the next paragraph) [FN91] or to set forth particularized facts showing a pattern of votes (in addition to the few challenged transactions) from which the Court could draw a reasonable inference.[FN92]

FN90.*See* Amended Compl. at ¶¶ 14-16, 139.

FN91.*Cf. In re eBay, Inc. S'holders Litig.,* 2004 WL 253521, at *4-*5 (Del. Ch.2004).

FN92.*See, e.g., Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *7, *9;*Beam v. Stewart,* 833 A.2d 961, 981 (Del. Ch.2003), *aff'd,*845 A.2d 1040 (Del.2004).*Cf. Brehm,* 746 A.2d at 257 n. 34.

> Although there may be instances in which a director's voting history would be sufficient to negate a director's presumed independence, routine consensus cannot suffice to demonstrate disloyalty on the part of a director. To conclude otherwise would simply encourage staged disagreements and nonunanimous decisions for the sake of nonunanimous decisions in the boardroom.

***16** Fourth, the Amended Complaint alleges, repeatedly, that the directors "derived the benefit of being and remaining on the Board of Directors of, and receiving compensation from, Covad...."[FN93] The Plaintiffs then conclusorily allege that the price of these "benefits" was the directors' support for the "self-dealing" occurring at Covad.[FN94]As with the allegations described above, the mere fact that a director receives compensation for her service as a board member adds little or nothing to demand-futility analysis, "without more" [FN95]-*i.e.,* unless the pleadings demonstrate, for example, that the status or compensation was somehow "material" to the director or otherwise outside the norm.

FN93.*See* Amended Compl. at ¶¶ 14-17.

FN94.*See id.*

FN95.*See, e.g., Grobow,* 539 A.2d at 188;*cf. Highland Legacy Ltd.,* 2006 WL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 20

741939, at *5;*White*, 793 A.2d at 366 (addressing allegations involving normal fees and compensation).

Finally, the Amended Complaint sets forth numerous allegations of various social and business ties among members of the Covad Board.[FN96]With the exception of Lynch, however, as discussed in some detail below, the Plaintiffs' allegations amount to no more than the equivalent of a simple assertion that demand should be excused due to "structural bias." As explained in *Beam v. Stewart,*[FN97]"to render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[FN98]The Court's analysis in *Beam* was primarily directed at social relationships, but it also may inform the evaluation of allegations of business relationships, as well: "Whether they arise before board membership or later as a result of collegial relationships among the board of directors, such affinities-standing alone-will not render presuit demand futile."[FN99]Although not all allegations of past or present social or business relationships may be lumped in the category of allegations that provide no grist for the mill of demand-futility inquiry, the heightened strength of relationship required to find that a director's "discretion would be sterilized" renders allegations concerning most ordinary relationships of limited value, at most.FN100

FN96.*See* Amended Compl. at ¶¶ 13-14.

FN97.845 A.2d 1040 (Del.2004).

FN98.*Id.* at 1051.

FN99.*Id.; see also Jacobs v. Yang,* 2004 WL 1728521, at *5-*6, *7 (Del. Ch. Aug. 2, 2004), *aff'd,*867 A.2d 902 (Del.2005) (TABLE) (citing *Orman v. Cullman,* 794 A.2d 5, 27 n. 33 (Del. Ch.2002) ("The naked assertion of previous business relation-

ships is not enough to overcome the presumption of a director's independence.")); *Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *9.

FN100.*See, e.g., Beam,* 845 A.2d at 1050-52;*see also* Michael P. Dooley & E. Norman Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared,* 44 BUS. LAW. 503, 534-35 (1989).

Having examined the repeated, conclusory allegations that comprise too much of the Amended Complaint, the Court now begins a director-by-director (and, as necessary, transaction-by-transaction) inquiry into the specific, substantive allegations of the Amended Complaint relevant to demand excusal.[FN101]

FN101. It should be noted that, in several instances during the course of analysis, the Court identifies facts that the Plaintiffs did not plead in their attempt to obtain demand excusal. This is not intended to set forth a requirement that each of the absent facts be pleaded in order that demand be excused; on the contrary, the Court's intent is only to point out facts that, if alleged, could significantly increase the likelihood of a finding of interestedness or lack of independence.

*1. Crandall*

The Amended Complaint, on its face, fails to create a reasonable doubt as to the disinterestedness or independence of Crandall. Crandall was only appointed to the Covad Board on June 20, 2002, after the challenged transactions took place.[FN102]While this does not, alone, make demonstration of potential interest or lack of independence impossible, it does make the Plaintiffs' burden more difficult. Indeed, the Amended Complaint may be read to concede Crandall's disinterestedness and independence. The complaint does not list Crandall as among the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

seven members of the Covad Board who are alleged either to be interested or lack independence.[FN103]

> FN102. Amended Compl. at ¶ 19. Nowhere in the Amended Complaint is Crandall alleged to have been interested in any of the transactions in question.

> FN103.See Amended Compl. at ¶¶ 137, 140; see alsoCT. CH. R. 23.1 (requiring that complaint "allege with particularity ... the reasons ... for not making [demand]").

**\*17** The Plaintiffs, in their answering brief, however, assert for the first time that Crandall's independence is compromised by his ties to BEA Systems, a Covad vendor.[FN104]The Plaintiffs explain that Crandall is a member of the board of directors of BEA Systems, a supplier of software and related support that received in excess of \$2.2 million in revenue from Covad in 2004. The Plaintiffs make no mention of BEA Systems in the Amended Complaint;[FN105] nevertheless, they now ask the Court to consider this information on the grounds that it is contained in Covad's 2004 Proxy, which is referenced in their brief with respect to the Plaintiffs' proxy disclosure claims.[FN106] Although the Court is skeptical that this constitutes a proper means of asserting by way of a *well-pleaded complaint* particularized facts within the meaning of Court of Chancery Rule 23.1,[FN107] the parties may refer to the substance of certain documents if those documents are "integral to plaintiffs' claims and incorporated in the complaint."[FN108]Here, the proxy statement was "integral" to the disclosure claims, not to assertions regarding Crandall's independence. To evaluate fully the Plaintiffs' claims, the Court will consider Crandall's ties to BEA Systems in analyzing his independence, as well.

> FN104. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 34.

> FN105.See Amended Compl. at ¶ 19.

> FN106.See Calder Decl., Ex. E (Covad's

2004 Proxy Statement).

> FN107. A plaintiff for whom demand will be excused should be capable of demonstrating demand futility by recourse solely to the particularized facts alleged in the complaint. Cf. *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 727-28 (Del.1988) ("When deciding a motion to dismiss for failure to make a demand under Chancery Rule 23.1 the record before the court must be restricted to the allegations of the complaint.").

> FN108.Saito v. McCall, 2004 WL 3029876, at \*1 n. 9 (Del. Ch. Dec. 20, 2004).Cf. *In re Gen. Motors (Hughes) S'holder Litig.*, 2006 WL 722198, at \*3 (Del. Mar. 20, 2006) (describing extent to which a court may consider matters outside complaint on motion to dismiss under Rule 12(b)(6)).

Ultimately, the inquiry into independence turns in this instance on whether Covad's business relationship with BEA Systems was material to BEA or to Crandall himself as a director of BEA.[FN109]The 2004 Proxy merely reports that Crandall is a member of the BEA Systems board of directors and the amounts Covad paid for the firm's products and services. These facts, standing alone, are insufficient to cast reasonable doubt on Crandall's independence for demand purposes.[FN110]The Court cannot discern whether the revenue from Covad is material to either BEA Systems or to Crandall because of his relationship with BEA Systems.[FN111]Neither the terms of BEA Systems' relationship with Covad (*e.g.*, whether the companies have entered into a long-term contract), nor particularized facts supporting the Plaintiffs' conclusory statement in their brief that BEA Systems' business with Covad could be "taken away"[FN112] by McMinn and others, are provided.[FN113]Moreover, no allegation has been made that Crandall's responsibilities to BEA Systems include managing the firm's relationship with Covad; nor could the Court conclude that Crandall

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 22

has a financial interest in BEA, other than possibly an unspecified director's salary, which might influence his decisions.[FN114]Put simply, even considering Crandall's ties to BEA Systems, the Plaintiffs have not alleged particularized facts sufficient to demonstrate that Crandall independent discretion would be compromised.[FN115]

FN109.*See, e.g., Jacobs,* 2004 WL 1728521, at *6.

FN110.*See id; see also Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *9.

FN111.*See Jacobs,* 2004 WL 1728521, at *6.

FN112. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 34.

FN113. These statements are too conclusory to demonstrate that particular interested Covad directors "have the authority or ability to cause [Covad] to terminate its relationships with the companies."*Jacobs,* 2004 WL 1728521, at *6.

FN114.*See id.*

FN115.*See id.*("[T]he existence of contractual relationships with companies that directors are affiliated with potentially makes the board's decision more difficult, 'but it does not sterilize the board's ability to decide.' " (citation omitted)).

## 2. *Runtagh*

Similarly, the Plaintiffs fail to create a reasonable doubt as to Runtagh's disinterestedness and independence. The Plaintiffs' principal claim is that Runtagh lacks independence because "[s]he became a director with the consent and approval of the McMinn-Shapero director appointees"[FN116] and "derived the benefits of being and remaining on the Board of Directors of, and receiving compensation from, Covad by supporting and favoring the self-

dealing of other directors in the BlueStar and Dishnet transactions."[FN117]As explained above, these bare allegations are insufficient to negate Runtagh's presumed independence.

FN116. Amended Compl. at ¶ 15.

FN117.*Id.* Similarly, the Court rejects the Plaintiffs' conclusory allegation that Runtagh "acquiesced knowingly in ... McMinn's breach of duty."*Id.* at ¶¶ 93, 139.*See Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *9 ("Our cases have determined that personal friendships, without more; outside business relationships, without more; *and approving of or acquiescing in the challenged transactions, without more,* are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment.") (emphasis added)).

**\*18** Interestingly, the Plaintiffs also allege that Runtagh has a "disabling interest" that was "acknowledged" by the Covad Board in its resolution creating the special committee to investigate the claims made by Khanna in his June 19, 2002 letter to the Covad Board .[FN118]The Plaintiffs quote the resolution, which provides: "Mr. Crandall shall have the authority to act alone in the event that, in his sole judgment, an alleged material conflict of interest arises with respect to Ms. Runtagh."FN119This short statement, however, cannot be construed as an admission by the Board, cannot satisfy demand-futility's pleading with particularity requirement, and does not permit a *reasonable* inference of interestedness or lack of independence.[FN120]

FN118. Amended Compl. at ¶¶ 125, 137. The Plaintiffs allege that "Defendant Runtagh ... has a disabling interest, which was acknowledged by defendants in their resolutions constituting the Committee."*Id.* at ¶ 137.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

FN119.*Id.* at ¶ 125.

FN120.*See White,* 783 A.2d at 549 (The Court "need not blindly accept as true all allegations, nor must [it] draw all inferences from them in plaintiffs' favor unless they are reasonable inferences ."(citation omitted)).

Because Count I of the Amended Complaint (the vesting of McMinn's founders' shares) may be analyzed under *Rales* for having resulted from board inaction, one additional issue must be considered with respect to Runtagh's capacity to consider demand: whether she faces a "substantial likelihood" of personal liability resulting from the vesting of McMinn's shares.[FN121]As the Court in *David B. Shaev Profit Sharing Account v. Armstrong,*[FN122] explained: "Most notably in *In re Caremark Int'l Inc. Derivative Litigation,* and then in other cases ... this court has taken cognisance of allegations that the directors failed to act when they otherwise should have done so."[FN123]When analyzing demand futility under *Rales* where no board action was taken,[FN124] the Court looks not only to whether directors are disinterested and independent for demand purposes, but also to whether directors "face a substantial likelihood of personal liability, because doubt has been created as to whether their actions were products of a legitimate business judgment."[FN125]A "mere threat of personal liability," however, is insufficient in this context.[FN126]

FN121. As discussed below, the Court considers whether a director considering demand faces a "substantial threat" of personal liability arising from the alleged wrongful acts-with a finding of a "substantial threat" resulting in reasonable doubt as to the capacity of that director to consider demand. *See, e.g., David B. Shaev Profit Sharing Account v. Armstrong,* 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006); *Guttman,* 823 A.2d at 501. This analysis would perhaps apply equally, for example, in analyzing the disinterestedness

of current directors who participated in the alleged wrongful conduct, *see Rales,* 634 A.2d at 936, even though a majority of board has "flipped." The confusion, here, lies in the fact that the Court cannot determine from the Amended Complaint whether Runtagh was a member of the Covad Board at the time the vesting challenged in Count I occurred-and, therefore, is unable to determine with confidence whether the *Rales* analysis proceeds under the first or second *Aronson* exception. *See Rales,* 634 A.2d at 934.As a consequence, the Court's analysis addresses both scenarios. The Court need not address these considerations for Board members other than Runtagh, however, because, with respect to Counts II and III, it is clear that a majority of the current Board members both did not participate in the underlying acts and have been determined otherwise to be disinterested and independent.

FN122.*Shaev,* 2006 WL 391931 (Del. Ch. Feb. 13, 2006).

FN123.*Id.* at *4 (citing *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959 (Del. Ch.1996)).

FN124.*Compare supra* note 121.

FN125.*Id.* (citing *Guttman,* 823 A.2d at 501).

FN126.*See Rales,* 634 A.2d at 936 ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors ...." (quoting *Aronson,* 473 A .2d at 815)).

The Plaintiffs allege that a breach of duty occurred because, "under his Restricted Stock Purchase Agreement, McMinn needed to remain a full-time

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

employee of Covad until November 2000 to fully vest in his founders' shares of [Covad]. If he did not maintain full-employment with the Company until all of his shares were vested, Covad had the right under the Restricted Stock Purchase Agreement to repurchase his unvested shares for mere pennies."FN127McMinn, however, determined that he wished to pursue other opportunities (namely, the formation of Certive), and informed Knowling by email, on May 3, 1999, that he would be pursuing investment opportunities with Crosspoint.FN128 The Amended Complaint further provides that, although McMinn "offered to leave Covad's employ altogether, but only if he could 'accelerate the vesting of the remaining 31% of [his] unvested Covad stock," ' an "exception" was made for his benefit.FN129"[U]nbeknownst to Covad's public shareholders, [McMinn] continued vesting his founders' shares, drew a full-time salary from Covad, and served as its Chairman of the Board...." FN130 The complaint additionally alleges that Shapero, as General and Managing Partner of Crosspoint, was aware of McMinn's activities, and that it was "highly likely" that Hawk, as a Special Limited Partner of Crosspoint, knew, as well .FN131McMinn resigned as a Covad director on November 1, 1999, and did not rejoin the board until late October 2000.

> FN127. Amended Compl. at ¶ 42.

> FN128.*Id.* at ¶ 43.

> FN129.*Id.* at ¶ 45.

> FN130.*Id.*

> FN131.*Id.* at ¶ 48.

**\*19** The Amended Complaint does not allege when McMinn's shares fully vested. It is this difficulty that potentially necessitates analysis of Runtagh's liability with respect to this claim. It perhaps can be said that two potential alternative conclusions may be reasonably inferred from the Plaintiffs' allegations: (1) that McMinn's shares were deemed vested

when he resigned on November 1, 1999, or (2) that the exception for McMinn permitted his shares to vest fully as of November 2000. The Amended Complaint provides only that Runtagh joined the Covad board in "November 1999." FN132If it is the former, then it is unreasonable to conclude that Runtagh faced a "substantial likelihood" of personal liability for a vesting of shares that occurred, at most, only on her first day as director. In the event it is the latter, however, it is theoretically possible that Runtagh could face personal liability for the vesting such that she would be unable to consider demand with respect to this claim. In that case, analysis of Runtagh's potential liability under *Caremark* would be necessary.

> FN132.*Id.* at ¶ 15.A third inference that may be drawn is that the vesting ended with the meeting of the Covad board on September 22, 1999, at which the board "blessed" McMinn's founding of Certive, but also adopted a corporate opportunity policy "expressly requir[ing] the prior approval of the Board before a fiduciary of Covad could take a corporate opportunity for himself."*Id.* at ¶ 54.

Notwithstanding the above, the Court concludes that this potential aspect the Plaintiffs' vesting claim, however, is without merit for several reasons. The dilemma presented by the multiple alternative scenarios points to the foremost reason why the Court need not develop this analysis: the absence of alleged facts permitting the Court to determine whether vesting occurred throughout the relevant period fails to satisfy the particularity requirements of Court of Chancery Rule 23.1.FN133

> FN133. Indeed, the imprecise allegation that Runtagh joined that Covad board in "November 1999" only compounds the Court's difficulties. Also, the question of whether the Plaintiffs' claims are time-barred has been vigorously debated; that defense would further diminish the prospect of liability for Runtagh (who also is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 25
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

not named by the Plaintiffs as a defendant liable with respect to Count I).*See Rales,* 634 A.2d at 936 (stating that a "mere threat of personal liability" is insufficient). Finally, the Plaintiffs have not argued that Runtagh is exposed to personal liability as the result of the vesting of McMinn's shares.

### 3. *Irving*

In setting forth their reasons for why Irving lacks independence, the Plaintiffs make conclusory allegations regarding Irving's voting history, that he became a director "with the consent and approval of the McMinn-Shapero nominees," and that he receives compensation as a Covad director.[FN134]Again, bare allegations of this nature are insufficient, separately or cumulatively, to negate Irving's independence.

    FN134. Amended Compl. at ¶¶ 16, 139.

First, the Plaintiffs allege that Irving "put[ ] the interests of the McMinn cronies ahead of Covad's...." This conclusory allegation, however, is essentially a repetition of the Plaintiffs' "acquiescence" arguments, which the Court has already rejected for being insufficient to assist in meeting the particularized pleading requirements.[FN135]Second, the Plaintiffs' refrain that a particular director was appointed to the Covad Board "with the consent and approval of the McMinn-Shapero nominees" fails, without more. Finally, the Plaintiffs have failed to allege particularized facts demonstrating that the fees Irving receives as a director would somehow interfere with the exercise of his judgment; indeed, they have failed to enumerate even what these fees are. As a consequence, Irving's disinterestedness and independence are not subject to reasonable doubt on the basis of the facts plead.

    FN135.*See also Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *9.

### 4. *Lynch*

The Plaintiffs have failed to satisfy their burden to present sufficient particularized facts to create a reasonable doubt as to the presumed disinterestedness and independence of Lynch. The Amended Complaint alleges that Lynch is a "long-time friend of McMinn." [FN136]Indeed, the Plaintiffs' allegations provide that their friendship is "so close" that they own both homes in the same neighborhood and "neighboring wineries." Certainly, according to these allegations, Lynch and McMinn are not strangers-indeed, they maybe fairly close-but allegations of this nature do not allow a reasonable inference that the exercise of a director's discretion and judgment is impaired. As alluded to above, "to render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[FN137]This is true regardless of whether such ties arose as a consequence of the directors' board membership or whether they were preexisting.[FN138]"Mere allegations that [the directors in question] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes."[FN139]In the context of pre-suit demand, "friendship must be accompanied by substantially more in the nature of *serious* allegations" supporting a reasonable doubt as to independence.[FN140]In other words, considering "the risks that directors would take by protecting their social acquaintances in the face of allegations that those friends engaged in misconduct,"[FN141] the Plaintiffs have failed to create a reasonable doubt that Lynch "would be more willing to risk his ... reputation than risk the relationship with the interested director."[FN142]

    FN136. Amended Compl. at ¶ 9.

    FN137.*Beam,* 845 A.2d at 1051;*see also Odyssey Partners, L.P. v. Fleming Cos., Inc.,* 735 A.2d 386, 409 (Del. Ch.1999) ("That [directors] were neighbors or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 26

former neighbors is of no moment.").

FN138.*See Beam*, 845 A.2d at 1051.

FN139.*Id.* at 1051-52.

FN140.*Id.* at 1052 (emphasis added); *see also id.* at 1050-51 (describing other instances in which reasonable doubt might arise).

FN141.*Id.* at 1052.

FN142.*Id.*

*20 Similarly, "the naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."[FN143]In their Amended Complaint, the Plaintiffs again repeat their well-worn allegation that Lynch "derived the benefits of being and remaining on the Board ... of, and receiving compensation from, Covad ...;"[FN144] the Court has already explained its reasons for giving little weight to such allegations. The Amended Complaint, however, also asserts in this instance that Lynch has "derived" these "benefits" as a consequence of certain unspecified "business dealings" with Covad directors.[FN145]As discussed above, the sweeping absence of particularity, here, precludes a reasonable inference that Lynch's business dealings or relationships compromised his presumed independence.

FN143.*Orman*, 794 A.2d at 27;*see also Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 980-81 (Del. Ch.2000).

FN144. Amended Compl. at ¶ 9.

FN145.*Id.*

Finally, the Plaintiffs allege that Lynch was rewarded for his support with membership on Certive's "Advisory Board," [FN146] and that fact demonstrates both his interestedness with respect to the Certive Claims, as well his lack of independence generally.[FN147]Though the question may be close,

the Plaintiffs' argument, however, ultimately fails for lack of support with sufficiently particularized allegations. The Amended Complaint does not inform the Court what membership on the Certive "Advisory Board" actually entails. Although the Court cannot conclude with certainty from the face of the pleadings, it does not appear to refer to Certive's board of directors.[FN148] Moreover, although the Plaintiffs contend that the position is prestigious and lucrative,[FN149] the only allegation offered to support this assertion is that Certive's website describes the Advisory Board by stating that "many companies use Advisory Boards as window dressing[,] Certive believes they should be much more...."[FN150] Perhaps a certain level of prestige (at least from Certive's perspective) can be inferred from this statement, but that alone does not prove its materiality to Lynch.

FN146.*Id.* at ¶ 56.

FN147.*Id.* at ¶¶ 137, 138, 140.

FN148.*See id.* at ¶ 56.The Amended Complaint quotes the Certive website as explaining: "[The Certive Advisory] Board meets quarterly and *provides insight that we actively use to run the business.*[Advisory] Board meetings are lively and protracted-one and a half days. And, everyone attends."*Id.* (emphasis added). These allegations appear to refer to a group of experienced, outside advisors who generally advise those actually managing the company's affairs. This demonstrates the Court's difficulty (and the need for compliance with the requirement of particularized pleading): the Court can only hazard a guess, based on the allegations-and, therefore, no inference doubting Lynch's presumed independence and disinterestedness can flow from this allegation.

FN149.*Id.* ("These positions are highly sought after and potentially lucrative as advisory board members in Silicon Valley

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 27
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

companies are given stock options which during the 1990s became a source of great wealth for many people.").

FN150.*Id.*

[I]n the absence of self-dealing, it is not enough to establish the interest of a director by alleging that he received *any* benefit not equally shared by the stockholders. Such benefit must be alleged to be *material* to that director. Materiality means that the alleged benefit was significant enough *"in the context of the director's economic circumstances,* as to have made it improbable that the director could perform her fiduciary duties to the ... shareholders without being influenced by her overriding personal interest."[FN151]

> FN151.*Orman,* 794 A.2d at 23 (footnotes omitted) (emphasis in original).

The allegations provided by the Plaintiffs clearly fail to meet the above-articulated standard: they set forth no particularized allegations of compensation actually received by Lynch in return for his Advisory Board service or as to whether such compensation would be material to a director in Lynch's position. Indeed, the Plaintiffs allege only that Certive "grant[ed] stock interests in Certive *and/or* provide[d] *some form* of compensation" to Lynch for his service on the Advisory Board.[FN152] These allegations fail to satisfy the materiality test described above, much less set forth particularized facts sufficient for the Court to conclude that Lynch was " 'beholden to [McMinn or Crosspoint] or so under their influence that [his] discretion would be sterilized."[FN153]

> FN152. Amended Compl. at ¶ 56; *see also id.* at ¶¶ 137-38.

> FN153.*Rales,* 634 A.2d at 936.Additionally, the Plaintiffs do not plead when Lynch received his appointment. The Plaintiffs offer no *particularized* facts demonstrating the necessary linkage

between Lynch's appointment to the Certive Advisory Board and his relationship to McMinn. Perhaps the Court should infer this from the facts, but the Plaintiffs have also alleged that "Lynch is a private investor in a number of start-up companies in the Internet area."Amended Compl. at ¶ 33. Indeed, it is the relatively "incestuous" nature of Silicon Valley's business culture that appears to be at the heart of the Plaintiffs' suit; however, on the other hand, "cozy" business relationships of this nature are perhaps an almost inevitable by-product of a highly-sophisticated growth industry reliant almost entirely on innovation and a narrow field of experienced entrepreneurial talent.

### 5. *Jalkut*

**\*21** The Plaintiffs dispute inclusion of Jalkut in the Court's demand futility analysis because they allege that his appointment to the Covad Board occurred in violation of the Standstill Agreement between Covad and Khanna, [FN154] which provided that the parties would "refrain from taking any action that could advance their respective positions."[FN155]Essentially, the Plaintiffs argue that Covad advanced its position in litigation by appointing Jalkut because it gave "the McMinn-tainted Board one more vote in their camp."[FN156]This argument begs the question, however, as the inquiry during demand futility analysis, in this context, is independence. Jalkut can only be viewed as a "vote in the McMinn camp" if he is not independent-and if he is not independent, then McMinn and his confederates gain no benefit from his presence. Thus, for demand futility purposes, it is appropriate to consider Jalkut because the inquiry into whether Covad advanced its litigation position by packing the Board (in violation of the Standstill Agreement) and inquiry into Jalkut's independence are substantially the same.

> FN154.*See* Amended Compl. at ¶¶ 136, 138.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 28

FN155. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33 n. 13.

FN156.*Id.*

Moreover, because the Court concludes that Jalkut is disinterested and independent, the Court's decision to include or to exclude Jalkut from its demand futility analysis results in no detriment to the Plaintiffs. Exclusion of Jalkut from the Board members considered lowers the total number of directors on the Board for demand futility purposes to seven-therefore, since the Court has already concluded that four are disinterested and independent, analysis under the first prong of *Aronson* is at an end. On the other hand, if Jalkut is included in the Court's analysis, then the total number of directors is raised to eight, with five disinterested and independent directors required to preclude demand excusal under *Aronson'* s first prong. Jalkut, then, is that fifth director.

Assuming that Jalkut is to be included, the Court turns to analysis of his disinterestedness and independence. The Plaintiffs allege that, in addition to his seat on the Covad Board, Jalkut serves as chief executive officer of TelePacific, a Covad reseller (*i.e.,* a Covad retailer). Specifically, the Plaintiffs allege that "[a]s the CEO of a customer of Covad, Jalkut lacks the independence to fairly and impartially judge the actions of his fellow Board members."FN157As with Crandall, the Plaintiffs point to information available in the 2004 Proxy Statement (but not explicitly mentioned in the Amended Complaint) to support their claim. Indeed, the allegations in the Amended Complaint, standing alone, are exceedingly conclusory.

FN157. Amended Compl. at ¶¶ 20, 138 ("Jalkut lacks independence from the McMinn-dominated Board because he is the CEO and president of one of Covad's customers, TelePacific.").

Assuming that the 2004 Proxy Statement may be considered for these purposes, FN158 the Plaintiffs

still fail to allege facts sufficient to create a reasonable doubt as to Jalkut's independence. Specifically, the Plaintiffs explain that Covad "recognized in excess of $1.3 million and $1.8 million in revenues from TelePacific [in 2002 and 2001], respectively."FN159The Plaintiffs contend that this "obviously" resulted in "many millions more in revenue" for TelePacific, on the theory that services purchased from Covad by TelePacifc were then sold to TelePacific customers at a mark-up.FN160Without particularized allegations of fact, however, there is nothing "obvious" about this argument. Without knowledge of the mark-up, one wonders if "many millions more" is even plausible. Moreover, although gross revenues are not unimportant, the critical information would be profits, something the Plaintiffs have not provided.

FN158. This may not be a good assumption. *Compare Hughes,* 2006 WL 722198, at *3 (holding that court may consider documents referred to in complaint "in some instances and for carefully limited purposes").*See also supra* text accompanying note 108.

FN159. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33-34.

FN160.*Id.*

*22 Moreover, there are no particularized facts alleged adequately linking the business relationship between TelePacific and Covad with the claimed lack of independence of Jalkut. The Plaintiffs argue that TelePacific, as a customer of Covad, would not want to jeopardize the current pricing structure offered to TelePacific (as an increase in price has the potential to adversely affect TelePacific's profits). Arguments of this nature (*i.e.,* that a customer wants to avoid offending its supplier) must be considered with care. First, the Plaintiffs' contention assumes that the market for TelePacific's product is highly elastic and that, as a consequence, increases in cost will be absorbed by TelePacific, instead of passed on to the firm's customers. Al-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                          Page 29
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

though it may be reasonable to assume that some percentage of cost increases will be absorbed by a retailer, the amount (and therefore its materiality) may vary widely across firms and industries. The Plaintiffs argue that "Jalkut clearly does not want TelePacific to have to pay more for [Covad's] services,"[FN161] which, though certainly a reasonable observation, is insufficient to lead to the broader inference that Jalkut's judgment has been sterilized as to the best interests of Covad shareholders.[FN162]Moreover, the Plaintiffs' allegations are insufficiently particularized to displace the notion that, in this context, if Covad unilaterally raised its prices relative to the market, TelePacific would purchase from another, lower-priced seller.

> FN161. Pls.' Ans. Br. to Covad's Mot. to Dismiss at 33-34.

> FN162.*Cf. Jacobs,* 2004 WL 1728521, at *5-*6.

Additionally, as with Crandall and BEA Systems, the Plaintiffs make no allegations as to the terms of TelePacific's business dealings with Covad; nor do the Plaintiffs allege facts permitting the Court to infer, in this context, that TelePacific's relationship with Covad is material. Although the Plaintiffs have asserted that Covad received certain revenue from TelePacific in 2001 and 2002, this tells the Court little about the materiality of this relationship to TelePacific. As a consequence, without more, the Plaintiffs have failed to create a reasonable doubt as to the presumed disinterestedness and independence of Jalkut.

In summary, the Court concludes that Khanna's June 19, 2002 letter to the Covad Board was not a demand letter, and, thus, there is no need to inquire into whether demand was wrongfully rejected. Additionally, although the Covad Board had "cozy" business and social relationships, the Plaintiffs have failed to plead particularized allegations that would cast a reasonable doubt on the disinterestedness and independence of at least half of the Covad

[FN163] Consequently, the Plaintiffs have failed to show that demand was excused under the first prong of *Aronson* or under *Rales.*[FN164]

> FN163. The Court notes that the factual paucity described above may have resulted from difficulties in accessing certain information. Indeed, even after using the "tools at hand" to develop particularized facts (*e.g.,* public filings and § 220), certain information may be restricted due to the fact that it is held by entities with no public disclosure obligations. Although the burdens presented by such obstacles have been recognized, *see Brehm,* 746 A.2d at 268 (Hartnett, J., concurring) ("Plaintiffs must not be held to a too-high standard of pleading because they face an almost impossible burden when they must plead facts with particularity and the facts are not public knowledge."), the pleading standard under which the Court examines allegations for requisite particularity remains unaltered, even for plaintiffs who employed the "tools at hand."

> FN164. Accordingly, the Certive Claims (Counts I through III) must be dismissed.

### IV. BUSINESS JUDGMENT

As discussed above, because the two prongs of the test for demand futility under *Aronson* "are disjunctive," the challenged transactions subject to analysis under *Aronson* must be examined under the test's second-prong, in addition to the first prong's "disinterestedness" and "independence" analysis.[FN165] As a consequence, the BlueStar Transactions and the Dishnet Settlement each require inquiry into whether reasonable doubt is created that these challenged transactions were "otherwise the product of a valid exercise of business judgment."[FN166]

> FN165.*See, e.g., In re J.P. Morgan & Co.,* 2005 WL 1076069, at *8.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

FN166.*See Aronson,* 473 A.2d at 814.Analysis under the second prong of *Aronson* is not required for the Certive Claims, because a majority of the board has changed since the events giving rise to Counts II and III and because Count I does not challenge a business decision. *See Rales,* 634 A.2d at 934.

## A. *Legal Standard*

**\*23** In order to satisfy the second prong of *Aronson,* the Plaintiffs must plead "particularized facts creating a reasonable doubt that the decisions of the [board] were protected by the business judgment rule."[FN167]"[A]bsent particularized allegations to the contrary, the directors are presumed to have acted on an informed basis and in the honest belief that their decisions were in furtherance of the best interests of the corporation and its shareholders."[FN168]It is not an easy task to allege that a decision falls outside the realm of the business judgment rule because "[t]his Court will not second-guess the judgment of a board of directors if it bases its decision on a rational business purpose."[FN169]Thus, "[t]he burden is on the party challenging the decision to establish facts rebutting the presumption."[FN170]In conducting its analysis, the Court must examine the "substantive nature of the challenged transactions and the board's approval thereof."[FN171]

FN167.*Brehm,* 746 A.2d at 258.

FN168.*Highland Legacy Ltd.,* 2006 WL 741939, at \*7;*see also Levine,* 591 A.2d at 206 ("[P]laintiff ... must plead particularized facts creating a reasonable doubt as to the 'soundness' of the challenged transaction sufficient to rebut the presumption that the business judgment rule attaches to the transaction."); *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984) ("A court does not assume that the transaction was a wrong to the corporation requiring corrective measures by the board."), *overruled on*

*other grounds, Brehm,* 746 A.2d at 254.

FN169.*Kahn v. Roberts,* 1995 WL 745056, at \*4 (Del. Ch. Dec. 6, 1995), *aff'd,*679 A.2d 460 (Del.1996).

FN170.*Aronson,* 473 A.2d at 812.

FN171.*Id.* at 814.

A plaintiff seeking to demonstrate demand futility under the second prong of *Aronson*"must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."FN172The Court's inquiry in this context is "predicated upon concepts of gross negligence."FN173"The plaintiff faces a substantial burden, as the second prong of the *Aronson* test is 'directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review.' " [FN174] Although the second prong of *Aronson* may potentially be satisfied by recourse to multiple theories,[FN175] establishing that a board's decision falls outside the scope of the business judgment rule frequently requires a showing of facts tantamount to corporate waste.[FN176]As a consequence, a plaintiff will bear a difficult, but not insurmountable, burden in pleading particularized facts demonstrating demand futility under this prong of *Aronson.*[FN177]

FN172.*In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 286 (Del. Ch.2003); *see also In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at \*11. *Cf. Levine,* 591 A.2d at 206 (although addressing only whether directors were adequately informed, identifying self-interest, entrenchment, waste, and acting in such an uninformed manner as to constitute gross negligence as topics of analysis in this context).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

FN173.*Aronson,* 473 A.2d at 812;*see also Brehm,* 746 A.2d at 259 ("Pre-suit demand will be excused in a derivative suit only if the Court ... conclude[s] that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence,* included consideration of all material information reasonably available."(emphasis in original)).

FN174.*Greenwald v. Batterson,* 1999 WL 596276, at *7 (Del. Ch. July 26, 1999) (quoting *Kahn v. Tremont Corp.,* 1994 WL 162613, at *6 (Del. Ch. Apr. 22, 1994)); *see also Highland Legacy Ltd.,* 2006 WL 741939, at *7.

FN175.*See, e.g., Levine,* 591 A.2d at 206;*see also*WOLFE & PITTENGER,*supra* note 77, § 9-2[b], at 9-76 n. 303 (describing analysis under second prong of *Aronson* generally as looking to substantive due care and to procedural due care).

FN176.*See Tremont Corp.,* 1994 WL 162613, at *6 ("The test for this second stage is thus necessarily high, similar to the legal test for waste.").

FN177.*See, e.g., Brehm,* 746 A.2d at 263 (describing waste as " 'an exchange that is so one sided that no business person of ordinary, sound business judgment could conclude that the corporation has received adequate consideration' " (quoting *Glazer v. Zapata Corp.,* 658 A.2d 176, 183 (Del. Ch.1993)); *Grobow,* 539 A.2d at 189 (holding that waste depends on "whether 'what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid' " (quoting *Saxe v. Brady,* 184 A.2d 602, 610

(Del. Ch.1962)); *see also Green v. Phillips,* 1996 WL 342093 (Del. Ch. June 19, 1996) ("That extreme test is rarely satisfied, because if a reasonable person could conclude the board's action made business sense, the inquiry ends and the complaint will be dismissed.").

**B. *The BlueStar Transactions***
The BlueStar acquisition was approved by the Covad Board on June 15, 2000, and announced on June 16, 2000. The Amended Complaint sets forth that, on September 22, 2000, the transaction was completed with Covad's issuance of approximately 6.1 million shares of Covad common stock to BlueStar stockholders "according to an exchange ratio by which BlueStar stockholders received an average market price of $14.23 in exchange for all outstanding preferred and common stock."[FN178]The Amended Complaint explains that this resulted in a price to Covad of "at least $200 million" for BlueStar.[FN179]The complaint further states that the day after the merger was announced, Covad's shares dropped 27%, constituting $1 billion of market value.[FN180]

FN178. Amended Compl. at ¶ 73. Outstanding BlueStar stock options and warrants were converted into options to purchase approximately 225,000 shares of Covad common stock at a "fair value" of $6.55 per share. *Id.*

FN179.*Id.*

FN180.*Id.* at ¶ 70.It is uncertain whether the drop in share price can be attributed solely to the BlueStar transaction, since the Amended Complaint ambiguously explains that, "at the same time [Covad] announced the merger," the company also announced that "it had reduced both the number of end-user lines it expected to be in service on June 30, 2000 and its 2000 line growth expectations primarily because of the channel conflict with BlueStar."*Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 32
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

**\*24** The Plaintiffs identify numerous grounds on which they contend that the BlueStar acquisition was not a valid exercise of the Covad Board's business judgment. They principally argue that the Board's approval process was procedurally deficient, that the Board failed to inform itself adequately and in good faith, and that the transaction constituted corporate waste.

The Amended Complaint alleges that no special committee of disinterested directors was formed to consider the transaction.[FN181] The mere allegation of a failure to form a committee is insufficient, however, to satisfy *Aronson'* s second prong.[FN182] This fact, however, is not without value, given the material interests in the transaction of at least one-quarter (*i.e* ., Shapero and Hawk) of the Covad Board.[FN183] Moreover, the Plaintiffs allege that the acquisition was initiated by the repeated lobbying of Covad's then-chief executive officer and board member, Knowling. The Amended Complaint provides that "Shapero lobbied Knowling through lengthy emails on the weekend of May 20-21, 2000 to have Covad acquire BlueStar and NewEdge. After Shapero's full-court press, Knowling decided on May 21, 2000-without any due diligence-that    Covad    should    acquire BlueStar."[FN184] The Amended Complaint further alleges that the reason for the "hasty process" was that it "served BlueStar's interests (and, therefore, Shapero/Crosspoint's interests) in that BlueStar was in a precarious financial condition and had it continued as a stand-alone company, it would have been unable to mask its serious problems any longer."[FN185] Indeed, the Amended Complaint alleges that the fairness opinion rendered by Donaldson, Lufkin & Jenrette ("DLJ") to BlueStar with respect to the merger stated that DLJ had been informed by the "management of the Company" that "the Company, as of June 14, 2000, expected to exhaust its liquidity in the near term and did not have a financing source for funding its anticipated operating and capital needs over the following 12 months."[FN186]

FN181. *See* Amended Compl. at ¶ 65.

FN182. The parties' briefs contain significant debate over which directors participated in the review and approval of the challenged transactions and the effect of those directors' participation on the Court's analysis. The Covad Board at the time of the BlueStar acquisition was comprised of Dunn, Hawk, Irving, Knowling, Lynch, Marshall, Runtagh, and Shapero. The Amended Complaint, however, does not allege which directors participated in the review and approval of the BlueStar acquisition. Although Paragraph 80 of the complaint provides that, with respect to the BlueStar earn-out settlement, "under normal Covad practice, self-interested directors would have left any Board meeting when matters pertaining to their self-interest are discussed and voted upon," the Court is unable to draw any conclusions from this fact as to approval of the BlueStar acquisition under the standard governing motions to dismiss.

> At the time of the BlueStar earn-out settlement, McMinn, Shapero, Hawk, Irving, Lynch, Marshall, and Runtagh were members of the Covad Board. Paragraph 80 does explicitly allege that McMinn, Hawk, and Shapero did not participate in board meetings for "review and approval" of the settlement.

FN183. The Amended Complaint provides that "at least as early as mid-1999, Shapero, through Crosspoint, owned approximately 46% of BlueStar's outstanding shares, and both McMinn and Hawk owned a substantial number of preferred shares." *Id.* at ¶ 59. Paragraph 72 of the Amended Complaint provides: "Each of Messrs. McMinn, Hawk and Shapero and/ or Crosspoint were significant shareholders of    BlueStar." Crosspoint,    for    which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 33

Shapero serves as General and Managing Partner, is alleged to have owned approximately 30 million shares, representing approximately 41.9% of all issued and outstanding BlueStar shares. *See id.* "Hawk, a Special Limited Partner of Crosspoint, was also a significant shareholder of BlueStar stock." *Id.* McMinn is alleged to have been the beneficial owner of approximately 656,942 shares of BlueStar common stock, *see id.;* however, it should be noted that McMinn had resigned from the Covad Board on November 1, 1999, prior to the BlueStar acquisition's approval. McMinn rejoined the Board in late October 2000, and was a member at the time of the BlueStar earn-out settlement.

FN184. Amended Compl. at ¶ 62. Shapero sat on the board of NewEdge Networks, a "provider of dedicated internet access for businesses and communications carriers." A reasonable doubt has also been shown as to Knowling's independence at the time of the acquisition. At that time, Knowling was Covad's chief executive officer, as well as a member of its Board, and "received a generous compensation package when hired": $1.5 million signing bonus, $400,000 salary, other bonuses, and stock options. *Id.* at ¶ 97. Additionally, Covad granted Knowling severance benefits "worth $1.5 million" and forgave a $500,000 loan to him when he resigned in November 2000 (months after the BlueStar acquisition). *Id.* Most significantly, Shapero served as a member of Covad's compensation committee at this time. *Id.* at ¶¶ 11, 72.

FN185. *Id.* at ¶ 62.

FN186. *Id.* at ¶ 63.

The Amended Complaint sets forth that "[a]lmost uniformly, Covad management objected to the transaction." [FN187]Indeed, the Amended Complaint alleges that Knowling "was the sole Covad officer to support" the BlueStar acquisition.[FN188] The complaint also describes a due diligence report prepared by Covad's engineering director, "which stated that the acquisition would be virtually useless because of the overlap in the companies' networks." [FN189]The complaint alleges that the Board "ignored" management's due diligence findings, which were presented to the Board and which "expressed serious concern" that "Covad already had overlapping physical assets to provide DSL coverage in 70% of BlueStar service territory...." [FN190] The Plaintiffs charge that the Covad directors did not "evaluate" the due diligence reports "prepared by ... [the director of engineering] and others that pointed out many of the key acute problems of BlueStar...." [FN191]

FN187. *Id.* at ¶ 64. The complaint particularly cites Khanna, Chuck Haas, Vice President and co-founder of Covad, and Ron Marquardt, Covad's engineering director, as having "expressed their objections to the deal."

FN188. *Id.* at ¶ 72.

FN189. *Id.* at ¶ 64. The Plaintiffs, in their answering brief, also charge, *inter alia,* that the directors approved the transaction after only a "35 minute telephone conversation" with five board members present. Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 40. This information, however, is not among the allegations of the Amended Complaint.

FN190. Amended Compl. at ¶ 68.

FN191. *Id.* at ¶ 65. The Plaintiffs' answering brief also provides that "no independent appraisal of BlueStar was sought much less obtained...." This allegation does not appear in the Amended Complaint. Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 40.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 34

**\*25** Finally, the Plaintiffs argue that Covad's investment banker (Bear Stearns), which provided a fairness opinion for the transaction, "had a conflict of interest with respect to the merger, and the Board was aware of the conflict."[FN192]The Amended Complaint recites that "Bear Stearns Corporate Lending, Inc ., an affiliate of Bear Stearns, provided BlueStar with a $40 million financing commitment to fund BlueStar's continuing operations until the effective date of the merger."[FN193]The complaint states that, as a result of this bridge loan, it was in the interest of Bear Stearns "to render a favorable opinion ... and ensure the closing of the transaction," and that, "even though all the signs at the outset indicated that the transaction would spell financial disaster for Covad," Bear Stearns was conflicted from "urging (and therefore failed to urge) Covad to cancel the deal."[FN194]As the Amended Complaint explains, "if Covad did not close the transaction, Bear Stearns would be left with the unpaid bridge loan...."[FN195]

FN192. Amended Compl. at ¶ 66. The Amended Complaint describes the fairness opinion as "perfunctory." *Id.* This perhaps adds context, but little substance, to the Court's inquiry. Moreover, the absence of an independent opinion on which the board relied would not, of itself, demonstrate gross negligence satisfying *Aronson'* s second prong. In this instance, however, the Amended Complaint alleges, for example, that Covad's management's opinion was "[a]lmost uniformly" hostile to the transaction.

FN193.*Id.* The Amended Complaint also provides that Bear Stearns was conflicted because it had an "ongoing interest in earning fees from this and other Covad transactions."*Id.* First, this is insufficiently particularized. Second, the mere fact that an investment bank will receive typical fees for its services does not render its advice conflicted.

FN194.*Id.*

FN195.*Id. Compare Crescent/Mach I Partners, L.P.,* 846 A.2d at 984-85.

The Court notes that the Amended Complaint does not specify when the bridge loan was extended to BlueStar. The chronology, however, may have substantial impact on the analysis. If the bridge loan was made prior to rendering the fairness opinion, then this fact certainly adds substance to the Court's "reasonable doubt" analysis. On the other hand, if the loan was not negotiated or extended until *after* Bear Stearns rendered its fairness opinion (or until after the Covad Board's vote to approve), then the existence of the bridge loan would be substantially less significant to the Court's analysis. Issues of continuing reliance on Bear Stearns' advice might arise, but these would perhaps be distinct from reliance on the fairness opinion, itself.

The Court is commanded to make all reasonable inferences in favor of the Plaintiffs from particularized allegations. In this instance, the inference clearly intended by the Plaintiffs' from Paragraph 66 of the Amended Complaint is that loaned funds were at risk-not merely fees for making the loan-because the loan was extended before the opinion was delivered. Similarly, Paragraph 141 states that the Board obtained a "highly-conflicted Bear Sterns [sic] opinion in connection with the First BlueStar Transaction."The Plaintiffs' briefs support the Court's inference and make even more clear the light in which the Plaintiffs intended the allegations to be read. *See, e.g.,* Pls.' Ans. Br. to Co-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 35
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

vad's Mot. to Dismiss at 36-37 ("The Amended Complaint ... is replete with facts *known to the Board at the time it approved the transaction* which unequivocally show the gross negligence of Runtagh and Lynch.... The only financial opinion before the Board was that of Bear Stearns.... That opinion was hopelessly conflicted (and the Covad Board knew it) because a subsidiary of Bear Stearns had a $40 million bridge loan outstanding to BlueStar and would not see a dime of that money returned to it unless Covad acquired BlueStar."); *id.* at 12 ("[The Covad Board] accepted the fairness opinion of Covad's investment banker, Bear Stearns, despite the fact that Bear Stearns *had* a glaring conflict of interest with respect to the merger. Bear Stearns Corporate Lending, Inc ....*had given* BlueStar a $40 million financing commitment to fund BlueStar's continuing operations, and would have had no hope of recouping a dime of that money without the merger."(citing Amended Compl. at ¶ 66 (emphasis added))); Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 10 ("[The Covad board] accepted a favorable 'preliminary' opinion from an investment banker that the Covad Board *knew* had an enormous conflict that prevented it from evaluating the BlueStar acquisition in an objective manner."(citing Amended Compl. at ¶¶ 65, 66) (emphasis in original)). The Court recognizes that this is perhaps an example of particularly artful drafting, as well. Indeed, at the hearing on these motions, the Defendants pointed to documents produced in § 220 action that may resolve this issue; however, the Court may not consider them in the present analysis.

On a motion to dismiss, the Court is required to ac-

cept as true all well-pleaded allegations and to draw all reasonable inferences from such allegations in favor of the Plaintiffs. The Court acknowledges that the above facts, if true, create a reasonable doubt that the transaction was the product of a valid exercise of business judgment. The Plaintiffs have argued that, in acting to approve the merger, the directors committed violations of their duties of good faith and due care. Demand will be excused, for example, where the Court "conclude[s] that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence,* included consideration of all material information reasonably available."[FN196]It is possible that demand may also be excused where the Court may reasonably doubt that directors have complied in good faith with the requirement they fulfill their fiduciary duties.[FN197]This Court has previously addressed the possibility that

> FN196.*Brehm,* 746 A.2d at 259 (emphasis in original).

> FN197.*Cf. Guttman v. Huang,* 823 A.2d 492, 506 (Del. Ch.2003); *IHS,* 2004 WL 1949290, at *9 n. 36.

disinterested, independent directors "knew that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss."If they did indeed act in such a way, they have acted in a manner that cannot be said to be the product of sound business judgment and so cannot be protected by the presumption of the business judgment rule.FN198

> FN198.*Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. ("IHS") v. Elkins,* 2004 WL 1949290, at *10 (Del. Ch. Aug. 24, 2004) (addressing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                           Page 36
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

motion to dismiss under Court of Chancery Rule 12(b)(6)) (quoting *In re Walt Disney Co.,* 825 A.2d at 289).

In other words, if they behaved in such a manner, then they " *'consciously and intentionally disregarded their responsibilities,'* and ... therefore, could be in violation of their fiduciary duties to the corporation."[FN199]

> FN199.*IHS,* 2004 WL 1949290, at *9 (quoting *In re Walt Disney Co.,* 825 A.2d at 289) (emphasis in original).

The Plaintiffs have pleaded particularized facts alleging, *inter alia,* that the Covad Board had members with significant, material interests in the transaction, ignored a management that objected to the acquisition "[a]lmost uniformly," failed to "evaluate" management due diligence findings that expressed "serious concerns" about the transaction, and knew of significant conflicts held by the investment banker rendering the fairness opinion on which the Board relied.[FN200]As a consequence, the Court concludes that the allegations contained in the Amended Complaint create a reasonable doubt as to whether approval of the BlueStar transaction was the product of a valid exercise of business judgment by the Covad Board.[FN201]Therefore, demand is excused as to the BlueStar acquisition of Count IV.[FN202]

> FN200. The Court acknowledges that, after an opportunity for discovery, it may become clear that the bridge loan was negotiated, and funded, only after Bear Stearns had rendered its opinion. *See, e.g., In re New Valley Corp.,* 2001 WL 50212, at *6 n. 17 (Del. Ch. Jan. 11, 2001) (remarking that affidavit might give reason to doubt allegations, but was nevertheless improper to consider on motion to dismiss); *Mizel v. Connelly,* 1999 WL 550369, at *5 n. 5 (Del. Ch. July 22, 1999) (same).

> FN201. The Director Defendants contend

that their compliance with the "safe harbor" provisions of 8 *Del.C.* § 144(a) conclusively rebuts the Plaintiffs' contentions; however, compliance with § 144(a) does not guarantee the benefit of the presumption of the business judgment rule that entire fairness review will not apply. *See, e.g., Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 185 (Del. Ch.2005); *In re Cox Commc'ns S'holders Litig.,* 879 A.2d 604, 614-15 (Del. Ch.2005); *Cal. Pub. Employees' Ret. Sys.,* 2002 WL 31888343, at *13.As the Court in *Benihana* explained:

> Satisfying the requirements of § 144 only means that the [challenged transaction] is not void or voidable *solely* because of the conflict of interest. 'While non-compliance with §§ 144(a)(1), (2)'s disclosure requirement by definition triggers fairness review rather than business judgment rule review, the satisfaction of §§ 144(a)(1) or (a)(2) alone does not always have the opposite effect of invoking business judgment rule review.... Rather, satisfaction of §§ 144(a)(1) or (a)(2) simply protects against invalidation of the transaction 'solely' because it is an interested one. As such, § 144 is best seen as establishing a floor for board conduct but not a ceiling." Thus, equitable common law rules requiring the application of the entire fairness standard on grounds other than a director's interest still apply.

891 A.2d at 185.Moreover, the Director Defendants' purported compliance may not be a matter amendable to resolution on the basis of the pleadings. *See supra* note 182.

The Director Defendants also argue that, since Covad's Amended and Restated Certificate of Incorporation exempts dir-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

ectors from liability for breaches of the duty of care pursuant to 8 *Del.C.* § 102(b)(7), all claims against the Director Defendants involving duty of cares must be dismissed. However, "when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision."*Alidina v. Internet.com Corp.,* 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002) (citing *Emerald Partners v. Berlin,* 787 A.2d 85, 91 (Del.2001); *see also Malpiede v. Townson,* 780 A.2d 1075 (Del.2001).

Additionally, charter provisions adopted under § 102(b)(7) merely work to exculpate liability, but do not erase the underlying breach of fiduciary duty. As a consequence, a tension potentially exists between the effect of § 102(b)(7) provisions on analysis under *Rales* and under the second-prong of *Aronson.*For instance, the pertinent question under *Rales,* in this context, is whether a director faces a "substantial likelihood" of personal liability, which, if it exists, would then be deemed as compromising the director's capacity to consider demand. *See, e.g., Guttman,* 823 A.2d at 501.If a mere breach of a duty of care is the exclusive well-pleaded claim, however, then, in the presence of a § 102(b)(7) provision, the question posed by *Rales,* above, will likely be answered in the negative. *See id.*With respect to analysis under *Aronson'* s second prong, however, courts are instructed to ask whether the "challenged transaction was otherwise the product of a valid exercise of business judgment"-*i.e.,* the pertinent question, in this context, is whether an underlying breach has occurred and not whether a substantial threat of liability exists, regardless of breach. The crucial factor, however, would seem to be ques-

tions of the potential for personal liability which affect capacity to consider demand. *See id.*("When ... there are allegations that a majority of the board that must consider a demand acted wrongfully, the *Rales* test sensibly addresses concerns similar to the second prong of *Aronson.*To wit, if the directors face a 'substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised under *Rales,* excusing demand."); *see also Aronson,* 473 A.2d at 815 ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.").

FN202. With respect to the Defendants' motion under Court of Chancery Rule 12(b)(6), the Court's conclusion here that demand is excused under the more demanding standard of *Aronson'* s second-prong necessarily moots analysis under Rule 12(b)(6).

The Defendants contend that the challenge to the BlueStar acquisition is barred by laches (or the "borrowed" three-year statute of limitations) because the Original Complaint was filed more than three years after the Covad Board's approval of the transaction. *See* Mem. in Supp. of Dirs.' Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Dirs.' Op. Br. to Dismiss") at 26-27 (citing *Kahn v. Seaboard Corp.,* 625 A.2d 269, 271 (Del. Ch.1993); *In re Marvel Entm't Group, Inc.,* 273 B.R. 58, 73-74

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

(D.Del.2002)).*But see* Pls.' Ans. Br. to Dirs.' Mot. to Dismiss, at 21 (citing *Kaufman v. Albin,* 447 A.2d 761 (Del. Ch.1982); *Dofflemyer v. W.F. Hall Printing Co.,* 558 F.Supp. 372 (D.Del.1983)). The motion to dismiss, with respect to the Defendants' affirmative defense of laches, is reviewed under Court of Chancery Rule 12(b)(6). Because the Court is unable to discern with reasonable certainty from the complaint that laches applies, the Court cannot grant the Defendants' motion on this ground at this time. *See, e.g.,* Amended Compl. at ¶ 144; Reply in Supp. of Dirs.' Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Dirs.' Reply Br. to Dismiss") at 9 (alluding to "requirement" that BlueStar shareholders "approve the transaction by tendering their shares on September 22, 2000").

**\*26** The Court, furthermore, will not conduct business judgment analysis examining the BlueStar earn-out settlement separately. The two aspects of the BlueStar investment, proximate in time, as well as presenting issues of fact and law not easily bifurcated, are best tackled by treating them as one for demand excusal purposes. Thus, demand is also excused with respect to claims the Plaintiffs asserted in Count IV involving the BlueStar earn-out settlement. [FN203]

> FN203. Although the acquisition appears disastrous with the benefit of hindsight, the Court cannot permit the *ex post* results of a decision to cloud analysis of a board's *ex ante* judgment. *See, e.g., White,* 783 A.2d at 554;*Ash,* 2000 WL 1370341, at \*8;*Greenwald,* 1999 WL 596276, at \*7 (citing *In re Walt Disney Co. Deriv. Litig.,* 731 A.2d 342, 361-62 (Del. Ch.1998), *aff'd in part and rev'd in part, sub nom.Brehm,* 746 A.2d 244;*Litt v. Wycoff,* 2003 WL 1794724, at \*10 (Del. Ch. Mar. 28, 2003);

William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem,* 96 NW. U.L.REV. 449, 454-55 (2002).

> BlueStar's performance has been characterized as "dismal," but the Court notes the possibility that the ultimate failure of the deal may have had much to do with exogenous market forces affecting all of the telecommunications industry during this time. The failure to anticipate and avoid these reversals of fortune may perhaps not have been the result of, for example, bad faith, but rather aggressive and overly-optimistic business strategies that, in times of better economic fortune, are lauded as demonstrative off entrepreneurial skill and wisdom.

### C. *The Dishnet Settlement*[FN204]

> FN204. Although the Plaintiffs cast aspersions on Covad's decision to invest in Dishnet, they have not pursued any attack with particularized allegations.

Again, the Plaintiffs challenge the Covad Board's alleged failure to employ certain procedural devices (*e.g.,* a special committee) in approving the Dishnet Settlement.[FN205]As above, such allegations do not establish a *per se* rebuttal of the business judgment rule, as the Plaintiffs suggest. The Plaintiffs make only a conclusory allegation that the agreement was entered into "without the benefit of the necessary financial and legal analysis...."[FN206] This clearly fails to meet the requirement that the Plaintiffs plead particularized facts. Although the Plaintiffs' briefs rely heavily, and expand, upon this "fact," the Court must look to the Amended Complaint to determine whether the Plaintiffs have satisfied their pleading burden-and they have not.[FN207]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 39

FN205. Amended Compl. at ¶ 141. At the time of the Dishnet settlement, McMinn, Shapero, Lynch, Marshall, Hawk, Hoffman, Irving, and Runtagh comprised the Covad Board. The Amended Complaint does not allege which directors participated in review and approval of the settlement. Although Paragraph 93 of the complaint addresses McMinn's "course and conduct in connection with the failed Dishnet investment" and provides that "the other Covad directors at the time-including Shapero, Lynch, Marshall, Hawk, Hoffman, Irving and Runtagh-acquiesced knowingly in, and as a group supported," McMinn's conduct, the Court cannot draw any conclusions with regard to director participation on the basis of the pleadings under the standard governing motions to dismiss.

FN206. *Id.* at ¶ 92. The Plaintiffs also make the highly conclusory allegation that, with respect to Dishnet, "the other Covad directors at the time," excluding McMinn, "acquiesced knowingly in, and as a group supported, McMinn's breach of duty. *Id.* at ¶ 93.

FN207. Although the Plaintiffs point out that McMinn was director of both Dishnet and Covad at this time, the Plaintiffs do not allege that McMinn participated in the meeting or voted to approve the settlement. The Amended Complaint essentially sets forth only the terms of the settlement. *See, e.g., id.* at ¶¶ 89, 92. This is significant in light of Paragraph 80 of the Amended Complaint, which, in addressing the Board's consideration of the BlueStar earn-out settlement, provides that "under normal Covad practice, self-interested directors would have left any Board meeting when matters pertaining to their self-interest are discussed and voted upon...."

The Plaintiffs' allegations regarding the Dishnet settlement appear principally, if not exclusively, directed toward corporate waste. The allegations of the Amended Complaint do not amount to waste because it cannot be said that the benefits received by Covad from the settlement are "so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid."[FN208] It is not, however, outside the realm of business reasonableness to conclude that Covad was better off settling with Dishnet and putting the Dishnet ordeal behind it than to engage in a drawn-out battle with the risk of losing.[FN209] There are certainly instances in which settling claims-even though of questionable merit-is the prudent course of conduct. Based on the facts alleged, the Plaintiffs have failed to plead that the Covad Board's decision to enter into the Dishnet settlement was beyond the business judgment rule.[FN210]

FN208. *See* note 177, *supra.*

FN209. If, as the Plaintiffs allege, the key principal of Dishnet "had a highly mixed reputation in Asia," *id.* at ¶ 88, it may not have been outside the realm of business judgment to determine that an immediate disentanglement from Dishnet was worth the cost.

FN210. The Director Defendants' opening brief contends that this action should be dismissed on the grounds that the Plaintiffs have failed to state a claim under Court of Chancery Rule 12(b)(6). *See* Dirs.' Op. Br. to Dismiss at 1, 3. In support of their argument, the Director Defendants contend that their approvals of the transactions are protected under the business judgment rule. *See* Dirs.' Op. Br. to Dismiss at 34-35. In their answering brief to the Director Defendants, the Plaintiffs raised certain arguments questioning applicability of the protections of the business judgment rule. *See* Pls.' Ans. Br. Dirs.' Mot. to Dismiss at 30,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

43-46. As the Plaintiffs chose only to address their arguments to the Director Defendants' briefing with respect to Rule 12(b)(6), in this context, the Court neither addresses them with respect to demand excusal nor expresses a view as to their potential applicability in light of dismissal of the various claims under Rule 23.1. *Compare* Pls.' Ans. Br. to Covad's Mot. to Dismiss 40-43.

## V. AIDING AND ABETTING CLAIMS

The Plaintiffs assert claims in Count VI of the Amended Complaint against Crosspoint for aiding and abetting poorly behaving fiduciaries with respect to the Certive and BlueStar transactions. The Court has already determined that the Plaintiffs' claims regarding Certive must be dismissed for failure to make demand upon the Board. The Court now addresses the Plaintiffs' aiding and abetting claim with respect to the BlueStar transactions.

A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party "knowingly participates" in the breach. To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants," and (4) damages proximately caused by the breach.[FN211]

FN211.*Malpiede*, 780 A.2d at 1096 (quoting *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch.1984) ("It is well settled that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship."), *aff'd*,575 A.2d 1131 (Del.1990)); *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch.1972)); *see also Laventhol, Krekstein,*

*Horwath and Horwath v. Tuckman*, 372 A.2d 168, 170-71 (Del.1976) ("[P]ersons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results.").

**\*27** The Court notes first the distinction between the party who stands in a fiduciary relationship (described by the first and second elements of the test) and the non-fiduciary defendant (described by the test's third element) against whom the aiding and abetting claim is brought.[FN212]Of course, the Covad Board at the time of the BlueStar acquisition owed fiduciary duties to Covad and its shareholders, thereby satisfying the first element of an aiding and abetting claim. Moreover, the Court has already determined that the Plaintiffs' claims with respect to the BlueStar transactions survive the motion to dismiss; thus, the second element of the test is satisfied here, as well. Similarly, the Amended Complaint sufficiently alleges that, in the event a breach of fiduciary duty is proved, damages were proximately caused.[FN213]As to the requirement that there be "knowing participation" in the breach by the non-fiduciary defendant (*i.e.*, Crosspoint), "[a] claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred."[FN214]Shapero's status as a Covad director and General and Managing Partner of Crosspoint is sufficient to impute knowledge of Shapero's conduct with respect to the BlueStar acquisition to Crosspoint, for purposes of this motion to dismiss.FN215The allegations of the Amended Complaint support the reasonable inference that Shapero, and therefore Crosspoint, knew of Blue-Star's gloomy business prospects at the same time he was touting the potential acquisition.[FN216]Moreover, the allegations permit the reasonable inference that Shapero-by his statements and influence over, at least, Knowling-initiated, induced, and contributed to the underlying breach of Covad's Board.[FN217]The Amended

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Complaint sets forth that "Shapero lobbied Knowling through lengthy emails on the weekend of May 20-21, 2000, to have Covad acquire BlueStar and NewEdge."[FN218] Additionally, the Complaint al- leges:

> FN212.*See, e.g., In re Gen. Motors (Hughes) S'holder Litig.,* 2005 WL 1089021, at *24 (Del. Ch. May 4, 2005), *aff'd,*2006 WL 722198 (Del. Mar. 20, 2006).

> FN213.*See also Hughes,* 2005 WL 1089021, at *23 (requiring that "damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary" (quoting *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 386 (Del. Ch.1999)).

> FN214.*Hughes,* 2005 WL 1089021, at *24 (quoting *In re Shoe-Town, Inc. S'holders Litig.,* 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990)). Crosspoint's motion to dismiss the Plaintiffs' aiding and abetting claim is reviewed under Court of Chancery Rule 12(b)(6).

> FN215.*See, e.g., Carlson v. Hallinan,* 2006 WL 771722, at *20-*21 (Del. Ch. Mar. 21, 2006) (imputing majority shareholder's knowledge to nonfiduciary defendant-entit- ies for which shareholder serves as director and officer) (citing *In re HealthSouth Corp. S'holders Litig.,* 845 A.2d 1096, 1108 n. 22 (Del. Ch.2003), *aff'd,*847 A.2d 1121 (Del.2004) (TABLE)).

> FN216.*See* Amended Compl. at ¶¶ 58, 59, 62, 63.

> FN217. Because Shapero serves as General and Managing Partner of Crosspoint, his acts permit the Plaintiffs to charge Cross- point with "participation" in the context of the third element of the aiding and abetting

claim. Indeed, the emails sent by Shapero to Knowling were from Shapero's Cross- point email account and are signed "Rich Shapero, Managing Partner, Crosspoint Venture Partners."Calder Decl., Ex. Q.

> FN218. Amended Compl. at ¶ 62.

According to Covad's amended Form S-4/A, filed with the Securities and Exchange Commission on August 30, 2000, BlueStar's directors, which in- cluded defendants McMinn and Shapero, sugges- ted that the CEOs of BlueStar and Covad meet initially to discuss a possible business combina- tion. In fact, the documents produced in the § 220 action clearly show that Shapero, a member of Covad's compensation committee, repeatedly and directly lobbied (and ultimately persuaded) Knowling, the CEO whose compensation was de- termined by Shapero and his other committee members, that Covad should acquire BlueStar.FN219

> FN219.*Id.* at ¶ 72.The Amended Com- plaint additionally provides:

>> Each of Messrs, McMinn, Hawk and Shapero and/or Crosspoint were signific- ant stockholder of BlueStar. Specifically, McMinn was the beneficial owner of ap- proximately 656,942 shares of BlueStar common stock. Shapero's venture capital firm, Crosspoint, owned approximately 30 million shares of BlueStar stock, which represented approximately 41.9% of all of BlueStar's issued and outstand- ing common stock. Hawk, a Special Limited Partner of Crosspoint, was also a significant shareholder of BlueStar stock. BlueStar's CEO, Robert Dupuis, had previously worked for Crosspoint and thus had ties to Shapero and Hawk.

>> *Id.* It should be noted that McMinn was not a member of Covad's Board at the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 42
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

time of the acquisition, having resigned on November 1, 1999, and rejoining only in "late October 2000." *Id.* at ¶ 8.

Crosspoint contends that documents produced as a consequence of the § 220 action, and on which the Plaintiffs in part rely,[FN220] fail to demonstrate that Shapero acted improperly.[FN221]Specifically, Crosspoint argues that document LWDK 0002013 shows that Shapero's statements were not improper, but merely constituted permitted "expression" of Shapero's views.[FN222] The Court need not resolve the question of the characterization of the disputed emails, however, since a reasonable inference to draw from the allegations in the Amended Complaint is that Shapero's power to infect the decisions of Knowling and the Board, and the process by which this was accomplished, were premised not solely on his salesmanship (as reflected in this limited email chain), but, *inter alia,* on his power over Knowling's compensation as a member of Covad's compensation committee. Thus, the Court concludes that, based on the allegations before it, the Plaintiffs' claim against Crosspoint for aiding and abetting, with respect to the BlueStar transactions, cannot be dismissed.[FN223]

> FN220.*See* Pls.' Ans. Br. in Opp'n to Def. Crosspoint Venture Partners, L.P.'s Mot. to Dismiss Am. Deriv. & Class Action Compl. ("Pls.' Ans. Br. to Crosspoint's Mot. to Dismiss") at 33 (citing Calder Decl., Exs. Q (LWDK0002013-2015), R (LDWK0002987-2988); *see also* Amended Compl. at ¶ 72 (stating that "the documents produced in the § 220 action clearly show" Shapero's involvement).

> FN221. Reply Br. in Further Supp. of Def. Crosspoint Venture Partners, L.P.'s Mot. to Dismiss Pls.' Am. Deriv. & Class Action Compl. ("Crosspoint's Reply Br. to Dismiss") at 26.

> FN222.*See id.* at 25-26.Crosspoint states that "[a]n interested director's expression

of his views does not taint the decision of the disinterested directors."*Id.* (citing *In re Ply Gem Indus. Inc. S'holders Litig.,* 2001 WL 755133 (Del. Ch. June 26, 2001); *Lewis v. Leaseway Transp. Corp.,* 1990 WL 67383 (Del. Ch. May 16, 1990)). Shapero, however, is alleged to have moved well beyond merely "expressing his views." Moreover, the inference can be drawn that he was well aware of BlueStar's dismal circumstances and prospects.

> FN223. The Plaintiffs asserted fiduciary duty claims against Crosspoint arising out of the Certive matters because, at that time, Crosspoint controlled a significant, even if less than half, portion of Covad's outstanding stock. Those claims were dismissed for failure to make demand on the Board. By the time of the BlueStar Transaction, Crosspoint had eliminated (or substantially reduced) its holdings in Covad and, thus, no longer owed (if it ever did) fiduciary duties to Covad.

> Additionally, in the context of the motion to dismiss, the Court cannot conclude that, *inter alia,* that the transaction was the product of arms-length negotiations sufficient to preclude aiding and abetting liability. *Compare Hughes,* 2005 WL 1089021, at *26-*28.

## VI. *RESPONDEAT SUPERIOR* CLAIM

**\*28** In Count VII of the Amended Complaint, the Plaintiffs also assert claims against Crosspoint under the doctrine of *respondeat superior.*The Court concludes that these claims must be dismissed in their entirety. The Plaintiffs have not cited any authority demonstrating that such claims are permissible, in this context. *"Respondeat superior* imposes liability upon a principal for the torts of his agent committed within the scope of their agency relationship."[FN224]As has already been described above, Crosspoint stands as a *non-fiduciary* defend-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

ant in this litigation vis-à-vis Covad and its share-holders with respect to the BlueStar matters.[FN225]Indeed, this is a critical element of the Plaintiffs' aiding and abetting claim against Crosspoint. To permit recovery, in this circumstance, under the common law tort law doctrine of *respondeat superior*"would work an unprecedented, revolutionary change in our law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors."[FN226]As a consequence, the Court determines that the Plaintiffs' claim for *respondeat superior* is insufficient as a matter of law, under these circumstances, and, therefore, must be dismissed.

> FN224.*Arnold v. Soc'y for Sav. Bancorp, Inc.,* 1995 WL 376919, at *8 (Del. Ch. June 15, 1995) (citing *Fields v. Synthetic Ropes, Inc.,* 215 A.2d 427, 432 (Del.1965)). Count VI also briefly mentions the "Certive Transaction." *See* Amended Compl. at ¶ 181.

> To the extent that the Plaintiffs may seek to plead an aiding and abetting claim against Crosspoint for matters arising out of events described by Counts I through III-which have been dismissed for failure to make demand on the Board, as described above-the Plaintiffs may not assert a claim for aiding and abetting, since the underlying claims may not be pursued.

> FN225.*Cf. Emerson Radio Corp. v. Int'l Jensen Inc.,* 1996 WL 483086, at *20 (Del. Ch. Aug. 20, 1996) ("As a stockholder, [defendant third-party entity] could attain fiduciary status only if it were a majority shareholder or it actually controlled the affairs of [defendant corporation].").

> FN226.*Emerson Radio Corp.,* 1996 WL 483086, at *20 n. 18 (analogizing plaintiffs' claims in that case to claims

brought under theory employed by the Plaintiffs in this litigation).*Cf. USAirways Group, Inc. v. British Airways PLC,* 989 F.Supp. 482, 494 (S.D.N.Y.1997) (denying recovery under this theory of tort law since it would "undermine" and "circumvent[ ] clear limitations imposed by Delaware corporate law").

## VII. PROXY STATEMENT DISCLOSURES

The Plaintiffs also assert direct claims against McMinn, Shapero, Hawk, Lynch, Marshall, Irving, Hoffman, Runtagh, Crandall, and Jalkut for material omissions from Covad's Proxy Statements from 2002, 2003, and 2004. The Plaintiffs allege that Covad shareholders might not have elected the directors who were up for election during those years had the omitted information been disclosed. Specifically, the Plaintiffs allege that the following material information should have been disclosed:

1. Khanna's June 19, 2002 letter to the Covad Board. (2002, 2003, & 2004)

2. The Standstill Agreement with Khanna. (2002)

3. "The real reasons for and circumstances relating to the removal of Khanna as General Counsel and his intention, expressed to them, of taking legal action, if necessary, to seek redress for the harm defendants had caused Covad."(2002, 2003, and 2004)

4. The earn-out criterion for the BlueStar transaction had not been met, and Shapero, McMinn, and Hawk derived a great benefit from the settlement. (2002, 2003, and 2004)

5. "[D]efendant McMinn, during the time period of February to November 1999 when he purported to be working for Covad full-time, was actually working for himself and Crosspoint to find new investment vehicles."(2002)

6. Generalized information with respect to Khanna's allegations-specifically, which transac-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                Page 44
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

tions and which directors challenged. (2003 & 2004)

In 2002, McMinn, Hawk, and Hoffman were slated for election and were re-elected. In 2003, Jalkut, Irving, and Lynch were slated for election and were re-elected. In 2004, Crandall and Runtagh were slated for election and were re-elected. Each of these elections was apparently uncontested.

A. *Legal Standards*

1. *Motion to Dismiss*

**\*29** The standards governing this Court's analysis of motions to dismiss under Rule 12(b)(6) have recently been reiterated:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[FN227]

> FN227.*Hughes,* 2006 WL 722198, at \*3 (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-7 (Del.2002)).

Although the Court must "accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor,"[FN228] it is "not ... required to accept as true conclusory allegations 'without specific supporting factual allegations.' "[FN229] Instead, the Court must "accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.' "[FN230] It should also be noted that the standard governing motions under Court of Chancery Rule 12(b)(6) is "less stringent" than the standard employed in de-

mand futility analysis under Court of Chancery Rule 23.1.[FN231]

> FN228.*Id.* (citing *Malpiede,* 780 A.2d at 1082).

> FN229.*Id.* (citing *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65-66 (Del.1995)); *see also Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del.1996).

> FN230.*Hughes,* 2006 WL 722198, at \*3 (quoting *Malpeide,* 780 A.2d at 1082).

> FN231.*Malpiede,* 780 A.2d at 1082-83 (citations omitted); *see also Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985).

2. *Fiduciary Duty with Respect to Disclosure*

Delaware common law of fiduciary duty requires that directors disclose fully and with complete candor all material facts in soliciting proxies from shareholders.[FN232]Although it has been held that this duty is "best discharged through a broad rather than a restrictive approach to disclosure,"[FN233] only material facts must be disclosed. "An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote."[FN234]

> FN232.*Arnold v. Soc'y for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1277 (Del.1994); *see also Malpiede,* 780 A.2d at 1086 (explaining that "duty of disclosure" does not exist as an independent fiduciary duty).

> FN233.*Zirn v. VLI Corp.,* 621 A.2d 773, 779 (Del.1993); *see also Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 144 (Del.1997) (declining to adopt "bright line" test for disclosure violations, even though it might be "better practice" for directors "to be more candid and forthcoming in their communications to stockholders

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

when presenting a slate for election to the board").

FN234.*Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) ("Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). In order to be material, however, it need not be demonstrated that disclosure of a fact would have changed the shareholder's vote.

In order to allege adequately a violation of disclosure requirements, a plaintiff must plead "some basis for a court to infer that the alleged violations were material. For example, a pleader must allege that facts are missing from the proxy statement, identify those facts, state why they meet the materiality standard and how the omission caused injury."[FN235]The test for whether an omitted fact is material is context-specific, and, therefore, determinations of materiality will not frequently be appropriate on a motion to dismiss.[FN236]Nevertheless, this Court may resolve such questions at the motion to dismiss stage if it is satisfied with reasonable certainty that no set of facts could be proved that would permit the plaintiffs to obtain relief under the allegations made.[FN237]Even though the Court's analysis in this context is not overly stringent, "it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory."[FN238]

FN235.*Loudon*, 700 A.2d at 141;*see also M & B Weiss Family Ltd. P'ship of 1996 v. Davie*, C.A. No. 20303, slip op. at 5, Chandler, Ch. (Bench Ruling Del. Ch. Apr. 12, 2005).*Cf. Orman*, 794 A.2d at 31 ("In order for a plaintiff to state properly a claim for breach of a disclosure duty by omission, he must 'plead facts identifying (1) material, (2) reasonably available, (3)

information that (4) was omitted from the proxy materials." ' (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 926 (Del. Ch.1999)); *accord Wolf v. Assaf*, 1998 WL 326662, at *1 (Del. Ch. June 16, 1998).

FN236.*See, e.g., Alessi v. Beracha*, 849 A.2d 939, 949 n. 68 (Del.Ch.2004).

FN237.*Seagraves v. Urstadt Property Co., Inc.*, 1989 WL 137918, at *5 (Del. Ch. Nov. 13, 1989); *see also In re Encore Computer Corp. S'holders Litig.*, 2000 WL 823373, at *8–*9 (Del. Ch. June 16, 2000); *In re JCC Holding Co., Inc.*, 843 A.2d 713, 720 (Del.Ch.2003); *Orman*, 794 A.2d at 32.

FN238.*Loudon*, 700 A.2d at 140.

### 3. Self-flagellation

A long-standing principle of disclosure jurisprudence provides that a board need not engage in "self-flagellation." [FN239]Notwithstanding the requirement that directors disclose fully all material facts in the solicitation of proxies from shareholders, a board of directors is not required to "confess to wrongdoing prior to any adjudication of guilt,"[FN240] nor must it "draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter."[FN241]

FN239.*See, e.g., Stroud v. Grace*, 606 A.2d 75, 84 n. 1 (Del.1992).

FN240.*Loudon*, 700 A.2d at 145.

FN241.*Stroud*, 606 A.2d at 84 n. 1.*Compare Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 2006 WL 846121, at *10 (Del. Ch. Mar. 28, 2006).

### 4. Laches

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 46

**\*30** "The essential elements of laches are: (1) the plaintiff must have knowledge of the claim and (2) there must be prejudice to the defendant arising from an unreasonable delay by the plaintiff in bringing the claim."[FN242]Essentially,

> FN242.*U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.,* 864 A.2d 930, 951 (Del 2004), *vacated on other grounds,*875 A.2d 632 (Del.2005) (TABLE).

[l]aches is defined as an unreasonable delay by a party, without any specific reference to duration, in the enforcement of a right. An unreasonable delay can range from as long as several years to as little as one month. The temporal aspect of the delay is less critical than the reasons for it, because in some circumstances even a long delay might be excused.[FN243]

> FN243.*Steele v. Ratledge,* 2002 WL 31260990, at \*3 (Del. Ch. Sept. 20, 2002) (footnotes omitted).

Determination of what constitutes "unreasonable delay" is most often necessarily a factual and context-specific inquiry and, therefore, not generally appropriate for resolution on a motion to dismiss. If, however, the pleadings make reasonably certain that laches is applicable and there can be no facts reasonably supporting a contrary inference, then no insurmountable procedural hurdle exists to prevent the Court from resolving the issue on a motion to dismiss claim.[FN244]

> FN244.*See Bay NewFoundland Co., LTD. v. Wilson & Co., Inc.,* 28 A.2d 157 (Del. Ch.1942), *aff'd,*37 A.2d 59 (Del.1944); *cf. Steele,* 2002 WL 31260990, at \*3 (applying doctrine of laches on summary judgment when "undisputed material facts" established applicability). Although this Court is frequently reluctant to apply laches on a motion to dismiss, *see, e.g.,*

*Goldman v. Pogo.com, Inc .,* 2002 WL 1358760, at \*2 n. 16 (Del. Ch. June 14, 2002), there is no *per se* bar to its application when it is clearly appropriate.

*5. Incorporation and Consideration of Matters Outside the Complaint*

"The complaint generally defines the universe of facts that the [Court] may consider in ruling on a ... motion to dismiss. When the [Court] considers matters outside of the complaint, a motion to dismiss is usually converted into a motion for summary judgment and the parties are permitted to expand the record."[FN245]The Court may, however, "in some instances and for carefully limited purposes," consider documents referred to in the complaint in order to rule on a motion to dismiss.[FN246]Additionally, the Court may take judicial notice "of matters that are not subject to reasonable dispute."[FN247]As a consequence, the Court will consider the challenged Covad proxy statements, as well as other documents incorporated into the Amended Complaint, in its analysis of the motion to dismiss.

> FN245.*Hughes,* 2006 WL 722198, at \*3 (citations omitted); *see also*CT. CH. R. 12(b).

> FN246.*See Hughes,* 2006 WL 722198, at \*3 (citing *In re Santa Fe Pac. Corp.,* 669 A.2d at 69).

> FN247.*See id.*(citing DEL. R. EVID. 201(b)).

*B. Analysis*

The Plaintiffs have identified information they allege was omitted from Covad Proxy Statements and have explained it was material because its omission permitted the re-election of particular directors who would perhaps not have been re-elected otherwise. The Plaintiffs ask the Court to grant equitable relief by overturning the 2002, 2003, and 2004 elections. "The courts of this state 'have long held that inequitable conduct by directors that interferes with a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

fair voting process may be set aside in equity." ' FN248 Therefore, "voiding results of directorial elections and ordering a new election is an appropriate remedy when an election occurs using materially false and misleading proxy materials." FN249

> FN248.*Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.,* 824 A.2d 11, 15 (Del. Ch.2002) (quoting *Linton v. Everett,* 1997 WL 441189, at *9 (Del. Ch. July 31, 1997)).

> FN249.*Shamrock Holdings of Cal., Inc. v. Iger,* 2005 WL 1377490, at *5 n. 37 (Del. Ch. June 6, 2005). The Court notes that the Amended Complaint does not specifically request that the Court order a new election.

Below, the Court addresses first the application of laches to the Plaintiffs' 2002 Proxy disclosure claims. The Court then turns to each of the Plaintiffs' remaining 2003 and 2004 Proxy disclosure claims and addresses them *seriatim.*

1. *Analysis of Plaintiffs' 2002 Proxy Claims Under Laches Doctrine*[FN250]

> FN250. This action was filed on September 15, 2003, well before Covad's issuance of the 2004 Proxy Statement on April 30, 2004, and the 2004 Covad Board meeting on June 10, 2004.

> It should also be noted that the Plaintiffs did not file their Amended Complaint asserting claims for omissions in the 2004 Proxy until August 3, 2004. Whether the Plaintiffs' 2004 Proxy claims should be dismissed because they were not sooner filed is a question the Court need not decide here, given its analysis below.

> The 2002 Proxy Statement is JTX 16; the 2003 Proxy Statement is JTX 24; and the 2004 Proxy Statement appears at

Calder Decl., Ex. E.

**\*31** As stated above, laches does not, in the mill run of cases, present a proper basis on which the Court may dismiss a plaintiff's claims, since determination of what constitutes "unreasonable delay" is frequently a factual and context-specific inquiry. Notwithstanding the Court's general reluctance to employ laches at the motion to dismiss stage, the Court will, however, dismiss claims when "unreasonable delay" may be found from the face of the pleadings and it is reasonably certain that no set of facts can be proved which would otherwise preclude such a finding.

In the present litigation, the chronology relevant to laches analysis is undisputed. The Plaintiffs seek now to overturn the 2002 election for directors. The directors elected in 2002 have since completed their three-year terms of office. This fact alone makes equitable relief with respect to the 2002 Proxy claim impossible.

Moreover, the Court is troubled by Khanna's delay of more than a year after the 2002 board elections in filing his Original Complaint challenging the adequacy of 2002 Proxy Statement. The Draft Complaint presented to the Covad board by Khanna on July 9, 2002 (as well as his letter to the board of June 19, 2002) demonstrates that he was aware of the facts underlying his disclosure claims before the 2002 board meeting, at the latest (and probably much earlier). Indeed, Khanna served as General Counsel of Covad when the transactions he now challenges (and which underlie the bulk of his disclosure claims) took place. Very few shareholders would stand in a better position to know the relevant facts than a corporation's General Counsel.FN251

> FN251. The Plaintiffs also argue that an issue of fact as to Khanna's delay in filing this action is created by a letter from Covad's outside counsel to Khanna's counsel, dated February 13, 2003, Pls.' Ans. Br. to Covad's Mot. to Dismiss at 46-47. JTX 62.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 48

The Court notes, first, that the February 13, 2003 letter was actually in response to a letter from Khanna's counsel sent two days earlier, on February 11, *see* JTX 63, and not an email from Khanna, dated November 13, 2002, *see* JTX 33. Moreover, although the February 13 letter does provide that Khanna's disclosure objections would be "refer[ed] ... to the Company, which is being advised by separate counsel on its disclosure obligations," the Court does not view this as potentially mitigating Khanna's already by then extensive delay in seeking the wide-ranging equitable relief he now requests.

Although this Court may overturn a board election, a plaintiff seeking such relief must present her claims with reasonable alacrity if useful equitable relief is to be granted.[FN252]Moreover, finality and predictability with respect to a corporation's governing structure clearly are not of insignificant benefit to the corporate enterprise.[FN253]Khanna, with his knowledge of the facts he now asserts were improperly omitted, could have acted at the time of the 2002 election. Similarly, he could have filed an action for equitable relief promptly following the 2002 election. The Plaintiffs have offered the Court no persuasive explanation for his delay of more than one year.

> FN252. The policy considerations animating this view in the context of challenges to board elections also apply in the context of challenges to mergers, although perhaps with more severe consequences for the dilatory plaintiff. *Cf. In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *12 (holding that failure to file TRO in merger context resulted in "equitable [being] relief is no longer practicable," since the " 'eggs' ha[d] been irretrievably 'scrambled' and there [was] no possibility of effective equitable relief"); *see also Arnold,* 678 A.2d at 537. *But see Loudon,* 700 A.2d at

138 (in context of board election, stating that "[a] timely complaint, properly pleaded and supported by proof sufficient to invoke preliminary equitable relief, could result in an *early* injunction or the imposition of corrective disclosures *before* the complained-of corporate activity had been consummated" (emphasis added)).

> FN253.*Compare Bay Newfoundland Co. v. Wilson & Co.,* 37 A.2d 59, 62 (Del.1944) (addressing certainty interests in the distinct, but analogous context of corporate act approval).

The Court concludes that, in light of equitable principles guiding the exercise of its jurisdiction, it would be inequitable to award the Plaintiffs the relief they seek with respect to their 2002 Proxy disclosure claims. Khanna served as Covad's General Counsel during the period the challenged transactions were approved; however, Khanna filed suit only after his termination, thus generating concern that his actions were motivated by his employment dispute.[FN254] Khanna's role at Covad provided him with knowledge and a platform from which the problems could have been addressed. Khanna now seeks to employ that knowledge against the corporation, and its directors, well after the fact.[FN255] Moreover, the addition of Sams and Meisel, as plaintiffs, fails to ameliorate the Court's concerns.FN256The Court cannot permit the Plaintiffs in this instance to have stood effectively idle until more than a year after the 2002 annual meeting to bring their challenge before this Court. Fundamentally, this is not an instance in which the grant of equitable relief would comport with its general notions of equity, and, as a consequence, the Plaintiffs' claims with respect to the 2002 Proxy Statement must be dismissed under the doctrine of laches.[FN257]

> FN254. The Court acknowledges the Plaintiffs' allegations that Khanna objected to the transactions and that he was investigated internally for sexual harassment as a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 49
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

result of his objections, *but see* Pls.' Ans. Br. to Covad's Mot. to Dismiss at 42 n. 14 (explaining that Khanna's objections with respect to Dishnet-and presumably the other transactions, as well-were business advice only, and not legal advice); however, the Court does not view Khanna's termination as isolated from Khanna's filing litigation against the defendants soon thereafter-*i.e.,* the timing of events is not mere coincidence. Indeed, given the Court's treatment of Khanna's June 19 letter to the Covad Board as made in the employment context (which is a treatment that the Plaintiffs necessarily desire), the Court will not now view the present litigation as unrelated (*i.e.,* not to gain advantage in what may perhaps be viewed as a substitute for convoluted employment litigation).

FN255. This does not diminish, however, the Court's ruling, below, that certain information is not subject to attorney-client privilege.

FN256. The Court holds Sams and Meisel, as co-plaintiffs with Khanna, charged with the behavior of Khanna that took place prior to their appearance in this action.

FN257. The Court also notes that prior decisions have held claims for equitable relief moot when the challenged directors' terms have expired. *See Loudon,* 700 A.2d at 138;*see also M & B Weiss Family Ltd. P'ship of 1996,* C.A. No. 20303, slip op. at 5. This applies to Hawk, and it also likely applies to the claims against McMinn and Hoffman. Because McMinn and Hoffman were re-elected on expiration of their terms in 2005, however, the Court declines to rely on this principle.

*2. Analysis of Plaintiffs' Individual Proxy Disclosure Claims*

*a. Disclosure Claim # 1: Khanna's June 19, 2002 Letter to the Covad Board (2002, 2003, and 2004 Proxy Statements)*

**\*32** The Plaintiffs first claim that the failure to disclose Khanna's June 19, 2002 letter to the Covad Board constituted a material omission from Covad's 2002 Proxy Statement.[FN258]Based on the foregoing analysis, this claim must be dismissed.

FN258. Amended Compl. at ¶ 194.

The claims presented in the Amended Complaint with respect to the 2003 and 2004 Proxy Statements do not specifically identify the letter as a material omission.[FN259]Nevertheless, assuming *arguendo* that the Amended Complaint does set forth such claims, they would be dismissed as well.

> FN259.*Compare id.* at ¶ 194,*with* ¶¶ 204, 213. Indeed, as explained above, failure to identify the omitted facts which form the basis of a plaintiff's claim is, in itself, cause to dismiss. *See Loudon,* 700 A.2d at 140.

First, any such claims involving the 2003 and 2004 Proxy Statements fail principally because, as explained above, Khanna's June 19, 2002 letter must be viewed primarily as part of an on-going employment dispute between Covad and Khanna. Therefore, the letter is a document that the Company is not required to disclose, standing alone. This Court has already ruled in the Plaintiffs' favor on this issue, deeming the letter not to have been a demand on the Covad Board, but the Plaintiffs must endure the consequences along with the benefits of this conclusion. Moreover, the Plaintiffs' claims with respect to the letter fail because disclosing the letter (and its characterization of the challenged transactions) would amount to a requirement that the Covad Board disclose and adopt Khanna's pejorative characterization of the challenged conduct. This would amount to "self-flagellation."

*b. Disclosure Claim # 2: Standstill Agreement*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                Page 50
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

*(2002 Proxy Statement)*

As explained above, this claim must be dismissed because it is a challenge to the 2002 Proxy Statement. The Court also briefly notes, however, that the Plaintiffs have failed to satisfy the materiality standard necessary to survive the motion to dismiss this claim, as well. On June 10, 2002, the Proxy Statement was issued. On June 19, 2002, Khanna sent the Covad Board his letter. The directors were elected on July 25, 2002. Thus, with regard to the 2002 disclosure of the Standstill Agreement, the question becomes whether this was material before July 25, 2002. The Court concludes that it was not. Since the Standstill Agreement related solely to Khanna's employment claims, it was not relevant to shareholders, at least in the way that the Amended Complaint alleges.[FN260]

> FN260. As discussed above, Khanna's June 19, 2002 letter-read it in the light most favorable to the Plaintiffs-relates to Khanna's employment dispute. The corporate governance allegations are subordinate to the employment demands. Similarly, the Standstill Agreement relates to Khanna's employment claims. The Amended Complaint does not allege that this understanding changed while the Standstill Agreement was in effect between July 10, 2002 and July 26, 2002. Obviously, at some point the posture of Khanna's claims against Covad purportedly changed from being centered on his termination to seeking redress for shareholders in general. When the nature of these claims changed is unclear from the Amended Complaint. However, it is clear that it was after July 25, 2002.

> Moreover, the Amended Complaint alleges that the omissions from Covad's 2002 Proxy Statement led to the election of McMinn, Hawk, and Hoffman and that the omitted facts would have been material to this decision. It is not at all

clear how disclosure of the Standstill Agreement would have been material to the decision of whether to reelect these directors.

c. *Disclosure Claim # 3: "Real Reasons" for Khanna's Termination as General Counsel of Covad (2002, 2003, & 2004 Proxy Statements)*

As with the above discussion of the June 19, 2002 letter, the Plaintiffs' third disclosure claim (that the "real reasons" behind Khanna's termination should have been disclosed) would constitute admissions of wrongdoing, which the Defendants contest, before a final adjudication on the merits. This constitutes a request that the Board engage in classic "self-flagellation," and, therefore, this claim is dismissed as well.[FN261] Moreover, the Plaintiffs' challenges to the 2002 Proxy must also be dismissed with respect to this claim for the reasons stated above.[FN262]

> FN261. The Court also views the additional disclosures the Plaintiffs seek here to be not material to shareholders' decisions of whether to elect particular directors, especially since they relate to an employment dispute. Moreover, the only directors whom the Plaintiffs allege tried to "intimidate" Khanna (McMinn and Hoffman) were re-elected in 2002.

> FN262. With respect to their 2002 Proxy claim, the Plaintiffs additionally assert that the Defendants failed to "disclose ... [Khanna's] intention, expressed to them, of taking legal action, if necessary, to seek redress for the harm defendants had caused Covad."Amended Compl. at ¶ 196. This claim is set forth in the same paragraph as the alleged omission of the "real reasons" for Khanna's termination. Khanna's purported "intentions," as a shareholder or even as a former General Counsel, cannot be said to be a material fact that a board must disclose in its proxy statement in this con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

text.

d. *Disclosure Claim # 4: Failure to Satisfy the BlueStar Earn-Out Criteria (2002, 2003, & 2004 Proxy Statements)*

**\*33** The Plaintiffs also allege that the failure of BlueStar to meet the earn-out criteria set forth in the BlueStar Acquisition constituted a material omission from all three challenged Covad Proxy Statements. Specifically, the Plaintiffs allege: "Defendants also did not disclose that the earn-out criteria for the BlueStar transaction had not been met, but that they decided to pay out the 3,250,000 shares. Defendants Crosspoint, Shapero, McMinn, and Hawk derived great benefit by, between them, receiving almost 50% of the 3,250,000 shares issued by Covad in this transaction."[FN263]

FN263.*Id.* at ¶¶ 197, 206, 215.

At the outset, the Court notes that the 2002 Proxy disclosure claims must be dismissed for the reasons set forth above. The Court, therefore, addresses only the Plaintiffs' claims with respect to the 2003 and 2004 Proxies. With respect to these two proxy statements, the Amended Complaint fails to set forth allegations sufficient to survive the Defendants' motion to dismiss. The materiality of any disclosure must be analyzed within the scope of the pleadings. Thus, the fact that BlueStar failed to meet its earning targets must be considered in light of its materiality to shareholders' decision to elect particular directors (*i.e.,* in the context in which the Plaintiffs bring their disclosure claims). Viewed in this light, BlueStar's earning disclosure cannot be viewed as material.[FN264]

> FN264. The BlueStar acquisition and earn-out settlement had occurred more than two years before the 2003 proxies were solicited. Shareholder approval was not required for the BlueStar earn-out settlement. If approval had been required, then disclosure of this information would likely have been material to that decision.

The only potential argument as to why disclosure would be material to shareholders, in the context of the board elections, is that the directors' approval of the earn-out payment may have been relevant in deciding whether or not to elect a particular director. This rationale alone, however, is not sufficient to mandate disclosure. A large quantity of information may exist regarding any director that *could* be useful to shareholders in making a decision whether or not to elect a particular director. Yet, the question is not merely whether a disclosure might be helpful in deciding to elect a director, but, instead, whether the information reaches the necessary threshold of materiality.[FN265]The business decision of a board to settle certain disputed claims is not, standing alone, within the class of information that is the proper subject of disclosure when shareholder action is not requested with respect to that action but, instead, in the context of a director election.[FN266] Because the BlueStar earn-out settlement was just one of many decisions that Covad's directors made, and given the passage of time following the earn-out settlement, the Court concludes that disclosure of BlueStar's financial data measured against Covad's earn-out obligations to former BlueStar shareholders in the 2003 and 2004 Proxy Statements was not material to the Covad shareholders in this context. Disclosure would not have significantly altered the total mix of information available to shareholders in deciding how to cast their votes in the 2003 and 2004 elections for disinterested directors. [FN267]

> FN265. A proxy statement need not disclose the details of all transactions in which uninterested directors slated for re-election participated. Certainly, broad disclosure is preferred, *see, e.g., Zirn*, 621 A.2d at 779, but the Plaintiffs' expectations are too expansive in this context.

> The Amended Complaint does not identify the lack of detail about Lynch's role in negotiating the BlueStar transaction as an improper omission from the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

2003 Proxy Statement. *See* Amended Compl. at ¶¶ 197, 206, 215.

FN266.*Cf. Loudon,* 700 A.2d at 145.("The details of a corporation's inner workings and its day-to-day functioning are not the proper subject of disclosure.").

FN267. The Court takes a dim view of the 2002 Proxy Statement's vague (if at all extant) references to the interests of McMinn and Hawk in the BlueStar earn-out settlement. Had the Plaintiffs' 2002 Proxy claims not been dismissed in their entirety, the Court may have found the disclosure shortcomings in this context material for purposes of the motion to dismiss.

**\*34** Moreover, Covad had already disclosed facts relevant to the BlueStar acquisition and settlement in its 2002 Proxy Statement, and Covad's 2003 10-K describes BlueStar's subsequent liquidation. Indeed, the disclosures of the 2002 Proxy approach, if not fulfill, disclosure of the information the Plaintiffs contend was improperly omitted. Although the Proxy Statement does not explicitly set forth that the criteria were not met, it does make clear that (1) the full amount BlueStar stockholders were originally to receive under the earn-out provisions was not paid, (2) settlement occurred before the full earn-out period had passed, and (3) the settlement was agreed-to "in exchange for a release of all claims against [Covad]."[FN268]

FN268. According to the 2002 Proxy Statement:

In connection with our acquisition of BlueStar, we agreed to place approximately 800,000 shares of our common stock in a third-party escrow account. Up to 5,000,000 additional common shares of our common stock were to be issued if BlueStar achieved certain specified levels of revenues and earnings before interest, taxes, depreciation and

amortization in 2001. However, in April 2001, we reached an agreement with the BlueStar stockholders' representative to resolve this matter, as well as the matters that caused 800,000 of the Company's common shares to be held in escrow as of December 31, 2000, by providing the BlueStar stockholders with 3,250,000 of the 5,000,000 shares, in exchange for a release of all claims against the Company. BlueStar's former stockholders received the additional shares of the Company's common stock during 2001. The 800,000 common shares held in escrow were ultimately returned to the Company under this agreement.

Were the Court to conclude that the failure to meet the earn-out criteria was material to the shareholders' decision and did not constitute self-flagellation-*e.g.,* if the proxy had been sent to solicit shareholder approval of the settlement-then the prior disclosures of material information would be insufficient to grant a motion to dismiss.[FN269]The Plaintiffs' claim presents a distinct set of issues, however. In the context of a director election, the Court, in this instance, must ask questions similar to those considered in both *Loudon v. Archer-Daniels-Midland Co.*[FN270] and *Wolf v. Assaf*.[FN271] Where can it be said that a bright-line rule should apply requiring disclosure of mere facts concerning a past action of the board that would otherwise appear to have bearing on a director's election no greater (unless the conclusion is made that the conduct was "wrongful") than any other facts regarding the numerous business decisions with which the director has been involved? Such a rule would seem to invite overwhelming disclosure of a broad range of information in the context of director elections (*e.g.,* information surrounding *all* transactions which the director has voted to approve) in order to avoid potential future litigation. Although broad disclosure is encouraged, it is also possible for such disclosure to become so extreme as to render proxies confusing and not par-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 53

ticularly useful to shareholders in casting an informed vote.[FN272]

> FN269.*Compare Wolf,* 1998 WL 326662, at *3 ("Including the description of the federal class action in the 10-K and attaching it to the proxy statement creates a substantial likelihood that the reasonable shareholder would have been on notice to review and would have been likely to review its contents."), *with ODS Techs., L.P. v. Marshall,* 832 A.2d 1254, 1261-62 (Del. Ch.2003) (granting preliminary injunction since omissions of purpose and effect underlying proposed amendments "cross the line" to become "affirmatively misleading," and rejecting argument that reference by 10-K mailed with proxy to attachment sent to shareholders in unrelated distribution years earlier was sufficient as it would create "a 'super' shareholder standard and create almost limitless opportunities for deception of the 'reasonable' shareholder").*Cf. Bren v. Capital Realty Group Senior Housing, Inc.,* 2004 WL 370214, at *9 (Del. Ch. Feb. 27, 2004) (although denying summary judgment and motion to dismiss, stating: "All material facts to the action must be disclosed. This does not require, however, that all material information that was previously disclosed be disclosed again with the specific correspondence requesting action."(citations omitted)).

> FN270.700 A.2d 135 (Del.1997).

> FN271.1998 WL 326662 (Del. Ch. June 16, 1998).

> FN272.*Cf. Brown v. Perrette,* 1999 WL 342340, at *8 (Del. Ch. May 14, 1999) (noting that "disclosure of a single unadorned fact can quickly snowball into wide-ranging disclosure of facts and opinions that otherwise would never come before the shareholders" (citing *Wolf,* 1998 WL 326662, at *4)).

The Plaintiffs might respond that BlueStar's shareholders were so undeserving of the earn-out payment, and Covad's decision to make any earn-out payment were so egregious, that disclosure of Blue-Star's earnings would have been material to Covad shareholders, because it would have alerted them that Covad's directors were not pursuing Covad's best interest. This argument, however, accepts Khanna's pejorative description of the BlueStar earn-out settlement, which the Covad Board was not required to disclose because it would constitute the legal characterization of facts (and not a statement of facts). Disclosure of the failure of BlueStar to meet the earn-out criteria would be material to shareholders in this context only if approval of the settlement by the directors up for re-election had been wrongful.[FN273]Thus, the Plaintiffs seek a disclosure "which by inference would convey" a breach of fiduciary duty.[FN274] Disclosure of the single, unadorned fact of the failure to meet the earn-out criteria, standing alone in the proxy to elect directors-especially in 2003 and 2004, two and three years after the settlement-would likely invite, if not require, the Board to explain its reasons why the settlement was warranted. The Court, then, views this as sufficiently analogous to other plaintiffs' prior "attempt[s] to 'skirt' the 'self-flagellation' rule," which would ultimately place the Court on a "well greased slippery slope" and on which the Court declines to tread.[FN275]

> FN273.*Cf. Loudon,* 700 A.2d at 145.

> FN274.*See Wolf,* 1998 WL 326662, at *4.

> FN275.*Id.; accord Loudon,* 700 A.2d at 145.*But cf. Brown,* 1999 WL 342340, at *7 (discussing, in context of Court's analysis of disclosures with respect to a transaction approval, potential drawbacks of application of self-flagellation rule).

Finally, the Court views as pertinent to the Court's discussion in *Wolf* of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 54

plaintiff's arguments that the omission in that action was "material to [the director's] character, competence, or fitness for office" is instructive:

Delaware law does not, however, require a proxy statement to impugn a director's character or draw negative inferences from his past business practices. It only requires a summary of his credentials and his qualifications to serve on the board as well as a description of any conflicts of interest. Nothing in our law requires a masochistic litany of management minutiae. If we required companies to include a detailed, subjective assessment of a director's character and past performance in proxy statements before an election, I do not see how this Court could avoid a flood of second-guessing, hindsighted shareholders seeking to contest admittedly subjective conclusions. This form of subjective titillation has never been required as spice for the "total mix."

1998 WL 326662, at *5. The Plaintiffs' claims with respect to the 2002 Proxy Statement have been dismissed for the reasons described above. Moreover, the Plaintiffs do not challenge the summary of credentials and qualifications or of any conflicts of interest with respect to the 2003 or 2004 Proxies.

*e. Disclosure Claim # 5: McMinn's Status at Covad While Creating Certive (2002 Proxy Statement)*

**\*35** The Plaintiffs' fifth disclosure claim alleges that the 2002 Proxy "did not disclose that defendant McMinn, during the time period of February to November 1999 when he purported to be working for Covad full-time, was actually working for himself and Crosspoint to find new investment vehicles."[FN276] A requirement that the board make this type of disclosure would implicate considera-

tions similar to those discussed, above, with respect to the Plaintiffs' fourth disclosure claim. Moreover, it would require that Covad adopt Khanna's interpretation of McMinn's employment status, as well as his conformity or non-conformity with the conditions on his compensation. As such, the claim must be dismissed. Additionally, this claim constitutes a challenge to the 2002 Proxy Statement, and therefore must be dismissed for the reasons set forth above.

FN276. Amended Compl. at ¶ 198.

*f. Disclosure Claim # 6: Disclosure of Challenged Directors, Officers, and Transactions (2003 & 2004 Proxy Statements)*

The Plaintiffs also make generalized claims with respect to the 2003 and 2004 Proxy Statements.[FN277] They variously allege that the directors failed to disclose "anything about Khanna's allegations regarding the Certive, Bluestar or Dishnet transactions;""[t]he substance of Khanna's allegations;" or "the information showing the pattern and practice of self-dealing and other malfeasance by the directors...."[FN278] The only omissions they point to with any reasonable specificity is that "Defendants did not identify which directors and officers or which transactions were the subject of Khanna's allegations."[FN279]

FN277.*Id.* at ¶¶ 204, 213.

FN278.*Id.* at ¶¶ 204, 205, 213, 214.

FN279.*Id.* at ¶¶ 204, 213.

As explained above, "it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory."[FN280] Certainly, the threshold is relatively low in order for a claim to be considered well-pleaded on a motion to dismiss under Court of Chancery Rule 12(b)(6). Nevertheless, in order to state a claim for material omission from a proxy statement, a plaintiff must, *inter alia,* identify the facts that were improperly omitted.[FN281] The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 55
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Plaintiffs claim here could be fairly read to challenge non-disclosure of all facts asserted in the Plaintiffs' Amended Complaint (or Khanna's June 19, 2002 letter to the Covad board or his July 9, 2002 Draft Complaint). The Court will not attempt, however, to parse a broadly generalized claim for non-disclosure for the benefit of the Plaintiffs-it is their responsibility to identify in a reasonable manner the facts which they allege were improperly omitted.

> FN280. *Loudon,* 700 A.2d at 140.

> FN281. *See id.* at 141; *id.* at 144 (upholding trial court's ruling that complaint "failed to 'identify any specific fact that should have been disclosed.' "); *see also M & B Weiss Family Ltd. P'ship of 1996,* C.A. No. 20303, slip op. at 5.

As a consequence, the Court understands the Plaintiffs to be asserting a claim for failure to identify the directors, officers, and transactions that were the subject of Khanna's allegations.[FN282] At the outset, the Court notes that, once Khanna had filed his Original Complaint on September 15, 2003, after the 2003 election, the subsequent 2004 Proxy discloses both the initiation of the lawsuit and lists the former and current directors named as defendants.[FN283] Though the 2004 Proxy Statement does not specifically identify the Certive, Bluestar, and Dishnet transactions as being the subject of his suit, it does describe in sufficient detail the history of Covad's dealings with Khanna, the steps it took in investigating his claims, the result of that investigation, and the general claims he now asserts.[FN284] Indeed, a requirement that the proxy statement disclose details (and conclusions that could be drawn from those details) the Plaintiffs apparently wish would most likely cross into self-flagellation. Therefore, the Court concludes that the Plaintiffs have failed to state a claim with respect to the 2004 Proxy Statement.

> FN282. Although the Amended Complaint is not clear, it does provide in the first sentence of the relevant paragraphs that "defendants did not disclose anything about Khanna's allegations regarding the Certive, BlueStar or Dishnet transactions." *See* Amended Compl. at ¶¶ 204, 213. The Court, therefore, understands the Plaintiffs to be claiming that these listed transactions should have been disclosed as having been the "subject of Khanna's allegations." *See id.*

> FN283. *See* 2004 Proxy Statement at 6-7.

> FN284. Neither Crandall nor Runtagh, the directors slated for re-election in 2004, was interested in any of the challenged transactions, and the Court does not view disclosure of these particular transactions as being the "subject of Khanna's allegations" as material to these directors' re-election. Covad's disclosure puts any shareholder who is concerned by Khanna's allegations on notice that the Covad Board is "too cozy" and that the shareholder should either vote no as to Covad's slate of directors or seek the nomination of fresh candidates.

**\*36** With respect to the 2003 Proxy Statement, no lawsuit had been filed during most important period (*i.e.,* before the 2003 election).[FN285] Although the Plaintiffs seek to characterize this information (*i.e.,* the directors, officers, and transaction that were the subject of Khanna's allegations) as "facts," information of this sort is not normally the subject of proper disclosure claims. The Court, instead, views the Plaintiffs' claim in this context as analogous to prior instances in which this Court has held that proxy statements need not set forth the "opinions of stockholders" who have merely voiced opposition to a transaction, even if they are "large holders of ... stock." [FN286]

> FN285. Though Khanna had filed his § 220 demand on Covad on June 10, 2003 (and a related § 220 action in this Court on August 11, 2003, *see Khanna,* 2004 WL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d    Page 56
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

187274), the date relevant to the present analysis is that on which he filed the present litigation.

FN286.*In re Triton Group Ltd. S'holders Litig.,* 1991 WL 36471, at *9 (Del. Ch. Feb. 22, 1991), *aff'd sub nom.Glinert v. Lord,* 604 A.2d 417 (Del.1991) (TABLE); *see also Seibert v. Harper & Row, Publishers, Inc.,* 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984). Khanna is the largest, or one of the largest, individual shareholders of Covad.

The Plaintiffs' contention that Khanna's opinions, as a former General Counsel of Covad, carry more weight and therefore merit different treatment is unpersuasive.[FN287]That Khanna's allegations came forth only contemporaneously with a contentious employment dispute, after Khanna had failed to take affirmative action when the transactions occurred, makes the Court less willing to draw a distinction for these Plaintiffs.

FN287.*See* Pls.' Ans. Br. to Dirs.' Mot. to Dismiss at 27.

Moreover, in response to Khanna's letter, Covad appointed a special committee to investigate whether there was any substance to his claims. An independent law firm was then retained by the committee to aid its investigation.[FN288] The committee, comprised of Crandall, Runtagh, and Jalkut, [FN289] directors whom the Court has already determined are disinterested and independent, informed Khanna of its conclusion that the allegations had no merit on December 26, 2002.[FN290]Khanna's allegations, the investigation, and the investigation's conclusions were disclosed in Covad's March 2003 10-K.[FN291] In view of Covad's actions, then, to require more would constitute self-flagellation. Because the Court finds that the Plaintiffs' 2003 Proxy disclosure claim does not, in this instance, properly state a claim for omitted material facts, it must also be dismissed.

FN288. Amended Compl. at ¶ 133 (quoting Covad's March 2003 10-K).

FN289. The Amended Complaint provides that the Covad Board determined, on July 18, 2002, that Crandall and Runtagh "had the authority to add" Jalkut to the investigation committee. *Id.* at ¶ 126.It also alleges that Jalkut's appointment "most likely" occurred "after Khanna's September 2002 meetings with counsel for the Committee," but before February 19, 2003, when Khanna was informed of Jalkut's appointment. *Id.* at ¶ 130.

FN290. Amended Compl. at ¶ 133.

FN291.*Id.* at ¶¶ 133.The Amended Complaint also provides that similar disclosures were made in Covad's May 2003 10-Q. *Id.* at ¶ 204.

## VIII. MOTIONS TO CONTINUE TO SEAL/ UNSEAL THE RECORD AND TO STRIKE PORTIONS OF THE AMENDED COMPLAINT

The Court now turns to motions addressing whether certain allegations should be given confidential treatment.

*A. Motion to Strike Portions of the Amended Complaint*

*1. Whether the Amended Complaint Contains Privileged Information*

Covad maintains that Paragraphs 52, 54, 55, and 57 of the Amended Complaint contain privileged information. Rule 502 of the Delaware's Rules of Evidence defines the attorney-client privilege:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client ... between the client or the cli-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

ent's representative and the client's lawyer or the lawyer's representative....[FN292]

> FN292.DEL. R. EVID. 502(b)(1). Although Khanna's professional obligations may be defined by California, the parties have pointed to no material difference between the lawyer conduct rules of California and Delaware.

In order for the communication to be confidential, the communication must not have been "intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication ."[FN293]Although the identity of one's attorney is usually not privileged,[FN294] the subject matter of the communications is privileged.

> FN293.DEL. R. EVID. 502(a)(2).

> FN294.*See, e.g., Gotham Partners v. Hallwood Realty,* 1999 WL 252377, at *1 (Del. Ch. Mar. 31, 1999) ("Neither the status nor identity of an attorney whose communications are privileged are privileged facts.").

*37 In the case at hand, the Amended Complaint, at times, reveals the subject matter of communications between Covad and Wilson Sonsini Goodrich & Rosati, P.C. ("Wilson Sonsini"), the law firm representing it-namely that the Certive transaction was a possible corporate opportunity for Covad. It is fair to read Paragraphs 52 [FN295] and 54 [FN296] as revealing confidential information-specifically, the general subject matter of Covad's communications with its inside- and outside-counsel.

> FN295. Amended Compl. at ¶ 52 ("Khanna voiced his opposition to the [Certive] deal, and raised with defendant Knowling and [Wilson Sonsini] the issue of Certive being a possible corporate opportunity for Covad."). This paragraph discusses both the

opinions of Khanna, Covad's inside-counsel, of the Certive transaction and the subject matter of Covad's conversations with Wilson Sonsini, its outside-counsel.

> FN296.*Id.* at ¶ 54 ("[T]he Board adopted (with the counsel of the conflicted Wilson Sonsini firm) a corporate opportunity policy which expressly required the prior approval of the Board before a fiduciary of Covad could take a corporate opportunity for himself...."). This reveals that Wilson Sonsini worked with Covad on its corporate opportunity policy, which, of course, reveals the subject matter of Wilson Sonsini's representation of Covad. Furthermore, if the information alleged in the Amended Complaint was gained from Khanna's attendance at the board meeting as General Counsel, then the information may be privileged for this reason as well.

Although paragraphs 52 and 54 reveal the subject matter of Wilson Sonsini's representation of Covad, it is less clear why paragraphs 55 and 57 are privileged. Paragraph 55 states that "[the Board] even disregarded the very obvious conflict of counsel to Covad, Wilson Sonsini, serving as counsel for Certive during the period when McMinn was founding Certive while on Covad's payroll as a full-time employee and representing Certive in the very transaction by which Covad acquired its Certive shares."[FN297]Paragraph 55 then goes on the describe Wilson Sonsini's interest in Certive.[FN298]Neither of these statements is privileged. Moreover, the fact of Wilson Sonsini's representation of Covad during the Certive transaction is not privileged because the identity of one's attorney does not constitute privileged information.[FN299]

> FN297.*Id.* at ¶ 55.

> FN298. The Court notes that Wilson Sonsini's interest in Certive is not privileged because it does not reveal any con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 58
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

fidential information that Covad provided to (or advice received from) Wilson Sonsini. Instead, Paragraph 55 merely discusses Wilson Sonsini's independent ownership interest in Certive. Covad holds no privilege with regard to this information.

FN299.*See supra* note 294 and accompanying text.

Paragraph 57 states that "while at Covad and on Covad's time, and using Covad's outside counsel, Wilson Sonsini, [McMinn] developed and pursued the Certive business opportunity...."[FN300] As with Paragraph 55, Paragraph 57 only reveals the identity of Covad's outside counsel and, therefore, is not privileged.

FN300. Amended Compl. at ¶ 57.

*2. Whether the Privilege was Waived with Regard to the Information in the Amended Complaint*

Because the Court has determined that Paragraphs 52 and 54 contain privileged information, it must now consider whether the attorney-client privilege, with respect these Paragraphs, has been waived by Covad.

The doctrine of waiver is expressly codified by Rule 510 of the Delaware Uniform Rules of Evidence which provides that "[a] person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter."[FN301]

FN301.*The Cove on Herring Creek Homeowners' Ass'n, Inc. v. Riggs,* 2001 WL 1720194, at *2 (Del. Ch. Dec. 28, 2001).

The Court first considers Khanna's argument that Covad waived its privilege by disclosing information to him when he was wearing his "Vice President hat," as opposed to his "General Counsel hat." Khanna cites authority, including *United States v. Vehicular Parking, Ltd.,*[FN302] for the proposition that "legal advice that is merely incidental to business advice may not be protected."[FN303]In *Vehicular Parking,* the court, ruling on the defendants' claims of privilege, held that "the communications in question indicate [that the defendants' attorney] was advising on matters of business. Privilege is not accorded to such communications."[FN304]Privilege as to the communications at issue in that case, however, was not a close call. The court had no difficulty separating the roles of attorney and businessman. As the court explained, "[The set of communications in question] is more than attorney-talk. It is big-as well as basic-business diction."[FN305]

FN302.52 F.Supp. 751 (D.Del.1943).

FN303. Pls.' Ans. Br. in Opp'n to Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. & Mot. to Strike Portions of Am. Deriv. & Class Action Compl. ("Pls.' Ans. Br. to Mot. to Disqualify") at 22.

FN304.52 F.Supp. at 753.

FN305.*Id.; see also*DEL. R. EVID. 502(a)(2) (describing "confidential information" as "disclosure made in the furtherance of the rendition of professional *legal* services" (emphasis added)).

*38 It is significantly more difficult, however, to relate the understanding that "business diction" occurring between an attorney and her client is not privileged to the case at hand. Khanna provides no specific evidence-other than stating that he was a Vice President at Covad-to buttress his assertion that the information Covad deems privileged was obtained outside his legal capacity. Instead, the Plaintiffs cite authority that would place the burden on Covad to demonstrate that the information it wishes to protect was given in Khanna's legal capacity.[FN306]The Court of Appeals in *In re Sealed*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                 Page 59
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

*Case,*[FN307] ruling on a corporation's claim that certain communications were privileged and could not be testified to by its former general counsel, explained that it was "mindful ... that [the general counsel] was a Company vice president, and had certain responsibilities outside the lawyer's sphere. The Company can shelter [the General Counsel's] advice only upon a clear showing that [the General Counsel] gave it in a professional legal capacity."[FN308]The Court of Appeals also explained, however, that "advice does not spring from lawyers' heads as Athena did from the brow of Zeus,"[FN309] and, since some nonlegal background is necessary for lawyers to give legal advice, the mere mention of nonlegal information does not negate the attorney-client privilege.[FN310]

> FN306.*See, e.g., In re Sealed Case,* 737 F.2d 94, 99 (D.C.Cir.1984) ("The Company can shelter [in-house counsel's] advice only upon a clear showing that [in-house counsel] gave it in a professional legal capacity.").

> FN307.737 F.2d 94 (D.C.Cir.1984).

> FN308.*Id.* at 99;*see also id.*("It remains the claimant's burden, however, to present to the court sufficient facts to establish the privilege; the claimant must demonstrate with reasonable certainty that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure."(citations omitted)).

> FN309.*Id.*

> FN310.*Id.*

*In re Sealed Case* was written in the context of the attorney and client, on the same side of litigation, trying to protect privilege. It was *not* written in the context of the attorney trying to break the attorney-client privilege. In other words, *In re Sealed Case* deals with an attorney and client attempting to deploy the attorney-client privilege as a shield, not an attorney trying to break the privilege and use the information as a sword. Given the importance this Court places on the attorney-client privilege and an attorney's ethical duties to his former client,[FN311] in the situation where an attorney is seeking to use potentially privileged information as a sword against a former client, the inquiry has been framed as:

> FN311.*See, e.g., Continental Ins. Co. v. Rutledge & Co., Inc.,* 1999 WL 66528, at *1 (Del. Ch. Jan. 26, 1999) ("The importance of the attorney-client privilege is central to the American model of adversarial litigation.").

whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject of this subsequent representation. [The Court] will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.[FN312]

> FN312.*T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268-69 (S.D.N.Y.1953). This Court has previously followed portions of *T.C. Theatre Corp.*-namely its "substantial relationship" test. *See Ercklentz v. Inverness Mgmt. Corp.,* 1984 WL 8251 (Del. Ch. Oct. 18, 1984).

In the present litigation, because Khanna served as General Counsel of Covad, it can reasonably be inferred that Khanna received information regarding the Certive transaction in his legal capacity. Furthermore, Khanna's response on learning information regarding the transaction was of a legal nature, FN313 which leads one to infer that the information was provided to him in the context of seeking legal advice. Finally, the fact that, as Khanna claims, he was "told to leave the meeting when the Board was ready to *discuss* and vote on the Board's ratification

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 60
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

of the McMinn and Crosspoint investments in Cert-ive"[FN314] leads one to believe that his *business* opinion was not valued (even for discussion purposes) and, thus, it is unlikely that he would have originally been given the information to provide a business opinion. For these reasons, the Court finds Khanna's argument, that the information in Paragraphs 52 and 54 of the Amended Complaint is not privileged because he was wearing his "Vice President hat" when he learned the information, to be unpersuasive.

> FN313.*See* Amended Compl. at ¶ 52 (noting that Khanna voiced his opposition to the deal as a possible corporate opportunity and objected to Shapero sitting on the board of a competitor).

> FN314.*Id.* at ¶ 53 (emphasis added).

*\*39* The only issue remaining, with regard to whether Paragraphs 52 and 54 are privileged, is whether Covad waived its privilege through disclosure during the § 220 trial.[FN315]The Court addresses Paragraph 52, first.

> FN315.*See supra* note 301, and accompanying text.

This Court has previously held that the attorney-client privilege does not apply "when the party holding the privilege waives the privilege in one of two basic ways: (1) the party injects the communications into the litigation, or (2) the party injects an issue into the litigation, the truthful resolution of which requires an examination of the confidential communications."[FN316]Additionally, the "attorney-client privilege may be waived by the public disclosure of information that was formerly confidential."[FN317]A fair reading of Joint Exhibit 119 from the § 220 trial, which is a letter from Khanna's counsel to an attorney for a subcommittee of Covad's Board, demonstrates that Covad waived privilege with respect to Paragraph 52. Covad used Joint Exhibit 119 at the § 220 trial. Perhaps Covad's intent was to introduce only letter itself and not the

subsequent chronology (authored by Khanna) attached to the letter. Permitting Covad to introduce the document as evidence at the § 220 hearing, and then allowing Covad to shield an integral and incorporated attachment to that document (and clearly referenced in the document itself),[FN318] would defeat the purpose of the "inject into litigation" exception to attorney-client privilege.[FN319]Joint Exhibit 119 clearly references, on multiple occasions, the attachment; and the letter can be viewed as a summary of that attachment. Since the attachment was so integral to the letter, the introduction, by Covad, of part of Joint Exhibit 119 into litigation waives the attorney-client privilege as to the entire document. Thus, the Court concludes that Paragraph 52 does not contain any currently privileged information because privilege was waived.

> FN316.*Baxter Int'l, Inc. v. Rhone-Poulenc Rorer, Inc.,* 2004 WL 2158051, at *3 (Sept. 17, 2004).

> FN317.*Texaco, Inc. v. Phoenix Steel Corp.,* 264 A.2d 523, 525 (Del. Ch.1970).

> FN318. JTX 119 (Letter from Grellas to Poss, at 1 (9/10/2002) ("We have attached a detailed chronology prepared by Mr. Khanna....")).

> FN319. According to *Baxter Int'l*:"The [inject into litigation] exception is based on the principles of waiver and of fairness, so that the party holding the privilege cannot use it as both a sword and a shield."2004 WL 2158051, at *3.

Waiver issues with regard to Paragraph 54 are relatively easy to resolve. The information alleged to be privileged (*i.e.,* Wilson Sonsini's involvement in shaping Covad's Corporate Opportunity Policy) can be inferred from documents produced by Covad in the § 220 production. Specifically, document LWDK 0003485 contains the policy, and document LWDK 0003473 lists the attendees at the board meeting at which the policy was adopted. This list

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                          Page 61
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

includes a Wilson Sonsini attorney, acting as sec-
retary. These two facts, made available through the
§ 220 production, lead to the inference that the Co-
vad Board adopted its Corporate Opportunity
Policy with the advice of a Wilson Sonsini attorney,
who was present at the meeting.

In conclusion, the information in Paragraphs 55 and
57 of the Amended Complaint is not protected by
the attorney-client privilege. Covad placed the in-
formation contained in Paragraph 52 into litigation
and, thus, waived attorney-client privilege with re-
gard to the pertinent documents. Finally, the in-
formation contained in Paragraph 54 can be de-
ciphered from the documents produced in the § 220
production. For these reasons, the Court denies Co-
vad's motion to strike Paragraphs 52, 54, 55, and 57
from the Amended Complaint.

### B. Motions to Seal/Unseal the Amended Complaint

*40 Much of the briefing with regard to sealing and
unsealing overlaps the Court's analysis, above, con-
cerning the motion to strike portions of the
Amended Complaint. Specifically, Covad argues
that the Amended Complaint should remain sealed
because Paragraphs 52, 54, 55, and 57 contain priv-
ileged information and Paragraphs 43, 44, and 74
contain trade secrets and unnecessarily embarrass
Covad executives and board members.

The sealing of Court records is addressed in Court
of Chancery Rule 5(g), which states:

   (1) Except as otherwise provided in this Rule ...
   all pleadings and other papers ... filed with the
   Register in Chancery shall become a part of the
   public record of the proceedings before this Court.

   (2) Documents shall not be filed under seal un-
   less and except to the extent that the person seek-
   ing such filing under seal shall have first ob-
   tained, for good cause shown, an order of this
   Court specifying those documents ... which

should be filed under seal; provided, however,
the Court ... may determine whether good cause
exists for the filing of such documents under
seal.FN320

   FN320.CT. CH. R. 5(g)(1)-(2); see also
   Romero v. Dowdell, C .A. No. 1398-N, slip
   op. (Del. Ch. Apr. 28, 2006).

For the reasons discussed above, the challenged
portions of the Amended Complaint do not contain
currently privileged information. It necessarily fol-
lows that the record should not be sealed on this
basis. Additionally, this Court is unable to determ-
ine what are the "trade secrets" revealed by Para-
graphs 43, 44, and 74. Although these Paragraphs
perhaps reveal some internal matters at Covad, they
are relevant to the Plaintiffs' case and simply are
not sufficiently sensitive to counteract the strong
policy reasons as to why the record is presumed to
be public unless good cause is shown as to why it
should be otherwise. Additionally, although per-
haps Marshall's admission of a mistake is embar-
rassing, this information, disclosed in Paragraph 74,
is relevant to the Plaintiffs' claim in that a member
of Covad's board thought the BlueStar transaction
was a disaster and yet Covad, as alleged, unneces-
sarily made a performance-based earn-out payment
to BlueStar's former shareholders. While perhaps
embarrassing, it is nonetheless relevant. An unfor-
tunate consequence of litigation is that information
sometimes surfaces that parties would prefer to
keep in the dark.FN321 Sealing any complaint that
contains mildly embarrassing information would
defeat the presumption, set forth in Rule 5(g), that a
record is public unless good cause is shown as to
why it should be sealed.

   FN321. See Romero, C.A. No. 1398-N, slip
   op. at 5-7.

Therefore, the Court denies Covad's Motion for the
Continued Sealing and Resealing of Documents and
grants the Plaintiffs' Cross-Motion to Unseal the
Record.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 62
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

## IX. DISQUALIFICATION OF THE PLAINTIFFS

The remaining issue for the Court to address is Covad's motion to disqualify Khanna, Sams, and Meisel as derivate and class plaintiffs in this action. This motion presents two questions: first, whether Khanna may continue as a representative plaintiff in the litigation; and second, if the Court finds Khanna not a proper representative plaintiff, whether Sams and Meisel may nevertheless continue as plaintiffs. The Court addresses these issues in turn, below.[FN322]

> FN322. The Court, in considering whether each of the Plaintiffs may bring this case, is not restricted solely to the face of the Amended Complaint and documents incorporated into it. When necessary, the Court may, in this context, look to affidavits submitted by the parties, as well as documents and testimony submitted as part of the related, earlier § 220 action. *But cf. Canadian Commercial Workers Indus. Pension Plan v. Alden,* 2006 WL 456786, at *8-*9 (Del. Ch. Feb. 22, 2006) (applying summary judgment standard in that instance).

**\*41** Khanna served as Covad's General Counsel for approximately six years, until mid-2002 when he was relieved of his duties. The parties adopted an overtly hostile posture soon thereafter.[FN323] During his time at Covad, Khanna served as a senior executive with supervisory responsibilities over Covad's legal department, in addition to the matters on which he worked directly. Khanna was Covad's General Counsel during the relevant periods for all of the challenged transactions.[FN324]

> FN323.*See, e.g.,* JTX 123 (June 19, 2002 letter to Covad Board from Khanna's counsel).

> FN324. The Dishnet Subscription Agreement was dated February 15, 2001, and the Dishnet Settlement was entered into by Covad in February 2002. *See* Amended

Compl. at ¶¶ 86, 92. Khanna was told of the charges of sexual impropriety against him on May 9, 2002, *see* JTX 106; JTX 123 at 8, and suspended from his position the following month.

Plaintiffs seeking to maintain derivative claims must satisfy the adequacy requirements implicit in Court of Chancery Rule 23.1.[FN325]"[A] derivative plaintiff serves in a fiduciary capacity as representative of persons whose interests are in plaintiff's hands and the redress of whose injuries is dependent upon her diligence, wisdom and integrity."[FN326]In a challenge to a particular plaintiff's adequacy, however, the burden rests with the defendant.[FN327]"The defendant must show a substantial likelihood that the derivative action is not being maintained for the benefit of the shareholders."[FN328]

> FN325.*See, e.g., Youngman v. Tahmoush,* 457 A.2d 376, 379 (Del. Ch.1983). The analysis of the Plaintiffs' capacity to serve as derivative plaintiffs will, in this instance, be the same as the analysis of the propriety of their service as class representatives. *See, e.g., In re Fuqua Indus. S'holder Litig.,* 752 A.2d 126, 129 n. 2 (Del. Ch.1999) ( "[A]nalysis of adequacy requirements is generally the same under Rules 23 and 23.1 as cases decided under Rule 23(a)(4), *i.e.,* the adequacy requirement of Rule 23, may be used in analyzing the adequacy requirements of Rule 23.1."(citations omitted)).

> FN326.*In re Fuqua Indus.,* 752 A.2d at 129 (citing *Katz v. Plant Indus., Inc.,* 1981 WL 15148, at *1 (Del. Ch. Oct. 27, 1981)).

> FN327.*See Emerald Partners v. Berlin,* 564 A.2d 670, 674 (Del. Ch.1989).

> FN328.*Id.; see also Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *8.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 63

A number of factors may be considered in determining whether a plaintiff is deemed "adequate" for these purposes:

(1) economic antagonisms between the representative and the class;

(2) the remedy sought by plaintiff in the derivative litigation;

(3) indications that the named plaintiff was not the driving force behind the litigation;

(4) plaintiff's unfamiliarity with the litigation;

(5) other litigation pending between plaintiff and defendants;

(6) the relative magnitude of plaintiff's personal interests as compared to her interest in the derivative action itself;

(7) plaintiff's vindictiveness toward defendants; and

(8) the degree of support plaintiff was receiving from the shareholders she purported to represent.FN329

FN329.*In re Fuqua Indus.,* 752 A.2d at 130.

This list, however, is not exhaustive.FN330"Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1...."FN331 It is possible that the inadequacy of a plaintiff may be concluded from a "strong showing of only one factor [; however,] that factor must involve some conflict of interest between the derivative plaintiff and the class."FN332

FN330.*See Katz,* 1981 WL 15148, at *2 (explaining that the factors are "[a]mong the elements which the courts have evaluated").

FN331.*Id.,* at *2 (quoting *Davis v. Comed, Inc.,* 619 F.2d 588, 593-94 (6th Cir.1980); *see also In re Fuqua Indus.,* 752 A.2d at 130 n. 5.

FN332.*In re Fuqua Indus.,* 752 A.2d at 130;*see also Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *8 (explaining that "economic" conflicts are often the primary consideration); *Youngman,* 457 A.2d at 379 (noting exception that "fact that the plaintiff may have interests which go beyond the interests of the class, but are at least co-extensives with the class interest, will not defeat his serving as a representative of the class"). The Court in *Youngman* also explained that "purely hypothetical, potential or remote conflicts of interests never disable the individual plaintiff."*Id.* (citation omitted).

The Court finds Khanna an inadequate representative plaintiff, one who must therefore be disqualified, for two principal reasons.FN333First, *Ercklentz v. Inverness Management Corp.*FN334 effectively controls disposition of this issue. In *Ercklentz,* the Court granted the defendants' motions to disqualify the plaintiff's law firm, which had formerly represented the defendant corporation, and the plaintiff, who had formerly served as general counsel (and director) of the defendant corporation. In granting the motion to disqualify the plaintiff, the Court ruled that "the ethical considerations which bar an attorney from acting as counsel against his former client also preclude him from acting as a class or derivative plaintiff against his former client."FN335The Court determined that, because the general counsel's former representation of his corporate employer involved issues that were "substantially related" to the claims he sought to assert derivatively, the plaintiff would be disqualified.FN336The parties agree that this is the standard to be applied.FN337

FN333. The Court's analysis addresses only the issue of whether Khanna may

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                   Page 64
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

serve a representative plaintiff, which implicates considerations distinct from affording an attorney the opportunity to vindicate rights *personal to him. See, e.g., Doe v. A Corp.,* 709 F.2d 1043 (5th Cir.1983) (disqualifying former in-house attorney as representative plaintiff in suit against former corporate employer, but permitting him to continue suit asserting personal cause of action).

FN334.1984 WL 8251 (Del. Ch. Oct. 18, 1984).

FN335.*Id.* at *4 (citing *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382 (3d Cir.1972); *Doe,* 709 F.2d 1043).

FN336.*See Ercklentz,* 1984 WL 8251, at *4-*5;*see also*DELAWARE LAWYERS' RULES OF PROFESSIONAL CONDUCT ("D.L.R.P.C.") 1.6, 1.9. *Cf. Richardson,* 469 F.2d 1382;*Doe v. A Corp.,* 330 F.Supp. 1352 (S.D.N.Y.1971), *aff'd sub nom., Hall v. A Corp.,* 453 F.2d 1375 (2d Cir1972).

FN337.*See* Pls.' Ans. Br. to Mot. to Disqualify at 15; Mem. in Supp. of Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. ("Covad's Op. Br. to Disqualify") at 8.

**\*42** To determine whether matters are "substantially related" for purposes of a conflict of interest with a former client the Court must evaluate: the nature and scope of the prior representation at issue; the nature and scope of the present lawsuit against the former client; and whether during the course of the previous representation the client may have disclosed confidential information that could be used against the former client in the current lawsuit. Matters may be substantially related if they involve the same transaction or legal dispute or there is substantial risk that confidential information obtained in the former representation could materially advance the client's position in the current matter. The former client is not required to reveal specific details of the information shared with the attorney, rather the Court may determine whether information regularly shared in that type of representation creates an unavoidable conflict with the current case.FN338

FN338.*Hendry v. Hendry,* 2005 WL 3359078, at *4 (Del. Ch. Dec. 1, 2005) (citing *Sanchez-Caza v. Estate of Whetstone,* 2004 WL 2087922, at *3 (Del.Super.Sept. 16, 2004))); D.L.R.P.C. 1.9 cmt. 3.

In the parties' briefs, much is made of the effect of language from *T.C. Theatre Corp.,* which is quoted by the Court in *Ercklentz:*"In cases of this sort the Court must ask whether it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject of his subsequent representation."*Ercklentz,* 1984 WL 8251, at *2 (quoting *T.C. Theatre Corp.,* 113 F.Supp. at 269 (emphasis added)). In *Ercklentz,* the Court noted that this test set forth a strict standard that, although followed by the Third Circuit, *see Richardson,* 469 F.2d at 1385, had been modified by the Second Circuit, which instead required that the "issues involved in the two representations have been 'identical' or 'essentially the same' " in order to find that a substantial relationship existed. *Ercklentz,* 1984 WL 8251, at *2. Ultimately, the Court concluded that it need not decide which standard to apply, since the defendants had met the higher burden of demonstrating that the two representations were essentially the same. *See id.* at *4; *see also*ABA Formal Op. 99-415 (Sept. 8, 1999) ("Representation Adverse to Organiza-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                    Page 65
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

tion by Former In-House Lawyer") (describing, in Part A(2), tests for "same or substantially related matters," and indicating approval of Second Circuit formulation).

The standard articulated in Comment 3 of D.L.R.P.C. 1.9, adopted in response to revisions of the ABA's Model Rules of Professional Conduct following the report of the ABA's Ethics 2000 Commission, appears to craft a middle approach between the two previously competing tests described above. *See also* E. Norman Veasey, *Ethics 2000: Thoughts and Comments on Key Issues of Professional Responsibility in the Twenty-First Century,* 5 DEL. L.REV. 1, 13 (2002).

Specifically, Comment 3 to D.L.R.P.C. 1.9 provides that "[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services."Additionally, "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation."FN339These principles govern the Court's analysis of whether Khanna's prior representation of Covad as its General Counsel is substantially related to the matters at issue in the present litigation.

FN339.D.L.R.P.C. 1.9 cmt. 3.

The Plaintiffs' principal argument as to why Khanna should not be disqualified is that the information he received regarding the challenged transactions was in his capacity as an officer and shareholder of Covad, and not as Covad's General Counsel.FN340The Plaintiffs contend that Khanna's

duties as General Counsel were primarily related to telecommunications regulatory work and that Covad's board members actively sought to "keep Khanna 'out of the loop' " with respect to the challenged transactions.FN341The Plaintiffs add that Khanna "was wholly preoccupied with hotly contested telecommunications regulatory matters and related litigation" and that, even if the board had not kept him " 'out of the loop,' the reality is that he likely still would not have even had time to participate in the transactions as counsel." FN342

FN340.*See* Pls.' Ans Br at 16 (citing Amended Compl. at ¶¶ 108-11).

FN341. Pls.' Ans. Br. to Mot. to Disqualify at 16, 22.

FN342.*Id.* at 16 n. 3.

These arguments are not persuasive, however, in light of Khanna's status as Covad's senior in-house counsel. In his testimony at the § 220 trial, Khanna claimed that he "owned" corporate governance issues for Covad and that he would have had a "role to play" in such areas.FN343Indeed, Khanna's Original Complaint sets forth that, as General Counsel, he was "charged with the role of reviewing all conflict of interest matters for Covad.FN344Khanna's June 19, 2002 letter to the Covad Board states that, with respect to the BlueStar acquisition: "Mr. Khanna had seriously objected, both on pure legal grounds (concerning the Clayton Act violations) and on legal/business grounds (waste and self-dealing)."FN345

FN343. Trial Tr. 121, 136-37.

FN344.*See* Original Compl. at ¶ 40.

FN345. JTX 123.

*43 Khanna's contention that board members did not solicit his advice does not dampen the Court's concerns as to the source of his information and the circumstances under which he obtained it. The Court finds that a "substantial risk" exists that an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 66
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

attorney in Khanna's position would, in the ordinary course, have learned confidential information relating to the challenged transactions. This concern is supported by the fact that Khanna, acting as board secretary, signed the minutes of the June 15, 2000 Covad board meeting at which the BlueStar acquisition was approved.[FN346]The Plaintiffs argue that Khanna was ordinarily excluded from board meetings when transactions of this nature were approved; however, the Plaintiffs cite only to board minutes regarding the Certive transaction.[FN347]Although it is the Defendants' burden to demonstrate that disqualification should occur, the Court concludes that this burden has been satisfied with respect to demonstrating a "substantial risk" that Khanna learned confidential information relating to the present litigation.[FN348]Moreover, document LDWK 0002012, an email from Knowling to several Covad employees, including Khanna, dated May 21, 2000, more than two weeks before the Board's vote, states, "Here is the game plan. I've asked Bear Stearns to move forward with BlueStar ASAP with an objective to come to terms on a deal this week. Tim, *Drhuv*, Davenport and Lach *are the handlers on this transaction.*"[FN349]It is unreasonable for Khanna now to argue that he was not involved with the BlueStar acquisition (claiming to have been fully engaged in regulatory matters or otherwise kept in the dark by the Covad Board about what was a major transaction, even though he served as Covad's General Counsel).

FN346.*See* JTX 117.

FN347. Moreover, even assuming, *arguendo*, that Khanna was excluded during the portions of the meeting discussing the BlueStar transaction, this would not diminish the substantial risk (indeed, likelihood) that Khanna learned confidential information either before his temporary absence or after rejoining the Board's meeting.

FN348. The Plaintiffs also argue that, unlike in *Ercllentz*, Khanna was not a member of the board and did not approve of the challenged transactions. That, however, is not a requirement for disqualification.

FN349. Calder Decl., Ex. R. (emphasis added).

In this instance, the issue of adequacy as a representative plaintiff, however, is not confined exclusively to Khanna's ethical responsibilities as Covad's former General Counsel. Indeed, the Court need not embrace here a *per se* rule of disqualification applicable to former in-house lawyers as representative plaintiffs.[FN350]Additional factors support, under these circumstances, the Court's decision that, with respect to Khanna, a substantial likelihood exists that the representative action is "not being maintained for the benefit of the shareholders."Specifically, Khanna's employment dispute with Covad has impaired Khanna's capacity to vindicate shareholders' best interests. The June 19, 2002 letter to the Covad Board, demonstrates a self-interested motivation that is not consistent with the continued pursuit of a derivative and class action by this plaintiff-a plaintiff on whom the Covad shareholders would be relying. The June 19, 2002 letter makes clear that Khanna's initial motive in threatening to bring the action was to provide leverage in his attempt to regain (and enhance) his position at Covad after his suspension as General Counsel. The letter lays out numerous requirements to be imposed on the Covad Board, including that Khanna be appointed to the Covad Board "with a not less than 15-year contract[, subject only to a vote of the general shareholders based on the classified Board seat],""be given a role as Executive Vice President for Corporate Strategy,""be compensated at all times not less than a comparable officer that serves as both an officer and as a director," and be permitted to name five individuals who would report directly to him. None of these requirements inures directly to the benefit of the shareholders, if at all-instead, the benefit is directed almost exclusively, if not solely, to Khanna. The letter continues on to threaten that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 67

FN350. The Court recognizes that, in a de-
rivative suit, relief is not sought from the
company; this distinction was afforded no
substance in *Ercklentz. See* 1984 WL 8251,
at \*4-\*5.

\*44 Mr. Khanna is more than prepared to act to
defend himself, and his reputation for tenacity in
this regard well precedes him. But he does not
desire to light a legal fuse unless his is given no
choice. The choice, then, belongs to the company
and its Board. We can only hope that it is wisely
made.

The Court acknowledges that mere selfish motives
FN351 and past bad behavior FN352 do not neces-
sarily disqualify an individual from serving as a de-
rivative plaintiff. The posture of these parties,
however, demonstrates ample history of bad will
creating a substantial likelihood that Khanna will
not maintain and prosecute the action according to
the best interests of the shareholders.FN353

FN351.*See Youngman,* 457 A.2d at
382.("Though the plaintiff may well have
in part a selfish motive in bringing this ac-
tion, which is not unusual, he will be per-
mitted to continue to act on behalf of [the
class].")

FN352.*See Emerald Partners,* 564 A.2d at
674-75.The Court notes that, in support of
Khanna's argument that his actions during
the initial stages of this litigation should be
overlooked by the Court, Khanna has pur-
ported to waive any employment claims he
may have had against Covad. Trial Tr. at
47. Khanna refers the Court to *Emerald
Partners,* where this Court permitted a
plaintiff who had engaged in "greenmail"
in the past to continue as a derivative
plaintiff because "Emerald further asserts
that it no longer seeks to 'make a quick
buck' from the situation. In support of this
contention, Emerald has presented evid-
ence that it rejected offers of 'greenmail'

payments.... I am not persuaded, therefore
that Emerald is maintaining this suit solely
in its own interest, or that it will be unable
to fairly and adequately represent the in-
terests of ... other shareholders."564 A.2d
at 674-75.However, concerns about
"greenmail" are far different from the con-
cerns surrounding Khanna. The concern
with a derivative plaintiff engaging in
greenmail is that the plaintiff will sell out
too quickly, will not pursue corporate gov-
ernance reform involving the nominal de-
fendant, or will seek personal financial re-
ward at the expense of the corporate enter-
prise to the detriment of shareholders in
general. These concerns are not unfoun-
ded. However, in the greenmail situation,
the prospective plaintiff's goal is economic
in nature and, once a greenmail offer has
been rejected, the concerns discussed
*supra* are not applicable. In the case at
hand, Khanna's objectives are more qualit-
ative in nature. One can reasonably infer
that many of Khanna's issues with Covad's
Board are personal in nature and, there-
fore, the fact that Khanna has offered to
forego these claims carries less weight
than in a less personal situation, such as
one involving greenmail.

FN353. The Plaintiffs also point to the
Court's ruling in the § 220 action that
Khanna's § 220 demand was brought under
a "proper purpose." The Court's ruling in
that context, however, involved different
standards and policies than those con-
sidered in the Court's analysis of Khanna's
adequacy as a representative plaintiff.

In concluding that Khanna must be disqualified as a
representative plaintiff, the Court relies primarily
on Khanna's position as Covad's former General
Counsel and the ethical quagmire that follows. This
result is significantly supported, however, by the
cloud hanging over the litigation created by the tan-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Page 68

gential and acrimonious employment dispute between Khanna and his former employer. Although the existence of a substantial relationship between Khanna's prior representation of Covad and the matters presently at issue is likely sufficient grounds to deem Khanna inadequate as a representative plaintiff under *Ercklentz*,[FN354] the Court ultimately concludes that, as a consequence of these two "intertwined and interrelated" considerations described above, Khanna must be disqualified as a representative plaintiff in this action.[FN355]

> FN354. This conclusion may be viewed as equivalent to the "strong showing" of one factor, demonstrating a conflict of interest, necessary to disqualify a plaintiff as an adequate representative. *See In re Fuqua Indus.,* 752 A.2d at 130.

> FN355. The Defendants have asked that the Court enter an injunction preventing Khanna from further participating in this litigation and from aiding any other persons in bringing their claims, in this context. No evidence has yet been presented to the Court requiring entry of injunctive relief-indeed, the Court's disqualification of Khanna relies in substantial part on the presumption that a danger exists that confidences will be revealed where a "substantial relationship" has been found. The Court presumes that Khanna will conform his behavior with his ethical obligations as a member of the bar; however, the Court may revisit this issue, if necessary.

Covad asserts two grounds for the disqualification of Sams and Meisel, in addition to Khanna: (1) that they are not the "driving force" behind the litigation and (2) that they have been improperly tainted by Khanna. Covad, as movant, must satisfy its burden of demonstrating inadequacy with respect to Sams and Meisel, in addition to Khanna. The evidence before the Court does not, as yet, constitute a sufficient showing of conflict to conclude in this context either that the remaining Plaintiffs are not the

"driving force" behind the litigation,[FN356] or that the same potential taint surrounding Khanna extends to Sams and Meisel.[FN357]Moreover, the Court is not satisfied that the evidence before it merits the disqualification of Sams and Meisel when these factors are viewed together. Counsel for the Plaintiffs have represented to the Court that "there has been no disclosure of privileged information by Khanna to the other plaintiffs or to any of plaintiffs' counsel."[FN358]It is within the Court's discretion, then, to rely on their representations as officers of the Court.[FN359]The Court may, however, reconsider disqualification of Sams and Meisel at a later date, should it become necessary.FN360

> FN356. Although whether a plaintiff is the "driving force" behind litigation is among the factors to be considered in determining adequacy for purposes of Court of Chancery Rule 23.1, *see, e.g., Youngman,* 457 A.2d at 379-80, Covad has yet to present persuasive evidence pointing to more than the potential that Sams and Meisel may not be sufficiently interested and involved to continue with this action. *See, e.g.,* Trial Tr. 54. This potential is insufficient. *Compare Nolen v. Shaw-Walker Co.,* 449 F.2d 506, 508-10 (6th Cir.1971) (finding strong showing of evidence that plaintiff was a front for person in actual control of litigation, who also had ties to corporations with which court concluded that litigation was intended to force nominal defendant to merge), *with In re Fuqua Indus.,* 752 A.2d at 130-36 (denying motion to disqualify, and, although addressing motion to disqualify focusing on one factor and thereby necessitating "strong showing," suggesting that "driving force" factor, in order to impact analysis, requires satisfaction of a fairly demanding burden by defendants).

> Covad's "driving force" arguments would have significant impact were the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

Court to conclude that Sams and Meisel's ability to maintain this action relied solely or in large part on information received from Khanna that was privileged or confidential-this, of course, would implicate considerations addressed with respect to Covad's second basis for arguing that Sams and Meisel should be disqualified, as well. Indeed, Covad contends that Sams and Meisel are not among the contemplated parties having proper access to documents produced as a consequence of the earlier § 220 trial under the Confidentiality Agreement resulting from that action. Covad states that "the Confidentiality Agreement provides that the Discovery Material produced in that action may be made available to ... parties *to that litigation,* i.e., the Section 220 Action.... It provides that additional parties that are joined *in that litigation* may sign the Confidentiality Agreement and thereby receive access to the Discovery Material.... However, plaintiffs Sams and Meisel *were not parties to the Section 220 Action,* and therefore they were *not* eligible to receive the Discovery Material produced in that action."Covad Commc'ns Group, Inc.'s Reply to Pls.' Ans. Br. to Covad Commc'ns Group, Inc.'s Mot. to Disqualify Pls. ("Covad's Reply Br. to Disqualify") at 25-26 (emphasis in original). The Court, however, rejects this argument. The present litigation was initially filed during the pendency of the prior § 220 action, and the Court does not view this as a fair reading of the parties' intent. Given that the Amended Complaint contains no improperly divulged privileged or confidential information and that Sams and Meisel have access to the § 220 action documents, the Court finds Covad's "driving force" arguments unpersuasive on the record before it.

FN357. The Court recognizes the potential for abuse in this context. Khanna's disqualification ultimately results from the Court's consideration of more than one factor. The Court is not, however, persuaded that the case law cited by Covad creates a *presumption* that Khanna's presence has improperly tainted Sams and Meisel, in this context. Meisel has separate counsel. The record is unclear whether Sams is similarly represented by separate counsel. Moreover, much of Covad's argument is premised on its contention that the Amended Complaint contained, and therefore evidenced the improper sharing of, privileged and confidential information; this, however, was rejected by the Court, above.

FN358. Pls.' Ans. Br. to Mot. to Disqualify at 27-28; *see also* Toll Aff., Ex. C at 3; Amended Compl. at ¶ 3 n. 1.

FN359.*See IMC Global, Inc. v. Moffett,* 1998 WL 842312, at *3 (Del. Ch. Nov. 12, 1998) ("Where, as officers of the Court, attorneys can represent the full extent of information flow between them to the Court it is within the Court's discretion to rely on those representations where there is seemingly no danger of intrusion on the fairness of the adjudication process.").

FN360.*See, e.g., Canadian Commercial Workers Indus. Pension Plan,* 2006 WL 456786, at *10.The issue of whether Sams is, and has been, represented by separate counsel may, for example, present a matter for the Court's further consideration with respect to his adequacy as plaintiff when the record on this point is clarified.

## X. CONCLUSION

For the reasons stated above, the Defendants' mo-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                  Page 70
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

tions to dismiss are granted as to Counts I, II, III,
V, VII, VIII, IX, and X of the Amended Complaint;
the motions are, however, denied as to Counts IV
and VI.[FN361]Khanna is dismissed as a representat-
ive plaintiff. In addition, Covad's motion to contin-
ue to seal the record is denied and the Plaintiffs'
cross-motion to unseal the record is granted. Fi-
nally, Covad's motion to strike is denied.

> FN361. Crosspoint's motion to dismiss is,
> however, granted as to the Certive Claims
> asserted in Count VI.

**\*45** IT IS SO ORDERED.

Del.Ch.,2006.
Khanna v. McMinn
Not Reported in A.2d, 2006 WL 1388744 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 11



Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046

**C**
Lewis v. Fites
Del.Ch.,1993.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Harry LEWIS, Plaintiff,
v.
Donald V. FITES, George A. Schaefer, James W.
Wogsland, Charles E. Rager, Frank N. Grimsley,
R.R. Thornton, Lilyan H. Affinito, John W.
Fondahl, Louis V. Gerstner, Jr., Robert E. Gilmore,
James P. Gorter, Walter H. Helmerich, III, Jerry R.
Junkins, Charles F. Knight, Lee L. Morgan, and
Rawleigh Warner, Jr., Defendants,
andCaterpillar, Inc., Nominal Defendant.
**Civ. A. No. 12566.**

Submitted: Nov. 10, 1992.
Decided: Feb. 19, 1993.

**\*\*1048** Kevin Gross, of Rosenthal, Monhait, Gross
& Goddess, P.A., Wilmington, of counsel: Stanley
M. Grossman, Marc I. Gross, and Judith R.
Schneider, of Pomerantz Levy Haudek Block &
Grossman, New York City, and Norman Berman, of
Berman DeValerio & Pease, Boston, MA, for
Plaintiff.
Lawrence A. Hamermesh, of Morris, Nichols, Arsht
& Tunnell, Wilmington, of counsel: Douglas A.
Poe, Franklin P. Auwarter, and Mitchell D. Raup,
of Mayer, Brown & Platt, Chicago, Ill, for defend-
ants.

MEMORANDUM OPINION

BERGER, Vice Chancellor.
**\*1** In this derivative action, a stockholder of de-
fendant, Caterpillar Inc. ("Caterpillar"), alleges that
the company's officers and directors breached their
fiduciary duties in connection with the dissemina-

tion of periodic financial reports. In addition to
Caterpillar, the complaint names as defendants thir-
teen directors, including three present or former of-
ficers, and three other Caterpillar officers who are
not directors of the company. This is the decision
on defendants' motion to dismiss for failure to make
demand pursuant to Chancery Court Rule 23.1.

The facts, summarized below, are drawn from the
complaint and a consent order, referred to in the
complaint, entered by the Securities and Exchange
Commission ("SEC") on March 31, 1992 (the
"Consent Order"). Caterpillar, a Delaware corpora-
tion with operations throughout the world, manu-
factures heavy industrial machinery. The claims in
this case relate to Caterpillar's Brazilian subsidiary,
Caterpillar Brazil, S.A. ("CBSA"). In 1989, CBSA
accounted for approximately 23% of Caterpillar's
net profits, although CBSA's revenues represented
only 5% of Caterpillar's total revenues. CBSA's ex-
ceptional 1989 results were based largely on non-
operating factors such as Brazil's high inflation and
a favorable currency exchange rate. In December,
1989, Brazil **\*\*1049** elected a new President who
was expected to institute economic reforms to curb
inflation.

Caterpillar's management recognized that changes
implemented by the new administration in Brazil
could have a significant impact on CBSA's 1990
performance. Caterpillar reports its financial results
on a consolidated basis and historically manage-
ment had not viewed each subsidiary's profits as re-
liable indicators of its contribution to the parent
company. In January of 1990, however, Caterpil-
lar's accounting department began to analyze
CBSA's performance separately. Management's
analysis was reported to Caterpillar's board at the
February 1990 board meeting. Caterpillar's direct-
ors were told that the situation in Brazil was
"volatile" and that operations in Brazil would have
a significant negative impact on Caterpillar's over-
all results for 1990.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                          Page 2
Not Reported in A.2d, 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046

Approximately two weeks after the February board meeting, Caterpillar filed its 1989 Form 10-K. As in prior years, the 1989 financial results were reported on a consolidated basis. As a result, CBSA's disproportionate impact on Caterpillar's overall profits was not disclosed. The Management Discussion and Analysis ("MD & A") section of the Form 10-K did not provide very much information about Brazil. It stated:

Sales rose 14% in 1989 [in Latin America], the sixth consecutive year of improvement. The biggest gain was in Brazil, where very high inflation rates increased demand for hard goods, including earth moving equipment. (Given the extraordinarily high rate of inflation in Brazil, many contractors preferred to own hard assets, such as equipment, rather than depreciating cruzados.) Toward yearend, however, sales growth in Brazil moderated as interest rates rose.

*2 OUTLOOK

... Sales in Brazil, however, could be hurt by postelection policies which will likely aim at curbing inflation.

Consent Order, p. 6.

On March 15, 1990, Fernando Collor de Mello, Brazil's newly elected President, took office. President Collor immediately instituted sweeping economic changes, including an 80% reduction in the amount of currency in circulation and a plan to devalue the Brazilian currency. The Consent Order describes these reforms as creating an "economic crisis [where] even large companies were unable to meet their payrolls or pay normal trade payables." Consent Order, p. 4. However, the impact of these changes on CBSA did **1050 not become manifest until after the close of its first quarter on March 31, 1990.

At Caterpillar's April 1990 board meeting, management advised the directors that profits in Brazil would be substantially lower in 1990 than they had

been in 1989. Management discussed the likely negative effects of President Collor's new programs, but the 1990 forecast was not revised because management considered the situation in Brazil too volatile and difficult to predict. On May 9, 1990, Caterpillar filed its Form 10-Q for the first quarter of 1990. The MD & A section of that report did not disclose anything about CBSA's anticipated performance. It stated only that demand in Brazil had increased but that Caterpillar continued to be concerned about Brazil's uncertain economic situation.

Caterpillar continued to monitor the impact of Brazil's new policies on CBSA throughout April and May of 1990. By June, Caterpillar had concluded that CBSA would suffer significant losses in 1990 as a result of the Brazilian economic reforms. Accordingly, on June 25, 1990, Caterpillar issued a press release announcing that results for 1990 would be substantially lower than previously projected. Later that day, Caterpillar also disclosed CBSA's importance to the company's 1989 earnings and advised stock analysts that Caterpillar's disappointing results for the second quarter of 1990 were caused largely by circumstances in Brazil. The next day, Caterpillar stock opened at 51 3/4 , down 9 5/8 points from the previous day's opening price.

Following these disclosures, the SEC began an investigation and two class action law suits were filed. The class action suits charged Caterpillar and its management with violations of federal securities laws based upon alleged false statements and omissions in the company's 1989 Form 10-K and first quarter 1990 Form 10-Q. On March 31, 1992, the SEC investigation was concluded by the issuance of the Consent Order in which the SEC found that Caterpillar violated Section 13(a) and Rules 13a-1 and 13a-13 of the Exchange Act. As part of the Consent Order, Caterpillar voluntarily implemented procedures to ensure future compliance with MD & A requirements. The federal court actions are still pending.

Plaintiff claims that the alleged misstatements and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046

omissions in Caterpillar's SEC filings have exposed the company to significant potential liability and that the company is already being injured by the cost of defending the pending class actions. Plaintiff alleges that the individual defendants breached their fiduciary duties by failing to fully disclose material information concerning CBSA and by failing **1051 to maintain adequate controls to assure proper disclosure of the same information. Plaintiff made no demand on Caterpillar's board before instituting this action. Rather, plaintiff alleges that demand would have been futile and, therefore, demand is excused pursuant to Chancery Court Rule 23.1. Defendants moved to dismiss on several grounds. However, in light of my conclusion that plaintiff has not adequately pled demand futility, I will not reach the alternative grounds for dismissal urged by all defendants or the jurisdictional argument raised by those individual defendants who are not also directors of Caterpillar.

*3 The test for determining whether a derivative plaintiff has adequately alleged demand futility is well settled:

(1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

*Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991). The complaint alleges that Caterpillar's directors have been aware of the alleged wrongs for more than two years but have taken no action because they participated in and approved the alleged wrongs and would have to sue themselves. Allegations of this sort offered as an excuse for failure to make demand have been rejected repeatedly. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815, 818 (1984); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984); *Haber v. Bell,* Del.Ch., 465 A.2d 353, 359, 360 (1983). Plaintiff offers two additional factors to buttress his claim that defendant directors

are interested for purposes of the demand requirement. In the complaint, he notes that defendants agreed to the entry of the Consent Order. Since the Consent Order establishes a violation of federal securities law, plaintiff argues that defendant directors are much more likely to be held liable in this case than in a case where there has been no finding of wrongdoing. This heightened threat of personal liability, according to plaintiff, creates a reasonable doubt that Caterpillar's directors are disinterested. Plaintiff also suggested, at oral argument, that several of Caterpillar's directors were interested in withholding information about CBSA because they were then standing for re-election and the undisclosed information would reflect poorly on them.

Neither of these additional facts excuse demand. The Consent Order does not contain any admission of wrongdoing and it does **1052 not include any findings concerning Caterpillar's directors. Thus, the Consent Order does not create a substantial likelihood of director liability. *See Aronson v. Lewis,* 473 A.2d at 815. The fact that three directors were being considered for re-election at the time of the alleged wrongdoing, likewise, fails to excuse demand. First, a majority of the Caterpillar directors were not slated for election at that time and, therefore, were not interested in avoiding disclosures in order to continue on the board. Second, the complaint contains no allegations suggesting that the positions of those directors who were seeking re-election were actually threatened. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

Alternatively, plaintiff argues that demand should be excused because there is a reasonable doubt that the directors' conduct was the product of a valid exercise of business judgment. He argues that Caterpillar's directors engaged in a knowing violation of federal securities laws. Before the two financial statements at issue were filed, the Caterpillar board knew that CBSA's profits in 1990 would be substantially lower than in 1989. Plaintiff describes this as being "obviously" material information that should have been fully disclosed. Plaintiff's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046

Memorandum of Law, p. 15. Plaintiff acknowledges that Caterpillar's general counsel opined on the adequacy of the disclosures before the board approved filing the 1989 Form 10-K. However, plaintiff contends that reliance on outside opinions and reports is not sufficient to insulate the directors as a matter of law. *See Avacus Partners, L.P. v. Brian,* Del. Ch., Civil Action No. 11,001, Allen, C. (October 24, 1990), Mem.Op. at 16. Here, plaintiff suggests that the board's reliance was misplaced in light of the information known to the directors. Accordingly, plaintiff argues that there is a reasonable doubt that the directors' conduct will be protected by the business judgment rule.

*4 The problem with this argument is that it is premised on an assumption that I am not prepared to make. Plaintiff seems to be arguing that because the directors knew of the economic problems affecting CBSA, they also must have known that Caterpillar's MD & A disclosures were inadequate and misleading. The facts set forth in the Consent Order suggest the opposite:

The MD & A sections of the 1989 10-K and 10-Q for the first quarter of 1990 were drafted by employees in Caterpillar's accounting department. Prior to the issuance of those reports, the language of the MD & A was reviewed by the Controller, Financial Vice President, Treasurer, and **1053 the company's legal, economic, and public affairs departments. After that, the language of the MD & A was reviewed by the top officers of the Company.

The board of directors reviewed the final draft of the 1989 Form 10-K, including the MD & A, at the February 1990 board meeting. At that time, the board, including top management who were members of the board, received a written opinion of the company's independent auditor that the financial statements complied with the rules and regulations of the Commission, and also an opinion of the company's General Counsel that the Form 10-K complied with all the rules and regulations of the Commission.

Consent Order, p. 5 (footnotes omitted). While it is true, as plaintiff suggests, that the directors' reliance on these reports does not totally insulate them from potential liability, that reliance certainly is a factor to be considered in deciding whether there is a reasonable doubt as to the applicability of the business judgment rule. Here, there is nothing in the complaint to suggest that the directors' reliance was unreasonable. Accordingly, I conclude that the complaint fails to satisfy the second prong of the demand futility test and that the complaint, therefore, must be dismissed for failure to make demand.

IT IS SO ORDERED.

Del.Ch.,1993.
Lewis v. Fites
Not Reported in A.2d, 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 12

Westlaw.
Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2002 WL 32332753 (D.Del.)

C
Microchip Technology, Inc. v. Motorola, Inc.
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
MICROCHIP TECHNOLOGY, INC., Plaintiff,
v.
MOTOROLA, INC., Defendant.
**No. Civ.A. 01-264-JJF.**

May 28, 2002.

John W. Shaw and Sara Beth A. Reyburn, of
Young, Conaway, Stargatt & Taylor, LLP, Wilm-
ington, Delaware, Edward A. Pennington, of
Swidler, Berlin, Shereff, Friedman, LLP, Washing-
ton, D.C., for Plaintiff, of counsel.
Jack B. Blumenfeld, of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware, Roberta Horton,
Michael Songer, James Walsh, and Jonathan
Hooks, of Arnold & Porter, Washington, D.C., for
Defendant, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Presently before the Court is a Motion To Stay
This Action (D.I.18) filed by Defendant, Motorola,
Inc. (hereinafter "Motorola"). For the reasons set
forth below, Motorola's Motion (D.I.18) will be
granted.

I. BACKGROUND

Plaintiff, Microchip Technology, Inc. (hereinafter
"Microchip") is the owner of a U.S. trademark re-
gistration, which issued in 1981, for the mark
"PIC." (D.I. 22 at 2). Microchip's "PIC" products
are used in industries such as automotive, telecom-
munications, household appliances, and security.
(D.I. 22 at 3). Motorola uses the designation "PIC"
in marketing its products as an acronym for various
terms including "personal interactive communicat-

ors," "program interrupt control-
ler," "programmable interrupt controller," "position
independent code," "personal intelligent commu-
nicator," "PC interrupt controller," and as a portion
of other names and claimed trademarks, such as
"CORE-PIC," "GPIC (Galileo Discovery Program-
mable Interrupt Controller)," and "EPIC
(Embedded Programmable Interrupt Controller)."
(D.I. 22 at 3).

In September 2000, Microchip notified Motorola of
its rights to the "PIC" trademark and requested that
Motorola cease all unauthorized use. (D.I. 22 at 3).
Because Motorola continued to use the "PIC" des-
ignation, on April 24, 2001, Microchip initiated this
action. (D.I. 22 at 3). By its Complaint, Microchip
alleges federal and common law trademark in-
fringement, false designation of origin, trademark
dilution, unfair competition, and deceptive trade
practices. (D.I. 22 at 3). On May 29, 2001, Mo-
torola filed an Answer asserting abandonment as an
affirmative defense, as well as a counterclaim al-
leging that Microchip's "PIC" mark has become
generic, and therefore, the "PIC" registration
should be cancelled pursuant to 15 U.S.C. § 1119.
(D.I. 19 at 2).

Before the parties engaged in any discovery, this
action was stayed for several months pending medi-
ation before Judge Thynge. (D.I. 19 at 2). The me-
diation occurred on November 20, 2001, but was
unsuccessful. (D.I. 19 at 2). On November 28,
2001, Motorola filed a petition with the Trademark
Trial and Appeal Board (hereinafter "TTAB"),
seeking cancellation of Microchip's trademark re-
gistration for "PIC" on the grounds that it is a gen-
eric term for integrated circuit chips. (D.I. 19 at
2-3). On April 9, 2002, the TTAB issued an Order
suspending the TTAB proceedings pending final
disposition of the civil action in this Court.
(D.I.40). The TTAB, however, noted that in the
event this Court "elects to suspend the civil action
to await determination of the Board proceeding, the
Board will go forward with its proceeding."(D.I.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32332753 (D.Del.)

Page 2

40, Ex. A at 3-4).

Subsequent to the unsuccessful mediation, the parties exchanged discovery requests. (D.I. 19 at 3). As of the filing date of Motorola's Motion To Stay (i.e. December 26, 2001), no documents had been produced, no written responses had been served, and no depositions had been noticed or taken. (D.I. 19 at 3). On 2/20/02, the Court entered a Scheduling Order setting 9/13/02 as the discovery cutoff date, 12/15/02 as the deadline for filing dispositive motions, 4/3/03 as the pre-trial date, and 5/12/03 as the trial date. (D.I.29). The parties have since noticed depositions and responded to various interrogatories and document requests.

## II. DISCUSSION

**\*2** Motorola contends that the Court should exercise its discretion and stay this action in order to permit the TTAB to resolve the issue of whether "PIC" is a generic term that is not entitled to trademark protection. (D.I. 19 at 1). According to Motorola, the Court can stay this action by either exercising its inherent power to promote economy of judicial time and effort, or invoking the "primary jurisdiction" doctrine, which "comes into play whenever enforcement of the claim requires the resolution of issues which ... have been placed within the special competence of an administrative body."(D.I. 19 at 3-4); *Driving Force, Inc. v. Manpower, Inc.,* 498 F.Supp. 21, 24 (E.D.Pa.1980); *SeealsoTexace, Inc. v. Borda,* 383 F.2d 607, 608 (3rd Cir.1967). Motorola contends that the TTAB regularly decides issues of genericism and would be a material aid to this Court, as an opinion from the TTAB would significantly expedite the Court's treatment of the issues presented. (D.I. 19 at 60. Specifically, Mortorola contends that if the TTAB determines that Microchip's "PIC" designation is generic, and the Court adopts that determination, this decision would warrant dismissal of Microchip's entire suit. (D .I. 19 at 9). Motorola further contends that a stay would not harm or prejudice either party, since Motorola has been using "PIC"

for many years and there is no expedited proceedings pending in this Court. (D.I. 19 at 13).

In response, Microchip contends that Motorola's reliance on the "primary jurisdiction" doctrine is misplaced. (D.I. 22 at 1). Microchip contends that the "primary jurisdiction" doctrine should only be applied when: 1) uniformity of regulation is appropriate; or 2) there is a need for an initial consideration of the problem by a tribunal with specialized knowledge. (D.I. 22 at 6). Additionally, Microchip contends that the "primary jurisdiction" doctrine should not be applied when the district court proceedings involve issues that would not be present in the TTAB proceeding. (D.I. 22 at 9-10). Because the genericism of the "PIC" designation is not a question that is within the special expertise of the TTAB, and because genericism is only one of several issues pending before this Court, Microchip contends that the doctrine of primary jurisdiction is not applicable. (D.I. 22 at 1-2).

Microchip further contends that it would suffer prejudice in the event a stay is granted, and that a stay would not expedite the proceedings in this action or promote judicial efficiency. (D.I. 22 at 2). Microchip contends that a cancellation proceeding before the TTAB will likely run for years from the time of initiation, and that, regardless of the outcome, TTAB's decision must be reviewed by this court *denovo.*(D.I. 22 at 2, 11). Additionally, Microchip contends that any delay works to its disadvantage in combating genericide, as additional time will only provide Motorola the opportunity to increase its misuse of the "PIC" designation. (D.I. 22 at 14). According to Microchip, the fairest and most efficient course of action is to deny Motorola's Motion To Stay and proceed in this Court, which is capable of resolving all of the issues between the parties. (D.I. 22 at 1-2).

**\*3** After reviewing the parties' arguments and the applicable law on this issue, the Court concludes that Motorola's Motion To Stay (D.I.18) should be granted. A court has the inherent power to stay an action in the interests of efficient and fair resolution

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32332753 (D.Del.)

of the disputed issues. See *Texaco, Inc. v. Borda,* 383 F.2d 607, 608 (3rd Cir.1967). In addition to this inherent power, a court may also enter a stay under the doctrine of primary jurisdiction. Application of the primary jurisdiction doctrine is appropriate when there is a need for an initial consideration of issues by an agency with specialized knowledge, and those issues have been place before that agency by the parties. See *Consolidated Rail Corp. v. City of Dover,* 450 F.Supp. 966 (D.Del.1978). In determining whether to apply the doctrine of primary jurisdiction, courts typically focus on whether the agency's decision could be dispositive of the district court action. See *American Bakeries Co.,* 650 F.Supp. 563 (D. Min 1986) (holding that "the case for permitting the PTO to proceed first is bolstered where the PTO adjudication might serve as a final disposition of the matter"); *Goya Foods v. Tropicana Prods. Inc.,* 846 F.2d 848 (2nd Cir.1988) (holding "if a district court action involves only the issue of whether a mark is entitled to registration [ (i.e., the same issue as was then before the TTAB) ] ..., the doctrine of primary jurisdiction might well be applicable"); *E & J Gallo Winery v. F & P S.p.A.,* 899 F.Supp. 465, 468 (E.D.Cal.1994) (holding that fact that issues raised in TTAB proceeding were "not dispositive" was the "most important" factor in denying a stay).

In this case, a determination that the "PIC" designation is generic, if adopted by the Court, would be dispositive of all of Microchip's claims, as each claim depends on Microchip owning a valid trademark. Additionally, because the TTAB is often called upon to determine whether a commonly-used word or term is generic, the issue of genericism is within the special expertise of the TTAB. See *Continental Airlines, Inc. v. United Air Lines, Inc,* 53 U.S.P.Q.2d 1385 (TTAB Jan. 7, 2000) (holding that the term "e-ticket" for computerized reservation and ticketing services is generic); *In re 3Com Corp.,* No. 74/495, 184, 2000 WL 1182872 (TTAB Aug. 14, 2000) (holding that "ATMlink" for computer network components was generic). Accordingly, despite Microchip's contentions, application

of the primary jurisdiction would not be improper.

In an attempt to convince the Court that a stay would not expedite the proceedings in this action or promote judicial efficiency, Microchip contends that, regardless of the outcome, the TTAB's decision must be reviewed by this Court *denovo.* While Microchip is correct that the Court must review any TTAB decision, Microchip misrepresents the standard by which a TTAB decision is reviewed. The district court's role in reviewing a TTAB decision has been described as "unique," in that the Court acts as both a reviewing body and as a fact-finder. See *CVP Systems, Inc. v. M-Tek Incorporated,* 32 U.S.P.Q.2d 1951 (N.D.Ill.1994); *seealsoLoglan Institute v. Logical Language Group,* 962 F.2d 1038, 1040 (Fed.Cir.1992) (holding that it is "well settled" that a TTAB decision "must be accepted as controlling upon a finding of fact ... unless the contrary is established by testimony which in character and amount carries thorough conviction"). The standard of review has been explained as follows:

*4 It is true that new evidence must itself be considered *denovo* by the district court-in the sense of being fairly weighed without placing a thumb on the scales of dismissing it out of hand. The evidence must then be weighed against the Board's findings under the thorough conviction standard. Unless the new evidence leads to a thorough conviction that a finding of the Board is incorrect, that finding is controlling.

*Spraying Systems Co. v. Delvan, Inc.,* 975 F.2d 387, 391 (7th Cir.1992).

In light of the deference that a district court must give to a TTAB decision under the "hybrid" standard of review and the fact that the genericism of the "PIC" designation is a dispositive issue, the Court concludes that staying this action to await a decision from the TTAB would promote judicial efficiency by either narrowing the issues for trial or making this case ripe for summary judgement. For these reasons, the Court will grant Motorola's Mo-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32332753 (D.Del.)

Page 4

tion To Stay This Action (D.I.18).

III. CONCLUSION

For the reasons discussed, the Motion To Stay This Action (D.I.18) filed by Motorola will be granted.

An appropriate Order will be entered.

*ORDER*

At Wilmington this 28th day of May, 2002, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1) Motorola's Motion To Stay This Action (D.I.18) is *GRANTED;*

2) This case is administratively *CLOSED;*

3) The parties shall promptly notify the Court when the TTAB has reached a decision regarding the genericism of the "PIC" designation.

D.Del.,2002.
Microchip Technology, Inc. v. Motorola, Inc.
Not Reported in F.Supp.2d, 2002 WL 32332753 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 13



Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 890909 (D.Del.), Fed. Sec. L. Rep. P 93,840

**C**
Seinfeld v. Barrett
D.Del.,2006.

United States District Court,D. Delaware.
Frank R. SEINFELD, Plaintiff,
v.
Craig R. BARRETT, Charlene Barshefsky, E. John
P. Browne, D. James Guzy, Reed E. Hundt, Paul S.
Otellini, David S. Pottruck, Jane E. Shaw, John L.
Thornton, David B. Yoffie, Andrew S. Grove, and
Intel Corporation, Defendants.
**No. Civ.A. 05-298-JJF.**

March 31, 2006.

Francis G.X. Pileggi, of Fox Rothchild, LLP,
Wilmington, Delaware. for Plaintiff.
Stephen C. Norman, of Potter Anderson & Corroon,
LLP, Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.
**\*1** Pending before the Court is Defendants' Motion
To Dismiss Based Upon Failure To Comply With
Rule 23.1 (D.I.15), Defendants' Motion To Dismiss
For Lack Of Jurisdiction Over The Subject Matter
(D.I.19), and Plaintiff's Motion For Summary Judg-
ment (D.I.5). For the reasons discussed, all Motions
will be denied.

Background

This derivative lawsuit relates to a Proxy State-
ment, issued by Defendants in March 2005, which
discussed four proposals to be voted on by Intel
Corporation's ("Intel") shareholders: the reelection
of ten of the eleven board members, the approval a
public accounting firm for the year, amendments to
and extension of the 2004 Equity Incentive Plan,
and amendments to and extension of the Executive
Officer Incentive Program ("EOIP"). Plaintiff al-

leges that the Proxy Statement provided that if the
shareholders approved the bonuses listed under the
EOIP, the bonuses would be tax deductible; if the
shareholders did not approve, however, the same
bonuses would be given but they would not be de-
ductible.

On May 16, 2005, Plaintiff filed his Complaint, al-
leging that Defendants violated Section 14(a) of the
Securities Exchange Act of 1934 (and Rule 14a-9
promulgated thereunder) and breached their fidu-
ciary duties under Delaware law. Specifically,
Plaintiff alleges that Defendants made false or mis-
leading statements in the Proxy Statement by rep-
resenting to the shareholders that the company
would receive a tax deduction if the EOIP were ap-
proved. According to Plaintiff, there would be no
deduction, regardless of whether the shareholders
approved the EOIP, because the tax code does not
allow a deduction where the same benefits will be
given to the executive officers even if the share-
holders do not approve the plan. Plaintiff further al-
leges that the Proxy Statement was false or mis-
leading because material terms were omitted, spe-
cifically, the variables used and the amount of the
bonuses for 2005.

On June 7, 2005, Plaintiff filed its Motion For Sum-
mary Judgment (D.I.5). Defendants filed their mo-
tions to dismiss (D.I.15, 19) on June 27, 2005.

Parties' Contentions

By their first Motion (D.I.15), Defendants contend
that Plaintiff violated Federal Rule of Civil Proced-
ure 23.1 and Delaware state law by failing to make
a demand on the Board prior to filing this lawsuit.
By their second Motion (D.I.19), Defendants con-
tend that the Court lacks subject matter jurisdiction
because the claims are not ripe for review. Specific-
ally, Defendants contend that the claims will not be
ripe for review until payments are made under the
2005 EOIP, a tax deduction has been claimed, or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890909 (D.Del.), Fed. Sec. L. Rep. P 93,840

the IRS rules that the deductions would be improper. Finally Defendants contend that the Court should not grant Plaintiff's motion for summary judgment because "[t]here are multiple issues of fact affecting multiple elements of plaintiff's claims" and because Plaintiff is not entitled to judgment as a matter of law. (D.I. 26 at 2).

In response, Plaintiff contends that demand would have been futile due to the Directors' interest and lack of business judgment. Plaintiff further contends that the claims are ripe for review because the claims arose when the allegedly false or misleading statements were made to shareholders. Finally, Plaintiff requests that the Court grant summary judgment on all of its claims because he contends that there are no issues of fact and he is entitled to judgment as a matter of law.

## Discussion

### I. Whether Plaintiff Failed To Comply With Rule 23.1 And Delaware State Law By Failing To Make A Demand On The Board of Directors

*2 Federal Rule of Civil Procedure 23.1 requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort."*Fed.R.Civ.P.* 23.1. Rule 23.1 only goes to the adequacy of a plaintiff's pleadings, however; "[t]he substantive requirements of demand are a matter of state law."*Blasband v. Rales,* 971 F.2d 1034, 1047 (3d Cir.1992).

Under Delaware law, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability."*Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984) (overruled on other grounds). As a result, in considering whether demand would have been futile,

[t]he trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

*Levine v. Smith,* 591 A.2d 194, 205 (Del.1990) (overruled on other grounds). These two inquiries are disjunctive, meaning that if either prong is met, demand is excused. *In re J.P. Morgan Chase & Co. S'holder Litig.,* No. 531-N, 2005 Del. Ch. LEXIS 51, at *28 (Del. Ch. Apr. 29, 2005).

Under the first prong, "directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal financial benefit from the transaction not equally shared by the shareholders."*Blasband,* 971 F.2d at 1048. A director lacks independence when a director's decision is based on extraneous influences, rather than the merits of the transaction. *Id.* In order for a court to find that demand is futile due to director interest or a lack of independence, a majority of the board of directors, or one-half of an evenly-numbered board, must be interested or lack independence. *Beam v. Stewart,* 845 A.2d 1040, 1046 n. 8 (Del.2004).

If the first prong is not satisfied, there is a presumption that the board's actions were the product of a valid exercise of business judgment. *Id.* at 1049.Thus, to satisfy the second prong, a plaintiff must plead sufficient particularized facts to "raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."*In re J.P. Morgan Chase & Co.,* 2005 Del. Ch. LEXIS 51, at *39 (quoting *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 286 (Del. Ch.2003)) (citations omitted).

The Court concludes that Plaintiff has failed to plead particularized facts sufficient to overcome the presumption of director disinterest and independ-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890909 (D.Del.), Fed. Sec. L. Rep. P 93,840

Page 3

ence. Plaintiff states that "[t]he entire board is neither disinterested nor independent since every member of the board is liable for violation of § 14(a) of the Exchange Act, Rule 14a-9, and Schedule 14A."(D.I. 1 at 3). The mere threat of personal liability for approving a board action, however, does not lead to the conclusion that a director is interested or lacks independence. *Aronson,* 473 A.2d at 815. Furthermore, Plaintiff has not alleged any other facts demonstrating that a majority of the Board is interested, nor has he refuted Defendants' contention that the Board of ten members contains, at most, three interested members. (D.I. 16 at 3-4) ("Of Intel's ten current Directors, only one is an officer of the company, and only two are eligible to participate in the 2005 EOIP.").

*3 While Plaintiff has failed to demonstrate that the directors are interested or lack independence, the Court concludes that Plaintiff has pleaded facts sufficient to raise a reason to doubt that the action was taken honestly and in good faith. In his Complaint, Plaintiff alleges that Defendants made a false or misleading statement when they promised tax deductions to shareholders in return for their approval of the EOIP, when, in fact, no tax deduction would result under 26 CFR 1.162-27(e)(4)(I). Plaintiff further alleges that Defendants misled shareholders when they omitted material terms, namely the variables used and the amount of the bonuses for 2005. These allegations could raise issues as to the honesty and good faith of the Directors. Accordingly, the Court concludes that demand on the Board would be futile, and the Court will, therefore, deny Defendants' Motion To Dismiss Based Upon Failure To Comply With Rule 23.1 (D.I.15).

II. Whether The Court Should Dismiss Plaintiff's Complaint For Lack Of Jurisdiction Over The Subject Matter

Having concluded that demand would be futile, the Court must determine whether the Court has subject matter jurisdiction over Plaintiff's claims.

Article III, Section 2 of the United States Constitution requires the existence of a justiciable case or controversy before a federal court may exercise jurisdiction over a matter. *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1462 (3d Cir.1994)."One aspect of justiciability is ripeness which 'determines when a proper party may bring an action." ' *Philadelphia Fed'n of Teachers v. Ridge,* 150 F.3d 319, 323 (3d Cir.1998) (quoting *Travelers Ins. Co. v. Obusek,* 72 F.3d 1148, 1154 (3d Cir.1995)) (citations omitted).

The United States Supreme Court has established a two-part inquiry for determining whether a case is ripe for review. Under this two-part inquiry, a court must look to (1) "the fitness of the issues for judicial decision and [ (2) ] the hardship to the parties of withholding court consideration."*Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967). Under the fitness inquiry, a court will consider whether the issues are legal or factual, whether the disputed action is final, whether the claim involves contingent events, and the adversarial nature of the parties' relationship. *Ridge,* 150 F.3d at 323. Under the hardship inquiry, a court looks to "whether the challenged action creates a 'direct and immediate' dilemma for the parties, such that the lack of pre-enforcement review will put the plaintiffs to costly choices."*Id.*

The Court concludes that this case is ripe for review. First, the case is fit for judicial review. The parties are adverse; Plaintiff is a shareholder suing derivatively for false statements allegedly made by Defendants to shareholders. Additionally, the claim does not involve contingent or uncertain events, nor is the claim bound up in the facts. Defendants contend that the case will not be ripe for review until after there are payments under the 2005 EOIP, a tax deduction has been claimed, or the IRS rules that the deductions would be improper. The Court concludes, however, that if Section 14(a) and Rule 14a-9 were violated, they were violated by the making of the allegedly false and misleading statements in order to solicit shareholder approval. *SeeGeneral*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                   Page 4
Not Reported in F.Supp.2d, 2006 WL 890909 (D.Del.), Fed. Sec. L. Rep. P 93,840

*Elec. Co. v. Cathcart,* 980 F.2d 927, 932 (3d Cir.1992). There is no additional requirement that a defendant do anything beyond making the false statement.

**\*4** Second, the Court finds there would be a great hardship to Plaintiff if the Court withholds consideration. The most significant hardship may be the expiration of the statute of limitations. The statute of limitations on claims filed pursuant Section 14(a) expires "one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation."*Westinghouse Elec. Corp. v. Franklin,* 993 F.2d 349, 353 (3d Cir.1993). If the Court delays this action until a tax deduction is claimed or is rejected by the IRS, the statute of limitations may run, and Plaintiff would be unable to assert his claim. Additionally, the Court finds Plaintiff will be harmed if the Court withholds consideration, because the payments, approved by the shareholders due to the allegedly false or misleading statements, will be made in 2006.

Because this case is fit for judicial review and there will be a hardship to Plaintiff if the Court withholds consideration, the Court will deny Defendants' Motion To Dismiss For Lack Of Jurisdiction Over The Subject Matter (D.I.19).

III. Whether The Court Should Grant Plaintiff's Motion For Summary Judgment

Having concluded that Plaintiff did not fail to comply with Rule 23.1 and that the Court does not lack jurisdiction over the subject matter, the Court turns to Plaintiff's Motion For Summary Judgment (D.I.5).

A. *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). In determining whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted). However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

B. *Analysis*

1. *Plaintiff's Claims Under Section 14(a) Of The Securities Exchange Act Of 1934*

**\*5** Plaintiff alleges that Defendants violated Section 14(a) of the Securities Exchange Act of 1934 by making false and misleading statements in the Proxy Statement. In order to prevail on his Section 14(a) claims, Plaintiff must prove that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than a particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.' " *Cathcart,* 980 F.2d at 932.[FN1]The materiality of the misrepresentation or omission is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890909 (D.Del.), Fed. Sec. L. Rep. P 93,840

determined by looking to whether "there is a sub-stantial likelihood that a reasonable shareholder would find the fact significant in deciding how to vote." *Id.*

> FN1. The parties dispute the existence and extent of a "state of mind" requirement. Plaintiff contends that a mental state is not required because he seeks only an injunction, or alternatively, that only negligence is required to prove a violation of Section 14(a). Defendants contend that actual knowledge is required under a safe harbor provision for forward-looking statements. The Court concludes that it need not reach the question of a state of mind requirement because the motion for summary judgment will be denied on other grounds.

a. Whether Plaintiff Is Entitled To Summary Judgment Under Section 14(a) For Defendants' Statement That Payments Under The EOIP Would Be Tax Deductible

The Proxy Statement provided that the purpose of the EOIP was to guarantee that compensation paid to executives over $1,000,000 would be tax deductible under Section 162(m) of the Internal Revenue Code. Section 162(m) provides a deduction for performance-based compensation in excess of $1,000,000, subject to several restrictions. D.I. 5, Ex. 2 at B-1; 26 U.S.C. § 162(m). This deduction is not available, however, if "the compensation would be paid regardless of whether the material terms are approved by shareholders."26 C.F.R. § 1.162-27(e)(4)(i).

Plaintiff contends that the Proxy Statement contained a false or misleading statement because it represented that compensation paid under the EOIP would be tax deductible when it would not be, because the executives would allegedly receive the bonus regardless of whether the shareholders approved the proposal. The Proxy Statement provided in pertinent part:

> If our stockholders do not approve the EOIP at the annual meeting, we will terminate the EOIP plan, and we will not pay any incentives under this plan for the 2005 performance year. However, we expect to make incentive payments to the executive officers in amounts similar to those that would have otherwise been paid under the EOIP; the difference is that we will lose a portion of the tax deductibility that would have otherwise been available to us. The Compensation Committee has not adopted a policy that all compensation paid must be tax-deductible and qualified under Section 162(m) of the Tax Code. If we cannot deduct incentives from our taxes, it will increase the overall cost of these incentive payouts to us and thus to our stockholders through reduced net income.

(D.I. 5, Ex. B at 39).

In arguing that summary judgment should be granted, Plaintiff primarily relies on the Third Circuit's decision in *Shaev v. Saper,* 320 F.3d 373 (3d Cir.2003). In *Shaev,* the Proxy Statement at issue provided that the board of directors "may grant another bonus for fiscal year 2000, a portion of which may not be deductible under Section 162(m)" if the shareholders did not approve the executive compensation plan. (D.I. 5, Ex. 1 at 13). The Court, deciding a motion to dismiss, concluded that this statement "undermined the deductibility of the bonus even if the shareholders approved it."*Shaev,* 320 F.3d at 381. Accordingly, the plaintiff had adequately alleged that the defendants made a false statement by promising a tax deduction if the shareholders approved the executive compensation plan. *Id.* at 384-85.

\*6 The Court concludes that summary judgment is not appropriate at this juncture. First, materiality is a "mixed question of law and fact,"*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 450 (1976), and cannot be decided as a matter of law unless the omission is "so obviously important to the shareholder's decision that reasonable minds cannot differ on the question of materiality and the underlying facts and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890909 (D.Del.), Fed. Sec. L. Rep. P 93,840

inferences to be drawn from those facts are free from controversy."*Gould v. American Hawaiian Steamship Co.*, 535 F.2d 761, 771 (3d Cir.1976). The Court is unable to conclude as a matter of law that tax deductibility was so obviously important that reasonable minds could not differ on the question of materiality.[FN2]

> FN2. Defendants argue that the statement is immaterial because the amount of the tax deduction is small in relation to Intel's revenues for 2005. This is not the standard. The Court must look to whether the statement was material to the shareholder in making its decision, not to whether the amount was material in the overall scheme of company profitability.

Second, the Court concludes that *Shaev* is distinguishable from this case because the allegedly false statements in the Proxy Statement differ from those in *Shaev*.Furthermore, the Court cannot rely on *Shaev* to dispose of the issues here because *Shaev* involved a motion to dismiss and looked only to the adequacy of the plaintiff's pleadings. Here the Court is presented with a motion for summary judgment and, therefore, must look to the merits of the claims. Accordingly, the Court will deny Plaintiff's Motion For Summary Judgment on Plaintiff's claim that Defendants violated Section 14(a) by making a false statement pertaining to the tax deductibility of executive bonuses under the EOIP.

**b. Whether Plaintiff Is Entitled To Summary Judgment Under Section 14(a) For Alleged Omissions From The Proxy Statement**

Plaintiff's original claim was that Defendants violated Section 14(a) by omitting the three variables FN3 used to determine the bonuses and the amount of the bonuses for 2005 from the Proxy Statement. In his reply brief, however, Plaintiff recognized that neither the EPS nor the amount of the bonuses for 2005 would be determined until the end of 2005. (D.I. 68 at 3-4). Thus, the Court will discuss

Plaintiff's claim in light of the other omitted variables.

> FN3. The three variables are the earnings per share ("EPS"), annual incentive baseline amounts, and annual factor for each executive officer. These three variables are used in a mathematical formula to determine the amount of the qualified executive officers' bonuses each year.

The Court concludes that summary judgment cannot be granted. As discussed above, materiality is a mixed question of law and fact. The Court is unable to conclude that the variables were so obviously important that reasonable minds could not differ on their materiality, particularly because the terms were defined and were provided for other years.

Additionally, the Code of Federal Regulations gives a non-exhaustive list of material terms including:

the employees eligible to receive compensation; a description of the business criteria on which the performance goal is based; and either the maximum amount of compensation that could be paid to any employee or the formula used to calculate the amount of compensation to be paid to the employee if the performance goal is attained.

26 C.F.R. § 1.162-27(e)(4)(i). The Proxy Statement provides for each of these terms: the employees eligible to receive compensation are Intel's executive officers; the EOIP includes the formula for calculating the bonuses; and the maximum amount of compensation that can be provided to any employee is $5,000,000. The Court cannot determine as a matter of law whether there were other material terms requiring inclusion. Accordingly, the Court will deny Plaintiff's Motion For Summary Judgment on Plaintiff's claim that Defendants violated Section 14(a) by omitting certain variables for the year 2005 from the Proxy Statement.

**2. *Plaintiff's Claim For Breach Of Fiduciary Duty***

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 890909 (D.Del.), Fed. Sec. L. Rep. P 93,840

*7 Plaintiff contends that the false and misleading statements also give rise to a claim for breach of fiduciary duty. "Under Delaware law, a board of directors is under a fiduciary duty to disclose fully and fairly all material information within the board's control when seeking shareholder action. This disclosure obligation clearly attaches to proxy statements."*State of Wisconsin Inv. Bd. v. Peerless Sys. Corp.,* No. 17657, 2000 Del. Ch. LEXIS 170, *58 (Del. Ch. December 4, 2000) (citing *Stroud v. Grace,* 606 A.2d 75, 84 (Del.1992)). Because the Delaware Supreme Court has adopted the same standard for materiality as that established by the United States Supreme Court in *TSC Industries,* materiality is a mixed question of law and fact.*Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985). As discussed above, the Court concludes that a determination of materiality in this case is inappropriate for consideration on summary judgment. Accordingly, the Court will deny Plaintiff's Motion For Summary Judgment (D.I.5).

### Conclusion

For the reasons discussed, Plaintiff's Motion For Summary Judgment (D.I.5), Defendants' Motion To Dismiss Based Upon Failure To Comply With Rule 23.1 (D.I.15), and Defendants' Motion To Dismiss For Lack Jurisdiction Over The Subject Matter (D.I.19) will all be denied.

An appropriate Order will be entered.

### ORDER

At Wilmington, the *31* day of March 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Plaintiff's Motion For Summary Judgment (D.I.5) is *DENIED.*

2. Defendants' Motion To Dismiss Based Upon Failure To Comply With Rule 23.1 (D.I.15) is *DENIED.*

3. Defendants' Motion To Dismiss For Lack of Subject Matter Jurisdiction (D.I.19) is *DENIED.*

D.Del.,2006.
Seinfeld v. Barrett
Not Reported in F.Supp.2d, 2006 WL 890909 (D.Del.), Fed. Sec. L. Rep. P 93,840

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 14



Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

Page 1

▷
Simon v. Navellier Series Fund
Del.Ch.,2000.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Donald SIMON, an individual and former Trustee
of the Navallier Series Fund, Plaintiff,
v.
THE NAVELLIER SERIES FUND, a Delaware
Business Trust, and the Aggressive Small Cap
Equity Portfolio of the Navellier Performance
Funds, a Delaware Business Trust, Defendants.
No. 17734.

Submitted Aug. 25, 2000.
Decided Oct. 19, 2000.

Ronald A. Brown, Jr. and Thomas A. Mullen, of
Prickett, Jones & Elliott, Wilmington, Delaware;
Vincent P. Finigan, Jr., Gregory L. Lippetz, and Ju-
lie F. Unmacht, of Brobeck, Phleger & Harrison
LLP, San Francisco, California, for Plaintiff, of
counsel.
Henry N. Herndon, Jr., P. Clarkson Collins, Jr., and
Michael A. Weidinger, of Morris, James, Hitchens
& Williams, Wilmington, Delaware; Samuel
Kornhauser, of Law Offices of Samuel Kornhauser,
San Francisco, California, for Defendants, of coun-
sel.

MEMORANDUM OPINION

STRINE, Vice Chancellor.
*1 Defendant Navellier Series Fund (the "Fund"), a
Delaware business trust, [FN1] has moved to dismiss
this suit for indemnification of legal fees and ex-
penses brought by plaintiff Donald Simon, formerly
a trustee of the Fund.

FN1. The Navellier Series Fund is the pre-

decessor in interest to co-defendant Ag-
gressive Small Cap Equity Portfolio of the
Navellier Performance Funds. For ease of
reference, I will refer to the defendants
collectively as "Navellier" or the "Fund"
or "defendant." Like the Navellier Series
Fund, the Aggressive Small Cap Equity
Portfolio is also a business trust.

Simon's indemnification claim arises out of a
breach of fiduciary duty action brought against Si-
mon and certain other trustees by several Fund
shareholders. Simon prevailed at trial in the under-
lying action, which was filed in the United States
District Court for the Northern District of Califor-
nia, and the Fund's appeal of the jury verdict is now
pending before the United States Court of Appeals
for the Ninth Circuit.

The Fund has moved for dismissal of this action on
two alternative grounds: (1) that this court is not the
proper venue for Simon's indemnification claim be-
cause his indemnification agreement with the Fund
provides that the courts of Reno, Nevada shall be
the exclusive venue for any indemnification dis-
putes between Simon and the Fund (the "Venue
Provision"); and (2) that this action is not ripe for
decision pending the Fund's exhaustion of its ap-
peals in California.

After examining the parties' competing contentions,
I conclude that this action must be dismissed in fa-
vor of adjudication by the Reno, Nevada courts, in
accordance with the exclusive forum selection
clause contained in Simon's indemnification agree-
ment with the Fund. I treat the Fund's motion as
falling under Court of Chancery Rule 12(b)(3),
rather than Rule 12(b)(6). Thus, I reject Simon's ar-
gument that I am not permitted to refer to the in-
demnification agreement's Venue Provision because
he pled this indemnification claim based solely on
the Fund's declaration of trust rather than on his
separate indemnification agreement with the Fund
and because the declaration of trust neither contains

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

a venue provision nor incorporates the agreement by reference.

Several considerations lead me to conclude that the indemnification agreement and the declaration of trust together comprise the parties' contract on the subject of indemnification. Chief among these factors are the language of the two instruments and the objective circumstances of their execution, which make clear that the only reasonable interpretation of the Venue Provision is that it would govern all indemnification disputes between the Fund and Simon.

Furthermore, even if this court were the proper venue for Simon's claim, I believe that prudential considerations would favor a stay of this matter pending the final disposition of the Fund's appeal of the verdict in the underlying action.

The following discussion outlines my reasoning in greater detail.[FN2]

> FN2. I note that I reject the Fund's third ground for dismissal: this court's supposed lack of equitable jurisdiction over indemnification claims against Delaware business trusts. While this appears to be a question of first impression, I am confident that equitable jurisdiction exists.

> Unlike the highly specific jurisdictional provision of 8 *Del. C.* § 145(k), vesting the Court of Chancery with jurisdiction over indemnification claims against Delaware corporations, § 3804(g) of Title 12 states more generally that "[t]he Court of Chancery shall have jurisdiction over business trusts to the same extent as it had jurisdiction over common law trusts formed under the laws of the State."12 *Del. C.* § 3804(g).*Compare*8 *Del. C.* § 145(k) ("The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or in-

demnification....").

Nevertheless, this court's jurisdiction over indemnification claims against business trusts by their trustees is made clear by the synopsis of § 3804 which indicates that "the Court of Chancery has jurisdiction over business trusts and any contested matters relating to the *internal affairs of a business trust, the rights, duties and liabilities of trustees and beneficial owners or the interpretation of its governing instrument.*"Substitute No. 1 for Senate Bill No. 332, 138th General Assembly § 4 (1996) (synopsis to 1996 Amendments to Title 12, Chapter 38) (emphasis added).

Here, Simon has based his indemnification claim on a declaration of trust executed pursuant to Chapter 38 of Title 12 and evaluation of his claim will require an "interpretation of [the Fund's] governing instrument," i.e., its declaration of trust. *Id.;* R.F. BALOTTI & J.A. FINKELSTEIN, DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 19.1, at 19-3 (3d ed. 2000) ("The Delaware Court of Chancery has jurisdiction over business trusts and ... the interpretation of the business trust's governing instrument."); *Nakahara v. NS American Trust,* Del. Ch., C.A. No. 15905, mem. op ., Chandler, C. (Mar. 20, 1998) & *Nakahara v. NS 1991 American Trust,* 718 A.2d 518 (1998) (decisions adjudicating claim for advancement and indemnification brought by trustee of business trust pursuant to the trust's governing instrument, but not discussing jurisdictional issue); *see also Bovay v. H.M. Byllesby & Co.,* Del. Ch., 29 A.2d 801, 804 (1943) ("An express trust is within the exclusive jurisdiction of a court of equity...."); *In re Corcoran*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

*Trusts,* Del. Ch., 282 A.2d 653, 655 (1971) (action to enforce trust agreement provision).

### I. *Factual Background*

At the center of this dispute is the Navellier Series Fund, which was formed as a Delaware business trust pursuant to Title 12, Chapter 38. Along with plaintiff Simon, the five original trustees of the Fund were Louis G. Navellier, Kenneth Sletten, Lawrence Bianchi, and John Drinkwater (together, the "Trustees").

### A. *The Underlying Litigation*

**\*2** The parties trace their falling out to the March 13, 1997 action taken by three of the Fund's Trustees - Simon, Sletten, and Bianchi (the "Former Trustees") - to remove Navellier Management, Inc. ("NMI"), an affiliate of their co-Trustee Navellier, as the Fund's investment advisor. The Former Trustees sought to replace NMI with Massachusetts Financial Advisors, another financial advisory firm.

A subsequent shareholder vote on the issue resulted in the reappointment of NMI, however, and the Former Trustees resigned from their offices shortly thereafter. On February 23, 1998, Navellier and certain other stockholders brought suit against the Former Trustees in California (the "Underlying Action"),[FN3] alleging breach of fiduciary duty and harm to Navellier, NMI, and the Fund's shareholders.

> FN3.*McLachlan v. Simon,* 31 F.Supp.2d 731 (N.D.Cal.1998).

After surviving a motion to dismiss, the Underlying Action was tried in June and July of 1998. The jury returned a verdict in favor of the Former Trustees, and judgment was entered in their favor on August 24, 1999. As indicated above, the U.S. Court of Appeals for the Ninth Circuit is now considering Navellier's and the other plaintiffs' appeal of the jury's verdict.

### B. *The Declaration Of Trust And Indemnification Agreements*

The present indemnification dispute turns on the above-mentioned instruments, the "Declaration of Trust of the Navellier Series Fund" (the "Declaration of Trust") and the "Trustee Indemnification Agreement" between the Fund and Simon (the "Indemnification Agreement" or "Agreement").

The Declaration of Trust, which was executed May 6, 1993, indemnifies its trustees, officers, employees, and agents "for any action or failure to act (including, without limitation, the failure to compel in any way any former or acting Trustee to redress any breach of trust) except for his own bad faith, willful misfeasance, gross negligence, or reckless disregard of his duties."[FN4]Section 10.02 of the Declaration of Trust provides that the Fund "shall indemnify each of its Trustees ... against all liabilities and expenses ... reasonably incurred by him ... by reason of his being or having been such a Trustee ... except with respect to any matter as to which he shall have been adjudicated to have acted in bad faith, willful misfeasance, gross negligence, or reckless disregard of his duties."[FN5]

> FN4. Defs.' Ex. A (Declaration of Trust) § 10.01.
>
> FN5.*Id.* § 10.02.

In conjunction with the Declaration of Trust, the Fund entered into separate indemnification agreements with each of the Trustees at the first meeting of the Trustees. These agreements, like the Declaration of Trust, became effective at or around the same time as the Declaration of Trust itself.[FN6]

> FN6. Or as Simon's own brief states: "At the time the former trustees executed the Declaration of Trust, they each were asked to execute five separate instruments entitled Trustee Indemnification Agreement (one each for the five trustees)." Simon's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

Ans. Br. at 5.

Simon's Indemnification Agreement states that "[t]he Fund agrees to indemnify and hold harmless Trustee against any claim ... except to the extent the Trustee has engaged in willful misfeasance, bad faith, gross negligence, or reckless disregard of his obligations."[FN7]The Indemnification Agreement also contains the Venue Provision, which states that "[t]he parties agree that any litigation arising out of this indemnification shall only be brought and heard and shall only be venued in a federal or state court in Reno, Nevada."[FN8]

> FN7. Defs.' Ex. B (Indemnification Agreement) at 1.

> FN8. Defs.' Ex. B (Indemnification Agreement) at 2.

*3 Although the Declaration of Trust and the Indemnification Agreement both refer to the Fund's responsibilities to indemnify the Trustees, Simon purportedly bases the present indemnification claim on the Declaration of Trust alone. Simon's complaint scrupulously avoids any reference to the Indemnification Agreement.

Similarly, one of the other Former Trustees, Sletten, also filed an action for indemnification in California pursuant to the Declaration of Trust alone.[FN9] Judge Orrick of the United States District Court for the Northern District of California dismissed that action in favor of adjudication of the claim by the Nevada courts on the basis that Sletten's indemnification agreement with the Fund contained the same Venue Provision as is in Simon's Agreement. Judge Orrick explained his reasoning for dismissing Sletten's case as follows:

> FN9.*Sletten v. The Navellier Series Fund,* No. C-99-4904 WHO, mem. decision and order (N.D.Cal. Mar. 9, 2000) (Orrick, J.).

Sletten carefully pleads his claims for relief; he purports to seek payment only pursuant to the Declaration of Trust, which contains no forum se-

lection clause. Because the contemporaneous indemnity agreement is mentioned only in passing in his complaint, Sletten argues that the only document at issue is the Declaration of Trust, which does not contain a forum selection clause. Because the indemnity agreement was contemporaneous, however, and because the indemnity agreement involves the same indemnification rights as ... those under the Declaration of Trust, Sletten cannot avoid the fact that his lawsuit implicates the agreement with the forum selection provision.

A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if the gist of those claims is a breach of that relationship ... Here, Sletten's action triggers the forum selection clause in the indemnity agreement even though he avoids mentioning it in his complaint. The Declaration of Trust defines the parties' business relationship, including rights of indemnity. The indemnity agreement is a contemporaneous document signed in consideration of Sletten's agreeing to act as a trustee, and pursuant to the Declaration of Trust. The indemnity agreement derives its life from the Declaration of Trust, and deals specifically with indemnity pursuant to the contract. Sletten's case is therefore one arising out of this indemnification; it is the same indemnification provided for in the Declaration of Trust. Although the reason for having two separate documents to govern the relationship between the parties is not clear, it is apparent that these two documents govern their business relationship.FN10

> FN10.*Id.* at 6-8 (quotations & citations omitted).

II. *The Applicable Procedural Standards*

The parties have spilled a lot of ink over the question of which subsection of Court of Chancery Rule 12 governs the aspect of the Fund's motion to dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

miss that is premised on its contention that the Venue Provision requires that any indemnification dispute between Simon and the Fund be litigated exclusively in the courts of Reno, Nevada.

*4 Therefore, the threshold issue the court must confront is whether the Fund's Venue Provision-based dismissal motion arises under Court of Chancery Rule 12(b)(3) or 12(b)(6). The Fund takes the position that its motion arises under Rule 12(b)(3) and that I may consider materials outside the complaint. But Simon contends that Rule 12(b)(6) applies and that I must hew to the four corners of the complaint or, after proper notice to him, convert the motion into a Rule 56 motion for summary judgment.

For the following reasons, I conclude that the Fund's motion is best considered one made pursuant to Court of Chancery Rule 12(b)(3) rather than Rule 12(b)(6). But, even if Court of Chancery Rules 12(b)(6) and Rule 56 were to apply, the approach I would take in deciding the motion would not change.

As with a motion for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), a motion to dismiss premised on a forum selection clause does not challenge whether the complaint states a claim upon which relief can be granted. Instead, a motion based on a forum selection clause challenges where the plaintiff may assert his claim.

In the *Hart Holding v. Drexel Burnham Lambert*FN11 case, Chancellor Allen persuasively articulated why it is impractical to apply Rule 12(b)(6)'s exclusive focus on the allegations of a complaint to a motion to dismiss for lack of personal jurisdiction. Of overriding importance was the fact that a complaint need not contain allegations sufficient to establish personal jurisdiction and thus it would rarely be possible to adjudicate a Rule 12(b)(2) motion solely by reference to the complaint's allegations.FN12

FN11.Del. Ch., 593 A.2d 535 (1991).

FN12.*Id.* at 538-39.

The same is true in the case of motions to dismiss based on a forum selection clause. It is not the law, at least as far as I know it, that the plaintiff must plead facts demonstrating that there is no contract that precludes the plaintiff from proceeding in the forum it has chosen. Given this reality and given the adversarial approach that characterizes the American approach to litigation, it is unlikely that a plaintiff will devote portions of his complaint to discussing documents that might be read to bar him from suing in his favored venue. This case illustrates that point because Simon admits that he pled around the Indemnification Agreement.

In cases like this, it therefore seems logical for this court to follow the flexible approach commonly used by federal courts in addressing motions under Federal Rules of Civil Procedure 12(b)(1)-(5).FN13*Hart Holding* articulates that basic approach well.FN14Under that approach, the court has discretion to shape a process that is efficient so long as it affords the parties a fair opportunity to take discovery and/or to have any relevant factual disputes resolved after an evidentiary hearing if either is necessary to a fair determination of the motion.

FN13.*See, e.g., Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund,* Del.Supr., 624 A.2d 1199 (1993) (because the Court of Chancery Rules are patterned upon the Federal Rules of Civil Procedure, federal precedent construing those rules is persuasive authority).

FN14.593 A.2d.at 539.

Put simply, this flexibility permits the court to consider evidence outside the pleadings in determining the motion.FN15This flexibility enables the court to grant a dismissal motion before the commencement of discovery on the basis of affidavits and documentary evidence if the plaintiff cannot make out a *prima facie* case in support of its position.FN16If,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

Page 6

however, the plaintiff seeking to avoid dismissal advances a non-frivolous legal argument that would defeat the motion if the facts turn out to be as it alleges, the court usually must allow the plaintiff to take discovery to gather proof of those facts.[FN17]Unless the factual record that emerges from that discovery process produces a set of uncontroverted facts that provide a basis for a legal ruling in favor of one party or the other on the paper record, the court will have to conduct an evidentiary hearing to resolve the motion.

> FN15. 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1364, at 468-69 (2d ed. 1990) ("The validity of [Rule 12(b)(1)-(5) ] defenses rarely is apparent on the face of the pleading and motions raising them generally require reference to matters outside the pleadings.") & § 1366, at 485 ("There never has been any serious doubt as to the availability of extra-pleading material on [Rule 12(b)(1)-(5), (7) ] motions. Moreover, the other Rule 12(b) defenses only challenge the propriety of the court adjudicating the claim before it and do not reach the validity of the claim itself. Since a motion for summary judgment is designed to test the merits of the claim, the defenses enumerated in Rule 12(b)(1) through Rule 12(b)(5) and Rule 12(b)(7) generally are not proper subjects for motions for summary judgment.").

> FN16.*Hart Holding,* 593 A.2d at 539.

> FN17.*Id.*

**\*5** As properly understood, this approach is quite similar to practice under Rule 12(b)(6), but with one difference. The approach outlined above enables the trial court to resolve the motion without being shackled to the plaintiff's complaint as an initial matter. Because the court is permitted to consider extrinsic evidence from the outset, the court

may be able to decide such motions without the expense of discovery if it concludes that such discovery is irrelevant or that either party's position is frivolous. Put more bluntly, when the court is faced - as it is in this case - with artful pleading,[FN18] this approach lets the court get to the substance of the motion without engaging in a torturous analysis of whether the document containing the forum selection clause is incorporated into and integral to the complaint.[FN19]

> FN18.*See, e.g., Anselmo v. Univision Station Group, Inc.,* 1993 WL 17173, at *2 (S.D.N.Y. Jan. 15, 1993) ("A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship.") (*citing Bense v. Interstate Battery Sys. of Am., Inc.,* 683 F.2d 718, 720 (2d Cir.1982); *Lambert v. Kysar,* 938 F.2d 1110, 1121 (1 st Cir.1993) (rejecting contention that forum selection clause did not apply to tort claims and stating that "[w]e cannot accept the invitation to reward attempts to evade enforcement of forum selection agreements through 'artful pleading of [tort] claims' in the context of a contract dispute").

> FN19.*See, e.g., Vanderbilt Income & Growth Assocs., LLC v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996) (emphasizing that the court may only consider documents outside the pleadings on a Rule 12(b)(6) motion for "carefully limited purposes," such as when a "document is integral to a plaintiff's claim and incorporated into the complaint.") (*citing In re Santa Fe Pac. Corp. Shareholder Litig.,* Del.Supr., 669 A.2d 59, 69-70 (1995)).

By moderate contrast, under Rule 12(b)(6) the court would first have to conduct an inquiry into whether

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

the extrinsic evidence was incorporated into the plaintiff's complaint. If the evidence could not be shoehorned into that narrow exception, the motion would have to be converted under Rule 56. But even that eventuality has more modest implications than is commonly understood.

The fact that a Rule 12(b)(6) motion has been converted does not provide a plaintiff with a blank check to take discovery. Rather, under Rule 56(f), the burden is on the plaintiff to demonstrate, after notice of conversion, why it cannot oppose the motion through the presentation of affidavits. In a case where a plaintiff has material information at its own disposal (as is the case here), the plaintiff must explain why it is necessary to defer consideration of the motion until discovery can be taken.[FN20]

> FN20.*E.g.,* Ct. Ch. R. 56(f); *Von Opel v. Youbet.com,* Del. Ch., C.A. No. 17200, let. op. at 2-3, Steele, V.C. (Jan. 26, 2000) (when defendants could respond to a Rule 56 motion adequately with affidavits the court denied the defendants' request to take discovery) (citing *Avacus Partners, L.P. v. Brian,* Del. Ch., C.A. No. 11001, ltr. op., at 2, Allen, C. (Oct. 5, 1989)); *In re ML/EQ Real Estate Partnership Litigation,* Del. Ch., Cons.C.A. No. 15741, let op. at 4-7, Strine, V.C. (Mar. 22, 2000) (same principle); 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56 .10[8][a] (3d ed. 1997) ("[T]he court will reject a Rule 56(f) request if the discovery sought pertains to information already available to the nonmoving party."); *Hudson River Sloop Clearwater, Inc. v. Dept. of Navy,* 891 F.2d 414, 422 (2d Cir.1989) (holding that insofar as the Rule 56(f) request was to uncover certain disclosures, the nonmoving party made no showing that they did not have reasonable access to such disclosures prior to bringing the request; therefore the request was properly denied); *Paul Kadair, Inc. v. Sony Corp. of Amer-*

*ica,* 694 F.2d 1017, 1032 (5 th Cir.1983) (affirming district court's denial of discovery request considering that some evidence in refutation of defendant's averments was available to appellant); *Mason Tenders Dist. Council Pension Fund v. Messera,* 958 F.Supp. 869, 894 (S.D.N.Y.1997) ("Relief under Rule 56(f) is not appropriate where the discovery allegedly desired 'pertain[s] to information already available to [the non-moving party].' ") (quoting *Frankel v. ICD Holdings S.A.,* 930 F.Supp. 54, 66 (S.D.N.Y.1996)).

Although the Rule 12(b)(6)/Rule 56 approach is not insurmountably inefficient, it is more cumbersome than the approach usually taken by federal courts under Rules 12(b)(1)-(5). Most important, the greater inefficiency the Rule 12(b)(6) approach introduces is not justified by any appreciable improvement in fairness to the litigants. Rather, it simply seems more likely: (i) to increase the need for this court to engage in the already too prevalent exercise of determining whether documents that a plaintiff has artfully omitted to mention in a complaint are in fact integral to that document, and (ii) to complicate and delay the just disposition of motions that do not ultimately resolve the merits of cases, but that do determine where the merits may, may not, or must be resolved.

For those reasons, I am disinclined to find that motions to dismiss based on forum selection clauses are subject to Rule 12(b)(6). That disinclination is also bolstered by the extremely weak fit between such motions and the language of Rule 12(b)(6).

A motion to dismiss based on a forum selection clause fits neatly within Rule 12(b)(3).[FN21] The fact is that an inquiry into whether parties have chosen an exclusive venue by contract is not materially different than determining whether statutory or common law dictates a different venue than the plaintiff has chosen. Quite plainly, Court of Chancery Rule 12(b)(3) focuses on whether the plaintiff has sued in a permissible venue. It seems highly ar-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

tificial to construe Rule 12(b)(3) as applying only when a statutory or common law bar to the court's venue is alleged, and to analyze a motion to dismiss based on a forum selection clause under Rule 12(b)(6) to determine if the complaint states a claim upon which relief may be granted *by this particular court.* Thus I agree with the majority approach taken by the federal courts, which construes the identical federal counterpart to this court's Rule 12(b)(3) as applying to dismissal motions premised on a forum selection clause.[FN22]

> FN21.*Cf.* WRIGHT & MILLER, *supra* note 15, § 1352, at 262-63 (noting that Rule 12(b)(3) practice typically stems from a statutory provision but that "[i]n recent years ... there have been a number of venue motions based on forum selection clauses in contracts.").

> FN22.*E.g., Commerce Consultants Internat'l, Inc. v. Vetretie Riunite,* S.p.A., 867 F.2d 697 (D.C.Cir.1989) (affirming Rule 12(b)(3) dismissal based on forum selection clause); *Frietsch v. Refco, Inc.,* 56 F.3d 825, 830 (7 th Cir.1995) (rejecting minority view that a motion to dismiss based on a forum selection clause should be handled under Rule 12(b)(6) rather than Rule 12(b)(3) in part because "judicial economy requires selection of the proper forum at the earliest possible opportunity ...." regardless of whether the venue disputes turns on a statute or a contract); *R.A. Argueta v. Banco Mexico, S.A.,* 87 F.3d 320, 324 (9 th Cir.1996) (treating a motion to dismiss based on a forum selection clause under Rule 12(b)(3) because the United States Supreme Court does not treat the pleadings as true for purposes of deciding such motions, and "Rule 12(b)(3)... permits the District Court to consider facts outside of the pleadings, and is consistent with the Supreme Court standard for resolving forum selection clause cases.");

> *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 956 (10 th Cir.1992) ( "A motion to dismiss based on a forum selection clause frequently is analyzed as a motion to dismiss for improper venue under Fed.R.Civ.P. 12(b)(3)."); *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285 (11 th Cir.1998) (finding that Rule 12(b)(3) is the correct subsection to address such motions).

**\*6** I acknowledge that there are federal cases going the other direction. I also acknowledge that the Superior Court recently found that its Rule 12(b)(6), rather than its Rule 12(b)(3), should govern motions to dismiss based on a forum selection clause. It did so without much elaboration, citing federal cases that define venue quite narrowly and as referring to a specific federal statute's definition.[FN23] In so ruling, it noted that a forum selection clause does not divest the court of jurisdiction, it simply represents a binding agreement that the parties will litigate only in a particular forum.[FN24]

> FN23.*Simm Associates, Inc. v. PNC Nat'l Bank,* Del.Super., No. 98C-02-219-WTQ, 1998 WL 961764, at *3, Quillen, J. (Oct. 8, 1998) (*citing, inter alia, Haskel v. FRP Registry, Inc.,* 862 F.Supp. 909, 915 (E.D.N.Y.1994)).*But see Double Z Enterprises, Inc. v. General Marketing Corp.,* Del.Super., No. 97C-08-076, 2000 WL 970718, at *2 - *3, Del Pesco, J. (June 1, 2000) (without discussion, treating a motion based on a forum selection clause that limited plaintiff to a particular venue as one under Rule 12(b)(3)); *Pfizer, Inc. v. Advanced Monobloc Corp.,* Del.Super., No. 97C-04-037, 1998 WL 110129, at *1 n.2,*2, Quillen, J. (Jan. 23, 1998) (same).

> FN24.*Simm Associates, Inc.,* 1998 WL 961764, at *3.

The federal cases that take this minority approach do not explain why it makes practical sense to ap-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

proach forum selection clause motions through the rubric of Rule 12(b)(6), rather than the subsection of Rule 12 that specifically addresses whether the case has been brought in a proper venue.[FN25]Furthermore, the focus on whether a forum selection clause ousts the court of jurisdiction seems misplaced; Rules 12(b)(1) and 12(b)(2) address *jurisdiction;*Rule 12(b)(3) addresses proper *venue.*Proper definitions of venue include the "particular county, or geographical area, in which a court may hear and determine a case,"[FN26] and the "proper or a possible place for the trial of a lawsuit...."[FN27] As a learned commentator has noted, "[t]he distinction must be clearly understood between jurisdiction, which is the power to adjudicate, and venue, which relates to the place where judicial authority may be exercised and is intended for the convenience of the litigants. It is possible for jurisdiction to exist though venue in a particular district is improper, and it is possible for a suit to be brought in the appropriate venue though it must be dismissed for lack of jurisdiction."[FN28]

FN25.*See, e.g., LFC Lessors, Inc. v. Pacific Sewer Maintenance Corp.,* 739 F.2d 4, 6-7 (1 st Cir.1984) (forum selection clause does not oust court of *jurisdiction,* thus the court finds that a motion to enforce such a clause does not go to *venue* but must be analyzed under Rule 12(b)(6); *see also Huntingdon Engineering & Environmental Inc.,* 882 F.Supp. 54, 56-57 (W.D.N.Y.1995) (treating such a motion under the federal transfer statute rather than Rule 12(b)(3) because venue was legally proper as defined by 28 *U.S.C.* § 1391; the court did not apply Rule 12(b)(6)); *Nat'l Micrographics Sys., Inc. v. Canon, U.S.A., Inc.,* 825 F.Supp. 671, 678-79 (D.N.J.1993) (same).

FN26. BLACK'S LAW DICTIONARY 1396 (5 th ed.1979).

FN27. BLACK'S LAW DICTIONARY 1553 (7 th ed.1999).

FN28. CHARLES ALAN WRIGHT, THE LAW OF FEDERAL COURTS § 42, at 257 (5 th ed.1994).

If a forum selection clause validly limits a plaintiff to a single forum, that clause operates to divest a court that otherwise has jurisdiction of its status as a proper venue for the plaintiff to sue. The fact that such a venue limitation is contractual rather than statutory does not render it less efficient and logical to confine the court's analysis to the four corners of the complaint; instead, it makes it all the more important that the court can take a more flexible approach that enables it to look at the contract that contains the forum selection provision.

Because I consider the Fund's motion to be one under Rule 12(b)(3), I will consider the Indemnification Agreement even though Simon avoided relying upon that Agreement in his complaint and even though it is doubtful that I can say that the Agreement is integral to his claim. After all, Simon would be ecstatic if the Indemnification Agreement did not exist and he could rely solely on the Declaration of Trust.

Even if I am wrong, however, and Rule 12(b)(6) applies, I do not believe that the manner in which I intend to handle this motion offends either the letter or the spirit of Rule 56. At oral argument, Simon was given firm notice of my intention to consider the Indemnification Agreement. At that time, his counsel waived any objection to considering that document but did continue to assert his objection to my consideration of the affidavits submitted by the Fund.[FN29]As Simon's counsel then admitted, he does not need discovery to address this motion so long as this court relies solely upon the Declaration of Trust and the Indemnification Agreement. Only if I decide to consider the affidavits the Fund submitted regarding the intent behind the Indemnification Agreement does Simon request leave to take discovery. Therefore, I intend to consider the Indemnification Agreement both in reliance on my view as to the appropriate subsection of Rule 12(b) under which this motion is proceeding, and in reli-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

ance on Simon's waiver of any objection of my con-
sideration of the Indemnification Agreement.

> FN29. Tr. at 68-71.

*7 I will not, however, consider the affidavits sub-
mitted by the defendants. I do so only because the
procedural uncertainty deprived Simon of a clear
indication of the precise burden he bore to produce
evidence to defeat this motion. Had that burden
been made clear, I am not convinced that Simon
would be entitled to discovery to address the mo-
tion. As a signatory to his own Indemnification
Agreement and a Former Trustee who signed the
other Trustees' Agreements in his official capacity,
Simon is obviously well-positioned to offer an affi-
davit discussing the circumstances of the execution of
those documents and his understanding of the scope
of the Venue Provision they each contain. If Simon
cannot advance a contrary and reasonable interpret-
ation to that offered by the defendants, it is not
clear to me that he should be allowed to attempt to
"discover" such an interpretation. At the very least,
he should be obliged to file an affidavit discussing
precisely what discovery he deems necessary,
whether the motion be considered under Rule
12(b)(3) or Rule 56.

Nonetheless, because there was uncertainty as to
whether Simon was required to provide evidence
opposing the motion or an affidavit explaining why
he needed discovery for that purpose, I will limit
myself to examining the two underlying
documents.FN30Simon concedes that such an ap-
proach is fair because additional evidence will only
be admissible if I conclude that the two agreements,
when read together, are ambiguous regarding the
scope of the Venue Provision and because Simon
has had a fair opportunity to brief his position re-
garding the meaning of the two agreements.

> FN30.*Cf.* WRIGHT & MILLER, *supra*
> note 15, § 1366 (noting the importance of
> notice of conversion to avoid unfair sur-
> prise to the parties).

### III. *Is Simon Obligated To Litigate His Indemnific-
ation Claims In The Courts Of Reno, Nevada?*

For many of the same reasons that led Judge Orrick
to make a similar decision, I conclude that the Ven-
ue Provision in the Indemnification Agreement re-
quires Simon to litigate his indemnification claims
arising under the Declaration of Trust in Reno,
Nevada.

In coming to that conclusion, I apply the well-
settled rule that "[c]ontract terms themselves will
be controlling when they establish the parties' com-
mon meaning so that a reasonable person in the po-
sition of either party would have no expectations
inconsistent with the contract language."FN31An
ambiguity can be found only if the contract is sus-
ceptible to two *reasonable* interpretations .FN32

> FN31.*Eagle Industries v. DeVilbiss Health
> Care,* Del.Supr., 702 A.2d 1228, 1232
> (1997).

> FN32.*Id.* at 1232 n.8;*Rhone Poulenc v.
> American Motorists Ins. Co.,* Del.Supr.,
> 616 A.2d 1192, 1196 (1992).

This case turns on another important principle of
construction. As former Chancellor Allen held in
*Crown Brooks Corp. v. Bookstop Inc.,*"in constru-
ing the legal obligations created by [a] document, it
is appropriate for the court to consider not only the
language of that document but also the language of
contracts among the same parties executed or
amended as of the same date that deal with related
matters...."FN33

> FN33.Del. Ch., C.A. No. 11255, mem. op.
> at 2, 1990 WL 26166, at *1, Allen, C.
> (Feb. 28, 1990); *see also*17A C.J.S. *Con-
> tracts* § 315, at 337 (1999) ("In the ab-
> sence of anything to indicate a contrary in-
> tention, writings executed at the same time
> and relating to the same transaction are
> construed together as a single contract, as
> though they were as much one in form as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

they are in substance, in order to determine the intent, rights, and interests of the parties."); 11 WILLISTON ON CONTRACTS § 30:26, at 239-42 (4 th ed. 1999) ("Apart from the explicit incorporation by reference of one document into another, the principle that all writings which are part of the same transaction are interpreted together also finds application in the situation where incorporation by reference of another document may be inferred from the context in which the documents in question were executed. Thus, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other."); *id.* § 30.26, at 5-6 (2000 Supp.); RESTATEMENT (SECOND) OF CONTRACTS § 202(2)(1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

Because the Indemnification Agreement was entered into for all relevant purposes contemporaneously with the Declaration of Trust, the two instruments in this case must be viewed together and in their entirety when determining the scope and nature of the indemnification arrangements between Simon and the Fund. Simon and the other Trustees entered into the Indemnification Agreement "[i]n consideration" of their agreement to act as Trustees.FN34Most important, by its own terms, the Indemnification Agreement was entered into "pursuant to" the Declaration of Trust.FN35

> FN34. Defs.' Ex. B (Indemnification Agreement) at 1.

> FN35.*Id.*

*8 The Indemnification Agreement is thus a subordinate document entered under the Declaration of Trust. Indeed, although the precise purpose for the separate document is unclear, the Indemnification Agreement appears to have been a rather imprecise attempt to reiterate the indemnification rights provided by the Declaration of Trust and, most important, to establish a single forum for the resolution of disputes between the Fund and the Trustees regarding indemnification.

Simon's claim for indemnification falls within the indemnification provided for by the Indemnification Agreement and thus within the scope of claims he agreed to exclusively litigate in Reno, Nevada. That is, his claim for indemnification "arises out of" the indemnification described in the Indemnification Agreement.FN36

> FN36.*Id.* at 2;*See also Sletten,* mem. op. at 8 (reaching same conclusion as to identical provision).

While Simon points out certain substantive differences between the scope of the indemnification provided by the Indemnification Agreement and the Declaration of Trust, those differences are not material to Simon's current indemnification claim.FN37His claim for indemnification falls within the four corners of the Indemnification Agreement. The fact that there may be circumstances in which the two documents do not cohere does not avail him because that lack of coherence is not relevant here.

> FN37. Simon identifies three primary differences between the documents, namely their provisions regarding the types of claims entitling a trustee to indemnity, the availability of advance payments of expenses and attorneys' fees, and the triggering events for exceptions to a trustee's right to indemnity. It is true that these discrepancies are not insignificant. Indeed, the varying triggering events for the indemnification exceptions could affect the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

Page 12

Fund's ultimate responsibility to indemnify Simon. But these differences do not support any *reasonable* reading of the Venue Provision as suggesting that the harmonization of these discrepancies (if that becomes necessary) should be permitted to occur in two separate courts. If one thing is clear, it is that it makes no sense to select an exclusive forum for Indemnification Agreement disputes arising in a contract "pursuant to" the Declaration of Trust, while permitting suits elsewhere for indemnification disputes that putatively relate only to the Declaration of Trust itself.

Of overriding importance is the lack of any plausible interpretation of the Indemnification Agreement that would construe the Venue Provision as leaving a Trustee free to litigate indemnification claims under the Declaration of Trust itself anywhere he wishes, but as requiring the Trustee to litigate identical claims covered by the Indemnification Agreement solely in Reno, Nevada. Simon has not explained why such an interpretation would advance any rational goal of the Fund or the Trustees, and I can discern no logical business purpose for such an approach. By contrast, the interpretation that the Venue Provision was designed (perhaps inartfully) to ensure that all indemnification disputes between the Fund and Trustees would be litigated in the city in which the Fund's business operations were centered advances a goal of obvious utility. It is in fact the only reasonable reading of the Venue Provision. Therefore, Simon must assert his claims in Reno, Nevada.[FN38]

> FN38. In *surrebuttal at oral argument,* Simon's counsel advanced the new argument that the Indemnification Agreement is an improper amendment of the Declaration of Trust. I reject this argument for two reasons. First, although I was uncertain about the question when it was sprung at the last moments of a lengthy oral argument, it is clear upon reflection that the argument

should not be heard now. The parties put in briefs and Simon never raised this argument. It is unfair for him to raise the argument now. By not fairly presenting the argument in his briefs, Simon waived it. *Emerald Partners, v. Berlin,* Del.Supr., 725 A.2d 1215, 1224 (1999). Second, the Venue Provision does not limit the substantive right to indemnification granted by the Declaration of Trust, it simply governs where that right may be asserted and thus in my view need not be accomplished by an amendment to the Declaration of Trust. Third, Simon signed the Indemnification Agreement voluntarily and he had the right to waive any of his *own* rights that he possessed under the Declaration of Trust. 3A JAMES SOLHEIM & KENNETH ELKINS, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1344, at 790-91 (1994). Finally, I note that the Declaration of Trust does not indicate what formalities are required for an amendment other than the approval by the Trustees. Each of the Indemnification Agreements was signed by all of the Trustees and none of them have disclaimed their validity until now-some seven years later. Having accepted the benefits of office that were connected to their execution of the Indemnification Agreements, neither Simon nor his fellow Trustees are in an equitable position to now claim that the Venue Provision is void. Had they taken that position earlier, before execution, they might well not have been asked to serve. *Cf. Continental Ins. Co. v. Rutledge & Co.,* Del. Ch., 750 A.2d 1219, 1240 (2000) ("one who has full knowledge of and accepts the benefits of a transaction may be denied equitable relief he or she thereafter attacks the same transaction"). Because these grounds dispose of Simon's waived argument, I do not reach the Fund's other arguments in favor of the validity of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

Page 13

Venue Provision and against Simon's right to disclaim its binding effect on him.

### IV. A Brief Comment On The Fund's Motion To Stay This Proceeding As Premature

Although I have determined that Simon's claim must be litigated in Reno, Nevada, I note that the Fund has also raised another argument in favor of its motion that deserves some comment in view of the possibility that the issue it concerns will arise in other cases.

As noted, the Underling Action for which Simon seeks indemnity is not yet finally concluded. An appeal is now pending with the U.S. Court of Appeals of the Ninth Circuit.

For that reason, the Fund argues that it would be premature and wasteful to consider Simon's claim now. If the Court of Appeals were to reverse the jury verdict in Simon's favor, any prior decision on Simon's claim for indemnification might be undone depending on the basis of the Court's ruling.

**\*9** Without addressing whether Simon's claim is ripe as a formal matter, [FN39] I note that this court's authority to control its own docket should include the authority to stay the determination of a claim such as his in the absence of any showing that such a stay would permit serious injury to him. As a matter of litigative efficiency, it makes little sense for this court to decide claims for indemnification - as opposed to claims for advancement of litigation expenses - in advance of a non-appealable final judgment. There is simply too great a risk that the appellate courts will take a different view than the trial court for it to make much sense to grapple with indemnification claims until the underlying litigation is concluded with finality.

> FN39. To my knowledge, only one court has had occasion to opine on when a corporate director's indemnification rights accrue for the purposes of 8 *Del.C.* § 145. In *Witco Corp. v. Beekhuis,* a decision af-

firmed by the United States Court of Appeals by the Third Circuit, the U.S. District Court for the District of Delaware confronted a claim for indemnification pursuant to 8 *Del.C.* § 145 and concluded, *inter alia,* that regardless of what happens on appeal or whether an appeal is taken at all, the disposition of a claim that "is final enough to be appealed is fial enough to satisfy the requirements of § 145(c)."*Witco Corp. v. Beekhuis,* C.A. No. 92-301-RRM, 1993 WL 749596, at \*4, McKelvie, J. (D.Del. Oct. 22, 1993), *aff'd,*38 F.3d 682 (3rd Cir.1994). In reliance on *Witco,* Judge Orrick denied the Fund's motion to dismiss or stay the *Sletten* case as premature. *Sletten,* mem. op. at 3-5. Without necessarily quibbling with *Witco's* holding, I only write to suggest that this court should retain the discretion to defer indemnification determinations when that is efficient and will not produce undue hardship.

In this regard, I note that as a matter of fairness and common sense our courts have assumed that the statute of limitations for an indemnification claim under 8 *Del. C.* § 145 would run from the time that the underlying investigation or litigation was definitely resolved.[FN40]The implicit rationale for this conclusion is that the person seeking indemnity should not have to rush in at the first possible moment but rather should be able to wait until the outcome of the underlying matter is certain.

> FN40.*See Scharf v. Edgcomb Corporation,* Del. Ch., C.A. No. 15224, mem. op. at 10, 1997 WL 762656, at \*4, Steele, V.C. (Dec. 2, 1997) (statute of limitations for indemnification claims based on a Securities and Exchange Commission investigation did not run until any plaintiff was "confident" that the investigation "had been resolved with certainty."); *Cochran v. Stifel Financial Corp.,* Del. Ch., C.A. No. 17350, mem. op. at 6, 2000 Del. Ch. LEXIS 58, at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*8- *9, Strine, V.C. (statute of limitations for plaintiff's indemnification claim began to run when the government's time to seek certiorari from the U.S. Supreme Court regarding plaintiff's acquittal by the Court of Appeals on criminal charges had expired).

As a general matter, similar considerations would seem to counsel against the adjudication of an indemnification claim until a definitive outcome is reached in the underlying matter. In the absence of a showing of undue hardship, such an approach will reduce the chance that the court will engage in a wasteful exercise in predictive justice, only to see its work undone by a reversal of the trial court's judgment in the underlying matter.

### V. *Conclusion*

For the foregoing reasons, the Fund's motion to dismiss is granted without prejudice to Simon's right to refile his claims in the courts of Reno, Nevada. IT IS SO ORDERED.

Del.Ch.,2000.
Simon v. Navellier Series Fund
Not Reported in A.2d, 2000 WL 1597890 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 15



Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)

**H**
Smith v. McGee
Del.Ch.,2006.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
SMITH
v.
MCGEE and Smitty McGee's, Inc.
**No. Civ.A. 2101-S.**

Submitted Sept. 7, 2006.
Decided Oct. 16, 2006.

CHANDLER, J.

Dear Counsel:

*1 For the reasons set forth below, after carefully
examining the arguments presented by counsel, I
grant the motion for partial summary judgment in
favor of defendants Dawn McGee and Smitty
McGee's, Inc. ("Smitty McGee's").

I. BACKGROUND

This case involves a classic claim of minority
shareholder oppression replete with allegations of
wrongful withholding of income, excessive officer
compensation, denial of access to corporate re-
cords, self-dealing, conversion, and fraud. Smith
seeks a declaration stating that McGee breached her
fiduciary duties of due care, loyalty and good faith
to both Smith and the company; a complete and ac-
curate accounting of all monies received; removal
of McGee as the sole director of the company; dis-
gorgement of ill-gotten gains; a constructive trust
on ill-gotten gains and the fruits of ill-gotten gains;
and an equitable lien on all shares of the company
owned by McGee. Before I discuss the merits of
Smith's claims in the context of this motion for par-

tial summary judgment, however, it may be helpful
to first examine the factual background and proced-
ural posture of this case.

In April 1989, Smith and Ronald ("Rick") McGee,
Dawn McGee's ex-husband, invested personal cap-
ital and formed Smitty McGee's, a private, closely-
held corporation. Shortly thereafter, they sold a
20% interest in the company to Alvah Price and
each retained a 40% interest. In June 1989, Smith,
Rick McGee and Price opened Smitty McGee's
Raw Bar & Restaurant. Although the Restaurant
met with great success, the business relationship
seemed to have deteriorated by 1992. Rick McGee,
without Smith's knowledge, purchased Price's 20%
interest, giving Rick McGee a 60% controlling in-
terest in the company. Two years later, Rick McGee
called a special stockholders meeting at which he
removed Smith as a director, accepted Price's resig-
nation as a director, and elected himself the sole
director of the company. Rick McGee also voted to
amend the company's by-laws to reduce the whole
board to one director and to permit corporate action
through written consent of the majority holder of
the company's outstanding stock. In the mid-1990s,
Dawn McGee became a 60% owner of the company
as a result of her divorce settlement and has re-
mained the company's sole director and majority
shareholder.

Smith asserts that McGee runs the business for her
personal benefit and to Smith's detriment since she
obtained control. Specifically, Smith alleges that
McGee precludes him completely from recognizing
any benefit from his investment in the company.
For example, he has not received any dividends in
over fifteen years, with the exception of a nominal
dividend issued on the eve of this litigation, nor has
he been an employee in over ten years. Further,
McGee blocks Smith's access to company records
and information by failing to hold shareholders
meetings and by largely rejecting Smith's demand
under 8 *Del. C.* § 220. From 2001-2004, however,
McGee paid to herself $884,811 in executive com-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)

pensation for running the single location, seasonal restaurant and bar; granted interest free loans to herself and Rick McGee; and acquired at least six company owned vehicles for a business that does no off-site catering.

**\*2** In 1997, Smith commenced a suit in his individual and derivative capacity against Rick McGee, Dawn McGee, and Smitty McGee's. Smith alleged breach of fiduciary duty, conversion of company funds, improper use of funds, fraud, unjust enrichment, and racketeering against Rick McGee. He asserted claims against Dawn McGee for negligent management, unjust enrichment, conspiracy to commit racketeering, and aiding and abetting Rick McGee's breaches of fiduciary duties. All of these claims arose as a result of the McGees' alleged mismanagement and misappropriation of Smitty McGee's corporate assets. In May 1998, then-Vice Chancellor Steele dismissed Smith's RICO and common law fraud claims and denied Smith's motion to amend his complaint to assert claims for failure to declare dividends.[FN1] Then, on August 27, 2002, Vice Chancellor Noble dismissed the entire complaint pursuant to Court of Chancery Rule 41(e) for failure to prosecute.

> FN1. *Smith v. Smitty McGee's, Inc.,* 1998 Del. Ch. LEXIS 87, 1998 WL 246681 (Del.Ch.) (May 8, 1998).

In 2003, suspicions of improper behavior motivated Smith to make a books and records demand under 8 *Del. C.* § 220. Smith received documents as a result of this demand, but he did not initiate any litigation. Then in 2005, Smith again demanded to review the company's books and records. The company, however, rejected this request, and I granted a partial judgment in Smith's favor regarding this demand.[FN2] Smith contends that the documents produced pursuant to that court order put him on notice of McGee's mismanagement and self-dealing and form the basis of the current lawsuit.

> FN2. *Smith v. McGee,* Del. Ch., C.A. No. 1295 (June 21, 2005).

The standard for reviewing a Court of Chancery

Broadly, the crux of this dispute is whether McGee mismanaged the company and breached numerous fiduciary duties making her liable to both the corporation and Smith. Smith seeks relief pursuant to six counts. First, Smith claims that by virtue of McGee's domination of the company, she has oppressed his reasonable shareholder expectations in the company. Second, Smith alleges breach of loyalty and good faith. Third, Smith contends that McGee breached her duty of due care. Further, he contends that McGee wrongfully converted funds and committed fraud. Smith insists that both he and the company suffered economic injuries as a result of McGee's actions and, thus, both are entitled to monetary damages. Defendants McGee and Smitty McGee's respond with a motion for partial summary judgment stating that Smith is barred from asserting claims arising prior to April 25, 2003, on the grounds of laches and the statute of limitations or, alternatively, that Smith is barred from asserting claims arising prior to August 27, 2002, under the doctrine of *res judicata.* Today, I rule on this motion for partial summary judgment.

## II. MOTION FOR SUMMARY JUDGMENT [FN3]

> FN3. Smith requests that this Court treat defendant's motion for summary judgment as a motion to dismiss because plaintiff has not been afforded the benefits of discovery. Court of Chancery Rule 56(f) provides an avenue by which Smith may have challenged application of the summary judgment standard. Specifically, he should have filed an affidavit pursuant to Rule 56(f) outlining what facts, if proven by discovery, would make summary judgment impossible. This action would have halted the motion for summary judgment and first allowed discovery. Smith's failure to utilize Rule 56(f) precludes the application of the motion to dismiss standard.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                          Page 3
Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)

Rule 56 motion for summary judgment is well-settled in Delaware law. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[FN4]Justice demands that the court view the facts in the "light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that there is no material question of fact."[FN5]The nonmoving party, however, "may not rest upon mere allegations or denials of [their] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."[FN6]

> FN4.*Korn v. New Castle County,* 2005 Del. Ch. LEXIS 25, at *13, 2005 WL 396341 (Del.Ch.) (Feb. 14, 2005).

> FN5.*Elite Cleaning Co. v. Walter Capel and Artesian Water Co.,* 2006 Del. Ch. LEXIS 105, at *8, 2006 WL 1565161 (Del.Ch.) (June 2, 2006).

> FN6.*Id.*

### III. STATUTE OF LIMITATIONS

**\*3** Smith asserts claims of breach of fiduciary duty, fraud, and conversion, all of which are subject to a three-year statute of limitations that begins to run at the time the alleged wrongful act is committed.[FN7]This limitations period, which would preclude all claims arising before April 25, 2003, may be suspended under several tolling theories. Smith alleges that Dawn McGee's actions impeded his access to the information that gave rise to this suit until 2005 and, thus, the limitations period is tolled under three tolling theories: (1) inherently unknowable injuries; (2) equitable tolling; and (3) fraudulent concealment. As the party seeking to toll the limitations period, Smith bears the burden of pleading specific facts to demonstrate that the facts were so hidden that a reasonable plaintiff could not have made timely discovery of an injury necessary to file a complaint within the statute of limitations. Further, "if the limitations period is tolled under any of these theories, it is tolled only until the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury"-that is to say, until plaintiff is on inquiry notice.[FN8]Plaintiff is on inquiry notice if he "is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious."[FN9]Thus, Smith must convince this Court that he was not on inquiry notice-not in possession of facts sufficient to make him suspicious of injury resulting from McGee's behavior-before April 25, 2003.

> FN7.10 *Del. C.* § 3106. The statue of limitations, of course, applies to equitable claims only by analogy. *See Fike v. Ruger,* 754 A.2d 254, 260 (Del.Ch.1999) (applying the three-year limitations period of 10 *Del. C.* § 3106 to breach of fiduciary duty by analogy); *see also State ex rel. Brady v. Pettinaro,* 870 A.2d 513, 531 (Del.Ch.2005) (applying the three-year limitations period to a claim of fraud); *Blake v. Town of Delaware City,* 441 F.Supp. 1189, 1205 n. 62 (D.Del.1977) (applying the three-year limitations period to a conversion claim).

> FN8.*In re Dean Witter P'ship Litig.,* 1998 Del. Ch. LEXIS 133, at *20, 1998 WL 442456 (Del.Ch.) (July 17, 1998) (citations omitted).

> FN9.*Id.* at *31 n. 49.

A limitations period may be tolled under the inherently unknowable doctrine so long as "the discovery of the existence of a cause of action is a practical impossibility."[FN10]Specifically, "there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury."[FN11]Plaintiffs may establish "blameless ignorance" by showing justifiable reliance on a person whom they have "no os-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)

Page 4

tensible reason to suspect of deception."[FN12]Such proof tolls the limitations period until a plaintiff had "reason to know" of a wrong.[FN13]

> FN10.*Id.* at *19-20.
>
> FN11.*Id.*
>
> FN12.*Id.*
>
> FN13.*Id.*

Equitable tolling is appropriate "where a plaintiff reasonably relies on the competence and good faith of a fiduciary."[FN14]Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]."[FN15] This doctrine also tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.[FN16]

> FN14.*Id.* at *21-22.
>
> FN15.*Id.*
>
> FN16.*Id.*

Fraudulent concealment, unlike the doctrines of inherently unknowable injuries and equitable tolling, "requires an affirmative act of concealment by a defendant-an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry."[FN17]Nevertheless, "mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute."[FN18]Like the previously mentioned doctrines, tolling exists only "until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence."FN19

> FN17.*Id.* at *20-21.
>
> FN18.*Id.*

> FN19.*Id.*

*4 Neither of these tolling theories can suspend the limitations period here because Smith was on inquiry notice of McGee's wrongdoing as of 1997. Setting aside what notice failure to be paid dividends for seven years may have provided, Smith filed a lawsuit against Rick and Dawn McGee that alleged breaches of fiduciary duty, conversion, fraud, RICO violations, and mismanagement of the company and its assets. Specifically, Smith alleged that Dawn McGee was an active and knowing participant in illegal transactions whereby she and her husband converted money from the company and committed fraud against Smith. Additionally, Dawn McGee was aware of, assisted in, and benefited from Rick McGee's breaches of his fiduciary duties. In the current complaint, Smith contends that Dawn McGee was involved in self-dealing, numerous breaches of fiduciary duties, conversion, and fraud, all of which are the same types of claims present in the 1997 action. The allegations in both the 1997 complaint and the present complaint are based on the same type of behavior-mismanagement and misuse of the company's assets-and, in some instances, the same incidents.

Thus, Smith cannot rely on the inherently unknowable doctrine because allegations in the 1997 complaint show that Smith had actual knowledge of improper and illegal activity and injuries to Smith and the company. This theory also fails because Smith cannot establish that he was blamelessly ignorant. He was rightfully suspicious of his only other partner; thus, there is no one in the company upon which he could justifiably rely. Equitable tolling is inappropriate because Smith cannot say that he reasonably relied on the competence and good faith of Dawn McGee since he has been in and out of nine years of litigation alleging numerous claims of wrongful conduct including breaches of fiduciary duties. Finally, the theory of fraudulent concealment provides no relief for two reasons. First, Smith alleged fraudulent activity in the 1997 action. He cannot now say that he was unaware of the same

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)

activity. Second, Smith does not specifically allege any actual artifice or affirmative acts of concealment that were intended to put him off the trail of an injury. Thus, he cannot rely on that theory. Since Smith was on inquiry notice of McGee's activities and the resulting injuries, the tolling theories are unavailable and the statute of limitations applies.

As such, Smith was on inquiry notice of injuries and wrongdoing as early as 1997. Further, nothing has occurred to allay any of his suspicions such that it would be unfair to state that he has remained on inquiry notice since 1997. The case lasted from 1997-2002 and nothing changed. McGee continued and continues to exclude Smith from the company, and to date has not been forced to rectify any of the alleged ills. Thus, Smith is precluded from bringing claims that arose before April 25, 2003. This, of course, does not include any wrongful actions that occurred after April 25, 2003. Similarly, it does not include actions where the injuries did not occur until after April 25, 2003. For example, while Smith may not include claims regarding pre-April 25, 2003, loans that McGee granted to herself and her ex-husband, he may seek damages that he and the company suffered and continue to suffer as a result of the continued nonpayment of those loans. Smith failed to distinguish the claims by date; therefore, I will not detail the barred claims. The parties should instead be advised that all claims arising before April 25, 2003, are barred by the statute of limitations and may not be litigated.[FN20]

> FN20. Dawn McGee asserts, in the alternative, that the doctrine of *res judicata* bars all claims arising before August 27, 2002. *Res judicata* would certainly bar all claims that were raised or should have been raised by Smith against McGee in the 1997 complaint. On the other hand, it would not bar any claims arising after the 41(e) dismissal of that action or any different claims that should not or could not have been included in the 1997 complaint. Since I am ruling in favor of defendant Dawn McGee based on

the statute of limitations defense, however, there is no need to further discuss the applicability and effect of the *res judicata* defense.

## IV. CONCLUSION

**\*5** In sum, the three-year statute of limitations operates to bar all claims arising prior to April 25, 2003.

IT IS SO ORDERED.

Del.Ch.,2006.
Smith v. McGee
Not Reported in A.2d, 2006 WL 3000363 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 16



Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

**H**
STEIN v. ORLOFF
Del.Ch. 1985

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
STEIN
v.
ORLOFF
No. 7276

May 30, 1985

In this derivative action, plaintiff shareholder, on behalf of all shareholders of the corporation, brought suit challenging the actions of the directors. Plaintiff claimed that directors' actions constituted breach of fiduciary duties concerning the appointment of directors amounting to the sale of corporate offices. Plaintiff also charged defendants with wastes of corporate assets in connection with the setting of stock option prices, compensation to officers, and sale of two of the corporation's divi- sions.

The court of chancery, per Vice-Chancellor Hartnett, held that because plaintiff had not alleged sufficient facts to demonstrate demand futility, the complaint must be dismissed for failure to make a pre-suit demand as applies to all allegations except those involving waste of corporate assets since suit contained sufficient allegations to state a claim for the latter action.

**[1] Corporations 101 ⋘═⋙206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k206 Refusal of Corporation, Officers, or Stockholders to Act
            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases
A motion to dismiss under Rule 23.1 where there has been no pre-suit demand requires that the court of chancery must decide whether the particular facts alleged give rise to a reasonable doubt that the directors were disinterested and independent or that the challenged transaction is protected by the business judgment rule from further judicial scrutiny. DEL. CH. CT. R. 23.1.

**[2] Corporations 101 ⋘═⋙206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k206 Refusal of Corporation, Officers, or Stockholders to Act
            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases
Where challenged transactions occurred over a period of time so that the composition of the board of directors was not the same at all times material to the challenged actions, the issue of whether a pre-suit demand would have been futile will be determined with reference to the circumstances existing at the time of commencement of the action.

**[3] Corporations 101 ⋘═⋙206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k206 Refusal of Corporation, Officers, or Stockholders to Act
            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases
The allegation of control, designation, and participation and approval of the transaction without allegations of facts to support the allegations are insufficient to excuse the failure to make a presuit demand pursuant to Delaware Chancery Court Rule 23.1.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

**[4] Corporations 101 ⬤➾320(8)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k320 Actions Between Shareholders and Officers or Agents
        101k320(8) k. Allegations as to Right to Sue. Most Cited Cases
In shareholder's derivative action, mere allegations of business relationships by corporate directors and major stockholder that do not state facts with particularity are not sufficient to show that there is a reasonable doubt that the directors were independent or disinterested.

**[5] Corporations 101 ⬤➾310(2)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k310 Management of Corporate Affairs in General
        101k310(2) k. Degree of Care Required and Negligence. Most Cited Cases
Unless facts are alleged from which it could be shown that board members acted in a grossly negligent manner in approving a challenged transaction, such board members will not be denied the protection of the business judgment rule.

**[6] Corporations 101 ⬤➾312(7)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k312 Corporate Property, Funds, and Securities
        101k312(7) k. Right to Question Transactions, and Estoppel and Acquiescence. Most Cited Cases
Where waste of corporate assets is alleged, the test for finding waste of corporate assets is whether the consideration received by the corporation was so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation paid.

**[7] Corporations 101 ⬤➾320(7)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k320 Actions Between Shareholders and Officers or Agents
        101k320(7) k. Bill, Petition, or Complaint in General. Most Cited Cases
In a stockholder's derivative action, a complaint alleging preexisting options on which the option price was reduced without any consideration being received for the reduction is a sufficient allegation of facts to state a claim for waste.

**313** Irving Morris, Esquire, and Joseph A. Rosenthal, Esquire, of Morris and Rosenthal, Wilmington, Delaware; and Bruce E. Gerstein, Esquire, and Scott W. Fisher, Esquire, of Garwin, Bronzaft & Gerstein, New York, New York, for plaintiff.
Charles F. Richards, Jr., Esquire, and Samuel Nolen, Esquire, of Richards, Layton & Finger, Wilmington, Delaware, for individual defendants and defendant NVF Company.
Victor F. Battaglia, Esquire, and Pamela S. Tikellis, Esquire, of Biggs & Battaglia, Wilmington, Delaware, for defendant Evans Products Company.

HARTNETT, *Vice-Chancellor*
*1 **314** This is a stockholder's derivative action brought by the plaintiff purportedly on behalf of all the shareholders of Evans Products Company challenging a number of transactions involving the corporation. Plaintiff made no demand on the Board of the corporation to take action regarding the alleged wrongful transactions prior to the commencement of this suit. Defendants assert that, because plaintiff has not alleged sufficient specific facts to demonstrate demand futility, the complaint must be dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

missed pursuant to Chancery Court Rule 23.1 for failure to make a pre-suit demand. A careful review of the complaint shows that it does not adequately allege that the Board was incapable of independently considering a pre-suit demand if it had been made as to the claims asserted in the Complaint except as to a claim of waste of corporate assets. The complaint does contain sufficient allegations so as to state a claim of waste of corporate assets in connection with the reduction of the purchase price of certain stock options and therefore it will not be dismissed as to those allegations.

I

[1] The Delaware Supreme Court recently stated that

'. . . in determining demand futility the Court of Chancery in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'

*Aronson v. Lewis,* Del. Supr., 473 A.2d 805 (1984), at 814.

In considering a motion to dismiss I am limited to a consideration of the allegations of the complaint and cannot consider other pleadings. *Id.* It is therefore my duty, when faced with a motion to dismiss under Rule 23.1, where there has been no pre-suit demand, to carefully scrutinize the factual allegations of the complaint to determine whether they give rise to a reasonable doubt that the directors were disinterested and independent or that the challenged transaction is protected by the business judgment rule from further judicial scrutiny. There are 83 separate allegations in the complaint.

II

The facts set forth are gleaned from the Amended

and Supplemental Complaint ('the Complaint'). Evans Products Company is **315 a Delaware corporation engaged in the business of manufacturing and distributing building materials, shelter products, automotive heating and ventilating products, and transportation equipment for trucks and railways, as well as the leasing of rail cars. Its common stock is listed and traded on the New York Stock Exchange, and as of May 4, 1983, there were over 12 million shares outstanding.

Victor Posner, the primary subject of the allegations of the Complaint, has large holdings of stock in a number of corporations which in turn have holdings in the same or other corporations. It was not alleged, however, that he owns 50% or more of the common stock of any one of these corporations. He is also Chairman of the Board, President, or Chief Executive Officer, or holds a combination of these offices with a number of these corporations. These corporations include Sharon Steel Corp. ('Sharon'), Summit Systems, Inc. ('Summit'), NVF Company ('NVF'), DWG Corporation ('DWG'), APL Corporation ('APL'), and Southeastern Public Services Company ('Southeastern'). Also involved is Security Management Corp.-described in the Complaint as 'a privately held Posner family corporation.'

*2 During 1980 and 1981 two of these corporations, Sharon and Summit, purchased shares of Evans Products Company's common stock. On November 12, 1981, these corporations held over 43% of Evans Products' outstanding common shares.

[2] The plaintiff challenges several transactions which were undertaken by the Board of Directors of Evans Products Company. The composition of the Board was not the same at all the times material to the challenged actions, but the issue of whether a presuit demand would have been futile will be determined with reference to the circumstances existing at the time of commencement of the action. *Aronson v. Lewis, supra.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                Page 4
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

### III

On February 17, 1982, six of the director-defendants were granted five-year employment contracts and another director-defendant's existing employment contract was amended. These contracts guaranteed payment of the then present value of all payments due under the contracts unless there was a termination for cause or the employee chose to terminate the contract in accordance with its provisions. Termination at the employee's option was to be permitted in the event of (1) a merger, consolidation, or sale of assets of the corporation, (2) an acquisition of more than 50% of the outstanding **316 shares of the corporation by a single stockholder, or (3) the then current membership of the Board of Directors of the corporation was reduced to less than 60% of the total Board. If an employee so chose to terminate for one of the stated reasons then he would be entitled to receive 12 months salary. Amendments extending the duration of the contracts or increasing the yearly minimum salary were subsequently made to two of these agreements.

On February 19, 1982, two days after these employment agreements were made, Evans Products Company entered into an agreement in principle to merge with Sharon Steel Corporation. Under the agreement Sharon's parent, NVF, would have held approximately 56% of the stock of the resulting entity. The proposed merger was never consummated, however, because Evans Products Company was advised in April of 1983 that its creditors would not approve the merger.

The Complaint further alleges that the employment agreements were designed so that the proposed, and thus foreseeable, merger would automatically trigger the benefits.

It is also alleged that after the merger attempt failed Mr. Orloff, the Chairman of the Board of Evans Products Company, and Mr. Posner entered into a plan whereby each would designate half the members of the Board of Evans Products Company.

At the Evans Products Company Board meeting on April 20, 1983, a number of changes took place. The Board of Directors expanded its number from 14 to 16. Three members of the Board resigned and two days later a fourth resigned, while four new members were elected (including Mr. Posner and his son, Stephen Posner). Mr. Orloff then resigned as Chairman of the Board in favor of Mr. Posner, and Stephen Posner was appointed Vice Chairman. Mr. Orloff, Mr. Posner and Stephen Posner were then appointed as the three members of Evans Products Company's Executive Committee.

*3 A Board composed of 16 directors was elected at a shareholders' meeting on June 8, 1983. The Complaint alleges that Mr. Posner designated eight of the members and that Mr. Orloff designated the other eight members.

The Complaint alleges that as an inducement to Mr. Orloff to allow the changes on Evans Products Company's Board, he was elected to the Boards of both Sharon and NVF and as President, Chief Executive and member of the Board of DWG. He was given a five-year employment contract with DWG for $390,000 per year. This contract is alleged to be a sham and allegedly intended as 'payment for the sale of offices and directorships which are assets **317 belonging exclusively to Evans Products Company.' The DWG contract is alleged to be in violation of Mr. Orloff's contract with Evans Products Company which requires his full-time services in exchange for a minimum salary of almost $600,000.

In January of 1984 a number of changes occurred in Evans Products Company's senior management. Mr. Posner was named Chief Executive Officer. Mr. Colvin, a Senior Vice President of Sharon and NVF and a member of the Posner family, replaced Mr. Robinson on the Board of Directors and was made a Senior Vice President. A number of other people who also hold positions with other corporations in which Mr. Posner holds substantial interests were appointed to management positions with Evans Products Company. Among these is Tracy Posner-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

Mr. Posner's then 21-year-old daughter-a recent college graduate who was appointed Vice President, Assistant Secretary, and Assistant Treasurer.

In response to this management shift, several high-ranking employees of Evans Products Company resigned-including Mr. Bragdon who resigned from the Board of Directors.

As will be seen, these allegations do not adequately state facts with sufficient particularity to excuse the failure to have made a presuit demand.

### IV

[3] It is now well settled that mere conclusory allegations of domination and control, as well as allegations that a benefitted shareholder designated the directors and that they owe their positions to him, are insufficient to excuse a pre-suit demand under Chancery Rule 23.1. See *Aronson, supra.*In order to excuse demand there must be allegations of fact which raise a reasonable doubt as to the actual independence of the directors and these facts must demonstrate that the directors are beholden to the controlling person through personal and other relationships. *Id.* Mere allegations of participation in the approval of the transaction are similarly insufficient.*Id.*

'Directorial interest exists whenever divided loyalties are present, or a director either has received or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders. The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction.'

*4 **318 Pogostin v. Rice*, Del. Supr., 480 A.2d 619 (1984), at 624 (citations omitted).
The allegation of control, designation, and participation and approval of the transaction without allegations of facts to support the allegations are there-fore insufficient to excuse the failure to make a pre-suit demand pursuant to Chancery Rule 23.1.

[4] The Complaint also contains allegations of extensive business relationships between the various directors and Mr. Posner. The existence of these relationships, absent more, is also insufficient to excuse the failure to make a pre-suit demand. No facts are alleged which suggest that the directors would not have retained their other positions unless they acted in accordance with Mr. Posner's wishes. See *Kaufman v. Belmont*, Del. Ch., 479 A.2d 282, 288 (1984).

The allegations of lack of independence of the directors, therefore, do not state facts with particularity which would lead me to conclude that there is a reasonable doubt that the directors were independent or disinterested. The directors therefore could have impartially entertained a pre-suit demand.

### V

[5] It is also clear that no facts are alleged in the Complaint which would give rise to a reasonable doubt that the Board members had acted in such a grossly negligent manner in approving the challenged transactions as to deny themselves the protection of the business judgment rule See *Smith v. van Gorkom*, Del. Supr., 488 A.2d 858 (1985).

The Complaint does contain an allegation that the realignment of the Board in April of 1983 constituted a sale of corporate offices by Mr. Orloff who allegedly received certain positions and compensation with other corporations for his part in the organization. Unfortunately for the plaintiff, however, there is no allegation of facts in the Complaint which, if true, show that any of the members of the Board at the time suit was filed, let alone a majority of them, were beholden to and controlled by Mr. Orloff.

### VI

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

Some of the allegations of wastes of corporate assets are, however, sufficient to raise a reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment.

Evans Products Company's 1979 Stock Option Plan ('1979 **319 Plan') provides for a price determination for the exercise of options by a Stock Option Committee which must be no less than 'fair market value of the stock.'The fair market value is defined in the 1979 Plan as being the value of the stock as of the date of granting of the option. The 1979 Plan was approved by Evans Products Company's shareholders at the annual meeting in May of 1979. No provision of the 1979 Plan allows the Board of Directors to amend the terms of previously granted options.

In January of 1983 the Board purported to approve an amendment to the 1979 Plan to allow the Stock Option Committee to reduce the option price of previously granted options although the price still must be no less than 'fair market value'. This amendment was not presented to the shareholders.

*5 The Complaint alleges that the amendment was designed to permit the lowering of the exercise price of the options to the then lower market price and thus to enable holders of the options to benefit from an 'inevitable' rise in market price even if that rise still kept the price substantially below the original option price.

At the same time that the amendment to the stock option plan was purportedly made, the Stock Option Committee reduced the exercise price of outstanding options for 225,000 shares of Evans Products Company's stock from $20.125 to $12.625 per share effective three months later in April of 1983. Seven members of the then Board of Directors held options to as more than 3/4 of these shares. Five of these directors were still members of the Board at the time this suit was brought.

It is alleged that the reduction in option price was given without consideration and constituted a waste

of corporate assets. It is further alleged that the amendment to the 1979 Plan had to be approved by the shareholders.

[6][7] The test for finding a waste of corporate assets is whether the consideration received by the corporation was so inadequate that no person of ordinary, sound business judgment would deem it worth that which the corporation paid. *Saxe v. Brady*, Del. Ch., 184 A.2d 602 (1962). The Complaint alleges pre-existing options on which the option price was reduced without any consideration being received for the reduction. This is a sufficient allegation of facts to state a claim for waste and therefore to create a reasonable doubt that the transaction was the result of a valid exercise of business judgment. See *Michelson v. Duncan*, Del. Supr., 407 A.2d 211 (1979).

**320 VII

The compensation granted to Posner family members and others by Evans in 1984 is also alleged by the plaintiff as not being related to their experience in managing Evans Products Company's affairs and as such to be lacking in consideration and to be a gift and a waste of corporate assets.

The allegations as to the compensation granted to the Posner family are, however, not sufficient to state a claim of waste. There is no assertion of fact which creates a reasonable doubt that these people were performing services for Evans so inadequate as to be insufficient consideration for their fees. This is, therefore, an insufficient allegation of waste for demand excusal purposes on the excessive compensation claims.

Waste is not alleged as to the 1982 employment contracts. Even if these contracts with their termination provisions were, however, in contemplation of a foreseen merger, no allegation is made that the employees did not continue in their jobs and perform valuable services for Evans Products Company. The fact that Mr. Orloff accepted employ-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 7
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

ment with other corporations may be a breach of his promise to provide substantially all of his business time to Evans Products Company but it does not convert the contract into a waste of corporate as- sets.

### VIII

The Complaint also alleges that in March of 1984 Evans Products Company sold two of its divisions. The Shelter Products Group ('Shelter Group') was sold to APL for $45 million, and the Evans Fiber Products Group ('Fiber Group') was sold to DWG for $30 million. These prices are alleged to have been substantially less than the fair market value of each of the divisions and thus a waste of corporate assets.

*6 The Complaint alleges that substantive inquiries were made by other companies wishing to purchase one or the other or both of the divisions. It is alleged that these inquiries were not pursued before the sale of the two divisions to corporations in which Mr. Posner had substantial holdings of stock.

At the time the Complaint was supplemented to allege these new wrongs seven of the members of the Evans Products Company's Board of Directors were also directors or officers of DWG and four were also directors or officers of APL-both corporations allegedly controlled by Mr. Posner.

**321 The Complaint contains allegations that there had been substantive inquiries made by others seeking to purchase the Fiber Group and the Shelter Group divisions. The only offer which is specifically mentioned, however, is an offer from a group organized by Dr. Zenczak who was formerly a director of Evans Products Company and President of the Fiber Group. The offer was allegedly for $34 million for the Fiber Group which was sold to DWG for $30 million. There is no allegation that the terms, other than price, were the same, nor is there an allegation as to the timing of the Zenczak offer. It is reasonably likely that a difference in

terms could have accounted for the acceptance of the lower price if the two offers had been considered together. These allegations, therefore, do not sufficiently allege such facts as to create a reasonable doubt that the Board properly exercised its business judgment.

Del.Ch. 1985
Stein v. Orloff
Not Reported in A.2d, 1985 WL 11561 (Del.Ch.), 11 Del. J. Corp. L. 312

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 17

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1995 WL 106520 (Del.Ch.), Fed. Sec. L. Rep. P 98,818, 20 Del. J. Corp. L. 854

▷
In re Tri-Star Pictures, Inc., Litigation
Del.Ch.,1995.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County
In re TRI-STAR PICTURES, INC., LITIGATION.
**Civ. A. No. 9477.**

Submitted Jan. 12, 1995.
Decided March 9, 1995.

William Prickett and Ronald A. Brown, Jr. of
Prickett, Jones, Elliott, Kristol & Schnee, Wilming-
ton, and Arthur T. Susman and Timothy J. Storm,
of Susman, Saunders & Buehler, Chicago, IL, for
plaintiffs.
Allen M. Terrell, Jr., of Richards, Layton & Finger,
Wilmington, and Robert C. Myers, Anthony J. Vi-
ola, and Jill R. Moskowitz of Dewey Ballantine,
New York City, for defendants Michael J. Fuchs, E.
Thayer Bigelow, Jr., and Joseph J. Collins.
A. Gilchrist Sparks, III, and Jon E. Abramczyk of
Morris, Nichols, Arsht & Tunnell, Wilmington, and
Michael C. Russ, L. Joseph Loveland, and Reginald
R. Smith of King & Spalding, Atlanta, GA, for de-
fendants the Coca-Cola Co., Ira C. Herbert and
Francis T. Vincent, Jr.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.
*1 Pending are two motions for summary judgment
in this action the merits of which will be tried dur-
ing May of this year. This Opinion addresses both
motions.

I.

This action was brought in December 1987 on be-

half of a class of public stockholders of Tri-Star
Pictures, Inc. ("Tri-Star"). The plaintiffs challenge
a 1987 transaction ("the Combination") in which
Tri-Star acquired certain assets of the Entertain-
ment Business Sector ("EBS") of the Coca-Cola
Company ("Coca-Cola") in exchange for approxim-
ately 75 million shares of Tri-Star common stock.
In their amended complaint the plaintiffs named as
defendants Tri-Star, Coca-Cola, Home Box Office
("HBO") and the persons who were Tri-Star's dir-
ectors at the time of the Combination. The plaintiffs
challenged the Combination on the basis of fraud,
corporate waste, and disclosure violations made in
connection with the Tri-Star proxy statement dis-
seminated in connection with the shareholder vote
on the transaction.

By Opinion and Order issued in May 1989, this
Court dismissed HBO as a defendant, and dis-
missed certain counts of the amended complaint for
failure to state a claim upon which relief could be
granted. *Siegman v. Tri-Star Pictures, Inc.,*
Del.Ch., C.A. No. 9477, Jacobs, V.C. (May 5,
1989, revised May 30, 1989).

In November 1989, Sony USA, Inc. acquired Tri-
Star in a cash-out merger that eliminated Tri-Star's
public shareholders. Following that merger, the re-
maining defendants moved to dismiss the amended
complaint on the ground that as a result of the mer-
ger, the plaintiffs were no longer Tri-Star stock-
holders, and that because all of the claims were de-
rivative in nature, the plaintiffs lacked standing to
maintain the action. By Opinion dated June 14,
1990, this Court dismissed all remaining counts of
the amended complaint, except for Count II insofar
as it asserted a claim for wrongful deprivation of
the shareholders' right to cast an informed vote-
which was found to be an individual claim. *In Re
Tri-Star Pictures, Inc., Litig.,* Del.Ch., Consol.C.A.
No. 9477, Jacobs, V.C. (June 14, 1990). The de-
fendants later moved for summary judgment on that
claim (Count II) on the ground that the plaintiffs
had adduced no evidence of individual or class

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 1995 WL 106520 (Del.Ch.), Fed. Sec. L. Rep. P 98,818, 20 Del. J. Corp. L. 854

damages. The Court granted that motion. *In Re Tri-Star Pictures, Inc., Litig.,* Del.Ch., Consol.C.A. No. 9477, Jacobs, V.C. (February 21, 1991).

The plaintiffs then appealed to the Delaware Supreme Court, which affirmed some of this Court's pretrial rulings and reversed others. *In Re Tri-Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319 (1993). Specifically, the Supreme Court (a) affirmed the dismissal of Count III, (b) reversed the dismissal of Counts I, II, V and VI, and (c) determined that plaintiffs' challenges to the dismissal of HBO and to the dismissal of Counts IV and VI had been abandoned. The Supreme Court remanded the case to this Court for further proceedings.

On remand this Court set the case down for trial, beginning in May of this year, on all of the reinstated claims.[FN1] However, the Court also granted the defendants leave to move for summary judgment as to certain of those claims. It is those summary judgment motions with which this Opinion deals.

3

*2 Two separate motions, made on behalf of different groups of director defendants, are presented. Defendants Ira C. Herbert ("Herbert") and Frances T. Vincent, Jr. ("Vincent"), who were Tri-Star directors at the time of the Combination have moved for summary judgment on all counts of the amended complaint. The basis of the motion was that Vincent and Herbert did not participate in the Tri-Star board's consideration of, or vote on, the Combination, nor did they prepare the proxy materials disseminated in connection with the shareholder vote. Defendant Michael J. Fuchs ("Fuchs"), who also was a Tri-Star director, moves for partial summary judgment on Count I of the complaint on the ground that he likewise did not participate in the vote on the Combination. These motions are addressed in Part II, *infra,* of this Opinion.

Separate and apart from those motions, defendants E. Thayer Bigelow, Jr. ("Bigelow") and Joseph J.

Collins ("Collins") (sometimes collectively referred to as the "HBO/Time directors") have moved for partial summary judgment on Count I, which claims that the directors breached their fiduciary duty of loyalty in approving the Combination. The crux of their summary judgment motion, which is treated in Part III of this Opinion, is that there is no evidence of record to support that claim.

Because of the nature of the issues presented and the manner in which those issues are disposed of, this Opinion contains no comprehensive recital of the "facts" of this case. (For a complete discussion of the facts, reference is made to the earlier Opinions of this Court and of the Supreme Court.) In this Opinion the facts are set forth as they become relevant to the analysis of the issues presented.

For the reasons discussed below, (1) the summary judgment motions of defendants Herbert, Vincent and Fuchs will be granted, and (2) except as set forth in Part III (B) *infra,* the partial summary judgment motion of defendants Bigelow and Collins will be denied.

II.

Respecting the first summary judgment motion, the critical undisputed fact is that defendants Vincent, Herbert, and Fuchs did not attend or otherwise participate in the Tri-Star board meeting at which the Combination was considered and approved, and they did not vote on that transaction.[FN2] Messrs. Vincent and Herbert deliberately removed themselves from the decision-making process (and also from the preparation of the proxy materials [FN3]), because they recognized that as senior executives of Coca-Cola (Herbert) and EBS (Vincent), they had potential conflicts of interest.

Delaware law clearly prescribes that a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve that transaction was wrongful. *Citron v. E.I. du*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 1995 WL 106520 (Del.Ch.), Fed. Sec. L. Rep. P 98,818, 20 Del. J. Corp. L. 854

*Pont de Nemours & Co.,* Del.Ch., 584 A.2d 490, 499 (1990); *In Re Wheelabrator Technologies, Inc. Shareholders Litigation,* Del.Ch., C.A. No. 11495, Jacobs, V.C. (Sept. 1, 1992) at 19-20; *Propp v. Sadacca,* Del.Ch., 175 A.2d 33, 39 (1961), *modified on other grounds, sub nomBennett v. Propp,* Del.Supr., 187 A.2d 405 (1962).

**\*3** Plaintiffs do not dispute that rule or the facts relevant to it. They argue, however, that that principle is not absolute and should not be applied to the facts here to exonerate these directors. Plaintiffs contend that there is no *per se* rule that operates to relieve a director from liability flowing from a challenged transaction solely because the director does not vote on the transaction. Moreover, plaintiffs urge, the directors here could, at least arguably, be found liable on the theory that they breached a duty to the shareholders by not voting, because their abstention left the decision in the hands of the remaining directors of whom a majority were conflicted. In these circumstances, plaintiffs conclude, Messrs. Vincent, Herbert and Fuchs were under a duty either to recuse themselves or, alternatively, to remove themselves only after admonishing the remaining directors not to vote on the Combination without first instituting appropriate procedural safeguards.

I agree that no *per se* rule unqualifiedly and categorically relieves a director from liability *solely* because that director refrains from voting on the challenged transaction. One might, for example, imagine a scenario in which certain members of the board of directors conspire with others to formulate a transaction that is later claimed to be wrongful. As part of the conspiracy, those directors then deliberately absent themselves from the directors' meeting at which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability. In such circumstances it is highly unlikely that those directors' "nonvote" would be accorded exculpatory significance. That, however, does not help the plaintiffs' case, because here the plaintiffs do not contend that Messrs. Herbert, Vin-

cent or Fuchs played any role, open or surreptitious, in formulating, negotiating or facilitating the transaction complained of. That is, there is no claim or evidence that those directors played any role, overt or covert, in the board's decision-making process. That being so, those directors' absence from the meeting, and their abstention from voting to approve the Combination, does, in my view, have dispositive significance, and shields these defendants from liability on any claims predicated upon the board's decision to approve that transaction.

The plaintiffs cite no authority for their assertion that the moving defendants had a fiduciary duty not to abstain or, alternatively, to abstain only after admonishing the remaining board members to institute procedural safeguards. Indeed, the plaintiffs' position runs squarely counter to the Supreme Court's command in *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983), that directors who have a conflict of interest relating to a proposed transaction should totally abstain from participating in the board's consideration of that transaction. Messrs. Herbert and Vincent can hardly be faulted for having observed that admonition, and Mr. Fuchs can hardly be exposed to possible liability for having *not* attended and participated in a board of directors' meeting. If there is any basis in law or equity for such a result, the plaintiffs have failed to identify it.

**\*4** Accordingly, the summary judgment motions of defendants Vincent, Herbert, and Fuchs will be granted.

### III.

#### A.

In support of their separate motion, the HBO/Time directors contend that they are entitled to summary judgment on the plaintiffs' claim, alleged in Count I of the amended complaint, that they breached their duty of loyalty by approving the Combination. The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 4
Not Reported in A.2d, 1995 WL 106520 (Del.Ch.), Fed. Sec. L. Rep. P 98,818, 20 Del. J. Corp. L. 854

argument, which is based on the considerable discovery record developed to date, is that: (i) the HBO/Time directors had no financial or other interest that conflicted with the interests of Tri-Star's public stockholders, and therefore those directors were not disabled from evaluating independently the merits of the proposed transaction, (ii) accordingly, the conduct of these directors must be evaluated under the business judgment standard of review, and (iii) under that standard, the HBO/Time directors breached no duty because there is no evidence that in deciding whether to approve the Combination, they considered anything other than the best interests of Tri-Star and its shareholders.

The plaintiffs respond that the HBO/Time directors are not entitled to summary judgment because the applicable standard of review is entire fairness or, alternatively, the "intermediate" standard of enhanced scrutiny. Under either standard, plaintiffs contend, the undisputed facts generate inferences that preclude a summary adjudication of the duty of loyalty claims. Alternatively, plaintiffs argue, even if business judgment is the applicable review standard, there are material issues of fact that can be resolved only at trial.

More specifically, the plaintiffs contend that the HBO/Time directors had a conflict of interest that deprived them of the benefit of business judgment rule presumptions, because (i) Messrs. Bigelow and Collins were directors and/or senior executives of Time, Inc. ("Time") or Time's wholly-owned subsidiary, HBO, and therefore owed a duty of loyalty to those corporations as well as to Tri-Star, and (ii) the duties owed to HBO were in conflict with those owed to Tri-Star's public shareholders because, by virtue of certain legal and economic relationships between HBO and Coca-Cola, it was in HBO's economic interest to accede to the wishes of Coca-Cola by voting to approve the Combination from which Coca-Cola would significantly benefit. The relationships that are said to create that conflict include a voting agreement between HBO and Coca-Cola, as well as a series of commercial agreements

between those two firms that (it is claimed) were highly valuable to HBO.[FN4] In addition, it is argued that the Proxy Statement itself discloses that by reason of these "significant commercial agreements," Messrs. Bigelow and Collins had "conflicts of interest."

The plaintiffs claim that those conflicts strip Bigelow and Collins of the protective presumptions of the business judgment rule, and impose on them the burden of proving that the Combination was entirely fair. That burden, plaintiffs conclude, cannot be satisfied on this record.

**\*5** Alternatively, plaintiffs argue that even if the entire fairness standard does not govern, the Combination was a "change of control" transaction that was subject to enhanced judicial scrutiny as prescribed by *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34 (1993). More particularly, plaintiffs contend that the Combination reduced the public shareholders' ownership from approximately 60% to 20%, and as a result, the defendants had a duty to obtain the highest value reasonably available. That duty, plaintiffs argue, also was not observed.

Finally, the plaintiffs urge that even if business judgment is found to be the appropriate standard of review, summary judgment must be denied because of material fact issues that can only be resolved after a trial. Plaintiffs argue that there is evidence that Messrs. Bigelow and Collins (and other Tri-Star directors) breached their duty of care to Tri-Star by negligently failing to ascertain the value of the EBS assets being acquired and the value of the 75 million Tri-Star shares being issued in exchange.

In reply, the defendants argue that (a) plaintiffs have adduced no evidence that HBO was dominated by or was beholden to Coca-Cola in any way, (b) as a matter of law the commercial agreements and the voting agreement do not establish any conflict between the interests of HBO (and its directors designees) and the interests of Tri-Star, (c) there is no evidence that Coca-Cola tried to influence in any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 5
Not Reported in A.2d, 1995 WL 106520 (Del.Ch.), Fed. Sec. L. Rep. P 98,818, 20 Del. J. Corp. L. 854

way the decision-making process of the HBO/Time directors in connection with the Combination, and (d) there is no evidence that the HBO/Time directors committed any act of disloyalty to Tri-Star or that they voted for the Combination for any reason other than their disinterested view of that transaction's merits.

Finally, the defendants contend that neither the "change of control," nor the "due care" arguments advanced by plaintiffs is properly in the case, because neither theory was pleaded, and the defendants were afforded no opportunity to explore these claims in discovery. In any event, defendants argue, the factual record establishes that Messrs. Bigelow and Collins exercised utmost due care by obtaining and relying upon a well-researched expert financial analysis of the Combination.

### B.

While the matter is not altogether free from doubt, it appears that the dispute here is not about conflicts in the evidence or facts but, rather, concerns what "ultimate" fact inferences should properly be drawn from facts that are undisputed. In a case such as this that becomes problematic because issues such as "director self-interest" and "domination" are, by their nature, fact-intensive and highly dependent upon context. A grant of summary judgment is discretionary. Even where the facts are not in dispute, a court may decline to grant summary judgment where a more thorough exploration of the facts is needed to properly apply the law to the circumstances. *Wolf v. Magness Construction Company,* Del.Ch., C.A. No. 13004, Chandler, V.C. (Feb. 16, 1995), Mem. op. at 2; *Jackson v. Copeland,* Del.Ch., C.A. No. 12710, Steele, V.C. (Jan. 25, 1995), Mem. op. at 4; *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962). As the authors of a noted treatise have aptly observed:

*6 [A]lthough the general rule is that difficult legal issues do not preclude summary judgment, it also has been held that difficult or complicated legal issues should not be adjudicated upon an inadequate legal record. As a result, an appraisal of the legal issues may lead a court to exercise its discretion and deny summary judgment in order to obtain the fuller factual foundation offered by a plenary trial.

10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2728 at 191 (citations omitted).

In this highly complex case, the Court is persuaded that such a "fuller factual foundation" is needed to enable it to determine, with the appropriate degree of confidence, the proper factual inferences to be drawn from the evidence and the correct application of the law to those inferences. Any summary adjudication on the present record runs the risk of being made in a vacuum. That risk will vanish once the Court, aided by live witness testimony, is in a better position to grasp the intricacies of the corporate relationships and the economic subtleties of the Combination. Nor will a denial of summary judgment procedurally prejudice Messrs. Bigelow and Collins, because they will have to defend against the plaintiffs' claims at trial in any event. That is, even if partial summary judgment in Bigelow's and Collins' favor were granted, there would be no shortening of the trial or reduction of the scope of the evidence. The remaining claims against the HBO/Time directors will still have to be tried, and a trial of those claims will require most, if not all, of the proof that would be developed in connection with the duty of loyalty claims for which summary judgment is being sought here. Because no saving of trial time and no material reduction of evidence would result from granting these motions, the benefits that might otherwise accompany a grant of summary judgment would not exist here.[FN8]

3

For the above reasons, the motion of defendants Vincent, Herbert and Fuchs for summary judgment is granted and the motion of defendants Bigelow and Collins for partial summary judgment is denied. IT IS SO ORDERED.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                          Page 6
Not Reported in A.2d, 1995 WL 106520 (Del.Ch.), Fed. Sec. L. Rep. P 98,818, 20 Del. J. Corp. L. 854

FN1. Those claims include Count I (breach of fiduciary duty), Count II (breach of the fiduciary duty of disclosure), Count V (manipulation of corporate machinery), and Count VII (aiding and abetting a breach of fiduciary duty).

FN2. Mr. Fuch's inability to recall (in a deposition taken over three years later) whether or not he attended that board meeting does not create a genuine issue of fact, because the minutes of that meeting and the Proxy Statement recite that Fuchs was absent, and plaintiffs have adduced no evidence to the contrary.

The plaintiffs also argue that the "abstention" argument cannot be considered, because it was not raised as an affirmative defense. The short answer is that those directors' nonparticipation at the meeting and their decision not to vote on the transaction are not an affirmative defense but, rather, are facts that negate an essential element of the plaintiffs' claim. As such, those circumstances are properly raised on this mo- tion.

FN3. Unlike Messrs. Herbert and Vincent, Mr. Fuchs did review drafts of the proxy statement, and, consequently, does not, seek summary judgment with respect to Count II.

FN4. Under the voting agreement, Coca-Cola and HBO each agreed to designate four nominees to the Tri-Star board and to vote for each other's nominees. They also agreed not to solicit proxies in opposition to any recommendations to the Tri-Star board.

Regarding the five HBO/Coca-Cola commercial agreements, the defendants point out that by the time of the Combin-

ation, three of those agreements had expired. The defendants further argue that none of the other agreements is shown to have influenced the vote of the HBO/Time directors on the Combination.

FN5. The denial of the HBO/Time directors' motions should not be misread as implicit approval of the plaintiffs' last minute effort to inject "due care" and "change of control" claims into this case. This litigation has been pending for over seven years. It has been the subject of extensive discovery and of four pretrial Opinions (including this one) and one appellate Opinion, each of which has, in some way, addressed and determined the legal sufficiency of the plaintiffs' claims and which of those claims will be tried. Discovery is now essentially completed and the trial will commence in less than two months. At no time before the filing of the plaintiffs' answering brief on remand were the defendants or the Court put on notice that the plaintiffs might seek the imposition of liability predicated upon claims of breach of the duty of care or the duty (articulated in *Paramount Communications Corp. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 48 (1993)) to obtain the highest available value in a transaction involving a transfer or change of control. Having never been pleaded or previously advanced, those claims may not be asserted now.

Del.Ch.,1995.
In re Tri-Star Pictures, Inc., Litigation
Not Reported in A.2d, 1995 WL 106520 (Del.Ch.), Fed. Sec. L. Rep. P 98,818, 20 Del. J. Corp. L. 854

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.