IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: INTEL CORPORATION DERIVATIVE
LITIGATION

)
)   C.A. No. 08-cv-93 (JJF)
)

## DEFENDANTS' REQUEST FOR JUDICIAL NOTICE
## IN SUPPORT OF THEIR MOTION TO DISMISS
## THE AMENDED CONSOLIDATED COMPLAINT

OF COUNSEL:

Jonathan C. Dickey
Marshall R. King
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

POTTER ANDERSON & CORROON LLP
Donald J. Wolfe, Jr. (I.D. #285)
Stephen C. Norman (I.D. #2686)
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6000
E-mail: dwolfe@potteranderson.com
E-mail: snorman@potteranderson.com

*Attorneys for Defendants*

Dated: September 5, 2008

Pursuant to Federal Rule of Evidence 201, Defendants in this action, consisting of Intel Corporation ("Intel") and the members of Intel's Board of Directors at the time this action was commenced, respectfully request that this Court take judicial notice of the following documents:

1. A Form 8-K Report, filed with the SEC by Advanced Micro Devices, Inc., dated January 19, 1995. A true and correct copy of this document is attached hereto as Exhibit A.

2. Intel's 2008 Proxy Statement, filed with the SEC, dated April 2, 2008. A true and correct copy of this document is attached hereto as Exhibit B.

3. The Complaint filed in *Advanced Micro Devices Inc. v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litigation)*, MDL Docket No. 05-1717-JJF, Civil Action No. 05-441-JJF (D. Del., filed June 27, 2005). A true and correct copy of this document is attached hereto as Exhibit C.

4. Intel's Third Restated Certificate of Incorporation, dated May 15, 2006. A true and correct copy of this document is attached hereto as Exhibit D.

5. A news article titled *Intel Feels Some Heat in Japan*, published in Business Week, dated April 19, 2004. A true and correct copy of this document is attached hereto as Exhibit E.

6. A news article by author Cliff Edwards titled *The EU's Hard Look Inside Intel*, published in Business Week, dated June 21, 2004. A true and correct copy of this document is attached hereto as Exhibit F.

## ARGUMENT

Defendants' Request for Judicial Notice is made pursuant to Federal Rule of Evidence 201(b)-(d), which provides that "[a] court shall take judicial notice if requested by a party and supplied with the necessary information," where such information is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

All of the foregoing documents — which include SEC public disclosure filings (Exhibits A, B), a court filing in a related action (Exhibit C), a certificate of incorporation (Exhibit D), and two news articles (Exhibits E and F) — are appropriate subjects for judicial notice. *See In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1331 (3d Cir. 2002) (affirming judicial notice of documents filed with SEC); *Swanger v. Zimmerman,* 750 F.2d 291, 297 (3d Cir. 1984) (taking judicial notice of court documents in related case); *Amalgamated Bank v. Yost,* 04-cv-0972, 2005 WL 226117, at *5 (E.D. Pa. Jan. 31, 2005) (taking judicial notice of exculpatory provisions of certificate of incorporation; noting that accuracy of certificate "cannot be questioned because it is a public document filed with the Secretary of State"); *Benak ex rel Alliance Premier Growth Fund v. Alliance Capital Mgt. L.P.,* 435 F.3d 396, 401, n.15 (3d Cir. 2006) (affirming judicial notice of news articles demonstrating that plaintiffs were on inquiry notice for statute of limitations purposes).

3

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court grant this

Request for Judicial Notice in its entirety.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Jonathan C. Dickey
Marshall R. King
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

By____ /s/ Stephen C. Norman _____
    Donald J. Wolfe, Jr. (I.D. #285)
    Stephen C. Norman (I.D. #2686)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P. O. Box 951
    Wilmington, Delaware  19899-0951
    (302) 984-6000
    E-mail: dwolfe@potteranderson.com
    E-mail: snorman@potteranderson.com

    *Attorneys for Defendants*

Dated: September 5, 2008

880749

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that, on September 5, 2008, the within document was filed with the

Clerk of Court using CM/ECF which will send notification of such filing to the following, and

that the document is available for viewing and downloading from CM/ECF:

Brian D. Long, Esquire
Rigrodsky & Long, P.A.
919 North Market Street
Suite 980
Wilmington, DE  19801


/s/ Stephen C. Norman
Stephen C. Norman (#2686)
Potter Anderson & Corroon LLP
Hercules Plaza – 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, Delaware  19899
(302) 984-6000
snorman@potteranderson.com

# EXHIBIT A

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: keymaster@town.hall.org
Originator-Key-Asymmetric:
 MFkwCgYEVQgBAQICAgADSwAwSAJBALeWW4xDV4i7+b6+UyPn5RtObb1cJ7VkACDq
 pKb9/DClgTKIm08lCfoilvi9W14SODbR1+lwaHhiGmeZO8OdgLUCAwEAAQ==
MIC-Info: RSA-MD5,RSA,
 nkyH9V/TN78tYouAwrcYOkYb3MEFy06u8VxMF0QaPhxzYxvZviTV5D1DZvncgzJE
 x924JLjxuEpUBnxWt2oXew==

<IMS-DOCUMENT>0000898430-95-000048.txt : 19950608
<IMS-HEADER>0000898430-95-000048.hdr.sgml : 19950608
ACCESSION NUMBER:        0000898430-95-000048
CONFORMED SUBMISSION TYPE:    8-K
PUBLIC DOCUMENT COUNT:        4
CONFORMED PERIOD OF REPORT:   19941230
ITEM INFORMATION:            Other events
FILED AS OF DATE:            19950119
SROS:              NYSE

FILER:

        COMPANY DATA:
            COMPANY CONFORMED NAME:          ADVANCED MICRO DEVICES INC
            CENTRAL INDEX KEY:               0000002488
            STANDARD INDUSTRIAL CLASSIFICATION:  3674
            IRS NUMBER:                      941692300
            STATE OF INCORPORATION:          DE
            FISCAL YEAR END:                 1227

        FILING VALUES:
            FORM TYPE:            8-K
            SEC ACT:             1934 Act
            SEC FILE NUMBER:     001-07882
            FILM NUMBER:         95501993

        BUSINESS ADDRESS:
            STREET 1:            901 THOMPSON PL
            STREET 2:            P O BOX 3453
            CITY:                SUNNYVALE
            STATE:               CA
            ZIP:                 94088
            BUSINESS PHONE:      4087322400
</IMS-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<DESCRIPTION>FORM 8-K
<TEXT>

<PAGE>

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C.  20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report:  December 30, 1994

ADVANCED MICRO DEVICES, INC.
-------------------------------
(Exact name of registrant as specified in its charter)

| Delaware | 1-7882 | 94-1692300 |
|----------|--------|------------|
| (State or other jurisdiction | (Commission | (I.R.S. Employer |

of incorporation)              File Number)              Identification No.)


One AMD Place
P.O. Box 3453
Sunnyvale, California                                    94088-3453
- - ----------------------                               ----------
(Address of principal executive office)                 (Zip Code)

Registrant's telephone number, including area code:     (408) 732-2400

Exhibit Index
located on sequential page 5                            Page 1 of  12
<PAGE>

Item 5.   Other Events
- - -------   ------------

On December 30, 1994, Advanced Micro Devices, Inc. (the "Company") issued a
press release announcing that the California Supreme Court upheld an
arbitrator's award of technology rights to the Company in a long-running legal
battle with Intel Corporation concerning a 1982 technology exchange agreement
between the two companies (the "AMD/Intel Technology Agreement Arbitration").
Prior to the settlement with Intel next discussed, the press release also
advised that Intel was expected to continue to challenge the validity of the
award in federal court.

On January 11, 1995, the Company issued a press release announcing that it had
reached agreement with Intel Corporation to settle all current outstanding legal
disputes (the "AMD/Intel Litigations") which include: (1) the AMD/Intel
Technology Agreement Arbitration; (2) the '287 Microcode Litigation; (3) the
'386 Microcode Litigation; (4) the '486 Microcode Litigation; (5) the Anti-trust
Litigation; (6) the Business Interference Litigation and (7) the ITC Action.
The settlement agreement terms include:

     1.    AMD will have a perpetual license to the microcode in the Intel
           386(TM) and Intel 486(TM) microprocessors.

     2.    AMD agrees that it has no right to copy any other Intel microcode
           including the Pentium(TM) Processor, P6 microcode and 486 ICE (in
           circuit emulation) microcode.

     3.    The companies will negotiate a new patent cross-license agreement to
           become effective 1/1/96.

     4.    Intel will receive $58 million as settlement for past damages related
           to the ICE module of the '486 Microcode Litigation case. As ordered in
           the 1992 arbitration between the two companies, Intel will pay AMD
           approximately $18 million in damages (which includes interest) awarded
           by the arbitrator for breach of contract and will not contest the
           rights granted AMD in the AMD/Intel Technology Agreement Arbitration.
           The damages amount of $18 million was previously recorded by the
           Company in the third quarter of 1994.

     5.    Intel and AMD will drop all cases including appeals currently pending
           in the courts.

     6.    AMD will have the right to use foundries for Am486(R) products
           containing Intel microcode for up to 20 percent of its 486 production.

     7.    AMD and its customers will get a license for Intel's "Crawford '338"
           patent, covering memory management.

     8.    The two companies agree not to initiate legal action against one
           another for any activity occurring prior to January 6, 1995.

                                        2
<PAGE>

On January 12 , 1995, the Company issued a press release announcing that it had
restated its 1994 financial results as a result of the settlement of the
AMD/Intel litigations, specifically the agreement to pay Intel $58 million for
past damages in the ICE module of the 486 Microcode Litigation.  Thus, the
Company recorded a $58 million charge in its fourth quarter of 1994 and revised
its previously released 1994 results.  Net income for the quarter and the year
end was reduced by $35,877,000 from the originally reported amounts because of

the tax benefit of the settlement and an accrual made for the AMD/Intel
Litigations previously recorded in the fourth quarter.

Currently, assuming the Intel settlement is fully consummated, the Company does
not anticipate that the AMD/Intel Litigations or the foregoing settlement will
have a material adverse impact on the Company's financial condition or results
of operations for fiscal year 1995.

                                    3

<PAGE>

                              SIGNATURES
                              ----------


Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.


                              ADVANCED MICRO DEVICES, INC
                                   (Registrant)


Date:  January 19,  1995          By:   /s/ Larry R. Carter
                                        ------------------------------
                                        Larry R. Carter

                                    4

<PAGE>

                              Exhibit Index
                              -------------

<TABLE>
<CAPTION>

                                                         Sequential
                                                         Page No.
                                                         ---------

<S>        <C>                                            <C>
28.1       Press Release dated December 30, 1994 announcing that      6
           the California Supreme Court upheld the arbitrator's
           award in the AMD/Intel Technology Agreement Arbitration.


28.2       Press Release dated January 11, 1995 announcing that       8
           the Company and Intel Corporation settled AMD/Intel
           Litigations.


28.3       Press Release dated January 12, 1995 announcing that       10
           the Company restated its 1994 financial results as a
           consequence of the settlement of the AMD/Intel Litigations.
</TABLE>
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-28.1
<SEQUENCE>2
<DESCRIPTION>EXHIBIT 28.1 TO 8-K
<TEXT>

<PAGE>

                              EXHIBIT 28.1


NEWS RELEASE


                              For further information:
                              John Greenagel (408) 749-3310
                              Chuck Mulloy   (408) 749-5481

CALIFORNIA SUPREME COURT UPHOLDS ARBITRATOR'S

AWARD TO ADVANCED MICRO DEVICES

SUNNYVALE, CA ... December 30, 1994 ... The California Supreme Court has upheld an arbitrator's award of technology rights to Advanced Micro Devices, Inc. in a long-running legal battle with Intel Corporation concerning a 1982 technology exchange agreement between the two companies.

The ruling ends litigation that began in 1987 when AMD brought suit to compel arbitration, alleging that Intel had failed to honor its obligations under the technology exchange agreement.  After finding that Intel had breached contractual obligations, including obligations of "good faith and fair dealing," retired Superior Court Judge J. Barton Phelps, acting as court-appointed arbitrator, awarded AMD, in addition to other remedies, a worldwide, royalty-free license to any Intel intellectual property contained in AMD's reverse-engineered Am386(R) microprocessor.  These rights included patents, copyrights, mask work rights and trade secrets.  Judge Phelps also extended the terms of AMD's license rights for two years as those rights concern the Am386 microprocessor.

In 1993 a Sixth District Court of Appeals panel ruled that the arbitrator had exceeded his jurisdiction and invalidated the award of technology rights. Today's Supreme Court action overrules this lower court decision and affirms the Superior Court's judgment in favor of AMD.
<PAGE>

In an unrelated proceeding earlier this year, unanimous jury verdicts upheld AMD's license rights to use Intel microcodes, including the microcode in the Am386 microprocessor family.

"AMD is delighted at a decision that not only does justice in this particular case, but also preserves the viability of arbitration as an alternative form of resolution for complicated business disputes in California," said W. J. Sanders III, chairman and chief executive officer.  "This ruling, which we expect will be followed by the federal courts, forecloses Intel's claims for monetary damages based on our sales of 386 microprocessors," Mr. Sanders continued.

Mr. Sanders said AMD does not believe the federal courts will respond favorably to Intel's pleas to ignore a ruling of the California Supreme Court simply because it involves copyright issues.  "This case involved a contract breach and the appropriate remedies for that breach," said Mr. Sanders. "Although the arbitrator awarded a license to a federally protected copyright, the arbitrator's authority to make that award is exclusively governed by state law. Because California contract law controlled AMD's 1982 agreement with Intel, the federal court must defer to the California Supreme Court's interpretation of the arbitrator's powers.  We are confident that the federal court will accept the Supreme Court's decision and dismiss Intel's federal copyright action on the Am386 microprocessor.

"AMD and Intel have been in litigation long enough. I hope we can now find a path to a resolution based on our mutual interest in supporting the continued expansion of the market for Microsoft(R) Windows(TM)-compatible computer systems," he concluded.

#####

AMD news release #94CORP27
Am386 is a registered trademark of Advanced Micro Devices, Inc.
Microsoft is a registered trademark of Microsoft Corp.
Windows is a trademark of Microsoft Corp.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-28.2
<SEQUENCE>3
<DESCRIPTION>EXHIBIT 28.2 TO 8-K
<TEXT>

<PAGE>

EXHIBIT 28.2

NEWS RELEASE

For further information:
Chuck Mulloy
AMD
(408) 749-5481

Howard High
Intel
(408) 765-1488


### AMD, INTEL SETTLE ALL LEGAL DISPUTES

SANTA CLARA, CA ... January 11, 1995 ... Advanced Micro Devices, Inc. and Intel
Corporation said they have reached agreement to settle all outstanding legal
disputes between the two companies.

Following are the major points of the agreement:
* AMD will have a perpetual license to the microcode in the
  Intel 386(TM) and Intel 486(TM) microprocessors.

* AMD agrees that it has no right to copy any other Intel
  microcode including the Pentium(TM) Processor, P6 microcode
  and 486 ICE (in circuit emulation) microcode.

* The companies will negotiate a new patent cross-license
  agreement to become effective 1/1/96.

* Intel will receive $58 million as settlement for past damages
  in the 486 ICE case. As ordered in the 1992 arbitration
  between the two companies, Intel will pay AMD approximately
  $18 million (which includes interest) awarded by the
  arbitrator for breach of contract and will not contest the
  rights granted AMD in the arbitration award.

<PAGE>

* Intel and AMD will drop all cases including appeals currently
  in the courts.

* AMD will drop its antitrust case against Intel.

* AMD will have the right to use foundries for Am486(R)
  products containing Intel microcode for up to 20 percent of
  its 486 production.

* AMD and its customers will get a license on Intel's "Crawford
  '338" patent, covering memory management.

* The two companies will agree not to initiate legal action
  against one another for any activity occurring prior to
  January 6, 1995.

The two companies said they have been in negotiations for 4 months.  The
talks were suggested by Judge Magistrate Patricia Trumbull of the U.S. District
Court in San Jose, who presided in the 386 and 486 cases.

In a joint statement, Richard Previte, president and chief operating
officer of AMD, and Craig Barrett, executive vice president and chief operating
officer of Intel, said "We are pleased to reach an agreement that will enable
the two companies to concentrate on competing in the marketplace, not the
courts.  This is clearly in the best interests of our customers, our
stockholders and the PC marketplace."  Messrs. Previte and Barrett were the lead
negotiators of the agreement.

AMD is the fifth-largest U.S. manufacturer of integrated circuits.
Focusing on the personal and networked computing and communications markets, AMD
produces microprocessors and related peripherals, memories, programmable logic
devices and circuits for telecommunications and networking applications.

Intel, the world's largest chip maker, is also a leading manufacturer of
personal computer, networking and communications products.

### 

AMD news release #95CORP3
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-28.3
<SEQUENCE>4
<DESCRIPTION>EXHIBIT 28.3 TO 8-K
<TEXT>

<PAGE>

EXHIBIT 28.3


NEWS RELEASE


For further information:
Chuck Mulloy
(408) 749-5481

ADVANCED MICRO DEVICES  RESTATES 1994 RESULTS
TO REFLECT LITIGATION SETTLEMENT

SUNNYVALE, CA ... January 12, 1995 ... Advanced Micro Devices (AMD) today
announced that as a result of the AMD and Intel litigation settlement as
required for financial reporting purposes, AMD recorded a $58 million charge in
its fourth quarter of 1994 and revised its previously released 1994 results. Net
income for the quarter and the year end was reduced by $ 35,877,000 from the
originally reported amounts because of the tax benefit of the settlement and an
accrual previously recorded in the fourth quarter.

Even after the restatement AMD still achieved record sales, operating
income and net income for 1994.  The settlement will have no financial impact on
1995 operating results or financial condition.

Advanced Micro Devices, Inc., is the fifth-largest U.S. manufacturer of
integrated circuits. Focusing on the personal and networked computing and
communications markets, AMD produces microprocessors and related peripherals,
memories, programmable logic devices and circuits for telecommunications and
networking applications.  AMD has sales offices worldwide and has manufacturing
facilities in Sunnyvale, California; Austin, Texas; Bangkok, Thailand; Penang,
Malaysia; Singapore; Aizu-Wakamatsu, Japan and Basingstoke, England.

### 

<PAGE>
Advanced Micro Devices, Inc.
CONSOLIDATED BALANCE SHEETS
(Thousands)

<TABLE>
<CAPTION>

|  | (Revised) * December 25, 1994 (Audited) | December 26, 1993 (Audited) |
|---|---|---|
| <S> | <C> | <C> |
| ASSETS | | |
| Current assets: | | |
| Cash and temporary cash investments | $     377,854 | $     488,198 |
| Accounts receivable, net | 337,107 | 263,617 |
| Inventories | 128,690 | 104,050 |
| Prepaid expenses and other current assets | 44,293 | 30,399 |
| Deferred income taxes | 98,675 | 77,922 |

| | | |
|---|---:|---:|
| Total current assets | 986,619 | 964,186 |
| Other assets | 70,284 | 58,633 |
| Property, plant, and equipment, net | 1,264,211 | 904,326 |
| Investment in joint venture | 124,588 | 2,086 |
| | $ 2,445,702 | $ 1,929,231 |

Liabilities and Shareholders' Equity

| | | |
|---|---:|---:|
| Current liabilities: | | |
| Notes payable to banks | $ 32,459 | $ 30,994 |
| Accounts payable | 149,122 | 127,151 |
| Accrued compensation and benefits | 104,526 | 81,860 |
| Other accrued liabilities | 140,570 | 83,982 |
| Income tax payable | 53,795 | 34,991 |
| Deferred income on shipments to distributors | 83,800 | 74,436 |
| Long-term debt and capital lease obligations due within one year | 27,895 | 21,205 |
| Total current liabilities | 592,167 | 454,619 |
| Deferred income taxes | 42,518 | 42,837 |
| Long-term debt and capital lease obligations due after one year | 75,752 | 79,504 |
| Shareholders' equity: | | |
| Capital stock: | | |
| Serial preferred stock, par value | 34 | 35 |
| Common stock, par value | 956 | 926 |
| Capital in excess of par value | 698,673 | 619,733 |
| Retained earnings | 1,035,602 | 731,577 |
| Total shareholders' equity | 1,735,265 | 1,352,271 |
| | $ 2,445,702 | $ 1,929,231 |

</TABLE>

\* Revised from previously released financial information as a result of a
  negotiated settlement with Intel Corporation.
<PAGE>
Advanced Micro Devices, Inc.
CONSOLIDATED STATEMENTS OF OPERATIONS
(Thousands except per share amounts)

<TABLE>
<CAPTION>

| | Quarter Ended (Unaudited) | | | Year Ended (Audited) | |
|---|---|---|---|---|---|
| | Dec. 25, 1994 (Revised)\* | Sept. 25, 1994 | Dec. 26, 1993 | Dec. 25, 1994 (Revised)\* | Dec. 26, 1993 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| NET SALES | $ 545,168 | $ 543,114 | $413,404 | $2,134,659 | $ 1,648,280 |
| Cost of sales | 263,837 | 252,409 | 208,552 | 982,306 | 789,564 |
| Research and development | 76,115 | 67,759 | 66,747 | 279,984 | 262,802 |
| Marketing, general, and administrative | 87,236 | 87,369 | 83,148 | 359,230 | 290,861 |
| | 427,188 | 407,537 | 358,447 | 1,621,520 | 1,343,227 |

| | | | | | |
|---|---|---|---|---|---|
| Operating income | 117,980 | 135,577 | 54,957 | 513,139 | 305,053 |
| Litigation settlement | (58,000) | -- | -- | (58,000) | -- |
| Interest income and other, net | 5,317 | 394 | 4,647 | 16,259 | 16,490 |
| Interest expense | (1) | (205) | (1,391) | (1,844) | (2,910) |
| Income before income taxes and equity in joint venture | 65,296 | 135,766 | 58,213 | 469,554 | 318,633 |
| Provision for income taxes | 21,548 | 44,803 | 16,300 | 153,703 | 89,218 |
| Income before equity in joint venture | 43,748 | 90,963 | 41,913 | 315,851 | 229,415 |
| Equity in net income (loss) of joint venture | (2,989) | (4,277) | (274) | (10,585) | (634) |
| NET INCOME | 40,759 | 86,686 | 41,639 | 305,266 | 228,781 |
| Preferred stock dividends | 2,588 | 2,587 | 2,588 | 10,350 | 10,350 |
| NET INCOME APPLICABLE TO COMMON SHAREHOLDERS | $ 38,171 | $ 84,099 | $ 39,051 | $ 294,916 | $ 218,431 |
| NET INCOME PER COMMON SHARE | | | | | |
| – Primary | $0.39 | $0.86 | $0.41 | $3.02 | $2.30 |
| – Fully diluted | $0.39 | $0.83 | $0.41 | $2.92 | $2.24 |
| Shares used in per share calculation | | | | | |
| – Primary | 98,636 | 97,778 | 95,895 | 97,510 | 95,108 |
| – Fully diluted | 105,490 | 104,872 | 102,751 | 104,570 | 102,063 |

</TABLE>

* Revised from previously released financial information as a result of a
  negotiated settlement with Intel Corporation.

</TEXT>
</DOCUMENT>
</IMS-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# EXHIBIT B

**INTEL CORPORATION**
**2200 Mission College Blvd.**
**Santa Clara, CA 95054-1549**
**(408) 765-8080**



April 2, 2008

Dear Stockholder:

　　We look forward to your attendance either in person or by proxy at the 2008 Annual Stockholders' Meeting. We will hold the meeting at 8:30 a.m. Pacific Time on May 21, 2008 at the Computer History Museum, 1401 N. Shoreline Blvd., Mountain View, California 94043. We are pleased to offer a live webcast of the annual meeting at *www.intc.com.*

　　We also are pleased to be using the new U.S. Securities and Exchange Commission rule that allows companies to furnish proxy materials to their stockholders primarily over the Internet. We believe that this new process should expedite stockholders' receipt of proxy materials, lower the costs of our annual meeting, and help to conserve natural resources. On April 2, 2008, we mailed our stockholders a notice containing instructions on how to access our 2008 Proxy Statement and 2007 Annual Report and vote online. The notice also included instructions on how to receive a paper copy of your annual meeting materials, including the notice of annual meeting, proxy statement, and proxy card. If you received your annual meeting materials by mail, the notice of annual meeting, proxy statement, and proxy card from our Board of Directors were enclosed. If you received your annual meeting materials via e-mail, the e-mail contained voting instructions and links to the annual report and the proxy statement on the Internet, which are both available at *www.intel.com/intel/annualreports.*

　　At this year's annual meeting, the agenda includes the following items:

| Agenda Item | Board Recommendation |
|---|---|
| Election of Directors | FOR |
| Ratification of Ernst & Young LLP | FOR |
| Stockholder Proposal to Amend Bylaws to Establish | |
| Board Committee on Sustainability | AGAINST |

　　Please refer to the proxy statement for detailed information on each of the proposals and the annual meeting. Your Intel stockholder vote is important, and we strongly urge you to cast your vote.

Sincerely yours,

Craig R. Barrett
*Chairman of the Board*



# INTEL CORPORATION

**2200 Mission College Blvd.,**
**Santa Clara, California 95054-1549**

## NOTICE OF 2008 ANNUAL STOCKHOLDERS' MEETING

| | |
|---|---|
| **TIME AND DATE** | 8:30 a.m. Pacific Time on May 21, 2008 |
| **PLACE** | Computer History Museum, 1401 N. Shoreline Blvd., Mountain View, California 94043 |
| **LIVE WEBCAST** | Listen to annual meeting and ask questions at *www.intc.com* |
| **AGENDA** | • Elect a Board of Directors |
| | • Ratify Ernst & Young LLP as independent registered public accounting firm |
| | • Act on one stockholder proposal to amend the Bylaws to establish a Board committee on sustainability, if properly presented at the meeting |
| | • Transact other business that may properly come before the annual meeting (including adjournments and postponements) |
| **RECORD DATE** | March 24, 2008 |
| **VOTING** | Please vote as soon as possible to record your vote promptly, even if you plan to attend the annual meeting. You have three options for submitting your vote before the annual meeting: |
| | • Internet |
| | • Phone |
| | • Mail |

By Order of the Board of Directors

Cary I. Klafter
*Corporate Secretary*

Santa Clara, California
April 2, 2008

# TABLE OF CONTENTS

| | Page |
|---|---|
| Internet Availability of Proxy Materials | 2 |
| Attending the Annual Meeting | 2 |
| Questions | 2 |
| Proxy Statement | 3 |
| Proposal 1: Election of Directors | 4 |
| Corporate Governance | 5 |
| Director Compensation | 10 |
| Director Summary Compensation | 11 |
| Outstanding Equity Awards for Directors at Fiscal Year-End 2007 | 13 |
| Security Ownership of Certain Beneficial Owners and Management | 15 |
| Certain Relationships and Related Transactions | 16 |
| Compensation Discussion and Analysis | 16 |
| Report of the Compensation Committee | 32 |
| Executive Compensation | 32 |
| Summary Compensation | 32 |
| Grants of Plan-Based Awards in Fiscal Year 2007 | 36 |
| Outstanding Equity Awards at Fiscal Year-End 2007 | 37 |
| Option Exercises and Stock Vested in Fiscal Year 2007 | 39 |
| Pension Benefits for Fiscal Year 2007 | 39 |
| Non-Qualified Deferred Compensation for Fiscal Year 2007 | 40 |
| Employment Contracts and Change in Control Arrangements | 41 |
| Other Potential Post-Employment Payments | 42 |
| Report of the Audit Committee | 43 |
| Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm | 45 |
| Proposal 3: Stockholder Proposal to Amend Corporate Bylaws to Establish a Board Committee on Sustainability | 46 |
| Additional Meeting Information | 47 |
| Other Matters | 47 |
| Stockholders Sharing the Same Last Name and Address | 49 |

## INTERNET AVAILABILITY OF PROXY MATERIALS

Under rules recently adopted by the U.S. Securities and Exchange Commission (SEC), we are furnishing proxy materials to our stockholders primarily via the Internet, instead of mailing printed copies of those materials to each stockholder. On April 2, 2008, we mailed to our stockholders (other than those who previously requested electronic or paper delivery) a Notice of Internet Availability containing instructions on how to access our proxy materials, including our proxy statement and our annual report. The Notice of Internet Availability also instructs you on how to access your proxy card to vote through the Internet or by telephone.

This new process is designed to expedite stockholders' receipt of proxy materials, lower the cost of the annual meeting, and help conserve natural resources. However, if you would prefer to receive printed proxy materials, please follow the instructions included in the Notice of Internet Availability. If you have previously elected to receive our proxy materials electronically, you will continue to receive these materials via e-mail unless you elect otherwise.

## ATTENDING THE ANNUAL MEETING

**Attending in Person**

- Doors open 8:00 a.m. Pacific Time
- Meeting starts at 8:30 a.m. Pacific Time
- No use of cameras
- Security measures may include bag search, metal detector, and hand-wand search
- You do not need to attend the annual meeting to vote if you submitted your proxy in advance of the annual meeting

**Viewing on the Internet**

- *www.intc.com*
- Webcast starts at 8:30 a.m. Pacific Time
- Viewers can submit questions by e-mail
- Replay available until June 20, 2008

## QUESTIONS

| For questions regarding | Contact |
|---|---|
| Annual meeting | Intel Investor Relations, (408) 765-1480 |
| Stock ownership | Computershare Investor Services, LLC<br>*www.computershare.com/contactus*<br>(800) 298-0146 (within the U.S. and Canada) or<br>(312) 360-5123 (outside the U.S. and Canada) |
| Voting | D. F. King & Co., Inc.<br>(800) 967-7858 (within the U.S. and Canada) or<br>(212) 269-5550 (outside the U.S. and Canada) |



**INTEL CORPORATION**
**2200 Mission College Blvd.**
**Santa Clara, CA 95054-1549**

## PROXY STATEMENT

Our Board of Directors solicits your proxy for the 2008 Annual Stockholders' Meeting to be held at 8:30 a.m. Pacific Time on Wednesday, May 21, 2008 at the Computer History Museum, 1401 N. Shoreline Blvd., Mountain View, California 94043, and at any postponement or adjournment of the meeting, for the purposes set forth in "Notice of Annual Stockholders' Meeting." We made this proxy statement available to stockholders beginning on April 2, 2008.

| | |
|---|---|
| **Record Date** | March 24, 2008 |
| **Quorum** | Majority of shares outstanding on the record date must be present in person or by proxy |
| **Shares Outstanding** | 5,744,608,312 shares of common stock outstanding as of March 24, 2008 |
| **Voting by Proxy** | Internet, phone, or mail |
| **Voting in Person** | Registered holders can vote in person. Beneficial owners must obtain a proxy from their brokerage firm, bank, or other holder of record and present it to the inspector of elections with their ballot. Voting in person will replace any previous votes submitted by proxy. |
| **Polls Close** | 9:30 a.m. Pacific Time on May 21, 2008 |
| **Changing Your Vote** | Registered holders may revoke their proxy at any time before polls close by submitting a later-dated vote in person at the annual meeting, via the Internet, by telephone, by mail, or by delivering instructions to our Corporate Secretary before the annual meeting. If you hold shares through a bank or brokerage firm, you must contact that firm to revoke any prior voting instructions. |
| **Votes Required to Adopt Proposals** | Each share of our common stock outstanding on the record date is entitled to one vote on each of the 11 director nominees and one vote on each other matter. To be elected, directors must receive a majority of the votes cast (the number of shares voted "for" a director nominee must exceed the number of votes cast "against" that nominee). Ratification of the selection of our independent registered public accounting firm and adoption of the stockholder proposal each require the affirmative vote of the majority of the shares of common stock present or represented by proxy. |
| **Effect of Abstentions and Broker Non-Votes** | Shares not present at the meeting and shares voting "abstain" have no effect on the election of directors. For the proposal ratifying the selection of our independent registered public accounting firm and the stockholder proposal, abstentions have the same effect as a negative vote and broker non-votes (shares held by brokers that do not have discretionary authority to vote on a matter and have not received voting instructions from their clients) have no effect. |
| **Voting Instructions** | If you complete and submit your proxy voting instructions, the persons named as proxies will follow your instructions. If you submit proxy voting instructions but do not direct how to vote on each item, the persons named as proxies will vote as the Board recommends on each proposal. The persons named as proxies will vote on any other matters properly presented at the annual meeting in accordance with their best judgment. We have not received notice of other matters that may be properly presented for voting at the annual meeting. |
| **Voting Results** | We will announce preliminary results at the annual meeting. We will report final results at *www.intc.com* and in our Form 10-Q for the second quarter of 2008. |

## PROPOSAL 1: ELECTION OF DIRECTORS

Our nominees for the election of directors at the annual meeting include nine independent directors, as defined in the applicable rules for companies traded on The NASDAQ Global Select Market* (NASDAQ), and two members of our senior management. Stockholders elect all directors annually. At the recommendation of our Corporate Governance and Nominating Committee, our Board has selected the nominees to serve as directors for the one-year term beginning at our annual meeting on May 21, 2008 or until their successors, if any, are elected or appointed.

Unless you direct otherwise through your proxy voting instructions, the persons named as proxies will vote all proxies received "for" the election of each nominee named in this section. If any director nominee is unable or unwilling to serve as a nominee at the time of the annual meeting, the persons named as proxies may vote for a substitute nominee chosen by the present Board to fill the vacancy or for the balance of the nominees, leaving a vacancy. Alternatively, the Board may reduce the size of the Board. We have no reason to believe that any of the nominees will be unwilling or unable to serve if elected as a director.

Intel's Bylaws require that each director receive a majority of the votes cast with respect to such director in uncontested elections (the number of shares voted "for" a director nominee must exceed the number of votes cast "against" that nominee). In 2008, all director nominees identified in the following list are currently serving on the Board. If stockholders do not elect a nominee who is serving as a director, Delaware law provides that the director would continue to serve on the Board as a "holdover director." Under our Bylaws and Corporate Governance Guidelines, each director annually submits an advance, contingent, irrevocable resignation that the Board may accept if stockholders do not elect the director. In that situation, our Corporate Governance and Nominating Committee would make a recommendation to the Board about whether to accept or reject the resignation, or whether to take other action. The Board would act on the Corporate Governance and Nominating Committee's recommendation and publicly disclose its decision and the rationale behind it within 90 days from the date that the election results were certified.

*Director Changes in 2007 and 2008.* In November 2007, the Board elected Carol A. Bartz to the Board effective January 2008. D. James Guzy is expected to retire in May 2008 in accordance with the Board's retirement age policy, and the size of the Board will be reduced to 11 at that time.

**The Board recommends that you vote "FOR" the election of each of the following nominees.**

*Craig R. Barrett*, age 68
- Intel Board member since 1992
- 2005 – present, Chairman of the Board
- 1998 – 2005, Chief Executive Officer
- 1997 – 2002, President
- Joined Intel 1974

*Ambassador Charlene Barshefsky*, age 57
- Intel Board member since 2004
- 2001 – present, Senior International Partner at the law firm of Wilmer Cutler Pickering Hale and Dorr LLP
- 1997 – 2001, United States Trade Representative, chief trade negotiator and principal trade policy maker for the United States and a member of the President's cabinet
- Member of American Express Company, Estée Lauder Companies, and Starwood Hotels & Resorts Worldwide Boards of Directors

*Carol A. Bartz*, age 59
- Intel Board member since 2008
- 2006 to present, Executive Chairman of the Board of Directors of Autodesk, Inc.
- 1992 – 2006, Chairman of the Board, Chief Executive Officer, and President of Autodesk
- Member of Cisco Systems, Inc. and Network Appliance, Inc. Boards of Directors

*Susan L. Decker*, age 45
- Intel Board member since 2006
- 2007 – present, President of Yahoo! Inc.
- 2006 – 2007, Executive Vice President of the Advertiser and Publisher Group of Yahoo! Inc.
- 2000 – 2007, Executive Vice President of Finance and Administration, and Chief Financial Officer of Yahoo! Inc.
- Member of Berkshire Hathaway Inc. and Costco Wholesale Corporation Boards of Directors

*Reed E. Hundt*, age 60
- Intel Board member since 2001
- 1998 – present, Principal of Charles Ross Partners, LLC
- 1998 – present, independent adviser to McKinsey & Company, Inc.
- 1993 – 1997, Chairman of the Federal Communications Commission
- Member of Data Domain, Inc. and Infinera Corporation Boards of Directors

---

*Other names and brands may be claimed as the property of others.*

4

*Paul S. Otellini*, age 57
- Intel Board member since 2002
- 2005 – present, President and Chief Executive Officer
- 2002 – 2005, President and Chief Operating Officer
- Member of Google, Inc. Board of Directors
- Joined Intel 1974

*James D. Plummer*, age 63
- Intel Board member since 2005
- 1999 – present, Dean of the School of Engineering at Stanford University
- 1978 – present, Professor of Electrical Engineering at Stanford University
- Member of National Academy of Engineering
- Member of International Rectifier Corporation and Leadis Technology, Inc. Boards of Directors

*David S. Pottruck*, age 59
- Intel Board member since 1998
- 2005 – present, Chairman and Chief Executive Officer of Red Eagle Ventures, Inc.
- 2005 – present, Chairman of Eos Airlines
- 2004 – present, Senior Fellow at Wharton School of Business Center for Leadership and Change Management
- 1984 – 2004, served as President, Chief Executive Officer, and a member of The Charles Schwab Corporation Board of Directors

*Jane E. Shaw*, age 69
- Intel Board member since 1993
- 1998 – 2005, Chairman and Chief Executive Officer of Aerogen, Inc.
- Member of McKesson Corporation Board of Directors

*John L. Thornton*, age 54
- Intel Board member since 2003
- 2003 – present, Professor and Director of Global Leadership at Tsinghua University in Beijing
- 1981 – 2003, President, Co-Chief Operating Officer, and member of the Goldman Sachs Group, Inc. Board of Directors
- Member of China Netcom Group Corporation (Hong Kong) Ltd., Ford Motor Company, and News Corporation Boards of Directors

*David B. Yoffie*, age 53
- Intel Board member since 1989
- 1993 – present, Professor of International Business Administration, Harvard Business School
- 1981 – present, member of Harvard University faculty

## CORPORATE GOVERNANCE

*Board Responsibilities and Structure.* The Board oversees, counsels, and directs management in the long-term interests of the company and our stockholders. The Board's responsibilities include:

- selecting and evaluating the performance of the Chief Executive Officer (CEO) and other senior executives;

- planning for succession with respect to the position of CEO and monitoring management's succession planning for other senior executives;

- reviewing and approving our major financial objectives and strategic and operating plans, business risks, and actions;

- overseeing the conduct of our business to evaluate whether the business is being properly managed; and

- overseeing the processes for maintaining our integrity with regard to our financial statements and other public disclosures, and compliance with law and ethics.

The Board believes that different people should hold the positions of Chairman of the Board and CEO to aid in the Board's oversight of management. Under our Bylaws, the Chairman presides over all meetings of the stockholders and the Board when he is present. In addition, the Board has an independent director, currently Dr. Yoffie, designated as the Lead Independent Director. A written charter adopted by the Board establishes the authority and responsibilities of the Lead Independent Director. They include:

- presiding over all meetings of the Board when the Chairman is not present;

- serving as a liaison between the Chairman and the independent directors;

- approving the information, agenda, and meeting schedules sent to the Board;

- calling meetings of the independent directors; and

- being available for consultation and communication with stockholders.

The Board and its committees meet throughout the year on a set schedule, hold special meetings, and act by written consent from time to time as appropriate. The Board holds regularly scheduled sessions for the independent directors to meet without management present, and the Board's Lead Independent Director leads those sessions, including three sessions in 2007. Board members have access to all of our employees outside of Board meetings, and the Board has a program that encourages each director to visit different Intel sites and events worldwide on a regular basis and meet with local management at those sites and events.

*Board Committees and Charters.* The Board delegates various responsibilities and authority to different Board committees. Committees regularly report on their activities and actions to the full Board. The Board currently has, and appoints the members of, standing Audit, Compensation, Corporate Governance and Nominating, Executive, and Finance Committees. The Board has determined that each member of the Audit, Compensation, Corporate Governance and Nominating, and Finance Committees is an independent director in accordance with NASDAQ standards.

Each of the Board committees has a written charter approved by the Board, and each committee conducts an annual evaluation of the committee's performance. We post each charter and the charter describing the position of Lead Independent Director on our web site at *www.intel.com/intel/finance/corp_docs.htm*. Each committee can engage outside experts, advisers, and counsel to assist the committee in its work. The following table identifies the current committee members.

| Name | Audit | Compensation | Corporate Governance and Nominating | Executive | Finance |
|---|---|---|---|---|---|
| Craig R. Barrett | | | | ✓ | |
| Charlene Barshefsky | | | | | ✓ |
| Carol A. Bartz | ✓ | | | | ✓ |
| Susan L. Decker | | | ✓ | | |
| D. James Guzy | ✓ | | | | Chair |
| Reed E. Hundt | | Chair | ✓ | | |
| Paul S. Otellini | | | | ✓ | |
| James D. Plummer | ✓ | | | | ✓ |
| David S. Pottruck | ✓ | ✓ | | | ✓ |
| Jane E. Shaw | Chair | | | | ✓ |
| John L. Thornton | | ✓ | ✓ | | |
| David B. Yoffie | | ✓ | Chair | Chair | |
| **Number of Committee Meetings Held in 2007** | 8 | 3 | 3 | 2 | 1 |

*Audit Committee.* The Audit Committee assists the Board in its general oversight of our financial reporting, internal controls, and audit functions, and is responsible for the appointment, retention, compensation, and oversight of the work of our independent registered public accounting firm. The Board has determined that Ms. Bartz, Mr. Pottruck, and Dr. Shaw each meet the SEC's qualifications to be an "audit committee financial expert," including meeting the relevant definition of an "independent director." The Board determined that each Audit Committee member has sufficient knowledge in reading and understanding the company's financial statements to serve on the Audit Committee. The responsibilities and activities of the Audit Committee are described in detail in "Report of the Audit Committee" and the Audit Committee's charter.

*Compensation Committee.* The Compensation Committee has authority for reviewing and determining salaries, performance-based incentives, and other matters related to the compensation of our executive officers, and administering our stock option plans, including reviewing and granting stock options to our executive officers. The Compensation Committee also reviews and determines various other compensation policies and matters, including making recommendations to the Board related to employee compensation and benefit plans generally, making recommendations to the Board on stockholder proposals related to compensation matters, and administering the employee stock purchase plan.

While the Compensation Committee is responsible for executive compensation, the Corporate Governance and Nominating Committee recommends the compensation for non-employee directors. The Compensation Committee can delegate to any member of the Board the authority to grant equity awards to employees who are not executive officers.

The Compensation Committee can also designate one or more of its members to perform duties on its behalf, subject to reporting to or ratification by the Compensation Committee.

Since 2005, the Compensation Committee has engaged the services of Professor Brian Hall of the Harvard Business School to advise the committee with respect to executive compensation philosophy, cash incentive design, the amount of cash and equity compensation awarded, and committee process. During 2007, Professor Hall's work with the Compensation Committee was related to the following:

- revisions to the committee's annual cycle of work and agendas;
- revisions to the lists of peer group and other companies used for benchmarking purposes;
- recommendations for Chairman and CEO compensation; and
- revisions to the content and format of data prepared for use by the Compensation Committee.

The Compensation Committee will continue to engage Professor Hall in 2008 to advise it with regard to executive compensation programs, data presentations, and related matters. The Compensation Committee selected Professor Hall, and he reports directly to the Compensation Committee and interacts with management at the direction of the Compensation Committee. Professor Hall has not performed work for Intel other than pursuant to his engagement by the committee. For more information on the responsibilities and activities of the Compensation Committee, including the committee's processes for determining executive compensation, see "Compensation Discussion and Analysis," "Report of the Compensation Committee," and "Executive Compensation" in this proxy statement, and the Compensation Committee's charter.

*Corporate Governance and Nominating Committee.* The Corporate Governance and Nominating Committee reviews and reports to the Board on a periodic basis with regard to matters of corporate governance and corporate responsibility, such as environmental, sustainability, workplace, and stakeholder issues. The committee also reviews and assesses the effectiveness of the Board's Corporate Governance Guidelines, makes recommendations to the Board regarding proposed revisions to the Guidelines and committee charters, and makes recommendations to the Board regarding the size and composition of the Board and its committees. In addition, the committee makes recommendations to the Board regarding the agendas for our annual meetings, reviews stockholder proposals, makes recommendations to the Board for action on such proposals, and reviews and makes recommendations concerning compensation for our non-employee directors. The Corporate Governance and Nominating Committee's charter describes the responsibilities and activities of the committee in detail.

The Corporate Governance and Nominating Committee is responsible for reviewing with the Board, from time to time, the appropriate skills and characteristics required of Board members in the context of the current makeup of the Board. This assessment includes issues of diversity in numerous factors such as age; understanding of and experience in manufacturing, technology, finance, and marketing; and international experience and culture. The committee reviews these factors, and others considered useful by the committee, in the context of an assessment of the perceived needs of the Board at a particular point in time. As a result, the priorities and emphasis of the committee and of the Board may change from time to time to take into account changes in business and other trends, as well as the portfolio of skills and experience of current and prospective Board members. The committee establishes procedures for the nomination process and recommends candidates for election to the Board.

Consideration of new Board candidates typically involves a series of internal discussions, review of information concerning candidates, and interviews with selected candidates. Board members or employees typically suggest candidates for nomination to the Board. In 2007, we employed a search firm in connection with seeking and evaluating Board candidates. Dr. Barrett initially suggested Ms. Bartz as a Board candidate. The committee considers candidates proposed by stockholders and evaluates them using the same criteria as for other candidates. A stockholder seeking to recommend a prospective nominee for the committee's consideration should submit the candidate's name and qualifications to our Corporate Secretary.

*Executive Committee.* The Executive Committee may exercise the authority of the Board between Board meetings, except to the extent that the Board has delegated authority to another committee or to other persons, and except as limited by applicable law.

*Finance Committee.* The Finance Committee reviews and recommends matters related to our capital structure, including the issuance of debt and equity securities; banking arrangements, including the investment of corporate cash; and management of the corporate debt structure. In addition, the Finance Committee reviews and approves finance and other cash management transactions. The Finance Committee appoints the members of, and oversees, an Investment Policy

Committee which sets the investment policy and chooses investment managers for the company's domestic profit sharing and retirement plans. Mr. Pottruck is chairman of this committee, whose other members are Intel employees.

*Attendance at Board, Committee, and Annual Stockholders' Meetings.* The Board held six meetings in 2007. We expect each director to attend every meeting of the Board and the committees on which he or she serves as well as the annual meeting. In 2007, each director attended the 2007 Annual Stockholders' Meeting, with the exception of Mr. Pottruck. All directors attended at least 75% of the meetings of the Board and the committees on which they served in 2007.

*Director Independence.* Each of the non-employee directors qualifies as "independent" in accordance with the published listing requirements of NASDAQ: Ambassador Barshefsky, Ms. Bartz, Ms. Decker, Mr. Guzy, Mr. Hundt, Dr. Plummer, Mr. Pottruck, Dr. Shaw, Mr. Thornton, and Dr. Yoffie. Dr. Barrett and Mr. Otellini do not qualify as independent because they are Intel employees.

The NASDAQ rules have objective tests and a subjective test for determining who is an "independent director." Under the objective tests, a director cannot be considered independent if he or she:

- is an employee of the company; or
- is a partner in, or an executive officer of, an entity to which the company made, or from which the company received, payments in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenue for that year.

The subjective test states that an independent director must be a person who lacks a relationship that, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

None of the non-employee directors was disqualified from "independent" status under the objective tests. In assessing independence under the subjective test, the Board took into account the standards in the objective tests, and reviewed and discussed additional information provided by the directors and the company with regard to each director's business and personal activities as they may relate to Intel and Intel's management. Based on all of the foregoing, as required by NASDAQ rules, the Board made a subjective determination as to each independent director that no relationships exist which, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. The Board has not established categorical standards or guidelines to make these subjective determinations, but considers all relevant facts and circumstances.

In addition to the Board-level standards for director independence, the directors who serve on the Audit Committee each satisfy standards established by the SEC providing that to qualify as "independent" for the purposes of membership on that committee, members of audit committees may not accept directly or indirectly any consulting, advisory, or other compensatory fee from the company other than their director compensation.

*Transactions Considered in Independence Determinations.* In making its independence determinations, the Board considered transactions occurring since the beginning of 2005 between Intel and entities associated with the independent directors or members of their immediate family. All identified transactions that appear to relate to Intel and a family member or entity with a known connection to a director are presented to the Board for consideration.

In making its subjective determination that each non-employee director is independent, the Board considered the transactions in the context of the NASDAQ objective standards, the special standards established by the SEC for members of audit committees, and the SEC and U.S. Internal Revenue Service (IRS) standards for compensation committee members. In each case, the Board determined that, because of the nature of the director's relationship with the entity and/or the amount involved, the relationship did not impair the director's independence. The Board's independence determinations included reviewing the following transactions.

Ambassador Barshefsky is a partner at the law firm of Wilmer Cutler Pickering Hale and Dorr LLP. Intel paid this firm less than 1% of this firm's revenue in 2007, 2006, and 2005 for professional services. Ambassador Barshefsky does not provide any legal services to Intel, and she does not receive any compensation related to our payments to this firm. Ambassador Barshefsky's husband is an officer of American Honda Motor Company, Inc. (which is wholly owned by Honda Motor Co., Ltd.). Intel and the Intel Foundation participated in a loan to Honda Finance Corp., a subsidiary of Honda Motor Co., Ltd., in 2006 and 2007 by purchasing a short-term debt instrument as part of our investment portfolio.

Ms. Bartz and Ms. Decker are executive officers of companies with which Intel does business. Mr. Hundt and Dr. Plummer were outside advisers to companies with which Intel does business, but in such capacity did not provide advice or services to Intel. Family members of Ambassador Barshefsky, Ms. Bartz, Ms. Decker, and Mr. Thornton are

directors or employees of companies with which Intel does business. The amount that Intel paid in each fiscal year to each of these companies for goods and services represented less than 1% of the other company's annual revenue, and the amount received in each fiscal year by Intel for goods and services from each company represented less than 1% of Intel's annual revenue.

Ms. Decker, Mr. Hundt, Dr. Plummer, Mr. Pottruck, Dr. Shaw, Mr. Thornton, Dr. Yoffie, or one of their immediate family members have each served as a trustee, director, employee, or advisory board member for one or more colleges and universities. Intel has a variety of dealings with these institutions, including:

- sponsored research and technology licenses;
- charitable contributions (matching and discretionary);
- fellowships and scholarships;
- facility, engineering, and equipment fees; and
- payments for training, event hosting, and organizational participation or membership dues.

Payments to each of these institutions (including discretionary contributions by Intel and the Intel Foundation) constituted less than the greater of $200,000 or 1% of that institution's 2007 annual revenue.

Each of our non-employee directors is, or was during the previous three fiscal years, a non-management director of another company that did business with Intel at some time during those years. These business relationships were, variously, as a supplier or purchaser of goods or services, licensing or research arrangements, or financing arrangements in which Intel or the Intel Foundation participated as a creditor.

*Code of Conduct and Principles for Responsible Business.* It is our policy that all employees must avoid any activity that is or has the appearance of being hostile, adverse, or competitive with Intel, or that interferes with the proper performance of their duties, responsibilities, or loyalty to Intel. Our Code of Conduct contains these policies and applies to our directors (with respect to their Intel-related activities), executive officers, and other employees.

Each director and executive officer must inform our Board when confronted with any situation that may be perceived as a conflict of interest with Intel, even if the person does not believe that the situation would violate our Code of Conduct. If in a particular circumstance the Board concludes that there is or may be a perceived conflict of interest, the Board will instruct our Legal department to work with our relevant business units to determine if there is a conflict of interest and, if there is, how the conflict should be resolved.

Any waivers of these conflict rules with regard to a director or an executive officer require the prior approval of the Board or the Audit Committee. Our Code of Conduct is our code-of-ethics document. Our Principles for Responsible Business express our commitment to ethical and legal practices on a worldwide basis. We have posted our Code of Conduct and our Principles for Responsible Business on our web site at *www.intc.com* under the "Corporate Governance & Responsibility" section.

*Communications from Stockholders to Directors.* The Board recommends that stockholders initiate communications with the Board, the Chairman, the Lead Independent Director, or any committee of the Board in writing to the attention of our Corporate Secretary at the address set forth in "Other Matters." This process will assist the Board in reviewing and responding to stockholder communications in an appropriate manner. The Board has instructed our Corporate Secretary to review such correspondence and, in his discretion, not to forward items if he deems them to be of a commercial or frivolous nature or otherwise inappropriate for the Board's consideration.

*Corporate Governance Guidelines.* The Board has adopted a set of Corporate Governance Guidelines. The Corporate Governance and Nominating Committee is responsible for overseeing the Guidelines and annually reviews them and makes recommendations to the Board concerning corporate governance matters. The Board may amend, waive, suspend, or repeal any of the Guidelines at any time, with or without public notice, as it determines necessary or appropriate in the exercise of the Board's judgment or fiduciary duties.

We have posted the Guidelines on our web site at *www.intc.com* under the "Corporate Governance & Responsibility" section. Among other matters, the Guidelines include the following items concerning the Board:

- Independent directors may not stand for reelection after age 72, and management directors, other than former CEOs, may not stand for reelection after age 65. Corporate officers may continue as such no later than age 65.

9

- Directors are limited to service on four public company boards, including Intel's but excluding not-for-profit and mutual fund boards. If the director serves as an active CEO of a public company, the director is limited to service on three public company boards, including Intel's.

- The CEO reports at least annually to the Board on succession planning and management development.

- The Chairman of the Board manages a process whereby the Board and its members are subject to annual evaluation and self-assessment.

- The Board will obtain stockholder approval before adopting any "poison pill." If the Board later repeals this policy and adopts a poison pill without prior stockholder approval, the Board will submit the poison pill to an advisory vote by Intel's stockholders within 12 months from the date that the Board adopts the pill. If the company's stockholders fail to approve the poison pill, the Board may elect to terminate, retain, or modify the poison pill in the exercise of its fiduciary responsibilities.

In addition, the Board has adopted a policy committing not to issue shares of preferred stock to prevent an unsolicited merger or acquisition.

## DIRECTOR COMPENSATION

The general policy of the Board is that compensation for independent directors should be a mix of cash and equity-based compensation. Intel does not pay management directors for Board service in addition to their regular employee compensation. The Corporate Governance and Nominating Committee, which consists solely of independent directors, has the primary responsibility for reviewing and considering any revisions to director compensation. The Board reviews the committee's recommendations and determines the amount of director compensation.

Intel's Legal department, Corporate Secretary, and Compensation and Benefits Group in the Human Resources department support the committee in setting director compensation and creating director compensation programs. In addition, the committee can engage the services of outside advisers, experts, and others to assist the committee. During 2007, the committee did not use an outside adviser to aid in setting director compensation.

To assist the committee in its annual review of director compensation, Intel's Compensation and Benefits Group provides director compensation data compiled from the annual reports and proxy statements of companies that the Board uses as its "peer group" for determining director compensation. The director peer group consists of companies within the S&P 100 and technology companies generally considered comparable to Intel. The committee targets cash and equity compensation at the median of the peer group. The director peer group consists of the following companies:

| Company | Reported Fiscal Year | Revenue (in billions) ($) | Net Income (in billions) ($) | Market Capitalization on February 20, 2008 (in billions) ($) |
|---|---|---|---|---|
| American International Group Inc. | 12/31/07 | 110.1 | 6.2 | 121.5 |
| Bank of America Corporation | 12/31/07 | 66.3 | 15.0 | 190.9 |
| Chevron Corporation | 12/31/07 | 220.9 | 18.7 | 180.3 |
| Cisco Systems Inc. | 7/28/07 | 34.9 | 7.3 | 139.4 |
| Dell Inc. | 2/2/07 | 57.4 | 2.6 | 44.3 |
| Hewlett-Packard Company | 10/31/07 | 104.3 | 7.3 | 122.1 |
| International Business Machines Corporation | 12/31/07 | 98.8 | 10.4 | 149.9 |
| Johnson & Johnson | 12/30/07 | 61.1 | 10.6 | 182.7 |
| JP Morgan Chase & Co. | 12/31/07 | 71.4 | 15.4 | 145.3 |
| Microsoft Corporation | 6/30/07 | 51.1 | 14.1 | 262.6 |
| Motorola, Inc. | 12/31/07 | 36.6 | — | 26.1 |
| The Proctor and Gamble Company | 6/30/07 | 76.5 | 10.3 | 203.6 |
| Texas Instruments Incorporated | 12/31/07 | 13.8 | 2.7 | 40.7 |
| Wal-Mart Stores, Inc. | 1/31/07 | 345.0 | 11.3 | 199.0 |
| **Intel 2007** | 12/29/07 | 38.3 | 7.0 | 119.0 |
| **Intel 2007 Percentile Rank** | | 16th | 23rd | 23rd |

After reviewing peer group director compensation data in 2007, the committee did not recommend any changes to director compensation, as the current level of compensation was deemed competitive. The Board followed the recommendation of the committee and determined that no changes would be made to non-employee director compensation in 2007. Non-employee director compensation consists of the following elements:

- annual cash retainer of $75,000

- annual restricted stock unit (RSU) grant with a market value of approximately $145,000

- Audit Committee chair annual fee of $20,000

- all other committee chair annual fees of $10,000

- non-chair Audit Committee member annual fee of $10,000

- Lead Independent Director annual RSU grant with a market value of approximately $30,000

The following table details the total compensation of Intel's non-employee directors for the year ended December 29, 2007.

### Director Summary Compensation

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | Total ($) |
|---|---|---|---|---|
| Charlene Barshefsky | 75,000[2] | 66,200 | — | 141,200 |
| Susan L. Decker | 75,000 | 42,000 | — | 117,000 |
| D. James Guzy | 95,000 | 140,200 | — | 235,200 |
| Reed E. Hundt | 85,000 | 124,100 | — | 209,100 |
| James D. Plummer | 85,000 | 66,200 | — | 151,200 |
| David S. Pottruck | 95,000 | 140,200 | — | 235,200 |
| Jane E. Shaw | 95,000 | 140,200 | — | 235,200 |
| John L. Thornton | 75,000 | 66,200 | — | 141,200 |
| David B. Yoffie | 95,000 | 169,200 | 10,000 | 274,200 |
| Total | 775,000 | 954,500 | 10,000 | 1,739,500 |

(1) Grant date fair value of RSUs granted in 2007: $140,200 for each director other than Ms. Decker ($209,900), who received a prorated grant for the 2007 compensation cycle upon joining the Board in 2006, and Dr. Yoffie ($169,200), who received an additional grant as Lead Independent Director. Because awards to Mr. Guzy, Mr. Pottruck, Dr. Shaw, and Dr. Yoffie would accelerate in full upon their retirement under the terms of the awards, we recognized all of the compensation expense associated with their 2007 RSUs at the time of grant.

(2) Ambassador Barshefsky received 1,485 RSUs on July 19, 2007 in lieu of one-half of her annual cash retainer. She will receive her remaining RSUs in July 2008 for the other half of her retainer. These shares vest in equal annual installments over three years.

*Fees Earned or Paid in Cash.* Directors receive cash fees in quarterly installments so that adjustments can be made during the year. Directors forfeit unpaid portions of cash retainers upon termination, retirement, disability, or death. The following table provides a breakdown of fees earned or paid in cash.

| Name | Annual Retainers ($) | Committee Chair Fees ($) | Audit Committee Member Fees ($) | Total ($) |
|---|---|---|---|---|
| Charlene Barshefsky | 75,000 | — | — | 75,000 |
| Susan L. Decker | 75,000 | — | — | 75,000 |
| D. James Guzy | 75,000 | 10,000 | 10,000 | 95,000 |
| Reed E. Hundt | 75,000 | 10,000 | — | 85,000 |
| James D. Plummer | 75,000 | — | 10,000 | 85,000 |
| David S. Pottruck | 75,000 | 10,000[1] | 10,000 | 95,000 |
| Jane E. Shaw | 75,000 | 20,000 | — | 95,000 |
| John L. Thornton | 75,000 | — | — | 75,000 |
| David B. Yoffie | 75,000 | 20,000 | — | 95,000 |

(1) Mr. Pottruck chairs the Retirement Plans Investment Policy Committee. The Finance Committee appoints the members of that committee, which includes company officers. This committee is responsible for adopting and amending investment policies for our U.S. employee retirement plans.

Under the RSU in Lieu of Cash Election program, directors can elect annually to receive all of their cash compensation in the form of RSUs. This election must be 100% or 0%, and must be made in the tax year prior to receiving compensation. The Board grants RSUs elected in lieu of cash on the same grant date and with the same vesting terms as the annual RSU grant to directors. Ambassador Barshefsky participated in this program in 2007.

*Equity Awards.* In accordance with Intel's 2006 Equity Incentive Plan, equity grants to non-employee directors may not exceed 30,000 shares per director per year. The current practice is to grant each non-employee director RSUs each July with a market value of the underlying shares on the grant date of approximately $145,000 and which vest in equal annual installments over a three-year period from the grant date. On July 19, 2007, Intel granted each independent director 5,755 RSUs; the closing price of Intel's common stock was $25.26 on that date. The Board awarded Dr. Yoffie an additional 1,190 RSUs for his service as Lead Independent Director. In addition, Ms. Decker received a prorated award of 3,505 RSUs on January 18, 2007 following her election to the Board. Vesting of all shares accelerates upon retirement from the Board if a director is 72 years of age or has at least seven years of service on Intel's Board. Directors do not receive dividends on unvested RSUs.

The amounts included in the "Stock Awards" column in the Director Summary Compensation table reflect the dollar amounts recognized for financial statement reporting purposes for the fiscal year ended December 29, 2007 in accordance with Statement of Financial Accounting Standards (SFAS) No. 123 (revised 2004), "Share-Based Payment" (SFAS No. 123(R)), excluding forfeitures. The "Stock Awards" column generally includes amounts from awards granted in 2007 and 2006. However, because Mr. Guzy, Mr. Pottruck, Dr. Shaw, and Dr. Yoffie are retirement-eligible under the 2006 Equity Incentive Plan, their 2007 RSU awards would accelerate in full upon their retirement from the Board. As a result, at the time of grant we recognized all of the compensation expense associated with their 2007 RSUs. The following table includes the assumptions used in the calculation of these amounts.

| Grant Date | Assumptions | |
|---|---|---|
| | Risk-Free Interest Rate (%) | Dividend Yield (%) |
| 7/21/06 | 5.2 | 2.3 |
| 1/18/07 | 5.0 | 2.2 |
| 7/19/07 | 5.0 | 1.8 |

The following table provides information on the outstanding equity awards at fiscal year-end for non-employee directors. Market value for option awards is calculated by taking the difference between the closing price of Intel common stock on NASDAQ on the last trading day of the fiscal year ($26.76 on December 28, 2007) and the option exercise price and multiplying it by the number of exercisable options. Market value for stock awards (consisting solely of RSUs) is

determined by multiplying the number of shares by the closing price of Intel common stock on NASDAQ on the last trading day of the fiscal year.

## Outstanding Equity Awards for Directors at Fiscal Year-End 2007

| Name | Option Awards | | | | | Stock Awards | | |
|------|---------------|---|---|---|---|--------------|---|---|
| | Grant Date | Number of Securities Underlying Unexercised Options (#) Exercisable | Option Exercise Price ($) | Option Expiration Date | Market Value of Unexercised Options ($) | Grant Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| Charlene Barshefsky | 5/19/04 | 15,000 | 27.53 | 5/19/11 | — | 7/21/06 | 5,647 | 151,100 |
| | 7/20/05 | 19,000 | 27.15 | 7/20/12 | — | 7/19/07 | 7,240 | 193,700 |
| | 1/21/04 | 5,000 | 32.06 | 1/21/14 | — | | | |
| Total | | 39,000 | | | — | | 12,887 | 344,800 |
| Susan L. Decker | | — | | | — | 1/18/07 | 3,505 | 93,800 |
| | | | | | | 7/19/07 | 5,755 | 154,000 |
| Total | | — | | | | | 9,260 | 247,800 |
| D. James Guzy | 5/20/98 | 20,000 | 19.48 | 5/20/08 | 145,600 | 7/21/06 | 5,647 | 151,100 |
| | 5/19/99 | 15,000 | 29.39 | 5/19/09 | — | 7/19/07 | 5,755 | 154,000 |
| | 5/17/00 | 15,000 | 61.45 | 5/17/10 | — | | | |
| | 5/19/04 | 15,000 | 27.53 | 5/19/11 | — | | | |
| | 5/23/01 | 15,000 | 29.41 | 5/23/11 | — | | | |
| | 5/22/02 | 15,000 | 29.19 | 5/22/12 | — | | | |
| | 7/20/05 | 19,000 | 27.15 | 7/20/12 | — | | | |
| | 5/21/03 | 15,000 | 18.73 | 5/21/13 | 120,500 | | | |
| Total | | 129,000 | | | 266,100 | | 11,402 | 305,100 |
| Reed E. Hundt | 5/19/04 | 15,000 | 27.53 | 5/19/11 | — | 7/21/06 | 5,647 | 151,100 |
| | 5/24/01 | 35,000 | 28.76 | 5/24/11 | — | 7/19/07 | 5,755 | 154,000 |
| | 5/22/02 | 15,000 | 29.19 | 5/22/12 | — | | | |
| | 7/20/05 | 19,000 | 27.15 | 7/20/12 | — | | | |
| | 5/21/03 | 15,000 | 18.73 | 5/21/13 | 120,500 | | | |
| Total | | 99,000 | | | 120,500 | | 11,402 | 305,100 |
| James D. Plummer | 7/20/05 | 15,000 | 27.15 | 7/20/12 | — | 7/21/06 | 5,647 | 151,100 |
| | | | | | | 7/19/07 | 5,755 | 154,000 |
| Total | | 15,000 | | | — | | 11,402 | 305,100 |
| David S. Pottruck | 1/26/99 | 20,000 | 33.58 | 1/26/09 | — | 7/21/06 | 5,647 | 151,100 |
| | 5/19/99 | 15,000 | 29.39 | 5/19/09 | — | 7/19/07 | 5,755 | 154,000 |
| | 5/17/00 | 15,000 | 61.45 | 5/17/10 | — | | | |
| | 5/19/04 | 15,000 | 27.53 | 5/19/11 | — | | | |
| | 5/23/01 | 15,000 | 29.41 | 5/23/11 | — | | | |
| | 5/22/02 | 15,000 | 29.19 | 5/22/12 | — | | | |
| | 7/20/05 | 19,000 | 27.15 | 7/20/12 | — | | | |
| | 5/21/03 | 15,000 | 18.73 | 5/21/13 | 120,500 | | | |
| Total | | 129,000 | | | 120,500 | | 11,402 | 305,100 |
| Jane E. Shaw | 5/20/98 | 20,000 | 19.48 | 5/20/08 | 145,600 | 7/21/06 | 5,647 | 151,100 |
| | 5/19/99 | 15,000 | 29.39 | 5/19/09 | — | 7/19/07 | 5,755 | 154,000 |
| | 5/17/00 | 15,000 | 61.45 | 5/17/10 | — | | | |
| | 5/19/04 | 15,000 | 27.53 | 5/19/11 | — | | | |
| | 5/23/01 | 15,000 | 29.41 | 5/23/11 | — | | | |
| | 5/22/02 | 15,000 | 29.19 | 5/22/12 | — | | | |
| | 7/20/05 | 19,000 | 27.15 | 7/20/12 | — | | | |
| | 5/21/03 | 15,000 | 18.73 | 5/21/13 | 120,500 | | | |
| Total | | 129,000 | | | 266,100 | | 11,402 | 305,100 |

| Name | Option Awards | | | | | Stock Awards | | |
|---|---|---|---|---|---|---|---|---|
| | Grant Date | Number of Securities Underlying Unexercised Options (#) Exercisable | Option Exercise Price ($) | Option Expiration Date | Market Value of Unexercised Options ($) | Grant Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| John L. Thornton | 5/19/04 | 15,000 | 27.53 | 5/19/11 | — | 7/21/06 | 5,647 | 151,100 |
| | 7/20/05 | 19,000 | 27.15 | 7/20/12 | — | 7/19/07 | 5,755 | 154,000 |
| | 7/23/03 | 12,500 | 24.58 | 7/23/13 | 27,300 | | | |
| Total | | 46,500 | | | 27,300 | | 11,402 | 305,100 |
| David B. Yoffie | 5/19/99 | 15,000 | 29.39 | 5/19/09 | — | 7/21/06 | 6,814 | 182,300 |
| | 5/17/00 | 15,000 | 61.45 | 5/17/10 | — | 7/19/07 | 6,945 | 185,900 |
| | 5/19/04 | 15,000 | 27.53 | 5/19/11 | — | | | |
| | 5/23/01 | 15,000 | 29.41 | 5/23/11 | — | | | |
| | 5/22/02 | 15,000 | 29.19 | 5/22/12 | — | | | |
| | 7/20/05 | 19,000 | 27.15 | 7/20/12 | — | | | |
| | 5/21/03 | 15,000 | 18.73 | 5/21/13 | 120,500 | | | |
| Total | | 109,000 | | | 120,500 | | 13,759 | 368,200 |

*Director Stock Ownership Guidelines.* The Board has established stock ownership guidelines for the non-employee directors. Within five years of joining the Board, the director must acquire and hold at least 15,000 shares of Intel common stock. After each succeeding five years of Board service, non-employee directors must own an additional 5,000 shares (for example, 20,000 shares after 10 years of service). Unexercised stock options and unvested RSUs do not count toward this requirement. As of December 29, 2007, each director had either satisfied these ownership guidelines or had time remaining to do so.

*Retirement.* Intel has a deferred compensation plan that allows non-employee directors to defer their cash and equity compensation. The Cash Deferral Election allows participants to defer up to 100% of their cash compensation and receive an investment return on the deferred funds as if the funds were invested in Intel common stock. Participants receive credit for reinvestment of dividends under this option. Plan participants must elect irrevocably to receive the deferred funds either in a lump sum or in equal annual installments over five or 10 years, and to begin receiving distributions either at retirement or at a future date not less than 24 months from the election date. This deferred cash compensation is an unsecured obligation for Intel. None of the directors chose the Cash Deferral Election with respect to their 2007 fees. The RSU Deferral Election allows directors to defer their RSUs until termination of service. This election must be 100% or 0% and applies to all RSUs granted during the year. Deferred RSUs count toward Intel's stock ownership guidelines once they vest. Directors do not receive dividends on deferred RSUs. Ambassador Barshefsky and Dr. Shaw participated in the RSU Deferral Election program in 2007.

In 1998, the Board ended its retirement program for independent directors. Non-employee directors serving at that time were vested with the number of years served. They will receive an annual benefit equal to the annual retainer fee in effect at the time of payment, to be paid beginning upon the director's departure from the Board. The payments will continue for the lesser of the number of years served as a non-employee director or the life of the director. The amounts in the "Change in Pension Value and Non-Qualified Deferred Compensation Earnings" column in the Director Summary Compensation table represent the actuarial increase in pension value accrued under this program. Assumptions used in determining these increases include a discount rate of 5.6%, a retirement age of 65 or current age if older, RP2000 Mortality Table projected to 2007, and an annual benefit amount of $75,000.

*Travel Expenses.* Intel does not pay meeting fees. We reimburse the directors for their travel and related expenses in connection with attending Board meetings and Board-related activities, such as Intel site visits and sponsored events, as well as continuing education programs.

*Charitable Matching.* Directors' charitable contributions to schools and universities that meet the guidelines of Intel's employee charitable matching gift program are eligible for matching funds of up to $10,000 per director per year, which is the same limit for employees generally.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table presents the beneficial ownership of our common stock by each of our directors and listed officers and all of our directors and executive officers as a group as of February 21, 2008. Amounts reported under "Number of Shares of Common Stock Beneficially Owned at February 21, 2008" include the number of shares subject to stock options and RSUs that become exercisable or vest within 60 days of February 21, 2008 (which are shown in the columns to the right). Our listed officers are the CEO, Chief Financial Officer (CFO), and three other most highly compensated executive officers in a particular year. In October 2007, Stacy J. Smith succeeded Andy D. Bryant as CFO; therefore, we have six listed officers. To our knowledge, none of our stockholders owns more than 5% of our common stock. Except as otherwise indicated and subject to applicable community property laws, each owner has sole voting and investment power with respect to the securities listed.

| Stockholder | Number of Shares of Common Stock Beneficially Owned at February 21, 2008 | Percent of Class | Number of Shares Subject to Options Exercisable as of February 21, 2008 or Which Become Exercisable Within 60 Days of This Date | Number of RSUs That Vest Within 60 Days of February 21, 2008 |
|---|---|---|---|---|
| D. James Guzy, Director | 10,369,175 | ** | 129,000 | — |
| Craig R. Barrett, Director and Chairman of the Board | 6,108,834[(1)] | ** | 2,795,196 | 5,641 |
| Paul S. Otellini, Director, President, and Chief Executive Officer | 3,488,008[(2)] | ** | 2,742,586 | 22,500 |
| Sean M. Maloney, Executive Vice President, General Manager, Sales and Marketing Group, and Chief Sales and Marketing Officer | 2,153,203[(3)] | ** | 1,998,487 | 12,125 |
| Andy D. Bryant, Executive Vice President, Finance and Enterprise Services, and Chief Administrative Officer | 1,806,018[(4)] | ** | 1,586,454 | 12,125 |
| David Perlmutter, Executive Vice President and General Manager, Mobility Group | 551,591 | ** | 505,390 | 11,375 |
| Jane E. Shaw, Director | 298,179[(5)] | ** | 129,000 | — |
| David B. Yoffie, Director | 258,206[(6)] | ** | 109,000 | — |
| Stacy J. Smith, Vice President and Chief Financial Officer | 235,781 | ** | 219,990 | 7,500 |
| David S. Pottruck, Director | 154,468[(7)] | ** | 129,000 | — |
| Reed E. Hundt, Director | 111,823 | ** | 99,000 | — |
| Charlene Barshefsky, Director | 54,000[(8)] | ** | 39,000 | — |
| John L. Thornton, Director | 49,323 | ** | 46,500 | — |
| James D. Plummer, Director | 20,823 | ** | 15,000 | — |
| Carol A. Bartz, Director | 6,766[(9)] | ** | — | — |
| Susan L. Decker, Director | 1,168 | ** | — | — |
| All directors and executive officers as a group (22 individuals) | 30,956,077 | ** | 14,849,985 | 123,516 |

** Less than 1%.

(1) Includes 150,000 shares owned by a private charitable foundation for which Dr. Barrett shares voting authority.

(2) Includes 1,364 shares held by Mr. Otellini's spouse, and Mr. Otellini disclaims beneficial ownership of these shares.

(3) Includes 4,085 shares held by Mr. Maloney's spouse.

(4) Includes 1,600 shares held by Mr. Bryant's son and 1,000 shares held by Mr. Bryant's daughter, and Mr. Bryant disclaims beneficial ownership of these shares.

(5) Includes 166,356 shares held by a family trust for which Dr. Shaw shares voting and disposition authority.

(6) Includes 4,400 shares held by Dr. Yoffie's mother. Dr. Yoffie had a power of attorney for his mother's finances, which has subsequently been cancelled. Dr. Yoffie disclaims any economic interest in these shares.

(7) Includes 800 shares held by Mr. Pottruck's daughter. Includes a total of 13,400 shares held in two separate annuity trusts for the benefit of Mr. Pottruck's brother for which Mr. Pottruck shares voting and disposition authority.

(8) Includes 3,977 shares held jointly with Ambassador Barshefsky's spouse for which Ambassador Barshefsky shares voting and disposition authority.

(9) Includes shares held by a family trust for which Ms. Bartz has sole voting and disposition authority.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The Board's Audit Committee is responsible for review, approval, or ratification of "related-person transactions" involving Intel or its subsidiaries and related persons. Under SEC rules, a related person is a director, officer, nominee for director, or 5% stockholder of the company since the beginning of the previous fiscal year, and their immediate family members. Intel has adopted written policies and procedures that apply to any transaction or series of transactions in which the company or a subsidiary is a participant, the amount involved exceeds $120,000, and a related person has a direct or indirect material interest.

The Audit Committee has determined that, barring additional facts or circumstances, a related person does not have a direct or indirect material interest in the following categories of transactions:

- any transaction with another company for which a related person's only relationship is as an employee (other than an executive officer), director, or beneficial owner of less than 10% of that company's shares, if the amount involved does not exceed the greater of $1 million or 2% of that company's total annual revenue;

- any charitable contribution, grant, or endowment by Intel or the Intel Foundation to a charitable organization, foundation, or university for which a related person's only relationship is as an employee (other than an executive officer) or a director, if the amount involved does not exceed the lesser of $1 million or 2% of the charitable organization's total annual receipts, or any matching contribution, grant, or endowment by the Intel Foundation;

- compensation to executive officers determined by the Compensation Committee;

- compensation to directors determined by the Board;

- transactions in which all security holders receive proportional benefits; and

- banking-related services involving a bank depository of funds, transfer agent, registrar, trustee under a trust indenture, or similar service.

Intel personnel in the Legal and Finance departments review transactions involving related persons that are not included in one of the above categories. If they determine that a related person could have a significant interest in such a transaction, the transaction is forwarded to the Audit Committee for review. The Audit Committee determines whether the related person has a material interest in a transaction and may approve, ratify, rescind, or take other action with respect to the transaction in its discretion.

In 2007, there was one related-person transaction under the relevant standards: Intel employed the brother-in-law of Robert J. Baker, an executive officer, as an industrial engineer. Mr. Baker's brother-in-law received total compensation of $149,300, which was calculated in the same manner as total compensation in the Summary Compensation table. The Audit Committee reviewed and ratified this transaction.

## COMPENSATION DISCUSSION AND ANALYSIS

The Compensation Committee of the Board of Directors determines the compensation for our executive officers. The committee considers, adopts, reviews, and revises executive officer compensation plans, programs, and guidelines and reviews and determines all components of each individual executive officer's compensation. The committee also consults with management regarding non-executive employee compensation plans and programs, including administering our equity incentive plans.

This section of the proxy statement explains how our executive compensation programs are designed and operate with respect to our listed officers (the CEO, CFO, and three other most highly compensated executive officers in a particular year). In October 2007, Stacy J. Smith succeeded Andy D. Bryant as CFO; therefore, in 2008 we have six listed officers. Because Mr. Smith was not an executive officer at the beginning of the year, the committee did not determine his base

salary, annual incentive cash baseline, or equity awards for 2007, but the committee did set these amounts for 2008. The "Executive Compensation" section presents compensation earned by the listed officers in 2007, 2006, and 2005.

## Executive Summary

Intel's compensation programs are designed to support our business goals and promote the short- and long-term profitable growth of the company. Intel's equity plans are designed to ensure that executive compensation programs and practices are aligned with the long-term interests of Intel's stockholders. Total compensation of each individual varies with individual performance and Intel's performance in achieving financial and non-financial objectives.

The committee and Intel's management believe that compensation should help to recruit, retain, and motivate the employees that the company will depend on for current and future success. The committee and Intel's management also believe that the proportion of at-risk, performance-based compensation should rise as an employee's level of responsibility increases. Intel's compensation philosophy is reflected in the following key design priorities that govern compensation decisions:

- alignment with stockholders' interests;
- pay for performance;
- employee recruitment, retention, and motivation;
- cost and dilution management; and
- egalitarianism.

Intel employees, including executive officers, are employed at will, without employment agreements, severance payment arrangements (except as required by local law), or payment arrangements that would be triggered by a "change in control" of Intel. Retirement plan programs are broad-based; Intel does not provide special retirement plans or benefits solely for executive officers.

The committee believes that the majority of the executive officers' total compensation should consist of equity awards, which are longer term incentive compensation, rather than cash, which is typically tied to shorter term performance. This view aligns the interests of executive officers with the interests of stockholders. We use the following descriptive categories in this "Compensation Discussion and Analysis" section:

- *Total cash compensation* refers to base salary plus performance-based cash compensation.
- *Performance-based cash compensation* includes annual and semiannual incentive cash payments.
- *Equity awards* include stock options and RSUs, both of which may be granted as annual or long-term awards with time-based vesting.
- *Performance-based compensation* refers to performance-based cash compensation and equity awards (with time-based vesting).
- *Total compensation* refers to base salary, performance-based cash compensation, and equity awards (note that this formulation differs from that in the Summary Compensation table).

Compensation for the majority of Intel's employees located in the United States, including executive officers, consists of the elements identified in the following table.

| Compensation Element | Objective | Key Features |
|---|---|---|
| Base Salaries | To provide a minimum, fixed level of cash compensation for the executive officers | Targeted at the 25th percentile of our peer group on average, since we strive to have the majority of executive officer pay at-risk and tied to company performance<br><br>Adjustments are based on an individual's current and expected future performance and pay relative to the market |

| Compensation Element | Objective | Key Features |
|---|---|---|
| Performance-Based Cash Compensation | To encourage and reward executive officers' contributions in producing strong financial and operational results | Annual incentive cash payments are based on a formula that includes relative and absolute net income growth, company performance to operational goals, and an individual performance adjustment<br><br>Semiannual incentive cash payments are based on pretax margin or net income, plus customer satisfaction goals<br><br>Total cash compensation (base salary plus performance-based cash compensation) is targeted at the 65th percentile of the peer group on average (actual percentile will vary based on annual performance) |
| Equity Awards | To retain executive officers and align their interests with those of stockholders | Targeted at the 65th percentile of our peer group on average when an executive officer receives annual and long-term stock options and RSU grants<br><br>Majority of listed officers' total compensation comes in the form of stock options that return value to the executive officer only if our stock price appreciates<br><br>Annual equity awards generally vest in 25% annual installments over four years<br><br>Long-term equity awards generally vest in full on the fifth anniversary of the grant date |
| Stock Purchase Plan | To encourage executive officer stock ownership, further aligning their interests with those of stockholders | Broad-based program under which employees, including executive officers, can purchase up to $25,000 in market value of Intel stock at a 15% discount to the market price |
| Profit Sharing Retirement Plan | To provide a minimum level of retirement income for the executive officers | Broad-based plan under which Intel makes profit sharing contributions (a percentage of eligible salary and performance-based cash compensation) up to the tax code limit<br><br>Intel's contributions vest in 20% annual increments after two years of service, completely vesting after six years |
| Deferred Compensation Plan | To provide retirement savings in a tax-efficient manner | Any profit sharing contributions exceeding the tax code limit are added to the executive officer's deferred compensation account<br><br>Executive officers can elect to defer their base salaries and annual incentive cash payments |

**History of Executive Compensation at Intel**

Historically, compensation for executive officers has consisted of base salary, annual and semiannual incentive cash payments linked to earnings and other performance factors, equity grants, employee stock purchase program, and retirement contributions.

Base salaries for executive officers have traditionally been below the median compared to our peer group. To offset these lower than market base salaries and tie total compensation to company performance, Intel has offered higher than market performance-based compensation in the form of annual and semiannual incentive cash payments and equity awards. As a result, executive officer compensation fluctuates significantly with company performance, aligning executive officers with

the long-term interests of our stockholders. In addition, Intel's egalitarian culture, inspired by Intel's founders, discourages the committee from offering employment agreements, severance payment arrangements, change in control agreements, or perquisites to our executive officers.

Although our core philosophy and the main elements of executive compensation have remained consistent over time, the committee has sought ways to improve Intel's compensation programs. Recent examples include:

- In 2006, Intel began granting RSUs in addition to stock options to manage dilution and promote retention.
- In 2007, the Executive Officer Incentive Plan was redesigned to provide greater clarity and alignment with performance by adopting a formula that includes relative and absolute financial components based on net income growth, an operational component based on achievement of business goals, and an individual performance adjustment.

The committee periodically reviews Intel's programs and philosophy to ensure that they are consistent with our goal of attracting, retaining, and motivating our executive officers to deliver outstanding results for our stockholders.

### Determining Executive Compensation

In determining base salary, annual incentive cash baselines, and equity awards, the committee uses the executive officers' current level of compensation as the starting point. The committee then makes adjustments to those levels primarily using benchmarking to peer companies and the individual's performance. Secondary considerations in determining the new level of compensation include internal pay equity and wealth accumulation. The committee has discretion to set compensation at levels that differ from the target levels.

*Benchmarking*

To assist the committee in its review of executive compensation, Intel's Compensation and Benefits Group provides compensation data compiled from executive compensation surveys, as well as data gathered from annual reports and proxy statements from companies that the committee selects as a "peer group" for executive compensation analysis purposes. This historical compensation data is then adjusted in order to arrive at current-year estimates for the peer group. The committee uses this data to compare the compensation of our executive officers to the peer group, targeting the 25th percentile for base salaries and the 65th percentile for total cash compensation on average. The committee's goal for equity compensation is that the combination of annual and long-term equity awards will approximate the 65th percentile of the peer group on average. Since the executive officers have the highest levels of responsibility for the company's overall performance, the committee believes these officers are in the best positions to influence the company's performance, and accordingly should have a significant portion of their cash compensation at risk. Professor Hall, the committee's independent adviser, and Intel's Compensation and Benefits Group review this data with the committee.

For 2007, the peer group consisted of technology companies generally considered comparable to Intel as well as non-technology companies within the Fortune 100. For the peer group used in 2007, the committee's intent was to choose companies that had one or more attributes similar to Intel's, including semiconductor or computer design, manufacturing and integration, and large enterprises with global operations. The peer group consisted of the following companies:

| Company | Reported Fiscal Year | Revenue (in billions) ($) | Net Income (in billions) ($) | Market Capitalization on February 20, 2008 (in billions) ($) |
|---|---|---|---|---|
| Advanced Micro Devices, Inc. | 12/29/07 | 6.0 | (3.4) | 4.0 |
| Apple, Inc. | 9/29/07 | 24.0 | 3.5 | 108.8 |
| Applied Materials, Inc. | 10/28/07 | 9.7 | 1.7 | 26.7 |
| Bank of America Corporation | 12/31/07 | 66.3 | 15.0 | 190.9 |
| Chevron Corporation | 12/31/07 | 220.9 | 18.7 | 180.3 |
| Cisco Systems Inc. | 7/28/07 | 34.9 | 7.3 | 139.4 |
| Citigroup Inc. | 12/31/07 | 81.7 | 3.6 | 127.3 |
| The Coca-Cola Company | 12/31/07 | 28.9 | 6.0 | 135.0 |
| Dell Inc. | 2/2/07 | 57.4 | 2.6 | 44.3 |
| EMC Corporation | 12/31/07 | 13.2 | 1.7 | 32.4 |
| Exxon Mobil Corporation | 12/31/07 | 404.6 | 40.6 | 474.2 |

| Company | Reported Fiscal Year | Revenue (in billions) ($) | Net Income (in billions) ($) | Market Capitalization on February 20, 2008 (in billions) ($) |
|---|---|---|---|---|
| Ford Motor Company | 12/31/07 | 172.5 | (2.7) | 13.5 |
| General Electric Company | 12/31/07 | 172.7 | 22.2 | 345.3 |
| General Motors Corporation | 12/31/07 | 181.1 | (38.7) | 14.5 |
| Hewlett-Packard Company | 10/31/07 | 104.3 | 7.3 | 122.1 |
| Honeywell International Inc. | 12/31/07 | 34.6 | 2.4 | 42.1 |
| International Business Machines Corporation | 12/31/07 | 98.8 | 10.4 | 149.9 |
| Johnson & Johnson | 12/30/07 | 61.1 | 10.6 | 182.7 |
| Lockheed Martin Corporation | 12/31/07 | 41.9 | 3.0 | 43.8 |
| Microsoft Corporation | 6/30/07 | 51.1 | 14.1 | 262.6 |
| Motorola, Inc. | 12/31/07 | 36.6 | — | 26.1 |
| National Semiconductor Corporation | 5/27/07 | 1.9 | 0.4 | 4.4 |
| Nortel Networks Corporation | 12/31/07 | 10.9 | (1.0) | 5.0 |
| PepsiCo, Inc. | 12/29/07 | 39.5 | 5.7 | 114.2 |
| Pfizer Inc. | 12/31/07 | 48.4 | 8.1 | 152.2 |
| Qualcomm Incorporated | 9/30/07 | 8.9 | 3.3 | 69.9 |
| Safeway Inc. | 12/29/07 | 42.3 | 0.9 | 14.1 |
| Sony Corporation | 3/31/07 | 70.3 | 1.1 | 46.9 |
| Sun Microsystems, Inc. | 6/30/07 | 13.9 | 0.5 | 15.6 |
| Target Corporation | 2/3/07 | 59.5 | 2.8 | 44.4 |
| Texas Instruments Incorporated | 12/31/07 | 13.8 | 2.7 | 40.7 |
| Time Warner Inc. | 12/31/07 | 46.5 | 4.4 | 59.3 |
| United Parcel Service, Inc. | 12/31/07 | 49.7 | 0.4 | 76.1 |
| The Walt Disney Company | 9/29/07 | 35.5 | 4.7 | 61.4 |
| **Intel 2007** | 12/29/07 | 38.3 | 7.0 | 119.0 |
| **Intel 2007 Percentile Rank** | | 41st | 71st | 65th |

*Peer Group Changes for 2008*

Based on the recommendation of Professor Hall and Intel's Compensation and Benefits Group, the committee revised the peer group that Intel will use for making compensation decisions in 2008. The size of the peer group was reduced to 25 companies with the goal of more accurately reflecting the companies with which Intel competes for talent and to resemble more closely the peer group that Intel uses for measuring relative financial performance for annual incentive cash payments. The new peer group includes 15 technology companies and 10 companies outside the technology industry from the S&P 100. The committee chose companies that resemble Intel in various respects, such as making large investments in research and development and having significant manufacturing and global operations. In addition, the committee selected companies whose three-year averages for revenue, net income, and market capitalization approximated Intel's. Based on the review of market data by Professor Hall and Intel's Compensation and Benefits Group, the committee does not expect changes in the peer group to have a significant impact on aggregate compensation for 2008. The new peer group is as follows:

| Company | Reported Fiscal Year | Revenue (in billions) ($) | Net Income (in billions) ($) | Market Capitalization on February 20, 2008 (in billions) ($) |
|---|---|---|---|---|
| Advanced Micro Devices, Inc. | 12/29/07 | 6.0 | (3.4) | 4.0 |
| Apple, Inc. | 9/29/07 | 24.0 | 3.5 | 108.8 |
| Applied Materials, Inc. | 10/28/07 | 9.7 | 1.7 | 26.7 |
| AT&T Corporation | 12/31/07 | 118.9 | 12.0 | 207.7 |
| Cisco Systems Inc. | 7/28/07 | 34.9 | 7.3 | 139.4 |

| Company | Reported Fiscal Year | Revenue (in billions) ($) | Net Income (in billions) ($) | Market Capitalization on February 20, 2008 (in billions) ($) |
|---|---|---|---|---|
| Dell Inc. | 2/2/07 | 57.4 | 2.6 | 44.3 |
| The Dow Chemical Company | 12/31/07 | 53.5 | 2.9 | 36.8 |
| EMC Corporation | 12/31/07 | 13.2 | 1.7 | 32.4 |
| General Electric Company | 12/31/07 | 172.7 | 22.2 | 345.3 |
| Google Inc. | 12/31/07 | 16.6 | 4.2 | 158.9 |
| Hewlett-Packard Company | 10/31/07 | 104.3 | 7.3 | 122.1 |
| International Business Machines Corporation | 12/31/07 | 98.8 | 10.4 | 149.9 |
| Johnson & Johnson | 12/30/07 | 61.1 | 10.6 | 182.7 |
| Merck & Co., Inc. | 12/31/07 | 24.2 | 3.3 | 102.4 |
| Microsoft Corporation | 6/30/07 | 51.1 | 14.1 | 262.6 |
| Motorola, Inc. | 12/31/07 | 36.6 | — | 26.1 |
| Oracle Corporation | 5/31/07 | 18.0 | 4.3 | 99.8 |
| Pfizer Inc. | 12/31/07 | 48.4 | 8.1 | 152.2 |
| Qualcomm Incorporated | 9/30/07 | 8.9 | 3.3 | 69.9 |
| Texas Instruments Incorporated | 12/31/07 | 13.8 | 2.7 | 40.7 |
| Tyco International Ltd. | 9/28/07 | 18.8 | (1.7) | 19.5 |
| United Parcel Service, Inc. | 12/31/07 | 49.7 | 0.4 | 76.1 |
| United Technologies Corporation | 12/31/07 | 54.8 | 4.2 | 70.7 |
| Verizon Communications Inc. | 12/31/07 | 93.5 | 5.5 | 101.4 |
| Yahoo! Inc. | 12/31/07 | 7.0 | 0.7 | 40.2 |
| **Intel 2007** | 12/29/07 | 38.3 | 7.0 | 119.0 |
| **Intel 2007 Percentile Rank** | | 51st | 69th | 66th |

*Individual Performance Reviews*

The CEO documents each executive officer's performance during the year, detailing accomplishments, areas of strength, and areas for development. The CEO bases his evaluation on his knowledge of each executive officer's performance, an individual self-assessment completed by each executive officer, and feedback provided by each executive officer's peers and direct reports. The CEO also reviews the compensation data gathered from the compensation surveys and makes a recommendation to the committee on each executive officer's base salary, annual incentive cash baselines, and equity awards. The CEO does not propose compensation for himself or the Chairman. Intel's Director of Human Resources and the Compensation and Benefits Group assist the CEO in developing the executive officers' performance reviews and reviewing the market compensation data to determine the compensation recommendations. Executive officers do not propose or seek approval for their own compensation.

The Chairman and the CEO's annual performance reviews are developed by the independent directors acting as a committee of the whole Board, chaired by the Lead Independent Director. For the CEO's review, formal input is received from the independent directors, the Chairman, and senior management. For the Chairman's review, input is received from the independent directors and the CEO. The Chairman and the CEO also submit self-assessments. The independent directors meet as a group in executive session to prepare the reviews, which are completed and presented to the Chairman and the CEO. These evaluations are used by the committee to determine the Chairman and CEO's base salaries, annual incentive cash baselines, and equity awards.

*Internal Pay Equity*

The committee compares the compensation of executive officers with the compensation of the top 100 highest paid employees at Intel to monitor internal pay equity. The committee does not use fixed ratios when conducting this analysis, but our CEO's total compensation has typically been $1.5 - 3x$ the total compensation paid to each of our executive vice presidents.

*Wealth Accumulation Analysis*

The committee's process for determining compensation also includes a review of Intel's executive compensation programs and practices, and an analysis of all elements of compensation. The committee also reviews the value of each element of compensation that the executive officer could potentially receive in the next 10 years, under scenarios of continuing employment, termination, and retirement. For this review, total remuneration includes all aspects of the executive officer's total cash compensation from continuing employment, the future value of equity awards under varying stock price assumptions (and including, as applicable, the impact of accelerated vesting upon retirement), the value of any deferred compensation, and profit sharing retirement benefits. The goal of the analysis is to allow the committee to see how each element of compensation interacts with the other elements and to see how current compensation decisions may affect future wealth accumulation. To date, the amount of past compensation, including amounts realized or realizable from prior equity awards, has generally not been a significant factor in the committee's considerations.

## Final Compensation Determinations

In the first quarter of 2007, the committee established base salaries, set the annual incentive cash baselines and operational goals under the Executive Officer Incentive Plan, and determined the equity awards for executive officers. When setting the annual incentive baseline amount, the committee takes into account that these amounts are subject to a multiplier under the Executive Officer Incentive Plan formula. Thus, even when the baseline amount was lower than an executive officer's base salary, the multiplier resulted in a higher percentage of total cash compensation being performance-based. Following the end of the year, the committee approved the calculation of the multiplier to be used in making annual incentive cash payments based on the Executive Officer Incentive Plan formula and determined any individual performance adjustments under the plan. These determinations are discussed below, after which we provide more details on the different elements of compensation.

With respect to adjustments based on market data, 2007 was the second year of a three-year program to increase cash and equity compensation levels to reach the target percentiles set by the committee, and mirrors an effort to increase compensation for employees generally. However, the target percentiles for base salary, total cash compensation, equity compensation, and total compensation are guidelines for the committee. The committee's subjective consideration of the other factors discussed above results in individual determinations that differ, at times significantly, from the target percentiles. In addition, actual cash compensation for each of the listed officers also increased due to higher annual incentive cash payments under the Executive Officer Incentive Plan that reflect stronger corporate performance compared to 2006.

*Considerations Specific to Dr. Barrett*

Dr. Barrett has served as Intel's Chairman since May 15, 2005, following his transition from serving as Intel's CEO, and he has been an Intel employee since 1974. In 2007, as in 2006, the committee elected to reduce Dr. Barrett's base salary by 23% and annual incentive cash baseline by 30%, primarily to reflect the differences in job scope between the role of Chairman and CEO. However, Intel's strong financial performance in 2007 resulted in an increase in his performance-based cash compensation. Accordingly, Dr. Barrett's total cash compensation increased 11% in 2007. Dr. Barrett received a higher proportion of RSUs in 2007, reflecting the committee's decision to provide executive officers with an equity mix of approximately 70% stock options and 30% RSUs. Primarily because of the increase in performance-based cash compensation, Dr. Barrett's total compensation increased 10% for 2007. The committee compensated Dr. Barrett at levels significantly below the target percentiles, primarily due to differences in the scope of his job compared to other chairman of the board positions in the peer group.

|  | 2007 ($) | 2006 ($) | Change (%) |
|---|---|---|---|
| Base Salary | 358,300 | 463,000 | (23) |
| Total Cash Compensation | 1,752,400 | 1,573,400 | 11 |
| Annual Equity Awards (based on grant date fair value) | 1,134,700 | 1,062,300 | 7 |
| Long-Term Equity Awards (based on grant date fair value) | — | — | — |
| Total Compensation | 2,887,100 | 2,635,700 | 10 |

*Considerations Specific to Mr. Otellini*

Mr. Otellini has served as Intel's CEO since May 15, 2005 and has been an Intel employee since 1974. In 2007, the Committee elected to increase Mr. Otellini's base salary by 10% and annual incentive cash baseline by 25%. Both elements were increased in light of peer data indicating that his cash compensation was significantly below the committee's compensation goals. Mr. Otellini's base salary was increased less than his annual incentive cash baseline in an effort to increase the proportion of at-risk, performance-based compensation. Based on market data, the committee believes that Mr. Otellini's base salary for 2007 was below the 25th percentile. Although his base salary and annual incentive cash baseline increases, along with the effect of Intel's strong financial performance on annual incentive cash payments, resulted in Mr. Otellini's total cash compensation increasing 91% in 2007, the committee believes that his total cash compensation remained below the 65th percentile. Based on grant date fair value, Mr. Otellini received a 4% increase in the value of his annual equity awards in 2007 compared to 2006. In 2007, Mr. Otellini was also granted a long-term stock option to purchase 700,000 shares. In order to reinforce the at-risk, performance-based nature of Mr. Otellini's total compensation package and reward long-term stock price appreciation, this long-term stock option award was granted in a single year instead of being spread over a number of years. Primarily because of Mr. Otellini's increased performance-based cash compensation and his long-term stock option, Mr. Otellini's total compensation increased 104% for 2007. However, the committee believes that his total compensation was still significantly below the 65th percentile. In 2007, the committee compensated Mr. Otellini at levels below the target percentiles because of his relatively short tenure as CEO.

| | 2007 ($) | 2006 ($) | Change (%) |
|---|---|---|---|
| Base Salary | 770,000 | 700,000 | 10 |
| Total Cash Compensation | 4,734,200 | 2,472,700 | 91 |
| Annual Equity Awards (based on grant date fair value) | 3,614,400 | 3,475,000 | 4 |
| Long-Term Equity Awards (based on grant date fair value) | 3,793,500 | — | — |
| Total Compensation | 12,142,100 | 5,947,700 | 104 |

*Considerations Specific to Mr. Bryant*

Mr. Bryant, an Executive Vice President, served as Intel's CFO for 13 years before transitioning in October 2007 to Intel's Chief Administrative Officer. He has been an Intel employee since 1981. In 2007, the committee elected to increase Mr. Bryant's base salary by 28% and annual incentive cash baseline by 22% in an effort to provide more market competitive pay. Based on market data, the committee believes that Mr. Bryant's base salary for 2007 was close to the 25th percentile. Mr. Bryant's total cash compensation increased 39% in 2007, resulting in his total cash compensation being above the 65th percentile. In 2007, the committee compensated Mr. Bryant above the 65th percentile for total cash compensation because of Intel's strong financial performance and his tenure as an Executive Vice President. Based on grant date fair value, Mr. Bryant received a 60% increase in the value of his annual equity awards in 2007 compared to 2006, in line with our target for market competitiveness and with grants to other Executive Vice Presidents. Primarily because of the increases in his annual equity awards and performance-based cash compensation, Mr. Bryant's total compensation increased 48% for 2007. The committee believes that his total compensation was close to the 65th percentile.

| | 2007 ($) | 2006 ($) | Change (%) |
|---|---|---|---|
| Base Salary | 455,000 | 355,000 | 28 |
| Total Cash Compensation | 2,128,400 | 1,533,500 | 39 |
| Annual Equity Awards (based on grant date fair value) | 1,903,200 | 1,192,200 | 60 |
| Long-Term Equity Awards (based on grant date fair value) | — | — | — |
| Total Compensation | 4,031,600 | 2,725,700 | 48 |

*Considerations Specific to Mr. Maloney*

Mr. Maloney has been an Executive Vice President at Intel for six years and an Intel employee since 1982. In 2007, the committee elected to increase Mr. Maloney's base salary by 34% and annual incentive cash baseline by 27%. Based on market data, the committee believes that Mr. Maloney's base salary for 2007 was above the 25th percentile. Mr. Maloney's total cash compensation increased 44% in 2007. The committee believes that his total cash compensation was above the 65th percentile. In 2007, the committee compensated Mr. Maloney above the 65th percentile for total cash

compensation because of Intel's strong financial performance and in an effort to maintain internal equity with other Executive Vice Presidents. Based on grant date fair value, Mr. Maloney received a 60% increase in the value of his annual equity awards in 2007 compared to 2006, in line with our target for market competitiveness and with grants to other Executive Vice Presidents. In 2007, Mr. Maloney was also granted a long-term stock option to purchase 82,500 shares and 11,750 long-term RSUs. Primarily because of these long-term equity awards and increases in annual equity awards and performance-based cash compensation, Mr. Maloney's total compensation increased 81% for 2007. The committee believes that his total compensation was close to the 65th percentile.

|  | 2007 ($) | 2006 ($) | Change (%) |
|---|---|---|---|
| Base Salary | 390,000 | 290,000 | 34 |
| Total Cash Compensation | 1,883,900 | 1,309,000 | 44 |
| Annual Equity Awards (based on grant date fair value) | 1,903,200 | 1,192,200 | 60 |
| Long-Term Equity Awards (based on grant date fair value) | 729,300 | — | — |
| Total Compensation | 4,516,400 | 2,501,200 | 81 |

### Considerations Specific to Mr. Perlmutter

Mr. Perlmutter has been an Executive Vice President at Intel since November 15, 2007 and an Intel employee since 1980. In 2007, the committee elected to increase Mr. Perlmutter's base salary by 38% and annual incentive cash baseline by 78%. In addition to individual performance and market-based reasons, Mr. Perlmutter's total cash compensation was increased because he was no longer participating in some Intel Israel site-specific compensation programs. The committee elected to remove Mr. Perlmutter from these compensation programs (other than retirement programs) in order to more closely align his compensation programs with those of Intel's other executive officers. Based on market data, the committee believes that Mr. Perlmutter's base salary for 2007 was below the 25th percentile. These factors, as well as Intel's strong financial performance, resulted in Mr. Perlmutter's total cash compensation increasing 72% in 2007. The committee believes that his total cash compensation was below the 65th percentile. Based on grant date fair value, Mr. Perlmutter received a 104% increase in the value of his annual equity awards in 2007 compared to 2006, in line with our target for market competitiveness and with grants to other Executive Vice Presidents. In 2007, Mr. Perlmutter was also granted a long-term stock option to purchase 52,500 shares and 5,000 long-term RSUs. Primarily because of the increases in his annual equity awards and performance-based cash compensation, Mr. Perlmutter's total compensation increased 72% for 2007. The committee believes that Mr. Perlmutter's total compensation was significantly below the 65th percentile. In 2007, the committee compensated Mr. Perlmutter at levels below the target percentile for total compensation due to his relatively short tenure as an Executive Vice President.

|  | 2007 ($) | 2006 ($) | Change (%) |
|---|---|---|---|
| Base Salary | 357,200 | 258,500 | 38 |
| Total Cash Compensation | 1,612,400 | 938,800 | 72 |
| Annual Equity Awards (based on grant date fair value) | 1,903,200 | 933,500 | 104 |
| Long-Term Equity Awards (based on grant date fair value) | 417,800 | 419,600 | — |
| Total Compensation | 3,933,400 | 2,291,900 | 72 |

### Considerations Specific to Mr. Smith

Since Mr. Smith was not an Executive Officer when the 2007 compensation decisions were made, Mr. Otellini determined Mr. Smith's compensation for 2007. Beginning in 2008, his compensation is determined by the committee.

## Elements of Compensation

### Base Salary

When the committee determines the executive officers' base salaries during the first quarter of the year, the committee takes into account each officer's role and level of responsibility at the company. In general, executive officers with the highest level of responsibility have the lowest percentage of their compensation fixed as base salary and the highest percentage of their compensation at risk. The committee strives to have the majority of the executive officers'

compensation at risk. Based on market data, the committee believes that in 2007 the base salaries of the listed officers were, on average, below the 25th percentile of our peer group companies. The committee believes the 25th percentile is an appropriate target for base salaries because the committee strives to have performance-based compensation be a substantial majority of executive officers' total compensation. Base salary represents a small percentage of total cash compensation (20% in 2007) and total compensation (7% in 2007) for the listed officers.

*Performance-Based Compensation*

Intel's pay-for-performance programs include performance-based cash compensation that rewards strong financial performance, and equity awards that reward stock price appreciation. Annual and semiannual incentive cash payments are determined primarily by Intel's financial results and are not linked directly to Intel's stock price performance. The committee believes that targeting total cash compensation at the 65th percentile is appropriate because of the high proportion of cash compensation that is variable, at risk, and tied to Intel's financial performance relative to the peer group. A high percentage of total compensation is performance-based (88% in 2007), with the majority of total compensation in the form of equity awards (58% in 2007).

*Annual Incentive Cash Payments.* Net income is the key financial component of Intel's incentive cash programs, and in 2007 net income increased 38% compared to 2006. Primarily because of this result, total cash compensation to listed officers increased 57% overall.

Annual incentive cash payments are made under the Executive Officer Incentive Plan. This plan mirrors the broad-based plan for employees, with the added feature of an individual performance adjustment. The three core elements of the program, which are multiplied together to determine the annual incentive cash payment, are as follows:

- a formula based on earnings growth and operational performance, which results in a bonus multiplier;

- an incentive cash baseline for each executive officer; and

- an individual performance adjustment.

The annual incentive cash payment cannot be increased beyond the maximum limits calculated each year under the formula and cannot in any event exceed $10 million for any individual. The following illustration shows the Executive Officer Incentive Plan formula.



As shown above, the sum of the three corporate performance components determines the Executive Officer Incentive Plan multiplier. We expect the multiplier calculated under the plan to typically range between 2 and 4 (but it may be higher or lower depending on the output of the formula), with a target multiplier of 3. The Executive Officer Incentive Plan provides that the individual performance adjustment could range between 90% and 110%. The committee has the ability to apply subjective, discretionary criteria to determine the individual performance adjustment percentage.

Each corporate performance component is targeted around a score of 100%, with a minimum score of zero. The committee elected to use net income as the financial performance metric to reward executive officers for growing

earnings. Diluted earnings per share was considered, but the committee preferred net income to evaluate both absolute and relative financial performance, as it is independent of factors such as stock price movements and stock buybacks that affect earnings per share. The committee may adjust Intel's net income based on qualifying criteria selected by the committee in its sole discretion as described in the plan. The methodology used to calculate Intel's net income for both absolute and relative financial performance is the same. Further details on each component follow:

- *Relative Financial Component.* To determine relative financial performance, the committee compares Intel's annual net income growth relative to the market, which for this purpose we define as the 15 technology peer companies plus the companies that make up the S&P 100. To determine Intel's performance relative to the market, Intel's net income percentage growth (plus one) is divided by the simple average (with each group weighted equally) of the annual net income percentage growth for the S&P 100 and the 15 technology peer companies (plus one). There is some overlap in the S&P 100 and the 15 technology peer companies that we have identified. We have done this intentionally to provide slightly more weighting to our relative performance compared to the technology peer companies that are also in the S&P 100. Through this component, the committee rewards executive officers for how well Intel performs compared to a broader market. In 2007, Intel's net income grew significantly faster than the market average (38.3% vs. 5%).

- *Absolute Financial Component.* To determine absolute financial performance, Intel's current-year net income is divided by Intel's average net income over the previous three years. Due to historical volatility in earnings, the committee decided to use a rolling three-year average in the denominator so that Intel does not over- or under-compensate executive officers based on volatility in earnings. Through this component, the committee rewards executive officers for sustained performance. In 2007, Intel's net income was 10% higher than the trailing three-year average.

- *Operational Component.* Each year, the committee approves operational goals and their respective success criteria for measuring operational performance. The operational goals typically link to performance in several key areas, including financial performance, product design/development roadmaps, manufacturing/cost/productivity improvements, and customer satisfaction. For 2007, the committee approved 23 operational goals, allocated and grouped into the categories described in the following tables, with weightings that total 100 points. The goals and success measures are defined within the first 90 days of the performance period. The scoring for each goal ranges from 0 to 1.25 based on the level of achievement reflected in Intel's confidential internal annual business plan. The results are summed and divided by 100, such that the final operational score is between 0 and 1.25. The operational goals selected by the committee are also used in the broad-based employee annual incentive cash plan and are prepared each year as part of the annual planning process for the company, so that all employees are focused on achieving the same company-wide operational results. These operational goals are derived from a rigorous process for tracking and evaluating performance; however, some goals have non-quantitative measures that require some degree of subjective evaluation. Over the past five years, operational goals have scored between 88% and 108%, with an average result of 99%. The operational goals are intended to be a practical and realistic estimate of the coming year based on the data, projections, and analyses that Intel uses in its planning processes. The scores for the year, representing Intel's achievement of the year's operational goals, are calculated by senior management and are reviewed and approved by the committee. The company scored 107% on its operational goals in 2007, up from 88% in 2006.

### 2007 Operational Goal Categories

| Architecture/Platforms – 25 points | Customer Orientation – 25 points |
| --- | --- |
| • Next-generation product development<br>• Graphics leadership | • Improved roadmap flexibility, delivery performance, and response rates<br>• Reinvigoration of brand leadership |
| **Manufacturing/Technology – 25 points** | **Growth and Execution – 25 points** |
| • Factory performance and costs<br>• Process technology milestones | • Revenue and product roadmap ramps/execution<br>• Headcount and spending metrics and execution |

**Executive Officer Incentive Plan Formula Results for 2007**

Following the end of fiscal year 2007, the committee determined the annual incentive cash payments in accordance with the plan's formula. The 2007 financial results yielded a multiplier of 3.49, calculated as follows:

| Relative Financial Component | Absolute Financial Component (In millions)($) | Operational Component | Points | EOIP Multiplier |
|---|---|---|---|---|
| $\dfrac{(1 + 38.3\%)}{(1 + 5.0\%)}$ | $\dfrac{6,976}{6,314^{(1)}}$ | Architecture/Platforms | 24.0 | |
| | | Manufacturing/Technology | 30.5 | |
| | | Customer Orientation | 24.6 | |
| | | Growth and Execution | 28.0 | |
| | | Total | 107.1/100 | |
| 1.32 | 1.10 | | 1.07 | 3.49 |

(1) With the requirement in 2006 to include the impact of stock-based compensation in generally accepted accounting principles financial statements, the 2004 and 2005 net income numbers include the impact of stock-based compensation to ensure consistency in measuring net income growth. Additionally, the 2005 net income number excludes the additional tax expense of $250 million related to the decision to repatriate non-U.S. earnings under the American Jobs Creation Act of 2004.

In addition, for fiscal 2007 the committee elected to provide each listed officer with a positive individual performance adjustment in light of the totality of Intel's strong performance in 2007.

The following graph illustrates how the amount of the average annual incentive cash payment to listed officers has varied with changes to Intel's net income.



*Semiannual Incentive Cash Payments.* Intel's executive officers participate in a company-wide, semiannual cash incentive plan that calculates payouts based on Intel's corporate profitability to link compensation to financial performance. Payouts are communicated as a number of extra days of compensation, with executive officers receiving the same number of extra days as other employees. Two formulas compute a payout, with the actual payout based on the formula that delivers the higher value:

- 0.65 days of compensation (calculated based on eligible earnings for the six-month period, including one-half of incentive baseline amounts) for every two percentage points of Intel's pretax profit as a percentage of revenue; or

- a payment expressed as days of compensation based on 4.5% of net income divided by the current value of a worldwide day of compensation (essentially, Intel's daily payroll cost).

An additional two days of compensation are awarded annually if Intel achieves customer satisfaction goals. Payouts occur in the first and third quarters of each year based on corporate performance for the preceding two quarters.

Plan payments earned in 2007 totaled 17.3 days of compensation per employee, up from 15.1 days in 2006. This total included two days of compensation resulting from Intel's achievement of its customer satisfaction goals in 2007. In 2007, 2006, and 2005, semiannual incentive cash payments represented 5% or less of listed officers' total performance-based cash compensation.

*Equity Incentive Plans*

The committee and management believe that equity compensation is a critical component of a total compensation package that helps Intel recruit, retain, and motivate the employees needed for the present and future success of the company. In 2006, Intel began granting employees RSUs in addition to stock options. Stock options provide actual economic value to the holder if the price of Intel stock has increased from the grant date at the time the option is exercised. In contrast, RSUs have economic value when they vest even if the stock price declines or stays flat. Stock options motivate executive officers by providing more potential upside. RSUs assist the company in retaining executive officers because they have more stable value.

The use of RSUs also assists in maintaining the Board's long-term goal that equity grants not result in an average annual dilution rate that exceeds 2%. Because the grant date fair value of each RSU that we grant is greater than the grant date fair value of each stock option, employees on average receive fewer RSUs now than stock options in the past. Most equity grants occur on an annual basis in connection with the annual performance review and compensation adjustment cycle. In general, annual stock options and RSUs vest in 25% annual increments beginning one year from the date of grant. For all employees including executive officers, Intel uses pre-established quarterly dates for the formal granting of equity awards during the year. With limited exceptions, these dates typically occur shortly after publication of Intel's quarterly earnings releases.

For Intel's executive officers, the committee grants a combination of annual equity grants targeted to be below market average in value, and long-term equity grants, which in combination with the annual grants are intended to approximate the 65th percentile of the peer group. The committee believes that the 65th percentile is an appropriate target because the majority of equity awards granted to executive officers are in the form of stock options, which have no economic value unless the market price of Intel's common stock increases. Executive officers are eligible to receive long-term grants that generally have a five-year cliff-vesting schedule, meaning that 100% of the grant vests on the fifth anniversary of the date that the grants are awarded. The annual equity grants and long-term equity grants are both generally a mix of stock options and RSUs based on their grant date fair values as calculated under SFAS No. 123(R). In 2007, the committee approved management's recommendation to increase the RSU mix for all employees, including moving almost all executive officers from an 80/20 split to a 70/30 split. The committee and Mr. Otellini believed that increasing the use of RSUs would help with retention and to make Intel's compensation package more competitive with the companies in the peer group.

The committee determines the amount of annual equity grants and long-term grants based on its subjective consideration of factors such as relative job scope, expected future contributions to the growth and development of the company, and the competitiveness of grants relative to the peer group. When evaluating future contributions, the committee projects the value of the executive officer's future performance based on the officer's expected career development. The equity grants are meant to motivate the executive officer to stay at Intel and deliver the expected future performance.

Because equity compensation is more complicated than cash compensation, there are a number of ways to present the costs to Intel and the benefits to the listed officers resulting from Intel's equity compensation program. The following graphs and table present five different views of Intel's equity compensation program. The first two graphs are based on the reporting of share-based compensation expense in Intel's financial statements. The table following these graphs shows some of the key metrics (dilution, burn rate, and overhang) that the committee and Intel's management use to measure how effectively Intel manages its equity compensation program. The third and fourth graphs show how the economic value that the listed officer receives from equity compensation varies with changes to Intel's stock price by showing the listed officers' realized and unrealized gains and losses.

The following graph shows the SFAS No. 123(R) expense that Intel incurred during each year for financial statement purposes for grants to listed officers. The amount of expense that Intel incurs each year relates to a portion of many years worth of equity awards. For example, expense related to annual stock options granted in April 2007 would typically be incurred as the award vests, with expense in 2007, 2008, 2009, 2010, and the beginning of 2011. SFAS No. 123(R) expense for the listed officers declined 19% in 2007 compared to 2006, primarily because the number of equity awards that completed vesting exceeded the number of new equity awards granted.



The graph below shows the expense for awards granted to listed officers during each year for financial statement purposes. The grant date fair value of annual and long-term equity awards granted to listed officers in January and April 2007 totaled $17.1 million, and this expense will be incurred over the service period as the awards vest in 2008, 2009, 2010, 2011, and 2012. The grant date fair value of equity awards that the committee granted in 2007 increased 92% compared to 2006, with the majority of the increase ($5.3 million) due to the granting of long-term equity awards.



While the two graphs above focus on how our equity compensation program impacts our financial statements, there are other key metrics that the committee and Intel's management use to determine the costs to stockholders of Intel's equity compensation program. The following table shows how these metrics have changed over the past three years. We define the metrics as follows:

- *Dilution* is total equity awards granted (less cancellations) divided by shares outstanding at the beginning of the year.

- *Burn rate* is similar to dilution, but does not take cancellations into account.

- *Overhang* is equity awards outstanding but not exercised plus equity awards available to be granted, divided by total equity awards outstanding at the end of the year.

### Equity Compensation Key Metrics

|  | 2007 (%) | 2006 (%) | 2005 (%) |
|---|---|---|---|
| Dilution | — | .2 | 1.3 |
| Burn rate | 1.0 | 1.4 | 1.9 |
| Overhang | 16.2 | 17.8 | 19.2 |

By policy, the committee limits grants to listed officers to no more than 5% of the total equity awards granted in any one year. The dilution, burn rate, and overhang amounts reported above are for all equity awards, not just those awarded to listed officers. The goal of the committee and Intel's management is to limit annual dilution to less than 2%.

While the graphs and table above show some of the costs of Intel's equity compensation program, the next two graphs show the economic benefit of equity compensation to the listed officers. Additionally, the graphs show how the value of the listed officers' equity awards is directly affected by changes in the price of Intel common stock. During 2007, the price of Intel common stock increased 32% from the beginning of the fiscal year to year-end. This 32% increase translated into an unrealized gain of $43.6 million for the listed officers and illustrates the performance-based nature of Intel's equity compensation program. To promote comparability from year to year, the Unrealized Gain/Loss on Equity Awards graph includes only awards that were outstanding at both the beginning and the end of the fiscal year (awards that were granted or that were exercised or settled during the year are excluded).



The Realized Gains graph below shows the aggregate value of the stock options that were exercised and RSUs that were settled by the listed officers for each of the past three years. This graph shows the gains that the listed officers actually received from their equity awards, while the Unrealized Gain/Loss on Equity Awards graph shows unrealized gains measured as of the end of each fiscal year (which may or may not ever be realized).



*Employee Stock Purchase Plan*

Intel's employee stock purchase plan allows employees to acquire Intel stock at a discount price and is intended to encourage employee stock ownership. This plan has a six-month look-back and allows participants to buy Intel stock at a 15% discount to the market price with up to 10% of their salary and performance-based cash compensation (up to $25,000).

*Retirement Plans*

Intel provides limited post-employment compensation arrangements to listed officers, consisting of an employee-funded 401(k) savings plan, a discretionary company-funded profit sharing retirement plan, and a company-funded pension plan, each of which is tax-qualified and available to substantially all U.S. employees; and a non-tax-qualified supplemental deferred compensation plan for highly compensated employees.

The committee allows for the participation of the executive officers in these plans to encourage the officers to save for retirement and to assist the company in retaining the officers. The deferred compensation plan is intended to promote retention by giving employees an opportunity to save in a tax-efficient manner. The terms governing the retirement

benefits under these plans for the executive officers are the same as those available for other eligible employees in the U.S. The plans differ, but each plan other than the pension plan results in individual participant balances that reflect a combination of:

- an annual amount contributed by the company or deferred by the employee (as a portion of his or her eligible cash compensation);

- the contributions and deferred amounts being invested at the direction of either the company or the employee (the same investment choices are available to all participants); and

- the continuing reinvestment of returns until the accounts are distributed.

Intel does not make matching contributions based on the amount of employee contributions under any of these plans. The profit sharing retirement plan consists of a discretionary cash contribution determined annually by the committee for executive officers, and by the CEO for other employees. These contribution percentages have historically been the same for executive officers and other employees. For 2007, Intel's discretionary contributions (including allocable forfeitures) to the profit sharing retirement plan for all eligible U.S. employees, including executive officers, equaled 7% of eligible salary (which included annual and semiannual incentive cash payments as applicable). To the extent that the amount of the contribution is limited by the tax code, Intel credits the additional amount to the non-qualified deferred compensation plan. Intel invests all of its contributions to the profit sharing retirement plan in a diversified portfolio.

Because the listed officers do not receive preferential or above-market rates of return under the deferred compensation plan, earnings under the plan are not included in the Summary Compensation table but are included in the Non-Qualified Deferred Compensation table. The investment options available under the non-qualified plan are the same investment options that are available in the 401(k) savings plan.

The benefit provided to listed officers who participate in the pension plan consists of a tax-qualified arrangement that offsets amounts that otherwise would be paid under the non-qualified deferred compensation plan described above. Each participant's tax-qualified amount in this arrangement was established based on a number of elements, including the participant's non-qualified deferred compensation plan balance as of December 31, 2003, IRS pension rules that take into consideration age and other factors, and limits set by Intel for equitable administration.

## Other Compensation Policies

*Personal Benefits.* The committee supports the goal of management to maintain an egalitarian culture in its facilities and operations. Intel's executive officers are not entitled to operate under different standards than other employees. Intel does not have programs for providing personal benefit perquisites to executive officers, such as permanent lodging or defraying the cost of personal entertainment or family travel. The company provides air and other travel for Intel's executive officers for business purposes only. Intel's company-operated aircraft hold approximately 40 passengers and are used in regularly scheduled shuttle routes between Intel's major U.S. facility locations, and Intel's use of non-commercial aircraft on a time-share or rental basis is limited to appropriate business-only travel. Intel's health care, insurance, and other welfare and employee benefit programs are essentially the same for all eligible employees, including executive officers, although the details of the programs may vary by country. Intel shares the cost of health and welfare benefits with its employees, a cost that is dependent on the level of benefits coverage that each employee elects. Intel's employee loan programs are not available to Intel's executive officers. Intel has no outstanding loans of any kind to any of its executive officers.

*Stock Ownership Guidelines.* Because the committee believes in linking the interests of management and stockholders, the Board has set stock ownership guidelines for Intel's executive officers. The ownership guidelines specify a number of shares that Intel's executive officers must accumulate and hold within five years of the later of the effective date of the guidelines or the date of appointment or promotion as an executive officer. The following table lists the specific share requirements. Stock options and unvested RSUs do not count toward satisfying these ownership guidelines. Each of our listed officers had either satisfied these ownership guidelines or had time remaining to do so as of December 29, 2007.

|  | CEO | Chairman | CFO | Executive Vice President | Senior Vice President |
|---|---|---|---|---|---|
| Minimum Number of Shares | 250,000 | 150,000 | 125,000 | 100,000 | 65,000 |

*Intel Policies Regarding Claw-Backs.* Intel's 2007 Executive Officer Incentive Plan and 2006 Equity Incentive Plan include standards for seeking the return (claw-back) from executive officers of cash incentive payments and stock sale proceeds in the event that they had been inflated due to financial results that later had to be restated. The 2007 Executive

Officer Incentive Plan and 2006 Equity Incentive Plan were approved by stockholders and were included in the 2007 Proxy Statement for the 2007 annual meeting, which can be found at *www.intel.com/intel/annualreports.*

*Tax Deductibility.* Section 162(m) of the tax code places a limit of $1 million on the amount of compensation that Intel may deduct in any one year with respect to its CEO and each of the next four most highly compensated executive officers. Certain performance-based compensation approved by stockholders is not subject to this deduction limit. Intel structured its 2006 Equity Incentive Plan with the intention that stock options awarded under this plan would qualify for tax deductibility. However, in order to maintain flexibility and promote simplicity in the administration of these arrangements, other compensation such as RSUs and payments under the 2007 Executive Officer Incentive Plan are not designed to qualify for tax deductibility.

## REPORT OF THE COMPENSATION COMMITTEE

The Compensation Committee, which is composed solely of independent members of the Board of Directors, assists the Board in fulfilling its responsibilities with regard to compensation matters, and is responsible under its charter for determining the compensation of Intel's executive officers. The Compensation Committee has reviewed and discussed the "Compensation Discussion and Analysis" section of this proxy statement with management, including our CEO, Paul S. Otellini, and our CFO, Stacy J. Smith. Based on this review and discussion, the Compensation Committee recommended to the Board of Directors that the "Compensation Discussion and Analysis" section be included in Intel's 2007 Annual Report on Form 10-K (incorporated by reference) and in this proxy statement.

**Compensation Committee**
Reed E. Hundt, Chairman
David S. Pottruck
John L. Thornton
David B. Yoffie

## EXECUTIVE COMPENSATION

The following table lists the annual compensation for the fiscal years 2007, 2006, and 2005 of our CEO, current and former CFOs, and our three other most highly compensated executive officers in 2007 (referred to as listed officers).

### Summary Compensation

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Craig R. Barrett | 2007 | 358,300 | 409,900 | 3,969,700 | 1,394,100 | 88,000 | 102,100 | 6,322,100 |
| Chairman of the Board | 2006 | 463,000 | 47,700 | 6,410,200 | 1,110,400 | 36,000 | 222,200 | 8,289,500 |
| | 2005 | 610,000 | — | 6,308,100 | 2,727,800 | 1,898,000 | 196,500 | 11,740,400 |
| Paul S. Otellini | 2007 | 770,000 | 595,100 | 6,034,700 | 3,964,200 | — | 178,000 | 11,542,000 |
| President | 2006 | 700,000 | 352,000 | 6,699,000 | 1,772,700 | 46,000 | 236,700 | 9,806,400 |
| Chief Executive Officer | 2005 | 608,300 | — | 7,600,800 | 2,683,400 | 1,171,000 | 158,500 | 12,222,000 |
| Andy D. Bryant[1] | 2007 | 455,000 | 357,700 | 3,124,500 | 1,673,400 | — | 114,000 | 5,724,600 |
| Executive Vice President, | 2006 | 355,000 | 117,300 | 4,888,000 | 1,178,500 | 49,000 | 148,200 | 6,736,000 |
| Finance and Enterprise Services | 2005 | 330,000 | — | 4,963,700 | 1,765,000 | 1,235,000 | 100,300 | 8,394,000 |
| Chief Administrative Officer | | | | | | | | |
| Stacy J. Smith | 2007 | 305,000 | 135,600 | 548,500 | 953,000 | — | 261,700[2] | 2,203,800 |
| Vice President | 2006 | 235,000 | 22,300 | 485,100 | 430,200 | 11,000 | 57,000 | 1,240,600 |
| Chief Financial Officer | 2005 | 202,000 | — | 450,500 | 580,100 | 371,000 | 37,000 | 1,640,600 |

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Sean M. Maloney Executive Vice President General Manager, Sales and Marketing Group Chief Sales and Marketing Officer | 2007 2006 2005 | 390,000 290,000 270,000 | 429,000 87,100 — | 3,207,200 4,678,400 4,823,400 | 1,493,900 1,019,000 1,530,700 | — 7,000 210,000 | 98,300 127,200 79,600 | 5,618,400 6,208,700 6,913,700 |
| David Perlmutter Executive Vice President General Manager, Mobility Group[3] | 2007 2006 2005 | 357,200 258,500 196,700 | 379,700 106,600 — | 1,619,600 1,753,700 1,663,800 | 1,255,200 680,300 839,100 | 300,700 206,100 99,600 | 393,700 190,300 44,700 | 4,306,100 3,195,500 2,843,900 |
| Total | 2007 2006 2005 | 2,635,500 2,301,500 2,217,000 | 2,307,000 733,000 — | 18,504,200 24,914,400 25,810,300 | 10,733,800 6,191,100 10,126,100 | 388,700 355,100 4,984,600 | 1,147,800 981,600 616,600 | 35,717,000 35,476,700 43,754,600 |

(1) Mr. Bryant served as Chief Financial Officer until October 16, 2007.

(2) In 2004, Intel arranged for a third party to provide Mr. Smith with a mortgage on his home in connection with his relocation from England to California. The loan principal was $950,000, the interest rate was 1.16%, and the term was five years. Mr. Smith paid off this mortgage in December 2006 (prior to his becoming an executive officer). In January 2007, Mr. Smith received a one-time payment of $210,000 (including a tax gross-up of $74,000) to replace the benefit that Mr. Smith gave up by paying off the low-interest loan prior to the original due date. The remaining $51,700 consists of profit sharing contributions.

(3) Mr. Perlmutter receives his cash compensation in Israeli shekels. The amounts reported above in the "Salary," "Non-Equity Incentive Plan Compensation," and certain amounts within the "All Other Compensation" columns were converted to U.S. dollars using a rate of 3.94 shekels per dollar calculated as of December 29, 2007. The "All Other Compensation" column for Mr. Perlmutter consists of the following amounts (in U.S. dollars):

| Year | Annual Israeli Site Bonus | Study Fund | Relocation |
|---|---|---|---|
| 2007 | — | 400 | 393,300 |
| 2006 | 31,500 | 19,300 | 139,500 |
| 2005 | 30,100 | 14,600 | — |

*Total Compensation.* Total compensation as reported in the Summary Compensation table was relatively flat from 2006 to 2007 for listed officers, primarily because increases in performance-based cash compensation were offset by decreases in SFAS No. 123(R) expense for outstanding option awards. CEO Paul S. Otellini received total compensation of $11.5 million in 2007, or 0.2% of Intel's 2007 net income of $7 billion. Intel's listed officers received total compensation of $35.7 million in 2007, or 0.5% of net income.

*Equity Awards.* Under SEC rules, the values reported in the "Stock Awards" and "Option Awards" columns of the Summary Compensation table represent the dollar amount, without any reduction for risk of forfeiture, recognized for financial reporting purposes related to grants of options and RSUs to each of the listed officers. We calculated these amounts in accordance with the provisions of SFAS No. 123(R) for 2007 and 2006, and SFAS No. 123 for 2005.

We calculate compensation expense related to stock options using the Black-Scholes option-pricing model. Because we do not pay or accrue dividends or dividend-equivalent amounts on unvested RSUs, we calculate compensation expense related to an RSU by taking the value of Intel common stock on the date of grant and reducing it by the present value of dividends expected to be paid on Intel common stock before the RSU vests. We amortize compensation expense over the service period and do not adjust the expense based on actual gains or losses. The compensation expense in the "Stock Awards" and "Option Awards" columns is related to RSUs and options awarded in 2007 and prior years.

To illustrate how we recognize compensation expense, assume that an employee received an option to purchase 100,000 shares of stock at the beginning of 2007 with a grant date fair value of $500,000 calculated using the Black-Scholes pricing model. This option vests over four years in 25% annual installments. Under SFAS No. 123(R), Intel would recognize compensation expense of $125,000 in each of 2007, 2008, 2009, and 2010 (the service period). However, under our form of award agreements, the vesting of stock options and RSUs—and thus the annual accounting expense reported in the Summary Compensation table—may accelerate based on the employee's age and years of service. For employees over 60 years of age, upon retirement the employee would generally receive an additional year of vesting for every five years of service to Intel. Alternatively, if an employee's age plus years of service equal 75 or above, the

33

employee would receive an additional year of vesting (Rule of 75). This acceleration shortens the service period and increases the amount of compensation expense reported in a given year. In the above example, if the employee were Rule of 75 eligible, the employee would be entitled to an additional year of vesting upon retirement. The service period would then be three years, and Intel would recognize compensation expense of $166,666 in each of 2007, 2008, and 2009. The amount of this compensation expense is not affected by changes in the price of our common stock after the grant date.

The following table includes the assumptions used to calculate the compensation expense reported for 2007, 2006, and 2005 on a grant-date by grant-date basis.

| Grant Date | Assumptions | | | |
|---|---|---|---|---|
| | Volatility (%) | Expected Life (Years) | Risk-Free Interest Rate (%) | Dividend Yield (%) |
| 11/12/97 | 36 | 6.5 | 6.6 | 0.1 |
| 1/20/98 | 36 | 6.5 | 5.3 | 0.2 |
| 4/25/00 | 42 | 6.5 | 6.2 | 0.1 |
| 4/10/01 | 47 | 6.0 | 4.9 | 0.3 |
| 10/31/01 | 47 | 6.0 | 4.9 | 0.3 |
| 11/27/01 | 47 | 6.0 | 4.9 | 0.3 |
| 3/26/02 | 49 | 6.0 | 3.7 | 0.3 |
| 4/9/02 | 49 | 6.0 | 3.7 | 0.3 |
| 11/25/02 | 49 | 7.0 | 3.7 | 0.3 |
| 1/22/03 | 50 | 8.9 | 3.7 | 0.4 |
| 4/22/03 | 55 | 4.0 | 2.0 | 0.4 |
| 1/21/04 | 46 | 9.0 | 3.8 | 0.5 |
| 4/15/04 | 51 | 4.0 | 3.0 | 0.6 |
| 7/15/04 | 50 | 4.0 | 3.3 | 0.7 |
| 10/14/04 | 49 | 6.0 | 3.4 | 0.8 |
| 2/2/05 | 26 | 7.8 | 4.1 | 1.4 |
| 4/21/05 | 27 | 4.8 | 3.9 | 1.4 |
| 4/21/06 | 27 | 4.8 | 5.0 | 2.0 |
| 1/18/07 | 26 | 6.7 | 4.8 | 2.2 |
| 4/19/07 | 25 | 4.8 | 4.6 | 2.1 |

*Non-Equity Incentive Plan Compensation.* The amounts in the "Non-Equity Incentive Plan Compensation" column of the Summary Compensation table include annual incentive cash payments made under the Executive Officer Incentive Plan and semiannual incentive cash payments. The allocation of payments was as follows:

| Name | Year | Annual Incentive Cash Payments ($) | Semiannual Incentive Cash Payments ($) | Total Incentive Cash Payments ($) |
|---|---|---|---|---|
| Craig R. Barrett | 2007 | 1,344,000 | 50,100 | 1,394,100 |
| | 2006 | 1,050,000 | 60,400 | 1,110,400 |
| | 2005 | 2,632,000 | 95,800 | 2,727,800 |
| Paul S. Otellini | 2007 | 3,840,000 | 124,200 | 3,964,200 |
| | 2006 | 1,680,000 | 92,700 | 1,772,700 |
| | 2005 | 2,585,000 | 98,400 | 2,683,400 |
| Andy D. Bryant | 2007 | 1,610,400 | 63,000 | 1,673,400 |
| | 2006 | 1,118,800 | 59,700 | 1,178,500 |
| | 2005 | 1,698,400 | 66,600 | 1,765,000 |
| Stacy J. Smith | 2007 | 915,000 | 38,000 | 953,000 |
| | 2006 | 407,900 | 22,300 | 430,200 |
| | 2005 | 557,400 | 22,700 | 580,100 |
| Sean M. Maloney | 2007 | 1,440,000 | 53,900 | 1,493,900 |
| | 2006 | 967,300 | 51,700 | 1,019,000 |
| | 2005 | 1,472,800 | 57,900 | 1,530,700 |
| David Perlmutter | 2007 | 1,205,400 | 49,800 | 1,255,200 |
| | 2006 | 639,200 | 41,100 | 680,300 |
| | 2005 | 803,500 | 35,600 | 839,100 |

*Change in Pension Value and Non-Qualified Deferred Compensation Earnings.* In December 2005, Intel established the tax-qualified pension plan arrangement that partially offsets the non-tax-qualified deferred compensation obligation of the company. Employees who were participants in the non-qualified deferred compensation plan as of December 31, 2003 were able to consent to a one-time change to the non-qualified deferred compensation plan's benefit formula. In 2005, the amounts reported in this column of the Summary Compensation table were the present value of the employee's entire accrued benefit under the pension plan. The effect of this change to the plan is to reduce the employee's distribution amount from the non-qualified deferred compensation plan by the lump sum value of the employee's tax-qualified pension plan arrangement at the time of distribution.

Since 2006, the amounts reported represented the actuarial increase in the pension plan arrangement. Since the age-65 annuity benefit under the tax-qualified pension plan arrangement is frozen, benefit amounts are not tied to years of service. Thus, the actuarial increases arise solely from changes in the interest rate used to calculate present value and the participant's age becoming closer to age 65. Mr. Perlmutter participates in a pension savings plan and a severance plan for Israeli employees. The changes in pension value reported above are the increases in the balance of the pension savings plan (less Mr. Perlmutter's contributions) and the increase in the actuarial value for the severance plan.

*All Other Compensation.* Amounts listed in this column of the Summary Compensation table (except as footnoted) consist of tax-qualified discretionary company contributions to the profit sharing retirement plan of $15,750 in 2007, $15,400 in 2006, and $16,800 in 2005, and discretionary company contributions credited under the profit sharing component of the non-qualified deferred compensation plan. These amounts will be paid to the listed officers only upon retirement, termination, disability, death, or after reaching the age of 70½ for an active employee.

### Additional Programs for Mr. Perlmutter

*Relocation Package.* In 2006, Mr. Perlmutter relocated to the United States from Israel and will reside in the U.S. for a two-year period. Since this is a temporary assignment, Mr. Perlmutter is receiving a two-way relocation package. The package he is receiving contains the same elements as a standard Intel employee relocation package. Intel's relocation packages include monetary allowances and moving services to help employees relocate. The packages are designed to meet the business needs of Intel and the personal needs of Intel employees and their families. Intel's relocation packages are consistent with market practices and Intel's compensation philosophy and are global in scope. Relocation packages apply to all employees based on set criteria such as duration of assignment, destination for the assignment, family size, and other needs as applicable.

*Israel Study Fund.* To encourage continuing education, Intel Israel offers eligible employees the opportunity to participate in a voluntary savings program to which both Intel and the employee contribute. Each month, an eligible employee contributes 2.5% and Intel contributes 7.5% of base salary to the study fund. The contributions are tax-free up to a certain salary amount fixed by legislation. After three years of membership, employees can withdraw the accrued funds for study in Israel or abroad; after six years, employees can use the accrued funds for any purpose. In 2007, Mr. Perlmutter participated in the Israel Study Fund for one month.

## Grants of Plan-Based Awards in Fiscal Year 2007

The following table presents equity awards and awards granted under our annual and semiannual incentive cash plans in 2007.

| Name | Award Type | Grant Date | Approval Date | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards | | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh)(1) | Market Price on Grant Date ($/Sh)(1) | Grant Date Fair Value of Stock and Option Awards ($)(2) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Target ($) | Maximum ($) | | | | | |
| Craig R. Barrett | Annual Option | 4/19/07 | 4/19/07 | | | | 140,000 | 21.52 | 21.81 | 724,800 |
| | Annual RSU | 4/19/07 | 4/19/07 | | | 20,000 | | | | 409,900 |
| | Annual Cash | | | 1,050,000 | 10,000,000 | | | | | |
| | Semiannual Cash | | | 60,400 | | | | | | |
| Paul S. Otellini | Long-Term Option | 1/18/07 | 1/16/07 | | | | 700,000 | 20.70 | 20.65 | 3,793,500 |
| | Annual Option | 4/19/07 | 4/19/07 | | | | 520,000 | 21.52 | 21.81 | 2,692,100 |
| | Annual RSU | 4/19/07 | 4/19/07 | | | 45,000 | | | | 922,300 |
| | Annual Cash | | | 3,000,000 | 10,000,000 | | | | | |
| | Semiannual Cash | | | 92,700 | | | | | | |
| Andy D. Bryant | Annual Option | 4/19/07 | 4/19/07 | | | | 235,000 | 21.52 | 21.81 | 1,216,600 |
| | Annual RSU | 4/19/07 | 4/19/07 | | | 33,500 | | | | 686,600 |
| | Annual Cash | | | 1,320,000 | 10,000,000 | | | | | |
| | Semiannual Cash | | | 59,700 | | | | | | |
| Stacy J. Smith | Long-Term Option | 1/18/07 | 1/16/07 | | | | 45,000 | 20.70 | 20.65 | 278,000 |
| | Long-Term RSU | 1/18/07 | 1/16/07 | | | 6,500 | | | | 121,500 |
| | Annual Option | 4/19/07 | 4/19/07 | | | | 160,000 | 21.52 | 21.81 | 828,400 |
| | Annual RSU | 4/19/07 | 4/19/07 | | | 23,000 | | | | 471,400 |
| | Annual Cash | | | 720,000 | 10,000,000 | | | | | |
| | Semiannual Cash | | | 22,300 | | | | | | |
| Sean M. Maloney | Long-Term Option | 1/18/07 | 1/16/07 | | | | 82,500 | 20.70 | 20.65 | 509,600 |
| | Long-Term RSU | 1/18/07 | 1/16/07 | | | 11,750 | | | | 219,700 |
| | Annual Option | 4/19/07 | 4/19/07 | | | | 235,000 | 21.52 | 21.81 | 1,216,600 |
| | Annual RSU | 4/19/07 | 4/19/07 | | | 33,500 | | | | 686,600 |
| | Annual Cash | | | 1,125,000 | 10,000,000 | | | | | |
| | Semiannual Cash | | | 51,700 | | | | | | |
| David Perlmutter | Long-Term Option | 1/18/07 | 1/16/07 | | | | 52,500 | 20.70 | 20.65 | 324,300 |
| | Long-Term RSU | 1/18/07 | 1/16/07 | | | 5,000 | | | | 93,500 |
| | Annual Option | 4/19/07 | 4/19/07 | | | | 235,000 | 21.52 | 21.81 | 1,216,600 |
| | Annual RSU | 4/19/07 | 4/19/07 | | | 33,500 | | | | 686,600 |
| | Annual Cash | | | 960,000 | 10,000,000 | | | | | |
| | Semiannual Cash | | | 41,100 | | | | | | |

(1) The exercise price was determined based on the average of the high and low price of Intel common stock on the grant date, while the market price on the grant date is the closing price of our common stock on that date.

(2) The grant date fair value is generally the amount that Intel would expense in its financial statements over the award's service period, but does not include a reduction for forfeitures.

Annual incentive cash awards are made under the Executive Officer Incentive Plan. The Compensation Committee sets the incentive baseline amount under the Executive Officer Incentive Plan annually as part of the annual performance review and compensation adjustment cycle, and this incentive baseline amount is then multiplied by a multiplier calculated at the end of the year. Amounts reported as "target" are incentive baseline amounts multiplied by 3, for a score of 100% on each component. The multiplier formula takes into account Intel's absolute and relative financial performance, as well as the achievement of operational goals. The maximum amounts in the table above are set forth in the Executive Officer Incentive Plan.

Semiannual cash awards are made under a broad-based plan based on Intel's profitability. Listed officers and other eligible employees receive 0.65 days of compensation for every two percentage points of corporate pretax margin, or a payment expressed as days of compensation based on 4.5% of net income divided by the current value of a worldwide day of compensation, whichever is greater. We will pay an additional day of compensation for each six-month period if Intel achieves customer satisfaction goals. Because benefits are determined under a formula and the Compensation Committee does not set a target amount under the plan, under SEC rules the target amounts reported in the table above are the amounts earned in 2006.

### Outstanding Equity Awards at Fiscal Year-End 2007

The following table provides information with respect to outstanding stock options and RSUs held by the listed officers as of December 29, 2007. Unless specified, equity awards vest at a rate of 25% per year over four years from the grant date.

| Name | Grant Date | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Market Value of Unexercised Options ($) | Grant Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
|---|---|---|---|---|---|---|---|---|---|
| | | **Option Awards** | | | | | **Stock Awards** | | |
| Craig R. Barrett | 4/14/98 | 288,000 | — | 19.00 | 4/14/08 | 2,234,900 | 4/21/06 | 1,922 | 51,400 |
| | 4/13/99 | 216,000 | — | 30.70 | 4/13/09 | — | 4/19/07 | 20,000 | 535,200 |
| | 4/25/00 | 200,000 | — | 61.19 | 4/25/10 | — | | | |
| | 3/21/01 | 84,696 | — | 25.69 | 3/21/11 | 90,600 | | | |
| | 4/10/01 | 200,000 | — | 24.23 | 4/10/11 | 506,000 | | | |
| | 10/31/01 | 200,000 | — | 24.37 | 10/31/11 | 478,000 | | | |
| | 4/9/02 | 584,000 | — | 29.33 | 4/09/12 | — | | | |
| | 1/22/03 | — | 1,000,000[1] | 16.42 | 1/22/13 | 10,340,000 | | | |
| | 4/22/03 | 350,000 | — | 18.63 | 4/22/13 | 2,845,500 | | | |
| | 4/15/04 | 262,500 | 87,500 | 27.00 | 4/15/14 | — | | | |
| | 4/21/05 | 125,000 | 125,000 | 23.16 | 4/21/12 | 900,000 | | | |
| | 4/21/06 | 50,000 | 150,000 | 19.51 | 4/21/13 | 1,450,000 | | | |
| | 4/19/07 | — | 140,000 | 21.52 | 4/19/14 | 733,600 | | | |
| **Total** | | **2,560,196** | **1,502,500** | | | **19,578,600** | | **21,922** | **586,600** |
| Paul S. Otellini | 4/14/98 | 128,000 | — | 19.00 | 4/14/08 | 993,300 | 4/21/06 | 33,750 | 903,200 |
| | 4/13/99 | 108,000 | — | 30.70 | 4/13/09 | — | 4/19/07 | 45,000 | 1,204,200 |
| | 4/25/00 | 120,000 | — | 61.19 | 4/25/10 | — | | | |
| | 3/21/01 | 49,586 | — | 25.69 | 3/21/11 | 53,100 | | | |
| | 4/10/01 | 108,000 | — | 24.23 | 4/10/11 | 273,200 | | | |
| | 10/31/01 | 200,000 | — | 24.37 | 10/31/11 | 478,000 | | | |
| | 4/9/02 | 664,000 | — | 29.33 | 4/09/12 | — | | | |
| | 1/22/03 | — | 600,000[1] | 16.42 | 1/22/13 | 6,204,000 | | | |
| | 4/22/03 | 300,000 | — | 18.63 | 4/22/13 | 2,439,000 | | | |
| | 4/15/04 | 225,000 | 75,000 | 27.00 | 4/15/14 | — | | | |
| | 2/2/05 | — | 400,000[2] | 22.63 | 2/02/15 | 1,652,000 | | | |
| | 4/21/05 | 250,000 | 250,000 | 23.16 | 4/21/12 | 1,800,000 | | | |
| | 4/21/06 | 130,000 | 390,000 | 19.51 | 4/21/13 | 3,770,000 | | | |
| | 1/18/07 | — | 700,000[3] | 20.70 | 1/18/17 | 4,242,000 | | | |
| | 4/19/07 | — | 520,000 | 21.52 | 4/19/14 | 2,724,800 | | | |
| **Total** | | **2,282,586** | **2,935,000** | | | **24,629,400** | | **78,750** | **2,107,400** |
| Andy D. Bryant | 4/13/99 | 90,000 | — | 30.70 | 4/13/09 | — | 4/21/06 | 11,250 | 301,000 |
| | 4/25/00 | 90,000 | — | 61.19 | 4/25/10 | — | 4/19/07 | 33,500 | 896,500 |
| | 3/21/01 | 37,704 | — | 25.69 | 3/21/11 | 40,400 | | | |
| | 4/10/01 | 108,000 | — | 24.23 | 4/10/11 | 273,200 | | | |
| | 10/31/01 | 108,000 | — | 24.37 | 10/31/11 | 258,100 | | | |
| | 3/26/02 | 100,000 | 300,000[4] | 30.50 | 3/26/12 | — | | | |
| | 4/9/02 | 404,000 | — | 29.33 | 4/09/12 | — | | | |
| | 11/25/02 | 50,000 | 150,000 | 20.23 | 11/25/12 | 1,306,000 | | | |
| | 4/15/04 | 150,000 | 50,000 | 27.00 | 4/15/14 | — | | | |
| | 4/21/05 | 100,000 | 100,000 | 23.16 | 4/21/12 | 720,000 | | | |
| | 4/21/06 | 45,000 | 135,000 | 19.51 | 4/21/13 | 1,305,000 | | | |
| | 4/19/07 | — | 235,000 | 21.52 | 4/19/14 | 1,231,400 | | | |
| **Total** | | **1,282,704** | **970,000** | | | **5,134,100** | | **44,750** | **1,197,500** |

| | | Option Awards | | | | | Stock Awards | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Market Value of Unexercised Options ($) | Grant Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) |
| Stacy J. Smith | 4/13/99 | 7,920 | — | 30.70 | 4/13/09 | — | 4/21/06 | 5,250 | 140,500 |
| | 4/25/00 | 10,000 | — | 61.19 | 4/25/10 | — | 1/18/07 | 6,500 | 173,900 |
| | 10/10/00 | 2,000 | — | 38.81 | 10/10/10 | — | 4/19/07 | 23,000 | 615,500 |
| | 3/21/01 | 4,350 | — | 25.69 | 3/21/11 | 4,700 | | | |
| | 4/10/01 | 13,320 | — | 24.23 | 4/10/11 | 33,700 | | | |
| | 10/31/01 | 10,800 | — | 24.37 | 10/31/11 | 25,800 | | | |
| | 11/27/01 | 15,000 | — | 31.95 | 11/27/11 | — | | | |
| | 4/9/02 | 5,000 | — | 29.33 | 4/09/12 | — | | | |
| | 4/15/04 | 12,375 | 4,125 | 27.00 | 4/15/14 | — | | | |
| | 7/15/04 | 4,500 | 1,500 | 23.36 | 7/15/14 | 20,400 | | | |
| | 10/14/04 | 15,000 | 45,000(5) | 20.75 | 10/14/14 | 360,600 | | | |
| | 4/21/05 | 20,400 | 20,400 | 23.16 | 4/21/12 | 146,900 | | | |
| | 4/21/06 | 22,500 | 67,500 | 19.51 | 4/21/13 | 652,500 | | | |
| | 1/18/07 | — | 45,000(1) | 20.70 | 1/18/17 | 272,700 | | | |
| | 4/19/07 | — | 160,000 | 21.52 | 4/19/14 | 838,400 | | | |
| Total | | 143,165 | 343,525 | | | 2,355,700 | | 34,750 | 929,900 |
| Sean M. Maloney | 4/14/98 | 48,854 | — | 19.00 | 4/14/08 | 379,100 | 4/21/06 | 11,250 | 301,000 |
| | 4/13/99 | 88,963 | — | 30.70 | 4/13/09 | — | 1/18/07 | 11,750 | 314,400 |
| | 4/25/00 | 79,354 | — | 61.19 | 4/25/10 | — | 4/19/07 | 33,500 | 896,500 |
| | 3/21/01 | 35,284 | — | 25.69 | 3/21/11 | 37,700 | | | |
| | 4/10/01 | 105,575 | — | 24.23 | 4/10/11 | 267,100 | | | |
| | 10/31/01 | 108,000 | — | 24.37 | 10/31/11 | 258,100 | | | |
| | 3/26/02 | — | 400,000(1) | 30.50 | 3/26/12 | — | | | |
| | 4/9/02 | 404,000 | — | 29.33 | 4/09/12 | — | | | |
| | 11/25/02 | — | 200,000(6) | 20.23 | 11/25/12 | 1,306,000 | | | |
| | 11/25/02 | 329,707 | — | 20.23 | 11/25/12 | 2,153,000 | | | |
| | 4/22/03 | 200,000 | — | 18.63 | 4/22/13 | 1,626,000 | | | |
| | 4/15/04 | 150,000 | 50,000 | 27.00 | 4/15/14 | — | | | |
| | 4/21/05 | 100,000 | 100,000 | 23.16 | 4/21/12 | 720,000 | | | |
| | 4/21/06 | 45,000 | 135,000 | 19.51 | 4/21/13 | 1,305,000 | | | |
| | 1/18/07 | — | 82,500(1) | 20.70 | 1/18/17 | 500,000 | | | |
| | 4/19/07 | — | 235,000 | 21.52 | 4/19/14 | 1,231,400 | | | |
| Total | | 1,694,737 | 1,202,500 | | | 9,783,400 | | 56,500 | 1,511,900 |
| David Perlmutter | 4/14/98 | 800 | — | 19.00 | 4/14/08 | 6,200 | 4/21/06 | 9,000 | 240,800 |
| | 4/13/99 | 22,800 | — | 30.70 | 4/13/09 | — | 4/21/06 | 5,000(7) | 133,800 |
| | 4/25/00 | 30,000 | — | 61.19 | 4/25/10 | — | 1/18/07 | 5,000(7) | 133,800 |
| | 3/21/01 | 12,160 | — | 25.69 | 3/21/11 | 13,000 | 4/19/07 | 33,500 | 896,500 |
| | 4/10/01 | 33,600 | — | 24.23 | 4/10/11 | 85,000 | | | |
| | 10/31/01 | 16,800 | — | 24.37 | 10/31/11 | 40,200 | | | |
| | 4/9/02 | 16,800 | — | 29.33 | 4/09/12 | — | | | |
| | 11/25/02 | 39,680 | — | 20.23 | 11/25/12 | 259,100 | | | |
| | 4/22/03 | 54,000 | — | 18.63 | 4/22/13 | 439,000 | | | |
| | 1/21/04 | — | 200,000(1) | 32.06 | 1/21/14 | — | | | |
| | 4/15/04 | 56,250 | 18,750 | 27.00 | 4/15/14 | — | | | |
| | 4/21/05 | 50,000 | 50,000 | 23.16 | 4/21/12 | 360,000 | | | |
| | 4/21/06 | 35,000 | 105,000 | 19.51 | 4/21/13 | 1,015,000 | | | |
| | 4/21/06 | — | 52,500(6) | 19.51 | 4/21/16 | 380,600 | | | |
| | 1/18/07 | — | 52,500(1) | 20.70 | 1/18/17 | 318,200 | | | |
| | 4/19/07 | — | 235,000 | 21.52 | 4/19/14 | 1,231,400 | | | |
| Total | | 367,890 | 713,750 | | | 4,147,700 | | 52,500 | 1,404,900 |

(1) Options are exercisable in 25% annual increments beginning six years from the grant date.

(2) Options are exercisable in 25% annual increments beginning four years from the grant date.

(3) Options become fully exercisable on the fourth anniversary of the grant date.

(4) Options are exercisable in 25% annual increments beginning five years from the grant date.

(5) Options are exercisable in 25% annual increments beginning three years from the grant date.

(6) Options become fully exercisable on the fifth anniversary of the grant date.

(7) RSUs vest in full five years from the grant date.

## Option Exercises and Stock Vested in Fiscal Year 2007

The following table provides information on stock option exercises and vesting of RSUs during fiscal year 2007.

| Name | Option Awards | | Stock Awards | | Equity Awards |
|---|---|---|---|---|---|
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) | Total Value Realized on Exercise and Vesting ($) |
| Craig R. Barrett | 1,440,000 | 9,583,500 | 640 | 14,100 | 9,597,600 |
| Paul S. Otellini | 928,000 | 5,561,200 | 11,250 | 247,100 | 5,808,300 |
| Andy D. Bryant | 528,852 | 3,789,300 | 3,750 | 82,400 | 3,871,700 |
| Stacy J. Smith | 65,995 | 436,100 | 1,750 | 38,400 | 474,500 |
| Sean M. Maloney | 16,000 | 52,000 | 3,750 | 82,400 | 134,400 |
| David Perlmutter | 455,200 | 2,710,800 | 3,000 | 65,900 | 2,776,700 |

## Pension Benefits for Fiscal Year 2007

The following table sets forth the estimated present value of accumulated pension benefits for the listed officers.

| Name | Plan Name | Number of Years Credited Service (#) | Present Value of Accumulated Benefit ($)(1) |
|---|---|---|---|
| Craig R. Barrett | Pension Plan | n/a | 2,022,000 |
| Paul S. Otellini | Pension Plan | n/a | 1,193,000 |
| Andy D. Bryant | Pension Plan | n/a | 1,260,000 |
| Stacy J. Smith | Pension Plan | n/a | 378,000 |
| Sean M. Maloney | Pension Plan | n/a | 213,000 |
| David Perlmutter | Pension Savings | n/a | 540,100[2] |
| | Severance Plan | 27 | 835,500[2] |

(1) Until distribution, these benefits are also reflected in the listed officer's balance reported in the Non-Qualified Deferred Compensation table (other than for Mr. Perlmutter). The amounts of these tax-qualified pension plan arrangements are not tied to years of credited service. Upon termination, the amount that the listed officer receives under the non-qualified deferred compensation plan will be reduced by the amount that he receives under the tax-qualified pension plan arrangement.

(2) Balance converted from Israeli shekels at an exchange rate of 3.94 shekels per dollar as of December 29, 2007.

The pension plan is a defined benefit plan with two components. The first component provides participants with retirement income that is determined by a pension formula based on final average compensation, Social Security covered compensation, and length of service upon separation not to exceed 35 years. It provides pension benefits only if a participant's account balance in Intel's tax-qualified profit sharing retirement plan does not provide a minimum specified level of retirement income, in which case the pension plan funds a benefit that makes up the difference. Because the profit sharing retirement plan balance for each of Intel's listed officers is and historically has been above this minimum, none of those individuals had an accumulated benefit under this component of the pension plan as of December 29, 2007. Accordingly, no amounts associated with this component are included in the table above.

The second component is a tax-qualified pension plan arrangement under which pension benefits offset amounts that otherwise would be paid under the non-qualified deferred compensation plan described below. Employees who were participants in the non-qualified deferred compensation plan as of December 31, 2003 were able to consent to a one-time change to the non-qualified deferred compensation plan's benefit formula. This change has the effect of reducing the employee's distribution amount from the non-qualified deferred compensation plan by the lump sum value of the employee's tax-qualified pension plan arrangement at the time of distribution. Each participant's pension plan arrangement was established as a fixed amount, designed to provide an annuity at age 65. The annual amount of this annuity is $165,000 for Mr. Bryant and Mr. Otellini; $150,500 for Dr. Barrett; $98,500 for Mr. Smith; and $40,500 for Mr. Maloney.

Each participant's benefit was set based on a number of elements, including the participant's non-qualified deferred compensation plan balance as of December 31, 2003, IRS pension rules that take into consideration age and other factors, and limits that Intel sets for equitable administration. The benefit under this portion of the plan is frozen, and accordingly, year-to-year differences in the present value of the accumulated benefit arise solely from changes in the interest rate used to calculate present value and the participant's age becoming closer to age 65. We calculated the present value assuming that the listed officers will remain in service until age 65, using the discount rate and other assumptions used by Intel for financial statement accounting as reflected in Note 18 to the financial statements in our Annual Report on Form 10-K for the year ended December 29, 2007. A participant can elect to receive his or her benefit at any time following termination of employment. However, distributions before age 55 may be subject to a 10% federal penalty tax.

*Retirement Plans for Mr. Perlmutter.* The retirement program of Intel Israel provides employees with benefits covering retirement, premature death, and disability. All employees are eligible and the government encourages retirement savings with tax incentives. The Intel Israel retirement program has two key components: "pension savings," which operates as a defined contribution plan, and "severance plan," which provides a benefit based on final salary and years of service. Every month, Intel Israel and Mr. Perlmutter each contribute a percentage of Mr. Perlmutter's base salary to his retirement program. Mr. Perlmutter may elect to defer between 5% and 7% of his base salary to pension savings. Intel Israel contributes 5% of Mr. Perlmutter's base salary to pension savings and another 8.33% to the severance plan, for a total company contribution of 13.33% of base salary to his retirement program. Mr. Perlmutter can determine whether he wants his total contribution to be directed toward an annuity or a lump sum with contracted third-party providers, and he holds investment discretion over such contributions.

Employees of Intel Israel receive their pension savings account balance upon retirement (age 67 for men, age 64 for women), termination, or voluntary departure. Because the pension savings plan is a traditional defined contribution plan, Intel retains no ongoing liability for the funds placed or invested in it. The severance plan is governed by Israeli labor law obligating an employer to compensate the termination of an employee with a payment equal to his or her latest monthly salary multiplied by years of service. Although Israeli labor law requires only involuntary termination to be compensated, Intel's practice is to pay employees upon voluntary or involuntary separation.

### Non-Qualified Deferred Compensation for Fiscal Year 2007

The following table shows the non-qualified deferred compensation activity for each listed officer during fiscal year 2007.

| Name | Executive Contributions in Last Fiscal Year ($)(1) | Intel Contributions in Last Fiscal Year ($)(2) | Aggregate Earnings in Last Fiscal Year ($)(3) | Aggregate Balance at Last Fiscal Year-End ($)(4) |
|------|---------|---------|---------|---------|
| Craig R. Barrett | — | 86,300 | 1,438,100 | 15,586,600 |
| Paul S. Otellini | 65,200 | 162,300 | 593,500 | 5,964,800 |
| Andy D. Bryant | 607,200 | 98,200 | 433,100 | 7,092,300 |
| Stacy J. Smith | 391,600 | 35,900 | 227,300 | 2,135,700 |
| Sean M. Maloney | 241,900 | 82,500 | 92,900 | 846,100 |
| David Perlmutter | — | — | — | — |

(1) Amounts included in the Summary Compensation table in the "Salary" and "Non-Equity Incentive Plan Compensation" columns.

(2) Amounts included in the Summary Compensation table in the "All Other Compensation" column.

(3) None of the amounts is included in the Summary Compensation table because plan earnings were not preferential or above market.

(4) The following amounts are also reported in the Summary Compensation table as 2006 and 2007 compensation: Dr. Barrett, $268,000; Mr. Otellini, $435,100; Mr. Bryant, $823,700; Mr. Smith, $1,021,900; and Mr. Maloney, $438,900.

Intel will distribute the balances reported in the Non-Qualified Deferred Compensation table (plus any future contributions or earnings) to the listed officers in the manner that the officers have chosen under the plan's terms. The balance reported in the table above includes the offset amount that the employee would receive under the tax-qualified pension plan arrangement; the actual amount distributed under this plan will be reduced by the benefit under the pension plan. See the Pension Benefits table for these amounts.

The following table summarizes the total contributions made by the participant and Intel, including gains and losses attributable to such contributions that were previously reported (or that would have been reported had the participant been a listed officer for all years) in the Summary Compensation table over the life of the plan.

| Name | Aggregate Executive Deferrals over Life of Plan ($) | Aggregate Intel Contributions over Life of Plan ($) |
|---|---|---|
| Craig R. Barrett | 9,586,000 | 6,000,600 |
| Paul S. Otellini | 3,235,600 | 2,729,200 |
| Andy D. Bryant | 5,185,500 | 1,906,800 |
| Stacy J. Smith | 2,013,400 | 122,300 |
| Sean M. Maloney | 320,100 | 526,000 |
| David Perlmutter | — | — |

Intel's non-qualified deferred compensation plan allows highly compensated employees, including executive officers, to defer up to 50% of their salary and 100% of their annual incentive cash payment. Gains on equity compensation are not eligible for deferral. Intel's contributions to the employee's account represent the portion of Intel's profit sharing contribution in excess of the tax code limit of $225,000 in 2007. Intel's contributions are subject to the same vesting provisions as the profit sharing retirement plan. Effective January 1, 2008, after two years of service, Intel's contributions vest in 20% annual increments, until the participant is 100% vested after six years of service. Intel's contributions also vest in full upon death, disability, or reaching the age of 60, regardless of years of service. All listed officers are fully vested in the value of Intel's contributions, as they each have more than six years of service.

Intel does not provide a guaranteed rate of return on these funds. Thus, the amount of earnings that a participant receives depends on the participant's investment elections for his or her deferrals and on the performance of the company-directed diversified portfolio for Intel's contributions. The non-qualified deferred compensation plan offers the same investment choices as the 401(k) savings plan with respect to participant investments and uses the same company-directed diversified portfolio as the profit sharing retirement plan with respect to Intel's profit sharing contribution. Prior to 2008, upon enrollment, participants made a one-time, irrevocable distribution election: a lump sum in the year of employment termination, a lump sum in March of the year following the year of termination, or annual installments over five or 10 years. Beginning with the 2008 plan year, Intel provided participants with the flexibility to begin receiving distributions at separation or a future date not less than 36 months from the deferral election date. Participants may make a hardship withdrawal under specific circumstances.

### Employment Contracts and Change in Control Arrangements

All of our employees, including our executive officers, are employed at will and do not have employment agreements (subject only to the effect of local labor laws). From time to time, we have implemented voluntary separation programs to encourage headcount reduction in particular parts of the company, and these programs have offered separation payments to departing employees. However, executive officers generally have not been eligible for any of these programs, nor do we generally retain executive officers following retirement on a part-time or consultancy basis.

In accordance with a stockholder request, the Board adopted a policy to seek stockholder approval if in the future we decide that we want to enter into severance agreements with senior executives that provide benefits in an amount exceeding three times the executive's base compensation. For this purpose, "future severance agreements" means any such agreements that we may enter into after adoption of this policy by the Board in February 2003. This includes employment agreements containing severance provisions, retirement agreements, and agreements renewing, modifying, or extending such agreements, but excluding retirement plans, deferred compensation plans, early retirement programs, or similar plans or programs available to more than 50 employees on reasonably similar terms.

"Senior executive" means any of our listed officers for any of the five years preceding termination of employment. "Benefits" include lump-sum cash payments (such as payments in lieu of medical and other benefits) and the estimated

present value of periodic retirement payments, fringe benefits, and consulting fees (including reimbursable expenses) to be paid to the executive. "Benefits" do not include settlement of a legal obligation, such as a cash payment in exchange for the surrender of vested stock options, or payments to settle pending or threatened litigation. "Base compensation" is determined consistent with federal regulations under Section 280G of the tax code, and generally means the executive's average W-2 compensation over the five full calendar years preceding termination of employment. The Board may in its discretion revise or terminate this policy in the future, but will publicly disclose any such action on its part.

## Other Potential Post-Employment Payments

SEC rules require companies to report the amount of benefits that are triggered by termination of employment. These amounts are reported in the second and third columns of the following tables under the headings "Accelerated Option Awards" and "Accelerated Stock Awards." The tables also report the value of all forms of compensation that would be available to the listed officers upon the specified events, an amount that is sometimes referred to as the "walk-away" amount. This amount includes the value of vested equity awards that the listed officer is entitled to regardless of whether his employment terminated, and the value of vested deferred compensation and retirement benefits that are also reported in the tables above. We do not maintain arrangements for listed officers that are triggered by a change of control. The amounts in the tables assume that the listed officer left Intel effective December 29, 2007 and that the price per share of Intel common stock on that date was $26.76. Amounts actually received should any of the listed officers cease to be employed will vary based on factors such as the timing during the year of any such event, the company's stock price, the executive's age, and any changes to our benefit arrangements and policies.

### Voluntary Termination/Retirement

| Name | Accelerated Option Awards ($) | Accelerated Stock Awards ($) | Previously Vested Option Awards ($) | Deferred Compensation ($) | Pension Plan ($) | Profit Sharing Retirement Plan ($) | 401(k) Plan ($) | Medical Benefits ($)(1) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Craig R. Barrett | 2,271,100 | 586,600 | 6,969,700 | 13,648,600 | 1,937,900 | 1,766,500 | 1,146,000 | 49,500 | 28,375,900 |
| Paul S. Otellini | 2,073,700 | 602,100 | 6,080,700 | 4,707,600 | 1,257,400 | 1,645,400 | 721,000 | 49,500 | 17,137,200 |
| Andy D. Bryant | 814,100 | 324,500 | 1,585,600 | 5,806,100 | 1,285,900 | 1,313,600 | 920,800 | 39,000 | 12,089,600 |
| Stacy J. Smith | — | — | 406,300 | 1,730,600 | 405,100 | 472,000 | 328,700 | — | 3,342,700 |
| Sean M. Maloney | 814,100 | 324,500 | 5,408,500 | 617,200 | 228,900 | 170,500 | — | 37,500 | 7,601,200 |
| David Perlmutter(2) | 651,600 | 304,400 | 1,270,300 | — | 1,375,600 | — | — | — | 3,601,900 |

(1) Sheltered Employee Retirement Medical Account funds can be used only to pay premiums under the Intel Retiree Medical Plan.

(2) Amounts in the "Deferred Compensation" and "Pension Plan" columns were converted to U.S. dollars at a rate of 3.94 shekels per dollar.

### Death or Disability

| Name | Accelerated Option Awards ($) | Accelerated Stock Awards ($) | Previously Vested Option Awards ($) | Deferred Compensation ($) | Pension Plan ($) | Profit Sharing Retirement Plan ($) | 401(k) Plan ($) | Medical Benefits ($)(1) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Craig R. Barrett | 12,611,100 | 586,600 | 6,969,700 | 13,648,600 | 1,937,900 | 1,766,500 | 1,146,000 | 49,500 | 38,715,900 |
| Paul S. Otellini | 18,550,300 | 2,107,400 | 6,080,700 | 4,707,400 | 1,257,400 | 1,645,400 | 721,000 | 49,500 | 35,119,100 |
| Andy D. Bryant | 3,549,700 | 1,197,500 | 1,585,600 | 5,806,100 | 1,285,900 | 1,313,600 | 920,800 | 39,000 | 15,698,200 |
| Stacy J. Smith | 1,949,500 | 929,900 | 406,300 | 1,730,600 | 405,100 | 472,000 | 328,700 | — | 6,222,100 |
| Sean M. Maloney | 4,376,100 | 1,511,900 | 5,408,500 | 617,200 | 228,900 | 170,500 | — | 37,500 | 12,350,600 |
| David Perlmutter(2) | 2,871,400 | 1,404,900 | 1,270,300 | — | 1,375,600 | — | — | — | 6,922,200 |

(1) Sheltered Employee Retirement Medical Account funds can be used only to pay premiums under the Intel Retiree Medical Plan.

(2) Amounts in the "Deferred Compensation" and "Pension Plan" columns were converted to U.S. dollars at a rate of 3.94 shekels per dollar.

*Equity Incentive Plans*

Under our equity incentive plans, the option holder generally has 90 days to exercise options that vested on or before the date that employment ends (other than for death, disability, retirement, or discharge for misconduct). The option holder's estate may exercise the option upon the holder's death (including amounts that had not vested) for a period of 365 days. Similarly, the option holder may exercise the option upon termination due to disability (including unvested amounts) for a

period of 365 days. The option holder has 365 days to exercise vested options upon retirement (other than for long-term grants that must be exercised within 90 days).

*Non-Qualified Deferred Compensation Plan and Pension Plan*

Each of the listed officers is fully vested in the non-qualified deferred compensation plan discussed above. If a listed officer ended employment with Intel on December 29, 2007 for any reason, the account balances set forth in the Non-Qualified Deferred Compensation table would continue to be adjusted for earnings and losses in the investment choices selected by the officer until paid, pursuant to the distribution election made by the officer. As discussed above, the amount payable under the non-qualified deferred compensation plan has been reduced to reflect the offset amount payable under the tax-qualified pension plan arrangement at December 29, 2007. The benefit amounts set forth in the Pension Benefits table would continue to be adjusted based on actuarial assumptions until paid to the officer.

*Profit Sharing Retirement Plan*

Effective January 1, 2008, after two years of service, Intel's contributions vest in 20% annual increments until the participant is 100% vested after six years. Intel's contributions vest in full upon death, disability, or reaching the age of 60, regardless of years of service. All listed officers are fully vested in the value of Intel's contributions, as they each have more than six years of service to Intel.

*401(k) Savings Plan*

Intel does not match the participant's contributions to his or her 401(k) savings plan. Each participant is always fully vested in the value of his or her contributions under the plan.

*Medical Benefits*

The Intel Retiree Medical Program, which consists of the Intel Retiree Medical Plan and the Sheltered Employee Retirement Medical Account, is designed to provide access to medical coverage for eligible U.S. Intel retirees (including executives) and their eligible spouses or domestic partners. Intel establishes an interest-earning medical account upon retirement and provides a one-time credit of $1,500 for each year of service to eligible retirees that may be used to offset the cost of coverage under the medical plan. The goal of the medical plan is to provide access to coverage for eligible retirees age 65 and older (Medicare eligible) and eligible early retirees who are unable to purchase health insurance coverage elsewhere. All of the medical plan's costs are passed on to the enrolled members. The medical plan includes medical coverage, mental health benefits, chiropractic benefits, a prescription drug program, and vision benefits. It excludes dental coverage. Medical plan benefits vary depending on Medicare eligibility. Non-retirement post-employment coverage is made available as required by law, with the premiums paid by the participant.

## REPORT OF THE AUDIT COMMITTEE

As described more fully in its charter, the purpose of the Audit Committee is to assist the Board in its general oversight of Intel's financial reporting, internal controls, and audit functions. Management is responsible for the preparation, presentation, and integrity of Intel's financial statements; accounting and financial reporting principles; internal controls; and procedures designed to reasonably assure compliance with accounting standards, applicable laws, and regulations. Intel has a full-time Internal Audit department that reports to the Audit Committee and to management. This department is responsible for objectively reviewing and evaluating the adequacy, effectiveness, and quality of Intel's system of internal controls related, for example, to the reliability and integrity of Intel's financial information and the safeguarding of Intel's assets.

Ernst & Young LLP, Intel's independent registered public accounting firm, is responsible for performing an independent audit of Intel's consolidated financial statements in accordance with generally accepted auditing standards and expressing an opinion on the effectiveness of Intel's internal control over financial reporting. In accordance with law, the Audit Committee has ultimate authority and responsibility for selecting, compensating, evaluating, and, when appropriate, replacing Intel's independent audit firm. The Audit Committee has the authority to engage its own outside advisers, including experts in particular areas of accounting, as it determines appropriate, apart from counsel or advisers hired by management.

Audit Committee members are not professional accountants or auditors, and their functions are not intended to duplicate or to certify the activities of management and the independent audit firm; nor can the Audit Committee certify that the independent audit firm is "independent" under applicable rules. The Audit Committee serves a board-level oversight role,

in which it provides advice, counsel, and direction to management and to the auditors on the basis of the information it receives, discussions with management and the auditors, and the experience of the Audit Committee's members in business, financial, and accounting matters.

The Audit Committee has an agenda for the year that includes reviewing Intel's financial statements, internal control over financial reporting, and audit matters. The Audit Committee meets each quarter with Ernst & Young, Intel's Chief Audit Executive, and management to review Intel's interim financial results before the publication of Intel's quarterly earnings press releases. Management's and the independent audit firm's presentations to, and discussions with, the Audit Committee cover various topics and events that may have significant financial impact and/or are the subject of discussions between management and the independent audit firm. In addition, the Audit Committee generally oversees Intel's internal compliance programs. In accordance with law, the Audit Committee is responsible for establishing procedures for the receipt, retention, and treatment of complaints received by Intel regarding accounting, internal accounting controls, or auditing matters, including the confidential, anonymous submission by Intel's employees, received through established procedures, of any concerns regarding questionable accounting or auditing matters.

Among other matters, the Audit Committee monitors the activities and performance of Intel's internal auditors and independent registered public accounting firm, including the audit scope, external audit fees, auditor independence matters, and the extent to which the independent audit firm can be retained to perform non-audit services. Intel's independent audit firm has provided the Audit Committee with the written disclosures and the letter required by the Public Company Accounting Oversight Board (PCAOB) in Rule 3600T regarding "Independence Discussions with Audit Committees," and the Audit Committee has discussed with the independent audit firm and management that firm's independence.

The Audit Committee has reviewed and discussed with management its assessment and report on the effectiveness of Intel's internal control over financial reporting as of December 29, 2007, which it made using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control—Integrated Framework." The Audit Committee has also reviewed and discussed with Ernst & Young its review and report on Intel's internal control over financial reporting. Intel published these reports in its Annual Report on Form 10-K for the year ended December 29, 2007, which Intel filed with the SEC on February 20, 2008.

In accordance with Audit Committee policy and the requirements of law, the Audit Committee pre-approves all services to be provided by Ernst & Young. Pre-approval includes audit services, audit-related services, tax services, and other services. In some cases, the full Audit Committee provides pre-approval for up to a year related to a particular defined task or scope of work and subject to a specific budget. In other cases, the chair of the Audit Committee has the delegated authority from the Audit Committee to pre-approve additional services, and the chair then communicates such pre-approvals to the full Audit Committee.

The Audit Committee has reviewed and discussed the consolidated financial statements for fiscal year 2007 with management and Ernst & Young, management represented to the Audit Committee that Intel's consolidated financial statements were prepared in accordance with U.S. generally accepted accounting principles, and Ernst & Young represented that their presentations included the matters required to be discussed with the independent registered public accounting firm by PCAOB Rule 3200T regarding "Communication with Audit Committees." This review included a discussion with management of the quality, not merely the acceptability, of Intel's accounting principles, the reasonableness of significant estimates and judgments, and the clarity of disclosure in Intel's financial statements, including the disclosures related to critical accounting estimates.

In reliance on these reviews and discussions, and the reports of Ernst & Young, the Audit Committee has recommended to the Board, and the Board has approved, the inclusion of the audited financial statements in Intel's Annual Report on Form 10-K for the year ended December 29, 2007.

**Audit Committee**
Jane E. Shaw, Chairman
Carol A. Bartz
D. James Guzy
James D. Plummer
David S. Pottruck

## PROPOSAL 2: RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED
## PUBLIC ACCOUNTING FIRM

Ernst & Young LLP has been our independent audit firm since our incorporation in 1968, and the Audit Committee has selected Ernst & Young as our independent audit firm for the fiscal year ending December 27, 2008. Among other matters, the Audit Committee concluded that current requirements for audit partner rotation, auditor independence through limitation of services, and other regulations affecting the audit engagement process substantially assist in supporting auditor independence despite the long-term nature of Ernst & Young's services to Intel. In accordance with applicable regulations on partner rotation, Ernst & Young's primary engagement partner for our audit was changed for 2005, and the concurring/reviewing partner for our audit was changed in 2004.

As a matter of good corporate governance, the Audit Committee submits its selection of the independent audit firm to our stockholders for ratification. If the selection of Ernst & Young is not ratified by the majority of the shares of common stock present or represented at the annual meeting and entitled to vote on the matter, the Audit Committee will review its future selection of an independent registered public accounting firm in the light of that vote result.

Representatives of Ernst & Young attended all meetings of the Audit Committee in 2007. The Audit Committee pre-approves and reviews audit and non-audit services performed by Ernst & Young as well as the fees charged by Ernst & Young for such services. In its pre-approval and review of non-audit service fees, the Audit Committee considers, among other factors, the possible effect of the performance of such services on the auditors' independence. For additional information concerning the Audit Committee and its activities with Ernst & Young, see "Corporate Governance" and "Report of the Audit Committee." We expect that a representative of Ernst & Young will attend the annual meeting, and the representative will have an opportunity to make a statement if he or she so chooses. The representative will also be available to respond to questions from stockholders.

### Fees Paid to Ernst & Young LLP

The following table shows the fees for audit and other services provided by Ernst & Young for fiscal years 2007 and 2006. All figures are net of Value Added Tax and other similar taxes assessed by non-U.S. jurisdictions on the amount billed by Ernst & Young. All of the services described in the following fee table were approved in conformity with the Audit Committee's pre-approval process.

|  | 2007 Fees ($) | 2006 Fees ($) |
|---|---|---|
| Audit | 13,306,000 | 12,896,000 |
| Audit-related | 2,996,000 | 2,455,000 |
| Tax | 6,000 | 8,000 |
| All other | 282,000 | 169,000 |
| Total | 16,590,000 | 15,528,000 |

*Audit Fees.* This category includes the audit of our annual financial statements, Ernst & Young's audit of our internal control over financial reporting, review of financial statements included in our Form 10-Q quarterly reports, and services that are normally provided by the independent registered public accounting firm in connection with statutory and regulatory filings or engagements for those fiscal years. This category also includes advice on accounting matters that arose during, or as a result of, the audit or the review of interim financial statements; statutory audits required by non-U.S. jurisdictions; the preparation of an annual "management letter" on internal control matters; and, for 2006, the audit of management's assessment of our internal control over financial reporting (which is no longer required).

*Audit-Related Fees.* This category consists of assurance and related services provided by Ernst & Young that are reasonably related to the performance of the audit or review of our financial statements and are not reported above under audit fees. The services for the fees disclosed under this category include audits related to the divestiture of Intel businesses, benefit plan audits, and consents issued in connection with SEC filings.

*Tax Fees.* This category consists of tax services generally for tax compliance and tax preparation.

*All Other Fees.* This category consists of fees for the following: an audit of an investment fund owned by Intel and a group of corporations that manufacture and/or use 64-bit Itanium®-based systems (as the coordinating member of the fund, we are responsible for coordinating the fund's financial audit); accountant's report on the liquidation of leasing entities in Ireland; agreed-upon procedures for a research and development grant program audit in Ireland; translation

services for statutory financial filings outside the U.S.; litigation support; and an annual subscription fee to Ernst & Young for accounting literature.

**The Board of Directors recommends that you vote "FOR" the ratification of the selection of Ernst & Young as our independent registered public accounting firm for 2008.**

## PROPOSAL 3: STOCKHOLDER PROPOSAL TO AMEND CORPORATE BYLAWS TO ESTABLISH A BOARD COMMITTEE ON SUSTAINABILITY

Harrington Investments, Inc., owner of $2,000 or more of Intel common stock, proposes the following resolution:

Amend Article III, Section 9 of the Bylaws, to add a new paragraph (e) as follows:

> Section 9(e) Board Committee on Sustainability: There is established a Board Committee on Sustainability. The committee is authorized to address corporate policies, above and beyond matters of legal compliance, in order to ensure our corporation's sustained viability. The committee shall strive to enhance shareholder value by responding to changing conditions and knowledge of the natural environment, including but not limited to, natural resource limitations, energy use, waste disposal, and climate change.

> The Board of Directors is authorized in its discretion, consistent with these Bylaws and applicable law to: (1) select the members of the Board Committee on Sustainability, (2) provide said committee with funds for operating expenses, (3) adopt regulations or guidelines to govern said Committee's operations, (4) empower said Committee to solicit public input and to issue periodic reports to shareholders and the public, at reasonable expense and excluding confidential information, on the Committee's activities, findings and recommendations, and (5) adopt any other measures within the Board's discretion consistent with these Bylaws and applicable law.

> Nothing herein shall restrict the power of the Board of Directors to manage the business and affairs of the company. The Board Committee on Sustainability shall not incur any costs to the company except as authorized by the Board of Directors.

### Supporting Statement

The committee would be authorized to initiate, review, and make policy recommendations regarding the company's preparation to adapt to changes in marketplace and environmental conditions that may affect the sustainability of our business. Issues related to sustainability might include, but are not limited to: global climate change, emerging concerns regarding toxicity of materials, resource shortages, and biodiversity loss.

Adoption of this resolution would reinforce our company's position as an industry leader in this area of increasing concern to investors and policy makers.

### Board of Directors' Response

The Board of Directors has long recognized the importance of sustainability. In 2003, the Board amended the charter of the Corporate Governance Committee (now the Corporate Governance and Nominating Committee) to act with regard to sustainability and corporate social responsibility. The charter states that this committee:

> Reviews and reports to the Board on a periodic basis with regards to matters of Corporate Responsibility performance, such as environmental, workplace or stakeholder issues, as appropriate, and the company's public reporting with regards to these topics.

The Board does not believe that an additional, redundant board committee is necessary to manage sustainability issues. Intel's commitment to the environment and corporate social responsibility are expressed in Intel's Code of Conduct and Principles for Responsible Business. The Code of Conduct states:

> We demonstrate respect for people and the planet and ask all our employees to consider the short and long-term impacts to the environment and the community when they make business decisions. In all Intel-related activities, we need to uphold Intel's long-standing, global reputation as a role model for socially responsible behavior.

Intel's position as a global benchmark in sustainability is well known and long-standing. Intel has been a member of the Dow Jones Sustainability Index for nine consecutive years (since inception of the list) and the Supersector Leader of all technology companies for seven consecutive years. Innovest Strategic Value Advisors gave Intel an AAA rating and named Intel one of the 100 Most Sustainable Corporations in the World for the last four years (since inception of the list).

Intel has been named one of the top 20 Best Corporate Citizens for 10 years in a row by *Business Ethics* and *Corporate Responsibility Officer (CRO)* magazines, and this year was named Best Corporate Citizen in its sector and Best Corporate Citizen among the Russell 1000. Intel received more than 50 awards and other recognition in both 2006 and 2007 for its social responsibility and sustainability performance.

The Board also opposes this proposal due to the format it is using. Intel's Bylaws have always included a provision that allows the Board to establish committees at its discretion. Each of our committees, and the position of Lead Independent Director, is established with a written charter that is published on our web site. Committee charters are amended from time to time to evolve as appropriate. The stockholder proposal would directly amend the Bylaws to create a new committee when no other committee (such as Audit or Compensation) is established in that manner. We see no reason why this committee should be specifically established through this unique and unnecessary process. As we have noted above, the functions of this proposed new committee are currently within the charter of an existing Board committee.

The Board believes that Intel's leadership on sustainability and corporate social responsibility matters is clear and strongly supports maintaining the Board's current governance structure.

**Recommendation of the Board**

**The Board of Directors recommends that you vote "AGAINST" this proposal amending the Bylaws to establish a Board committee on sustainability.**

## ADDITIONAL MEETING INFORMATION

*Proxy Solicitation.* We will bear the expense of soliciting proxies, and we have retained D. F. King & Co., Inc. to solicit proxies for a fee of less than $20,000 plus a reasonable amount to cover expenses. Our directors, officers, and other employees, without additional compensation, may also solicit proxies personally or in writing, by telephone, e-mail, or otherwise. We are required to request that brokers and nominees who hold stock in their names furnish our proxy materials to the beneficial owners of the stock, and we must reimburse these brokers and nominees for the expenses of doing so in accordance with statutory fee schedules. We currently estimate that this reimbursement will cost us more than $3 million.

*Inspector of Elections.* Computershare Investor Services, LLC has been engaged as our independent inspector of elections to tabulate stockholder votes for the 2008 annual meeting.

*Stockholder List.* The stockholder list will be available for inspection for 10 days prior to the 2008 annual meeting. Please call the Investor Relations department at (408) 765-1480 to schedule an appointment.

## OTHER MATTERS

*Section 16(a) Beneficial Ownership Reporting Compliance.* Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our directors and executive officers, among others, to file with the SEC and NASDAQ an initial report of ownership of our stock on Form 3 and reports of changes in ownership on Form 4 or Form 5. Persons subject to Section 16 are required by SEC regulations to furnish us with copies of all Section 16(a) forms that they file. As a matter of practice, our administrative staff assists our executive officers and directors in preparing initial ownership reports and reporting ownership changes, and typically files these reports on their behalf. Based solely on a review of the copies of such forms in our possession, and on written representations from reporting persons, we believe that during fiscal 2007 all of our executive officers and directors filed the required reports on a timely basis under Section 16(a) with the following exceptions:

- William Holt had one late filing in 2007 related to the sale of shares by his son;

- Sean M. Maloney had one late filing in 2007 with respect to 4,085 shares owned by his spouse;

- David Perlmutter had one late filing in 2007 related to an exercise of options and sale of shares that were executed pursuant to a 10b5-1 trading plan;

- David S. Pottruck had one late filing for each of 2006 and 2007 related to open market purchases of shares; and

- Arvind Sodhani had two late filings in 2007 related to an exercise of options and sale of shares.

*2009 Stockholder Proposals or Nominations.* Pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended, some stockholder proposals may be eligible for inclusion in our 2009 proxy statement. These stockholder proposals must be submitted, along with proof of ownership of our stock in accordance with Rule 14a-8(b)(2), to our

principal executive offices in care of our Corporate Secretary. Failure to deliver a proposal by one of these means may result in it not being deemed timely received. We must receive all submissions no later than December 3, 2008.

We strongly encourage any stockholder interested in submitting a proposal to contact our Corporate Secretary in advance of this deadline to discuss the proposal, and stockholders may want to consult knowledgeable counsel with regard to the detailed requirements of applicable securities laws. Submitting a stockholder proposal does not guarantee that we will include it in our proxy statement. The Corporate Governance and Nominating Committee reviews all stockholder proposals and makes recommendations to the Board for action on such proposals. For information on recommending individuals for consideration as nominees, see the "Corporate Governance" section of this proxy statement.

Alternatively, under our Bylaws, if a stockholder wants to submit a proposal for the 2009 annual meeting for presentation at our annual meeting pursuant to Delaware corporate law instead of under Rule 14a-8, or intends to nominate a person as a candidate for election to the Board directly, the stockholder can submit the proposal or nomination between December 3, 2008 and February 16, 2009. If the 2009 annual meeting is held more than 30 days from the anniversary of the 2008 annual meeting, the stockholder must submit any such proposal or nomination by the later of the 60th day before the 2009 annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made.

A stockholder's submission pursuant to Delaware corporate law must be made by a registered stockholder on his or her behalf or on behalf of the beneficial owner of the shares, and must include information specified in our Bylaws concerning the proposal or nominee, as the case may be, and information as to the stockholder's ownership of our stock. We will not entertain any proposals or nominations at the annual meeting that do not meet the requirements set forth in our Bylaws. If the stockholder does not also comply with the requirements of Rule 14a-4(c)(2) under the Securities Exchange Act of 1934, as amended, we may exercise discretionary voting authority under proxies that we solicit to vote in accordance with our best judgment on any such stockholder proposal or nomination. The Bylaws are posted on our web site at *www.intel.com/intel/finance/corp_docs.htm.* To make a submission or to request a copy of our Bylaws, stockholders should contact our Corporate Secretary. We strongly encourage stockholders to seek advice from knowledgeable counsel before submitting a proposal or a nomination.

*Financial Statements.* Our financial statements for the year ended December 29, 2007 are included in our 2007 Annual Report to Stockholders, which we are providing to our stockholders at the same time as this proxy statement. Our annual report and this proxy statement are also posted on our web site at *www.intel.com/intel/annualreports.* If you have not received or had access to the annual report, please call our Investor Relations department at (408) 765-1480, and we will send a copy to you.

*Communicating with Us.* If you would like to receive information about us, you can visit our main Internet site at *www.intel.com,* which contains product and marketing information and job listings. Our Investor Relations site at *www.intc.com* contains press releases, earnings releases, financial information, stock quotes, corporate governance information, and links to our SEC filings. To have information such as our latest Form 10-Q or annual report mailed to you, contact our transfer agent, Computershare Investor Services, LLC, by e-mail through their web site at *www.computershare.com/contactus* or call (800) 298-0146 (within the U.S. and Canada) or (312) 360-5123 (outside the U.S. and Canada).

If you would like to contact us, call our Investor Relations department at (408) 765-1480, or send correspondence to Intel Corporation, Attn: Investor Relations, M/S RNB-4-148, 2200 Mission College Blvd., Santa Clara, California 95054-1549. If you would like to communicate with our Board, see the procedures described in "Communications from Stockholders to Directors."

You can contact our Corporate Secretary via e-mail at *corporate.secretary@intel.com,* by fax to (408) 653-8050, or by mail to Cary Klafter, Intel Corporation, M/S RNB-4-151, 2200 Mission College Blvd., Santa Clara, California 95054-1549 to communicate with the Board, nominate or suggest a director candidate, make a stockholder proposal, or revoke a prior proxy instruction.

**STOCKHOLDERS SHARING THE SAME LAST NAME AND ADDRESS**

To reduce the expense of delivering duplicate proxy materials to stockholders who may have more than one account holding Intel stock but sharing the same address, we have adopted a procedure approved by the SEC called "householding." Under this procedure, certain stockholders of record who have the same address and last name, and who do not participate in electronic delivery of proxy materials, will receive only one copy of our Notice of Internet Availability of Proxy Materials and, as applicable, any additional proxy materials that are delivered until such time as one or more of these stockholders notifies us that they want to receive separate copies. This procedure reduces duplicate mailings and saves printing costs and postage fees, as well as natural resources. Stockholders who participate in householding will continue to have access to and utilize separate proxy voting instructions.

If you receive a single set of proxy materials as a result of householding, and you would like to have separate copies of our Notice of Internet Availability of Proxy Materials, annual report, or proxy statement mailed to you, please submit a request to our Corporate Secretary, or call our Investor Relations department at (408) 765-1480, and we will promptly send you what you have requested. However, please note that if you want to receive a paper proxy or voting instruction form or other proxy materials for purposes of this year's annual meeting, you should follow the instructions included in the Notice of Internet Availability that was sent to you. You can also contact our Investor Relations department at the phone number above if you received multiple copies of the annual meeting materials and would prefer to receive a single copy in the future, or if you would like to opt out of householding for future mailings.

By Order of the Board of Directors

Cary I. Klafter
*Corporate Secretary*

Santa Clara, California
April 2, 2008

---

*Intel, Intel logo, and Itanium are trademarks of Intel Corporation in the U.S. and other countries.*

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ADVANCED MICRO DEVICES, INC., a )
Delaware corporation, and AMD )
INTERNATIONAL SALES & SERVICE, )
LTD., a Delaware corporation, )
                      )
              Plaintiffs, )
                      )
          vs. )
                      )
INTEL CORPORATION, a Delaware )
corporation, and INTEL KABUSHIKI )
KAISHA, a Japanese corporation, )
                      )
           Defendants. )

0 5 - 4 4 1

Civil Action No. _____

**JURY TRIAL DEMANDED**

2005 JUN 27 PM 4: 22

**COMPLAINT**

Plaintiffs ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL

SALES & SERVICE, LTD. (hereafter collectively, "AMD"), by and through their undersigned

attorneys, and for their complaint against INTEL CORPORATION and its worldwide family of

dominated subsidiaries, including INTEL KABUSHIKI KAISHA (hereafter collectively, "Intel"),

aver on knowledge as to themselves and their own acts and on information and belief as to all

other matters, as follows:

**NATURE OF THE ACTION**

    1.    Like Standard Oil at the turn of the Nineteenth Century and Alcoa Aluminum

during the Twentieth, Intel holds a monopoly in a market critical to our economy:

microprocessors that run the Microsoft Windows and Linux families of operating systems (hereinafter the "x86 Microprocessor Market"). Although AMD competes with Intel in this global market, Intel possesses unmistakable and undeniable market power, its microprocessor revenues accounting for approximately 90% of the worldwide total (and 80% of the units).

2.   Just like Standard Oil and Alcoa before it, for over a decade Intel has unlawfully maintained its monopoly by engaging in a relentless, worldwide campaign to coerce customers to refrain from dealing with AMD. Among other things,

- Intel has forced major customers into exclusive or near-exclusive deals;

- it has conditioned rebates, allowances and market development funding on customers' agreement to severely limit or forego entirely purchases from AMD;

- it has established a system of discriminatory, retroactive, first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying customers the freedom to purchase any significant volume of processors from AMD;

- it has threatened retaliation against customers introducing AMD computer platforms, particularly in strategic market segments;

- it has established and enforced quotas among key retailers effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, thereby artificially limiting consumer choice;

- it has forced PC makers and technology partners to boycott AMD product launches and promotions;

- and it has abused its market power by forcing on the industry technical standards and products which have as their central purpose the handicapping of AMD in the marketplace.

3.   Intel's economic coercion of customers extends to all levels – from large computer-makers like Hewlett-Packard and IBM to small system-builders to wholesale distributors to retailers such as Circuit City. All face the same choice: accept conditions that exclude AMD or suffer discriminatory pricing and competitively crippling treatment. In this

2

way, Intel has avoided competition on the merits and deprived AMD of the opportunity to stake its prices and quality against Intel's for every potential microprocessor sale.

4.    Intel's conduct has become increasingly egregious over the past several years as AMD has achieved technological leadership in critical aspects of microprocessor architecture. In April 2003, AMD introduced its Opteron microprocessor, the first microprocessor to take x86 computing from 32 bits to 64 bits – an advance that allows computer applications to address exponentially more memory, thereby increasing performance and enabling features not possible with just 32 bits. Unlike Intel's 64-bit architecture of the time (Itanium), the AMD Opteron – as well as its subsequently-introduced desktop cousin, the AMD Athlon64 – offers backward compatibility, allowing PC users to continue using 32-bit software as, over time, they upgrade their hardware. Bested in a technology duel over which it long claimed leadership, Intel increased exploitation of its market power to pressure customers to refrain from migrating to AMD's superior, lower-cost microprocessors.

5.    Intel's conduct has unfairly and artificially capped AMD's market share, and constrained it from expanding to reach the minimum efficient levels of scale necessary to compete with Intel as a predominant supplier to major customers. As a result, computer manufacturers continue to buy most of their requirements from Intel, continue to pay monopoly prices, continue to be exposed to Intel's economic coercion, and continue to submit to artificial limits Intel places on their purchases from AMD. With AMD's opportunity to compete thus constrained, the cycle continues, and Intel's monopoly profits continue to flow.

6.    Consumers ultimately foot this bill, in the form of inflated PC prices and the loss of freedom to purchase computer products that best fit their needs. Society is worse off for lack of innovation that only a truly competitive market can drive. The Japanese Government recognized these competitive harms when on March 8, 2005, its Fair Trade Commission (the "JFTC") recommended that Intel be sanctioned for its exclusionary misconduct directed at AMD. Intel chose not to contest the charges.

3

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

8.    Venue is proper because Intel Corporation and Intel Kabushiki Kaisha reside and are found in this district within the contemplation of 28 U.S.C. § 1391 (b) and (c) and as provided in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22. Additionally venue is proper as to Intel Kabushiki Kaisha, an alien corporation, under 28 U.S.C. § 1391(d).

## THE PARTIES

9.    Plaintiff ADVANCED MICRO DEVICES, INC. is a Delaware corporation with its principal executive offices at Sunnyvale, California. AMD designs, produces and sells a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries worldwide. Plaintiff AMD INTERNATIONAL SALES & SERVICE, LTD., also a Delaware corporation based in Sunnyvale, is a wholly-owned AMD subsidiary engaged in selling AMD microprocessors outside of North America.

10.    Defendant INTEL CORPORATION is a Delaware corporation with its principal executive offices at Santa Clara, California, and it conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce, and sell a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries worldwide. Defendant INTEL KABUSHIKI KAISHA, a Japanese corporation, is Intel's wholly-owned and dominated subsidiary through which Intel sells its microprocessors in Japan.

4

## FACTUAL BACKGROUND

**Early History**

11.    The brain of every computer is a general-purpose microprocessor, an integrated circuit capable of executing a menu of instructions and performing requested mathematical computations at very high speed. Microprocessors are defined by their instruction set – the repertoire of machine language instructions that a computer can follow. So, too, are computer operating systems – software programs that perform the instructions in the set allowing the computer to perform meaningful tasks. The first generation of microprocessors, which were capable of handling 4 and then later 8 bits of data simultaneously, evolved to provide 16-bit capability (the original DOS processors), then sometime later a 32-bit capability (allowing the use of advanced graphical interfaces such as later versions of Windows), and now 64-bit capability.

12.    When IBM defined the original PC standards in the early 1980s, it had available to it a variety of microprocessors, each with its own instruction set – among these were microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel and AMD. IBM opted for the Intel architecture, which utilized what became known as the x86 instruction set (after Intel's naming convention for its processors, *i.e.*, 8086, 80186, 80286, 80386), and a compatible operating system offered by Microsoft, known as DOS. Unwilling to be consigned to a single source of supply, however, IBM demanded that Intel contract with another integrated circuit company and license it to manufacture x86 chips as a second source. AMD, which had worked with Intel before in supplying microprocessors, agreed to abandon its own, competing architecture, and it undertook to manufacture x86 chips as a second source of supply. Assured that it would not be dependent upon a monopoly supplier of x86 chips, IBM introduced the PC in August 1981 – and its sales exploded.

13.    Although an arbitrator later found that "AMD's sponsorship helped propel Intel from the chorus line of semiconductor companies into instant stardom," Intel soon set out to torpedo the 1982 AMD-Intel Technology Exchange Agreement (the "Agreement") by which

5

each would serve as a second source for products developed by the other. For example, Intel was required by the Agreement to send AMD timely updates of its second generation 80286 chip. Instead, in a "deliberate[]" effort "to shackle AMD progress," Intel sent AMD information "deliberately incomplete, deliberately indecipherable and deliberately unusable by AMD engineers." The conduct was, in the arbitrator's words, "inexcusable and unworthy." And it was not isolated. Intel elsewhere tried to "sabotage" AMD products, engaged in "corporate extortion" and demonstrated a near-malevolent determination "to use all of its economic force and power on a smaller competitor to have its way."

14.    In another underhanded effort to stifle AMD's business, Intel decided in 1984 that, the agreement between the parties notwithstanding, Intel would become the sole-source for the promising 80386 chip. To fully realize its objective, Intel engaged in an elaborate and insidious scheme to mislead AMD (and the public) into erroneously believing that AMD would be a second source, thereby keeping AMD in the Intel "competitive camp" for years. This duplicitous strategy served a broader purpose than simply preventing AMD from competing with Intel. Customers' perception that AMD would continue to serve as Intel's authorized second source was essential to Intel's aim of entrenching the x86 family of microprocessors as the industry standard (as it had been essential to IBM's original introduction of the PC). Intel was well aware that if computer manufacturers knew Intel intended to sole source its 32-bit product, they would be motivated to select alternative products produced by companies offering second sources. Intel could not preserve the appearance that AMD would second source the 386 if it terminated the contract or otherwise disclosed its actual intent. Thus, Intel stalled negotiations over product exchanges, while at the same time allowing AMD to believe that it could ultimately obtain the 386. This injured competition by deterring and impeding serious competitive challenges to Intel and directly injured AMD by depriving it of the revenues and profits it would have earned from such a challenge.

15.    Intel implemented this secret plan for the purpose of acquiring and maintaining an illegal monopoly in the x86 line of microprocessors, which it did by at least 1987. As was its

6

plan, Intel's conduct drained AMD's resources, delayed AMD's ability to reverse-engineer or otherwise develop and manufacture competitive products, and deterred AMD from pursuing relationships with other firms. In so doing, Intel wrongfully secured the benefit of AMD's marketing skills and talent in support of the x86 line of microprocessors and related peripherals and secured the benefit of substantial competitively sensitive AMD information regarding its product development plans. When AMD petitioned to compel arbitration in 1987 for Intel's breach and bad faith, the arbitrator took notice of Intel's anticompetitive design: "In fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the microprocessor marketplace, to effectively remove AMD as a competitor."

16.    In 1992, after five years of litigation, the arbitrator awarded AMD more than $10 million plus prejudgment interest and a permanent, nonexclusive and royalty-free license to any Intel intellectual property embodied in AMD's own 386 microprocessor, including the x86 instruction set. Confirmation of the award was upheld by the California Supreme Court two years later. In bringing the litigation to a close, the arbitrator hoped that by his decision, "the competition sure to follow will be beneficial to the parties through an expanded market with appropriate profit margins and to the consumer worldwide through lower prices." Not for the first time, and certainly not for the last, Intel's anticompetitive zeal was woefully underestimated.

**AMD Moves from Second Source to Innovator**

17.    Shortly after confirmation of the award, AMD settled its outstanding disputes with Intel in a 1995 agreement which gave AMD a shared interest in the x86 instruction set but required it to develop its own architecture to implement those instructions. The settlement had the unintended benefit of forcing AMD to reinvent itself. Beginning in the late 1990s, AMD committed its resources to innovating not just to be different, but to deliver solutions of greatest benefit to its customers. Going its own way proved beneficial: AMD's first x86 chip without Intel pin-compatibility, the Athlon microprocessor delivered in 1999, marked the first

7

(but not last) time AMD was to leapfrog Intel technologically and beat it to market with a new generation Windows microprocessor (and break the 1GHz speed barrier to boot).

18.    But AMD's biggest breakthrough came four years later when it introduced an extension of x86 architecture that took Windows processors into the realm of 64-bit computing. Unlike Intel, which invested billions in its Itanium microprocessor and a new, uniquely 64-bit proprietary instruction set (which, because it was proprietary, would have been a game-ending development for AMD had it become the industry standard), AMD undertook to supplement the x86 instructions to accommodate 64-bit processing while allowing 32-bit software to be run as well. AMD's efforts culminated when, in April 2003, it brought to market its Opteron microprocessor for servers (the workhorse computers used by businesses to run corporate networks, e-commerce websites and other high-end, computationally-intense applications). Opteron was the industry's first x86 backward compatible 64-bit chip. Six months later, AMD launched the Athlon64, a backward compatible 64-bit microprocessor for desktops and mobile computers.

19.    The computing industry hailed AMD's introduction of 64-bit computing as an engineering triumph. Said *Infoworld* in its August 27, 2004, issue,

> You just gotta love a Cinderella story.... AMD's rapid rise from startup to $5 billion semiconductor powerhouse is, as Humphrey Bogart's English teacher once said, the stuff of which dreams are made.... In the process, AMD has become known as the company that kept Intel honest, the Linux of the semiconductor world.... After decades of aping Intel architectures, the AMD64 architecture, rooted in Opteron and Athlon 64 processors, has actually been imitated by Intel in the form of Nocona, Intel's 64-bit version of Xeon. In a stunning reversal of fortune, Intel was forced to build that chip because Opteron was invading a server market that the Intel Itanium was supposed to dominate.

In what represented a paradigm shift in the microprocessor world, Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support it. As noted by *Infoworld*,

8

Intel then copied AMD's technology for its own 64-bit offerings – an event that poignantly marked AMD's technological emergence.  Intel still has yet to catch up.

20.    AMD has since extended its AMD64 technology to the balance of AMD's microprocessor line-up (which now includes AMD Athlon 64, AMD Athlon 64 FX, Mobile AMD Athlon 64, AMD Sempron, and AMD Turion64 products).  Owing also to AMD's pioneering developments in dual-core processors and its introduction of an improved architecture that speeds up microprocessor communications with memory and input/output devices, AMD has seized technological leadership in the microprocessor industry.  Its innovation has won for it over 70 technology leadership and industry awards and, in April 2005, the achievement of being named "Processor Company of 2005" at, to Intel's embarrassment, an Intel-sponsored industry awards show.

21.    Tellingly, AMD's market share has not kept pace with its technical leadership.  Intel's misconduct is the reason.  Intel has unlawfully maintained the monopoly IBM bestowed on it and systematically excluded AMD from any meaningful opportunity to compete for market share by preventing the companies that buy chips and build computers from freely deploying AMD processors; by relegating AMD to the low-end of the market; by preventing AMD from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel; and by erecting impediments to AMD's ability to increase its productive capacity for the next generation of AMD's state of the art microprocessors.  Intel's exclusionary acts are the subject of the balance of this complaint.

## THE x86 PROCESSOR INDUSTRY

### Competitive Landscape

22.    The x86 versions of Windows and Linux, the two operating systems that dominate the business and consumer computer worlds, have spawned a huge installed base of Windows- and Linux-compatible application programs that can only run the x86 instruction set.  This has given Intel effective ownership of personal computing.  Although other

9

microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

23.    The relevant product market is x86 microprocessors because a putative monopolist in this market would be able to raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessors as to make this increase unprofitable.  While existing end-users can theoretically shift to other operating-system platforms, high switching costs associated with replacing existing hardware and software make this impractical.  Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time.  Computer manufacturers would also encounter high switching costs in moving from x86 processors to other architectures, and no major computer maker has ever done it.  In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

24.    The relevant geographic market for x86 microprocessors is worldwide.  Intel and AMD compete globally; PC platform architecture is the same from country to country; microprocessors can be easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.

25.    Intel dominates the worldwide x86 Microprocessor Market.  According to published reports, over the past several years it has consistently achieved more than a 90% market share as measured by revenue, while AMD's revenue share has remained at approximately 9%, with all other microprocessor manufacturers relegated to less than 1%. Intel has captured at least 80% of x86 microprocessor unit sales in seven of the last eight years. Since 1999, AMD's worldwide volume share has hovered at 15%, only once penetrating barely the 20% level.  The following chart is illustrative:

10

**x86 Worldwide CPU Unit Market Share**

|        | 1997  | 1998  | 1999  | 2000  | 2001  | 2002  | 2003  | 2004  |
|--------|-------|-------|-------|-------|-------|-------|-------|-------|
| Intel  | 85.0% | 80.3% | 82.2% | 82.2% | 78.7% | 83.6% | 82.8% | 82.5% |
| AMD    | 7.3%  | 11.9% | 13.6% | 16.7% | 20.2% | 14.9% | 15.5% | 15.8% |
| Others | 7.5%  | 7.9%  | 4.2%  | 1.1%  | 1.1%  | 1.4%  | 1.7%  | 1.7%  |

26.    Intel's x86 family of microprocessors no longer faces any meaningful competition other than from AMD. National Semiconductor acquired Cyrix in 1997 but shuttered it less than two years later. At the beginning of this year only two other x86 chip makers remained, Via Technologies, Inc. and Transmeta Corporation – which together account for less than 2% of the market. Transmeta has since announced its intention to cease selling x86 microprocessors, and Via faces dim prospects of growing its marketshare to a sustaining level.

27.    Intel is shielded from new competition by huge barriers to entry. A chip fabrication plant ("fab") capable of efficiently mass-producing x86 microprocessors carries a price tag of at least $2.5 to $3.0 billion. In addition, any new entrant would need the financial wherewithal to underwrite the billions more in research and development costs to design a competing x86 microprocessor and to overcome almost insurmountable IP and knowledge barriers.

**Customers for x86 Microprocessors**

28.    Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade. Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices. Most x86 microprocessors are used in desktop PCs and mobile PCs, with desktops currently outnumbering mobile by a margin of three to one. Of the total worldwide production of computers powered by x86 microprocessors, 32% are sold to U.S. consumers; U.S. sales of AMD-powered computers account for 29% of AMD's production.

11

29.   The majority of x86 microprocessors are sold to a handful of large OEMs (original equipment manufacturers), highly visible companies recognized throughout the world as the leading computer makers.  Regarded by the industry as "Tier One" OEMs over most product categories are: Hewlett-Packard ("HP"), which now also owns Compaq Computer; Dell, Inc.; IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens, the latter a Europe-based joint venture. Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market.  HP and Dell are the dominant players, collectively accounting for over 30% of worldwide desktop and mobile sales, and almost 60% of worldwide server sales. Both are U.S.-based companies, as are IBM and Gateway/eMachines; and all but Gateway have U.S. manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

30.   Worldwide, the Tier One OEMs collectively account for almost 80% of servers and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs, and over 80% of worldwide mobile PCs.  According to industry publications, unit market share in 2004 among the Tier One OEMs were as follows:

**OEM Market Shares – 2004**

| Company | Server/WS | Desktop | Mobile |
|---|---|---|---|
| Hewlett-Packard | 29.86% | 13.69% | 16.23% |
| Dell | 28.34% | 16.18% | 17.27% |
| IBM/Lenovo | 14.46% | 3.69% | 9.20% |
| Fujitsu/Siemens | 3.70% | 2.83% | 6.88% |
| Acer | 0.81% | 1.85% | 8.53% |
| Toshiba | 0.31% | 0.05% | 12.73% |
| NEC | 2.06 | 2.02% | 4.50% |
| Sony | -- | 0.76% | 4.23% |
| Gateway/eMachines | 0.16% | 2.48% | 1.45% |
| Total | 79.70% | 43.55% | 81.02% |

12

31.    The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers and other, smaller distributors. Currently, distributors account for over half of AMD's sales.

32.    OEMs have adopted a variety of business models, including sales directly to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which markets to consumers only directly (mostly over the internet), most OEMs also sell through retail chains. Intel and AMD compete not only to have OEMs incorporate their microprocessors into their retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

33.    Through its economic muscle and relentless marketing – principally its *"Intel Inside"* and *"Centrino"* programs which financially reward OEMs for branding their PCs as Intel machines -- Intel has transformed the OEM world. While once innovative companies themselves, the OEMs have largely become undifferentiated distributors of the Intel platform, offering *"Intel Inside"* and *"Centrino"* computers largely indistinguishable from those of their rivals. As their products have become commoditized, the Tier One OEMs operate on small or negative margins, and, as shown in the following chart, the overwhelming portion of PC profit flows to Intel.

13

**Operating Margins 2001-04 – Intel vs. OEMs**



34.    This profit drain has left OEMs and others in the distribution chain in a quarter-to-quarter struggle to eke out even a modest return on their assets, thereby making them continually susceptible to Intel's economic coercion, which is described next.

## INTEL'S UNLAWFUL PRACTICES

35.    Intel has maintained its x86 microprocessor monopoly by deploying a host of financial and other exclusionary business strategies that in effect limit its customers' ability and/or incentive to deal with AMD.  Although differing from customer to customer and segment to segment, the Intel arsenal includes direct payments in return for exclusivity and near-exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer "loyalty" that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements; threats of economic retaliation against those who give, or even contemplate giving, too much of their business to AMD, or who refuse to limit their AMD business to Intel-approved models, brands, lines and/or sectors, or who cooperate too closely with AMD's promotion of its competitive processors; and misuse of industry standards-setting processes so as to disadvantage AMD products in the marketplace.

14

36.    Intel's misconduct is global.  It has targeted both U.S. and offshore customers at all levels to prevent AMD from building market share anywhere, with the goal of keeping AMD small and keeping Intel's customers dependent on Intel for very substantial amounts of product.  In this way, OEMs remain vulnerable to continual threats of Intel retaliation, AMD remains capacity-constrained, the OEMs remain Intel-dependent, and Intel thereby perpetuates its economic hold over them, allowing it to continue to demand that customers curtail their dealings with AMD.  And the cycle repeats itself: by unlawfully exploiting its existing market share, Intel is impeding competitive growth of AMD,  thereby laying foundation for the next round of foreclosing actions with the effect that AMD's ability to benefit from its current technological advances is curtailed to the harm of potential customers and consumers.

37.    The following is not intended as an exhaustive catalog of Intel's misconduct, or a complete list of its unlawful acts, but only as examples of the types of improper exclusionary practices that Intel has employed.

### 1. Practices Directed At OEMs

#### a. Exclusive and Near-Exclusive Deals

38.    **Dell.**  In its history, Dell has not purchased a single AMD x86 microprocessor despite acknowledging Intel shortcomings and customer clamor for AMD solutions, principally in the server sector.  As Dell's President and CEO, Kevin Rollins, said publicly last February:

> Whenever one of our partners slips on either the economics or technology, that causes us great concern. . . .  For a while, Intel admittedly slipped technologically and AMD had made a step forward.  We were seeing that in customer response and requests.

39.    Nonetheless, Dell has been and remains Intel-exclusive.  According to industry reports, Intel has bought Dell's exclusivity with outright payments and favorable discriminatory pricing and service.  In discussions about buying from AMD, Dell executives have frankly conceded that they must financially account for Intel retribution in negotiating pricing from AMD.

15

40. **Sony**. With the introduction of its Athlon microprocessor in 1999, AMD began to make notable inroads into Intel's sales to major Japanese OEMs, which export PCs internationally including into the U.S. By the end of 2002, AMD had achieved an overall Japanese unit market share of approximately 22%. To reverse the erosion of its business, in 2003 Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD Mobile Athlon notebook model. Soon thereafter, it cancelled plans to release AMD Athlon desktop and notebook computers. As a result, AMD's share of Sony's business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains today. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Sony.

41. **Toshiba**. Like Sony, Toshiba was once a significant AMD customer, but also like Sony, Toshiba received a very substantial payment from Intel in 2001 not to use AMD processors. Toshiba thereupon dropped AMD. Its executives agreed that Intel's financial inducements amounted to "cocaine," but said they were hooked because reengaging with AMD would jeopardize Intel market development funds estimated to be worth $25-30 million per quarter. Toshiba made clear to AMD that the tens of millions of dollars of additional marketing support was provided on the explicit condition that Toshiba could not use AMD microprocessors. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Toshiba.

42. **NEC**. AMD also enjoyed early success with NEC, capturing nearly 40% of its microprocessor purchases for notebooks and desktops in the first quarter of 2002. In May 2002, Intel agreed to pay NEC more than three billion yen per quarter in exchange for caps on NEC's purchases from AMD. The caps assured Intel at least 90% of NEC's business in Japan, and they established an overall worldwide quota on NEC's AMD dealings. The impact was immediate. While AMD had maintained an 84% share of NEC's Japanese consumer desktop business in the third quarter of 2002, after the payments, AMD's share quickly plummeted to virtually zero in the first quarter of 2003. NEC has made clear to AMD that its Japanese share

16

must stay in the single digits pursuant to NEC's agreement with Intel. Worldwide, AMD's share dipped from nearly 40% to around 15%, where it stands today. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to NEC.

43.    **Fujitsu**. In the summer of 2002, Fujitsu informed AMD that Intel had pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website. Fujitsu complied by making any potential AMD-buyer click past Intel products to get to the AMD offerings. Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's business. Intel offered an undisclosed package of financial incentives in return for Fujitsu's agreement to restrict its dealings with AMD. Fujitsu's catalog currently limits AMD to a single notebook product. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Fujitsu.

44.    **Hitachi**. According to the JFTC, Intel has also purchased an exclusive-dealing arrangement with Hitachi, which had been a substantial AMD customer. The agreement caused AMD's Hitachi business to fall precipitously. For example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter. But by the middle of the year, AMD sold no microprocessors to Hitachi at all. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Hitachi.

45.    **Gateway/eMachines**. From 2001 to 2004, Gateway was exclusively Intel. In 2001 former Gateway CEO, Ted Waitt, explained to an AMD executive that Intel offered him large sums not to deal with AMD, which he could not refuse: "I have to find a way back to profitability. If by dropping you, I become profitable, that is what I will do." Shortly thereafter, Gateway stopped purchasing from AMD and issued a press release announcing its Intel exclusivity. The announcement came within weeks of similar public announcements of Intel exclusivity by both IBM and Micron.

46.    **Supermicro**. Intel's exclusive dealing also extends to small, specialty OEMs of which Supermicro is a good example. Supermicro, the preeminent system assembler for servers and other high-end computers, historically has followed the Dell strategy of never

17

buying from AMD. This arrangement foreclosed AMD from a large part of the approximately one fifth of the server sector not controlled by the Tier One OEMs. Following two years of negotiation, Supermicro finally agreed last year to begin developing an Opteron-powered server; however, it so feared Intel retaliation that it secretly moved the AMD development to quarters behind Supermicro's main manufacturing facility. Further, it forbade AMD from publicizing the product or beginning any marketing prior to its actual release. When, in April 2005, Supermicro finally broke away from years of Intel exclusivity, it restricted distribution of its newly-released Opteron-powered product to only sixty of its customers and promoted them with a glossy, upscale brochure devoid of its name and labeled "secret and confidential.".

### b. Product-Line, Channel or Geographic Restrictions

47.    Intel has also bought more limited exclusivity from OEMs in order to exclude AMD from the most profitable lines or from channels of distribution best tailored to take advantage of AMD's price/performance advantage over Intel. In exchange for discriminatory discounts, subsidies or payments, for example, Intel has largely foreclosed AMD from the lucrative commercial desktop sector. Intel has focused on the major OEMs because, when IT executives from Fortune 1000 companies purchase desktop computers, they look for a strong brand on the box – Dell, IBM or HP. Knowing this, Intel has relentlessly fought to block the introduction of an AMD-powered commercial desktop by the major OEMs who have not ceded total exclusivity to Intel. What follows, again, are only representative examples of Intel misconduct.

48.    **HP.** In 2002, when AMD set out to earn a place in HP's commercial desktop product roadmap, HP demanded a $25 million quarterly fund to compensate it for Intel's expected retaliation. Eager to break into the commercial market, and to earn a place in HP's successful "Evo" product line, AMD agreed instead to provide HP with the first million microprocessors for free in an effort to overcome Intel's financial hold over HP. On the eve of the launch, HP disclosed its plan to Intel, which told HP it considered AMD's entry into HP's commercial line a "Richter 10" event. It immediately pressured HP into (1) withdrawing the

18

AMD offering from its premier "Evo" brand and (2) withholding the AMD-powered computer from HP's network of independent value-added resellers, the HP's principal point of access to small business users for whom the computer was designed in the first place. Intel went so far as to pressure HP's senior management to consider firing the HP executive who spearheaded the AMD commercial desktop proposal. As a result of Intel's coercion, the HP-AMD desktop offering was dead on arrival. HP ended up taking only 160,000 of the million microprocessors AMD offered for free. As of today, HP's AMD-equipped commercial desktops remain channel-restricted, and AMD's share of this business remains insignificant.

49.    Intel also purchased HP's exclusivity for its most popular notebook line. HP captured 15% of the U.S. retail market last Christmas with an Intel-powered 14.1" display notebook (the "DV 1000") with a popular power saving feature called Quick Play. When AMD sought to convince HP to carry a similar AMD-powered notebook, HP declined. It explained that Intel had paid between $3 and $4 million to lock up this product line for at least one year.

50.    **Gateway**. After Gateway's 2004 merger with eMachines, AMD attempted to revive the relationship it had enjoyed with Gateway until 2001, but experienced extremely limited success. While Gateway built one AMD-powered desktop model at the request of Circuit City, AMD remains locked out entirely of Gateway's direct internet sales, its commercial offerings and its server line. According to Gateway executives, their Company has paid a high price for even its limited AMD dealings. They claim that Intel has beaten them into "guacamole" in retaliation.

51.    **IBM**. AMD and IBM began negotiations in August 2000 over a proposed commercial PC business partnership. After seven months and with a deal nearing completion, Intel approached IBM with an incentive-based program under which Intel would become IBM's "preferred supplier" for processors in commercial products. "Preferred" meant exclusive. IBM accepted Intel's proposal and terminated discussions with AMD. In return for

19

that exclusivity, according to IBM executive Ed Thum, Intel paid IBM "millions of dollars in market development funds."

52.    Intel also acted to thwart AMD efforts to partner with IBM on servers. Although IBM joined AMD as a launch partner when it introduced its Opteron 64-bit server chip in April 2003 – signaling to the industry and IT professionals its confidence in the product – Intel soon dissuaded IBM from aggressively marketing Opteron servers. After investing heavily in its design, IBM consigned its one Opteron computer model to a single target market segment (High Performance and Technical Computing). This was done, according to an industry report (confirmed by an IBM executive), because Intel paid IBM to shelve any further Opteron development. IBM also took Intel money in 2004 to scrap plans for a multiple-microprocessor Opteron server it had already designed and previewed with customers.

53.    Intel has also purchased IBM exclusivity in its "ThinkCentre" line of commercial desktops. When AMD pressed IBM to add an Athlon 64 model to its "ThinkCentre" roadmap, IBM executives explained that the move would cost them important Intel subsidies, and they declined.

54.    **Fujitsu**. In 2002, Fujitsu and AMD formed an alliance to develop a low-power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first quarter of 2003, which AMD spent over 20 million yen designing. Shortly before the launch, Fujitsu told AMD that Intel would not allow it to launch an AMD-powered commercial notebook, and the project died. To this day, AMD remains locked out of Fujitsu's commercial notebook lines. Intel's exclusionary conduct with Fujitsu extends beyond commercial notebooks. In the consumer space, for example, Intel purchased total exclusivity for Fujitsu's FM-Biblo NB consumer notebook line. When AMD tried to break Intel's lock on Fujitsu notebooks by offering to match any Intel discount, Fujitsu made clear that there was no price AMD could pay because Intel simply would not allow it. To this day, AMD remains locked out of Fujitsu's Biblo line.

55. **Fujitsu-Siemens**. Fujitsu-Siemens, a European joint-venture, was once a mainstay for AMD's desktop business, with AMD chips powering over 30% of Fujitsu-Siemens' offerings in the consumer sector. In early 2003, Intel offered Fujitsu-Siemens a "special discount" on Celeron processors which Fujitsu-Siemens accepted in exchange for hiding its AMD computers on its website and removing all references to commercial AMD-powered products in the company's retail catalog.

56. Intel has also succeeded in convincing Fujitsu-Siemens to impose market restrictions on its AMD-powered PCs. Its parent, Fujitsu, currently sells an AMD-equipped Lifebook S2010, a commercial notebook, but only in the U.S. and Japan. Fujitsu-Siemens has declined AMD's plea to offer the machine in the European market as well. Similarly, Fujitsu-Siemens designed for the European market the FMC Lifebook MG Series notebook. But it refused to offer that computer in Asia or North America. Finally, although Fujitsu-Siemens produces an AMD commercial desktop, the Scenico, it refuses to advertise it on its website, offering it instead only as a build-to-order product. Having invested significantly to bring these computers to market, Fujitsu-Siemens has been able to offer no explanation for its refusal to exploit them worldwide. AMD's unit share of Fujitsu-Siemens' business recently fell below 30% for the first time in four years.

57. **NEC.** Intel was forced to relax its hold on NEC's business when long-time NEC customer, Honda Motor Company, demanded that NEC supply it with servers powered by AMD's Opteron microprocessors. After underwriting the considerable expense of designing and manufacturing an Opteron server for Honda, NEC then inexplicably refused to market the product to any of its other customers.

58. There is no reason, other than Intel's chokehold on the OEMs, for AMD's inability to exploit its products in important sectors, particularly commercial desktops. These computers, which large corporate customers buy in the tens of thousands at a time, represent a lucrative opportunity for the supplier. Yet, the microprocessors that power them are identical to microprocessors in consumer computers, a sector in which AMD has won both praise and

21

market share. The only material difference between the consumer and commercial segments is that many more system builders supply desktops to consumers, making it more difficult for Intel to control their microprocessor choice.

### c. *Exclusionary Rebates*

59.    Intel has also imposed on OEMs a system of first-dollar rebates that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements and artificially foreclosing AMD from competing for a meaningful share of the market. In general, the rebate schemes operate as follows: quarterly, Intel unilaterally establishes for each of its customers a target level of purchases of Intel microprocessors. If the customer achieves the target, it is entitled to a rebate on all of the quarter's purchases of <u>all</u> microprocessors – back to the very first one – generally in the neighborhood of 8-10% of the price paid. Intel provides the rebate in cash at the quarter's close. OEMs operate on razor-thin margins, so qualifying for an Intel rebate frequently means the difference between reporting a profit or a loss in the coming – and closely watched – quarterly earnings.

60.    In contrast to "volume discounts" that sellers offer on a graduated and non-discriminatory basis to reflect cost efficiencies that accrue when dealing in larger quantities, Intel's is a system of "penetration" or "loyalty" rebates designed to exclude AMD from a substantial portion of the market. Intel intentionally sets a rebate trigger at a level of purchases it knows to constitute a dominant percentage of a customer's needs. It is able to develop discriminatory, customer-by-customer unit or dollar targets that lock that percentage (without ever referencing it) because industry publications accurately forecast and track anticipated sales and because OEM market shares – which industry publications also report weekly, monthly and quarterly – do not change significantly quarter to quarter.

61.    Intel's retroactive discounts can operate to price microprocessors so low that AMD is put at a competitive disadvantage it cannot overcome. Consider an OEM which anticipates purchasing 100 microprocessors that both Intel and AMD sell for $100 each. Intel knows that because of its prior model introductions, the customer will have to buy 60 from

22

Intel. The customer considers buying its expected balance for its new models from AMD, but Intel offers it a rebate that will entitle it to a 10% retroactive discount if, but <u>only</u> if, it purchases 90 units or more. If the customer buys 30 of the 40 additional units from Intel to qualify for the rebate, its incremental cost for the 30 will be $3,000 (30 units at $100/unit) less the 10% rebate going back to the first unit it purchased, which amounts to $900 (90 units x $10/unit x 10%), for a total of $2,100.

62.    AMD can only capture the 30 units if it offers a price that makes the customer indifferent between getting the Intel rebate and getting an overall equivalent deal on AMD microprocessors. Thus, for the 30 units that are up for grabs, AMD would have to lower its price to $70 per unit (because 30 units x $70/unit equals the $2,100 net cost for buying from Intel). In effect, the rebate forces AMD to charge $20 dollars less than the $90 discounted Intel price if it attempts to get any business from the customer at all. That is because it is selling the customer only 30 units over which it has to spread a $900 discount while Intel can spread it out over 90. At the end of the day, this creates a serious competitive disadvantage for AMD. As shown in the example, AMD is forced to discount its price three times as much as Intel just to match the Intel discount – not because its processors are inferior – far from it – but because Intel has assured for itself – by its past predatory practices – a significant base of assured demand which enables Intel to inexpensively spread its first-dollar discount. Importantly, this new base of demand – driven by the OEM's purchasing – will enable Intel to repeat its exclusionary practice when the next line of models is unveiled.

63.    At least in the short run, most if not all of the major OEMs must engage significantly with Intel (1) because AMD is too small to service all their needs while continuing to satisfy other customer demand; (2) because to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's lifecycle; and (3) because Intel has encouraged end-users to specify that processors be of the same family among similar computers in one installation, as this is perceived to increase reliability (although technically

23

this is not the case). Intel uses its retroactive discounts to make its large, captive market share self-perpetuating. In any one quarter, AMD cannot economically match Intel's retroactive rebate because it competes for too small a share of the customer's volume over which to spread the dollars necessary to equal the customer's total Intel cost savings. As a result, it loses the business and thus goes into the next selling cycle with Intel imbedded in additional customer product over which Intel can spread its rebates. This serves again to artificially constrain AMD's opportunity to match Intel's ensuing round of retroactive discounts. Intel's inter-temporal leveraging of its market share effectively forecloses AMD from ever having a fair opportunity to compete.

64.     Intel exacts a severe penalty from OEMs who fail to meet their targets. For example, during the fourth quarter of 2004, AMD succeeded in getting on the HP retail roadmap for mobile computers, and its products sold very well, helping AMD capture nearly 60% of HP's U.S. retail sales for the quarter. Intel responded by withholding HP's fourth quarter rebate check and refusing to waive HP's failure to achieve its targeted rebate goal. Instead, Intel "allowed" HP to make up the shortfall in succeeding quarters when HP promised Intel at least 90% of HP's mainstream retail business.

65.     Intel has deployed a variety of variants of this basic rebate scheme. In the case of one European OEM, for example, Intel imposes the additional condition that the customer purchase target volumes of specific processors, generally microprocessors against which AMD's products compete particularly well. In the case of another, Intel offers as an inducement discounted microprocessors rather than rebates. In the case of the European division of one U.S. OEM, Intel has imposed a target of between 70-90% of the customer's requirements. Rather than qualifying the customer for a cash rebate, however, meeting the target entitles the OEM to purchase designated processors at up to 20% below "normal" cost, thereby enabling the customer to obtain favorable pricing on bundled products (e.g., a Centrino-series processor and chipset) and/or to receive product offerings not available to competitors.

24

66.    Intel makes similar offers to smaller OEMs but they are generally unwritten, and Intel leaves undefined the consequences of failing to meet a target. Thus, a customer falls short at its peril, knowing only that it may lose its account with Intel and have to source future products from Intel distributors, which is both more expensive and provides less security of supply than direct purchase.

67.    The salient features of all of Intel's rebate schemes are that they are discriminatory and market-foreclosing. If the customer chooses to purchase any significant quantity of microprocessors from AMD, it will not qualify for its rebate, and its price will be higher on all the Intel processors it buys across the board. By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself – but to a greater harm to AMD and ultimately consumers – as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

68.    Intel's use of retroactive rebates leads, in some cases, to below-cost pricing on incremental sales. The following example shows why a customer's incremental cost of purchasing from Intel those units that both Intel and AMD could supply (the "contested sales") can be zero or even negative – a price AMD cannot match. Consider an OEM which has purchased 90 units of Microprocessor A at $100 per unit under an Intel rebate scheme that entitles it to a 10% first-dollar discount but only after it purchases more than 90 units. Its cost for the 90 processors is $9,000. The OEM is now considering an additional purchase of a further 10 units. If it makes the additional purchase from Intel, the OEM will meet the expenditure condition and will qualify for the 10% per unit discount on all units. Accordingly, the total spent will remain $9,000. The incremental cost of the 10 additional microprocessors – as well as Intel's incremental revenue – will be zero (the $1,000 additionally spent, less the $1,000 thereby saved). In other words, this scheme leads to incremental units being offered to the OEMs for nothing, leaving AMD hopelessly boxed out.

25

69.    Importantly, even if Intel were to earn some incremental revenue on these marginal units, these additional revenues could be below the incremental cost of their production. As a result, Intel's additional profit on the sale would be negative, but for the fact that it had a long-run exclusionary effect on AMD. (Obviously, if Intel earns no revenues on its additional sales, it has to be foregoing profits.) As this analysis shows, some of Intel's discriminatory, retroactive rebates amount to unlawful, predatory below-cost pricing.

70.    Even where Intel's prices are above cost on the incremental volumes and overall despite its retroactive rebate schemes, these rebates enable Intel to lower prices selectively in the contested market segment while maintaining higher prices in its captive market. For example, Intel can offer rebates which are granted across the entire volume of sales but which are triggered only if the OEM increases its purchases beyond the portion of its requirements which is captive to Intel. Indeed, Intel can even price above the "monopoly" level for the volumes below the benchmark and offer huge discounts for additional purchases knowing full well that the OEM will not buy less than the benchmark and, instead, source the overwhelming share of its purchases from Intel thereby "qualifying" for the putative rebate while at the same time denying AMD any reasonable volume opportunity.

71.    The use of retroactive rebates to limit AMD to a small share of an OEM's business heightens the obstacle to inducing the OEM to launch AMD-powered platforms. OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebate and other business strategies effectively cap the volumes of AMD-powered products that an OEM can sell. Hence, Intel's practices exacerbate normal impediments to entry and expansion.

### d. Threats of Retaliation

72.    Beyond exclusive dealing, product and channel restrictions and exclusionary rebates, Intel has resorted to old-fashioned threats, intimidation and "knee-capping" to deter OEMs from dealing with AMD. Intel has a variety of pressure points at its disposal: it can

26

unilaterally reduce or withdraw a discount, rebate or subsidy; it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate – all of which can turn a profitable quarter for an OEM into an unprofitable one. Other pressure points on accounts it deems disloyal include threatening to delay or curtail supplies of scarce processors or essential technical information. Examples abound.

73. As Gateway executives have recounted, Intel's threats beat them into "guacamole." But Gateway is not alone. Prior to its merger with HP, Compaq Computer received Intel threats every time it engaged with AMD. In late 2000, for example, Compaq's CEO, Michael Capellas, disclosed that because of the volume of business he had given to AMD, Intel withheld delivery of server chips that Compaq desperately needed. Reporting that "he had a gun to his head," Capellas informed an AMD executive that he had to stop buying AMD processors.

74. In 2002, Intel pointed its gun at NEC. Intel threatened to discontinue providing NEC with the technological roadmap of future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC would be at a distinct competitive disadvantage. Predictably, NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003.

75. NEC's European subsidiary, NEC-CI, which operates NEC's European and non-Japanese Asian divisions, reported that Intel executives said they would "destroy" NEC-CI for engaging with AMD in the commercial desktop segment. Intel told NEC-CI's retailers that NEC-CI's AMD dealings could impair its ability to supply products to its customers, and when NEC-CI resisted the pressure, Intel imposed a discriminatory price increase.

76. AMD had been engaged in discussions with IBM about introducing an Opteron "blade" server, when IBM suddenly announced that any such product it distributed could not

bear an IBM logo. When pressed for an explanation, IBM reported that it could not appear overly supportive of AMD server products because it feared Intel retaliation.

### e. Interference with AMD Product Launches

77.    Key to gaining quick market acceptance of a new microprocessor is a chipmaker's ability to develop a lineup of reputable launch partners, consisting of OEMs prepared to roll out products featuring the chip, major customers who are willing to buy and embrace it, and other industry allies, such as major software vendors and infrastructure partners who can attest to its quality and reliability. Particularly for commercial and enterprise (*i.e.*, server-work station) purchasers, a successful and impressive "launch" is essential to generating confidence among the computer professionals who will be the potential audience for the new microprocessor.

78.    Aware of the importance of product launches, Intel has done its utmost to undermine AMD's. Set forth below are several examples.

79.    AMD's September 23, 2003, launch of Athlon64 was a watershed event for the Company. Upon learning the launch schedule, Intel did its best to disrupt it. For example, Acer committed to support the AMD rollout by making a senior executive available for a videotaped endorsement and by timing the introduction of two computers, a desktop and a notebook, to coincide with AMD events planned for Cannes, San Francisco and Taiwan. Days before the event, Intel CEO, Craig Barrett, visited Acer's Chairman, CEO and President in Taiwan, expressed to them Intel's "concern" and said Acer would suffer "severe consequences" if it publicly supported AMD's launch. The Barrett visit coincided with an unexplained delay by Intel providing $15-20 million in market development funds owed to Acer. As a result, Acer withdrew from the launch in the U.S. and Taiwan, pulled its promotional materials, banned AMD's use of the video, and delayed the announcement of its Athlon64-powered computers. Acer's President subsequently reported that the only thing different about Intel's threats was the messenger – they were "usually done by lower ranking managers," not Intel's CEO.

28

80.    HP also withdrew precipitously from the Athlon64 launch after committing to participate. HP had agreed to support the launch by producing a promotional video and by sending senior executives to all three launch sites. Just before launch, however, HP manager, John Romano, pulled the video and announced that HP would only be sending a junior manager, and then only to Europe.

81.    Other AMD customers and channel partners reporting Intel coercion to withdraw from the Athlon64 launch were Lenovo, NEC-CI and Best Buy.

82.    Intel also disrupted AMD's launch of its Opteron server chip, which was rolled out on April 22, 2003, with few in attendance and little industry support. A computer industry journal reported Intel's fingerprints: "They all [vendors] told me that prior to the launch, they received a phone call from Intel. Intel asked if they were going to the launch. If they replied yes, the Intel rep asked them if it was 'important to them to go', or 'if they really wanted to go.' Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was quite clear from that phone call that we would be risking our various kickback money if we went.'"

83.    Other companies that reported being intimidated from participating in the Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens. Indeed, Intel representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended, they would be the only Tier One OEM showing its support as all of the others would back out. With the exception of IBM, Intel was right.

84.    These are not isolated examples, but rather illustrations of Intel's relentless campaign to undermine marketing efforts by its one remaining competitor. For example, IBM pulled its AMD-powered computers from the 2004 Palisades eServer and PC Show, citing a contractual agreement with Intel said to prohibit it from endorsing those competitive products. And at the 2004 Super Computing Show, an annual conference devoted to high performance computing, Intel offered two other AMD customers money to remove AMD systems from their

29

booths. At CeBit, Intel threatened to pull a half million dollars of support from Fujitsu-Siemens for displaying AMD products (which were removed).

### f. Product Bundling

85.    Intel also uses product bundling as an exclusionary weapon in a variety of ways. Intel's most common deployment is in bidding for a new OEM platform: it bundles microprocessors with free (or heavily discounted) chipsets or motherboards, often offered in amounts exceeding the OEM's requirements for the new platform. (The excess, of course, is only compatible with Intel processors, thereby providing the OEM a strong inducement to go with Intel rather than AMD on uncommitted models.). AMD does not sell chipsets or motherboards; they are provided by independent suppliers such as ATI, nVidia and Via which incur their own costs and control their own pricing. Hence, to match Intel's bundled microprocessor-chipsets-motherboards offer, AMD must extend a discount on its microprocessors that will not only match any Intel discount on the microprocessors themselves but also will compensate the OEM for the savings it will lose on independent Intel chipset and motherboard purchases. The additional compensation AMD is forced to provide through a discount on the sale of microprocessors alone makes AMD's sale of microprocessors potentially unremunerative, and it also enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently superior to that of Intel's.

86.    As retaliation for dealing with AMD, Intel has also used chipset pricing as a bludgeon. For example, in 2003, Acer had committed to launch the AMD Athlon XP. Acer executives worldwide had been working with AMD to bring the product to market post-launch. But, on the eve of the launch the Acer management in Taiwan pulled the plug. AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel-based Acer systems if *any* processor business was awarded to AMD outside of Europe.

30

87.    Intel's dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 2. Practices Directed At Distributors

88.    Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic. For example, it entered into an exclusive deal with Synnex, which is one of the largest U.S. distributors. Given Intel's 80% plus market share, there is no pro-competitive justification for this arrangement.

89.    As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub-markets. For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off discussions to distribute AMD chips as well. A high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up.

90.    Intel also offers a panoply of special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs. When such more nuanced means of achieving exclusivity fail, Intel has simply bribed distributors not to do business with AMD. For example, a high-ranking Tech Data executive turned down $1 million to stop doing business with AMD, which caused the Intel representatives to ask, "How much would it take?"

91.    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much AMD business. But, unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them.

Intel does not share this information with them; they simply receive a check at the end of a quarter. As a result, every AMD chip they purchase, they buy at their peril.

92.    Finally, those distributors who choose to do business with AMD have been conditioned to expect Intel retaliation. For example, when ASI, one of the largest computer hardware and software distributors, began distributing AMD processors, Intel demanded that it exclude AMD personnel from its ASI Technology Shows and its General Managers' meetings. Until recently, ASI refused master distributor status from AMD, despite the financial benefits attached, because it feared that such a public alignment with AMD would trigger Intel retaliation. When, in January 2005, it finally accepted Master Distributor status, Intel began reducing the level of market development funds ASI received.

93.    Avnet Inc., one of the world's largest computer equipment distributors and an avid AMD supporter, has also received its share of Intel intimidation. Thus, Avnet cited Intel as the reason it could not distribute AMD parts to the industrial sector. And when AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin distributing that chip. When Avnet did so anyway, Intel threatened to cut if off. Another distributor got even worse treatment. In retaliation for Supercom's AMD dealings in Canada, Intel pressured Supercom's customers to switch to another distributor.

94.    These are not the only distributors that Intel has attempted to coerce from doing business with AMD. Others include R.I.C. in Germany, Paradigit in the Netherlands, and Quote Components, also in the Netherlands.

95.    Intel's dealings with distributors are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 3. Practices Directed At Retailers

96.    In both the U.S. and internationally, approximately one fifth of desktop and notebook computers is purchased at retail stores. A handful of retailers dominate the U.S. PC market: Best Buy and Circuit City are the largest. Other significant but smaller retailers are Walmart/Sams Club, Staples, Office Depot and Office Max.

97.    Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar ("Dads and Grads," "Back to School," "Holiday," etc.), and retailers refresh their inventory for each.  A chipmaker faces a two-step process to get its platform on retail shelves: first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price point (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines.  Shelf space does not come for free.  The major retailers demand market development funds ("MDF") in exchange.  MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff.  The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

98.    Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' roadmaps and the ability to exert pressure to keep AMD out of their product plans.  Also, it has significantly greater financial resources with which to buy retail shelf space.

99.    But to leverage those advantages, Intel has also made exclusive deals with many key retailers around the world.  For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk.  Fry's is Fujitsu's only retailer in the United States.  When Intel learned that Fry's was very successfully marketing a Fujitsu's Athlon™ XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

100.    The story is even worse in Europe.  AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales.  Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively.  Intel subsidies also foreclose AMD from Aldi,

33

a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market.

101. In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major chains including Dixon and PC World that collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just on account of the small amount of business it does with AMD. Toys`R´Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers, including Conforama, Boulanger, causing them to cease dealing with AMD or drastically reduce their AMD business.

102. AMD has nonetheless made some progress in gaining retail market share. Because of price/performance advantages, which are key in retail, OEMs build approximately 15% of their U.S. domestic market desktops with AMD processors; within notebook roadmaps, AMD represents approximately 10%. On a shelf-space to sales basis, AMD has generally outperformed Intel. For instance, in the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves. And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD computers accounted for roughly 30% and 22% of their sales, respectively. These numbers confirm that AMD's products perform well at retail, provided that space is available.

103. In fact, Intel's sales staff was instructed "not to let this happen again." As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-

34

based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% *across all products.*

104. This is how the program works at Circuit City. If less than 20% of Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to pay Circuit City $15 in MDF per Intel-powered machine; but if the AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10. This creates a $5 per box "tax" on the retailer for doing 20% or more of its dollar volume with AMD-powered machines; and this "tax" is applicable to all of the Intel-powered machines that the retailer buys, back to the very first machine.

105. The following illustrates the competitive disadvantage this creates for AMD: if Circuit City were to purchase only Intel-powered notebooks for its 200,000-unit inventory in a quarter, Intel would pay it $15 of MDF per computer, or a total of $3 million. However, if Circuit City were to reduce its purchases of Intel-based notebooks to 80% (160,000 units) so that it could stock a modest number of AMD-powered computers, Intel MDF would fall to $1.6 million ($10 MDF/unit times 160,000 units). Were AMD to match Intel's $10 per unit MDF on the 40,000 units it supplied, Circuit City would receive an additional $400,000, bringing its total MDF to $2 million, leaving it $1 million worse off for doing business with AMD. For AMD to make Circuit City "whole," it would have to vastly increase its MDF on its 20% share to $35 MDF per unit (40,000 x $35 = $1.4M), which together with Intel's $1.6 million would bring the total MDF back to $3 million. In other words, to just capture a 20% share, AMD must offer two or three times as much MDF as Intel – because it has far fewer units over which to spread the difference. Given these perverse economics, Circuit City is not likely to allocate less than 80% of its notebook sales to Intel, even if it means taking AMD stock off the shelves at the end of a quarter. (Indeed, to avoid inadvertently running afoul of the limitation, a prudent distributor would keep AMD's share well short of 20%.)

35

106. Nor is Intel above threatening retailers to gain preferred treatment. For example, at the recent CeBit computer show in Hanover, Germany (the largest computer show in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new mobile microprocessor. Intel's German general manager and its vice president for mobile products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the Intel representatives threatened immediately to stop microprocessor shipments to Vobis' supplier. The banner was removed before the CeBit show opened.

107. Intel's dealings with retailers are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 4. Intel's Standard Setting and Other Technical Abuses

#### a. Intel's Exclusion of AMD from Industry Standards

108. Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential. But when a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market.

109. By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its processors, thus dispensing with the need for an extra chip and speeding up

36

communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices.

110. The Joint Electron Device Engineering Council ("JEDEC") is the industry organization responsible for the standards governing the most recent generations of computer memory chips. Even though JEDEC was already developing the standards for the next generation of memory chips, Intel convened a secret committee that it dubbed the Advanced DRAM Technology ("ADT") Consortium to develop a competing memory standard.

111. The ADT Consortium was cleverly structured with multiple tiers of membership, each with different levels of access to information. The majority of companies were consigned to the lowest tier, meaning that they would receive access to the memory standard only upon its completion, but not during its development. The actual development effort was undertaken by companies with the highest tier membership status, which Intel reserved for itself and the major memory manufacturers. No other companies were allowed input or full access to the standard during its development by the ADT Consortium.

112. AMD desperately needed access to the developing standard, and input into its definition, in order to be able to launch a microprocessor with updated memory controller technology at the same time as Intel. AMD lobbied repeatedly for higher tier membership status, but was continually turned down. Intel had structured the ADT Consortium's rules to require a unanimous vote – a rule that gave Intel veto power – over any decision to allow AMD to join the development committee; and it used that veto power to cause the Consortium arbitrarily to reject AMD's application.

113. By foreclosing AMD from input or access to the memory standard during its development process, Intel deliberately placed AMD at a severe competitive disadvantage. As a consequence of its exclusion, AMD had no opportunity to monitor participants' suggestions and to object to Intel-proposed features that were without substantial benefit to consumers and were instead motivated by Intel's desire to disadvantage AMD's microprocessor architecture.

37

Furthermore, by keeping the ADT Consortium memory standard-setting process shrouded in secrecy, Intel was able to gain a significant head start. While the ADT Consortium was ultimately unsuccessful in implementing an industry standard, this type of exclusionary conduct exemplifies Intel's attempts to use industry standard-setting to competitively disadvantage AMD in an unlawfully exclusionary manner.

114. Indeed, Intel is attempting a repeat performance with respect to a new memory standard, this time excluding AMD by avoiding the open standard-setting committee entirely. Intel is currently coercing the major memory producers into signing non-disclosure agreements and working exclusively with Intel in a "secret" committee to develop the next generation memory interface standard. Once under this agreement, the memory manufacturers are prohibited from sharing information about their own product designs implementing the memory interface standard. This has the effect of preventing AMD from completing the design of its processor memory controllers until Intel permits memory manufacturers to communicate their interface specifications to the industry.

115. By this scheme, Intel tightens its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, and thereby guarantees itself an undeserved head-start and unfair competitive advantage.

### b. Intel's Promotion of Industry Standards that Disadvantage AMD

116. Even where it has been unable to exclude AMD from participating in the development of industry standards, Intel has attempted to drive the adoption of standards having no substantial consumer benefit and whose sole or dominant purpose was to competitively disadvantage AMD based on its highly integrated microprocessor architecture.

117. As an example, in 2004, JEDEC began developing standards governing the design of the memory modules for next generation ("DDR3") memory devices. These modules, known as dual inline memory modules, or "DIMMs," consisted of printed circuit boards upon which a number of memory chips were mounted. The DIMMs connected the memory chips to the computer's motherboard through a series of metal connectors known as "pins." One

38

purpose of the JEDEC standards was to define the functions of these pins so as to enable chipmakers to design compatible memory controllers that would allow their microprocessors and the memory on the DIMMs to communicate.

118. The JEDEC committee, which consists of members representing companies throughout the computer industry, had already adopted a scheme for defining the pins for the previous generation ("DDR2") DIMMs used in desktop and laptop computers. When the JEDEC committee began work on standards for DDR3 memory modules for desktop computers, Intel proposed that the committee adopt a pin definition similar to that used for the DDR2 memory modules. This proposal made perfect sense, as Intel explained to the committee, because it allowed DDR3 memory controllers to be compatible with DDR2 and DDR3 memory modules.

119. However, when the JEDEC committee began to define the pins for DDR3 laptop memory modules in this consistent manner, Intel completely reversed its position, counter-proposing instead that the committee rearrange the pin definitions. Intel's proposal had no discernable technical merit or basis.

120. In fact, Intel's motivation for proposing modification of the laptop memory module pin definition was to competitively disadvantage AMD. Any modification to the laptop memory module pin definition would require Intel and AMD to make corresponding modifications of their memory controllers. AMD's microprocessor design, while representing a huge breakthrough in integration, embeds the memory controller directly into its microprocessor. While this produces significant computing advantages, modification of an embedded memory controller requires significantly more time and expense.

121. Knowing this vulnerability, Intel proposed its modified DDR3 memory module pin definition for laptop computers for the purpose of delaying AMD's introduction of a technologically superior part. While Intel's proposal was ultimately rejected by the JEDEC committee, confirming the proposal's complete lack of technical merit, this is yet another example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

39

### c. Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage AMD in the Marketplace

122. Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity.

123. An example is Intel's compilers. Generally, independent software vendors ("ISVs") write software programs in high-level languages, such as C, C++, or Fortran. Before these programs can be understood by a computer system, they must be translated into object code – a machine-readable language – by a software program called a compiler. Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.). Intel offers compilers for use with a variety of different operating systems and programming languages.

124. Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations. Such programs include, for example, mathematical modeling, multimedia, and video game applications.

125. Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform. To achieve this, Intel designed the compiler to compile code along several alternate code paths. Some paths are executed when the program runs on an Intel platform and others are executed when the program is operated on a computer with an AMD microprocessor. (The choice of code path is determined when the program is started, using a feature known as "CPUID" which identifies the computer's microprocessor.) By design, the code paths were not created equally. If the program detects a "Genuine Intel" microprocessor, it executes a fully optimized code path and operates with the maximum efficiency. However, if the program detects an "Authentic AMD" microprocessor, it executes a different code path that will degrade the program's performance or cause it to crash.

40

126.  ISVs are forced to choose between Intel's compilers, which degrade the performance of their software when operated with AMD microprocessors, or third-party compilers, which do not contain Intel's particular optimizations. Sadly for AMD and its customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially those developing software programs that rely heavily on floating point and vectorized math calculations. Unbeknownst to them, performance of their programs is degraded when run on an AMD microprocessor not because of design deficiencies on the part of AMD, but deviousness on the part of Intel.

### EFFECTS OF INTEL'S MISCONDUCT

127.  Intel's unlawful conduct has caused and will continue to cause substantial harm to competition in the market for x86 microprocessors in domestic, import, and export trade. Were it not for Intel's acts, AMD and others would be able to compete for microprocessor business on competitive merit, both domestically and internationally, bringing customers and end-product consumers lower prices, enhanced innovation, and greater freedom of choice.

128.  Intel's anticompetitive acts both inside and outside the territorial boundaries of the United States have a direct, substantial, and reasonably foreseeable effect on trade and commerce that is not trade and commerce with foreign nations, and on United States import trade and commerce. In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them from the product market worldwide. As the domestic U.S. market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U.S. competitive potential.

129.  Intel's Sherman Act violative conduct throughout the world has caused and will continue to cause substantial harm to the business of AMD in the domestic, import, and export trades, in the form of artificially constrained market share, lost profits and increased costs of capital. Additionally, that same conduct has had, and will continue to have, a direct,

41

substantial, and reasonably foreseeable effect on AMD's ability to sell its goods to foreign customers in restraint of its U.S.-based and directed business, including its U.S. export business. These harms are evidenced by the following:

- When AMD first entered the server market in 2002 with its Athlon microprocessor – a part designed for desktops, not servers – the small OEMs and white-box vendors deploying the chip nonetheless managed to secure approximately 3% of the worldwide server market. AMD introduced its next generation Opteron microprocessor for servers the following year, and the chip won rave reviews and passionate customer testimonials, including Best of Show at the June 2003 ClusterWorld Conference and Expo and Best Processor award in July 2003 from InfoWorld. Nonetheless, by means of its exclusionary and anticompetitive conduct, as of the Fourth Quarter 2004, Intel had limited AMD's worldwide server market share to less than 5%, not appreciably more than before it introduced the Opteron.

- Intel's exclusionary conduct has successfully boxed AMD out of the notebook sector. Its exclusive deals with Dell, Sony and Toshiba alone bar AMD from a third of the world market and half of U.S. domestic sales. Intel's economic coercion and fidelity rebates have foreclosed AMD from an appreciable share of the remainder.

- AMD's Athlon64 is widely recognized as fully competitive with Intel's best desktop offering with the added benefit that it can run 64-bit software. Nonetheless, with the exception of a channel-restricted HP machine and a single Fujitsu-Siemens'model, AMD has failed to get a single major OEM – which collectively dominate the lucrative commercial desktop sector – to launch broadly an Athlon64 commercial desktop. Fortune 500 companies won't take a chance on AMD unless it partners with a Tier One desktop OEM, but Intel's exclusionary conduct, including its economic coercion of Dell, HP, IBM, Gateway and Acer, prevents that from happening. As a result, AMD's commercial desktop share is no greater now than it was in 2002.

## CLAIMS FOR RELIEF

## CLAIM 1

### Willful Maintenance of a Monopoly In Violation of Sherman Act, Section 2

130.  AMD realleges and incorporates by reference the averments set forth in paragraphs 1 through 129.

131.  The x86 Microprocessor Market is a relevant product market within the meaning of the antitrust laws.

132.  The relevant geographic market is the world.

133.  Intel possesses monopoly power in the relevant market, maintaining a market share of over 90% by revenue and 80% by unit volume.

134.  Substantial barriers to entry and expansion exist in the relevant market.

135.  Intel has the power to control prices and exclude competition.

136.  Intel has engaged in conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high, to stifle competition and to eliminate consumer choice through unlawfully exclusionary behavior designed to keep AMD weak, undersized, and unable to achieve a minimum efficient scale of operation needed to become a viable substitute for Intel with respect to significant customers, or to an essential portion of the market.  It has done so with the intent to maintain its monopoly in the relevant market.

137.  There is no legitimate business justification for Intel's conduct.

138.  AMD has suffered and will continue to suffer injury to its business and property.

139.  Intel's conduct has caused and will continue to cause injury to the relevant market in the form of higher prices and reduced competition, innovation and consumer choice.

43

## CLAIM 2

### Secret Discriminatory Rebates and Discounts
### In Violation of California Business and Professions Code § 17045

140. AMD realleges and incorporates by reference the averments in paragraphs 1 through 129.

141. California Business & Professions Code § 17045 provides in pertinent part:

> 17045. The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful.

142. As set forth above, particularly in paragraphs 59 through 71, 89 through 91 and 103 through 105, Intel has systematically engaged in a scheme to extend discriminatory secret rebates and discounts to OEMs, distributors, retailers and others for the purpose of injuring AMD and tending to destroy competition.

143. Intel has also secretly given engineering funds, advance technical information, and other benefits to certain customers but not to others similarly situated. This conduct constitutes special services or privileges not extended to all customers purchasing upon like terms and conditions. AMD has information that this practice is occurring, but due to Intel's nondisclosure agreements and engendered customer fear, AMD as well as Intel's other customers do not know the extent or degree of the preferential treatment.

144. Intel keeps secret its discriminatory rebates and discounts by, among other things, purposely concealing from one customer discounts it extends to another, and by signing customers, retailers and other beneficiaries of its secret discounts and rebates to nondisclosure and confidentiality agreements.

44

145. Intel's conduct emanated from its Santa Clara, California headquarters, and/or was intended to and did harm California residents, including AMD, and is therefore subject to California law.

146. Intel's secret rebates, unearned discounts, and preferential treatment of certain customers are mechanisms to divert sales and customers away from AMD. Intel targets these mechanisms at AMD's actual and potential customers. Intel bestows them to reward those customers who cease or curtail their dealings with AMD, and withholds them to punish customers who do not. As a result, AMD has lost millions of dollars in potential sales.

147. Intel's secret payment of rebates and unearned discounts, and its secret and discriminatory bestowal of special services and privileges, tend to diminish and destroy competition in the relevant product market.

### CLAIM 3

#### Interference with Prospective Economic Advantage
#### In Violation of California Business and Professions Code § 17045

148. AMD realleges and incorporates by reference the averments in paragraphs 1 through 129.

149. Intel intentionally interfered with AMD's prospective economic advantage.

150. AMD has enjoyed economic relationships with OEMs, distributors, retailers, and other actual and potential customers and partners which contained the probability of future economic benefit.

151. With knowledge of these relationships, Intel has engaged in intentional, wrongful conduct designed to interfere with and disrupt AMD's relationships with these third parties. As set forth above, Intel has made direct payments in return for exclusivity and near-exclusivity; offered discriminatory rebates, volume discounts and subsidies conditioned on customer "loyalty"; threatened economic retaliation against those who gave, or contemplated giving, too much of their business to AMD or who refused to limit AMD to Intel-approved

45

models, lines and/or sectors, or who cooperated too closely with AMD's promotion of its competitive processors.

152. Intel's actions were independently wrongful as they violated federal and state law, were in restraint of trade, and were independently tortious.

153. Intel's intentional, wrongful conduct resulted in the actual disruption of AMD's relationships with these third parties. As set forth above, Intel's conduct caused these third parties (i) to cease purchasing microprocessors from AMD, (ii) to limit their purchases of microprocessors from AMD, (iii) to abstain from purchasing microprocessors from AMD in the first instance, (iv) to restrict sales of products containing AMD microprocessors, (v) to abandon planned AMD offerings, (vi) to restrict distribution and marketing of planned AMD offerings, and (vii) to withdraw from participating in AMD product launches and promotions.

154. AMD has suffered economic harm proximately caused by Intel's conduct in the form of artificially constrained market share, increased costs of capital, lost profits and sales, as well as lost publicity and promotion.

155. Intel's conduct emanated from its Santa Clara, California headquarters, and/or was intended to and did harm California residents, including AMD, and is therefore subject to California law.

156. Intel is not entitled to the "competition privilege" because Intel employed improper means and intended to create and/or to continue an illegal restraint of competition.

157. Intel acted both oppressively and maliciously with intent to cause injury to AMD and with conscious disregard for the rights of others. As such, AMD is entitled to punitive damages, in addition to compensatory damages, as permitted by law.

## DEMAND FOR TRIAL BY JURY

158. Pursuant to Fed. R. Civ. P. 38(b), AMD demands trial by jury of all issues so triable under the law.

## PRAYER FOR RELIEF

WHEREFORE, AMD PRAYS THIS COURT:

A.    Find that Intel is wrongfully maintaining its monopoly in the x86 Microprocessor Market in violation of Section 2 of the Sherman Act and award AMD treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

B.    Find that Intel has made secret payments and allowance of rebates and discounts, and secretly and discriminatorily extended to certain purchasers special services or privileges, all in violation of California Business & Professions Code § 17045, and pursuant thereto award AMD treble damages for its resulting lost profits in an amount to be proven at trial.

C.    Find that Intel has intentionally interfered with valuable business relationships of AMD to its economic detriment and award AMD damages in an amount to be proven at trial for its resulting losses, as well as punitive damages, as permitted by law.

D.    Grant injunctive relief prohibiting Intel and all persons, firms and corporations acting on its behalf or under its direction or control from engaging in any further conduct unlawful under Section 2 of the Sherman Act or Section 17045 of the California Business and Professions Code.

E.    Award AMD such other, further and different relief as may be necessary or appropriate to restore and maintain competitive conditions in the x86 Microprocessor Market.

47

F.    Award AMD attorney's fees and costs of the action.

Respectfully submitted,

_____

Jesse A. Finkelstein (#1090)
   finkelstein@rlf.com
Frederick L. Cottrell, III (#2555)
   cottrell@rlf.com
Chad M. Shandler (#3796)
   shandler@rlf.com
Steven J. Fineman (#4025)
   fineman@rlf.com
One Rodney Square
P. O. Box 551
Wilmington, DE   19899
(302) 651-7500

Attorneys for Plaintiffs Advanced Micro
Devices, Inc. and and AMD International
Sales & Service, Ltd.

OF COUNSEL:
Charles P. Diamond, Esq.
   cdiamond@omm.com
Linda J. Smith, Esq.
   lsmith@omm.com
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067
(310) 246-6800

Mark A Samuels, Esq.
   msamuels@omm.com
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
213-430-6340

Dated:  June 27, 2005

48

# EXHIBIT D

## THIRD RESTATED CERTIFICATE OF INCORPORATION

### OF

### INTEL CORPORATION

INTEL CORPORATION, a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

FIRST:  The name of the corporation is Intel Corporation.

SECOND:  The original Certificate of Incorporation of the corporation was filed with the Secretary of State of Delaware on March 1, 1989, and the original name of the corporation was Intel Delaware Corporation.  The first Restated Certificate of Incorporation of the corporation was filed with the Secretary of State of Delaware on May 11, 1993. The second Restated Certificate of Incorporation of the corporation was filed with the Secretary of State of Delaware on March 13, 2003.

THIRD:  Pursuant to Section 245 of the General Corporation Law of the State of Delaware, the provisions of the Certificate of Incorporation as heretofore amended and supplemented are hereby restated and integrated into the single instrument which is hereinafter set forth, and which is entitled "Third Restated Certificate of Incorporation of Intel Corporation," without further amendment and without any discrepancy between the provisions of the Certificate of Incorporation as heretofore amended and supplemented and the provisions of such single instrument as hereinafter set forth.

FOURTH:  The Board of Directors of the corporation has duly adopted this Third Restated Certificate of Incorporation pursuant to the provisions of Section 245 of the General Corporation Law of the State of Delaware in the form set forth as follows:

1.      The name of the Corporation is Intel Corporation.

2.      The address of its registered office in the State of Delaware is 1209 Orange Street, in the City of Wilmington, 19801, County of New Castle.  The name of its registered agent at such address is The Corporation Trust Company.

3.      The nature of the business of the Corporation and the objects or purposes to be transacted, promoted or carried on by it are as follows: To engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

4.      The total number of shares of all classes of stock that the Corporation is authorized to issue is ten billion fifty million (10,050,000,000) consisting of ten billion (10,000,000,000) shares of Common Stock with a par value of one-tenth of one cent ($.001) per share and fifty million (50,000,000) shares of Preferred Stock with a par value of one-tenth of one cent ($.001) per share.  The Preferred Stock may be issued in one or more series, and the Board of Directors of the Corporation is expressly authorized (i) to fix the descriptions, powers, preferences, rights, qualifications, limitations, and restrictions with respect to any series of Preferred Stock and (ii) to specify the number of shares of any series of Preferred Stock.

5.      The Board of Directors is expressly authorized to make, alter, or repeal the bylaws of the Corporation.

6.      Elections of directors need not be by written ballot unless the bylaws of the Corporation shall so provide.

7.      The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Third Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

8.    To the fullest extent permitted by Delaware statutory or decisional law, as amended or interpreted, no director of this Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. This Article 8 does not affect the availability of equitable remedies for breach of fiduciary duties. Any repeal or modification of the provisions of this Article 8 by the stockholders of the Corporation shall not adversely affect any right or protection of any director existing at the time of such repeal or modification.

9.    Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing by the stockholders.

   **IN WITNESS WHEREOF,** Intel Corporation has caused this certificate to be signed by its Senior Vice President and General Counsel and attested by its Corporate Secretary this _5th_ day of May, 2006.

                                        By: _____
                                            Bruce Sewell
                                            Senior Vice President and General
                                            Counsel


Attest: _____
        Cary Klafter
        Corporate Secretary

# EXHIBIT E



► Close Window

APRIL 9, 2004

NEWS ANALYSIS:TECHNOLOGY

# Intel Feels Some Heat in Japan

**In what may be an anticompetition probe, agents from Japan's Fair Trade Commission on Apr. 8 raided three of the chipmaker's offices**

Software giant Microsoft (**MSFT** ) may be getting some company on the hot seat. On Apr. 8, Agents from Japan's Fair Trade Commission raided three of chipmaker Intel's (**INTC** ) offices, including divisional headquarters in Tokyo, in an investigation that sources say is looking into potential anticompetitive practices.

Japanese commission agents spent the day poring over Intel documents and interviewing executives, Intel spokesman Chuck Mulloy said from the chipmaker's Santa Clara (Calif.) headquarters. Mulloy said Intel didn't know what prompted the investigation and declined to comment further. "We're trying to cooperate with investigators," he noted.

Rival Advanced Micro Devices (**AMD** ) likely prompted the inquiry. Its executives have complained for years that Intel strong-arms PC makers into using its microprocessors over other offerings. AMD spokesman Morris Denton declined on Thursday to comment on whether the chipmaker has complained to Japanese authorities. But he added: "We support and believe in an environment of open and free competition. Intel is clearly a monopoly, and the company has been investigated continuously for violating antitrust laws in the U.S. and Europe."

**RETALIATION?** As part of its "Intel Inside" marketing strategy, Intel doles out hundreds of millions of dollars annually to PC makers such as Dell (**DELL** ), Sony (**SNE** ), Hewlett-Packard (**HPQ** ), and Gateway (**GTW** ). Those companies get money based on the number of notebook and desktop PCs they sell with the Intel Inside logo. (HP sells machines with AMD processors as well.) Intel chips power slightly more than 80% of the world's PCs and about 85% of Japan's, according to researcher IDC.

AMD Chief Executive Hector de Jesus Ruiz, in recent interviews with *BusinessWeek*, has complained that Intel threatened PC makers with retaliation if they supported the April, 2003, launch of AMD's new 64-bit Opteron server chip and the follow-on launch of its 64-bit Athlon 64 desktop processor. Both launch events featured relatively small players, although IBM (**IBM** ), Sun (**SUNW** ), and HP have since agreed to ship some of AMD's new 64-bit chips in their server products.

Despite average selling prices that often are significantly below Intel chips, AMD's share of the global chip market has been static at about 12% over the past three years. "We've been saying for a long time that someone should take a look and realize that the business strategy of our competitor is not in the best interests of customers and partners," Ruiz said in a February interview.

**OVER IN EUROPE?** Responds Intel's Mulloy: "AMD has been making these kinds of statements for years, despite the fact these claims have been investigated thoroughly by the U.S. Federal Trade Commission twice [1991-93 and 1997-2000] and been found baseless." Indeed, the FTC in 2000 wrapped up a three-year investigation into potential Intel anticompetitive practices without taking action.

In 2001, the European Commission announced that based on an AMD complaint, it would look into similar practices. That investigation hasn't officially concluded. However, Mulloy says the EC "also has notified Intel it's no longer pursuing its investigation of AMD's complaints." Will Japan be the next battleground?

# EXHIBIT F



JUNE 21, 2004

# UP FRONT

## The EU's Hard Look Inside Intel

A dormant, three-year-old European Union investigation into potential anticompetitive practices at chipmaker Intel (**INTC** ) is suddenly heating up again. *BusinessWeek* has learned that, over the past two weeks, regulators sent letters of inquiry to three dozen PC and server makers, including Dell (**DELL** ), Hewlett-Packard (**HPQ** ), and IBM (**IBM** ).

Regulators are trying to confirm allegations made by rival Advanced Micro Devices (**AMD** ) (AMD) that Intel threatened PC makers with retaliation if they supported the April, 2003, launch of its new 64-bit Opteron server chip and the follow-on introduction of its 64-bit Athlon 64 desktop processor. Both launches featured relatively small players, although IBM, Sun (**SUNW** ), and HP have since agreed to use AMD's new chips.

EU officials note that the inquiry doesn't necessarily signal it's launching a case against Intel. "This is a new fact-finding phase," says a spokeswoman.

Intel, which says it's cooperating with the investigation, hasn't received any recent inquiries from regulators. "We believe that our business practices are both fair and lawful," says spokesman Chuck Mulloy.

AMD declined to identify the basis of its complaints. Privately, company officials say that they have new information supporting their claims and have passed it to regulators.

AMD has alleged that the "Intel Inside" branding campaign makes it more difficult to compete. The chip giant gives hundreds of millions of marketing dollars annually to PC makers such as Dell, Sony (**SNE** ), HP, and Gateway (**GTW** ). The money, which is determined by the number of notebook and desktop PCs they sell with the Intel Inside logo, supports their ad campaigns. (HP sells machines with AMD processors as well.) Intel chips power more than 83% of the world's PCs.

The investigation could go on for months, and while nothing may come of it, the bitter rivalry between AMD and Intel is sure to last much longer than that.

*By Cliff Edwards, with Andy Reinhardt*